Ahilan T. Arulanantham (SBN 237841)
aarulanantham@aclu-sc.org
Jennifer L. Pasquarella (SBN 263241)
jpasquarella@aclu-sc.org
ACLU FOUNDATION OF SOUTHERN CALIFORNIA
1313 West Eighth Street
Los Angeles, California 90017
Tel: (213) 977-5236
Fax: (213) 977-5297

Bert Voorhees (SBN 137623)
bv@tvlegal.com
Laboni A. Hoq (SBN 224140)
lhoq@tvlegal.com
TRABER & VOORHEES
128 N. Fair Oaks Avenue
Pasadena, California 91103
Tel: (626) 585-9611
Fax: (626) 585-1400

Attorneys for Plaintiffs

FILED
CLERK, U.S. DISTRICT COURT

OCT 1 4 2010

CENTRAL DISTRICT OF CALIFORNIA
BY                         DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NAJI JAWDAT HAMDAN, HOSSAM HEMDAN, ACLU OF SOUTHERN CALIFORNIA, <br><br>           Plaintiffs, <br><br>      v. <br><br> UNITED STATES DEPARTMENT OF JUSTICE; FEDERAL BUREAU OF INVESTIGATION, a component of the U.S. Department of Justice; U.S. NATIONAL CENTRAL BUREAU - INTERPOL, a component of the U.S. | CASE NO. CV 10-6149 JHN (JEMx) <br><br> **FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** <br><br> Freedom of Information Act, 5 U.S.C. §552 and Privacy Act, 5 U.S.C. §552a |

Department of Justice; NATIONAL
SECURITY DIVISION, a component of
the U.S. Department of Justice;
DEPARTMENT OF STATE; UNITED
STATES CENTRAL INTELLIGENCE
AGENCY; UNITED STATES
DEPARTMENT OF DEFENSE;
DEFENSE INTELLIGENCE AGENCY, a
component of the U.S. Department of
Defense; NATIONAL SECURITY
AGENCY, a component of the U.S.
Department of Defense; OFFICE OF
INSPECTOR GENERAL, a component of
the U.S. Department of Defense;
DEFENSE OFFICE OF FREEDOM OF
INFORMATION, a component of the
U.S. Department of Defense; UNITED
STATES DEPARTMENT OF
HOMELAND SECURITY;  BUREAU
OF CUSTOMS & BORDER
PROTECTION, a component of the U.S.
Department of Homeland Security;
TRANSPORTATION SECURITY
ADMINISTRATION, a component of the
U.S. Department of Homeland Security;
IMMIGRATION AND CUSTOMS
ENFORCEMENT, a component of the
U.S. Department of Homeland Security;
OFFICE OF INTELLIGENCE &
ANALYSIS, a component of the U.S.
Department of Homeland Security;
OFFICE OF DIRECTOR OF NATIONAL
INTELLIGENCE,

                    Defendants.

**INTRODUCTION**

1.      This case arises from the detention and torture of Naji Hamdan, and the intensive surveillance of him and his brother Hossam Hemdan.  After years of surveillance by the U.S. government, Naji Hamdan was detained and tortured at a secret prison in the United Arab Emirates.  He filed a lawsuit in federal district court alleging that the U.S. government was complicit in his abduction.  Shortly afterwards, he was released from the secret prison.

2.      More than nine months ago, on January 29, 2010, plaintiffs ACLU of Southern California ("ACLU-SC"), Mr. Naji Jawdat Hamdan and Mr. Hossam Hemdan submitted a request pursuant to the Freedom of Information Act, 5 U.S.C. §552 ("FOIA") and the Privacy Act 5 U.S.C. §552a ("PA"), to a number of federal agencies.  Their Request seeks to uncover information about why the federal government subjected Mr. Naji Hamdan and Mr. Hossam Hemdan to constant surveillance and questioning over the course of a decade and what role the federal government played in the overseas detention and torture of Mr. Naji Hamdan. Plaintiffs know that the government has a significant number of documents responsive to their request given their interactions with defendant agencies that generated documents, including, for example, records of voluntary FBI and CBP interviews, ACLU correspondence, Department of State consular memos, and an affidavit submitted by the FBI in Mr. Hamdan's prior lawsuit.  Despite the passage of time,

plaintiffs have received only a handful of heavily redacted records from only a single agency in response to their Request.

3.        Disclosure of the requested records will help inform public debate about an issue of great public concern: the U.S. government's overseas detention and torture practices in the war on terrorism.  In particular, plaintiffs seek to shed light on the U.S. government's practice of contracting foreign governments to detain, interrogate and often torture individuals it suspects – rightly or wrongly – of having connections to terrorism because it cannot lawfully do so itself.  Plaintiffs believe Naji Hamdan was arrested by United Arab Emirates ("U.A.E.") authorities at the behest of the U.S. government and detained in a secret location for three months where he was tortured and interrogated with the U.S. government's approval.  After the ACLU-SC filed a lawsuit in U.S. court seeking his release, Mr. Hamdan was released from the secret prison, but transferred to a prison in Abu Dhabi and charged with vague crimes of terrorism by U.A.E. authorities.  For nearly one year, Mr. Hamdan waited to be prosecuted in sham criminal proceedings in the U.A.E., at the direction, plaintiffs believe, of the U.S. government.

4.        Plaintiffs bring this civil action to compel defendant agencies to respond to their Request, perform an adequate search for responsive records, and disclose all records not clearly exempted from disclosure under FOIA and the PA.  Plaintiffs also seek to compel defendant agencies to process the Request on an expedited basis and waive all fees associated with the Request in accordance with FOIA and the PA.  To

4

date, although plaintiffs have exhausted their administrative remedies, defendant agencies have failed to comply with these requirements.

## JURISDICTION AND VENUE

5.      This Court has both subject matter jurisdiction over the FOIA claims asserted here and personal jurisdiction over the parties to this action pursuant to 5 U.S.C. §552(a)(4)(B); §552 (a)(6)(E)(iii).  This Court also has jurisdiction over this action pursuant to 28 U.S.C. §1331 and 5 U.S.C. §§701-706.

6.      Venue lies in this district under 5 U.S.C. § 552(a)(4)(B).

## PARTIES

7.      Plaintiff Naji Jawdat Hamdan is a U.S. citizen of Lebanese descent.  Mr. Hamdan moved to the United States in the early 1980s and lived primarily in the Los Angeles Area until 2006, at which time he and his family moved to the U.A.E.  In Los Angeles, Mr. Hamdan owned and operated a successful autoparts business, called Hapimotors or Honda Acura Palace.  Mr. Hamdan was subjected to FBI surveillance for nearly a decade prior to his detention by the U.A.E. authorities in August 2008.  Mr. Hamdan currently resides in Beirut, Lebanon.

8.      Plaintiff Hossam Hemdan is a U.S. citizen of Lebanese descent.  Mr. Hemdan moved to the United States in approximately 1987 and has lived in the Los Angeles area since that time.  Mr. Hemdan is Naji Hamdan's brother and is now the owner of Hapimotors.

9.      Plaintiff ACLU of Southern California ("ACLU-SC") is a non-profit, non-partisan organization dedicated to the defense of civil rights and civil liberties.  The ACLU-SC is committed to ensuring that the U.S. government acts in compliance with the Constitution and federal laws, including its international legal obligations.  The ACLU-SC is also committed to principles of transparency and accountability in government, and seeks to ensure that the American public is informed about the conduct of its government in matters that affect civil liberties and human rights.  As part of its work, ACLU-SC disseminates information to the public through newsletters, news briefings, "Know Your Rights" documents, and other educational and informational materials.  ACLU-SC also disseminates information to individuals, tax-exempt organizations, not-for-profit groups, and members through its website, http://www.aclu-sc.org.  In addition, ACLU-SC shares information with the national ACLU office, which has a membership of 500,000.  The national ACLU publishes and disseminates information through multiple outlets including newsletters, action alerts, videos, emails, its website http://www.aclu.org, and other media to individuals and organizations throughout the country.  The ACLU-SC maintains its principal office in Los Angeles, California.

