# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

NAJI JAWDAT HAMDAN, *et al.*,

Plaintiffs,

v.

UNITED STATES DEPARTMENT OF JUSTICE, *et al.*,

Defendants.

Case No: CV 10-6149-JHN-JEMx

## DECLARATION OF DAVID M. HARDY

I, David M. Hardy, declare as follows:

(1)    I am currently the Section Chief of the Record/Information Dissemination Section ("RIDS"), Records Management Division ("RMD"), formerly at Federal Bureau of Investigation Headquarters ("FBIHQ") in Washington, D.C., and currently located in Winchester, Virginia. I have held this position since August 1, 2002. Prior to joining the FBI, from May 1, 2001, to July 31, 2002, I was the Assistant Judge Advocate General of the United States Navy for Civil Law. In that capacity, I had direct oversight of Freedom of Information Act ("FOIA") policy, procedures, appeals, and litigation for the Navy. From October 1, 1980 to April 30, 2001, I served as a Navy Judge Advocate at various commands and routinely worked with FOIA matters. I am also an attorney who has been licensed to practice law in the State of Texas since 1980.

(2)    In my official capacity as Section Chief of RIDS, I supervise approximately 276 employees who staff a total of ten (10) units and two (2) field operational service center units whose collective mission is to effectively plan, develop, direct, and manage responses to requests for access to Federal Bureau of Investigation ("FBI") records and information pursuant to the FOIA, 5 U.S.C. § 552; Privacy Act of 1974; Executive Order ("E.O.") 13526; Presidential, Attorney General and FBI policies and procedures; judicial decisions; and other Presidential and Congressional directives. My responsibilities also

1   include the review of FBI information for classification purposes as mandated by

2   Executive Order 13526[1], and the preparation of declarations in support of FOIA

3   Exemption 1 claims asserted under the FOIA.[2]  I have been designated by the Attorney

4   General of the United States as an original classification authority and a declassification

5   authority pursuant to Executive Order 13526, §§ 1.3 and 3.1.  The statements contained

6   in this declaration are based upon my personal knowledge, upon information provided to

7   me in my official capacity, and upon conclusions and determinations reached and made

8   in accordance therewith.

9          (3)    Due to the nature of my official duties, I am familiar with the procedures

10   followed by the FBI in responding to requests for information pursuant to the provisions

11   of the FOIA, 5 U.S.C. § 552 and the Privacy Act (PA) of 1974, 5 U.S.C. § 552a.

12   Specifically, I am aware of the FBI's response to the FOIA/Privacy Act request of

13   plaintiffs, Naji Hamdan, Hossam Hemdan, and the ACLU of Southern California, who

14   seeks access to FBI records pertaining to Naji Hamdan, Hossam Hemdan, Jehad Suliman

15   or Hapimotors.[3]

16          (4)    The FBI has processed a total of 771 pages[4] responsive to plaintiffs' January

17   29, 2009 request.  Specifically, it has released to plaintiffs a total of 521 pages in full or

18   in part.  In accordance with Vaughn v. Rosen, 484 F.2d 820 (D.C. Cir. 1973), this

19   declaration provides an explanation of the FBI's record-keeping system and the

20   procedures used to search for records responsive to plaintiffs' request, and provides

_____

22   [1]  75 Fed. Reg. 707 (2010).

23   [2]  5 U.S.C. § 552 (b)(1).

24   [3]  Jehad Suliman was also a subject of the request, but as he has not been included
25   in this litigation, he will not be addressed any further in this declaration.
       Additionally, since Hapimotors was owned by Naji Hamdan, the two subjects were
26   combined into one FOIPA case for ease of reference.

27   [4]  The FBI has processed a total of 771 pages responsive to plaintiffs' January 29,
28   2009 request.  The release dated December 30, 2010 was Bates stamped FBI-ACLU-1-
       118.  The release dated May 5, 2011 was Bates stamped ACLU-Hamdan-94-746.  There
       were 25 pages that were inadvertently repeated during the Bates stamp process.

1 justifications for the FBI's withholding of information from these records pursuant to

2 Privacy Act Exemption (j)(2), 5 U.S.C. § 552a (j)(2), and FOIA Exemptions 1, 2, 5, 6,

3 7(C), 7(D), and 7(E), 5 U.S.C. §§ 552 (b)(1), (b)(2), (b)(5), (b)(6), (b)(7)(C), (b)(7)(D),

4 and (b)(7)(E).[5]

5 **PROCEDURAL HISTORY OF PLAINTIFFS' FOIA/PRIVACY ACT REQUEST**

6      Set forth below is a chronology and description of the pertinent correspondence

7 concerning plaintiffs' request.[6]  Copies of this correspondence are attached hereto as

8 **Exhibits A-K.**

9     **FOIPA Number 1143419**

10     (5)    By letter dated January 29, 2009, the ACLU of Southern California, on

11 behalf of plaintiffs, submitted a FOIA/Privacy Act request for "information about the

12 federal government's surveillance, monitoring, questioning, investigation, and

13 participation in the overseas detention and torture of Mr. Naji Jawdat Hamdan" dated

14 January 1, 1998 to the present.  Plaintiffs also seek any records for Hapimotors.  In their

15 letter, plaintiffs also requested expedited processing and a waiver of search, review and

16 duplication fees associated with this FOIA/Privacy Act request.  (**See** **Exhibit A).**

17     (6)    By letter dated March 9, 2010, the FBI advised plaintiffs that the request for

18 expedited processing was being denied because plaintiffs did not provide information to

19 show there was "a particular urgency to inform the public about an actual or alleged

20

21     [5] FOIA exemption (b)(2) was used in conjunction with other exemptions during

22 processing of plaintiffs' FOIA request, but effective with the United States Supreme

23 Court's March 7, 2011 decision in <u>Milner v. Department of the Navy</u>, the FBI will no longer rely upon Exemption (b)(2) as to investigative techniques and procedures.

24 However, the FBI continues to assert all other claimed FOIA exemptions indicated in the original releases to plaintiffs of December 30, 2010, May 5, 2011, and June 30, 2011.

25     Additionally, the FBI is now asserting Exemption (b)(7)(E) to protect file

26 numbers.  Revised copies of these pages are attached to the declaration at Exhibit L and can be located at Bates pages FBI-ACLU-1-5, 7, 25, 27, 32, 36, 45-52, 54-59, 61-66, 68-

27 72, 74-75, and 77-114.

28     [6] While only one request letter was sent, the FBI's standard procedure is to open a separate FOIPA number for each subject.  Since this request consisted of three subjects, three separate FOIPA numbers were utilized.

1   federal government activity beyond the public's right to know about government activity

2   generally." Plaintiffs were also advised that they could appeal the FBI's denial of

3   expedited processing response within sixty (60) days by writing to the U.S. Department

4   of Justice ("DOJ") Office of Information and Privacy ("OIP"). (**See Exhibit B.**)

5       (7)   By letter dated April 16, 2010, plaintiffs sent an appeal request to OIP in

6   response to the FBI's March 9, 2010 denial of expedited processing. (**See Exhibit C.**)

7       (8)   By letter dated May 24, 2010, OIP advised plaintiffs that the Director of

8   Public Affairs considered plaintiffs' request for expediting processing and determined

9   that it should be granted. OIP also informed plaintiffs that their appeal from the FBI's

10  failure to respond to their request had no basis as DOJ regulations provide for an

11  administrative appeal only after there has been an adverse determination made by the

12  FBI. Since the FBI had not made any adverse determinations, except the denial of

13  expediting processing, there was no action for OIP to consider. Finally, OIP informed

14  plaintiffs that if they were unsatisfied with the appeals action, they could file a lawsuit.

15  (**See Exhibit D**).

16      (9)   By letter dated July 21, 2010, the FBI sent plaintiffs an interim letter

17  informing them that their request had been assigned to an analyst. The letter further

18  advised plaintiffs that upon confirmation of all records being responsive to plaintiffs'

19  request, the records would be reviewed for the application of FOIA exemptions.

20  (**See Exhibit E.**)

21      (10)   By letter dated December 30, 2010, the FBI released 99 pages to plaintiffs.[7]

22  The FBI stated that it had reviewed 118 pages responsive to plaintiffs' request and that it

23  was releasing 99 pages. Furthermore, the FBI indicated that it had withheld information

---

25  [7] The FBI decided it would be easiest to include all three FOIPA numbers and
    releases as part of one letter. Therefore, the release letter lists the FOIPA number and
26  subject for each subject in this request. However, since Jehad Suliman (FOIPA
    1143422) is not a plaintiff, this declaration does not include the correspondence trail or
27  search for records as they relate to him. It is only necessary to mention him as he is
    included in the release letter that is attached as an exhibit to this declaration. As such,
28  the pages that were released in the December 30, 2010 release will not include the pages
    that relate to him (Bates pages FBI-ACLU-115-118).

1   pursuant to Exemption (j)(2) of the Privacy Act and FOIA Exemptions (b)(1), (b)(2),

2   (b)(6), (b)(7)(C), (b)(7)(D), and (b)(7)(E).  Finally, the FBI advised plaintiffs of their

3   right to appeal the denials in the release to OIP.  (**See** **Exhibit F.**)

4          (11)   By letter dated May 5, 2011, the FBI released 422 pages to plaintiffs.  The

5   FBI stated that it had reviewed 654 pages responsive to plaintiffs' request and that it was

6   releasing 422 pages.  Furthermore, the FBI indicated that it had withheld information

7   pursuant to Exemption (j)(2) of the Privacy Act and FOIA Exemptions (b)(1), (b)(2),

8   (b)(5), (b)(6), (b)(7)(C), (b)(7)(D), and (b)(7)(E).  Finally, the FBI advised plaintiffs of

9   their right to appeal the denials in the release to OIP.  (**See** **Exhibit G.**)

10         (12)   By letter dated June 30, 2011, the FBI released 24 pages to plaintiffs.  These

11   consisted of eight illegible pages previously released (Bates pages ACLU-Hamdan-37-

12   44) and 16 pages of material referred to other government agencies for review.

