Exhibit L

SECRET

# FEDERAL BUREAU OF INVESTIGATION

Precedence: ROUTINE                    Date: 05/04/1998

To: Los Angeles

From: Los Angeles
  NSD-5                                          b6 -2
  Contact: Detective                             b7C -2

Approved By:                                     b6 -1,2
                                                 b7C -1,2

Drafted By:                  kan

Case ID #:                                       b7E -1

(U)

(S)   199M-LA-165731   (Closed)                  b7E -1

(U) Title:                                       b6 -3
                                                 b7C -3
        IT-OTHER (EGYPT)
        OO: LOS ANGELES

(U) Synopsis:        Asset reporting.

(U)                  Classified By: 8362, NSD-5/Los Angeles
                     Reason       : 1.5a
                     Declassify On: X1              b2
                                                    b7E -3

(U)

(S) Details:   On 4/29/98,                    contact with whom has    b1
been insufficient to determine reliability but who is believed to
be in a position to know, provided the following information.

(U)                                                                 b7D -2

SECRET

DATE: 11-17-2010                    ALL INFORMATION CONTAINED
CLASSIFIED BY 65179/DMH/LRP/bls     HEREIN IS UNCLASSIFIED EXCEPT    b7E -1
REASON: 1.4 (c)                     WHERE SHOWN OTHERWISE
DECLASSIFY ON: 11-17-2035

199M-LA-165731-42

FBI-ACLU-1



~~SECRET~~

(U)  To: Los Angeles  From: Los Angeles  b7E -1
Re: ⊠ �█▊▊▊▊▊▊  05/04/1998

▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊ which was funded by  b6 -5
the school.  The school would give either $300 or $400 per month  b7C -5
which was used to fund the mosque activities.  Asset, a  b7D -2
▊▊▊▊▊▊ did not know subject in ▊▊▊▊▊  Asset stated that one
▊▊▊ (NFI) ▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊ knew
subject from ▊▊▊▊▊▊▊ ▊▊▊▊▊▊▊▊▊ left the United States in
1992, but believes he has a ▊▊▊▊▊ currently living in ▊▊▊

(U)  ⊠ ▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊
▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊  b7D -2
▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊ In his opinion, asset felt
subject's personal traits were inconsistent with an ▊▊▊▊
▊▊▊▊▊  Asset's opinion was based primarily on subject's
tendency to ▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊
On the other hand, subject would ▊▊▊▊▊▊

⊠ In late ▊▊▊▊▊▊▊▊▊ was living near  b6 -3,5
intersection of ▊▊▊▊▊▊▊▊▊▊ Subject was  b7C -3,5
living with ▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊  b7D -2

(S) ▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊
▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊  b1
▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊
▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊
▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊

(U)  ⊠ ▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊  b6 -3
▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊  b7C -3
b7D -2

~~SECRET~~
2

(U)   To: Los Angeles   From: Los Angeles      b7E -1
      Re: ☒ ▢                05/04/1998

                                                         b7D -2

(U)              ☒ Asset stated that an ABDALLAH AZZAM (NFI) came to
the United States to promote the war in Afghanistan. AZZAM, a
would show photographs and videos while soliciting
donations for the Jihad in Afghanistan. AZZAM was a dynamic     b6 -4,5
speaker, very much like ▢             Asset believ b7C -4,5
that AZZAM's influence is what prompted subject to go to         b7D -2
Afghanistan. ▢          HOSSAM HEMDAN ▢
▢        (NFI) went ▢     to Afghanistan. AZZAM set up
avenues, bank accounts, etc., in assisting those persons who
wanted to leave the United States to fight in Afghanistan. It is
unknown if AZZAM is associated with the organization in New York
that was mentioned previously. Asset stated that AZZAM and two
children were killed by a car bomb in either 1992 or 1993. The
Pakistanian government, in a conspiracy with the CIA, were
believed responsible.

(U)              ☒ Upon his return to the United States, subject told
asset that he wanted to ▢

                                                         b7D -2

(U)              ☒ While living at the ▢
subject heard that ▢                and
would visit the ▢              Subject wanted to get     b6 -3,5
▢                                                        b7C -3,5
▢              Subject was asking for help but nobody woul b7D -2
help him. Even though subject was around a lot of people, not
many liked him. Subject told asset that he had ▢

                                ☒Secret☒

                                   3

SECRET

(U) To: Los Angeles   From: Los Angeles   b7E -1
Re: ~~~~~~~~~~~   05/04/1998

b7D -2

(U) ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

b2
NAJI HAMDAN (199M-LA-165731,   b6 -3,5
closed) had belonged to AL TAWHEED, a support mechanism for   b7C -3,5
HIZBALLAH.   b7D -2
b7E -1

Additional influence by ~~~~~~~~~~~~~~ NAJI
HAMDAN and ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

(U) ~~~~~ In 1991 and 1992, subject became involved in   b7D -2

After late 1994, asset had
no further contact with subject.

(U) ~~~~ Asset was asked to explain what he/she knew about
the founding of the Islamic Center of Hawthorne and any roll
played by HAMAS. Asset stated that the North American Islamic
Trust (NAIT) is the organization handling the money for
establishing new mosques in America. Any money donated for that
cause will go to NAIT who then dispenses it as needed. Asset   b6 -5
identified a photograph of ~~~~~~~~~~~~ indicating he knew him.   b7C -5
(Note: It has been reported that ~~~~~ is the ~~~~~~ of   b7D -2
~~~~~~~~~~ Asset became somewhat defensive about
~~~~~~~~ stating that ~~~~~~~~ has no intention of doing violent
acts in America against Americans, that his interest is in the
Middle East.

(U) ~~~~~ Asset identified a photograph as being MOHAMMAD
ZAKY. Asset stated that he knew ZAKY and that he had died in
Bosnia. ZAKY was active in the Afghan War and believes he would
be involved in violence here.

SECRET

4

(major unknown ), _____ came to the United States in early 1990 and asset believes him to now have a green card. Asset states that BAKIR is so involved in his work that he has no interest in political activities. He has been asked to help in the past but refused. _____ who attends a mosque in the El Toro area, might give donations to certain causes but doesn't believe his involvement would go beyond that.

b6 -5
b7C -5
b7D -2

◆◆

SECRET

(U)  To: Los Angeles  From: Los Angeles
Re: _____  05/04/1998   b7E -1

(U)  _____ Asset identified a photograph as being
SHOHAYEB. Asset stated that SHOHAYEB was a doctor who had a
clinic in Culver City. SHOHAYEB came to America _____ in
the 1980's and associates primarily with Egyptians. Asset
doesn't believe _____ belongs to an organization. Asset
believes _____ is not very proficient in his work and has been
told _____

b6 -5
b7C -5
b7D -2

(U)  _____ Asset identified a photograph as being ESSA OMARY
(dob 1/2/52). Asset stated that _____
subject. OMARY went to Northrup University and attended the El
Huda Mosque with subject. Asset believes OMARY to talk about
violence but would not do it. (Note: During the arrest of subject
in _____ stood in front of the apartment building
intently watching the search of subject's residence and vehicle.
Later that same day, _____ transported subject's _____ downtown to
visit subject in jail.)

b6 -5
b7C -5
b7D -2

(U)  _____ Asset identified a photograph as being _____
HANI. Asset stated that BANI HANI was close to subject and went
to Afghanistan with him. Asset stated that if there is an
underground organization or if something was planned _____
would be involved.

b6 -5
b7C -5
b7D -2

(U)  _____ Asset identified a photograph as being GHASSAN
_____ Asset stated that _____

b6 -5
b7C -5
b7D -2

(U)  _____ Asset identified a photograph as being
_____ Asset stated that _____
ALI SOUSSI, NAJI HAMDAN and HOSSAM HEMDAN have a used auto parts
business in Los Angeles. They receive shipments of damaged cars
from Japan then sell off the parts. The current telephone number
for this business is (213) 357-9939.

(U)  _____ Asset stated that _____ (199H-LA-159493
pending) is currently living at _____
BAKIR is employed at Nichols Laboratory in Orange County. Asset
is unsure of the exact location but believes it is approximately
20 miles south of Mission Viejo. BAKIR works on the machinery
within the laboratory where he averages 60 hours per week. Asset
stated BAKIR obtained a California Board license in the medical

b6 -5
b7C -5
b7D -2



SECRET

5

FBI-ACLU-5



To: Los Angeles   From: Los Angeles
Re: 199M-LA-152793, 05/04/1998

(major unknown.). BAKIR came to the United States in early 1990
and asset believes him to now have a green card. Asset states
that BAKIR is so involved in his work that he has no interest in
political activities. He has been asked to help in the past but
refused. BAKIR, who attends a mosque in the El Toro area, might
give donations to certain causes but doesn't believe his
involvement would go beyond that.

FBI-ACLU-6

# FEDERAL BUREAU OF INVESTIGATION

Precedence: ROUTINE                                      Date:  12/24/1999     b6 -1
                                                                               b7C -1

To:  Los Angeles                        Attn:  SA ▮▮▮▮▮▮▮▮▮▮▮▮
                                                Long Beach RA

From:  ▮▮▮▮▮▮▮ IOC                                                    b2 -1
       Investigative ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ Center (IIOC)             b6 -1
       Contact: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮                                b7C -1

Approved By: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮        b6 -1
                                  b7C -1      **DECLASSIFIED BY 65179/DMH/LRP/bls**
Drafted By:  ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮       **ON 11-17-2010**

(U)  Case ID #:  ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ (Pending)

(U)  Title:  ▮▮▮ Naji Jawdat Hamdan
             NJ-TE-▮▮▮▮▮▮▮

(U)  Synopsis:  To report results of request submitted to Savannah

(U)  Enclosure:  ▮▮▮ IIOC Database printouts are maintained in the
                 ▮▮▮ case file.

(U)  Details:  ▮▮▮ IIOC DATABASE PRINTOUTS HAVE BEEN SENT TO THE
REQUESTER AND WILL BE MAINTAINED AS PERMANENT FILE MATERIAL IN
THE OO CASE FILE.

           Two copies of each form are being submitted with
instructions that ▮▮ designated that you return the
original/signed copy of each request to those ferms, return one copy
to the IIOC and maintain one copy as a serial in your ▮▮ file.

           Searches included are as follows:

           Query on ▮▮▮▮▮▮▮ databases revealed SCAN #45-97-▮▮▮▮
which was tasked in LA in ▮▮▮▮.  It also appears that 12780▮
person from ▮ New Jersey, SS ▮▮ ▮▮▮ or 1501 Shore St., South Gate,
is known to the most recent address for Hamdan.

           A comprehensive report is enclosed re Hamdan which      b6 -5
shows numerous possible addresses.  The same two addresses is       b7C -5
contained above appear to be the most recent addresses for
Hamdan.  Telephone ▮▮▮-▮▮▮-▮▮▮▮ is shown in relation to Naji Jawdat

▮▮▮▮▮▮▮▮▮▮

FBI-ACLU-7
▮▮▮▮ ▮▮ ▮▮▮▮▮ ▮▮▮▮▮ ▮▮
                                                                   b7E -1
                                        ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

(U)   To:  Los Angeles   From:  Savannah ITC
      Re:  _____-LA-165731, 12/24/1999

No record was located for 12708 Ramona St. #J.  No
other current property records were located for Hamdan.

No derogatory _____ beyond of _____ records were located
for Hamdan.

No records were located for _____ Wazria Palace, Inc. which
_____ leased for the three year __.

_____ records were located for Hamdan
with his name _____ _____ _____ _____ at Los Angeles.

____ these searches were negative.

FBI-ACLU-8



FBI-ACLU-9

OPCA-20 (12-3-96)

XXXXXX
XXXXXX
XXXXXX

### FEDERAL BUREAU OF INVESTIGATION
### FOIA/PA DELETED PAGE INFORMATION SHEET

___1___     Page(s) withheld entirely at this location in the file.  One or more of the following
statements, where indicated, explain this deletion.

⊠Deletions were made pursuant to the exemptions indicated below with no segregable
material available for release to you.

| **Section 552** | | **Section 552a** |
|---|---|---|
| ☐(b)(1) | ☐(b)(7)(A) | ☐(d)(5) |
| ☐(b)(2) | ☐(b)(7)(B) | ☐(j)(2) |
| ☐(b)(3)_____ | ☐(b)(7)(C) | ☐(k)(1) |
| _____ | ☐(b)(7)(D) | ☐(k)(2) |
| _____ | ⊠(b)(7)(E)-1 | ☐(k)(3) |
| _____ | ☐(b)(7)(F) | ☐(k)(4) |
| ☐(b)(4) | ☐(b)(8) | ☐(k)(5) |
| ☐(b)(5) | ☐(b)(9) | ☐(k)(6) |
| ☐(b)(6) | | ☐(k)(7) |

☐  Information pertained only to a third party with no reference to the subject of your request
or the subject of your request is listed in the title only.

☐  Document(s) originated with another Government agency(ies).  These documents were
referred to that agency(ies) for review and direct response to you.