10.      Defendant United States Department of Justice ("DOJ") is a Department of the Executive Branch of the United States and is an agency within the meaning of 5 U.S.C. §552(f)(1).  The DOJ is responsible for enforcing the law and defending the interests of the United States according to the law, ensuring public safety against

6

threats foreign and domestic, providing federal leadership in preventing and

controlling crime, seeking punishment for those guilty of unlawful behavior, and

ensuring fair and impartial administration of justice for all Americans.

11.     Defendant Federal Bureau of Investigation ("FBI") is a component of the

DOJ and is an establishment in the executive branch of the government and therefore

is an agency within the meaning of 5 U.S.C. §552(f)(1).  The FBI is responsible for the

investigation of federal crimes and is a domestic intelligence agency.  The FBI also

investigates activity abroad under certain circumstances.  On or about July 2008, FBI

agents flew to the U.A.E. to interrogate Naji Hamdan in Abu Dhabi.  They also

conducted numerous interviews of Naji Hamdan and Hossam Hemdan in the United

States.

12.     Defendant United States National Central Bureau of the International

Criminal Police Organization ("USNCB - Interpol") is a component of the DOJ and is

an establishment in the executive branch of the government and therefore is an agency

within the meaning of 5 U.S.C. §552(f)(1).  USNCB-Interpol serves as the U.S.'s

representative to the International Criminal Police Organization ("INTERPOL").

USNCB – Interpol is responsible for coordinating and transmitting requests for

criminal investigative and humanitarian assistance between U.S. federal, state and

local law enforcement authorities and their foreign counterparts.  Upon information

and belief, INTERPOL issued a warrant regarding Naji Hamdan.

13.	Defendant National Security Division ("NSD") is a component of the DOJ and is an establishment in the executive branch of the government and therefore is an agency within the meaning of 5 U.S.C. §552(f)(1).  NSD was created in order to consolidate the DOJ's national security efforts, and consists of the Counterterrorism and Counterespionage Sections, the Office of Intelligence, the Law and Policy Office, the Office of Justice for Victims of Overseas Terrorism, and the Executive Office.

14.	Defendant United States Department of State ("DOS") is a Department of the Executive Branch of the United States and is an agency within the meaning of 5 U.S.C. §552(f)(1).  The DOS engages in international relations, foreign policy-making, and international diplomacy.  A DOS official in the U.A.E. spoke with and visited Naji Hamdan on several occasions, and observed his criminal trial in the U.A.E.

15.	Defendant United States Central Intelligence Agency ("CIA") is a federal intelligence agency within the meaning of 5 U.S.C. §552(f)(1).  The CIA is responsible for national security intelligence and covert operations.  The CIA has participated in the interrogation and torture of detainees held abroad at the behest of the U.S. government.

16.	Defendant United States Department of Defense ("DOD") is a Department of the Executive Branch of the United States and is an agency within the meaning of 5 U.S.C. §552(f)(1).  The DOD is responsible for coordinating and supervising all activities of government relating to the U.S. armed forces and responds to general national security concerns.

17.     Defendant Defense Intelligence Agency ("DIA") is a component of the DOD and is an establishment in the executive branch of the government and therefore is an agency within the meaning of 5 U.S.C. §552(f)(1).  The DIA is responsible for military intelligence, and coordinating the intelligence activities of the individual branches of the armed forces by providing military intelligence to warfighters, defense planners, and defense and national security policymakers.

18.     Defendant National Security Agency ("NSA") is a component of the DOD and is an establishment in the executive branch of the government and therefore is an agency within the meaning of 5 U.S.C. §552(f)(1).  The NSA focuses on cryptology, cryptanalysis, cryptography, and intelligence gathering through the collection and analysis of foreign communications and signals intelligence.

19.     Defendant Defense Office of the Inspector General ("DOD-OIG") is a component of the DOD and is an establishment in the executive branch of the government and therefore is an agency within the meaning of 5 U.S.C. §552(f)(1). The DOD-OIG is primarily tasked with internal investigation and auditing of the DOD in order to prevent waste, abuse, fraud, and criminal activity.  The torture of an American citizen abroad would likely constitute "abuse," as well as criminal activity under 18 U.S.C. § 2340.

20.     Defendant Defense Office of Freedom of Information ("DOD-OFOI") is a component of the DOD and is an establishment in the executive branch of the government and therefore is an agency within the meaning of 5 U.S.C. §552(f)(1).

The DOD-OFOI is responsible for the formulation and implementation of FOIA policy for the DOD.

21.     Defendant U.S. Department of Homeland Security ("DHS") is a Department of the Executive Branch of the United States and is an agency within the meaning of 5 U.S.C. §552(f)(1).  The DHS is responsible for guarding against terrorism, securing U.S. borders, enforcing U.S. immigration laws, and responding to disasters,

22.     Defendant Bureau of Customs and Border Protection ("CBP") is component of the DHS and is an establishment in the executive branch of the government and therefore is an agency within the meaning of 5 U.S.C. §552(f)(1). CBP is responsible for regulating and facilitating trade and travel, as well as for enforcing U.S. immigration and drug laws.  CBP officials interrogated both Naji Hamdan and Hossam Hemdan at the airport on several occasions.

23.     Defendant Transportation Security Administration ("TSA") is a component of the DHS and is an establishment in the executive branch of the government and therefore is an agency within the meaning of 5 U.S.C. §552(f)(1). The TSA is responsible for security in all modes of transportation.

24.     Defendant Immigration and Customs Enforcement ("ICE") is a component of the DHS and is an establishment in the executive branch of the government and therefore is an agency within the meaning of 5 U.S.C. §552(f)(1).

ICE is responsible for the criminal and civil enforcement of federal laws governing border control, customs, trade and immigration.

25.      Defendant Office of Intelligence and Analysis ("OI&A") is a component of the DHS and is an establishment in the executive branch of the government and therefore is an agency within the meaning of 5 U.S.C. §552(f)(1).  OI&A is responsible for management of DHS-wide intelligence, including disseminating information throughout DHS, to other members of the United States intelligence community, and to first responders at the state and local level.

26.      Defendant Office of the Director of National Intelligence ("ODNI") is an agency within the meaning of 5 U.S.C. §552(f)(1).  The ODNI is headed by the Director of National Intelligence who serves as the principal advisor to the President, the National Security Council, and the Homeland Security Council for intelligence related to national security matters.

## STATUTORY FRAMEWORK

27.      The Freedom of Information Act, 5 U.S.C. §552 , mandates disclosure of records held by a federal agency in response to a request for such records by a member of the public, unless those records fall within nine narrow statutory exemptions.

28.      The basic purpose of the FOIA is to enable the public to hold the government accountable for its actions, through transparency and public scrutiny of governmental operations and activities.  Through access to government information

FOIA helps the public better understand the government, thereby enabling a vibrant and functioning democracy.

29.     Any member of the public may make a request for records to an agency of the United States under the FOIA.  An agency that receives a FOIA request must notify the requestor within 20 business days after the receipt of such request.  5 U.S.C. §552(a)(6)(A)(i).  In its response the agency must inform the requestor whether or not it intends to comply with the request, provide reasons for its determination, and inform the requestor of his or her right to appeal the determination.  *Id.*

30.     The FOIA requires an agency to make a reasonable search for responsive records.  *Weisberg v U.S. Dep't of Justice,* 627 F.2d 365, 371 (D.C. Cir. 1980).