13   Furthermore, the FBI indicated that it had withheld information pursuant to Exemption

14   (d)(5), (j)(2), and (k)(1) of the Privacy Act and FOIA Exemptions (b)(1), (b)(5), (b)(6),

15   (b)(7)(C), and (b)(7)(E).  Finally, the FBI advised plaintiffs of their right to appeal the

16   denials in the release to OIP.  (**See** **Exhibit H.**)

17   **FOIPA Number 1143421**

18         (13)   By letter dated January 29, 2009, the ACLU of Southern California, on

19   behalf of plaintiffs, submitted a FOIA/Privacy Act request on Hossam Hemdan for

20   information pertaining to himself because he "also underwent substantial surveillance,

21   monitoring, questioning, and investigation" because of his relationship with Naji

22   Hamdan, dated January 1, 1998 to the present.  In their letter, plaintiffs also requested

23   expedited processing and a waiver of search, review and duplication fees associated with

24   this FOIA/Privacy Act request.  (**See** **Exhibit A.**)

25         (14)   By letter dated February 17, 2010, the FBI informed plaintiffs that the

26   indices to the CRS were being searched and they would be advised of the results as soon

27   as possible.  (**See** **Exhibit I.**)  In accordance with the FBI's standard FOIA/Privacy Act

28

1  procedures, plaintiffs' request was assigned FOIPA Number 1143421 and logged into

2  the RIDS FOIPA Document Processing System ("FDPS").

3       (15)   By letter dated March 9, 2010, the FBI advised plaintiffs that the request for

4  expedited processing was being denied because plaintiffs did not provide information to

5  show there was "a particular urgency to inform the public about an actual or alleged

6  federal government activity beyond the public's right to know about government activity

7  generally." Plaintiffs were also advised that they could appeal the FBI's denial of

8  expedited processing response within sixty (60) days by writing to OIP.  (**See Exhibit J.**)

9       (16)   By letter dated April 16, 2010, plaintiffs sent an appeal request to OIP in

10  response to the FBI's March 9, 2010 denial of expedited processing to OIP.

11  (**See Exhibit C.**)

12       (17)   By letter dated May 24, 2010, OIP advised plaintiffs that the Director of

13  Public Affairs considered plaintiffs' request for expediting processing and determined

14  that it should be granted.  OIP also informed plaintiffs that their appeal from the FBI's

15  failure to respond to their request had no basis as DOJ regulations provide for an

16  administrative appeal only after there has been an adverse determination made by the

17  FBI.  Since the FBI had not made any adverse determinations, except the denial of

18  expediting processing, there was no action for OIP to consider.  Finally, OIP informed

19  plaintiffs that if they were unsatisfied with the appeals action, they could file a lawsuit.

20  (**See Exhibit D**).

21       (18)   By letter dated July 21, 2010, the FBI sent plaintiffs an interim letter

22  informing them that their request had been assigned to an analyst.  The letter further

23  advised plaintiffs that upon confirmation of all records being responsive to plaintiffs'

24  request, the records would be reviewed for the application of FOIA exemptions.

25  (**See Exhibit K.**)

26       (19)   By letter dated December 30, 2010, the FBI released 99 pages to plaintiffs.

27  The FBI stated that it had reviewed 118 pages responsive to plaintiffs' request and that it

28  was releasing 99 pages.  Furthermore, the FBI indicated that it had withheld information

1   pursuant to Exemption (j)(2) of the Privacy Act and FOIA Exemptions (b)(1), (b)(2),

2   (b)(6), (b)(7)(C), (b)(7)(D), and (b)(7)(E).  Finally, the FBI advised plaintiffs of their

3   right to appeal the denials in the release to OIP.  (**See** Exhibit F.)

4                **EXPLANATION OF THE FBI'S CENTRAL RECORDS SYSTEM**

5          (20)   The Central Records System ("CRS") enables the FBI to maintain

6   information which it has acquired in the course of fulfilling its mandated law

7   enforcement responsibilities.  The records maintained in the CRS consist of

8   administrative, applicant, criminal, personnel and other files compiled for law

9   enforcement purposes.  This system consists of a numerical sequence of files, called FBI

10  "classifications," which are broken down according to subject matter.  The subject matter

11  of a file may relate to an individual, organization, company, publication, activity or

12  foreign intelligence matter (or program).  Certain records in the CRS are maintained at

13  FBIHQ, whereas records that are pertinent to specific field offices of the FBI are

14  maintained in those field offices.  Although the CRS is primarily designed to serve as an

15  investigative tool, the FBI searches the CRS for documents that are potentially

16  responsive to FOIA/Privacy Act requests.  The mechanism that the FBI uses to search

17  the CRS is the Automated Case Support System ("ACS").

18         (21)   On or about October 16, 1995, the ACS system was implemented for all

19  Field Offices, Legal Attaches ("Legats"), and FBIHQ in order to consolidate portions of

20  the CRS that were previously automated.  ACS can be described as an internal

21  computerized subsystem of the CRS.  Because the CRS cannot electronically query the

22  case files for data, such as an individual's name or social security number, the required

23  information is duplicated and moved to the ACS so that it can be searched.  Over 105

24  million records from the CRS were converted from automated systems previously

25  utilized by the FBI.  Automation did not change the CRS; instead, automation has

26  facilitated more economic and expeditious access to records maintained in the CRS.

27

28

1    (22)   The retrieval of data from the CRS is made possible through the ACS using

2   the General Indices, which are arranged in alphabetical order.[8]  The General Indices

3   consist of index cards on various subject matters that are searched either manually or

4   through the automated indices.  The entries in the General Indices fall into two

5   categories:

6           (a) A "main" entry -- A "main" entry, or "main" file, carries the name corresponding with a subject of a file contained in the
7           CRS.

8           (b) A "reference" entry -- A "reference" entry, sometimes called "cross-references," are generally only a mere mention or
9           reference to an individual, organization, or other subject matter, contained in a document located in another "main" file on a
10          different subject matter.

11   (23)   Searches made in the General Indices to locate records concerning a

12   particular subject, such as Naji Hamdan, Hapimotors or Hossam Hemdan, are made by

13   searching the subject requested in the index.

14   (24)   The ACS consists of three integrated, yet separately functional, automated

15   applications that support case management functions for all FBI investigative and

16   administrative cases:

17          (a)  Investigative Case Management ("ICM") – ICM provides the ability to open, assign, and close investigative and administrative
18          cases as well as set, assign, and track leads.  The Office of Origin ("OO"), which sets leads for itself and other field offices, as needed, opens a
19          case.  The field offices that receive leads from the OO are referred to as Lead Offices ("LOs"), formerly known as Auxiliary Offices.  When a
20          case is opened, it is assigned a Universal Case File Number ("UCFN"), which is used by all FBIHQ, as well as all FBI field offices and Legats
21          that are conducting or assisting in the investigation.  Using the file number "157-SF-12345" as an example, an explanation of the UCFN
22          is as follows:  "157" indicates the classification for the specific type of investigation, in this case "Civil Unrest (Disorders and Demonstrators);"
23          "SF" is the abbreviated form used for the OO of the investigation, in this case San Francisco Field Office; and "12345" denotes the individual
24          case file number for the particular investigation.

25          (b)  Electronic Case File ("ECF") – ECF serves as the central electronic repository for the FBI's official text-based documents.  ECF supports the
26          universal serial concept in that only the creator of a document serializes it

27   _____

28   [8] The General Indices, which became fully automated on September 24, 1987, also includes index cards which allow the FBI to conduct a manual search for records prior to that date.

into a file. This provides a single-source entry of serials into the computerized ECF system. All original serials are maintained in the OO case file.

(c) Universal Index ("UNI") – UNI continues the universal concepts of ACS by providing a complete subject/case index to all investigative and administrative cases. Only the OO is required to index; however, the LOs may index additional information as needed. UNI, an index of approximately 110.9 million records, functions to index names to cases, and to search names and cases for use in FBI investigations. Names of individuals or organizations are recorded with identifying applicable information such as date or place of birth, race, sex, locality, Social Security number, address, and/or date of event.

(25)    The decision to index names other than subjects, suspects, and victims is a discretionary decision made by the FBI Special Agent ("SA") – and on occasion, support employees – assigned to work on the investigation, the Supervisory SA ("SSA") in the field office conducting the investigation, and the SSA at FBIHQ. The FBI does not index every name in its files; rather, it indexes only that information considered to be pertinent, relevant, or essential for future retrieval. Without a "key" (index) to this enormous amount of data, information essential to ongoing investigations could not be readily retrieved. The FBI files would thus be merely archival in nature and could not be effectively used to serve the mandated mission of the FBI, which is to investigate violations of federal criminal and national security statutes. Therefore, the General Indices to the CRS files are the means by which the FBI can determine what retrievable information, if any, the FBI may have in its CRS files on a particular subject matter or individual, such as Naji Hamdan, Hapimotors or Hossam Hemdan.

## SEARCH FOR RECORDS RESPONSIVE TO PLAINTIFFS' REQUEST

(26)    In response to plaintiffs' FOIA/Privacy Act request regarding Naji Hamdan and Hapimotors, the FBI conducted a search of the CRS to identify all potentially responsive files indexed to either subject. The FBI conducted a search using a six-way phonetic breakdown of "Naji Jawdat Hamdan" to include such variations as "Hamdan, Naji," "Hamdan, Jawdat Naji" and "Jawdat Naji Hamdan," as well as "Hapimotors," "Hapimotors.com," "Honda Acura Palace," "HondaAcura Palace," "HondaAcura Palace Incorporated" and "Authentic Auto Parts." As a result of this search, the FBI identified

1   one main file, 199M-LA-165731, as potentially responsive. Since this file was
2   previously partially processed as part of an earlier 2004 FOIPA request made by plaintiff
3   Hamdan, the FBI only processed the serials that were not previously processed from the
4   199 file. Additionally, plaintiff Hamdan's civil litigation file that concerned his habeas
5   case has also been processed.