_____     Page(s) contain information furnished by another Government agency(ies).  You will be
advised by the FBI as to the releasability of this information following our consultation with the
other agency(ies).

_____     Page(s) withheld inasmuch as a final release determination has not been made.  You will be
advised as to the disposition at a later date.

_____     Page(s) were not considered for release as they are duplicative of _____.

_____     Page(s) withheld for the following reason(s): _____

_____

_____

⊠ The following number(s) is (are) to be used for reference regarding these pages:

FBI-ACLU-10 _____

XXXXXXXXXXXXXXXXXXX
X     Deleted Page(s)      X
X     No Duplication Fee   X
X        for this page     X
XXXXXXXXXXXXXXXXXXX

XXXXXX
XXXXXX

OPCA-20 (12-3-96)

XXXXXX
XXXXXX
XXXXXX

# FEDERAL BUREAU OF INVESTIGATION
## FOIA/PA DELETED PAGE INFORMATION SHEET

___1___     Page(s) withheld entirely at this location in the file.  One or more of the following statements, where indicated, explain this deletion.

⊠Deletions were made pursuant to the exemptions indicated below with no segregable material available for release to you.

| Section 552 | | Section 552a |
|---|---|---|
| ☐(b)(1) | ☐(b)(7)(A) | ☐(d)(5) |
| ☐(b)(2) | ☐(b)(7)(B) | ☐(j)(2) |
| ☐(b)(3)_____ | ⊠(b)(7)(C)-5 | ☐(k)(1) |
| _____ | ☐(b)(7)(D) | ☐(k)(2) |
| _____ | ⊠(b)(7)(E)-1 | ☐(k)(3) |
| _____ | ☐(b)(7)(F) | ☐(k)(4) |
| ☐(b)(4) | ☐(b)(8) | ☐(k)(5) |
| ☐(b)(5) | ☐(b)(9) | ☐(k)(6) |
| ⊠(b)(6)-5 | | ☐(k)(7) |

☐  Information pertained only to a third party with no reference to the subject of your request or the subject of your request is listed in the title only.

☐  Document(s) originated with another Government agency(ies).  These documents were referred to that agency(ies) for review and direct response to you.

_____     Page(s) contain information furnished by another Government agency(ies).  You will be advised by the FBI as to the releasability of this information following our consultation with the other agency(ies).

_____     Page(s) withheld inasmuch as a final release determination has not been made.  You will be advised as to the disposition at a later date.

_____     Page(s) were not considered for release as they are duplicative of _____.

_____     Page(s) withheld for the following reason(s): _____

_____

_____

⊠ The following number(s) is (are) to be used for reference regarding these pages:

FBI-ACLU-11 _____

XXXXXXXXXXXXXXXXXX
X     Deleted Page(s)          X
X     No Duplication Fee    X
X        for this page           X
XXXXXXXXXXXXXXXXXX

XXXXXX
XXXXXX

OPCA-20 (12-3-96)

XXXXXX
XXXXXX
XXXXXX

# FEDERAL BUREAU OF INVESTIGATION
## FOIA/PA DELETED PAGE INFORMATION SHEET

___3___   Page(s) withheld entirely at this location in the file.  One or more of the following statements, where indicated, explain this deletion.

☒Deletions were made pursuant to the exemptions indicated below with no segregable material available for release to you.

| Section 552 | | Section 552a |
|---|---|---|
| ☐(b)(1) | ☐(b)(7)(A) | ☐(d)(5) |
| ☐(b)(2) | ☐(b)(7)(B) | ☐(j)(2) |
| ☐(b)(3)_____ | ☐(b)(7)(C) | ☐(k)(1) |
| _____ | ☐(b)(7)(D) | ☐(k)(2) |
| _____ | ☒(b)(7)(E)-1 | ☐(k)(3) |
| _____ | ☐(b)(7)(F) | ☐(k)(4) |
| ☐(b)(4) | ☐(b)(8) | ☐(k)(5) |
| ☐(b)(5) | ☐(b)(9) | ☐(k)(6) |
| ☐(b)(6) | | ☐(k)(7) |

☐   Information pertained only to a third party with no reference to the subject of your request or the subject of your request is listed in the title only.

☐   Document(s) originated with another Government agency(ies).  These documents were referred to that agency(ies) for review and direct response to you.

_____   Page(s) contain information furnished by another Government agency(ies).  You will be advised by the FBI as to the releasability of this information following our consultation with the other agency(ies).

_____   Page(s) withheld inasmuch as a final release determination has not been made.  You will be advised as to the disposition at a later date.

_____   Page(s) were not considered for release as they are duplicative of _____.

_____   Page(s) withheld for the following reason(s): _____

_____

_____

☒ The following number(s) is (are) to be used for reference regarding these pages:

FBI-ACLU-12-14 _____

XXXXXXXXXXXXXXXXXX
X     Deleted Page(s)     X
X     No Duplication Fee   X
X     for this page         X
XXXXXXXXXXXXXXXXXX

XXXXXX
XXXXXX

OPCA-20 (12-3-96)

XXXXXX
XXXXXX
XXXXXX

# FEDERAL BUREAU OF INVESTIGATION
## FOIA/PA DELETED PAGE INFORMATION SHEET

___3___     Page(s) withheld entirely at this location in the file.  One or more of the following
statements, where indicated, explain this deletion.

⊠Deletions were made pursuant to the exemptions indicated below with no segregable
material available for release to you.

|  | Section 552 | | Section 552a |
|---|---|---|---|
| ☐(b)(1) | ☐(b)(7)(A) | | ☐(d)(5) |
| ☐(b)(2) | ☐(b)(7)(B) | | ☐(j)(2) |
| ☐(b)(3)_____ | ⊠(b)(7)(C)-5 | | ☐(k)(1) |
| _____ | ☐(b)(7)(D) | | ☐(k)(2) |
| _____ | ⊠(b)(7)(E)-1 | | ☐(k)(3) |
| _____ | ☐(b)(7)(F) | | ☐(k)(4) |
| ☐(b)(4) | ☐(b)(8) | | ☐(k)(5) |
| ☐(b)(5) | ☐(b)(9) | | ☐(k)(6) |
| ⊠(b)(6)-5 | | | ☐(k)(7) |

☐  Information pertained only to a third party with no reference to the subject of your request
or the subject of your request is listed in the title only.

☐  Document(s) originated with another Government agency(ies).  These documents were
referred to that agency(ies) for review and direct response to you.

_____     Page(s) contain information furnished by another Government agency(ies).  You will be
advised by the FBI as to the releasability of this information following our consultation with the
other agency(ies).

_____     Page(s) withheld inasmuch as a final release determination has not been made.  You will be
advised as to the disposition at a later date.

_____     Page(s) were not considered for release as they are duplicative of _____.

_____     Page(s) withheld for the following reason(s): _____

_____

_____

⊠ The following number(s) is (are) to be used for reference regarding these pages:

FBI-ACLU-15-17 _____

XXXXXXXXXXXXXXXXXXX
X     Deleted Page(s)     X
X     No Duplication Fee   X
X     for this page         X
XXXXXXXXXXXXXXXXXXX

XXXXXX
XXXXXX

OPCA-20 (12-3-96)

XXXXXX
XXXXXX
XXXXXX

## FEDERAL BUREAU OF INVESTIGATION
## FOIA/PA DELETED PAGE INFORMATION SHEET

___1___      Page(s) withheld entirely at this location in the file.  One or more of the following statements, where indicated, explain this deletion.

⊠Deletions were made pursuant to the exemptions indicated below with no segregable material available for release to you.

| Section 552 | | Section 552a |
|---|---|---|
| ☐(b)(1) | ☐(b)(7)(A) | ☐(d)(5) |
| ☐(b)(2) | ☐(b)(7)(B) | ☐(j)(2) |
| ☐(b)(3)_____ | ☐(b)(7)(C) | ☐(k)(1) |
| _____ | ☐(b)(7)(D) | ☐(k)(2) |
| _____ | ⊠(b)(7)(E)-1 | ☐(k)(3) |
| _____ | ☐(b)(7)(F) | ☐(k)(4) |
| ☐(b)(4) | ☐(b)(8) | ☐(k)(5) |
| ☐(b)(5) | ☐(b)(9) | ☐(k)(6) |
| ☐(b)(6) | | ☐(k)(7) |

☐   Information pertained only to a third party with no reference to the subject of your request or the subject of your request is listed in the title only.

☐   Document(s) originated with another Government agency(ies).  These documents were referred to that agency(ies) for review and direct response to you.

_____    Page(s) contain information furnished by another Government agency(ies).  You will be advised by the FBI as to the releasability of this information following our consultation with the other agency(ies).

_____    Page(s) withheld inasmuch as a final release determination has not been made.  You will be advised as to the disposition at a later date.

_____    Page(s) were not considered for release as they are duplicative of _____.

_____    Page(s) withheld for the following reason(s): _____

_____

_____

⊠ The following number(s) is (are) to be used for reference regarding these pages:

FBI-ACLU-18 _____

XXXXXXXXXXXXXXXXXXX<br>
X   Deleted Page(s)    X<br>
X   No Duplication Fee  X<br>
X     for this page    X<br>
XXXXXXXXXXXXXXXXXXX

XXXXXX
XXXXXX



FBI-ACLU-19



FBI-ACLU-20

FBI-ACLU-21

OPCA-20 (12-3-96)

XXXXXX
XXXXXX
XXXXXX

# FEDERAL BUREAU OF INVESTIGATION
## FOIA/PA DELETED PAGE INFORMATION SHEET

_____   Page(s) withheld entirely at this location in the file.  One or more of the following statements, where indicated, explain this deletion.

☒Deletions were made pursuant to the exemptions indicated below with no segregable material available for release to you.

| **Section 552** | | **Section 552a** |
|---|---|---|
| ☐(b)(1) | ☐(b)(7)(A) | ☐(d)(5) |
| ☐(b)(2) | ☐(b)(7)(B) | ☐(j)(2) |
| ☐(b)(3)_____ | ☐(b)(7)(C) | ☐(k)(1) |
| _____ | ☐(b)(7)(D) | ☐(k)(2) |
| _____ | ☐(b)(7)(E) | ☐(k)(3) |
| _____ | ☐(b)(7)(F) | ☐(k)(4) |
| ☐(b)(4) | ☐(b)(8) | ☐(k)(5) |
| ☐(b)(5) | ☐(b)(9) | ☐(k)(6) |
| ☐(b)(6) | ☐(k)(7) | |

☐  Information pertained only to a third party with no reference to the subject of your request or the subject of your request is listed in the title only.

☐  Document(s) originated with another Government agency(ies).  These documents were referred to that agency(ies) for review and direct response to you.

_____   Page(s) contain information furnished by another Government agency(ies).  You will be advised by the FBI as to the releasability of this information following our consultation with the other agency(ies).

_____   Page(s) withheld inasmuch as a final release determination has not been made.  You will be advised as to the disposition at a later date.

_____   Page(s) were not considered for release as they are duplicative of _____.

__2__   Page(s) withheld for the following reason(s): These pages are illegible and no better copies are available _____

☒ The following number(s) is (are) to be used for reference regarding these pages:

FBI-ACLU-22-23 _____

XXXXXXXXXXXXXXXXXXX
X    Deleted Page(s)      X
X    No Duplication Fee   X
X       for this page      X
XXXXXXXXXXXXXXXXXXX

XXXXXX
XXXXXX

REPLY FORM - INVESTIGATIVE INFORMATION SERVICES

To help us better serve your investigative needs, please
complete and return to:

FBI, Savannah Information Technology Center
240 East Bryan St., Savannah, GA  31401 (Federal Express)
P. O. Box 316, Savannah, Georgia  31402-0316 (U. S. Post Office)

b6  -1
b7C -1

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 11-17-2010 BY 65179/UC/LRP/bls

(01/26/1998)



## FEDERAL BUREAU OF INVESTIGATION

**Precedence:** PRIORITY                    **Date:** 12/24/1999

**To:** Los Angeles

**From:** Los Angeles                    DECLASSIFIED BY 65179/DMH/LRP/bls
          LBRA Squad 4                    ON 11-17-2010
          **Contact:**
                                          b6 -1
**Approved By:**                          b7C -1

(U) **Drafted By:**

(U) **Case ID #:** (S) 199M-LA-165731 (Pending)

(U) **Title:** (S) NAJI JAWADI HEMDAN
                   IT - Other

(U) **Synopsis:** (S) Surveillance of 12705 Ramona Street #J, Hawthorne, California.

(U) (S) Derived From: G-3                 b6 -2
        Declassify On: X-1                b7C -2

(U) **Details:** (S) _____ is a Detective with the Long Beach Police Department and is assigned to the Long Beach component of the Federal Bureau of Investigation (FBI) Metropolitan Violent Crimes Task Force.