31.     The FOIA requires an agency to timely disclose all records responsive to a FOIA request that do not fall within nine narrowly-construed statutory exemptions. 5 U.S.C. § 552(a)(3)(A); § 552(b)(1)-(b)(9).

32.     A FOIA requestor is deemed to have exhausted his or her administrative remedies if the agency fails to comply with the statutory time limits for responding to a request.  5 U.S.C. § 552(a)(6)(C)(I).  At that point, the requester may immediately file suit in federal court and to obtain the requested documents.  *Spannaus v. DOJ*, 824 F.2d 52, 58 (D.C. Cir. 1987).

33.     A district court has jurisdiction to enjoin the agency from withholding records, to order production of records that are subject to disclosure, and to grant a

public interest fee waiver of any costs associated with the production of such records. 5 U.S.C. §§ 552(a)(4)(B); 552(a)(4)(A)(iii).

34.     Documents shall be furnished without charge or at a reduced charge if disclosure of the information is in the public interest because it "is likely to contribute significantly to public understanding of the operations or activities of the government," and is "not primarily in the commercial interest of the requester."  5 U.S.C. §552(a)(4)(A)(iii).   Requests for fee waivers are to be "liberally construed in favor of waivers for noncommercial requesters."  *Federal CURE v. Lappin*, 602 F.Supp.2d 197, 203 (D.D.C. 2009) (citation and quotation omitted).

35.     A requestor can also seek a waiver of search and review fees on the grounds that the requester is a "representative of the news media" and the records are not sought for a commercial purpose.  *See* 5 U.S.C. §552(a)(4)(A)(ii).  A representative of the news media is "any person or entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience."  *Id.*

36.     A FOIA requestor who has been denied records or a waiver of fees associated with the search and production of records may appeal such denials to the agency.  The agency must make a determination on the appeal within 20 business days of receipt of the appeal.  5 U.S.C. § 552(a)(6)(A)(ii).

37.     FOIA also requires an agency to produce records on an expedited basis when there is a "compelling need" for expedition.  5 U.S.C. §552(a)(6)(E)(i).  A

compelling need is established if a person "primarily engaged in disseminating information shows an "urgency to inform the public concerning actual or alleged Federal Government activity."  5 U.S.C. §552(a)(6)(E)(v)(ii). *See also* 32 C.F.R. §1900.34(c)(2) (CIA regulations); 18 C.F.R. §16.5(d)(1)(ii) (DOJ regulations); 22 C.F.R. §171.12(b)(2) (DOS regulations); 6 C.F.R. §5.5(d) (DHS regulations).  A FOIA requestor may also be entitled to expedited processing on the grounds that the records sought relate to a "breaking news story of general public interest."  22 C.F.R.§171.12(b)(2)(i) (DOS regulations); 32 C.F.R. §286.4(d)(3)(ii)(A) (DOD regulations).  *See also* 28 C.F.R. §16.5(d)(1)(iv) (DOJ regulations providing for expedited processing in relation to a "matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence"); 32 C.F.R. §1900.34(c)(2) (CIA regulations providing for expedited processing when "the information is relevant to a subject of public urgency concerning an actual or alleged Federal government activity").

## FACTUAL BACKGROUND

### Proxy Detention

38.     Plaintiffs' filed their Request in order to uncover the facts behind the U.S. government's involvement in the overseas detention and torture of plaintiff Naji Hamdan, a practice known as "proxy detention."

39.     The U.S. government has increasingly used foreign governments as their proxy to detain and interrogate terrorism suspects abroad outside the rule of law.  This

practice has increased in recent years, particularly as the government has closed CIA

blacksites and reduced the practice of extraordinary rendition. *See* Eric Schmitt &

Mark Mazzetti, *U.S. Relies More on Aid of Allies in Terror Cases*, N.Y. TIMES, May

23, 2009 ("American officials say that in the last years of the Bush administration and

now on Mr. Obama's watch, the balance has shifted toward leaving all but the most

high-level terrorist suspects in foreign rather than American custody.").

40. Proxy detention is a matter of significant public concern, both in the

United States and abroad. It is unknown to the public how widespread this practice is

and how many people are currently in the custody of foreign governments at the

United States' request. A 2010 United Nations Human Rights Council Joint Study

found that at least 35 individuals were held in proxy detention sites in Jordan, Egypt,

Syria, Morocco, and Djibouti, with an unknown number of individuals possibly being

held in Ethiopia and Uzbekistan. U.N. Human Rights Council, *Joint Study on Global*

*Practices in Relation to Secret Detention in the Context of Countering Terrorism*, U.N.

Doc. A/HRC/13/42 (Feb. 19, 2010). The Study also found that several hundred

detainees were held in Pakistan as part of a "secret detention programme." *Id.* at 78. It

stressed that, "[g]iven the prevailing secrecy regarding the CIA rendition programme,

exact figures regarding the numbers of prisoners transferred to the custody of other

Governments by the CIA without spending any time in CIA facilities are difficult to

ascertain." *Id.* at 70. The public is aware of the identities of only a few U.S. citizens

who were detained and interrogated by a foreign government at the behest of the

United States.  *See, e.g.*, *Abu Ali v. Ashcroft,* 350 F.Supp.2d 28 (D.D.C. 2004); Scott

Shane, *American Sues F.B.I., Saying He Was Detained in Africa*, N.Y. TIMES, Nov. 10,

2009; Jonathan S. Landay & Shashank Bengali, *CIA Didn't Try to Stop Secret*

*Deportation of U.S. Citizen, Officials Say*, MCCLATCHY WASHINGTON BUREAU, Mar.

19, 2007; Stephanie McCrummen and Dana Linzer, *American To Be Freed By*

*Ethiopia Faces Hurdle*, WASH. POST, April 13, 2007.

### Surveillance and Overseas 'Proxy Detention' of Plaintiff Naji Hamdan

41.     Naji Hamdan is an American citizen, who was born in Lebanon on May

26, 1966.  He moved to the United States in the early 1980s and lived mostly in the

Los Angeles area until 2006.  Mr. Hamdan is a practicing Muslim.

42.     Mr. Hamdan studied in the United States at Northrup University, and later

started a successful auto parts business, called Hapimotors or Honda Acura Palace in

Los Angeles, California.  He also was a founding leader of the Islamic Center of

Hawthorne, a mosque in Hawthorne, California.  Mr. Hamdan frequently served as a

volunteer imam at that mosque.

43.     The FBI conducted surveillance of Mr. Hamdan for nearly a decade.  FBI

agents first visited him at his home in December 1999, at which point agents asked

him if he knew Osama Bin Laden or of any imminent terrorist plots.  *See* Teresa

Watanabe & Eric Lichtblau, *FBI Accused of Terror Overreaction*, L.A. TIMES, Jan.

10, 2000, at B-1, *available at* http://articles.latimes.com/2000/jan/10/local/me-52684

(quoting Naji Hamdan).  The FBI approached him again shortly after September 11,

2001, and returned to his home and his workplace on approximately six occasions in the following years.  The FBI also questioned Mr. Hamdan's friends, relatives and business associates, including Plaintiff Hossam Hemdan and Jehad Suliman (the then manager of Hapimotors), about Mr. Hamdan's activities, political beliefs, and religion. In addition and as a result of this surveillance, air travel became increasingly difficult for Mr. Hamdan; U.S. officials frequently stopped and questioned him in secondary inspection at airports both leaving and returning to the United States.