6       (27)   In response to plaintiffs' FOIA/Privacy Act request regarding Hossam
7   Hemdan, the FBI conducted a search of the CRS to identify all potentially responsive
8   files indexed to this subject. The FBI conducted a search using a six-way phonetic
9   breakdown of "Hossam Hemdan." to include such variations as "Hemdan, Hossam" and
10  "Hossam, Hemdan." As a result of this search, the FBI identified one cross-reference
11  file as potentially responsive regarding plaintiff Hamdan's arrest and detention in the
12  United Arab Emirates ("UAE").

13      (28)   The FBI's current policy is to search for and identify only "main" files
14  responsive to FOIA/Privacy Act requests at the initial administrative stage. The FBI
15  subsequently conducted a second search of the CRS to locate cross-references responsive
16  to plaintiffs' request using the same search terms described above. As a result of this
17  search, no additional files were located.

18                          **PRIVACY ACT EXEMPTION (j)(2)**

19      (29)   Section (j)(2) of the Privacy Act exempts from mandatory disclosure
20  systems of records "maintained by an agency or component thereof which performs as its
21  primary function any activities pertaining to the enforcement of criminal laws, including
22  police efforts to prevent, control, or reduce crime or to apprehend criminals . . . ."

23      (30)   The investigatory records at issue here are part of the FBI's CRS. The
24  records responsive to plaintiffs' request are contained in a file which was compiled as a
25  result of the FBI's legitimate law enforcement investigation of plaintiffs and others.
26  Specifically, the responsive documents relate to a criminal investigation into
27  international terrorism. Accordingly, these files are exempt from disclosure pursuant to
28  5 U.S.C. § 552a (j)(2) of the Privacy Act, in conjunction with 28 C.F.R. § 16.96.

Although access to the records responsive to plaintiffs' request was denied under the Privacy Act, these records have also been processed under the access provisions of the FOIA to achieve maximum disclosure.

## EXPLANATION OF CODED FORMAT USED FOR THE JUSTIFICATION OF REDACTED MATERIAL

(31)   In processing the documents responsive to plaintiffs' request, the FBI sought to achieve maximum disclosure consistent with the access provisions of the FOIA. Every effort was made to provide plaintiffs with all material in the public domain and with all reasonably segregable portions of releasable material. No reasonably segregable, nonexempt portions were withheld from plaintiffs. To further describe the information withheld could identify the very material which the FBI seeks to protect. The exemptions asserted by the FBI as grounds for non-disclosure of portions of documents are FOIA Exemptions 1, 2, 5, 6, 7(C), 7(D), and 7(E), 5 U.S.C. §§ 552 (b)(1), (b)(2), (b)(5), (b)(6), (b)(7)(C), (b)(7)(D), and (b)(7)(E).

(32)   Copies of the designated documents contain, on their face, coded categories of exemptions which detail the nature of the information withheld pursuant to the provisions of the FOIA. The coded categories are provided to aid the Court's and plaintiffs' review of the FBI's explanations of FOIA exemptions used to withhold the protected material. Accordingly, a review of this information will demonstrate that all material withheld is exempt from disclosure pursuant to FOIA Exemptions, or it is so intertwined with protected material that segregation is not possible without revealing the underlying protected material. Copies of the responsive records addressed in this declaration are attached hereto as **Exhibit L**.

(33)   Each withholding of information is accompanied by a code that corresponds to the categories listed below. For example, if "(b)(7)(C)-1" appears on the page, the "(b)(7)(C)" designation refers to "Exemption (b)(7)(C)" of the FOIA concerning "Unwarranted Invasion of Personal Privacy." The subcategory "1 " narrows the main category into the more specific subcategory "Names and/or Identifying Information of FBI Special Agents ("SAs ") and Support Personnel."

1   (34)   The coded categories of exemptions used in the processing of documents

2   responsive to plaintiffs' request are set forth as follows:

3   ## SUMMARY OF JUSTIFICATION CATEGORIES

| | |
|---|---|
| 4  **EXEMPTION (b)(1)** | **CLASSIFIED INFORMATION** |
| 5  (b)(1) | Information Properly Classified by an FBI Classification Authority Pursuant to Executive Order 13526 |
| 6/7  **EXEMPTION (b)(2)** | **INFORMATION RELATED SOLELY TO THE INTERNAL RULES AND PRACTICES OF AN AGENCY** |
| 8/9  (b)(2)-1 | Internal Telephone Numbers of FBI Special Agents and Support Personnel |
| 10  **EXEMPTION (b)(5)** | **PRIVILEGED INFORMATION** |
| 11  (b)(5)-1 | Attorney Work-Product Privilege |
| 12  (b)(5)-2 | Attorney-Client Privilege |
| 13  **EXEMPTION (b)(6)** | **CLEARLY UNWARRANTED INVASION OF PERSONAL PRIVACY** |
| 14  **AND** | |
| 15  **EXEMPTION (b)(7)(C)** | **UNWARRANTED INVASION OF PERSONAL PRIVACY** |
| 16/17  (b)(6)-1 and (b)(7)(C)-1 | Names and/or Identifying Information of FBI Special Agents and Support Personnel |
| 18/19  (b)(6)-2 and (b)(7)(C)-2 | Names and/or Identifying Information of Local Law Enforcement Personnel |
| 19/20  (b)(6)-3 and (b)(7)(C)-3 | Names and/or Identifying Information of Third Parties of Investigative Interest |
| 21/22  (b)(6)-4 and (b)(7)(C)-4 | Name and/or Identifying Information of a Third Party who Provided Information to the FBI |
| 22/23  (b)(6)-5 and (b)(7)(C)-5 | Names and/or Identifying Information of Third Parties Merely Mentioned |
| 24/25  (b)(6)-6 and (b)(7)(C)-6 | Names and/or Identifying Information of Non-FBI Federal Government Personnel |
| 25/26  **EXEMPTION (b)(7)(D)** | **CONFIDENTIAL SOURCE INFORMATION** |
| 26/27  (b)(7)(D)-1 | Confidential Source Symbol Number |
| 27/28  (b)(7)(D)-2 | Information Provided by a Confidential Source Symbol Numbered Informant Under an Express Assurance of Confidentiality |

| EXEMPTION (b)(7)(E) PROCEDURES | INVESTIGATIVE TECHNIQUES AND |
|---|---|
| (b)(7)(E)-1 | Investigative Techniques and Procedures |
| (b)(7)(E)-2 | Names and/or Locations of FBI Units |
| (b)(7)(E)-3 | Dates and Types of Investigations (Preliminary of Full Field Investigations) as well as the Basis for the Initiation |

## JUSTIFICATIONS FOR SPECIFIC DELETIONS OF INFORMATION

(35)   The paragraphs that follow explain the FBI's rationale for withholding each particular category of information under the specific exemption coded categories described above.  A review of this information will reveal that all material which the FBI has withheld is exempt from disclosure pursuant to one or more FOIA exemptions, including Exemptions (b)(1), (b)(2), (b)(5), (b)(6), (b)(7)(C), (b)(7)(D), and (b)(7)(E) or it is otherwise so intertwined with protected material that segregation is not possible without revealing the very underlying material the FBI is trying to protect.

## EXEMPTION (b)(1)
## CLASSIFIED INFORMATION

(36)   5 U.S.C. § 552 (b)(1) exempts from disclosure those records that are: "(A) specifically authorized under criteria established by an Executive Order to be kept secret in the interest of national defense or foreign policy; and (B) are in fact properly classified pursuant to such Executive Order . . . ."

(37)   Before I consider an Exemption (b)(1) claim for withholding agency records, I determine whether the information in those records is information that satisfies the requirements of E.O. 13526, the Executive Order which governs the classification and protection of information that affects the national security,[9] and whether the information complies with the various substantive and procedural criteria of the Executive Order.  E.O. 13526, which was signed by President Barack Obama on December 29, 2009, is the Executive Order that currently applies to the protection of

---

[9]  Section 6.1 (cc) of E.O. 13526, defines "National Security" as "the national defense of foreign relations of the United States."

national security information.  I am bound by the requirements of E.O. 13526, when making classification determinations.

(38)   For information to be properly classified, and thus properly withheld from disclosure pursuant to Exemption (b)(1), the information must meet the requirements set forth in E.O. 13526 § 1.1 (a):

> (1) an original classification authority is classifying the information;
>
> (2) the information is owned by, produced by or for, or is under the control of the United States Government;
>
> (3) the information falls within one or more of the categories of information listed in § 1.4 of this order;
>
> (4) the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security, which includes defense against transnational terrorism, and the original classification authority is able to identify or describe the damage.

(39)   All information which I determined to be classified, and which is under the control of the United States Government, is marked at the "Secret" level since the unauthorized disclosure of this information reasonably could be expected to cause serious damage ("Secret") to national security.  See E.O. 13526 § 1.2 (a)(2).  In addition to this substantive requirement, certain procedural and administrative requirements of E.O. 13526, must be followed before information can be considered to be properly classified, such as proper identification and marking of documents.  I made certain that all procedural requirements of E.O. 13526, were followed in order to ensure that the information was properly classified.  I made certain that:

> (a) each document was marked as required and stamped with the proper classification designation;
>
> (b) each document was marked to indicate clearly which portions are classified and which portions are exempt from declassification as set forth in E.O. 13526 § 1.5 (b);
>
> (c) the prohibitions and limitations on classification specified in E.O. 13526 § 1.7, were adhered to;
>
> (d) the declassification policies set forth in E.O. 13526 §§ 3.1 and 3.3 were followed; and
>
> (e) any reasonably segregable portion of these classified documents that did not meet the standards for classification under E.O. 13526, were

declassified and marked for release, unless withholding was otherwise warranted under applicable law.