(U) (S) On 12/24/1999 at approximately 12:15 p.m.        b6 -1,2
Detective (Det.) _____ and Special Agent (SA) _____   b7C -1,2
conducted a physical surveillance at 12705 Ramona Street,
Apartment #J, Hawthorne, California to determine if Hemdan
resided at the location.

(U) (S) SA _____ and Det. _____ observed the mail box    b6 -1,2
marked with the letter "J" to have the name Naji Hamdan affixed  b7C -1,2
to the box.

(U) (S) While walking past the apartment labeled "J", SA
_____ and Det. _____ observed the windows to be open and heard   b6 -1,2
voices and a television set on.                                     b7C -1,2

(U) (S) During a search of the underground garage SA _____
and Detective _____ observed a wooden box affixed to the wall

SECRET

FBI-ACLU-25

                                                    b7E -1



SECRET

(U)    To: Los Angeles   From: Los Angeles
       Re:  ☒  199M-LA-165731, 12/24/1999

with the letter "J" marked on the front and was locked with a
padlock. No other markings were on the box. No vehicles known
to belong to Hamden were located in the garage or parked on the
street in front of the apartment complex. The surveillance was
concluded at that point.



SECRET

2



SECRET/ORCON/NOFORN

## FEDERAL BUREAU OF INVESTIGATION

Precedence:  IMMEDIATE                    Date: 12/30/1999

                                                                b6 -1
To:  Counterterrorism        Attn:  UC                          b7C -1
                                    SSA
                                    SSA
                                                                b2
                                                                b7E -2

New York            DECLASSIFIED BY 65179/DMH/LRP/bls
                    ON 11-17-2010
Seattle

From:  Los Angeles
       Long Beach RA/Squad 4
       Contact: SA                                              b6 -1
Approved By:                                                    b7C -1

Drafted By:                      ms

Case ID #:  (S)   265A-NY-259391   (Pending)
     (U)          199N-NY-257503   (Pending)
                  265A-SE-83340    (Pending)
                  199M-LA-165731   (Pending)

(U)  Title:  (S)  USAMA BIN LADEN
                  AOT-IT
                  OO:NY

                  USAMA BIN LADEN
                  IT-UBL/ALQAEDA
                  OO:NY
                                          b6 -3
                                          b7C -3
                  AOT-IT
                  OO:SE

                  NAJI JAWADI HAMDAN
                  IT-OTHER
                  OO:LA

(U)  Synopsis:  (S)  Results of interview of NAJI JAWADI HAMDAN on
     12/30/1999.

(U)  (S)  Derived From:  G-1
          Declassify On:  X-3

SECRET/ORCON/NOFORN

                                                                b7E -1

~~SECRET~~/ORCON/NOFORN

To:  Counterterrorism   From: Los Angeles
(U) ···· Re: ····  265A-NY-259391, 12/30/1999

(U) ···· **Details:**  On 12/30/1999, NAJI JAWADI HAMDAN, aka NAJI JAWADI
HEMDAN, born 05/26/1966, in Lebanon, address 12705 Ramona Street,
Apt. J, Hawthorne, California, was interviewed at his residence
by FBI Special Agents (SAs) [          ] and [          ]     b6 -1,6
and U.S. Customs Service SA [          ]  After being advised  b7C -1,6
of the identity of the interviewing agents and the nature of the
interview, he provided the following information:

(U) ········  HAMDAN advised that he was born in Lebanon and
came to the U.S. in 1985.  HAMDAN said that he went to school in
the U.S. and had previously worked at Northrop.  HAMDAN stated
that he currently owns his own business selling new and used
Honda and Accura parts.  A business card handed to the agents
shows that his business is HondAcura Palace Inc., 1800 E. 55th
Street, Los Angeles, California, 90058, telephone number 323-357-
9999, FAX number 323-357-0406, e-mail addresses
info@hondacura.com and naji@mainnet.net, web site
http://www.hondacura.com.

(U) ········  HAMDAN advised that he has never met USAMA BIN
LADEN and does not know anyone who knows USAMA BIN LADEN.  HAMDAN
also stated that he was unaware of anyone, either in the United
States or overseas, that had plans of disrupting the Millennium
or commiting terrorist acts.  HAMDAN indicated that he is only
aware of the name, USAMA BIN LADEN, and any disruption of the
Millennium from what he has seen on television.  HAMDAN said that
he attends the Islamic Center of Hawthorne which he indicated is
a family oriented mosque.

(U) ········  HAMDAN was asked by agents to call the FBI if he    b6 -1
should hear anything of interest to the FBI.  HAMDAN handed       b7C -1
business cards to the agents and SA [          ] handed his business
card to HAMDAN in case HAMDAN needed to contact the FBI.

~~SECRET~~/ORCON/NOFORN

2

~~DRAFT~~  FBI-ACLU-28

SECRET/ORCON/NOFORN 

# FEDERAL BUREAU OF INVESTIGATION

**Precedence:** ROUTINE                              **Date:** 12/26/1999

**To:** Los Angeles                 **Attn:** Closed files
                                            IMA- NSD5
**From:** Los Angeles
         LBRA, Squad 4
         **Contact:** SA ▮▮▮▮▮▮▮▮▮▮▮▮▮▮     b6 -1
                                            b7C -1
**Approved By:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**Drafted By:** ▮▮▮▮▮▮▮▮▮▮ :cm           DECLASSIFIED BY 65179/DMH/LRP/bls
                                          ON 11-17-2010

(U)     **Case ID #:** ✕ 199H-LA-165731   (Pending)

(U)     **Title:** ✕  NAJI J. HEMDAN;
                      IT-OTHER (Egypt);
                      OO: Los Angeles

(U)     **Synopsis:** ✕   REQUEST OPENING AND REASSIGNMENT OF CASE

(U)     ✕   **Derived From:** G-3
             **Declassify On:** X-1                          b2
                                                            b7E -3    b2
          (U)   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮              b6 -1
                                                                      b7C -1
**Details:** (S) Based on events on ▮▮▮▮▮▮▮▮ Los Angeles,  b7E -1
Long Beach RA has reviewed closed files and it is requested that
the above case be reopened and assigned to SA ▮▮▮▮▮▮▮ LBRA-4.

(U)        ✕   Based on the events, on ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮ aka ▮▮▮▮▮▮▮▮▮▮▮▮▮ aka ▮▮▮▮▮▮▮▮ aka ▮▮▮
▮▮▮▮▮▮ aka ▮▮▮▮▮▮▮ an Algerian national, attempted to enter   b2
the United States via ▮▮▮▮▮. The subject was ultimately questioned by U.S. Customs   b6 -3
officials and his vehicle searched. During the search, Customs   b7C -3
officials discovered explosive materials consisting of a white,   b7E -1
powder-type substance which was later determined to be urea
sulfate and nitroglycerine, as well as fusing components. ▮▮▮▮▮
is currently in the custody of U.S. Immigration authorities and
the evidence obtained from the above-noted search is in the
possession of the FBI.

(U)        ✕   According to investigation conducted thus far,   b6 -3
▮▮▮▮▮▮▮ is believed to be linked to a terrorist cell identified as   b7C -3
the ALGERIAN ARMED ISLAMIC GROUP (GIA.)  The GIA is suspected of
having conducted numerous bombings in Algeria, as well as a
series of bombings of the Paris subway system in 1995 and

SECRET/ORCON/NOFORN

▮▮▮▮▮▮▮▮▮▮▮▮          b6 -1         b6 -1
                     b7C -1        b7C -1

          b2
          b7E -1     b2
                     b7E -1

                                                     b2
                                                     b7E -1

356 cm 01 EC



SECRET/ORCON/NOFORN

To: Los Angeles From: Los Angeles
(U) Re: ☒ 199H-LA-165731, 12/26/199912/26/1999

possibly 1996. Additionally, intelligence indicates that GIA extremists have undergone terrorist training in Pakistan sponsored by UBL's Islamic Army.

(U) ☒ According to intelligence received from Legat Ottawa, ☐ was working with an accomplice. During searches of ☐ a map of Los Angeles was found. In ☐ rental vehicle where the explosive components were found, also found were maps and tourist guides to Washington, Oregon and California. A possible accomplice was identified as ☐ aka ☐ who is the ☐ The names, addresses and telephone numbers were found in ☐ address book in June, 1996 and are believed to have some contact in Long Beach R.A. territory.

b2
b6 -3,5
b7C -3,5
b7E -1

(U) ☒ Background: The investigation was predicated upon information that the subject is an associate of ☐ HOSAM HEMDAN, ☐ arrested on February 18, 1993 by Los Angeles Police Department on charges of credit card fraud.

b2
b6 -5
b7C -5
b7E -3

(U) ☒ The captioned subject was the person paying rent for Unit #212 at 733 Hindry Ave., Inglewood California. This unit was designated as "El Huda Mosque" which in turn was visited and used as a ☐ during his visit to Los Angeles in ☐

b2
b6 -5
b7C -5
b7E -1

(U) ☒ On ☐ The investigation was authorized based on information that ☐ was a member of Al-Gama Al-Islamiyyah (IG), a violent Islamic fundamentalist group which was responsible for the assassination of the Egyptian president ANWAR SADAT, the WORLD TRADE CENTER bombing in New York City in 1993. Prior to ☐ arrest, he remained in contact with ☐ and other known members of the IG in the Sudan, Jordan and the United States.

b2
b6 -5
b7C -5
b7E -3

(U) ☒ ☐ The investigation was authorized based on information that ☐ was a member of the IG in Los Angeles.

(U) ☒ ☐ HOSSAM HEMDAN. HOSSAM, the brother of the ☐

b2
b7E -3

SECRET/ORCON/NOFORN

2

SECRET

FBI-ACLU-30

~~SECRET~~

To:   Los Angeles   From:  Los Angeles
(U)   Re:   ╳   199H-LA-165731, 12/26/199912/26/1999

b6 -5
b7C -5

captioned subject, was one of the close circle of followers who
met with ▓▓▓▓▓▓▓▓▓▓▓ during his visits to Los Angeles
in 1992.

(U)   ╳   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ for the   b2
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓   b7E -3
captioned subject on ▓▓▓▓▓▓▓▓▓▓▓ and closed on September
24, 1997.

(U)   ╳   This reinvestigation will determine if the
captioned subject is engaged in any terrorist activities stemming
from the recent events on ▓▓▓▓▓▓▓▓▓▓▓   b2
b7E -3

~~SECRET~~/ORCON/NOFORN

3



FBI-ACLU-31

DECLASSIFIED BY 65179/DMH/LRP/bls
ON 11-19-2010



 **U.S. Department of Justice**

Federal Bureau of Investigation

In Reply, Please Refer to
File No.

11000 Wilshire Boulevard #1700
Los Angeles, CA 90024

March 22, 2000

(U) ——————————— (S) NAJI J. HAMDAN;

IT - OTHER(EGYPT)

OO: Los Angeles

b2
b7E -3

(U)

  (U) This communication is classified "SECRET" in its entirety unless otherwise marked.

Identity of Subject:

| | |
|---|---|
| Name: | NAJI JAWDAT HAMDAN |
| Alias: | Nagi Jamal Hemdan |
| Sex: | Male |
| Race: | White |
| DOB: | 05/26/1966 |
| POB: | Lebanon |
| SSAN: | 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 |
| Height: | 5'07" |
| Weight: | 172 lbs. |
| Hair: | Brown |
| Eyes: | Brown |
| Driver's Lic.: | CA - C6017864 |
| Marital Status: | Married |
| Address | 12705 Ramona Street, Apt. J |
| | Hawthorne, California |
| Business: | HondAcura Palace Inc. |
| | 1800 E. 55th Street |
| | Los Angeles, California, 90058 |

Basis for Investigation: (S) This investigation was predicated upon information that the subject    HOSAM HEMDAN,    arrested on February 18, 1993 by Los Angeles Police Department on charges of credit card fraud.

b2
b6 -3
b7C -3
b7E -3

1

SECRET

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

b7E -1

O&A AFG OR LHM

194-LA-166731-A7

<u>NAJI JAWDAT HAMDAN</u>

b6 -5
b7C -5

(U)      ✗      The captioned subject was the person paying rent for Unit #212 at 733 Hindry Ave., Inglewood California. This unit was designated as "El Huda Mosque" which in turn was visited and used as a departure point for      during his visit to Los Angeles in

(U)      ✗      On      The investigation was authorized based on information that      was a member of Al Gama Al-Islamiyyah (IG), a violent Islamic fundamentalist group which was responsible for the assassination of the Egyptian president ANWAR SADAT, the WORLD TRADE CENTER bombing in New York City in 1993. Prior to      arrest, he remained in contact with      and other known members of the IG in the Sudan, Jordan and the United States.

b2
b6 -3,5
b7C -3,5
b7E -3

(U)      ✗      The investigation was authorized based on information that      was a member of the IG in Los Angeles.

b2
b6 -3
b7C -3
b7E -3

(U)      ✗      HOSSAM HEMDAN. HOSSAM, the brother of the captioned subject, was one of the close circle of followers who met with      during his visits to Los Angeles in

(U)      ✗      captioned subject on      and      and closed on September 24, 1997.

b2
b7E -3

(U)      ✗      On December 14, 1999,      aka      aka      aka      an Algerian national, attempted to enter the United States via      The subject was ultimately questioned by U.S. Customs officials and his vehicle searched. During the search, Customs officials discovered explosive materials consisting of a white, powder-type substance which was later determined to be urea sulfate and nitroglycerine, as well as fusing components.      is currently in custody.

b2
b6 -3
b7E -3

(U)      ✗      According to investigation conducted thus far,      is believed to be linked to a terrorist cell identified as the ALGERIAN ARMED ISLAMIC GROUP (GIA.) The GIA is suspected of having conducted numerous bombings in Algeria, as well as a series of bombings of the Paris subway system in 1995 and

b6 -3
b7C -3

2

~~SECRET~~



<u>NAJI JAWDAT HAMDAN</u>

possibly 1996. Additionally, intelligence indicates that GIA extremists have undergone terrorist training in Pakistan sponsored by UBL's Islamic Army.