44.     In August 2006, Mr. Hamdan relocated his family to the U.A.E. where he opened another auto business.  At the time of his departure for the U.A.E., federal officials intercepted him at the airport and interrogated him for several hours prior to departure.

45.     The FBI's interest in Mr. Hamdan intensified after his relocation to the U.A.E.  In March 2007, Mr. Hamdan returned to the United States on a one-week visit. Upon arrival at LAX airport, federal agents questioned him for more than four hours. Throughout the duration of his week-long trip, the FBI followed him with an entourage of three to four FBI cars, which were easily identifiable by Mr. Hamdan and the friends and associates he met.  While the FBI did not question him during that trip, many of the people with whom Mr. Hamdan met were subsequently visited by the FBI and questioned about their conversations with him.

46.     On his return to the U.A.E., Mr. Hamdan stopped in Lebanon where his wife and children were staying.  En route back to the U.A.E., Lebanese intelligence

officials arrested him at the airport in Beirut for no apparent reason and detained him for one week, during which time Lebanese officials questioned him, accused him of terrorist involvement, and subjected him to inhumane and physically abusive treatment. Months later, Mr. Hamdan had his case reviewed by a Lebanese judge who examined his file and, upon information and belief, stated that he knew of no reason Lebanese authorities detained Mr. Hamdan in the first place. Mr. Hamdan later learned from a family friend who works in the Lebanese intelligence service that he was detained at the behest of a prominent foreign government, possibly by a request delivered through INTERPOL. Given his extensive FBI surveillance, Mr. Hamdan believes that the prominent foreign government that sought his detention in Lebanon must be the United States. Shortly after he was released, two FBI agents visited his brother, Plaintiff Hossam Hemdan, in Los Angeles and questioned him about Mr. Hamdan's detention in Lebanon.

47.     In July, the FBI agents again visited Hossam Hemdan and asked if he could help arrange a meeting between them and his brother Mr. Hamdan at the U.S. Embassy in Abu Dhabi. Mr. Hamdan agreed to the meeting. On July 26, 2008, two FBI agents from the Los Angeles Field Office, Joshua Price and Jerry Price, flew to the U.A.E. and questioned Mr. Hamdan at the Embassy for several hours.

48.     A month and a half later, on August 26, 2008, U.A.E. State Security forces (the "Amn al-Dawla") arrested Mr. Hamdan at his home without explanation.

The officials put a hood over his head, forced him into a vehicle, and took him to a secret location somewhere outside of Abu Dhabi.

49.     Mr. Hamdan was detained incommunicado in this secret location for three months without charge.  During that time, U.A.E. officials subjected Mr. Hamdan to severe forms of torture in order to extract false confessions to an ever-changing array of terrorist activities and affiliations.  His captors placed him in a refrigerated, underground room with almost no clothing for prolonged periods of time; he was blindfolded and severely beaten on his back, legs, head and the soles of his feet; kicked in his liver with military boots despite his disclosure to his torturers that he had a liver condition; strapped to an electric chair and told that they would use it if he didn't confess; and told that they would bring his wife there and rape her if he did not confess to what they wanted to hear.

50.     During his lengthy interrogation sessions while in secret detention, his captors asked him about subjects related to his life in the United States, subjects about which only the FBI was likely to have information.  Mr. Hamdan believes that, on at least one occasion, an agent of the United States government participated in his interrogation and at least acquiesced to the torture against him.  Although he was blindfolded, Mr. Hamdan believes the interrogator was American because he spoke to him in perfect English with an American accent and did not speak Arabic.  Mr. Hamdan could also see by looking down through the gap in his blindfold that the likely

U.S. official wore western clothing, not the robes and military boots of the U.A.E. interrogators.

51.     Although Mr. Hamdan's wife immediately informed the U.S. Embassy in Abu Dhabi that the U.A.E. officials had arrested him, Mr. Hamdan was only first visited by a consular official, Sean Cooper, approximately a month and a half after his arrest.

52.     On November 19, 2008, the ACLU-SC filed a lawsuit in federal district court in Washington, D.C. alleging that Mr. Hamdan was in the constructive custody of the U.S. because Mr. Hamdan's U.A.E. detention was at the behest of the United States.  One week after filing the lawsuit, Mr. Hamdan was criminally charged with three vague counts of terrorism and transferred from the secret detention site to Al Wathba prison in Abu Dhabi.  Thereafter, Mr. Hamdan remained in prison for eleven months until his case was heard before the U.A.E. Supreme Court.  At his criminal trial, U.A.E. prosecutors introduced no evidence that proved the charged crimes. Finally, in October 2009, the U.A.E. Supreme Court convicted him, but without specifying what charges he was convicted of and on what grounds, and sentenced him to "time served."  In October 2009, the U.A.E. deported him to Lebanon, where he currently resides with his family.

53.     Events since the filing of plaintiffs' Request have only served to highlight the importance and urgency of the Request.  On February 1, 2010, Mr. Hamdan received a notice from the TSA informing him that he "pose[s] or [is] suspected of

posing a security threat" and that the agency was in the process of revoking his

Airframe and Power-plant Mechanic's license from the Federal Aviation

Administration ("FAA").

54.     Recent human rights reports published since the filing of plaintiffs'

Request have also highlighted the intense public interest in Mr. Hamdan's case.  *See,*

*e.g.,* AMNESTY INTERNATIONAL, AMNESTY INTERNATIONAL REPORT 2010: THE STATE

OF THE WORLD'S HUMAN RIGHTS 338 (2010); HUMAN RIGHTS WATCH, WORLD REPORT

2010 571 (2010); U.S. DEP'T OF STATE, COUNTRY REPORTS ON HUMAN RIGHTS

PRACTICES (2010) *at* http://www.state.gov/g/drl/rls/hrrpt/.  *See also* AMNESTY

INTERNATIONAL, AMNESTY INTERNATIONAL REPORT 2009: THE STATE OF THE WORLD'S

HUMAN RIGHTS 340 (2009).

### Surveillance of Plaintiff Hossam Hemdan

55.     Hossam Hemdan is an American citizen, who was born in Lebanon on

April 4, 1970.   He moved to the United States in approximately 1987 and has resided

in the Los Angeles area ever since.  Mr. Hemdan currently lives in Hawthorne,

California and owns and manages a car emissions testing company called Redondo

Smog in Hawthorne, California and Hapimotors (or Honda Acura Palace) in Los

Angeles.

56.     Mr. Hemdan, like his brother, was subjected to FBI questioning,

monitoring and surveillance beginning in 1999.  Over the course of several years, Mr.

Hemdan received numerous visits by the FBI at his home and workplace for

questioning, often about his brother Naji. On several occasions, he noticed FBI vehicles parked outside his shop.

57.     From 2006 until 2009, Mr. Hemdan regularly experienced difficulties leaving and entering the United States at airports and was routinely pulled into secondary inspection by federal authorities for questioning, including extensive questioning about Naji Hamdan.

58.     From 2006 until approximately 2009, Mr. Hemdan had trouble receiving his mail at his home, which was owned by his brother Mr. Hamdan until his departure in 2006, and has reason to believe that the FBI intercepted his mail.

**Plaintiffs' FOIA Request**

59.     On January 29, 2010, plaintiffs mailed their Request to the following government agencies, including certain of their components: DOJ, FBI, USNCB-Interpol, NSD, DOS, CIA, DOD, DIA, NSA, DOD-OIG, DHS, CBD, ICE, TSA, OI&A, and ODNI. A copy of the Request is attached as Exhibit 1 to this complaint.[1]

60.     Plaintiffs' Request seeks information about the federal government's surveillance, monitoring, questioning, and investigation of Mr. Hamdan, as well as information about its participation in Mr. Hamdan's overseas detention and torture. The Request also seeks information about the surveillance and questioning of Mr.