## FINDINGS OF DECLARANT REGARDING EXEMPTION (b)(1)

(40)   With the above requirements in mind, I personally and independently examined the information withheld from plaintiff pursuant to FOIA Exemption 1.  As a result of this, I determined that the classified information continues to warrant classification at the"Secret" level, respectively, and is exempt from disclosure pursuant to E.O. 13526, § 1.4, categories "(c) intelligence activities (including covert action), intelligence sources or methods, or cryptology; and (d) foreign relations or foreign activities of the United States, including confidential sources."  At the administrative phase, category (b) was inadvertently asserted for the document beginning at Bates page ACLU-Hamdan-183 and has since been removed from the document.

## INTELLIGENCE ACTIVITIES, SOURCES AND METHODS

(41)   E.O. 13526, § 1.4(c), exempts intelligence activities (including covert action), intelligence sources or methods, or cryptology from disclosure.  An intelligence activity or method includes any intelligence action or technique utilized by the FBI against a targeted individual or organization that has been determined to be of national security interest.  An intelligence method is used to indicate any procedure (human or non-human) utilized to obtain information concerning such individual or organization. An intelligence activity or method has two characteristics.  First, the intelligence activity or method -- and information generated by it -- is needed by U. S. Intelligence/Counterintelligence agencies to carry out their missions.  Second, confidentiality must be maintained with respect to the activity or method if the viability, productivity and usefulness of its information is to be preserved.  The information withheld in these documents pursuant to Exemption (b)(1) was withheld to protect an intelligence method utilized by the FBI for gathering intelligence data.

(42)   The classification redactions were made to protect from disclosure information that would reveal the actual intelligence activities and methods used by the FBI against specific targets of foreign counterintelligence investigations or operations; identify a target of a foreign counterintelligence investigation; or disclose the intelligence-gathering capabilities of the activities or methods directed at specific targets.

1  The information obtained from the intelligence activities or methods is very specific in
2  nature, provided during a specific time period, and known to very few individuals.

3       (43)   It is my determination that the disclosure of the specific information which
4  describes the intelligence activities or methods withheld in this case which are still used
5  by the FBI today to gather intelligence information, could reasonably be expected to
6  cause serious damage to the national security for the following reasons: (1) disclosure
7  would allow hostile entities to discover the current intelligence-gathering methods used;
8  (2) disclosure would reveal current specific targets of the FBI's national security
9  investigations; and (3) disclosure would reveal the determination of the criteria used and
10 priorities assigned to current intelligence or counterintelligence investigations. With the
11 aid of this detailed information, hostile entities could develop countermeasures which
12 would, in turn, severely disrupt the FBI's intelligence-gathering capabilities. This severe
13 disruption would also result in severe damage to the FBI's efforts to detect and
   apprehend violators of the United States' national security and criminal laws.

14      (44)   The FBI protected the following categories of information specific to
15 intelligence activities and methods because disclosure reasonably could be expected to
16 cause serious damage to the national security: (A) detailed intelligence activity
17 information compiled regarding a specific individual or organization of national security
18 interest; (B) intelligence sources; (C) file numbers; and (D) character and/or title of case.
   Below is a more detailed discussion of each of these categories.

19             A.    Detailed Intelligence Activities

20      (45)   The classified information withheld on FBI-ACLU-48-49, 51, 53-56, 59-63,
21 65-69, 74, 76-77, 94, 99, 104-105, and 109; and ACLU-Hamdan-174-175 and 184-186
22 contains detailed intelligence activities information gathered or compiled by the FBI on a
23 specific individual or organization of national security interest. The disclosure of this
24 information could reasonably be expected to cause serious damage to the national
25 security, as it would: (a) reveal the actual intelligence activity or method utilized by the
26 FBI against a specific target; (b) disclose the intelligence-gathering capabilities of the
27 method; and (c) provide an assessment of the intelligence source penetration of a specific
   target during a specific period of time. This information is properly classified at the

28

"Secret" level, withheld pursuant to E.O. 13526, § 1.4(c), and is exempt from disclosure pursuant to Exemption 1.

### B.   Intelligence Sources

(46)   An intelligence source who requires continued classification is an individual who provided or is currently providing information that pertains to national security matters, the disclosure of which could reasonably be expected to result in serious damage to the FBI's intelligence and counterintelligence-gathering capabilities.

(47)   My review determined that the information contained in FBI-ACLU-1 and 2, which pertains to a classified intelligence source, is likely to identify this source if released. The withheld information and material provided by -- or which pertains to -- that source is specific and, if disclosed, reasonably could be expected to reveal the identity of the contributing source. I considered a number of factors in reaching this conclusion, including most importantly, the damage to the national security that would result by publicly identifying sources utilized in intelligence investigations, and the FBI's ability to protect and recruit intelligence sources in the future.

(48)   Disclosure of the identities of FBI intelligence sources, regardless of whether they are active or inactive, alive or deceased, can reasonably be expected to cause current and potential intelligence sources to fear that their identities will be publicly revealed at some point, despite the FBI's express or implied assurances of confidentiality. The disclosure of sources' identities could jeopardize the emotional and physical well-being of the source or the sources' family or associates and/or subject them to public ridicule and ostracism.

(49)   Thus, the release of information I determined to be source-identifying could reasonably be expected to cause damage to the national security by causing current intelligence sources to cease providing information, and discourage potential intelligence sources from cooperating with the FBI for fear their identities would be publicly revealed at some point. Such a source reaction would eliminate one of the most crucial means of collecting intelligence information and, therefore, severely hamper the FBI's law enforcement efforts to detect and apprehend individuals who seek to damage the national security through violation of the United States criminal and national security laws. The classified information provided by intelligence sources on certain pages is

properly classified at the "Secret" level, withheld pursuant to E.O. 13526, § 1.4(c), and is exempt from disclosure pursuant to Exemption 1.

(50)    The following categories of intelligence source information were withheld: (1) detailed intelligence source information; and (2) intelligence source symbol numbers. Below is a more detailed discussion of each of these categories.

### 1.    Detailed Intelligence Source Information

(51)    The classified information withheld on FBI-ACLU-2 contains detailed information provided by human intelligence sources. This information is specific in nature and reflects a specific vantage point from which the sources are reporting and if disclosed, would identify the intelligence sources. As a result, this information is properly classified at the "Secret" level, withheld pursuant to E.O. 13526, § 1.4(c), and is exempt from disclosure pursuant to Exemption 1.

### 2.    Intelligence Source Symbol Numbers

(52)    The classified information withheld on FBI-ACLU-1 contains numerical designators for intelligence sources. Numerical designators serve as a singular identifier for an intelligence source used to provide information for a specific individual or organization determined to be of national security interest. A singular identifier is any word, term or phrase which could identify an intelligence source, either if released by itself or in the aggregate. This includes code names or sources, numerical designators and file numbers. A singular identifier is used in lieu of the true identity of a source. The numerical designator is assigned to this specific source and is unique to, and solely used for, this source. The numerical designator is assigned sequentially and is typically prefixed with the particular FBI field office from which the source is operated.

(53)    The classified symbol numbers withheld on the pages referenced above, relate to sources who provided information of value on individuals and/or organizations of national security interest. The disclosure of this information could permit a hostile analyst to correlate the documents and whatever information that can be gleaned from the documents. By matching source identifiers, such as file numbers and numerical designators, with bits and pieces of other inadvertently released information, one can begin to discern the true identity of the intelligence sources. Public identification of a source will limit the effectiveness of these sources, and also have a significant chilling

effect on the FBI's ability to recruit future sources.  This information is properly classified at the "Secret" level, withheld pursuant to E.O. 13526, § 1.4(c) and is exempt from disclosure pursuant to Exemption 1.

### C. File Numbers

(54)   The classified information withheld on FBI-ACLU-109 and 110 includes FBI file numbers assigned to specific intelligence activities, including channelization and dissemination instructions.  Their release would lead to exposure of the particular intelligence activities and methods at issue.  Individual file numbers are assigned by FBIHQ and field offices and contain a geographical prefix or the originating office and case number, which includes the numerical characterization of the type of investigation followed by a chronological number assigned to a specific investigation/activity.

(55)   The disclosure of an intelligence file number in the aggregate will enable a hostile analyst to attribute any information released from the documents containing such a file number to that particular file.  A hostile analyst can identify the specific intelligence activity by supplying further missing pieces.  Hence, a partial mosaic of the activity begins to appear as more information is identified with the file leading to the exposure of actual current activities or methods.  Disclosure of this file number will allow a hostile analyst, or anyone not privileged to this information, to patch bits and pieces of information together until the actual use of the application of the source or method can be determined.  The identification of these intelligence methods, which continue to furnish positive intelligence information to this day, will severely limit its application.  In addition, disclosure will inform hostile intelligence of the possible range of our intelligence capabilities, as well as the probable intelligence that the FBI has gathered, or can collect, concerning them.  This knowledge provides potential or actual violators of the United States' national security laws a means of deflection or avoidance of lawful regulations.  Disclosure will allow countermeasures to be implemented, making future operations more difficult, and compromise other ongoing planned intelligence operations.  Accordingly, the release of the file numbers can lead to the exposure of the actual intelligence activity or method utilized in FBI investigations, and can reasonably be expected to cause serious damage to national security.  The file numbers are properly

1   classified at the "Secret" level, withheld pursuant to E.O. 13526, § 1.4(c), and is exempt

2   from disclosure pursuant to Exemption 1.

3                      D.      Character and/or Title of Case

4        (56)   The classified information withheld on FBI-ACLU-109 identifies the

5   character and/or title of the case for a specific type of intelligence activity directed at a

6   specific target of national security interest.  Disclosure of the characterization and/or title

7   of the case could reasonably be expected to cause serious damage to the national

8   security, as it would (a) disclose a particular intelligence or counterintelligence

9   investigation; (b) disclose the nature, scope or thrust of the investigation and (c) reveal

10  the manner of acquisition of the intelligence or counterintelligence information.  This

11  information is properly classified at the "Secret" level, withheld pursuant to E.O. 13526,

    § 1.4(c), and is exempt from disclosure pursuant to Exemption 1.