(U) _____ According to intelligence received from Legat Ottawa, _____ was working with an accomplice. During searches of _____ a map of Los Angeles was found. In _____ rental vehicle where the explosive components were found, also found were maps and tourist guides to Washington, Oregon and California. A possible accomplice was identified as _____ aka _____ who is the _____ b6 -3,5
b7C -3,5
b7E -3

The names, addresses and telephone numbers were found in _____ address book in June, 1996 and are believed to have some contact in Long Beach R.A. territory.

(U) _____ (⨯ The reopening of this investigation on December 22, 1999, was to try to determine if the captioned subject is engaged in any terrorist activities stemming from the recent events on _____

(U) <u>Investigation to Date:</u> ⨯ On December 23, 1999, a check with the California Department of Motor Vehicles (DMV), showed that HAMDAN lives at 12705 Ramona Street, Apt. J, Hawthorne, California, 90250, and owns a 1987 Nissan pickup truck, California license 5M14526.

(U) _____ (⨯ On December 24, 1999, a physical surveillance of 12705 Ramona Street, Hawthorne, California, was conducted. A mailbox at this address with the letter "J" was observed with the name NAJI HAMDAN affixed to the box.

(U) _____ ⨯ Checks conducted by Savannah Information Technology Center (SITC) showed that HAMDAN has a valid Social Security Number, 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, issued in California in 1985. No bankruptcy, judgment or lien records were located for HAMDAN. A record was located that showed HAMDAN as the President of Hondacura Palace, Inc. Three border crossing records were located for HAMDAN with the most recent being November, 27 1999.

(U) _____ (S) On December 30, 1999, NAJI JAWADI HAMDAN, aka NAJI JAWADI HEMDAN, born 05/26/1966, in Lebanon, address 12705 Ramona Street, Apt. J, Hawthorne, California, was interviewed at his residence by FBI and U.S. Custom Service Special Agents (SAs). After being advised of the identity of the interviewing agents and the nature of the interview, he provided the following information:

3

<del>SECRET</del>



NAJI JAWDAT HAMDAN ~~SECRET~~

(U)     HAMDAN advised that he was born in Lebanon and came to the U.S. in 1985. HAMDAN said that he went to school in the U.S. and had previously worked at Northrop. HAMDAN stated that he currently owns his own business selling new and used Honda and Accura parts. A business card handed to the agents shows that his business is HondAcura Palace Inc., 1800 E. 55th Street, Los Angeles, California, 90058, telephone number 323-357-9999, FAX number 323-357-0406, e-mail addresses info@hondacura.com and naji@mainnet.net, web site http://www.hondacura.com.

(U)     HAMDAN advised that he has never met USAMA BIN LADEN and does not know anyone who knows USAMA BIN LADEN. HAMDAN also stated that he was unaware of anyone, either in the United States or overseas, that had plans of disrupting the Millennium or committing terrorist acts. HAMDAN indicated that he is only aware of the name, USAMA BIN LADEN, and any disruption of the Millennium from what he has seen on television. HAMDAN said that he attends the Islamic Center of Hawthorne which he indicated is a family oriented mosque.

(U)     There was no information obtained in this investigation that indicated that HAMDAN was involved with the events that took place on December 14, 1999. Therefore, Los Angeles is closing this investigation. Should any information be discovered that shows that captioned subject has been engaging in terrorist activities, Los Angeles will review the information and determine if this case should be reopened.

4

~~SECRET~~



FBI-ACLU-35

SECRET

FEDERAL BUREAU OF INVESTIGATION 

Precedence: ROUTINE                      Date: 03/22/2000

To: National Security          Attn: NS-3C

From: Los Angeles
      Long Beach/Squad 4
      Contact: SA

DECLASSIFIED BY 65179/DMH/LRP/bls
ON 11-17-2010

b2 -1
b6 -1
b7C -1

Approved By:                              b6 -1
                                          b7C -1

(U)  Drafted By:                    afg

(U)  Case ID #:      199M-LA-165731  (Closed)

(U)  Title:      (U)  NAJI J. HAMDAN;
                      IT - OTHER(EGYPT)

(U)  Synopsis:       Close case.  Closing LHM for National Security on
     captioned subject.

(S)  Derived From : G-3
     Declassify On: X-1

(U)                                                            b2
                                                              b7E -3

(U)  Enclosures:       For National Security, five (5) copies of
     closing LHM for review.

(U)  Details:        Enclosed for National Security are five copies of
     the closing LHM for review.

**

Close
4
3/28/00

SECRET

SECRET

b7E -1

199M-LA-165731-48

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 03-09-2011 BY 65179/DMH/BAW/STP/bls

PAGE 001   12/23/99   19:58:45 FBLP PRINT REQUESTED BY TERMINAL FBL2
TO: FBL2   FROM: CLETS                 12/23/99   19:58:39
IN
DATE:12-23-99*TIME:1958*

MATCHED ON:*L/N*E/NX M1

DMV RECORD FOR LAW ENFORCEMENT USE ONLY

DL/NO:C601788#*B/D:05-26-1966*NAME *HAMDAN NAJI JAWDAT*
RES/ADDR: AS OF 11-01-97:12705 RAMONA ST J HAWTHORNE 90250*
OTH/ADDR AS OF 04-21-97:4448 W EL SEGUNDO BLVD APT 205 HAWTHORNE *
AKA:HEMDAN NAGI JAMAL*

IDENTIFYING INFORMATION:

SEX:MALE*HAIR:BROWN*EYES:BRN*HT:5-07*WT:172*

ID CARD MLD:00-00-00*EXPIRES:05-26-96*

LIC/ISS:04-21-97*EXPIRES:05-26-01*CLASS:C NON-COMMERCIAL*
ENDORSEMENTS:NONE*

LATEST APP:

PAGE 002

DL TYPE:RENEWAL*ISS/DATE: 04-21-97*OFFICE: HAW*BATES:MAG*


LICENSE STATUS:
    VALID*

DEPARTMENTAL ACTIONS:
NONE

CONVICTIONS:
NONE

FAILURES TO APPEAR:
NONE

ACCIDENTS:
NONE

END

ACLU - Hamdan-37

b7E -1

1991A-LA-165731 - 49

-1-

```
PAGE 001  12/23/99  20:02:45 FBLF PRINT REQUESTED BY TERMINAL FBL2
TO: FBLE  FROM: CLETS           12/23/99  20:02:38
IN
DATE: 12/23/99 TIME: 20:02
REG VALID FROM: 03/31/99 TO 03/31/00
LIC:  SMI4526 YRMD:87 MAKE:NISS BTM :PK VIN :JN6ND11S0HW000472
R/O :HAMDAN NAJI J, 12705 RAMONA AVE APT J CITY:HAWTHORNE C.C.:19
ZIP#:90250
SOLD:00/00/88 RCID:03/18/99 OCID:03/14/97 LOCD:9

TYPE:31 POWR:G AXLE:2 WGHT:02715 VEH :32 BODY:P CLAS:BM
REG STATUS:
01/05/1999 NO RENEWAL NOTICE EXTRACTED
03/20/99 SMOG DUE 03/31/01

03/04/97 PREV LIC     067393


CLEARANCE INFORMATION RECORDS:
OFFICE   WORK DATE   TECH/ID   SEQ #   VALUE    FICHE DATE   TTC
  172    12/15/88      P1      0021   00000.00  00/00/00     H00
  009    03/04/97      F4      0020   00061.00  00/00/00     F00
  148    03/03/98      49      5540   00064.00  00/00/00     P0T
  606    03/18/99      42      0033   00060.00  00/00/00     H05



PAGE 002
END
```

ACLU - Hamdan-38

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 03-09-2011 BY 65179/DMH/BAW/STP/bls

PAGE 001   12/23/99   20:07:24 FBLP PRINT REQUESTED BY TERMINAL FBL2
TO: FBL2   FROM: LWS        1W     12/23/99   20:06:24
*INFO* —  HAMDAM NAJI J            NO HIT

PAGE 002
TO: FBL2   FROM: CLETS            12/23/99   20:06:25
1W
R.OH.CAP.BILB00.NAM/HAMDAN, NHJ
2 .111 SEX INVALID DATA

ACLU - Hamdan-39

PAGE 003
TO: FBL2   FROM: CLETS                    12/23/99   20:06:28
16
CAFBILB00   RE: GGH.CAFBILB00.NAM/HAMDAN, NAJI
RESPONSE TO GGH INQUIRY

NO HISTORY RECORD IN AFS
END AFS RESPONSE.

PAGE 004
TO: FBL2   FROM: CLETS                    12/23/99   20:06:29
16
DATE: 12/23/99 TIME: 20:06
REG VALID FROM: 03/31/99 TO 03/31/00
LIC#:3M14526 YRMD:87 MAKE:NISS BTM :PK VIN :JN6ND11S0HW000473
R/O :HAMDAN NAJI J, 12705 RAMONA AVE APT J CITY:HAWTHORNE C.C.:19
ZIP#:90250
SOLD:00/00/00 RDID:03/18/99 GDID:03/14/97 LDID:9

REC STATUS:
01/05/1999 NO RENEWAL NOTICE EXTRACTED
03/20/99 SMOG DUE 03/31/01

03/04/97 PREV LIC       06/353

END

ACLU - Hamdan-40

PAGE 005
TO: FBL2   FROM: CLETS                    12/23/99   20:06:30
IN
DATE:12-23-99*TIME:20:06*

MATCHED ON:*L/N*F/N* DT* BD

DMV RECORD FOR LAW ENFORCEMENT USE ONLY

DL/NO:C601/864*B/D:05-26-1966*NAME:HAMDAN NAGI JAWDAT*
RES/ADDR: AS OF 11-01-97:12705 RAMONA ST J HAWTHORNE 90250*
OTH/ADDR AS OF 04-21-97:4448 W EL SEGUNDO BLVD APT 205 HAWTHORNE *
AKA:HEMDAN NAGI JAMAL*

IDENTIFYING INFORMATION:

SEX:MALE*HAIR:BROWN*EYES:BRN*HT:5-07*WT:172*

ID CARD MLD:00-00-00*EXPIRES:05-26-98*

LIC/ISS:04-21-97*EXPIRES:05-26-01*CLASS:C NON-COMMERCIAL*
ENDORSEMENTS:NONE*

LATEST APP:

PAGE 006
DL TYPE:RENEWAL*ISS/DATE: 04-21-97*OFFICE: HAW*BATES:MAG*


LICENSE STATUS:
   VALID*

DEPARTMENTAL ACTIONS:
NONE

CONVICTIONS:
NONE

FAILURES TO APPEAR:
NONE

ACCIDENTS:
NONE

END

ACLU - Hamdan-41

PAGE 007
TO: FBLZ   FROM: CLETS                    12/23/99   20:06:30
IH
CAFBILB00   RE: QVC.CAFBILB00.NAM/HAMDAN, NAJI
NO MATCH NAM FIELD
NO WANTS
INSUFFICIENT DATA FOR NCIC CHECK
INQUIRY MADE TO RESTRAINING ORDER SYSTEM
********* END OF WPS MESSAGE *********

PAGE 008
TO: FBLZ   FROM: CLETS                    12/23/99   20:06:30
IH
RE:QMA.CAFBILB00.NAM/HAMDAN, NAJI        DATE:19991223 TIME:20:06:28
RESTRICTED-DO NOT USE FOR EMPLOYMENT,LICENSING OR CERTIFICATION PURPOSES
ATTN:SA MAK-199-FBLZ

RECORD #                 NHM              DOB    S X HGT EYE HAI TYP
MJ7701383 HAMDAN,NAJI JAWDAT             19660326 M X 507 BRO BLK APP