---

[1] Note that the date listed on the FOIA Request contains a typographical error – the year was 2010, not 2009.

Hossam Hemdan and Mr. Jehad Suliman on account of their close association with Mr. Hamdan.

61.    The Request specifically seeks any records from January 1, 1998 to the present which were prepared, received, collected, and/or maintained by any of the agencies listed in the complaint, relating to or concerning four subjects: (a) Mr. Naji Jawdat Hamdan; (b) Mr. Hossam Jawdat Hemdan (a.k.a. Sammy Hemdan or Sam Hemdan), (c) Mr. Jehad Suliman; and (4) Hapimotors (a.k.a. Honda Acura Palace or HondAcura Palace).  *See* Exhibit 1.

62.    Plaintiffs' Request seeks information and documents relating to a number of questions of serious public concern regarding the U.S. government's continued reliance on proxy detention in the war on terror, such as:

- Did the U.S. government request that the governments of Lebanon or the U.A.E. detain Mr. Hamdan?

- Did any U.S. government agent participate in Mr. Hamdan's interrogation and/or torture sessions?

- Did the U.S. government know the U.A.E. authorities were torturing Mr. Hamdan?

- Did the U.S. government direct the U.A.E. to release Mr. Hamdan from the secret prison but to criminally charge him?

23

- Does the U.S. routinely use the U.A.E. as a partner in proxy detention?  How widespread is the practice?  How many other individuals have been or are currently being detained at the behest of the United States?

- What instructions does the U.S. give to foreign partners in proxy detention when it makes a request?  Does the government take any steps to ensure that individuals are not tortured, held indefinitely or subject to inhumane or degrading treatment or conditions?

**Plaintiffs' Request for Expedited Processing**

63.     Plaintiffs' Request seeks expedited processing because it implicates matters of public urgency, namely, the nature and extent of the federal government's surveillance and detention of American citizens in the name of national security.

64.     In connection with their request for expedited processing, plaintiffs also explained that ACLU-SC is primarily engaged in disseminating information.  For example, ACLU-SC distributes newsletters, action alerts, videos and maintains a website that publishes information of public concern at no charge.

65.     Plaintiffs further explained in their Request that the records they seek relate to matters of widespread and exceptional media interest, as evidenced by articles and broadcast news covering both Naji Hamdan's own experience with proxy detention, as well as the broader news story of the federal government's continued use of this secretive practice.  Plaintiffs identified a number of both regional and national news sources that covered Naji Hamdan's experience with proxy detention, including

McClatchy Newspapers, the Associated Press, the Los Angeles Times, the Sacramento Bee, the Washington Post, ABC News, and CBS News.  Even after plaintiffs served their Request, media coverage of this story has continued.  *See* Anna Louise Sussman, *Naji Hamdan's Nightmare*, THE NATION, Mar. 4, 2010.

### Plaintiffs' Fee Waiver Request

66.     In their Request, plaintiffs seek a waiver of all search, review and duplication fees on the grounds that disclosure of the requested records is "in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester."  5 U.S.C. §552(a)(4)(A)(iii).  *See* 22 C.F.R. §171.17(a) (DOS regulations); 28 C.F.R. §16.11(k)(1) (DOJ regulations); 32 C.F.R. §1900.13(b)(2) (CIA regulations); 32 C.F.R. §286.28(d)(1) (DOD regulations); 6 C.F.R.. §5.11(k)(1) (DHS regulations).  Plaintiff ACLU-SC is a non-profit organization that intends to disseminate the information it seeks in the Request to the public at no cost.

67.     Plaintiffs also seek a waiver of all search, review and duplication fees on grounds that plaintiff ACLU-SC qualifies as a "representative of the news media" and the records are not sought for commercial use.  5 U.S.C. §552(a)(4)(A)(ii).  *See* 22 C.F.R. §§171.11(o), 171.15(c) (DOS regulations); 28 C.F.R. §16.11(b), (c), (d)(1) (DOJ regulations); 32 C.F.R. §286.28(e)(7) (DOD regulations); 32 C.F.R. §§1900.02(h)(3), 1900.13(i)(2) (CIA regulations); 6 C.F.R. §5.1(b)(6) (DHS regulations).  Plaintiff ACLU-SC is a representative of the news media because it

gathers information of potential interest to the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience.

68.     Despite the fact that plaintiffs' Request alone demonstrates that their attempt to collect and disseminate information regarding the federal government's "proxy detention" of Naji Hamdan meets the requirements for a fee waiver, several agencies and/or their components still have yet to decide whether plaintiffs are entitled to a fee waiver, including:  DOJ, FBI, DIA, NSA, DOD-OFOI, CBD, TSA, and ODNI. In addition, the following agencies and/or their components have either denied plaintiffs' fee waiver request without adequate grounds or deferred ruling on their fee waiver request, which issue plaintiffs have administratively exhausted prior to filing this suit:  NSD, DOS, CIA (as to Hapimotors), DOD-OIG, DHS,  ICE and OI&A.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

### DOJ - FBI

69.     The DOJ acknowledged receipt of the Request by letter dated February 22, 2010 and indicated that it had referred the Request to its component, the FBI.  A copy of the letter is attached here as Exhibit 2.[2]

70.     By letters dated February 17, 2010, the FBI acknowledged receipt of the Request as to each of the four subjects of the Request (Naji Jawdat Hamdan, Hossam Hemdam, Jehad Suliman and Hapimotors).  The letters indicated in form responses

---

[2]  The correspondence attached as exhibits to this complaint includes the original correspondence but omits any attached exhibits to that correspondence to eliminate redundancy.

that the FBI was "searching the indices of [its] Central Records System for the information [plaintiffs] requested, and will inform [plaintiffs] of the results as soon as possible."   Copies of these letters are attached here as Exhibit 3.

71.      By three letters dated March 9, 2010, the FBI denied Plaintiffs' request for expedited processing of their Request.  Copies of these letters are attached here as Exhibit 4.  Neither of the FBI's February 17 and March 9 letters address plaintiffs' request for a waiver of fees associated with the processing of their Request.

72.      By letter dated April 16, 2010, plaintiffs timely appealed the FBI's denial of their request for expedited processing, and its failure to timely provide a substantive response to their Request, either by producing the requested records or providing proper grounds upon which the records could not be produced.  A copy of this letter is attached as Exhibit 5.

73.      By letter dated May 24, 2010, the FBI granted plaintiffs' appeal of their request for expedited processing and indicated that the Request "will be processed as quickly as practicable."  Regarding the FBI's failure to provide a substantive response to the Request within the statutory timeframe, the FBI did not identify any exceptional circumstances justifying its delay and instead indicated that plaintiffs were not required to administratively appeal this delay and could proceed to file a lawsuit.  A copy of this letter is attached here as Exhibit 6.

74.      In three letters dated July 21, 2010, the FBI informed plaintiffs that their Request as it relates to Naji Hamdan, Hossam Hemdan and Jehad Suliman is

"[c]urrently being reviewed by an analyst."  The letters do not identify how long that review would take and when plaintiffs could expect to receive a substantive response to the Request.  A copy of these letters is attached here as Exhibit 7.

75.      As more than nine months have elapsed since plaintiffs served their Request on the FBI with no substantive response, plaintiffs have exhausted their administrative remedies with respect to the FBI.  *See* 5 U.S.C. §§552(a)(3); 552(a)(6)(A)(i); 552(a)(6)(C)(i).