12              **FOREIGN RELATIONS OR FOREIGN ACTIVITIES**

13       (57)   E.O. 13526, § 1.4 (d), exempts foreign relations or foreign activities of the

14  United States, including confidential sources.  The classified information withheld on

15  ACLU-Hamdan-174-175 and 184-185 contains sensitive intelligence information

16  gathered by the United States either about or from a foreign country.  This condition

17  exists due in part to the delicate nature of international diplomacy.  This information

18  must be handled with care so as not to jeopardize the fragile relationships that exist

    among the United States and certain foreign governments.

19       (58)   The unauthorized disclosure of information concerning foreign relations or

20  foreign activities of the United States can reasonably be expected to lead to diplomatic or

21  economic retaliation against the United States; identify the target, scope, or time frame of

22  intelligence activities of the United States in or about a foreign country, which may

23  result in the curtailment or cessation of these activities; enable hostile entities to assess

24  United States intelligence gathering activities in or about a foreign country and devise

25  countermeasures against these activities; or compromise cooperative foreign sources

26  which may jeopardize their safety and curtail the flow of information from these sources.

    Thus, the foreign relations or foreign activities which are withheld by the FBI are

27  properly classified in accordance with E.O. 13526, § 1.4 (d) and is exempt from

28  disclosure pursuant to Exemption 1.

1

## DEFENDANT'S BURDEN OF ESTABLISHING EXEMPTION (b)(1) CLAIMS

2

(59)    The information withheld in this case pursuant to Exemption 1 was examined in light of the body of information available to me concerning the national defense and foreign relations of the United States. This information was not examined in isolation. Instead, each piece of information was evaluated with careful consideration given to the impact that disclosure of this information will have on other sensitive information contained elsewhere in the United States intelligence community's files. Equal consideration was given to the impact that other information either in the public domain or likely known or suspected by present or potential adversaries of the United States, would have upon the information I examined.

(60)    In those instances where, in my judgment, the disclosure of this information could reasonably be expected to cause serious damage to the national security, and its withholding outweighed the benefit of disclosure, I exercised my prerogative as an original classification authority and designated that information as classified in the interest of national security, and invoked Exemption 1 of the FOIA to prevent disclosure. Likewise, the justifications for the withheld classified information were prepared with the intent that they be read with consideration given to the context in which the classified information is found. This context includes not only the surrounding unclassified information, but also other information already in the public domain, as well as information likely known or suspected by other hostile intelligence entities. It is my judgment that any greater specificity in the descriptions and justifications set forth with respect to information relating to foreign activities and intelligence sources and methods of the United States could reasonably be expected to jeopardize the national security of the United States.

## EXEMPTION (b)(2) INTERNAL AGENCY RULES AND PRACTICES

(61)    5 U.S.C. § 552 (b)(2) exempts from disclosure information "related solely to the internal personnel rules and practices of an agency." Until March 6, 2011, Exemption 2 encompassed two distinct categories of internal agency records:  those

involving trivial administrative matters of no public interest ("Low" 2), and those more substantial in nature, the disclosure of which would risk circumvention of a statute or regulation ("High" 2). In this case, the FBI asserted Exemption 2 ("High") - in conjunction with Exemption (b)(7)(E) - to protect investigative techniques and procedures. The FBI had also asserted Exemption 2 to protect secure and non-secure internal telephone numbers.[10] The U.S. Supreme Court's decision in <u>Milner v. Department of the Navy</u>, 131 S.Ct. 1259 (2011), eliminates the distinction between low 2 and high 2, and narrows the application of Exemption 2 to those records which relate to employee relations and human resources issues. As a result, the FBI has re-reviewed all of the documents in this case and has determined the following: it will continue to assert Exemption 2 solely for telephone numbers associated with particular individuals, but will no longer assert Exemption 2 solely for telephone numbers not associated with particular individuals. (<u>See</u> specific Bates pages listed in footnote 11, infra.) To the extent that Exemption 2 was asserted in conjunction with other exemptions and is not withdrawn, the FBI will refrain from removing the (b)(2) markings on those pages due to the administrative burden of re-processing all of the affected documents. Also, upon re-reviewing the released material, the FBI has determined that Exemption (b)(7)(E) is more accurately asserted than Exemption (b)(2) to protect file numbers. (<u>See</u> specific Bates pages listed in ¶ 97, infra.)

**Exemption (b)(2)-1:**        **<u>Internal Telephone Numbers of FBI Special Agents and Support Personnel</u>**

(62)   Exemption (b)(2)-1 has been asserted, in conjunction with Exemptions (b)(6)-1 and (b)(7)(C)-1, to protect the internal telephone numbers of FBI Special Agents ("SA") and support personnel. The business telephone numbers clearly relate to the internal practices of the FBI because these numbers are used by FBI SAs and support personnel during the performance of their duties. Disclosure of the business telephone

---

[10] The FBI re-reviewed the original documents it released and is no longer asserting Exemption (b)(2) on four pages where it was originally asserted: Bates pages FBI-ACLU-1, 53, 60, and 94.

1  numbers of SAs and support personnel could subject these individuals to harassing

2  telephone calls which could disrupt the official business of the FBI (including impeding

3  the ability of these FBI employees to conduct and conclude law enforcement

4  investigations in a timely and efficient manner).

5      (63)   Accordingly, because these internal telephone numbers are related solely to

6  the FBI's internal practices, because disclosure would not serve any public interest, and

7  because disclosure would impede the FBI's effectiveness by subjecting the FBI SAs and

8  support employees whose telephone numbers were disclosed to the possibility of

9  harassment, the FBI has properly withheld this information pursuant to Exemption

10  (b)(2)-1, in conjunction with Exemptions (b)(6)-1 and (b)(7)(C)-1.[11]

## EXEMPTION (b)(5)
## PRIVILEGED INFORMATION

11

12      (64)   Exemption 5 allows the FBI to protect information contained in "inter-

13  agency or intra-agency memorandums or letters which would not be available by law to a

14  party other than an agency in litigation with the agency." This exemption has been

15  construed to exempt those documents or information normally privileged in the civil

16  discovery context, including, as is the case here, the attorney work-product privilege and

17  the attorney-client privilege. Generally, the attorney work-product privilege protects

18  documents and other memoranda prepared by an attorney in contemplation of a

19  litigation. This privilege extends to administrative proceedings and covers documents

20  prepared in anticipation of foreseeable litigation. The attorney-client privilege protects

21  confidential communications between an attorney and his client relating to a legal matter

22

23

24

25      [11]  Exemption (b)(2)-1 has been asserted on the following pages: FBI-ACLU-7, 36, 45, 67, 73, 76, 81, 98, 101, 104, 109, and 111.

26      Additionally, the FBI re-reviewed the original documents and released some additional information to plaintiffs with respect to Exemption (b)(2) on Bates page FBI-

27  ACLU-95. The additional release was made to achieve maximum disclosure consistent with the access provisions of the FOIA. The FBI is also no longer asserting Exemption

28  (b)(2) on the following pages as it was inadvertently applied during the administrative phase: FBI-ACLU-1, 53, and 94.

1   for which the client has sought professional advice.  This privilege encompasses any

2   opinions given by an attorney to his client based upon and reflecting those facts, as well

3   as communications between attorneys that reflect client-supplied information.[12]

4           **Exemption (b)(5)-1:**                **Attorney-Work Product Privilege**

5           (65)  Bates-stamped pages ACLU-Hamdan-116, 166, 226, and 512 were withheld

6   in part under the attorney work-product privilege because they contain the notes of an

7   FBI Office of General Counsel ("OGC") attorney's analysis of a legal status of a case.

8           (66)  Bates-stamped pages ACLU-Hamdan-169-170 were withheld in full under

9   the attorney work-product privilege because they contain a time line that was created by

10  DOJ attorneys for their own internal use in plaintiff Hamdan's habeas corpus litigation.

11  Mallouk, et al. v. Bush, et al., No. 08-cv-2003 (DDC).

12          (67)  Bates-stamped pages ACLU-Hamdan-179 and 181 were withheld in full

13  under the attorney work-product privilege because they contain the draft FBI answers

14  prepared by an FBI OGC attorney in relation to this litigation.

15          (68)  Bates-stamped pages ACLU-Hamdan-183-186 were withheld in part under

16  the attorney work-product privilege because they contain the text of emails between FBI

17  attorney's and other employees regarding the legal strategy of plaintiff Hamdan's habeas

18  litigation.

19          (69)  Bates-stamped page ACLU-Hamdan-206 was withheld in full per the

20  Department of State under the attorney work-product privilege because it contains the

21  text of an email between that agency and the FBI regarding draft documents the FBI was

22  preparing in relation to plaintiff Hamdan's habeas litigation.

23          (70)  Bates-stamped pages ACLU-Hamdan-213-214 were withheld in full per the

24  Department of State under the attorney work-product privilege because they consist of

25  _____

26         [12]  The FBI re-reviewed the original documents it released and is no longer
    asserting Exemption (b)(5) on two pages that were originally withheld in full:  Bates
27  pages ACLU-Hamdan-180 and 182.  Additionally, the FBI re-reviewed the original
    documents and released some additional information to plaintiff with respect to
28  Exemption (b)(5) on Bates page ACLU-Hamdan-704.  These additional releases were
    made to achieve maximum disclosure consistent with the access provisions of the FOIA.

1    drafts of material that was prepared to be sent to representatives of plaintiff Hamdan.

2    (71)   Bates-stamped pages ACLU-Hamdan-331-349, 394-433, 435-477 were

3    withheld in full under the attorney work-product privilege because they consist of drafts

4    of pleadings that were to be filed with the Court in reference to plaintiff Hamdan's

5    habeas litigation.

6    (72)   Bates-stamped pages ACLU-Hamdan-746 was withheld in full under the

7    attorney work-product privilege because it contains the notes of an FBI OGC attorney

8    regarding the possible legal strategy of plaintiff Hamdan's habeas litigation.