    *    *    *    *    *    *   END OF MESSAGE   *    *    *    *    *    *    *

ACLU - Hamdan-42

PAGE 009
TO: FBL2   FROM: CLETS                12/23/99   20:06:30
1R
CAFBILB00   RE: QVC.CAFBILB00.NAM/HAMDAN,NAJI J.SEX/X.AGE/33
NO MATCH NAM FIELD
NO SUPERVISED RELEASE RECORDS
********* END OF SUPERVISED RELEASE FILE MESSAGE *********

PAGE 010
TO: FBL2   FROM: CLETS                12/23/99   20:06:31
1W
GYYX.CAFBILB00   RE: QRR.CAFBILB00.NAM/HAMDAN,NAJI J.DOB/19500226.SEX/X.RUG/?
NO MATCH NAM FIELD
NO RESTRAINING ORDERS
********* END OF DVROS MESSAGE *********

ACLU - Hamdan-43

```
PAGE 011
TO: FBL2   FROM: CLETS                12/23/99  20:06:31
1W
BYYX.CAFBILB00   RE: QRR.CAFBILB00.NAM/HAMDAN,NAJI J.AGE/33.SEX/X.RUS/Y
NO MATCH NAM FIELD
NO RESTRAINING ORDERS
********** END OF DVROS MESSAGE **********
```

```
PAGE 012
TO: FBL2   FROM: NCIC                 12/23/99  20:06:31
IJ
ILB1
CAFBILB00

NO NCIC WANT NAM/HAMDAN,NAJI J DOB/19660326
```

ACLU - Hamdan-44

~~SECRET~~

# FEDERAL BUREAU OF INVESTIGATION

Precedence: ROUTINE                    Date: 09/19/2005

To: Cairo                    Attn: Legat Joseph Brent
                                   ALAT

    Counterterrorism        Attn:
                                   SSA                          b2
                                   IA                           b6  -1
    Los Angeles             Attn: FIG/SA                        b7C -1
                                   JTTF                         b7E -2
                                   SA
                                   SA
                                   SA
                                   SA
                                   SA
                                   SA

    Sacramento              Attn: JTTF/SA
    Phoenix                 Attn: JTTF/SA
    Cincinnati              Attn: JTTF/SA
    New York                Attn: JTTF
    San Francisco           Attn: JTTF

                                                               b2  -1
    From:  Los Angeles, California                             b6  -1
           CT-2                                                 b7C -1
           Contact: SA

Approved By:                                    b6  -1
                                                b7C -1

Drafted By:                          tpm (272tpm03.ec)

Case ID #:
             (S)
             (S)
             (S)
             (S)
  (U)        (S)                                b7E -1
             (S)
             (S)
             (S)
             (S)
             (S)

                    ~~SECRET~~

                                     ALL INFORMATION CONTAINED
                                     HEREIN IS UNCLASSIFIED EXCEPT
                                     WHERE SHOWN OTHERWISE  b7E -1
DATE: 11-17-2010
CLASSIFIED BY 65179/DMH/LRP/bls
REASON: 1.4 (c)
DECLASSIFY ON: 11-17-2035

~~SECRET~~

To:  Cairo  From:  Los Angeles, California      b7E -1
(U)  Re:                       09/19/2005

b7E -1

(U)

199M-LA-165731  (closed),GC

b7E -1

(U)  Title:                                    b6 -3
                                               b7C -3

IT-UBL/AL-QAEDA

(U)                                            b6 -3
                                               b7C -3

~~SECRET~~

2

FBI-ACLU-46

SECRET

(U)  To:  Cairo   From:  Los Angeles, California
     Re:  ⊠                  09/19/2005          b7E -1



(U)

NAJI JAWDAT HAMDAN

b6 -3
b7C -3

b6 -3
b7C -3

(U)  Synopsis:  ⊠  Summary of milestones for captioned case travel to
     Cairo and Tripoli.

(U)  ⊠  Derived From:  G-1
         Declassify On:  X1

SECRET

3

FBI-ACLU-47

SECRET

(U)  To:  Cairo   From:  Los Angeles, California
     Re:                         09/19/2005        b7E -1

(U)  Reference:   (1)                              b7E -1
                  (2)
                  (3)

(S)                                                b1

(S)

**Details:** (U) On 09/09/2005, the following FBI personnel    b2
departed for Cairo, Egypt in support of captioned case:        b6 -1
                                                               b7C -1
SSA                                                            b7E -2
IA
LA                  FBIHQ
SA                  FBI Los Angeles.

(S)        (U) On 09/10/2005, the aforementioned FBI personnel
     arrived in Cairo.

(S)        (U) On 09/11/2005, FBIHQ and FBI Los Angeles        b1
     conducted an in-brief with ALAT            The FBI also   b6 -1,3
(S)  conducted an in-brief with                                b7C -1,3
           Also on this date, ALAT          conducted final
(S)  coordination via secure phone with

           On 09/12/2005, the FBI conducted an in-brief

(S)                                                            b1
                                                              b6 -3
                                                              b7C -3

(S)                                                            b1
                                                              b6 -3
                                                              b7C -3

                                                      was a

SECRET
4

FBI-ACLU-48

(U)   To: Cairo  From: Los Angeles, California
      Re: ✗                        09/19/2005              b7E -1

(S)   student from Yemen. _____ petitioned the Libyan
      government for assistance and permission for _____ to
      come back to Libya. The Libyan government granted this
      request. _____ and was arrested based on          b1
      information from another detainee named                   b6 -3,5
      _____                              implicated    b7C -3,5
      _____ in the plot to bomb the American Embassy in Sanaa,
      Yemen. After the Libyan Internal Security Organization (ISO)
      (the Libyan equivalent of the FBI) opened an investigation on
      _____ he was arrested and interviewed. _____ was arrested
      for transporting weapons from Yemen into Libya. It is illegal
      to possess weapons in Libya. The weapons consisted of _____
      ammunition. _____ told the Libyans that he brought the
      weapons to Libya so he can kill Americans when they arrive.
      _____ used a container to transport the weapons and his
      personal belongings. _____
      Jihad camps. _____ has a relationship with the Muslim
      Brotherhood and the Libyan Islamic Fighting Group (LIFG).
      _____ has had contact with Jihadist individuals who were of
      Egyptian and Yemeni descent.

(U)   ✗ On 09/14/2005, the FBI conducted the first             b2
      intelligence debrief of subject _____ (see            b6 -3
      Reference (1)). _____ was brought into the room in leg   b7C -3
      shackles and hand cuffs, and his eyes were blind-folded. At  b7E -1
      the request of the FBI, _____ hand cuffs and blind-fold
      were removed and he was provided water and food. FBIHQ
      determined that this would be an _____
      _____ requested an attorney which the host nation did not provide at
      that time.

(S)   _____
      ✗_____
      _____ the Libyan case against
      _____ was strong and if convicted _____ can receive ten to twenty  b1
      years in jail. The weapons were found in _____ house in a  b6 -3
      hole in the floor. _____ said he did not distribute the  b7C -3
      weapons to anyone else.

(S)   _____
      _____
      _____


SECRET
5

FBI-ACLU-49

SECRET

(U)  To:  Cairo  From:  Los Angeles, California
Re:  ✗                         09/19/2005                    b7E -1

(U)          On 09/15/2005, the FBI conducted ✗          (see          b2
Reference (2) followed by the          (see Reference (3)).  Again,    b6 -3,5
subject          was brought into the room in leg shackles and hand   b7C -3,5
cuffs  and his eyes were blind-folded.  At the request of the         b7E -1
FBI,          hand cuffs and blind fold were removed and he
was provided water and food.          seemed to be under
something akin to house arrest, as he walked into the
interview room with neither a blind fold nor restraints.
FBIHQ determined that both of these interviews would be



(U)  In summary,          said he brought the weapons
from Yemen to Libya for personal protection and because he was
a gun collector.          said he lied to the Libyans about
wanting to use the guns to kill Americans because he was under
"pressure" (NFI)          denied involvement in the plot to
attack the American Embassy in Sanaa.  According to
the extent of his participation was providing room and board
to the individuals who devised the plot, who happened to live    b6 -3,5
in the area and would spend time talking at          residence.    b7C -3,5
          I also admitted to acquiring a passport which
was altered for          LNU who was coming to Yemen to
construct the bombs for the attack.          admitted to being
a Muslim Brotherhood member and said the Brotherhood was a
peaceful organization.          denied being a member of the
LIFG, Al Gama Al Islamiyah, or Islamic Jihad member.
confirmed that he escorted          from
SHARIF KAMAL EID
(deceased), who          described as having the same thoughts
as Al-Gama Al-Islamiyah, Jama'at Islamiyah  and Muslim
Brotherhood.



(U)          denied possessing knowledge of any
current threats to U.S. persons, facilities, or interests at
home or abroad.          did admit to knowing two individuals
named          who know          and are
jihadist for          cause.          and          visited    b6 -3,5
                                                                        b7C -3,5
          and          said they were going to
Iraq.  Prior to their departure,          told          that a cell
in Somalia was plotting to attack an American military base in

SECRET

6

FBI-ACLU-50

SECRET

(U)  To:  Cairo   From:  Los Angeles, California
     Re:                        09/19/2005                    b7E -1

Djibouti.  The Somalian cell consisted of approximately ten to
fifteen people.  A Yemeni cell sent money to the Somalian cell
for a planned attack on two occasions.  The first occasion was
a wire transfer of one thousand two-hundred USD from the
Yemeni cell to the Somalian cell.  After the initial wire
transfer, the Yemeni cell attempted to send the Somalian cell
fifteen to eighteen thousand dollars via an unknown courier.
This unknown courier subsequently disappeared with the money.

(S)                                                            b1
                                                              b6 -3
                                                              b7C -3

     (U) On 09/16/2005, the FBI requested
take fingerprints and a digital photograph of          The FBI
provided an ink pad and blank ten-print cards.         agree    b6 -1,3
and will bring the requested items back to Washington, D.C.     b7C -1,3
where he will provide them to SSA

     (U) On 09/16/2005, the FBI boarded a return flight
to Cairo, Egypt.



SECRET

7

~~SECRET~~

To: Cairo    From: Los Angeles, California         b7E -1
(U) ———— Re: ✗ ☐☐☐☐☐☐☐  09/19/2005

**LEAD(s):**

**Set Lead 1:  (Info)**

ALL RECEIVING OFFICES

     (U)  Read and clear.  No hard copies to follow.

◆◆

~~SECRET~~

8

FBI-ACLU-52

(Rev. 06-04-2007)



SECRET/NOFORN

# FEDERAL BUREAU OF INVESTIGATION



Precedence:  ROUTINE                     Date:  03/19/2008      b6 -1
                                                                b7C -1
To:  Counterterrorism          Attn:                            b7E -2
                                      SSA
                                      IA
                                      IA

From:  Los Angeles
       LBRA Squad 4
       Contact:  TFO

Approved By:                                   b6 -1,2
                                               b7C -1,2

Drafted By:                                    b6 -3
                                               b7C -3
                                               b7E -1

(U)

Title:          IT-UBL / AL-QAEDA

(U)    Synopsis:         To request LAFO approval and CTD concurrence to     b7E -1
conduct operational travel to the UAE

(U)                 Derived From:  G-3
                    Declassify On:  X1

(U)    (U)

(U)    Details:     Los Angeles is seeking the concurrence of CTD for        b2
operational travel to the UAE                                               b7E -3

(U)            Background

(S)                                                                          b1
                                                                            b6 -3
                                                                            b7C -3

SECRET/NOFORN

DATE: 11-17-2010                        ALL INFORMATION CONTAINED
CLASSIFIED BY65179/DMH/LRP/bls          HEREIN IS UNCLASSIFIED EXCEPT
REASON: 1.4 (c)                         WHERE SHOWN OTHERWISE
DECLASSIFY ON: 11-17-2035

FBI-ACLU-53

SECRET/NOFORN

```
To: Counterterrorism  From:  Los Angeles                    b7E -1
Re: (U)                       03/19/2008
```



(S)

(S)

(S) HAMDAN                          until his recent arrest by the Lebanese
authorities.

b1
b6 -3
b7C -3

(U)  Lebanese Government Arrest of HAMDAN

(U)  On January 10, 2008, American Citizen's Services
in Beirut was contacted by HAMDAN's
advised ACS that [          ] had been arrested by the police at
Beirut International Airport around midnight on January 8, 2008.
She said that the police, after arresting [          ] came to
the house and confiscated their two computers.  ALAT
inquired with various Lebanese Government contacts who advised
that HAMDAN was arrested by the  Military Police and turned over
to Military Intelligence.  HAMDAN was suspected of having
"connections with extremist organizations" based on
uncorroborated information received by the authorities.
was distraught because their [          ] had been
called in for questioning as well.  The police, she said, needed
the son to provide passwords for websites cached in the computers
that [          ] did not know [the passwords].  The [      ] was questioned
and released on January 11, 2008.  Naji HAMDAN was released from
Lebanese custody on Saturday January 12, 2008.  Lebanese
authorities explained that they did not develop any information
to confirm their initial suspicions and HAMDAN had to be
released, by law.

b6 -5
b7C -5

(S)

b1
b6 -3,5
b7C -3,5

SECRET/NOFORN

2                    FBI-ACLU-54

SECRET/NOFORN

To: Counterterrorism   From: Los Angeles                    b7E -1
Re: (U) [                    ] 03/19/2008

(S)

b1
b6 -3,5
b7C -3,5

HAMDAN was released from custody on Saturday, January 12, 2008.