### DOJ – USNCB-Interpol

76.      By letter dated February 19, 2010, USNCB-Interpol responded to plaintiffs' Request by indicating that it had conducted a search for the requested records and had located no responsive records.  USNCB-Interpol's response did not address plaintiffs' request for a fee waiver or expedited processing.  A copy of the letter is attached here as Exhibit 8.

77.      By letter dated April 20, 2010, plaintiffs timely appealed USNCB-Interpol's response to the Request on the grounds that it had failed to demonstrate that it had conducted an adequate search for the requested records, including by failing to "denote which files were searched or by whom... [applying] a systematic approach to document location, and... provide[ing] information specific enough to enable [the requestor] to challenge the procedures utilized."  *Weisberg v U.S. Dept. of Justice,* 627 F.2d 365, 371 (D.C. Cir. 1980).  Plaintiffs also provided additional facts demonstrating the likelihood that USNCB-Interpol would have records responsive to the Request,

including facts demonstrating that Naji Hamdan's detention in Lebanon in early January 2008 may have been pursuant to a warrant for his arrest by USNCB-Interpol. A copy of plaintiffs' appeal is attached as Exhibit 9.

78.     By letter dated May 25, 2010, the DOJ denied plaintiffs' appeal on the conclusory finding that USNCB-Intepol had conducted an "adequate, reasonable search for records responsive to" the Request.  The DOJ did not furnish any affidavits or other evidence with the necessary facts to show that USNCB-Interpol's search was legally sufficient.  A copy of this letter is attached as Exhibit 10.   Therefore, plaintiffs have exhausted their administrative remedies with regard to USNCB-Interpol.

**DOJ - NSD**

79.     By letter dated June 11, 2010 plaintiffs filed their FOIA Request to NSD. A copy of this letter is attached as Exhibit 11.

80.     By letter dated June 24, 2010, NSD acknowledged receipt of the Request, indicating that the Request would be processed as quickly as possible and that plaintiffs' request for expedited processing and a fee waiver was under consideration. A copy of this letter is attached as Exhibit 12.

81.     As more than nine months have elapsed since plaintiffs served their Request on the NSD with no substantive response, plaintiffs have exhausted their administrative remedies with respect to the NSD.  *See* 5 U.S.C. §§552(a)(3); 552(a)(6)(A)(i); 552(a)(6)(C)(i).

29

**DOS**

82.      By letter dated March 12, 2010, the DOS acknowledged receipt of the Request and indicated that it will begin processing plaintiffs' Request.  However, DOS denied plaintiffs' requests for a fee waiver and expedited processing.  The DOS classified plaintiffs as "Representatives of the News Media" such that in processing their Request it would charge them the amount necessary to "recover the cost of duplicating the record(s) sought only, after the first 100 pages of duplication."   A copy of this letter is attached as Exhibit 13.

83.      By letter dated April 13, 2010, plaintiffs timely appealed the DOS's denial of plaintiffs' request for fee waiver and expedited processing.  Plaintiffs appealed DOS's denial of the fee waiver and expedited processing on the basis that they clearly meet the standards set forth under the DOS regulations.  *See* 22 C.F.R. §§171.17(a)(1)(i-iv); 171.12(b)(2).  A copy of this appeal is attached as Exhibit 14.

84.      By letter dated May 7, 2010, DOS responded to plaintiffs' appeal by upholding its denial of their request for expedited processing.  It held that, based on information submitted by plaintiffs, it would defer the decision to grant or deny the request for a fee waiver until it could "determine whether the disclosure of any records responsive to the request is in the public interest, consistent with the application of 22 C.F.R. §171.17."  A copy of this letter is attached as Exhibit 15.

85.      As more than nine months have elapsed since plaintiffs served their Request on the DOS with no substantive response, plaintiffs have exhausted their

administrative remedies with respect to the DOS.  *See* 5 U.S.C. §§552(a)(3);

552(a)(6)(A)(i); 552(a)(6)(C)(i).

## CIA

86.     By letter dated February 25, 2010, the CIA denied plaintiffs' Request with

regard to Hapimotors pursuant to FOIA exemptions (b)(1) and (b)(3) by stating that it

can "neither confirm nor deny the existence or nonexistence of records responsive to"

Hapimotors, which is known as a *Glomar* response.  *See Phillippi v. C.I.A.*, 546 F.2d

1009 (D.C. Cir. 1976).  It further stated that "[t]he fact of the existence or nonexistence

of requested records is currently and properly classified and is intelligence sources and

methods information that is protected from disclosure by section 6 of the CIA Act of

1949, as amended."  A copy of this letter is attached as Exhibit 16.

87.     By letter dated April 5, 2010, plaintiffs timely appealed the CIA's denial

of their Request with regard to Hapimotors on two grounds.  First, the CIA failed to

demonstrate that it had met its obligation to make a good faith search for the requested

records.  Second, the CIA failed to meet the requirements of a *Glomar* response (or the

claim that it can neither confirm nor deny the existence of responsive records)

including by failing to provide a detailed explanatory affidavit.  *See Hunt v. C.I.A.*, 981

F.2d 1116, 1119 (9th Cir. 1992) ("affidavits must describe the justifications for

nondisclosure with reasonably specific detail, demonstrate that the information

withheld logically falls within the claimed exemptions, and show that the justifications

are not controverted by contrary evidence in the record or by evidence of CIA bad faith.").     A copy of plaintiffs' appeal is attached here as Exhibit 17.

88.       By letter dated April 23, 2010, the CIA acknowledged receipt of plaintiffs' appeal of its denial of the Request regarding Hapimotors, and indicated that it was unlikely that it could process the appeal within the required 20 days.   A copy of this letter is attached here as Exhibit 18.

89.       By letters dated April 27, 2010 and May 6, 2010, the CIA acknowledged receipt of plaintiffs' additional Privacy Act information for Hossam Hemdan and Naji Hamdan, respectively, and informed them that it would process their Request as to information regarding Naji Hamdan and Hossam Hemdan in accordance with FOIA without charging fees.   The letters did not address plaintiffs' request for expedited processing.   (Plaintiffs did not submit Privacy Act information for Jehad Suliman and do not seek CIA records relating to Mr. Suliman).   A copy of these letters are attached here as Exhibit 19.

90.       By letters dated June 28, 2010, the CIA provided a "final response" to the Request as it relates to Naji Hamdan and Hossam Hemdan.   It stated that it conducted a search for documents that reflect an "open" or "acknowledged" agency affiliation and was unable to locate any such records.   It also stated with respect to records that would reveal a classified connection to the CIA, it could neither confirm nor deny the existence of such responsive records, but that any such records would be subject to

FOIA exemptions (b)(1) and (b)(3) and Privacy Act exemptions (j)(1) and (k)(1).

Copies of these letters are attached here as Exhibit 20.

91.     On July 16, 2010, plaintiffs appealed the CIA's response to plaintiffs' Request as it relates to Naji Hamdan and Hossam Hemdan on two grounds.  First, the CIA failed to demonstrate that it had met its obligation to make a good faith search for the requested records.  Second, the CIA failed to meet the requirements of a *Glomar* response including by failing to provide a detailed explanatory affidavit.  *See Hunt v. C.I.A.*, 981 F.2d 1116, 1119 (9th Cir. 1992) ("affidavits must describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemptions, and show that the justifications are not controverted by contrary evidence in the record or by evidence of CIA bad faith.").   A copy of plaintiffs' appeal is attached here as Exhibit 21.

92.     More than six months have elapsed since plaintiffs filed their appeal of the CIA's denial of the Request as it relates to Hapimotors.  In addition, nearly three months have elapsed since plaintiffs filed their appeal of the CIA's denial of the Request as it relates to Naji Hamdan and Hossam Hemdan.  Therefore, plaintiffs have exhausted their administrative remedies with respect to the CIA.  *See* 5 U.S.C. §§552(a)(6)(A)(i)-(ii) and 552(a)(6)(C)(i).