9    **Exemption (b)(5)-2:**                **Attorney-Client Privilege**

10   (73)   Bates-stamped pages ACLU-Hamdan-174 and 176 were withheld in part

11   under the attorney-client privilege because they contain the text of emails between FBI

12   attorneys and other employees regarding the legal strategy of plaintiff Hamdan's habeas

13   litigation.  These pages also contain the handwritten notes of an FBI OGC attorney's

14   legal strategy.

15   (74)   Bates-stamped pages ACLU-Hamdan-179 and 181 were withheld in full

16   under the attorney-client privilege because they contain the confidential communications

17   made between the FBI and their counsel regarding this litigation.

18   (75)   Bates-stamped pages ACLU-Hamdan-331-349, 394-433, 435-477 were

19   withheld in full under the attorney-client privilege because they contain the drafts of

20   pleadings that were to be filed with the Court in reference to plaintiff Hamdan's habeas

21   litigation.  The material found in the draft pleadings was provided to counsel by an FBI

22   OGC attorney.

23   (76)   Bates-stamped pages ACLU-Hamdan-663, 701-704 were withheld in full

24   under the attorney-client privilege because they consist of the text of emails that contain

25   confidential communications made between the FBI and their counsel regarding plaintiff

26   Hamdan's habeas litigation.

27

28

## EXEMPTION (b)(7) THRESHOLD

(77)   Exemption (b)(7) of the FOIA protects from mandatory disclosure records or information compiled for law enforcement purposes, but only to the extent that disclosure could reasonably be expected to cause one of the harms enumerated in the subpart of the exemption.  See 5 U.S.C. § 552 (b)(7).  In this case, the harm that could reasonably be expected to result from disclosure concerns invasion of personal privacy (b)(7)(C), reveal the identity of confidential sources (b)(7)(D), and reveal sensitive law enforcement techniques (b)(7)(E).

(78)   Before an agency can invoke any of the harms enumerated in Exemption (b)(7), it must first demonstrate that the records or information at issue were compiled for law enforcement purposes.  Law enforcement agencies such as the FBI must demonstrate that the records at issue are related to the enforcement of federal laws and that the enforcement activity is within the law enforcement duties of that agency. Documents responsive to plaintiffs' request relate to the FBI's investigation of plaintiff Hamdan's possible activities related to international terrorism and his arrest and detainment in the UAE.  Accordingly, the information readily meets the threshold requirement of Exemption (b)(7).  The remaining inquiry is whether disclosure "could reasonably be expected to constitute an unwarranted invasion of personal privacy," "disclose the identity of confidential sources," or "reveal sensitive law enforcement techniques."

## FOIA EXEMPTIONS (b)(6) AND (b)(7)(C) CLEARLY UNWARRANTED AND UNWARRANTED INVASION OF PERSONAL PRIVACY

(76)   5 U.S.C. § 552 (b)(6) exempts from disclosure "personnel and medical files and similar files" when the disclosure of such information would constitute a clearly unwarranted invasion of personal privacy.  Similarly, 5 U.S.C. § 552 (b)(7)(C) exempts from disclosure:

> records or information compiled for law enforcement purposes,
> but only to the extent that the production of such law enforcement
> records or information . . . could reasonably be expected to constitute

1    an unwarranted invasion of personal privacy.[13]

2    (80)    When withholding information pursuant to these exemptions, the FBI is

3    required to balance the privacy interests of the individuals mentioned in these records

4    against any public interest in disclosure.  In asserting this exemption, the FBI has

5    scrutinized each item of information to determine the nature and strength of the privacy

6    interest of every individual whose name and/or identifying information appears in the

7    documents at issue.  In conducting this analysis, the public interest in disclosure of this

8    information is determined by whether the information in question would shed light on

9    the FBI's performance of its mission to protect and defend the United States against

10   terrorist and foreign intelligence threats, to uphold and enforce the criminal laws of the

11   United States, and to provide leadership and criminal justice services to federal, state,

12   municipal, and international agencies and partners.  In this case, the FBI concluded that

13   the information should be withheld under Exemptions (b)(6) and (b)(7)(C), and

14   determined that the individuals' privacy interests were not outweighed by any public

15   interest in disclosure.[14]

16

17

18

19

_____

20   [13]  The practice of the FBI is to assert Exemption (b)(6) in conjunction with
21   (b)(7)(C).  Although the balancing test for (b)(6) uses a "would constitute a clearly
     unwarranted invasion of personal privacy" and the test for (b)(7)(C) uses the lower
22   standard of "could reasonably be expected to constitute an unwarranted invasion of
     personal privacy," the analysis and balancing required by both exemptions is sufficiently
23   similar to warrant a consolidated discussion.  The privacy interests are balanced against
24   the public's interest in disclosure under the analysis of both exemptions.

25   [14]  The FBI re-reviewed the original documents it released and is asserting
     Exemptions (b)(6) and (b)(7)(C) on the following pages where it was not originally
26   asserted:  Bates pages FBI-ACLU-2, 48, 51, 53-55, 57, 59-62, 64-66, 68, 76, and 104.
     Additionally, the FBI re-reviewed the original documents and determined that
27   Exemptions (b)(6) and (b)(7)(C) do not apply in some places on Bates pages FBI-ACLU-
     1-4.  Finally, upon re-review of the documents, it was determined that Exemptions (b)(6)
28   and (b)(7)(C) should have been applied in place of Exemptions (b)(2) and (b)(7)(E) on
     Bates page FBI-ACLU-27.

1    **Exemptions (b)(6)-1 and (b)(7)(C)-1:**      **Names and/or Identifying**
                                                   **Information of FBI Special Agents**
2                                                  **and Support Personnel**

3        (81)   Exemptions (b)(6)-1 and (b)(7)(C)-1 have been asserted, at times in

4    conjunction with Exemption (b)(2)-1, to protect the names and/or identifying

5    information (such as social security numbers and telephone numbers) of FBI SAs and

6    support personnel who were responsible for conducting, supervising, and/or maintaining

7    the investigative activities reported in the documents responsive to plaintiffs' request.

8    Publicity (adverse or otherwise) regarding any particular investigation to which they

9    have been assigned may seriously prejudice their effectiveness in conducting other

10   investigations.  The privacy consideration is also to protect FBI SAs and support

11   personnel, as individuals, from unnecessary, unofficial questioning as to the course of an

12   investigation, whether or not they are currently employed by the FBI.

13       (82)   FBI SAs conduct official inquiries into violations of various criminal

14   statutes and national security cases.  They come into contact with all strata of society,

15   conducting searches and making arrests, both of which result in reasonable but

16   nonetheless serious disturbances to people and their lives.  It is possible for an individual

17   targeted by such law enforcement actions to carry a grudge which may last for years, and

18   to seek revenge on the agents involved in a particular investigation.  The publicity

19   associated with the release of an agent's identity in connection with a particular

20   investigation could trigger hostility toward a particular agent.  There is no public interest

21   to be served by disclosing the identities of the SAs to the public.  Thus, disclosure of this

22   information would constitute a clearly unwarranted invasion of personal privacy, and

23   could reasonably be expected to constitute an unwarranted invasion of their personal

24   privacy.[15]

25

26   ————————————

27   [15] For the convenience of the reader, rather than repeat this phrase "clearly
     unwarranted invasion of personal privacy under the standard of Exemption 6 and an
28   unwarranted invasion of personal privacy under the standard of Exemption 7C" every
     time the FBI asserts Exemptions 6 and 7(C) we will simply use the phrase "clearly
     unwarranted and unwarranted invasion of personal privacy" to refer to both standards.

1     (83)   The names of FBI support personnel are also withheld pursuant to FOIA

2 Exemptions (b)(6)-1 and (b)(7)(C)-1.  These employees were assigned to handle tasks

3 related to the official investigation into the arrest and detainment of plaintiff in the files

4 responsive to plaintiffs' request.  They were, and possibly are, in a position to access

5 information regarding official law enforcement investigations, and therefore could

6 become targets of harassing inquiries for unauthorized access to investigations if their

7 identities were released.  These individuals maintain substantial privacy interests in not

8 having their identities disclosed.  There is no public interest to be served by releasing the

9 identities of these individuals.  Thus, disclosure of this information would constitute a

10 clearly unwarranted and unwarranted invasion of their personal privacy.  The FBI

11 properly protected this information pursuant to FOIA Exemptions (b)(6)-1 and (b)(7)(C)-

12 1, at times in conjunction with Exemption (b)(2)-1.[16]

13     **Exemptions (b)(6)-2 and (b)(7)(C)-2:**     **Names and/or Identifying**

14                                                **Information of Local Law**
                                               **Enforcement Officers**

15     (84)   Exemptions (b)(6)-2 and (b)(7)(C)-2 have been asserted to withhold the

16 names and/or identifying information of local law enforcement officers who were part of

17 a joint task force.  These officers were acting in their official capacities and aided the

18 FBI in its law enforcement efforts.  Disclosure of the identities of these officers could

19 subject them, as individuals, to unofficial inquiries not anticipated in connection with

20 their assistance to the FBI.  Thus, these officers have substantial interests in protecting

21 their identities.  There is no public interest to be served in releasing the identities of these

22 officers.  Therefore, the FBI concluded that the disclosure of this information would

23 constitute a clearly unwarranted invasion of their personal privacy and could reasonably

24 be expected to constitute an unwarranted invasion of personal privacy.  Accordingly, the

25 FBI has properly protected the names and/or identifying information of these officers

26

27     [16]   Exemptions (b)(6)-1 and (b)(7)(C)-1 have been cited on the following pages:
FBI-ACLU-1, 7, 24-25, 27-29, 36, 45, 48, 51, 53, 58, 60, 65, 67-68, 70-71, 73, 76, 81,

28 84, 94, 98-99, 101, 104, 109, 111; and ACLU-Hamdan-171, 173-174, 176, 183-186,
203-205, 207-208, 210, 226, 261, 378, 419, 427, 434, 437, 444, 450, 663, 701-703, and
740-743.