(U)  On January 14, 2008, HAMDAN came to the U.S Embassy in Beirut to offer his gratitude in person for the concern and assistance regarding his imprisonment and release. HAMDAN claimed to not know the specific reasons which led to his apprehension.  He stated his captors' accusations spanned the political gamut.  He claimed to be accused of spying for the Americans and Israelis one minute and for being affiliated with Islamic terrorists the next.  HAMDAN stated he was taken from the airport when trying to check into a flight to Dubai.  At the airport, he was led to a corner, handcuffed, and taken in an elevator to a special area of the airport.  There, he met an officer who took HAMDAN's information, but refused to answer HAMDAN's questions concerning the reason(s) for arrest.  HAMDAN was eventually blindfolded and taken to a vehicle.  HAMDAN's blindfold was removed when he arrived to the prison where a military officer there informed him that he was at Yarze prison. [NOTE:  Yarze is Department of Defense Headquarters and Military Intelligence maintains a holding facility there where they conduct interviews].

(U)  HAMDAN was not allowed to call his family until the third day of captivity.  The family knew of HAMDAN's arrest because the authorities went to their residence and confiscated the computers and his brother's AK-47 assault rifle.  HAMDAN described his interrogations as confusing.  He said that the authorities had transcribed his e-mail correspondence and



SECRET/NOFORN

3

FBI-ACLU-55

SECRET/NOFORN

To: Counterterrorism   From: Los Angeles                    b7E -1
Re: (U) [redacted]  , 03/19/2008

questioned him harshly on it.  HAMDAN claimed that the
authorities mis-translated the emails so he did not understand
what they were asking.  According to HAMDAN, authorities were
convinced that his Slingbox (device for watching cable TV over
the Internet) was solid proof that he had been "transmitting from
his home."  HAMDAN claimed to have been struck once while in
captivity by a guard who became angry when the blindfolded HAMDAN
accidentally dropped a piece of bread while trying to place it in
the guard's hand.  Another official apologized for the incident.

        (U)  HAMDAN stated that in addition to enlisting the
Embassy's help, he also sought the help of Lebanese Member of
Parliament Bahia Hariri.  [NOTE:  MP Bahia Hariri is the sister
of assassinated Prime Minster Rafiq Hariri.]  Bahia told HAMDAN
after his release that she was told Syria had demanded that
HAMDAN be sent to them.  HAMDAN claims that he has never done
business in Syria and had never traveled there.  ALAT [redacted] has
been unable to verify the claim that the Syrian Government ask    b6 -5
that HAMDAN be turned over to them.                              b7C -5

        (U)  HAMDAN gave three possibilities for his
apprehension:
        1- He recently had a dispute with a family member who
lives in Saudi Arabia over money HAMDAN had lent him.
        2- His [redacted] is pro-Hizballah and the
two have political arguments all the time.
        3- HAMDAN has had a dispute with an old neighbor who
lives downstairs from HAMDAN and that neighbor refuses to pay
shared building expenses.

        (U)  HAMDAN provided his personal email as
hamdan.naji@gmail.com.  HAMDAN stated he plans on going to Dubai
again to resume working on his car business.  From there, he will
either visit the U.S. or come back to Lebanon.  HAMDAN added that
he plans on moving back to the U.S. probably after his children's
school year ends.  HAMDAN claimed that his car business in
California is worth $2 million dollars.

(U) --------------- ✗  Proposed Operational Travel and Interview

           ✗   In light of this recent arrest and the fact that
(S)  HAMDAN [redacted] Los                b1
Angeles would like to travel to the UAE and interview HAMDAN
about this arrest.  This proposed interview would include the
following subjects and possibly more to be determined later:



SECRET/NOFORN

4

FBI-ACLU-56

SECRET/NOFORN

b7E -1

To: Counterterrorism   From: Los Angeles
Re: (U)                  03/19/2008

- Detailed interview concerning his arrest by the Lebanese.

- [redacted]

b2
b7E -1

- [redacted]

- [redacted]

b2
b7E -1

(U) While HAMDAN was in the custody of the Lebanese authorities his wife sought the assistance of ACS via the American embassy in Lebanon. Once Hmdan was released he went to the embassy in Lebanon and thanked them for the help and concern Los Angeles conducted [redacted] interviews of Hossam Hemdan [redacted] and Jehad Suliman [redacted] to determine what happened and if HAMDAN needed assistance.

(U) [redacted] to interview HAMDAN concerning his arrest. Los Angeles believes that this should be accomplished while HAMDAN is in the UAE. [redacted]

b2
b6 -3
b7C -3
b7E -1

(U) Los Angeles would like to use resources at the US Embassy in Abu Dhabi, UAE to contact HAMDAN and request that he make an appointment for an interview at the embassy regarding his arrest.

SECRET/NOFORN

5

FBI-ACLU-57



SECRET/NOFORN

To: Counterterrorism   From: Los Angeles                    b7E -1
Re: (U) [          ]        03/19/2008

### Proposed Dates of Travel and Cost Estimate

(U) ⊗   Los Angeles would like to complete this interview as
soon as possible.  Los Angeles is aware that the travel dates
depend on the location of HAMDAN, the availability of the
LEGAT/ALAT and person(s) at the US Embassy in the UAE.  Los
Angeles is looking forward to completing this interview within
the next 2 months.

[                                                    ]        b2
                                                             b7E -1

### Person(s) traveling for the interview



|                    |  Naji HAMDAN |
| DOB:               |              |
| POB:               |              |
| SSN:               |              |
| Official Passport #|              |
| Issued:            |              |
| Expires:           |              |

|                    |  Naji HAMDAN |              b6 -1,2
| DOB:               |              |              b7C -1,2
| POB:               |              |
| SSN:               |              |
| Official passport #|              |
| Issued:            |              |
| Expires:           |              |

SECRET/NOFORN

FBI-ACLU-58

SECRET/NOFORN

To:  Counterterrorism  From:  Los Angeles                    b7E -1
Re:  (U) [                    ]   03/19/2008


LEAD(s):

Set Lead 1:   (Action)

    COUNTERTERRORISM

    AT WASHINGTON, DC


        It is requested that [                ] review this EC and
if necessary, respond to TFO [            ] for further            b1
coordination. If necessary, obtain [      ] concurrence and LEGAT  b6 -2
country clearance.                                                 b7C -2
                                                                  b7E -2

(S)

♦♦079mcs01.08


SECRET/NOFORN

7                                    FBI-ACLU-59

(Rev 06-04-2007)



SECRET/NOFORN/ORCON
# FEDERAL BUREAU OF INVESTIGATION

**Precedence:** Priority                    **Date:** 07/07/2008    b6 -1
                                                                    b7C -1
**To:** Counterterrorism          **Attn:**                        b7E -2
                                            SSA
                                            SSA
                                            IA
                                            IA

**From:** Los Angeles
          LBRA Squad 4
          **Contact:** TFO                                          b6 -1,2
                                                                    b7C -1,2
**Approved By:**

**Drafted By:**

                                                                    b7E -1,2

(U)   **Title:**
                    IT-UBL / AL-QAEDA

(U)   **Synopsis:**         To outline background information and operational
      details of                                    in the UAE.

(U)                 Derived From : G-3
                    Declassify On: X1                               b2
                                                                    b7E -1,3

(U)   **Details:**       Reference                        dated
      03/19/2008, where LBRA agents received SAC approval for
      operational travel to the UAE in support of              for
      the purpose of interviewing Naji HAMDAN.

(U)                 Background

(S)                                                                 b1
                                                                    b6 -3
                                                                    b7C -3

(S)

SECRET/NOFORN/ORCON

DATE: 11-17-2010
CLASSIFIED BY 65179/DMH/LRP/bls
REASON: 1.4 (c)                    FBI-ACLU-60
DECLASSIFY ON: 11-17-2035

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED EXCEPT
WHERE SHOWN OTHERWISE

~~SECRET~~/NOFORN/ORCON

To: Counterterrorism   From: Los Angeles                    b7E -1
Re: (U) [          ], 07/07/2008

(S) [                                                              ]
                                                                    b1
                                                                    b6 -3
(S) [                                                              ]  b7C -3

(S) [ ] HAMDAN [                                                   ]

(S) [          ] until his recent arrest by the Lebanese
authorities.

(U)  <u>Lebanese Government Arrest of HAMDAN</u>

        (U)  On January 10, 2008, <u>American Citizen's Services</u>
in Beirut was contacted by HAMDAN's [                            ]
advised ACS that her [         ] had been arrested by the police at
Beirut International Airport around midnight on January 8, 2008.
She said that the police, after arresting her [        ] came to  b6 -5
the house and confiscated their two computers.  ALAT            b7C -5
inquired with various Lebanese Government contacts who advised
that HAMDAN was arrested by the  Military Police and turned over
to Military Intelligence.  HAMDAN was suspected of having
"connections with extremist organizations" based on
uncorroborated information received by the authorities. [      ]
was distraught because their [                        ] had been
called in for questioning as well.  The police, she said, needed
the [  ] to provide passwords for websites cached in the computers
that [      ] did not know [the passwords].  The [   ] was questioned
and released on January 11, 2008.  Naji HAMDAN was released from
Lebanese custody on Saturday January 12, 2008.  Lebanese
authorities explained that they did not develop any information
to confirm their initial suspicions and HAMDAN had to be
released, by law.

(S) [                                                              ]
                                                                    b1
                                                                    b6 -3,5
                                                                    b7C -3,5

~~SECRET~~/NOFORN/ORCON

2            FBI-ACLU-61

SECRET/NOFORN/ORCON

To: Counterterrorism   From: Los Angeles                    b7E -1
Re: (U) [        ]              07/07/2008



(S)

b1
b6 -3,5
b7C -3,5

HAMDAN was released from custody on Saturday, January 12, 2008.

(U)   On January 14, 2008, HAMDAN came to the U.S Embassy in Beirut to offer his gratitude in person for the concern and assistance regarding his imprisonment and release. HAMDAN claimed to not know the specific reasons which led to his apprehension.   He stated his captors' accusations spanned the political gamut.   He claimed to be accused of spying for the Americans and Israelis one minute and for being affiliated with Islamic terrorists the next.   HAMDAN stated he was taken from the airport when trying to check into a flight to Dubai.   At the airport, he was led to a corner, handcuffed, and taken in an elevator to a special area of the airport.   There, he met an officer who took HAMDAN's information, but refused to answer HAMDAN's questions concerning the reason(s) for arrest.   HAMDAN was eventually blindfolded and taken to a vehicle.   HAMDAN's blindfold was removed when he arrived to the prison where a military officer there informed him that he was at Yarze prison. [NOTE:   Yarze is Department of Defense Headquarters and Military Intelligence maintains a holding facility there where they conduct interviews].

(U)   HAMDAN was not allowed to call his family until the third day of captivity.   The family knew of HAMDAN's arrest because the authorities went to their residence and confiscated the computers and his brother's AK-47 assault rifle.   HAMDAN described his interrogations as confusing.   He said that the authorities had transcribed his e-mail correspondence and questioned him harshly on it.   HAMDAN claimed that the authorities mis-translated the emails so he did not understand



SECRET/NOFORN/ORCON

3                    FBI-ACLU-62

SECRET/NOFORN/ORCON

b7E -1

TO: Counterterrorism  From: Los Angeles
Re: (U) ████████████  07/07/2008   .

what they were asking. According to HAMDAN, authorities were
convinced that his Slingbox (device for watching cable TV over
the Internet) was solid proof that he had been "transmitting from
his home." HAMDAN claimed to have been struck once while in
captivity by a guard who became angry when the blindfolded HAMDAN
accidentally dropped a piece of bread while trying to place it in
the guard's hand. Another official apologized for the incident.

(U)  HAMDAN stated that in addition to enlisting the
Embassy's help, he also sought the help of Lebanese Member of
Parliament Bahia Hariri. [NOTE: MP Bahia Hariri is the sister
of assassinated Prime Minster Rafiq Hariri.] Bahia told HAMDAN
after his release that she was told Syria had demanded that
HAMDAN be sent to them. HAMDAN claims that he has never done
business in Syria and had never traveled there. ALAT ████████ has
been unable to verify the claim that the Syrian Government asked
that HAMDAN be turned over to them.

b6 -5
b7C -5

(U)  HAMDAN gave three possibilities for his
apprehension:
     1- He recently had a dispute with a family member who
lives in Saudi Arabia over money HAMDAN had lent him.
     2- His ████████████████ is pro-Hizballah and the
two have political arguments all the time.
     3- HAMDAN has had a dispute with an old neighbor who
lives downstairs from HAMDAN and that neighbor refuses to pay
shared building expenses.