## DOD - DIA

93.     By letter dated February 18, 2010 the DIA acknowledged receipt of plaintiffs' Request, denied plaintiffs' request for expedited processing and informed

them that there "is currently a substantial delay in processing requests."  DIA's response did not address plaintiffs' request for a waiver of fees associated with the processing of their Request.  A copy of this letter is attached as Exhibit 22.

94.       By letter dated April 19, 2010, plaintiffs appealed the DIA's denial of their request for expedited processing and their failure to timely provide plaintiffs a substantive response to their Request.  As referenced in their appeal, prior to filing the appeal, plaintiffs' counsel spoke to a representative at the customer service desk of the DOD FOIA office, who informed counsel that there were 1,561 requests ahead of them and it would take "at least one year" for the agency to process their Request.  A copy of plaintiffs' appeal is attached here as Exhibit 23.

95.       By letter dated April 28, 2010, the DIA issued an "interim response" to plaintiffs' appeal of the DIA's denial of their request for expedited processing and its failure to provide plaintiffs a substantive response to their Request.  It stated that DIA was "unable to respond" to plaintiffs' Request within the 20 day statutory time period given the following "unusual circumstances": "(a) the need to search for and collect records from a facility geographically separated from this office; (b) the potential volume of records responsive to your request; and (c) the need for consultation with one or more agencies which have substantial interest in either the determination or the subject matter of our records."  A copy of this letter is attached here as Exhibit 24.

96.       As more than nine months have elapsed since plaintiffs served their Request on the DIA with no substantive response, plaintiffs have exhausted their

administrative remedies with respect the DIA. *See*

5 U.S.C. §§552(a)(3)552(a)(6)(A)(i); 552(a)(6)(C)(i).

### DOD - NSA

97.     By letter dated February 5, 2010, the NSA denied plaintiffs' Request

pursuant to FOIA exemptions (b)(1) and (b)(3) by stating that it can "neither confirm

nor deny the existence or nonexistence of records responsive to" Hapimotors, also

known as a *Glomar* response. A copy of this letter is attached as Exhibit 25.

98.     By letter dated April 5, 2010, plaintiffs timely appealed the NSA's denial

of their Request on two grounds. First, the NSA failed to demonstrate that it had met

its obligation to make a good faith search for the requested records. Second, the NSA

failed to meet the requirements of a *Glomar* response, including failing to provide a

detailed explanatory affidavit. *See Hunt v. C.I.A.*, 981 F.2d 1116, 1119 (9th Cir. 1992)

("affidavits must describe the justifications for nondisclosure with reasonably specific

detail, demonstrate that the information withheld logically falls within the claimed

exemptions, and show that the justifications are not controverted by contrary evidence

in the record or by evidence of CIA bad faith."). A copy of plaintiffs' appeal is

attached here as Exhibit 26.

99.     As more than six months have elapsed since plaintiffs served their appeal

of the NSA's denial of their Request with no substantive response, plaintiffs have

exhausted their administrative remedies with respect to the NSA. *See* 5

U.S.C. §§552(a)(6)(A)(ii); 552(a)(c)(C)(i).

**DOD - OIG**

100.    By letter dated February 4, 2010 DOD-OIG provided plaintiffs with an "interim response" to the Request by denying plaintiffs' request for expedited processing, denying their request for waiver of fees associated with its search for their requested records, and deferring the decision whether to waive costs. A copy of this letter is attached here as Exhibit 27.

101.    By letter dated February 24, 2010, DOD-OIG provided a "final response" to the Request, indicating that it had conducted a search for the requested records and had located no responsive records. A copy of the letter is attached here as Exhibit 28.

102.    By letter dated April 23, 2010, plaintiffs timely appealed DOD-OIG's final response to the Request on the grounds that it had failed to demonstrate that it had conducted an adequate search for the requested records, including by failing to "denote which files were searched or by whom... [applying] a systematic approach to document location, and... provid[ing] information specific enough to enable [the requestor] to challenge the procedures utilized." *Weisberg v U.S. Dept. of Justice,* 627 F.2d 365, 371 (D.C. Cir. 1980). A copy of plaintiffs' appeal is attached here as Exhibit 29.

103.    As nearly six months have elapsed since plaintiffs served their appeal of the DOD-OIG's denial of their Request with no substantive response, plaintiffs have exhausted their administrative remedies with respect the DOD-OIG. *See* 5 U.S.C. §552(a)(6)(A)(ii).

**DOD - OFOI**

104.    By letter dated February 5, 2010, DOD-OFOI closed plaintiffs' Request with "no further action" on the basis that plaintiffs had not established any "link or involvement of the [DOD] with the requesters," and that plaintiffs had also directed their Request to intelligence agencies including the ODNI, CIA, NSA and DIA. DOD-OFOI did not address plaintiffs' request for a fee waiver or expedited processing.  A copy of this letter is attached here as Exhibit 30.

105.    By letter dated April 6, 2010, plaintiffs appealed the DOD-OFOI's response to their Request on the grounds that it had failed to conduct an adequate search for the requested records; that plaintiffs are not obligated to establish a "link" between the requesters and the agency from whom they sought records, despite having provided ample foundation for why DOD-OFOI would likely be in possession of the requested records; and that DOD-OFOI provided no explanation for its assertion that the requested records more likely resided with other agencies to which  the Request was also directed.  A copy of plaintiffs' appeal is attached here as Exhibit 31.

106.    By letter dated May 25, 2010, DOD denied plaintiffs' appeal.  Without citation to any authority, DOD-OFOI stated that it was not required to conduct a search for documents when it had no reason to believe that the Office of the Secretary of Defense (OSD) or the Joint Staff (JS) would maintain such records.  It also held that the Request was denied because it "does not reasonably describe records that would be maintained within the OSD or JS," although DOD-OFOI had not initially raised this as

a basis to "administratively close" the Request.  A copy of this letter is attached here as Exhibit 32.

107.     DOD acknowledged in its May 25, 2010 denial of plaintiffs' appeal that plaintiffs have the right to judicial review of this decision pursuant to 5 U.S.C. §552(a)(4)(B).

**DHS**

108.     By letter dated March 5, 2010, DHS responded to the Request by invoking a 10 day extension to respond because the subject of the Request was of substantial interest to two or more components of the DHS, and by denying plaintiffs' request for expedited processing and a fee waiver.  A copy of this letter is attached here as Exhibit 33.

109.     By letter dated April 23, 2010, plaintiffs appealed DHS's denial of expedited processing and a fee waiver.  A copy of plaintiffs' appeal is attached here as Exhibit 34.

110.     By letter dated May 10, 2010, DHS acknowledged receipt of plaintiffs' appeal, stating that "there may be some delay in resolving the matter."  A copy of this letter is attached here as Exhibit 35.

**DHS - ICE**

111.     By letter dated August 12, 2010, DHS identified that it also had conducted a search for records with various Immigration and Customs Enforcement ("ICE") program offices, and that it located 28 records responsive to the Request.  ICE

produced redacted versions of those records with its August 12, 2010 letter asserting

that the redacted material was subject to a number of FOIA and PA exemptions.  A

copy of DHS's August 12, 2010 letter is attached here as Exhibit 36.

112.     By letter dated September 15, 2010 plaintiffs appealed ICE's August 12,

2010 response to the Request on grounds that ICE did not conduct an adequate search

for the requested records, and that it failed to justify the claimed exemptions or

reasonably segregate those portions of the records that are not subject to the claimed

exemptions.