1    pursuant to Exemptions (b)(6) and (b)(7)(C).  Exemptions (b)(6)-2 and (b)(7)(C)-2 are
2    cited on the following pages:  FBI-ACLU-1, 25, 53, 58-60, 65-68, 70, 84, and 94.
3         **Exemptions (b)(6)-3 and (b)(7)(C)-3:**          **Names and/or Identifying**
4                                                           **Information of Third Parties of**
                                                            **Investigative Interest**
5         (85)   Exemptions (b)(6)-3 and (b)(7)(C)-3 have been asserted to withhold the
6    names and/or identifying information of third parties who were of investigative interest
7    to the FBI.  These third party individuals were of investigative interest to the FBI
8    because of their criminal activities.  Disclosure of the identities of these individuals
9    could subject them to harassment, embarrassment and could cause undue public
10   attention.  Thus, the privacy interests in non-disclosure of these third parties of
11   investigative interest are very strong and outweigh the limited public interest in
12   disclosure.  Accordingly, the FBI concluded that the disclosure of the identities of third
13   parties of investigative interest would constitute a clearly unwarranted and unwarranted
14   invasion of their personal privacy.  The FBI  has properly withheld this information
15   pursuant to Exemptions (b)(6)-3 and (b)(7)(C)-3 on the following pages: FBI-ACLU-1-
16   4, 27, 29-30, 32-34, 46-51, 53-55, 57, 60-62, 64-65, 67-68, 73, 76, 81, 104, and 111.
17        **Exemptions (b)(6)-4 and (b)(7)(C)-4:**          **Name and/or Identifying**
18                                                          **Information of a Third Party Who**
                                                            **Provided Information to the FBI**
19        (86)   Exemptions (b)(6)-4 and (b)(7)(C)-4 have been asserted, at times in
20   conjunction with Exemption (b)(7)(D)-2, to protect the name and/or identifying
21   information of a third party who provided information to the FBI during the course of the
22   investigation of plaintiff Hamdan.
23        (87)   The FBI has found that information provided by individuals during an
24   interview is one of the most productive investigative tools used by law enforcement
25   agencies.  The FBI's experience has shown that individuals interviewed by the FBI fear
26   that their identity may be exposed and, consequently, that they could be harassed,
27   intimidated, or threatened with legal consequences, economic reprisal, or possible
28   physical harm.  To surmount these fears, individuals interviewed by the FBI must be

assured that their names and personally-identifying information will be held in the strictest of confidence.  In this case, the FBI balanced the significant personal privacy interests of the third party interviewee in not having his or her name and identifying information disclosed against the negligible public interest in the disclosure of his or her identity.  Disclosure of the third party's name and/or identifying information would shed no light on the operations and activities of the FBI.  Accordingly, the FBI concluded that the disclosure of this information would constitute a clearly unwarranted and unwarranted invasion of his or her personal privacy.  The FBI therefore properly withheld the name and/or identifying information concerning a third party interviewed by the FBI pursuant to Exemptions (b)(6)-4 and (b)(7)(C)-4, at times in conjunction with Exemptions (b)(7)(D)-2, on Bates page FBI-ACLU-3.

**Exemptions (b)(6)-5 and (b)(7)(C)-5:**     **Names and/or Identifying Information of Third Parties Merely Mentioned**

(88)   Exemptions (b)(6)-5 and (b)(7)(C)-5 have been asserted to withhold the names and/or identifying information concerning third parties merely mentioned in documents related to the FBI's investigations of plaintiff Hamdan.  The FBI obtained this identifying information concerning these third parties during the course of its investigation into plaintiff Hamdan's possible involvement in international terrorism, as well as his arrest and detainment in the UAE.  These third parties maintain significant personal privacy interests in not having their identifying information disclosed.  If the FBI were to disclose their names and other personal information, the disclosure would reveal that these third parties were connected in some way with the FBI's 1993 investigation of plaintiff Hamdan and his arrest and detention in the UAE.  Disclosure of these third parties' names and/or identifying information in connection with the FBI's investigations of plaintiff Hamdan carries an extremely negative connotation.  Disclosure of their identities would subject these individuals to possible harassment or criticism and focus derogatory inferences and suspicion on them.  Accordingly, the FBI has determined that these third parties have substantial privacy interests in not having

1   information about them found in the FBI's investigations of plaintiff Hamdan disclosed.

2   After identifying the substantial privacy interests of these third party individuals, who

3   are merely mentioned in the investigative file, the FBI balanced these privacy interests

4   against the minimal public interest in the disclosure of the information.  The FBI

5   determined that the personal privacy interests in non-disclosure outweighed the public in

6   disclosure, as disclosure would not shed light on the operations and activities of the FBI.

7   Disclosure of this information would constitute a clearly unwarranted and unwarranted

8   invasion of their personal privacy.  Accordingly, the FBI properly protected this

9   information from disclosure pursuant to FOIA Exemptions (b)(6)-5 and (b)(7)(C)-5 on

10  the following pages: FBI-ACLU-2-5, 7, 11, 15-17, 30-31, 33-34, 49-5054-56, 61-64, 69-

11  70, 77, 81-82, 85-89, 91-92, 95, 101-102, 104-105, 110, 112-114; and ACLU-Hamdan-

12  185.

13   **Exemptions (b)(6)-6 and (b)(7)(C)-6:**        **Names and/or Identifying**
                                                     **Information of Non-FBI Federal**
14                                                   **Government Employees**

15        (89)   Exemptions (b)(6)-6 and (b)(7)(C)-6 have been asserted to withhold the

16  names and/or identifying information of  non-FBI federal government employees, whose

17  names appear in the documents responsive to plaintiffs' request.  Disclosure of the

18  identities of these individuals could subject them to unauthorized inquiries and

19  harassment as these individuals are in a position to have access to information regarding

20  an official law enforcement investigation.  The substantial privacy interest in not having

21  their identities revealed, when balanced against the public's interest in disclosure, leads

22  to the protection of these employees' names, as release would not shed light on the

23  operations and activities of the FBI, and disclosure would constitute a clearly

24  unwarranted and unwarranted invasion of their personal privacy.  Exemptions (b)(6)-6

25  and (b)(7)(C)-6 have been cited on FBI-ACLU-28; and ACLU-Hamdan-184, 208, 226,

26  701-704, and 741-743.

27

28

## (b)(7)(D)
## CONFIDENTIAL SOURCE MATERIAL

(90)   5 U.S.C. § 552 (b)(7)(D) permits an agency to withhold :

> records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to disclose the identity of a confidential source, including a State, local or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of a record or information compiled by a criminal law enforcement authority in the course of a criminal investigation or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source.

(91)   Numerous confidential sources report to the FBI on a regular basis, they provide information under express assurances of confidentiality, and are "informants" within the common meaning of the term.  Other individuals are interviewed under implied assurances of confidentiality or under circumstances from which assurances of confidentiality may be inferred.  Both of these categories of individuals are considered viable confidential sources and they furnish information only with the understanding that their identities and the information provided will not be divulged outside the FBI.  It is only with the understanding of complete confidentiality (whether express or implied) that the aid of such sources can be enlisted, and only through this confidence that these sources can be persuaded to continue providing valuable assistance in the future.

(92)   The release of a source's identity could forever remove that source as a future means of obtaining information.  The FBI has learned through experience that individuals who assist, cooperate with, and provide information to the FBI must be free to do so without fear of reprisal.  The FBI also has learned that individuals who provide information to the FBI must be free to furnish that information with complete candor and without the understandable tendency to hedge or withhold information because of fear that their names or their cooperation with the FBI will later be made public.  Individuals who provide information to the FBI should be secure in the knowledge that their assistance and their identities will be held in confidence.  In addition, disclosure of the

1  identity of one source has a chilling effect on the activities and cooperation of other

2  sources.[17]

3      **Exemption (b)(7)(D)-1:**      **Confidential Source Symbol Number**

4      (93)   Exemption (b)(7)(D)-1 has been asserted to protect from disclosure the

5  permanent source symbol number of a confidential source of the FBI.  The FBI assigns

6  permanent source symbol numbers in sequential order to confidential informants who

7  report information to the FBI on a regular basis pursuant to an express assurance of

8  confidentiality.  In this case, the FBI did not refer to the confidential source by his or her

9  true name.  Instead, the source was referred to only by his or her individually assigned

10  permanent source symbol number.  The FBI obtained information from this confidential

11  source regarding the possible criminal activities of plaintiff Hamdan.

12      (94)   If the FBI disclosed the confidential source symbol number of this

13  informant, his or her identity could be ascertained by persons knowledgeable of the FBI's

14  previous investigation of plaintiff Hamdan.  Furthermore, if the FBI disclosed his or her

15  identity, the informant, as well as his or her family, could be subjected to embarrassment,

16  humiliation, and/or physical or mental harm.  Disclosure of a source symbol number at

17  various times and in various documents could identify this confidential FBI source

18  because such disclosure would reveal the connections of this confidential informant to

19  the subject matter of these documents.  Repeated release of this confidential source

20  symbol number along with the information provided by this confidential source would

21  narrow the possibilities of his or her true identity.  This is especially true inasmuch as

22  each confidential source symbol number is assigned to only one confidential informant.

23      (95)   Moreover, the disclosure of this confidential informant's identity would

24  have a chilling effect on the activities and cooperation of other FBI confidential

25  informants.  The FBI has found that it is only with the understanding of complete

26  _____

27  [17]  The FBI re-reviewed the original documents it released and is asserting
Exemption (b)(7)(D) on the following pages where it was not originally asserted:  Bates

28  pages FBI-ACLU-1-2.
    Additionally, the FBI re-reviewed the original documents and is no longer
asserting Exemption (b)(7)(D) on Bates page FBI-ACLU-68.