(U)  HAMDAN provided his personal email as
hamdan.naji@gmail.com. HAMDAN stated he plans on going to Dubai
again to resume working on his car business. From there, he will
either visit the U.S. or come back to Lebanon. HAMDAN added that
he plans on moving back to the U.S. probably after his children's
school year ends. HAMDAN claimed that his car business in
California is worth $2 million dollars.

                Proposed Operational Travel and Interview
(S)
          X  In light of this recent arrest and the fact that   b1
HAMDAN ████████████████████████████████████████████ Los
Angeles would like to travel to the UAE and interview HAMDAN
about this arrest. This proposed interview would include the
following subjects and possibly more to be determined later:

SECRET/NOFORN/ORCON

~~SECRET~~/NOFORN/ORCON

To: Counterterrorism  From: Los Angeles
Re: (U) [          ]  07/07/2008

b2
b7E -1

- Detailed interview concerning his arrest by the Lebanese.

- 

- 

- 

(U) ....... ✗ While HAMDAN was in the custody of the Lebanese authorities [     ] sought the assistance of ACS via the American embassy in Lebanon. Once HAMDAN was released he went to the Embassy in Lebanon and thanked them for the help and concern. Los Angeles conducted [     ] interviews of Hossam Hemdan [     ] and Jehad Suliman [     ] determine what happened and if HAMDAN needed assistance.

b2
b6 -3,5
b7C -3,5
b7E -1

(U) ....... ✗ [                              ] interview HAMDAN concerning his arrest. Los Angeles believes that this should be accomplished while HAMDAN is in the UAE.

✗

(U) ....... ✗ Los Angeles will contact HAMDAN's brother in the CONUS, Hossam Hemdan and solicit his help to notify HAMDAN of the interview, dates, location and POC in the UAE (LEGAT and or ALAT). Los Angeles will have Hossam confirm with us that he contacted HAMDAN. Los Angeles will have Hossam Hemdan provide us with contact telephone numbers for HAMDAN in the UAE [     ]

b2
b6 -3
b7C -3
b7E -1

~~SECRET~~/NOFORN/ORCON

5    FBI-ACLU-64

SECRET/NOFORN/ORCON

```
To:  Counterterrorism  From:  Los Angeles                    b7E -1
Re:  (U) [            ]  07/07/2008
```

(U) ⋯⋯ [X] Los Angeles would like for the interview to take place    b2
at the US Embassy in Abu Dhabi or as a backup, the U.S. Consul    b6 -3
in Dubai.  If HAMDAN does not contact the LEGAT before our    b7C -3
arrival, we can use the telephone numbers provided by Hossam to    b7E -1
contact HAMDAN once we arrive in the UAE. [                    ]

(S) ⋯⋯ [                                                    ]    b1

<u>Proposed Dates of Travel</u>

(U) ⋯⋯ [X] Los Angeles is aware that the travel dates depend on
the location of HAMDAN, the availability of the LEGAT/ALAT and
person(s) at the US Embassy in the UAE.  Los Angeles is looking
forward to completing this interview during the week of July 14th
2008.

<u>Person(s) traveling for the interview</u>

[                                           ] Naji HAMDAN
DOB: [                    ]
POB: [                    ]
SSN: [                    ]
Official Passport # [                ]                    b6 -1,2
Issued: [                ]                                b7C -1,2
Expires: [            ]

[                                           ] Naji HAMDAN
DOB: [                    ]
POB: [                    ]
SSN: [                    ]
Official passport # [                ]
Issued: [                ]
Expires: [            ]

SECRET/NOFORN/ORCON

FBI-ACLU-65

~~SECRET~~/NOFORN/ORCON

```
To:  Counterterrorism  From:  Los Angeles            b7E -1
Re:  (U) [                    ] 07/07/2008
```

**LEAD(s):**

**Set Lead 1:  (Action)**

    <u>COUNTERTERRORISM</u>

      <u>AT WASHINGTON, DC</u>

(S)         It is requested that [            ] review this EC and
if necessary, respond to TFO [            ] for further        b1
coordination.  Please confirm CTD/AD, [        ] LEGAT, and [    ]   b2
(S)  concurrence have been obtained.                             b6 -2
                                                         b7C -2
                                                       b7E -1,2

    ◆◆189mcs01.08

~~SECRET~~/NOFORN/ORCON

FBI-ACLU-66

(Rev. 01-31-2003)

~~SECRET~~/ORCON/NOFORN



## FEDERAL BUREAU OF INVESTIGATION

**Precedence:** IMMEDIATE                    **Date:** 07/09/2008

**To:**  Abu Dhabi            **Attn:** LEGAT Gary Price

Security              **Attn:** CADM Unit -_____  b6 -1

International Operations  **Attn:** Middle East   b7C -1
                                                  b7E -2

Counterterrorism        **Attn:**  _____

Los Angeles             **Attn:** SSA _____
                                 SA _____
                                 TFO _____
                                 Long Beach RA

**From:**  Counterterrorism                         b2 -1
          _____                   b6 -1
       **Contact:**  SSA _____         b7C -1
                                                    b7E -2

**Approved By:** _____

**Drafted By:** _____ cah

(U) ____ _____
                                X              b7E -1,2

(U) ____ **Title:** X _____
              IT-UBL/A1-QAEDA

(U) ____ **Synopsis:** X   FBIHQ approves the travel of FBI Intelligence
Analyst _____ TFO _____ and
Special Agent _____ to Abu Dhabi, UAE in support of the
above captioned investigation.  FBIHQ and FBI-LA request
dates of travel to occur on July 14-18, 2008.            b1

(S) ____ X  Request for ____ concurrence has been p_   b6 -1,2,3
                                                      b7C -1,2,3

(U) ____ X  ~~Derived From : FBI SCG G-3~~
            ~~Declassify On: 20080709~~

~~SECRET~~/ORCON/NOFORN

DATE: 11-17-2010
CLASSIFIED BY 65179/DMH/LRP/bls
REASON: 1.4 (c)
DECLASSIFY ON: 11-17-2035

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED EXCEPT
WHERE SHOWN OTHERWISE

SECRET/ORCON/NOFORN

(U)   To:  Abu Dhabi  From:  Counterterrorism                    b7E -1
     Re:  (S)                              , 07/09/2008

(U)

(U)

                                                                b2
                                                                b7E -1
(U)

(U)   Details: (S)   FBIHQ approves the travel of FBI Intelligenc b2
     Analyst            , TFO            , and  b6 -1,2
     Special Agent            to Abu Dhabi, UAE            b7C -1,2
                            FBIHQ and FBI-LA request  b7E -1
     dates of travel to occur in July 14-18, 2008.

(U)   (S)   FBI-HQ and FBI-LA concur with the need for FBI
     Intelligence Analyst            TFO
            and Special Agent            to travel to Legat Abu
     Dhabi                            NAJI HAMDAN
     (HAMDAN).

(U)   (S)  Background

(S)
                                                                b1
                                                                b6 -3
                                                                b7C -3
(S)

SECRET/ORCON/NOFORN

2            FBI-ACLU-68

~~SECRET~~/ORCON/NOFORN

(U) To: Abu Dhabi  From: Counterterrorism                 b7E -1
    Re: ☒ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉  07/09/2008

(S) ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉   b1
    ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
    ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

        (U)  Lebanese Government Arrest of HAMDAN

        (U)  On January 10, 2008, American Citizen's
Services (ACS) in Beirut was contacted by HAMDAN's
▉▉▉▉▉▉▉▉▉▉▉▉▉ advised ACS that ▉▉▉▉▉▉▉ had been
arrested by the police at Beirut International Airport around
midnight on January 8, 2008.  She said that the police, after
arresting ▉▉▉▉▉▉▉▉▉ came to the house and confiscated their
two computers.  ALAT ▉▉▉▉▉▉▉ inquired with various Lebanese   b6 -5
Government contacts who advised that HAMDAN was arrested by    b7C -5
the Military Police and turned over to Military Intelligence.
HAMDAN was suspected of having "connections with extremist
organizations" based on uncorroborated information received by
the authorities ▉▉▉▉▉▉▉was distraught because their
▉▉▉▉▉▉▉▉▉▉▉▉ had been called in for questioning as well.
The police, she said, needed the ▉▉▉to provide passwords for
websites cached in the computers that ▉▉▉▉ did not know [the
passwords].  The ▉▉▉was questioned and released on January
11, 2008.  HAMDAN was released from Lebanese custody on
Saturday January 12, 2008.  Lebanese authorities explained
that they did not develop any information to confirm their
initial suspicions and therefore according to their laws,
HAMDAN was released.

        (U)  After his release, on January 14, 2008, HAMDAN
came to the U.S Embassy in Beirut to offer his gratitude in
person for the concern and assistance regarding his
imprisonment and release.  HAMDAN claimed to not know the
specific reasons which led to his apprehension.  He stated his
captors' accusations spanned the political gamut.  HAMDAN
stated he was taken from the airport when trying to check into
a flight to Dubai.  At the airport, he was led to a corner,
handcuffed, and taken in an elevator to a special area of the
airport.

        (U)  HAMDAN stated that in addition to enlisting the
Embassy's help, he also sought the help of Lebanese Member of
Parliament Bahia Hariri.  [NOTE:  MP Bahia Hariri is the
sister of assassinated Prime Minster Rafiq Hariri.]  Bahia
told HAMDAN after his release that she was told Syria had
demanded that HAMDAN be sent to them.  HAMDAN claims that he
has never done business in Syria and had never traveled there.

~~SECRET~~/ORCON/NOFORN

FBI-ACLU-69

~~SECRET~~/ORCON/NOFORN

(U)  To: Abu Dhabi  From: Counterterrorism                    b7E -1
     Re: ~~XX~~ ████████████████████, 07/09/2008


ALAT ████████ has been unable to verify the claim that the
Syrian Government asked that HAMDAN be turned over to them.

          (U)  HAMDAN gave three possibilities for his
apprehension:
          1- He recently had a dispute with a family member    b6 -5
who lives in Saudi Arabia over money HAMDAN had lent him.       b7C -5
          2- His ████████████████ is pro-Hizballah and
the two have political arguments all the time.
          3- HAMDAN has had a dispute with an old neighbor who
lives downstairs from HAMDAN and that neighbor refuses to pay
shared building expenses.

          (U)  HAMDAN provided his personal email as
hamdan.naji@gmail.com.  HAMDAN stated he plans on going to
Dubai again to resume working on his car business.  From
there, he will either visit the U.S. or come back to Lebanon.
HAMDAN added that he plans on moving back to the U.S. probably
after his children's school year ends.  HAMDAN claimed that
his car business in California is worth $2 million dollars.

(U)            (U)  Proposed Operational Travel and Interview

          ~~XX~~  In light of this recent arrest, Los Angeles has
arranged with HAMDAN to interview him in the UAE on July 16,
2008.  The interview is to take place at the US Embassy in Abu
Dhabi.  HAMDAN has provided the following phone number to FBI
LA:  971-050-483-0562.

(U)       ~~XX~~/NF)  LEGAT Price is assisting in and has approved the
interview and the travel of the below mentioned individuals:

          NAME: ████████████████████████
          DOB: ████████████████████
          POB: ██████████████
          SSAN: ████████████
          PP#: OFFICIAL ███████████                          b6 -1,2
          ISSUED: ████████████                               b7C -1,2
          EXPIRES:

          NAME: ████████████████
          DOB: ██████████████
          POB: ████████████
          SSN:
          OFFICIAL PASSPORT # ████████████████
          ISSUED:

~~SECRET~~/ORCON/NOFORN

4        FBI-ACLU-70

SECRET/ORCON/NOFORN

(U)   To: Abu Dhabi  From: Counterterrorism                    b7E -1
      Re:  ~~(X)~~                          07/09/2008

                EXPIRES:

                NAME:                                          b6 -1
                DOB:                                           b7C -1
                POB:
                SSAN:
                PP#:      OFFICIAL          ISSUED:
                EXPIRES:

SECRET/ORCON/NOFORN

5          FBI-ACLU-71

SECRET/ORCON/NOFORN

(U) To: Abu Dhabi  From: Counterterrorism                    b7E -1
Re:                              07/09/2008

**LEAD(s):**

**Set Lead 1:  (Action)**

ABU DHABI

AT ABU DHABI, UNITED ARAB EMIRATES

(U)  Please obtain country clearance for aforementioned travelers.

**Set Lead 2:  (Action)**

SECURITY

AT CADM UNIT, WASHINGTON, DC

(U)  For CADM Unit, please pass security clearances for the aforementioned travelers to ABU DHABI.

**Set Lead 3:  (Action)**

INTERNATIONAL OPERATIONS

AT WASHINGTON, DC

(U)  Please expedite country and security clearance passage for aforementioned travelers.

**Set Lead 4:  (Info)**

COUNTERTERRORISM                                             b2
                                                            b7E -2
AT

(U)  For information only.  Read and clear.