113.     As several months have elapsed since plaintiffs served their appeal of

ICE's response to their Request with no substantive response, plaintiffs have exhausted

their administrative remedies with respect the ICE.  *See* 5 U.S.C. §552(a)(6)(A)(ii).

### DHS – OI&A

114.     By letter dated August 12, 2010, DHS responded to the Request by stating

that it had conducted a "search of … Office of Intelligence and Analysis (OI&A)" and

"failed to disclose any responsive records."  A copy of DHS's August 12, 2010 letter is

attached here as Exhibit 36.

115.     By letter dated September 15, 2010 plaintiffs appealed OI&A's August

12, 2010 response to the Request on grounds that OI&A did not conduct an adequate

search for the requested records.  A copy of this letter is attached as Exhibit 42.

116.     As several months have elapsed since plaintiffs served their appeal of

OI&A's response to their Request with no substantive response, plaintiffs have

exhausted their administrative remedies with respect the ICE.  *See*

5 U.S.C. §552(a)(6)(A)(ii).

## DHS - CBP

117.     As set forth in DHS's August 12, 2010 letter, Exhibit 36, CBP received

the Request on or about February 3, 2001, but has never responded to it.  While DHS

stated in its August 12, 2010 letter that it had tasked CBP to conduct a search for

responsive records, CBP has failed to respond to the Request.

118.     As more than nine months has elapsed since CBP received the request

with no response, plaintiffs have exhausted their administrative remedies with respect

the CBP.  *See* 5 U.S.C. §§552(a)(6)(A)(i) and 552(a)(6)(C)(i).

## DHS - TSA

119.     As set forth in DHS's August 12, 2010 letter, Exhibit 36, TSA received

the Request on or about February 3, 2001, but has never responded to it.  While DHS

stated in its August 12, 2010 letter that it had tasked TSA to conduct a search for

responsive records, TSA has failed to respond to the Request.  As more than nine

months has elapsed since TSA received the request with no response, plaintiffs have

exhausted their administrative remedies with respect to the TSA.  *See*

5 U.S.C. §§552(a)(6)(A)(i) and 552(a)(6)(C)(i).

## ODNI

120.     By letter dated March 9, 2010, ODNI acknowledged receipt of plaintiffs'

Request, indicating that the Request would be processed in accordance with FOIA.

ODNI denied plaintiffs' request for expedited processing, but did not address their request for a fee waiver.  A copy of this letter is attached here as Exhibit 37.

121.     By letter dated April 5, 2010, plaintiffs appealed ODNI's denial of their request for expedited processing.  A copy of this letter is attached here as Exhibit 38. ODNI did not respond to the appeal.

122.     By letter dated June 18, 2010, ODNI issued a "final response" stating that it had searched for unclassified records responsive to plaintiffs' Request and did not locate any such records.  It also stated that while it did not search for classified records responsive to the Request, pursuant to FOIA exemptions 5 U.S.C. §552(b)(1) and (3), it can neither confirm nor deny the existence of classified records responsive to the Request.  A copy of this letter is attached here as Exhibit 39.

123.     By letter dated June 22, 2010, plaintiffs appealed ODNI's response to their Request on two grounds.  First, the ODNI failed to demonstrate that it had met its obligation to make a good faith search for the requested records.  Second, the ODNI failed to meet the requirements of a *Glomar* response, including by failing to provide a detailed explanatory affidavit.  *See Hunt v. C.I.A.*, 981 F.2d 1116, 1119 (9th Cir. 1992) ("affidavits must describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemptions, and show that the justifications are not controverted by contrary evidence in the record or by evidence of CIA bad faith.").  A copy of plaintiffs' appeal is attached here as Exhibit 40.

124.     By letter dated July 8, 2010, ODNI acknowledged receipt of plaintiffs'

appeal and indicated that it would be processed in accordance with FOIA and the

Privacy Act.  A copy of this letter is attached as Exhibit 41.

125.     As several months have elapsed since plaintiffs filed their appeal of

ODNI's response to the Request, plaintiffs have exhausted their administrative

remedies with respect the ODNI.  *See* 5 U.S.C. §552(a)(6)(A).

## CLAIMS FOR RELIEF

### First Claim
### Violation of FOIA for Failure to Adjudicate Request for Records
### (DOJ, FBI, NSD, DOS, CIA, DIA, CBP, TSA, ODNI)

126.     Plaintiffs reallege and incorporate, as though fully set forth herein, each

and every allegation contained in the above paragraphs.

127.     Defendants' failure to respond to plaintiffs' Request violates 5 U.S.C.

§552(a)(6)(A)(i).

### Second Claim
### Violation of FOIA for Failure to Adequately Search for and
### Promptly Release Records
### (All Defendants)

128.     Plaintiffs reallege and incorporate, as though fully set forth herein, each

and every allegation contained in the above paragraphs.

129.     Defendants failed to make an adequate search for records responsive to

plaintiffs' FOIA Request and to promptly release the responsive records sought by

plaintiffs, in violation of 5 U.S.C. § 552(a)(3)(A)-(D).

## Third Claim
## Violation of FOIA for Improper Denial of Expedited Processing
## (USNCB-Interpol, NSD, DOS, CIA, DIA, NSA, DOD-OIG, DOD-OFOI, DHS, ICE, OI&A, CBP, TSA, ODNI)

130.    Plaintiffs reallege and incorporate, as though fully set forth herein, each and every allegation contained in the above paragraphs.

131.    Defendants' denial of plaintiffs' request for expedited processing of the Request violates 5 U.S.C. §552(a)(6)(E)(v)(II) and corresponding agency regulations.

## Fourth Claim
## Violation of FOIA for Improper Disposition of Fee Waiver Request
## (DOJ, FBI, NSD, DOS, CIA, DIA, NSA, DOD-OIG, DOD-OFOI, DHS, ICE, OI&A, CBP, TSA, ODNI)

132.    Plaintiffs reallege and incorporate, as though fully set forth herein, each and every allegation contained in the above paragraphs.

133.    Defendants failed to grant plaintiffs' fee waiver request in violation of 5 U.S.C. §§552(a)(4)(A)(ii)-(iii) and corresponding agency regulations.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against defendant agencies as follows:

(a)    For declaratory relief declaring that defendant agencies' failure to properly search for and disclose the records requested by plaintiffs is unlawful;

(b)    For injunctive relief ordering defendant agencies to expedite processing of plaintiffs' FOIA Request and, upon such processing, to make available the requested records to plaintiffs;

(c)     For injunctive relief ordering defendant agencies to grant plaintiffs' request for a fee waiver;

(d)     For plaintiffs' reasonable attorney fees and other litigation costs reasonably incurred in this action pursuant to 5 U.S.C. § 552(a)(4)(E) and any other applicable statute; and

(e)     For such other relief as the Court may deem just and proper.

DATED:  October 14, 2010

                                   ACLU FOUNDATION OF SOUTHERN
                                   CALIFORNIA
                                   AHILAN ARULANANTHAM
                                   JENNIFER L. PASQUARELLA

                                   By:

                                   _____
                                            Jennifer L. Pasquarella
                                   Attorneys for Plaintiffs

                                   NAJI JAWDAT HAMDAN
                                   HOSSAM HEMDAN
                                   ACLU OF SOUTHERN CALIFORNIA

                                   TRABER & VOORHEES
                                   BERT VOORHEES
                                   LABONI A. HOQ

                                   By:

                                   _____
                                            Laboni A. Hoq
                                   Attorneys for Plaintiffs

                                   NAJI JAWDAT HAMDAN
                                   HOSSAM HEMDAN
                                   ACLU OF SOUTHERN CALIFORNIA