1   confidentiality that the aid of such informants can be enlisted, and only through this

2   confidence that these informants can be persuaded to continue providing valuable

3   assistance in the future.  Accordingly, since this source symbol number is related solely

4   to the FBI's internal practices and his or her disclosure would not serve any public

5   interest, and because the disclosure of this source symbol number could reasonably be

6   expected to disclose the identity of an FBI confidential source.  Accordingly, the FBI

7   properly withheld this information pursuant to Exemption (b)(7)(D)-1on Bates page FBI-

8   ACLU-1.

9   **Exemption (b)(7)(D)-2:**          **Information Provided by a Confidential Source**
10                                       **Symbol Numbered Informant Under an**
                                         **Express Assurance of Confidentiality**

11        (96)   Exemption (b)(7)(D)-2 has been asserted to protect from disclosure certain

12   identifying information concerning a confidential symbol number source of the FBI who

13   reported information to the FBI on a regular basis under express assurances of

14   confidentiality.  This identifying information concerns the particular investigative

15   matters and individuals in which  this confidential symbol number source reported

16   information to the FBI.   Informant symbol numbers are not assigned to all informants of

17   the FBI.  They are only assigned to informants who have been developed, instructed,

18   closely monitored and, in many cases, paid for their services.  Symbol numbered

19   informants often work their way into criminal organizations and into the confidences of

20   subjects of FBI criminal investigations.  They become privy to the latest information

21   about the activities of subjects under investigation and are often the recipients of

22   sensitive, confidential disclosures by subjects of investigations.  These informants report

23   information to the FBI on a regular basis under strictly controlled and confidential

24   circumstances pursuant to an express assurance of confidentiality.  Given the sensitive

25   and singular nature of the information provided by such sources, any information

26   provided by them to the FBI which could ultimately identify them was exempted.

27        (97)   Source symbol numbers and confidential source file numbers are assigned

28   in sequential order to confidential informants.  These sources are not referred to by name

in any FBI document which records the information the sources have furnished. The reference in an FBI document to a confidential source by source symbol number rather than by name is designed to protect the true identity of the source who provide information in the course of an FBI investigation. These precautions against the disclosure of the identities of confidential sources are observed because of the sensitive nature of the information provided by such sources and the possibility of harm to these sources and their families if their identities were revealed.

(98)   The release of the identity of a confidential symbol number source to the public would result in the FBI's inability to use that source in the future. In addition, the revelation of one confidential source's identity has a chilling effect on the activities and cooperation of other sources. It is only with the understanding of complete confidentiality that the aid of such sources can be enlisted, and only through this confidence that these sources can be persuaded to continue providing valuable assistance in the future. The FBI could not identify any legitimate public interest in release of this identifying information since it would not shed any light on the operations and activities of the FBI in the previous criminal investigation of plaintiff Hamdan. Accordingly, since the disclosure of this information could reasonably be expected to disclose the identity of a permanent confidential symbol number source of the FBI, the FBI has properly withheld this information pursuant to Exemption (b)(7)(D)-2 on Bates pages FBI-ACLU-1-5.

## EXEMPTION (b)(7)(E)
## INVESTIGATIVE TECHNIQUES AND PROCEDURES

(99)   Exemption (b)(7)(E) provides for the withholding of:

law enforcement records that would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law.

1    5 U.S.C. § 552(b)(7)(E).[18]

2    **Exemption (b)(7)(E)-1:          Investigative Techniques and Procedures**

3    (100) Exemption (b)(7)(E)-1 has been asserted to protect procedures and

4    techniques used by FBI agents to conduct national security investigations.  Disclosure of

5    this information could enable subjects of FBI investigations to circumvent similar

6    currently used techniques and procedures by law enforcement.  The relative benefit of

7    these techniques and procedures could be diminished if the actual techniques and

8    procedures were revealed in this matter.  This in turn could facilitate the accumulation of

9    information by other investigative subjects regarding the circumstances under which

10   these techniques and procedures were used or requested and the value of the information

11   obtained.  Release of this type of information could enable criminals to educate

12   themselves about the law enforcement investigative techniques and procedures employed

13   for the location and apprehension of individuals and therefore allow these individuals to

14   take countermeasures to circumvent the effectiveness of these techniques and procedures

15   and to continue to violate the law.  Thus, the FBI properly protected this information

16   from disclosure pursuant to FOIA Exemption (b)(7)(E)-1, which is cited on the

17   following pages: FBI-ACLU-1-2, 4, 10-18, 25, 27, 29-30, 32, 36-37, 45-50, 52, 54-114;

18   and ACLU-Hamdan-186.

19   **Exemption (b)(7)(E)-2:          Location and Identity of FBI Units**

20   (101) Exemption (b)(7)(E)-2 has been asserted to protect methods and techniques

21   involving the location and identity of FBI units which were involved in the underlying

22   investigations.  The office location and units are usually found  in the administrative

23   headings of internal FBI documents.  These headings identify the location of the office

24   and unit that either originated or received the documents.  Disclosure of the location of

25   the units conducting the investigations would reveal the targets, the physical areas of

26   interest of the investigation, and when taken together with the other locations if

27   _____

28   [18] The FBI re-reviewed the original documents it released and is asserting Exemption (b)(7)(E) on Bates pages FBI-ACLU-30, 34, and 48 where it was not originally asserted.

1    identified, could establish a pattern or "mosaic" that identification of a single location

2    would not. If the locations are clusters in a particular area, it would allow hostile

3    analysts to avoid or circumvent those locations especially if one or more location

4    appeared with frequency or in a pattern. This would disrupt the method of the

5    investigative process and deprive the FBI of valuable information. The withholding of

6    the units involved is justifiable as well under a similar rationale. Once identified, the

7    units's areas of expertise becomes known and an individual would then be aware of

8    exactly what the law enforcement agency's interest is. For example, knowing that a unit

9    whose focus is on financial crimes is involved is quite different information than

10    knowing that the unit involved has a focus on crimes of violence. This knowledge could

11    allow an individual to avoid or circumvent activities in the area of the unit's focus. The

12    revelation of the involvement that one or more units of differing focuses is critical

13    information that can allow the adjustment of behaviors and activities to avoid detection.

14    Because release of this information could reasonably be expected to impede the FBI's

15    effectiveness and potentially aid circumvention of the law, the FBI has properly withheld

16    the information pursuant to Exemption (b)(7)(E)-2 on the following pages: FBI-ACLU-

17    27, 45, 48, 59-60, 66-67, 72-73, 76, 81, 83, 94, 98, 103-104, and 111.

18    **Exemption (b)(7)(E)-3:**    **Dates and Types of Investigations (Preliminary
19                                    or Full Investigation) as well as the Basis for
the Initiation**

20        (102) Exemption (b)(7)(E)-3 has been asserted to protect from disclosure

21    information pertaining to the type and dates of investigations referenced in the records at

22    issue, as well as the basis for the initiation of these investigations. Specifically, the

23    information withheld, when referenced in connection with an actual investigation and

24    not in general discussion, pertains to the type of investigation, whether it is a Preliminary

25    or a Full investigation, the date it was initiated, and the basis for the initiation of the

26    particular investigations referenced in the documents at issue. Release of this

27    information would allow individuals to know the types of activities that would trigger a

28    full investigation as opposed to a preliminary investigation and the particular date which

1    it covers, causing individuals to adjust their behavior accordingly.  Moreover, the

2    knowledge that a specific activity in general warrants investigation could likewise cause

3    individuals to adjust their behavior to avoid detection.  Because release of this

4    information could reasonably be expected to impede the FBI's effectiveness and

5    potentially aid circumvention of the law, the FBI has properly withheld the information

6    pursuant to Exemption (b)(7)(E)-3 on the following pages: FBI-ACLU-1, 29-34, 36, 53,

7    60, and 94.

8                    **DOCUMENTS REFERRED TO OTHER AGENCIES**

9          (103) As part of its search for and processing of records responsive to plaintiffs'

10   request, the FBI identified pages which contained information and/or equities originating

11   with the Department of State ("State").  In accordance with DOJ regulations,

12   28 C.F.R. § 16.4, the FBI contacted State to determine how they wanted the FBI to treat

13   their information contained within the responsive FBI documents.  By undated letter,

14   State instructed the FBI to withhold its information in its entirety on three pages of the

15   referral pursuant to Privacy Act Exemption (d)(5) and FOIA Exemption (b)(5).  The FBI

16   was also advised by State to withhold its information on one page of the referral pursuant

17   to Privacy Act Exemption (k)(1) and FOIA Exemption (b)(1).  Finally, the FBI was

18   advised by State to withhold its information on one page of the referral pursuant to FOIA

19   Exemptions (b)(6) and (b)(7)(C).  The information withheld at the request of State is

20   located on ACLU-Hamdan-206, 208, 210, and 213-214.

21                                **CONCLUSION**

22         (104) The FBI has processed and released all reasonably segregable information

23   from the documents responsive to plaintiffs' request.  The FBI has properly withheld

24   information pursuant to Privacy Act Exemption (j)(2), 5 U.S.C. § 552a (j)(2) and FOIA

25   Exemptions (b)(1), (b)(2), (b)(5), (b)(6), (b)(7)(C), (b)(7)(D) and (b)(7)(E),

26   5 U.S.C. §§ 552 (b)(1), (b)(2), (b)(5), (b)(6), (b)(7)(C), (b)(7)(D) and (b)(7)(E).  The FBI

27   has carefully examined the responsive documents and has determined that the

28   information withheld from plaintiffs, if disclosed, could reasonably be expected to cause

1   serious damage to national security; could reasonably be expected to reveal internal

2   administrative information; reveal privileged information; could cause a clearly

3   unwarranted and unwarranted invasion of personal privacy; could disclose confidential

4   source information; and could disclose investigative techniques and procedures for law

5   enforcement investigations, the disclosure of which could reasonably be expected to risk

6   circumvention of the law.  The FBI has released all reasonably segregable, non-exempt

7   information to plaintiffs in response to plaintiffs' FOIA/Privacy Act request.

8          Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing

9   is true and correct, and that Exhibits A through L attached hereto are true and correct

10  copies.

11         Executed this _____ day of August, 2011.

12

13

14  DAVID M. HARDY
    Section Chief

15  Record/Information Dissemination Section
    Records Management Division

16  Federal Bureau of Investigation
    Winchester, Virginia

17

18

19

20

21

22

23

24

25

26

27

28