**Set Lead 5:  (Info)**

LOS ANGELES

AT LONG BEACH, CALIFORNIA

(U)  Information only.  Read and clear.

◆◆

SECRET/ORCON/NOFORN

6

FBI-ACLU-72

(Rev. 05-01-2008)

~~SECRET~~//ORCON/NOFORN



# FEDERAL BUREAU OF INVESTIGATION

**Precedence:** ROUTINE                **Date:** 08/18/2008

                                            b7E -2

**To:** Counterterrorism          **Attn:** [        ]
    Los Angeles

**From:** Los Angeles                    b2 -1
    LBRA-4                                b6 -1
    **Contact:** SA [        ]            b7C -1

**Approved By:** [        ]

**Drafted By:** [        ] jps

(U) [        ]                            b7E -1

(U) [        ]

(U) **Title:** ~~(S)~~ [        ]        b6 -3
        IT - UBL / AL QAEDA              b7C -3
                                          b7E -1

        IT - UBL / AL QAEDA

(U) **Synopsis:** ~~(S)~~  (1)  Telcal between Hossem Hemdan, Naji Hamdan's brother to request meeting in United Arab Emirates (UAE).  (2) Telcal between Naji Hamdan and FBI Los Angeles to confirm meeting.

~~Derived From : Multiple Sources~~
~~Declassify On: 20330818~~

(U) **Details:** ~~(S)~~  On July 08, 2008, FBI Los Angeles contacted Hossem Hemdan, work:  310-679-1326; cellular: 213-944-4491, Naji Hamdan's (HAMDAN) brother who lived and worked in Los Angeles, California.  FBI Los Angeles previously met with Hossem Hemdan to follow-up on the disposition of his brother's January 2008 detainment in Lebanon.  During that conversation, Hossem Hemdan offered to contact HAMDAN.  At the time, FBI Los Angeles declined.  During this conversation, FBI Los Angeles requested Hossem Hemdan to contact HAMDAN and provide him with information to contact FBI Los Angeles at his convenience.

(U) ~~(S)~~  At approximately 1000 hours, PST on July 09, 2008, HAMDAN contacted FBI Los Angeles in response to FBI Los Angeles'

~~SECRET~~//ORCON/NOFORN                    FBI-ACLU-73



DATE: 11-17-2010
CLASSIFIED BY 65179/DMH/LRP/bls
REASON: 1.4 (c)
DECLASSIFY ON: 11-17-2035

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED EXCEPT
WHERE SHOWN OTHERWISE

SECRET//ORCON/NOFORN

(U)   To:   Counterterrorism   From:  Los Angeles                    b7E -1
      Re:

request                                                              b1

{S}

          Since HAMDAN was from Los Angeles, FBI Los Angeles was
given the "lead" to contact him, and others, in an attempt to get
final disposition and close the lead.  FBI Los Angeles planned to
travel to the UAE to conduct interviews and asked if HAMDAN could
schedule an interview at the US Embassy, Abu Dhabi, UAE.

(U)       HAMDAN agreed to meet at 1000 hours on July 16 2008
(Wednesday) at the US Embassy located in Abu Dhabi, United Arab
Emirates.  HAMDAN was instructed to contact POC LEGAT Gary Price
upon arrival.

(U)       HAMDAN indicated the distance from his home to the US
Embassy was approximately a 2 ½ hour drive, but did not have a
problem making the trip.  HAMDAN also said his family was flying
into town soon.  HAMDAN provided telephone number: 971-050-483-
0562.

SECRET//ORCON/NOFORN

2

FBI-ACLU-74

SECRET//ORCON/NOFORN

To:  Counterterrorism  From:  Los Angeles          b7E -1
(U)     Re.:  ☒  [        ]  08/18/2008

**LEAD(s):**

**Set Lead 1:   (Info)**

COUNTERTERRORISM

AT WASHINGTON D.C.

(U)  ☒   Read and clear.


♦♦231jps01.08

SECRET//ORCON/NOFORN

FBI-ACLU-75

(Rev. 05-01-2008)

SECRET//ORCON/NOFORN

# FEDERAL BUREAU OF INVESTIGATION

**Precedence:** ROUTINE                          **Date:** 09/03/2008

                                                 b7E -2
**To:** Counterterrorism          **Attn:**
     Los Angeles

**From:** Los Angeles
       LBRA-4                                    b2 -1
       **Contact:** SA                           b6 -1
                                                 b7C -1

**Approved By:**

**Drafted By:**                    jps

(U)                                              b7E -1

(U)

(U)   **Title:** (S)                             b6 -3
                                                 b7C -3
          IT - UBL / AL QAEDA                    b7E -1

          IT - UBL / AL QAEDA

(U) **Synopsis:** (S)  Telcal between Hossem Hemdan, Naji Hamdan's (HAMDAN) brother, who requested any information concerning HAMDAN's detainment by the United Arab Emirates (UAE) government.

     **Derived From:** Multiple Sources
     **Declassify On:** 20330818

(U)                                              b7E -1

**Details:** (S)  At approximately 0930 hours on August 30, 2008 Hossem Hemdan (HOSSEM)                    contacted FBI Los Angeles' complaint desk (OCC) and specifically requested to speak to writer.  The OCC did not transfer the call and took HOSSEM's contact information.   OCC contacted writer and relayed HOSSEM's indication the information he wanted to discuss was important.

     Writer re-contacted HOSSEM on Wednesday, September 03, 2008
(S)                                              b1
                                                 b6 -3
                                                 b7C -3

          Since HAMDAN was from Los Angeles, FBI Los

SECRET//ORCON/NOFORN

                                        FBI-ACLU-76

DATE: 11-17-2010                 ALL INFORMATION CONTAINED
CLASSIFIED BY 65179/DMH/LRP/bls  HEREIN IS UNCLASSIFIED EXCEPT
REASON: 1.4 (c)                  WHERE SHOWN OTHERWISE
DECLASSIFY ON: 11-17-2035

SECRET//ORCON/NOFORN

(U) To: Counterterrorism  From: Los Angeles              b7E -1
Re:                  09/03/2008

Angeles was given the "lead" to contact him, and others, in an attempt to get final disposition and close the lead.  FBI Los Angeles planned to travel to the UAE to conduct interviews and asked if HAMDAN could schedule an interview at the US Embassy, Abu Dhabi, UAE.

(S)    At approximately 0935 hours, on September 03, 2008, writer contacted HOSSEM (cellular: 213-944-4491 and work: 310-644-9099) and left a voice mail message to return writer's call.  At approximately 1100 hours, HOSSEM returned writer's call                    b1
HOSSEM immediately requested if writer was aware of what happened to his brother HAMDAN, which writer responded no.  Writer requested HOSSEM to explain further what happened.

(U)    HOSSEM indicated he was contacted first by his brother                    and then by HAMDAN's wife          who explained HAMDAN was arrested for unknown reasons by the UAE government. b6 -5
HAMDAN's wife said she recently spoke with HAMDAN who indicate b7C -5 he was well, that he would released soon, but did not say what he was being charged with by the UAE.  HOSSEM was not sure if the UAE authorities were the police or another UAE government agency.  Neither HOSSEM,        or his family were aware of HAMDAN's charges.  HOSSEM speculated the UAE government believed HAMDAN worked for Mossad or the CIA.  When asked why HOSSEM believed this, HOSSEM responded he felt his brother (HAMDAN) was constantly watched by all governments, like Lebanon, the United States, and now the UAE.  HOSSEM assumed that because HAMDAN visited the US Embassy, UAE in July 2008 that he was being watched by the UAE authorities and concluded HAMDAN worked for the United States.

(U)    HOSSEM was told by        HAMDAN was arrested at his place of business in the UAE.  HAMDAN was told by an unknown individual at his business there was an accident in the front and when HAMDAN b6 -5 went to check, the police or government officials arrested him. b7C -5 HOSSEM could not provide further information about HAMDAN's arrest and continued to ask writer for any further information the FBI could provide.  Writer respectfully declined HOSSEM's continued requests and advised that due to HAMDAN's United States Citizenship, the Department of State would make contact with him to ensure his rights were observed.

(U)    HOSSEM asked if the United States had a good relationship with the UAE government, which writer responded yes, however the United States would not know the details of any investigation by the UAE government.  HOSSEM went on to explain that countries in

SECRET//ORCON/NOFORN

2

FBI-ACLU-77

SECRET//ORCON/NOFORN

To: Counterterrorism From: Los Angeles                    b7E -1
(U)  Re:  ☒                      09/03/2008

general, like Lebanon and the UAE watched individuals who were foreigners and accused them of being part of "militias" that were anti-government. HOSSEM opined HAMDAN was put on government's lists and that were exchanged between other governments to get his brother arrested. HOSSEM could not provide further information nor details of his reasoning.

(U)   ☒  Writer asked if HAMDAN was apart of any terrorist organizations, which HOSSEM responded he (HAMDAN) was "100% not involved with any groups." HOSSEM explained he was the closest of his brothers with HAMDAN and that if his brother was, he (HOSSEM) would be the first to tell the FBI. HOSSEM theorized informants or enemies in Lebanon provided misleading information to get his brother in trouble. HOSSEM did not provide further information as to who the informants were, the information they provided, nor the countries they were located.

(U)   ☒  HOSSEM said the last time he spoke with HAMDAN was approximately a week ago, August 24, 2008. They spoke about HOSSEM's son who was in Lebanon with his brother. HOSSEM did not provide his brother's name or who his son was staying with in Lebanon.

(U)   ☒  HOSSEM offered to provide any and all information he could to find out information concerning HAMDAN. Writer took this opportunity to address general areas as to why HAMDAN "could" be arrested by another country's government. Writer admonished HOSSEM that any information he provided had to be accurate and true, which HOSSEM agreed and emphasized his commitment to help the FBI anyway he could.

(U)   ☒  HOSSEM indicated HAMDAN was a very religious Sunni Muslim, who when he lived in Los Angeles prayed at the Hawthorne Mosque, Los Angeles, California. HOSSEM admitted he was not as religious as HAMDAN and joked that he was "infidel" because he no longer prayed. HOSSEM added he did not like the people who went to the Hawthorne Mosque, he did not like their opinions. Writer queried what opinions, which HOSSEM provided a generic distinction between persons who disagree of about Democratic and Republican politics. Writer directly asked if HAMDAN belonged to any extremist groups similar to those individuals who attacked the United States on September 11, 2001. HOSSEM responded HAMDAN would never be apart of those groups. HOSSEM listed Al-Qaeda, HAMAS, and Hizballah as examples of terrorist groups.

(U)   ☒  NOTE:  HOSSEM explained that he and HAMDAN knew they were followed by government vehicles and asked writer again why the

SECRET//ORCON/NOFORN

3


FBI-ACLU-78

SECRET//ORCON/NOFORN

To: Counterterrorism From: Los Angeles                    b7E -1
(U) Re: ☒ [        ], 09/03/2008

United States government followed HAMDAN. Writer asked how
HOSSEM knew government vehicles followed he and HAMDAN, which he
replied his smog business, located at 13737 Hawthorne Boulevard,
Hawthorne, California 90250; telephone: 310-644-9099; regularly
smogged law enforcement and government vehicles, to include that
HAMDAN also frequented car auctions and could easily identify
unmarked cars.

(U) ☒ Writer continued to generalize questions and asked if HAMDAN
had any issues at any of his businesses, or criminal/civil
history. HOSSEM responded no, but added his dislike for Jihad
(Jihad Sulieman) who currently managed HAMDAN's business. HOSSEM
did not trust Jihad Sulieman and accused him of stealing from
HAMDAN, not filing taxes on time, paying bills late, and not
paying city licenses on time. Writer asked if HAMDAN paid his
taxes, which HOSSEM said, "to the penny." HOSSEM added HAMDAN
did not have any criminal or civil complaints or history.

(U) ☒ Writer asked if HAMDAN had any enemies or mistresses that
would say anything negative. HOSSEM indicated HAMDAN did not
have any enemies nor any mistresses, that he was a faithful
husband. HOSSEM joked that he was the only "bad boy." HOSSEM
added HAMDAN had high blood pressure and high cholesterol.
HOSSEM was not aware of any medications HAMDAN took, but believed
he did take prescription drugs.

(U) ☒ The call concluded with HOSSEM emphasizing his willingness
to help in anyway he could, and he would be available twenty-four
hours a day. Writer advised HOSSEM if he heard anything further
about HAMDAN to not hesitate to contact writer. HOSSEM asked
writer what HAMDAN should do in his position. Writer again
advised he could not provide any advice or guidance, but could
only collect his information. Writer did not promise anything to
HOSSEM nor promised to do anything further for HAMDAN. Writer
advised his position was merely to collect information provided
to the FBI from the Department of State as it related to
circumstances of United States Citizens traveling or living
abroad.

SECRET//ORCON/NOFORN

4

FBI-ACLU-79