SECRET//ORCON/NOFORN

To: Counterterrorism  From:  Los Angeles

(U)  Re:  (S)                          09/03/2008                    b7E -1

**LEAD(s):**

**Set Lead 1:  (Info)**

COUNTERTERRORISM

AT WASHINGTON D.C.

(U)              Read and clear.

◆◆247jps01.08

SECRET//ORCON/NOFORN

5

FBI-ACLU-80

(Rev. 05-01-2008)

~~SECRET~~//ORCON/NOFORN

# FEDERAL BUREAU OF INVESTIGATION

**Precedence:** ROUTINE                                    **Date:** 09/09/2008        b7E -2

**To:** Counterterrorism                    **Attn:**
Los Angeles

**From:** Los Angeles                DECLASSIFIED BY 65179/DMH/LRP/bls
LBRA-4                        ON 11-17-2010
**Contact:** SA                                            b2 -1
                                                           b6 -1
**Approved By:**                                           b7C -1

(U) **Drafted By:**                jps

(U)                                                        b7E -1

(U) **Title:** ~~(S)~~                                     b6 -3
                   IT - UBL / AL QAEDA                     b7C -3
                                                           b7E -1

                   IT - UBL / AL QAEDA

(U) **Synopsis:** ~~(S)~~ Second Telcal with Hossem Hemdan, Naji Hamdan's
(HAMDAN) brother, who requested any information concerning
HAMDAN's detainment by the United Arab Emirates (UAE) government.

~~Derived From~~ : Multiple Sources
~~Declassify On~~: 20330818                                b7E -1

(U) **Details:** ~~(S)~~ At approximately 0945 hours on September 09, 2008
Hossem Hemdan (HOSSEM)                    contacted FBI Los Angeles'
complaint desk (OCC) and specifically requested to speak to
writer.  OCC transferred the call to writer's cellular telephone.

(U)         ~~(S)~~ HOSSEM requested an update to his brother's (HAMDAN) status
in the United Arab Emirates.  Writer advised he provide no
further information concerning the status of HAMDAN.  HOSSEM sa     b6 -5
he was in contact with HAMDAN's                , who was currently in  b7C -5
Lebanon.  HOSSEM indicated      and HOSSEM's family were not
successful with obtaining any information from the United Arab
Emirates government.  HOSSEM said HAMDAN's telephone call to
was the last contact made.  HOSSEM informed no further contact
was received by HAMDAN.

~~SECRET~~//ORCON/NOFORN

FBI-ACLU-81

SECRET//ORCON/NOFORN

(U) To: Counterterrorism From: Los Angeles

b7E -1

Re: (X) [            ] 09/09/2008

(U) (S) HOSSEM claimed writer knew more about HAMDAN's detainment than provided because writer was aware of HAMDAN's Lebanon detainment and United Arab Emirates detainment. Writer advised he was only aware of HAMDAN's Lebanon detainment based on internal communications received from the Department of State. Writer further advised HOSSEM, he made aware of HAMDAN's recent detainment by HOSSEM's September 03, 2008 telcal.

(U) (S) Writer asked how HAMDAN's United Arab Emirates business was doing, which HOSSEM responded the business continued to run but needed HAMDAN there for management reasons. Writer asked if HAMDAN's United States business manager (Jihad Sulieman) was informed of HAMDAN's arrest. HOSSEM replied and emphasized he had not and had no intention of telling him (Sulieman) because he would only take more advantage of HAMDAN. HOSSEM did not explain further Sulieman's intentions.

b6 -5
b7C -5

(U) (S) Writer advised HOSSEM to relay to [      ] to seek American Citizen Services in Lebanon, similar to what she did in January 2008. HOSSEM relayed his father in Lebanon speculated if HAMDAN was detained for importing stolen vehicles, which HOSSEM ensured all vehicles were legitimate.

(U) (S) Writer concluded the telcal by reemphasizing to HOSSEM he would be unable to provide any further information concerning HAMDAN's disposition.

SECRET//ORCON/NOFORN

2

FBI-ACLU-82

SECRET//ORCON/NOFORN

b7E -1

(U) To:   Counterterrorism   From:  Los Angeles
Re:  (X)                      09/09/2008

**LEAD(s):**

**Set Lead 1:   (Action)**

COUNTERTERRORISM

AT WASHINGTON D.C.

(U) (X)  Request ▢ to obtain an official response
and guidance from LEGAT Abu Dhabi, United Arab Emirates to be b2
forwarded to Los Angeles.                                        b7E -2

♦♦253jps01.08

SECRET//ORCON/NOFORN

FBI-ACLU-83

FD-302 (Rev. 10-6-95)

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 06-04-2010 BY 60322/UC/LRP/PLJ/bls

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription   08/13/2008

At approximately 1100 hours on July 16, 2008, NAJI
JAWADAT HAMDAN (HAMDAN), a US Citizen, DPOB: 05-26-1966, Ablah,
Lebanon; SSN: 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; OCONUS Address: Nuay Mia Towers, Block
B-8, Apartment 1601, Ajman, United Arab Emirates (UAE), OCONUS
mailing address: PO Box 14050, Ajman, UAE; CONUS address: 1848 E.
55th Street, Los Angeles, California; OCONUS telephone: 050-483-
0562 (cellular), 06-74-84285 (land land line and facsimile); was
interviewed by SA [                    ] and TFO [                    ] at the   b6 -1,2
United States Embassy, Abu Dhabi, UAE.                                          b7C -1,2

[                                                                            ]

The following is a partial summary of the interview, based on        b2
recollection and notes [                                        ]            b7E -1
After being advised of the nature of the interview and the
identities of the interviewing agents, HAMDAN responded to
interviewer's questions and provided the following information:

        HAMDAN was unable to provide his US Passport due to US
Embassy security procedures which required visitors to surrender
passport identification upon entry to the compound.  HAMDAN did
provide his Lebanese Identification Card which had HAMDAN's picture
on the front and was written in Arabic.

        HAMDAN holds dual citizenship with the United States and
Lebanon.  HAMDAN indicated he immigrated to the United States in
1984 or 1985.  HAMDAN's port of entry was Los Angeles, California.
HAMDAN explained he entered the United States under a Student Visa
sponsored through NORTHROP GRUMMAN, Los Angeles, California.
HAMDAN obtained a Bachelor's Degree in Aerospace Engineering and
Master's Degree.  HAMDAN was a contract hire with NORTHROP GRUMMAN
and provided instruction and re-training to engineers and mechanics
who worked on the center assembly of the US Navy, F-18 fighter
airplane.  HAMDAN instructed students at a Los Angeles college and
at the NORTHROP GRUMMAN facility.  HAMDAN did not work on the
airplane and did not provide further information.

BUSINESS OWNERSHIP

        HAMDAN indicated he owned several businesses in the
United States and the UAE.  HAMDAN identified himself as the
owner/operator of two (2) businesses located in Ajman, UAE; HAMDAN



Investigation on   07/16/2008   at   US Embassy, Abu Dhabi, UAE

File # [                              ]        b7E -1              Date dictated _____

SA [                              ] ps
by TF [                              ]          b6 -1,2                          FBI-ACLU-84
                                                b7C -1,2

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 10-6-95)

b7E -1

Continuation of FD-302 of ___NAJI JAWADAT HAMDAN_____, On 07/16/2008 , Page    2

AUTO SALES and AL NOOR GARAGE.  HAMDAN imported and sold late 1990's model Lexus and Camry automobiles at HAMDAN AUTO SALES and operated a general automotive body and repair shop at AL NOOR GARAGE.  HAMDAN operated both businesses for approximately two (2) years.  HAMDAN provided the names and country of origin of six (6) employees who worked for his businesses: [          ], Lebanon; [          ] Lebanon; [          ], Syria; [          ], Sryia;  b6 -5
[          ], Syria; [          ] Syria.  These individuals  b7C -5
worked at AL NOOR GARAGE.  [      ]LNU, India worked at HAMDAN AUTO SALES.

     HAMDAN is also the owner/operator of HONDA ACURA PALACE located Los Angeles, California.  HAMDAN operated this business for approximately twelve (12) years.  HAMDAN also owned property near the vicinity HONDA ACURA PALACE, but sold the land to his brother HOSSEM HEMDAN for approximately four (4) hundred thousand dollars. Writer asked if the business was known as "HAPI MOTORS", which HAMDAN explained it was and but is now HONDA ACURA PALACE.  HAMDAN received a letter from HONDA MOTOR COMPANY for using the same name "HONDA."  HAMDAN indicated he was able to keep the name, but was not allowed to use it as advertisement.  HAMDAN became involved in automobile sales, automobile import/export, and automobile dismantling (hereinafter "automobile business") through his brother in Lebanon.  HAMDAN did not indicate which brother introduced him to the business.  HAMDAN noticed his brother profited from the business and encouraged HAMDAN to go into business for himself. While in the United States, HAMDAN opened an automobile business in Los Angeles, but relocated to his current Los Angeles address 1848 E. 55th Street, Los Angeles, California due to Los Angeles County zoning laws which moved HAMDAN's type of business (automobile wrecking) within areas of similar businesses.  HAMDAN opined his Los Angeles business' location was in a good part of Los Angeles, but had since declined.  HAMDAN explained his business was burglarized on several occasions.  HAMDAN did not explain the details of each burglary.  HAMDAN added that although his business was equipped with surveillance cameras, it was not worth reporting each robbery to his insurance in belief his premiums would increase.

     Writer questioned how HAMDAN was able to successfully operate a business from another country, which HAMDAN answered in addition to regular contact with the manager, Jihad Suliman, he contracted a computer program business which developed an internet program for his business.  HAMDAN identified the business as "UNI OPS" (sic).  HAMDAN worked with the system administrator to create

FBI-ACLU-85

FD-302a (Rev. 10-6-95)

b7E -1

Continuation of FD-302 of    NAJI JAWADAT HAMDAN    , On 07/16/2008 , Page    3

a business website which allowed him to remotely access HONDA
ACURA's internal business inventories and proprietary information.
HAMDAN explained upon completion of the website, he was able to
easily monitor the business from abroad. HAMDAN admitted he was
not computer literate enough, specifically "not able to program"
the software himself and needed a specialist in the field to
complete these services. HAMDAN explained he would not of been
able to leave HONDA ACURA PALACE if this system was not completed.

MILITARY SERVICE

        HAMDAN explained when he received his United States
citizenship, as a requirement of becoming a citizen, he was
registered with the United States Military Selective Service.
HAMDAN never attempted to enroll with the US Military, Reserves,
nor National Guard. HAMDAN was never contacted by any US Military
Service.

FAMILY INFORMATION

        HAMDAN is married to [          ]. HAMDAN was married to
his wife in 1988. HAMDAN was never married before his current
wife. HAMDAN has three children; [          ]                    b6 -5
[                                            ] All HAMDAN's          b7C -5
children are US Citizens. Writer inquired about the quality of the
UAE's school system, which HAMDAN indicated was poor and that he
planned to pay $17,000 USD for private school for his two sons
[                        ], not including future college expenses. HAMDAN
was not happy with price but explained it was a British run school
and although it was behind in school curriculum it was the most
affordable amongst private schools for the area he lived (Ajman,
UAE).

        HAMDAN is the second youngest of six (6) siblings; [          ]
[              ] approximately 50 years (Brother), located in Lebanon,
[                                    ] in Lebanon and UAE; [     ]      b6 -5
[                        approximately 48 years (Brother), located in    b7C -5
Lebanon, [                        ] approximately 46
years (Brother), located in Lebanon; [                    ] approximately 44
years (Sister), located in Ontario, Canada, married with four (4)
children; Hossem Hemdan, approximately 38 years, located in Los
Angeles, California (Brother).

        Writer questioned how HAMDAN communicated with his
family. HAMDAN responded with his personal cellular telephone

FD-302a (Rev. 10-6-95)

b7E -1

Continuation of FD-302 of   NAJI JAWADAT HAMDAN                              , On 07/16/2008 , Page   4

(971-050-483-0562).  Writer commented his brother (Hossem Hemdan), while in the presence of Agents, used voice over internet protocol (VOIP) services to contact HAMDAN's brother [          ] in [b6 -5, b7C -5] Lebanon to find out information concerning the details of HAMDAN's arrest in Lebanon in January 2008.  HAMDAN replied his brother used a "SKYPE E-PHONE."  HAMDAN added, VOIP services were blocked by the UAE government and was not available.  Before VOIP was blocked, HAMDAN did attempt to use the system but concluded the connection was bad and did not work well while conducting business.

LEBANON ARREST - JANUARY 2008

        Writer asked HAMDAN if he had any criminal record, which HAMDAN answered "no."  Before HAMDAN addressed the details of his detainment in Lebanon, he specified to Agents he had to "provide an introduction" in an attempt to explain the context by which he believed he was arrested.  HAMDAN referenced the Summer 2006 Lebanese Hizballah/Israel war.  HAMDAN explained he recently moved to the UAE with his family to start his automobile business. During this time, HAMDAN did not want his family to go to Lebanon because of the current conflict.  After the war ended, HAMDAN moved his family to Lebanon in a home he owned in Lebanon while he stayed behind and established the business in the UAE .  HAMDAN did not provide the location to his Lebanon home.  HAMDAN stated his family did not like the weather in UAE and wanted to go to Lebanon. HAMDAN's intent was to manage his UAE business while he traveled back and forth to Lebanon from UAE.

        HAMDAN speculated starting his business was tough; that it required him to work long hours, so he had to become more involved with the businesses to be successful.  HAMDAN believed having a small automobile business operated by a foreigner in the UAE deemed to be more difficult than he planned.  Currently, HAMDAN did not feel his automobile business was successful and cost more to operate than when he lived in the United States.  HAMDAN illustrated his personal and business life in the United States was less stressful than in the UAE.  Long hours were required to be worked in his UAE businesses just to make ends meet.  HAMDAN cited instances where he incurred additional expenses in form of country taxes and fees due to being a foreign business.  Also, HAMDAN did not trust local automobile shops because they would steal parts or provide poor service because his business was new.

        HAMDAN made the transition to his arrest.  HAMDAN explained in the beginning of January 2008 he finished a visit with

FBI-ACLU-87

FD-302a (Rev. 10-6-95)

b7E -1

Continuation of FD-302 of   NAJI JAWADAT HAMDAN                                 , On 07/16/2008 , Page   5

his family in Lebanon and intended to fly back to the UAE.  HAMDAN was present at the AIR ARABIA ticket counter.  HAMDAN provided his identification to the ticket person.  Upon identification, the ticket person announced HAMDAN's name very loudly.  Shortly thereafter, unknown individuals who identified themselves as airport security confronted and escorted HAMDAN to an airport elevator.  While in the elevator HAMDAN was handcuffed.  HAMDAN was taken to an unknown office space located in the Lebanon Airport and directed not to speak.  HAMDAN's requests to make a telephone call to his family were declined by the Lebanese Airport Security.  HAMDAN said all of his identification, credit cards, and personal documents were seized.  At an unspecified time, HAMDAN indicated he was blind folded by an unknown individual, taken to a vehicle, and escorted to an unknown location.  HAMDAN later discovered he was held by the "Mukhabarat."  Writer queried if the Mukhabarat was Lebanese Intelligence Service, which HAMDAN answered, "yes."

HAMDAN described his experience with the Mukhabarat as a "nightmare."  HAMDAN was unable to provide the specific location of where he was detained by the Makhabarat.  HAMDAN believed it was in Baabda Region, Lebanon.  HAMDAN said he was placed in a small cell, with air conditioning, a small blanket, and two bottles; one for urination and the other for water.  HAMDAN speculated the Makhabarat intentionally wanted to make it very cold and uncomfortable for him.  HAMDAN was placed with other unknown individuals being detained by the Makhabarat.  HAMDAN was unsure how many times he was questioned by the Mukhabarat, but thought it was more than ten (10) times.  HAMDAN was blindfolded each time he was moved from his cell to the interrogation rooms.  HAMDAN told the Makhabarat he would "confess to anything" in order to be set free.  Through the course of being held, HAMDAN continued to ask what he was being accused.

The Makhabarat interrogator(s) accused HAMDAN of spying for a number of different countries.  Specifically, for the United States and Israel.  The Makhabarat questioned why HAMDAN frequently visited the United States Embassy in Lebanon, which HAMDAN explained it was to obtain citizenship paperwork for his youngest child                              and United States passport for his son                   .  In addition to accusing HAMDAN of spying, the Makhabarat b6 -5 questioned why HAMDAN frequently traveled to and from Lebanon and b7C -5 UAE, which HAMDAN explained he was trying to establish his UAE business and his family was based in Lebanon.  HAMDAN further explained he had money from his United States business and could afford the frequent travel.  The Makhabarat asked why he employed

FBI-ACLU-88

FD-302a (Rev. 10-6-95)

b7E -1

Continuation of FD-302 of     NAJI JAWADAT HAMDAN                    , On 07/16/2008 , Page    6

individuals from Syria, Lebanon, and India and inferred that HAMDAN
consorted in terrorist activities with these individuals.  HAMDAN
explained the diversity of his employees from the different
countries was salary driven, meaning he could pay employees from
poor countries a lower wage, similar to how South Americans were
paid a lower wage in America.

        The Makhabarat asked HAMDAN what email addresses he used,
which HAMDAN answered he had two (2).  The Makhabarat provided
copies of email correspondence and a list of email addresses
printed from HAMDAN's computer located in Lebanon.  HAMDAN claimed
the Makhabarat obtained the email information from his computer
located at his home in Lebanon.  Initially, HAMDAN could not
provide answers to the Makhabarat concerning the list of email
addresses.  HAMDAN explained his home computer was used by many
visitors to his home because the internet was not easily
accessible.  HAMDAN said the Makhabarat did not believe his
response.

        HAMDAN was asked by the Makhabarat if he knew[          ]
[                  ], which HAMDAN answered, "no."  HAMDAN noted a
particular email which the Makhabarat accused his (HAMDAN)          b6 -5
involvement with Fatah al-Islam, a terrorist group located in       b7C -5
Northern Lebanon.  HAMDAN stated he's never traveled to Northern
Lebanon.  HAMDAN claimed this email caused particular trouble for
him because the Makhabarat misconstrued the content and inferred
HAMDAN commented on the escape of a known Fatah al-Islam terrorist
[          ].  HAMDAN explained the email's content discussed a
conversation between he and Jihad Suliman, the manager of his Los
Angeles, California business and HAMDAN's brother Hossem Hemdan.
HAMDAN addressed the email to "Ju Ju."  "Ju Ju" was a nickname
given to Jihad because after the 9/11 terrorist attacks, the name
"Jihad" was not publically received well with customers.  HAMDAN
added that his brother Hossem Hemdan was nicknamed at an early age,
"Husu," which was also written in the email.

        In the email, HAMDAN told Jihad Suliman his brother
(Hossem Hemden) "bailed out" of the proposed purchase of his
(HAMDAN's) Los Angeles business and Jihad Suliman was to "go back
to business as usual."  HAMDAN claimed the Makhabarat believed the
"bailed out" comment was reference to a previous attack on Fatah
al-Islam where all except[        ] were killed and escaped.  HAMDAN
indicated the Makhabarat believed the comment "bailed out" and      b6 -5
"return to business as usual" was code in reference to[        ]     b7C -5
escape and continue plans for terrorist activities.  In addition,

FBI-ACLU-89

FD-302a (Rev. 10-6-95)

b7E -1

Continuation of FD-302 of _____NAJI JAWADAT HAMDAN_____ , On _07/16/2008_ , Page __7__

the Makhabarat scrutinized HAMDAN's relationship to Jihad Suliman. HAMDAN explained Jihad Suliman was Palestinian and lived in the United States for approximately twenty-five years, was a family man, and was not related to any terrorist groups. HAMDAN claimed the Makhabarat became very agitated with HAMDAN and punished him for not knowing about the email or the that anyone escaped prison. HAMDAN admitted he began to cry underneath his blindfold because of the threats made by the Makhabarat.

The Makhabarat accused HAMDAN of being apart of a "terrorist gang who was supplied money from America" and was "broadcasting." HAMDAN was confused by this accusation and explained the Makhabarat referred to a "sling box" (sic) located in his home. HAMDAN explained he brought the sling box from the United States and used to obtain television channels via the internet. HAMDAN said the sling box did not work and the connection was terrible.

HAMDAN was also asked if he downloaded a speech by USAMA BIN LADIN, which HAMDAN replied yes. HAMDAN explained he downloaded a video from his laptop computer at his Lebanon residence. HAMDAN said the video was USAMA BIN LADIN speaking about the Lebanese and Palestinian conflict. HAMDAN indicated the video was accessible from the internet and claimed no wrong doing. Writer asked HAMDAN specifically if he ever supported or belonged to any terrorist organization, which HAMDAN immediately responded "no." HAMDAN was asked one more time toward the conclusion of the interview if he supported the beliefs of/or was affiliated with Al Qaeda or USAMA BIN LADIN, which HAMDAN again answered "no." HAMDAN was asked why the Makhabarat would question him about terrorist affiliations, which HAMDAN answered that because of his constant travel he must be receiving money from someone, which HAMDAN inferred were terrorist organizations. HAMDAN indicated his business was successful and worth approximately three (3) million dollars which allowed him to travel.

HAMDAN described the conditions of his detainment. HAMDAN was subjected to a complete strip search and his clothing taken away while exposed to cold conditions. HAMDAN claimed to be verbally and physically accosted. Specifically, he was slapped on one occasion, constantly thrown into walls and forced to stumble and hit objects while led to and from his cell. During interrogations, he could hear and smell what he described as "electricity" being used on detainees. On one occasion, HAMDAN believed electricity was to be used on him. HAMDAN explained to

FBI-ACLU-90

FD-302a (Rev. 10-6-95)

b7E -1

Continuation of FD-302 of ___NAJI JAWADAT HAMDAN_____ , On 07/16/2008 , Page  8

the interrogator he took medications and "was going to die" if
subjected.  HAMDANp appeared to become visibly disturbed while
recalling this event.

   Throughout his detention, HAMDAN was declined any
communication with family members and not given specific charges
against him.  HAMDAN was unable to provide the exact date he was
arrested nor could provide the actual length of his detainment due
to the conditions and treatment he claimed to receive from Lebanese
authorities.

   During the interrogation, the Makhabarat asked what
HAMDAN had at his home.  HAMDAN reasoned the Makhabarat had already
searched his home and volunteered he had an AK-47 rifle.  Writer
further questioned HAMDAN if there was anything else the Makhabarat
discovered.  HAMDAN recalled two hand grenades which he claimed
were attached to a military load carrying vest.  HAMDAN commented
the grenades, vest, and AK-47 rifle were easy to obtain and were
for protection from Hizballah.  HAMDAN added that all of his
neighbors owned weapons.  HAMDAN said initially the Makhabarat did
not take issue with him in possession of the weapons.

   HAMDAN had to appear in front of the Lebanese Marshall
Court where he was charged with possession of weapons and
explosives.  HAMDAN was sentenced to fifteen (15) days in prison or
he could pay $100.00 total.  HAMDAN paid the fine, the court
dropped the charges, and HAMDAN was released.  HAMDAN speculated
the Makhabarat did not have any real charges and used as a last
resort to charge him for weapons possession.

   HAMDAN explained his family supported the Hariri Family.
HAMDAN's brother, [                    ], was an organizer for the
Hariri Party.  HAMDAN could not confirm, but believed members of
the Hariri Party did have some type involvement in expediting his
release.  HAMDAN's brother, [                    ] told him he followed
up with the Makhabarat daily and discovered Syria was also
interested in HAMDAN and possibly wanted to interview HAMDAN.
HAMDAN did not know why Syria was interested in him.  HAMDAN noted
that Syria sent persons, he identified as terrorists to Lebanon to
"cause trouble" and HAMDAN believed the Makhabarat tried to connect
him to the group.  HAMDAN did not describe what type of "trouble"
the group was sent to cause and did not know if it was the Syrian b6 -5
Government or unknown persons from Syria.  HAMDAN noted when his   b7C -5
wife, [                ] contacted American Citizen Services, at the
United States Embassy, Beirut to report HAMDAN was in custody.

FBI-ACLU-91

FD-302a (Rev. 10-6-95)

b7E -1

Continuation of FD-302 of __NAJI JAWADAT HAMDAN_____ , On 07/16/2008 , Page 9

After hearing news about Syria, [_____] relayed for HAMDAN to
be sent to the United States and not to Syria.

b6 -5
b7C -5

    HAMDAN rationalized he was reported to the Lebanese
Government by his sister-in-law's husband, who HAMDAN described as
a "ranked" Hizballah member.  HAMDAN said the two quarreled and
disagreed over local political matters.  HAMDAN pointed out before
he was detained, he only made it to the ticket counter and not
passport control.  HAMDAN believed Lebanon's airport had employees
who were Hizballah.

    These factors in addition to constant travel to and from
Lebanon to visit his family lent to what he believes made him of
interest to the Lebanese Government.

    Writer questioned since his release from Lebanese
authorities if he was comfortable traveling to and from Lebanon.
HAMDAN replied he had returned to Lebanon on three (3) occasions
and each time he entered the Lebanese airport he felt anxious and
afraid he would be taken by Lebanese authorities again.  The same
question was posed about living in the UAE, which HAMDAN replied he
felt safe and secure.  HAMDAN described the UAE as having a good
people and a good system.  HAMDAN stated he did not need to own any
weapons in the UAE.

    HAMDAN was asked if he would ever return to the United
States, which he replied yes.  HAMDAN explained his business in the
UAE was doing poorly and would suffer a loss if he were to leave
now.  HAMDAN intended to stay for as long as he could turn a profit
or break even.  HAMDAN mentioned again, he worked harder while in
the UAE than when in the United States and was experienced a
considerable amount of stress which has affected his health.
HAMDAN indicated he took a number of medications.  HAMDAN did not
provide the name of the medications.

CONCLUSION

    Writer concluded the interview with HAMDAN and thanked
him for agreeing to meet with Agents.  HAMDAN was advised if he had
any further interaction with any country, to continue to use the
appropriate American Citizen Service Office at the US Embassies.
HAMDAN was very pleased with the individuals at American Citizen
Services in Beirut, Lebanon and indicated he would use the services
again.  HAMDAN did not have any further questions or comments for
interviewing Agents.

FBI-ACLU-92

FD-302a (Rev. 10-6-95)

b7E -1

Continuation of FD-302 of   NAJI JAWADAT HAMDAN                    , On 07/16/2008 , Page   10

     The interview concluded and HAMDAN was escorted from the US Embassy, Abu Dhabi compound.

FBI-ACLU-93

DATE: 06-09-2010
CLASSIFIED BY UC60322LP/PLJ/CC
REASON: 1.4 (c)
DECLASSIFY ON: 06-09-2035

(Rev. 06-04-2007)

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED EXCEPT
WHERE SHOWN OTHERWISE

~~SECRET~~ 

# FEDERAL BUREAU OF INVESTIGATION

Precedence:  ROUTINE                         Date:  02/15/2008

To:  Counterterrorism                    Attn: _____  b2
                                                                       b7E -2
                                          SSA _____
                                          IA  _____  b6 -1
                                                           b7C -1

From:  Los Angeles
       LBRA-4
       Contact:  TFO _____  b6 -1,2
                                                    b7C -1,2

Approved By:  _____  b6 -1
                                         b7C -1
Drafted By:  _____

_____  b7E -1

Title:  _____  b2
        IT-UBL/AL-QAEDA        b7E -1

(U)  Synopsis:  (S)  To document _____ interviews of Jehad  b2
     Suliman and Hossam Hemdan on 02/04/2008.                    b7E -1

(U)  (S)          Derived From : ~~G-3~~
                  ~~Declassify On:~~ 02/15/2033

_____  b2
                                                b7E -3

Details:  (S)  SA _____ and I went to interview Suliman and
     Hemdan, based upon Naji HAMDAN's recent detention in Lebanon.  b1
                                                                     b6 -1
(S) _____  b7C -1
    _____|we

     could learn additional details about HAMDAN's detention.

(U)  (S)  Jihad Suliman _____ - 1st interview            b7E -1
                              ~~SECRET~~

SECRET

To: Counterterrorism  From: Los Angeles
Re: (U) [_____] 02/15/2008                    b7E -1

(U) (S) We spoke with Jihad at his place of business, HondAcura
Palace, Los Angeles, where Jihad allowed us to speak with him
privately.  The interview was short and held in a back office
room.  Jihad took the position he was not aware of any of the
details which involved Naji's arrest or "problem" and that Naji
would not discuss those details with him (Jihad).  We obtained
two phone numbers for Naji (we have them already) and Jihad
advised with the exception of Naji's brother Hossam Hemdan, all
of Naji's family (wife, four children, parents and brothers)
lived in Lebanon.  Naji regularly did not do business in Lebanon
because the country was unstable.

(U) (S)  Hossam Hemdan [_____] - 2nd interview           b7E -1

(U) (S) We spoke to Hossam at his place of business, Redondo Smog,
Hawthorne, where Hossam allowed us to speak to him privately.
Hossam was more open to our presence and offered to contact Naji
or [_____] [_____] who Hossam identified as a [_____]
We left it open to Hossam and advised we could not officially        b6 -5
discuss matters over the telephone, but Hossam was free to call      b7C -5
and then talk to us.  Hossam chose to call [_____]  Hossam used a
Skype telephone and contacted [_____] and had a brief conversation
in Arabic.  Hossam concluded the telephone call and informed us
Naji was detained by the Lebanese Government because someone
(unknown) contacted the Lebanese Government and informed them
Naji was involved with weapons.  Hossam surmised the call was
from someone Naji previously did business with and was upset with
Naji, therefore prompting the call.  Hossam did not elaborate as
to why the person was upset.

(U) (S)  Hossam indicated the Lebanese government takes these types
of reports very seriously and concluded this was why he was
arrested.  Hossam went on to say if the accusations were true,
they (Lebanese government) would skin Naji.  Hossam meant this as
a literal indication the government would skin Naji as an
interrogative tactic.  Hossam indicated "everything was ok", Naji
was free and if there was anything wrong, [_____] would of told
him.  Hossam asked us if it was safe for Naji to return to the US   b6 -5
because the reason Naji left in the first place was due to the      b7C -5
FBI following him.  We replied he can return anytime he would
like to.  Hossam explained he offered to purchase Naji's business
to help him and believed Naji's business in the UAE was not doing
well.  Hossam did not provide a reason.  Hossam did not know if
Naji had any court dates or an attorney related to his detention
by the Lebanese authorities.

SECRET

2

SECRET

To:   Counterterrorism   From:  Los Angeles                           b7E -1
Re:   (U) [redacted], 02/15/2008

SECRET

3

FBI-ACLU-96

SECRET

To:  Counterterrorism   From:  Los Angeles
Re:  (U) [             ]   02/15/2008                        b7E -1

LEAD(s):

Set Lead 1:  (Info)

      COUNTERTERRORISM

         AT WASHINGTON, DC

         (U)  Read and clear.


♦♦046mcs01.08



SECRET
4

FBI-ACLU-97

DATE: 06-09-2010
CLASSIFIED BY UC60322LP/PLJ/CC
REASON: 1.4 (c)
DECLASSIFY ON: 06-09-2035

(Rev. 05-01-2008)

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED EXCEPT
WHERE SHOWN OTHERWISE

SECRET//ORCON/NOFORN

# FEDERAL BUREAU OF INVESTIGATION

Precedence:  ROUTINE                    Date:  08/18/2008

To:  Counterterrorism              Attn:  [          ]        b2
     Los Angeles                                            b7E -2

From:  Los Angeles
       LBRA-4
       Contact:  SA [              ]                        b2 -1
                                                           b6 -1
                                                           b7C -1

Approved By:  [            ]                                b6 -1
                                                           b7C -1
Drafted By:  [              ]:jps

(U) [                                    ]                  b7E -1
(U) [                                    ]

(U)  Title: (S) [                      ]
            IT - UBL / AL QAEDA                             b2
                                                           b7E -1
            [                      ]
            IT - UBL / AL QAEDA

(U)  Synopsis: (S)  (1)  Telcal between Hossem Hemdan, Naji Hamdan's
brother to request meeting in United Arab Emirates (UAE).  (2)
Telcal between Naji Hamdan and FBI Los Angeles to confirm
meeting.

        Derived From:  Multiple Sources
        Declassify On:  20330818

(U)  Details: (S)  On July 08, 2008, FBI Los Angeles contacted Hossem
Hemdan, work: 310-679-1326; cellular: 213-944-4491, Naji
Hamdan's (HAMDAN) brother who lived and worked in Los Angeles,
California.  FBI Los Angeles previously met with Hossem Hemdan to
follow-up on the disposition of his brother's January 2008
detainment in Lebanon.  During that conversation, Hossem Hemdan
offered to contact HAMDAN.  At the time, FBI Los Angeles
declined.  During this conversation, FBI Los Angeles requested
Hossem Hemdan to contact HAMDAN and provide him with information
to contact FBI Los Angeles at his convenience.

    (S)  At approximately 1000 hours, PST on July 09, 2008, HAMDAN
contacted FBI Los Angeles in response to FBI Los Angeles'



SECRET//ORCON/NOFORN

FBI-ACLU-98

SECRET//ORCON/NOFORN

(U)  To:  Counterterrorism  From:  Los Angeles
     Re:  [S]                    , 08/18/2008                              b7E -1

(S)      request.                                                          b1

         Since HAMDAN was from Los Angeles, FBI Los Angeles was
given the "lead" to contact him, and others, in an attempt to get
final disposition and close the lead.  FBI Los Angeles planned to
travel to the UAE to conduct interviews and asked if HAMDAN could
schedule an interview at the US Embassy, Abu Dhabi, UAE.

(U)  [X]  HAMDAN agreed to meet at 1000 hours on July 16 2008
(Wednesday) at the US Embassy located in Abu Dhabi, United Arab
Emirates.  HAMDAN was instructed to contact [            ]          b6 -1
upon arrival.                                                       b7C -1

(U)  [X]  HAMDAN indicated the distance from his home to the US
Embassy was approximately a 2 ½ hour drive, but did not have a
problem making the trip.  HAMDAN also said his family was flying
into town soon.  HAMDAN provided telephone number: 971-050-483-
0562.

SECRET//ORCON/NOFORN

2

FBI-ACLU-99

~~SECRET//ORCON/NOFORN~~

To: Counterterrorism  From: Los Angeles

(U) ---- Re: ---- (⊗) [          ] 08/18/2008                    b7E -1

LEAD(s):

Set Lead 1:  (Info)

    <u>COUNTERTERRORISM</u>

      <u>AT WASHINGTON D.C.</u>

    (U) ---- (⊗)  Read and clear.

◆◆231jps01.08

~~SECRET//ORCON/NOFORN~~

3

FBI-ACLU-100

DECLASSIFICATION AUTHORITY DERIVED FROM:
FBI AUTOMATIC DECLASSIFICATION GUIDE
DATE 06-09-2010

(Rev. 05-01-2008)

SECRET//ORCON/NOFORN

# FEDERAL BUREAU OF INVESTIGATION

Precedence:  ROUTINE                    Date:  09/09/2008

To:  Counterterrorism          Attn: [redacted]          b2
     Los Angeles                                          b7E -2

From:  Los Angeles
       LBRA-4
       Contact:  SA [redacted]               b2 -1
                                             b6 -1
                                             b7C -1

Approved By: [redacted]              b6 -1
                                     b7C -1
Drafted By: [redacted] :jps

(U) [redacted]                       b7E -1
(U) [redacted]

(U)  Title: [redacted]
           IT - UBL / AL QAEDA        b2
                                      b7E -1
           [redacted]
           IT - UBL / AL QAEDA

(U)  Synopsis: [redacted]  Second Telcal with Hossem Hemdan, Naji Hamdan's
     (HAMDAN) brother, who requested any information concerning
     HAMDAN's detainment by the United Arab Emirates (UAE) government.

           Derived From : Multiple Sources
           Declassify On: 20330818

(U)  Details: [redacted]  At approximately 0945 hours on September 09, 2008
     Hossem Hemdan (HOSSEM) [redacted] contacted FBI Los Angeles  b7E -1
     complaint desk (OCC) and specifically requested to speak to
     writer.  OCC transferred the call to writer's cellular telephone.

(U)  [redacted]  HOSSEM requested an update to his brother's (HAMDAN) status
     in the United Arab Emirates.  Writer advised he provide no
     further information concerning the status of HAMDAN.  HOSSEM said
     he was in contact with HAMDAN's [redacted], who was currently in
     Lebanon.  HOSSEM indicated [redacted] and HOSSEM's family were not
     successful with obtaining any information from the United Arab    b6 -5
     Emirates government.  HOSSEM said HAMDAN's telephone call to [redacted]  b7C -5
     was the last contact made.  HOSSEM informed no further contact
     was received by HAMDAN.

SECRET//ORCON/NOFORN

SECRET//ORCON/NOFORN

(U)   To:  Counterterrorism  From:  Los Angeles
      Re:  (S)[          ], 09/09/2008                    b7E -1

(U)      (S)  HOSSEM claimed writer knew more about HAMDAN's detainment
      than provided because writer was aware of HAMDAN's Lebanon
      detainment and United Arab Emirates detainment.  Writer advised
      he was only aware of HAMDAN's Lebanon detainment based on
      internal communications received from the Department of State.
      Writer further advised HOSSEM, he made aware of HAMDAN's recent
      detainment by HOSSEM's September 03, 2008 telcal.

(U)      (S)  Writer asked how HAMDAN's United Arab Emirates business was
      doing, which HOSSEM responded the business continued to run but
      needed HAMDAN there for management reasons.  Writer asked if
      HAMDAN's United States business manager (Jihad Sulieman) was
      informed of HAMDAN's arrest.  HOSSEM replied and emphasized he
      had not and had no intention of telling him (Sulieman) because he
      would only take more advantage of HAMDAN.  HOSSEM did not explain
      further Sulieman's intentions.

(U)      (S)  Writer advised HOSSEM to relay to [      ] to seek American
      Citizen Services in Lebanon, similar to what she did in January  b6 -5
      2008.  HOSSEM relayed his father in Lebanon speculated if HAMDAN  b7C -5
      was detained for importing stolen vehicles, which HOSSEM ensured
      all vehicles were legitimate.

(U)      (S)  Writer concluded the telcal by reemphasizing to HOSSEM he
      would be unable to provide any further information concerning
      HAMDAN's disposition.

SECRET//ORCON/NOFORN

2

FBI-ACLU-102

SECRET//ORCON/NOFORN

(U)  To:  Counterterrorism  From:  Los Angeles
     Re:  ☒☒  [_____]  09/09/2008                b7E -1

LEAD(s):

Set Lead 1:  (Action)

    <u>COUNTERTERRORISM</u>

        <u>AT WASHINGTON D.C.</u>

    (U)  ☒☒  Request [_____] to obtain an official response
and guidance from LEGAT Abu Dhabi, United Arab Emirates to be     b2
forwarded to Los Angeles.                                         b7E -2

◆◆253jps01.08

SECRET//ORCON/NOFORN

3

FBI-ACLU-103

DATE: 06-09-2010
CLASSIFIED BY UC60322LP/PLJ/CC
REASON: 1.4 (c)
DECLASSIFY ON: 06-09-2035

(Rev. 05-01-2008)

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED EXCEPT
WHERE SHOWN OTHERWISE

SECRET//ORCON/NOFORN

# FEDERAL BUREAU OF INVESTIGATION

Precedence:   ROUTINE                          Date:  09/03/2008

To:  Counterterrorism          Attn: [ ]                b2
     Los Angeles                                         b7E -2

From:  Los Angeles
       LBRA-4
       Contact:  SA [ ]                                  b2 -1
                                                         b6 -1
                                                         b7C -1

Approved By:  [ ]
                                 b6 -1
Drafted By:   [ ]:jps            b7C -1

(U)  [ ]                                                 b7E -1
(U)  [ ]

(U)  Title:  (S) [ ]
             IT - UBL / AL QAEDA                         b2
                                                         b7E -1
             IT - UBL / AL QAEDA

(U)  Synopsis:  (S)  Telcal between Hossem Hemdan, Naji Hamdan's
     (HAMDAN) brother, who requested any information concerning
     HAMDAN's detainment by the United Arab Emirates (UAE) government.

             Derived From :  Multiple Sources
             Declassify On:  20330818

(U)  Details:  (S)  At approximately 0930 hours on August 30, 2008
     Hossem Hemdan (HOSSEM) [ ] contacted FBI Los Angeles'
     complaint desk (OCC) and specifically requested to speak to      b7E -1
     writer.  The OCC did not transfer the call and took HOSSEM's
     contact information.  OCC contacted writer and relayed HOSSEM's
     indication the information he wanted to discuss was important.

     (S)  Writer re-contacted HOSSEM on Wednesday, September 03, 2008

(S)  [ ]                                                 b1
                                                         b6 -3,5
                                                         b7C -3,5
             Since HAMDAN was from Los Angeles, FBI Los

SECRET//ORCON/NOFORN

FBI-ACLU-104

SECRET//ORCON/NOFORN

(U)  To: Counterterrorism  From: Los Angeles
     Re: ⊠ [＿＿＿＿＿＿＿]  09/03/2008                                      b7E -1

Angeles was given the "lead" to contact him, and others, in an
attempt to get final disposition and close the lead.  FBI Los
Angeles planned to travel to the UAE to conduct interviews and
asked if HAMDAN could schedule an interview at the US Embassy,
Abu Dhabi, UAE.

     ⊠  At approximately 0935 hours, on September 03, 2008, writer
contacted HOSSEM (cellular: 213-944-4491 and work: 310-644-9099)
and left a voice mail message to return writer's call.  At
approximately 1100 hours, HOSSEM returned writer's call. [＿＿＿]   b1
(S)  [＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿]
HOSSEM immediately requested if writer was aware of what happened
to his brother HAMDAN, which writer responded no.  Writer
requested HOSSEM to explain further what happened.

(U)  ⊠  HOSSEM indicated he was contacted first by his brother
[＿＿＿＿＿＿＿＿] and then by HAMDAN's wife [＿＿＿＿] who explained
HAMDAN was arrested for unknown reasons by the UAE government.
HAMDAN's wife said she recently spoke with HAMDAN who indicated
he was well, that he would released soon, but did not say what he   b6 -5
was being charged with by the UAE.  HOSSEM was not sure if the      b7C -5
UAE authorities were the police or another UAE government agency.
Neither HOSSEM, [＿＿＿＿] or his family were aware of HAMDAN's
charges.  HOSSEM speculated the UAE government believed HAMDAN
worked for Mossad or the CIA.  When asked why HOSSEM believed
this, HOSSEM responded he felt his brother (HAMDAN) was
constantly watched by all governments, like Lebanon, the United
States, and now the UAE.  HOSSEM assumed that because HAMDAN
visited the US Embassy, UAE in July 2008 that he was being
watched by the UAE authorities and concluded HAMDAN worked for
the United States.

(U)  ⊠  HOSSEM was told by [＿＿＿＿], HAMDAN was arrested at his place of   b6 -5
business in the UAE.  HAMDAN was told by an unknown individual at      b7C -5
his business there was an accident in the front and when HAMDAN
went to check, the police or government officials arrested him.
HOSSEM could not provide further information about HAMDAN's
arrest and continued to ask writer for any further information
the FBI could provide.  Writer respectfully declined HOSSEM's
continued requests and advised that due to HAMDAN's United States
Citizenship, the Department of State would make contact with him
to ensure his rights were observed.

(U)  ⊠  HOSSEM asked if the United States had a good relationship
with the UAE government, which writer responded yes, however the
United States would not know the details of any investigation by
the UAE government.  HOSSEM went on to explain that countries in

SECRET//ORCON/NOFORN

2

FBI-ACLU-105

SECRET//ORCON/NOFORN

(U) To: Counterterrorism   From: Los Angeles
(U) Re: (X)_____, 09/03/2008                                    b7E -1

general, like Lebanon and the UAE watched individuals who were
foreigners and accused them of being part of "militias" that were
anti-government.  HOSSEM opined HAMDAN was put on government's
lists and that were exchanged between other governments to get
his brother arrested.  HOSSEM could not provide further
information nor details of his reasoning.

(U)     (X)  Writer asked if HAMDAN was apart of any terrorist
organizations, which HOSSEM responded he (HAMDAN) was "100% not
involved with any groups."  HOSSEM explained he was the closest
of his brothers with HAMDAN and that if his brother was, he
(HOSSEM) would be the first to tell the FBI.  HOSSEM theorized
informants or enemies in Lebanon provided misleading information
to get his brother in trouble.  HOSSEM did not provide further
information as to who the informants were, the information they
provided, nor the countries they were located.

(U)     (X)  HOSSEM said the last time he spoke with HAMDAN was
approximately a week ago, August 24, 2008.  They spoke about
HOSSEM's son who was in Lebanon with his brother.  HOSSEM did not
provide his brother's name or who his son was staying with in
Lebanon.

(U)     (X)  HOSSEM offered to provide any and all information he could
to find out information concerning HAMDAN.  Writer took this
opportunity to address general areas as to why HAMDAN "could" be
arrested by another country's government.  Writer admonished
HOSSEM that any information he provided had to be accurate and
true, which HOSSEM agreed and emphasized his commitment to help
the FBI anyway he could.

(U)     (X)  HOSSEM indicated HAMDAN was a very religious Sunni Muslim,
who when he lived in Los Angeles prayed at the Hawthorne Mosque,
Los Angeles, California.  HOSSEM admitted he was not as religious
as HAMDAN and joked that he was "infidel" because he no longer
prayed.  HOSSEM added he did not like the people who went to the
Hawthorne Mosque, he did not like their opinions.  Writer queried
what opinions, which HOSSEM provided a generic distinction
between persons who disagree of about Democratic and Republican
politics.  Writer directly asked if HAMDAN belonged to any
extremist groups similar to those individuals who attacked the
United States on September 11, 2001.  HOSSEM responded HAMDAN
would never be apart of those groups.  HOSSEM listed Al-Qaeda,
HAMAS, and Hizballah as examples of terrorist groups.

(U)     (X)  NOTE:  HOSSEM explained that he and HAMDAN knew they were
followed by government vehicles and asked writer again why the

SECRET//ORCON/NOFORN

3

FBI-ACLU-106

SECRET//ORCON/NOFORN

(U)  To:  Counterterrorism  From:  Los Angeles
     Re:  (S)  [                    ]  09/03/2008                    b7E -1

United States government followed HAMDAN.  Writer asked how
HOSSEM knew government vehicles followed he and HAMDAN, which he
replied his smog business, located at 13737 Hawthorne Boulevard,
Hawthorne, California  90250; telephone:  310-644-9099; regularly
smogged law enforcement and government vehicles, to include that
HAMDAN also frequented car auctions and could easily identify
unmarked cars.

(U)  (S)  Writer continued to generalize questions and asked if HAMDAN
had any issues at any of his businesses, or criminal/civil
history.  HOSSEM responded no, but added his dislike for Jihad
(Jihad Sulieman) who currently managed HAMDAN's business.  HOSSEM
did not trust Jihad Sulieman and accused him of stealing from
HAMDAN, not filing taxes on time, paying bills late, and not
paying city licenses on time.  Writer asked if HAMDAN paid his
taxes, which HOSSEM said, "to the penny."  HOSSEM added HAMDAN
did not have any criminal or civil complaints or history.

(U)  (S)  Writer asked if HAMDAN had any enemies or mistresses that
would say anything negative.  HOSSEM indicated HAMDAN did not
have any enemies nor any mistresses, that he was a faithful
husband.  HOSSEM joked that he was the only "bad boy."  HOSSEM
added HAMDAN had high blood pressure and high cholesterol.
HOSSEM was not aware of any medications HAMDAN took, but believed
he did take prescription drugs.

(U)  (S)  The call concluded with HOSSEM emphasizing his willingness
to help in anyway he could, and he would be available twenty-four
hours a day.  Writer advised HOSSEM if he heard anything further
about HAMDAN to not hesitate to contact writer.  HOSSEM asked
writer what HAMDAN should do in his position.  Writer again
advised he could not provide any advice or guidance, but could
only collect his information.  Writer did not promise anything to
HOSSEM nor promised to do anything further for HAMDAN.  Writer
advised his position was merely to collect information provided
to the FBI from the Department of State as it related to
circumstances of United States Citizens traveling or living
abroad.

SECRET//ORCON/NOFORN

4

SECRET//ORCON/NOFORN

(U)   To:  Counterterrorism  From:  Los Angeles
      Re:  (S)                   09/03/2008                              b7E -1

LEAD(s):

Set Lead 1:  (Info)

    COUNTERTERRORISM

      AT WASHINGTON D.C.

(U)          (S)  Read and clear.


◆◆247jps01.08

SECRET//ORCON/NOFORN

5

FBI-ACLU-108

DATE: 06-08-2010
CLASSIFIED BY UC60322LP/PLJ/CC
REASON: 1.4 (c)
DECLASSIFY ON: 06-08-2035

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED EXCEPT
WHERE SHOWN OTHERWISE

(Rev. 10-01-1999)

SECRET

# FEDERAL BUREAU OF INVESTIGATION

Precedence:  ROUTINE                    Date:  10/08/2001

To:  Los Angeles

From:  Los Angeles
         NSD-5/JTTF
         Contact: _____    b2 -1
                                            b6 -1
                                            b7C -1

Approved By: _____              b6 -1
                                           b7C -1

Drafted By: _____sml

(S) _____       b1
                                           b7E -1

(S)  Title: _____           b1
            OO: LA

(U)  Synopsis:  ___  Interview of Hossam J. HEMDAN.

     (U)    (S)        Classified By:  5973, NSD-5/LA
                       Reason      :  1.5(c)
                       Declassify On:  X1

Administrative:  (U)  Attached is a copy of the e-mail given to the
FBI.

Details: ___                                b1
                                            b6 -1
(S)                                         b7C -1

                           ____ by writer and SA ____
      ____  at his place of business, Redondo Smog Check.

(U) ___        ___  HEMDAN had no information concerning Usama Bin
Laden and did not know of anyone who might be planning any
terrorist acts or engaging in any radical fundamentalist
activity.  HEMDAN advised he had not visited or fought in
Afghanistan during the 1980s or at any other time.  When asked if
he had ever fought in Beirut, Lebanon (the place of his birth) he
stated that he was young, sixteen or eighteen years old (Note:
HEMDAN would not elaborate and the interviewing agents believe
HEMDAN's response and body language implied he may have fought in

SECRET



SECRET

(S)  To: Los Angeles  From: Los Angeles
Re: (X̶)␣␣␣␣␣␣␣␣␣␣␣␣␣␣␣␣␣ 10/08/2001                          b1

Lebanon in the 1980s and was trying to explain it as youthful indiscretion).

(U) ␣␣␣␣␣␣ (X̶)␣␣ HEMDAN did mention the names of [␣␣␣␣␣␣␣␣␣]
and [␣␣␣␣␣␣␣␣␣␣] as possible people to watch. HEMDAN referred
to [␣␣␣␣␣␣␣␣] as being a crazy person. [␣␣␣␣␣␣␣␣] was arrested       b6 -5
and deported several years ago. HEMDAN did not know the                 b7C -5
whereabouts of [␣␣␣␣␣␣␣].

(U) ␣␣␣␣␣␣ (X̶)␣␣ HEMDAN was friendly and understood why the FBI
wanted to talk to him. He offered to talk to the FBI again if
any more questions arose or if the FBI wanted any clarification
on Islamic/Muslim customs. HEMDAN is a U.S. citizen, married and
has four children. He works Monday-Saturday, 8am-5pm.

Descriptive Data (U):

                    Last Name:          HEMDAN
                    First Name:         Hossam
                    Middle Initial:     J
                    A.K.A.              Sammy Hemdan
                    DOB:                04/04/1970
                    POB:                Beirut, Lebanon
                    Citizenship:        U.S., 09/14/00
                    SSN#:               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
                    CDL#:               A5174762
                    FBI#:               955201TA8
                    CII#:               A10330533
                    Height:             5'8"
                    Weight:             200 lbs.
                    Hair:               Brown
                    Eyes:               Brown
                    Home Address:       3908 W. 111th St.
                                        Inglewood, CA, 90303
                    Home Telephone:     310-673-7705
                    Cell Telephone:     213-944-4491
                    Business:           Redondo Smog Check
                                        (co-located with
                                        Hawthorne Muffler)
                    Business Address:   13737 S. Hawthorne Blvd.,
                                        Hawthorne, CA, 90250
                    Business Telephone: 310-644-9099.

♦♦

SECRET

2

FBI-ACLU-110

DECLASSIFIED BY 60322LP/PLJ/CC
ON 06-10-2010

(12/31/1995)

SECRET/ORCON/NOFORN

# FEDERAL BUREAU OF INVESTIGATION

Precedence: Immediate                    Date:  12/30/1999

To:  Counterterrorism          Attn:        b2
                                            b7E -2
                                     UC                        b6 -1
                                     SSA                       b7C -1
                                     SSA

        New York

        Seattle

From:  Los Angeles
        LBRA, Squad 4
        Contact:  SA                              b2 -1
                                                  b6 -1
                                                  b7C -1

Approved By:                              b6 -1
                                          b7C -1

Drafted By:

(U)                                       b7E -1
    (U)      (U)
(U)

(U)  Title:  (S)   USAMA BIN LADEN
                   AOT-IT
                   OO: NY

    (U)      (S)   USAMA BIN LADEN
                   IT-UBL/AL-QAEDA
                   OO: NY

(U)          (S)                          b6 -3
                                          b7C -3
                   AOT-IT
                   OO: SE

(U)          (S)                          b2
                                          b7E -1
                   IT-Other (Egypt)
                   OO: Los Angeles

SECRET/ORCON/NOFORN

FBI-ACLU-111



SECRET/ORCON/NOFORN

To: Counterterrorism  From: Los Angeles

(U) Re: [X] [_____], 12/30/1999                    b7E -1

(U) Synopsis: [X] Lead covered regarding interview of subjects in an effort to counter Usama Bin Laden related threats to the United States' interests during the weeks surrounding the Millennial celebrations.

(U) [X] Derived From : ~~G-3~~
        Declassify On:~~ X-1

(U) Details: [X] HOSSAM J. HEMDAN's, [_____] [_____] was contacted on 12/30/1999 at approximately 5:45 am by Special Agents [_____] of the Long Beach RA Squad 4, [_____] advised that [_____] was at a Mosque and will return in approximately 1 hour.  The agents observered HEMDAN returning to the residence at approximately 6:10 am driving a black 1991 Acura bearing California license plate IBLVNJC, registered to [_____]. Los Angeles, California. Also observed on the driveway was a blue Chevrolet Lumina, CA plate 3EWN897 registered to HEMDAN.  HEMDAN and [_____] were advised of the identity of the interviewing agents and the nature of the interview, and provided the following information.

b6 -1,5
b7C -1,5
b7E -1

(U) [X] HEMDAN resides at 3908 111th Street, Inglewood, California telephone number (310) 673-7705. He is the owner of Budget Auto Repair, located on Prairie Ave between 131st and 132nd Street, Inglewood, California, telephone number (310) 675-5653.

(U) [X] HEMDAN stated he was returning from the Islamic Center of Hawthorne.  After some questioning about the Mosque, [_____] stated they were not Shiite Muslims but were Sunni. HEMDAN also added that he has not gone to the Mosque for a long time because of work but was starting to go again.  HEMDAN advised that the Mosque does do fund raising to support Hamas.

b6 -5
b7C -5

SECRET/ORCON/NOFORN

2

FBI-ACLU-112

SECRET/ORCON/NOFORN

To: Counterterrorism  From: Los Angeles
(U) Re: (S)⬚⬚⬚⬚⬚⬚ , 12/30/1999                                b7E -1

(U)        (S) HEMDAN advised he was arrested for credit card
fraud and stated that the arrest should be expunged from his
records. HEMDAN stated his role in the credit card fraud was
very limited. HEMDAN stated his associates in this fraud were
⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚. HEMDAN currently has no
contact with ⬚⬚⬚⬚⬚ and advised that he may have been        b6 -5
deported. HEMDAN stated he has occasional contact with ⬚⬚⬚⬚⬚  b7C -5
while playing soccer on a team in Torrance, California.

(U)        (S) HEMDAN described ⬚⬚⬚⬚⬚⬚ as a very bad man who
always expressed terrorist ideas. ⬚⬚⬚⬚⬚⬚ has brought guns to
the Mosque and has shown others how to shoot guns. HEMDAN      b6 -5
admitted to weapons training with others from the Mosque       b7C -5
including ⬚⬚⬚⬚⬚⬚. HEMDAN stated the training was conducted
at a public range somewhere east on the I-10 freeway in
California. The training consisted of weapons familiarity and
safety.

(U)        (S) When questioned about travel to Bosnia, HEMDAN
paused and stammered and asked if he was to tell the truth.
HEMDAN admitted he traveled to Bosnia in 1993 with a Imam named
⬚⬚⬚⬚⬚⬚ (LNU), from the old Inglewood Mosque (now the Hawthorne  b6 -5
Mosque), for approximately 1 - 1.5 months to observe the ongoing b7C -5
events in that area. HEMDAN denied he fought with the Muslim
Mujahedeem or did any type of fighting.

(U)        (S) HEMDAN advised he has no past or present knowledge
of any terrorist activities.

(U)        (S) HEMDAN asked why he was selected to be
interviewed. The interviewing agents told him that many others
were being interviewed and it could possibly be from his
association with ⬚⬚⬚⬚⬚⬚.

(U)        (S) HEMDAN and ⬚⬚⬚⬚ stated they were going to be home b6 -5
on New Year's Eve with their three children. ⬚⬚⬚ stated they    b7C -5
live an isolated life and do not associate with others from the
Mosque. Without any solicitation from the interviewing agents

SECRET/ORCON/NOFORN

3

SECRET/ORCON/NOFORN

To: Counterterrorism   From: Los Angeles

(U)  Re: [ ][                    ] 12/30/1999          b7E -1


HEMDAN stated he would cooperate with the Federal Bureau of        b6 -5
Investigation by wearing a wire into the Mosque in Hawthorne.      b7C -5
[        ] added that the tape recordings would be boring to listen to.
HEMDAN added that he would help in any way to prevent any trouble
for the New Year.

SECRET/ORCON/NOFORN

4

FBI-ACLU-114

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 03-07-2011 BY 65179/DMH/BAW/STP/bls







HOME    NEWS & FEATURES    TAKE ACTION    SUPPORT US    EVENTS    LEGAL    ABOUT US

## American Citizen Held Abroad Needs *Your* Help

Wednesday, December 17, 2008 permalink

We're working on a case that will make your hair stand on end.

Our client, Naji Hamdan, a U.S. citizen, was detained and tortured this fall for three months by the United Arab Emirates with United States involvement. Naji is still in prison there, now under the custody of local officials who charged him with terrorism-related offenses based on coerced confessions.

Urge Secretary of State designee, Hillary Clinton to intervene and get Naji released by signing our petition.



For over two decades, Naji and his family lived in Hawthorne, California, where he ran an auto-parts business and helped manage the Islamic Center of Hawthorne, a mosque and community center. He was also monitored by the FBI. The past two years were especially intense. Naji's brother, Hossam, and others who know him from his activities at the Islamic Center have all said that he's a peaceful family man who would never support violence.

Because of the U.S. government, Naji was a victim of violence. He was severely beaten and kicked with military boots, strapped into an electric chair and threatened with its use.

Urge Secretary of State designee, Hillary Clinton to intervene and get Naji released by signing our petition.

In 2006, Naji decided to relocate to the United Arab Emirates for business and family reasons. This summer FBI agents traveled from Los Angeles to the U.A.E. to continue their questioning of Naji. Three weeks later he was taken into custody by agents of the U.A.E. state security forces and detained incommunicado for the next three months.
His brother and his wife, Mona, also a U.S. citizen, were frantic. They contacted the ACLU/SC for help. On November 26, 2008, one week after lawyers for the ACLU/SC filed a lawsuit alleging that the U.S. government was responsible for his detention, Naji was transferred from U.A.E. state security custody to the Al Wathba prison in Abu Dhabi where he remains to this day, charged with terrorism-related offenses.

GET INVOLVED!

### UP FRONT

**CRIMINAL JUSTICE**

*Report: Racial Profiling and the LAPD: Reform & Resistance*

*Jails Project Helps LA County Inmates and Families*

**STUDENTS & EDUCATION**

*Military Recruiting in Our Public Schools*

*Get Help Fixing California's Broken Classrooms*

**FREEDOM OF SPEECH**

*Access For All: Our Campaign For Net Neutrality*

**IMMIGRANT RIGHTS**

*U.S. Citizen Illegally Detained and Deported Latest Victim of Unconstitutional Immigration Enforcement Policy*

**LGBT EQUALITY**

*Equality For All: Help Preserve the Freedom To Marry*

ACLU - Hamdan-94

<u>Urge Secretary of State designee, Hillary Clinton to intervene and get Naji released by signing our petition.</u>

Recently, Naji was able to finally contact his family and an American consular official and told them he was severely tortured during his detention in U.A.E. state security custody and forced to confess to crimes that he did not commit.

His torturers blindfolded Naji, so he couldn't see them. Naji heard some of the interrogators speak native English with an American accent. They asked him questions about topics only federal agents would know.

From all angles, his imprisonment looks like it's been done at the request of the U.S. government, and his interrogation, which included severe torture, was done with participation of U.S. federal officials. If the U.S. government requested or participated in his detention and torture in the U.A.E., the United States government has violated this U.S. citizen's most fundamental rights.

<u>Urge Secretary of State designee, Hillary Clinton to intervene and get Naji released by signing our petition.</u>

Naji's situation is now urgent. If his prosecution is allowed to proceed in the U.A.E. based on evidence obtained through torture, Naji will receive a deeply unfair trial and unjust sentence.

<u>Urge Secretary of State designee, Hillary Clinton to intervene and get Naji released by signing our petition</u>

The policies of the current administration make appealing to Secretary Rice practically pointless. Please help us urge Senator Hillary Clinton, President Elect Obama's choice for the next Secretary of State, for Naji's release and return to the U.S., where his rights can be protected. If Naji has done something wrong, then the U.S. should charge him with a crime and prosecute him in the United States, where he can be assured his due process rights. In addition, the role played by the U.S. government in causing Naji's detention and torture must be thoroughly investigated. Naji must be treated as all Americans deserve to be treated, with dignity and respect for their rights.

**Related**

Read: *U.S. Complicit in American's Detention and Torture in the U.A.E.*

Read: *Official Protect on Behalf of Tortured American Citizen*

*« previous*                                              *news index*
*December 12, 2008*

home | contact us | volunteer | jobs | privacy policy | legal intake | chapter calendar | RSS feeds

*This is the web site of the American Civil Liberties Union of Southern California and the ACLU Foundation of Southern California.*
*Learn more about the distinction between these two components of the ACLU. Copyright 2007 The ACLU of Southern California.*

ACLU - Hamdan-95

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 03-07-2011 BY 65179/DMH/BAW/STP/bls

## American Alleges Torture In UAE Detention

Miamiherald.com
By Jonathan S. Landay
December 2, 2008

WASHINGTON, DC -- A Muslim American contends that he was tortured and beaten into confessing to a terrorism-related charge while the security services of the United Arab Emirates held him for nearly three months, allegedly at the U.S. government's request, his brother said Tuesday.

Hossam Hemdan, of Los Angeles, said he received a predawn telephone call from his brother, Naji Hamdan, who he said detailed his treatment by the security services of Abu Dhabi, one of seven oil-rich UAE sheikdoms that have cooperated in the Bush administration's fight against Islamic extremism since Sept. 11. "They released him after he gave up and signed whatever they gave him. He was willing to sign anything. Now they have put him into the criminal court system," Hemdan said during a telephone interview in which he insisted that his brother has no links to terrorism. "He is with criminals, like killers and drug dealers." Hamdan, he said, couldn't give him specifics of the criminal charge to which he confessed beyond it being terrorism-related.

Hamdan is the subject of a lawsuit filed last month in federal court in Washington in which the American Civil Liberties Union charged that the administration illegally asked the UAE security services to hold the 42-year-old naturalized U.S. citizen in order to circumvent his constitutional protection against illegal and unlimited detention. The lawsuit, which named President Bush, Attorney General Michael Mukasey and **FBI Director Robert Mueller** as defendants, asked that the administration be ordered to demand Hamdan's release. Jennie Pasquerella, an attorney with the ACLU's Southern California office, said that U.S. District Judge James Robertson on Tuesday gave the government 30 days to respond to the ACLU's request.

Hamdan's detention in August followed several years of intense **FBI** scrutiny in the wake of Sept. 11 while he lived in Los Angeles. The **FBI** has acknowledged that the case involved counterterrorism but has denied asking the UAE to hold Hamdan. An **FBI** spokesman Tuesday declined to comment on the torture allegations. The State Department and the UAE Embassy didn't respond to requests for comment. Hemdan said his brother called him from prison in Abu Dhabi at 1:22 a.m. on Tuesday, and they spoke for more than six minutes before the line was cut.

"My brother has been tortured over there," said Hemdan, who owns two vehicle emissions testing centers in Los Angeles. "He was speaking (Arabic) with a Lebanese accent very quickly so that the Emiratis couldn't understand it. He was using Lebanese slang."

Hamdan told his brother that he was held and interrogated in "a very cold room" after UAE security officers learned his "weak spot" of being susceptible to cold. The room was constantly illuminated by very bright lights and "they didn't let him sleep," Hemdan said. "They beat him very badly. They stood on his back and another person pulled his feet. They beat him on the bottoms of his feet," he continued. "He said he had a liver problem. They beat him on his liver on the right side (of his body)."

ACLU - Hamdan-96

Hamdan told Hemdan that the treatment was "unimaginable" and that he'd lose consciousness. "He asked me why is this happening to him? Why did they pick him up?" said Hemdan. "He's not a normal person anymore. He's lost. He's willing to be accused of anything they want." Hemdan said he had to press his brother to provide details of his alleged treatment, recounting that he was afraid that "they will disappear him if he says more." "I told him he had to tell me everything," Hemdan said. "I said we have to do the right thing and get this out. He said 'OK, you know the right thing to do.'" "Naji was like someone falling from a height and holding onto a thread and begging for help," Hemdan said, adding that he tried contacting a lawyer in Abu Dhabi but was unable to reach one because of a national holiday.

## U.S. Citizen Allegedly Tortured In United Arab Emirates

ACLU Says Naji Hamdan, A Naturalized American, Was Detained At The Behest Of The U.S. Government And Has Been Charged In The Persian Gulf Nation With A Terrorism-Related Offense.

The Los Angeles Times
7:33 PM PST
By Raja Abdulrahim
December 3, 2008

LOS ANGELES, CA -- A former Hawthorne man detained in the United Arab Emirates since Aug. 29 has been tortured and ultimately charged with a terrorism-related offense, according to a lawyer with the ACLU of Southern California.

Naji Hamdan, told his brother during a six-minute call early Tuesday morning that he had been pinned to the ground with his arms and legs twisted behind him and beaten until he passed out, according to an ACLU statement released Wednesday. The ACLU's information was based on the account from Hamdan's brother. Hamdan, a naturalized U.S. citizen, was also beaten on the soles of his feet, kept awake by a spotlight and told that his family would be punished if he didn't confess to his interrogators' allegations, the ACLU said. "They took out his soul," said Hamdan's brother, Hossam Hemdan, using a common Arabic expression, in an interview with The Times.

In addition to the beatings, Hemdan said, his brother told him that he had been stripped of nearly all his clothes and kept in a small, cold underground room for the three months. He was also denied medication for a liver condition, Hemdan said. Hemdan, who spells his last name differently, said his brother signed every confession given to him, though he didn't know what he was signing and didn't care, in an unsuccessful attempt to stop the torture. "Please get me out of here, I'm willing to sign anything," Hemdan said his brother told him.

Hamdan, who lived in the Hawthorne area for two decades and still owns an auto parts business in Los Angeles, faces four charges, including one related to terrorism, Hemdan said. "It seems like they are trying to prosecute him using statements he made under torture," said Jennie Pasquarella, the ACLU attorney. The ACLU filed a habeas corpus petition last month against the U.S. government alleging that Hamdan was being held at the government's behest. ACLU lawyers said they were considering amending the

ACLU - Hamdan-97

lawsuit to include the torture allegations.  "If the U.S. is responsible for his detainment -- which we believe they are -- they are responsible for this torture," Pasquarella said. Hamdan's family has also hired its own attorney in the Emirates.

A State Department Bureau of Consular Affairs spokeswoman did not return calls for comment Wednesday and a spokesman for the Emirates embassy in Washington, D.C,. said it would be inappropriate to comment on a police and security matter involving a private U.S. citizen.  Hamdan was released from state security custody and taken to a prison near the city of Abu Dhabi on Nov. 26.  Since his transfer he has not been tortured, Hemdan said.  When they spoke, he tried to calm his jailed brother and assure him that things would be OK.  "I didn't even know my brother.  They turned him into an old, shivery man; he's turned insane," Hemdan said.  "He's a different person; he's not the Naji I know, not the brother I know."

ACLU - Hamdan-98

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 03-07-2011 BY 65179/DMH/BAW/STP/bls

# US Citizen of Lebanese Origin Detained for Suspected Terror Links

Amira Agarib and Preeti Kannan

DUBAI — An American citizen of Lebanese origin is being held for interrogation by the UAE State Security Authority, since August, for suspected links with terror activities.

The authorities detained Naji Hamdan, 43, who has been living in Abu Dhabi for the past two years, in August.

"Hamdan has been detained for security reasons by the State Security in Abu Dhabi and is being questioned for any alleged links with terrorist activities. This is a routine procedure and he

"Hamdan has been detained for security reasons by the State Security in Abu Dhabi and is being questioned for any alleged links with terrorist activities"

would be released once the interrogation is complete."

"The US government is aware of his detention," an official from the State Security Authority told Khaleej Times on the condition of anonymity.

The official said that Hamdan, a naturalised US citizen of Lebanese origin, regularly travelled to Lebanon, US and other countries.

His family also lives in Abu Dhabi.

"We have met Naji Hamdan in October and we have made another request to meet him again," Steven D. Pike, Counsellor for Press and Cultural Affairs, US Embassy in Abu Dhabi, told Khaleej Times.

American media reported recently that the American Civil Liberties Union (ACLU) has petitioned the US government on Wednesday for Hamdan's release.

Meanwhile, an Emirati national, Khalifa Ali, detained as a terrorist suspect by Saudi authorities for more than a year and a half, has been transferred to the UAE and is due for release, reported German news agency Deutsche Presse-Agentur on Wednesday.

Khaleej Times could not confirm the DPA report.

amiraa@khaleejtimes.com
preeti@khaleejtimes.com

## Iraqi Artefacts Sized

From Page 1

...was entering the emirate through the entry point on the Creek.

"The acts of the captain and five crew members aroused suspicion among customs officers who questioned the captain and crew who said the dhow was carrying mango," said Ahmed.

The officers searched the vessel but couldn't spot anything initially. However, the thick wooden wall, which looked like a part of the dhow, aroused suspicion and officers asked to break it. But the captain refused saying the dhow would fall if they broke it.

"Our officers insisted on breaking the wall and found the antiquities and artefacts hidden in paper boxes," said Ahmed, adding that all Iranian crew members were arrested.

"We still cannot confirm that the antiquities were intended to be sold in Dubai or smuggled to other countries. The detained crew have only limited information about the final destination of the antiquities," said Ahmed.

The main culprits are operating from some other countries and it is not clear whether the antiquities were looted from any museum or specific archaeological sites. Ahmed said Dubai Customs is in touch with the different ministries to decide where the confiscated antiquities should be transferred to.

"We will take a decision on this after the expert from Britain gives us more details about their history. Until then, we will keep the antiquities in custody," said Ahmed. The three officers who seized the antiquities have been promoted.

ACLU - Hamdan-99

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 03-07-2011 BY 65179/DMH/BAW/STP/bls

  

HOME    NEWS & FEATURES    TAKE ACTION    SUPPORT US    EVENTS    LEGAL    ABOUT US    Search »

Home → News Releases → Release

# Tortured U.S. Citizen Sentenced to 18 Months Time Served in U.A.E. on Unspecified Charges

Monday, October 12, 2009

LOS ANGELES, Calif. – A judge in the United Arab Emirates sentenced U.S. citizen Naji Hamdan to 18 months after finding him guilty of unspecified terrorism-related charges that stem from an apparent U.S.- orchestrated arrest and a coerced confession obtained under torture.

| **Related** |
| Read more about this case. |

Hamdan, who has been imprisoned in the U.A.E. for more than a year, will be released shortly based on time already served. In handing down the sentence Monday, the U.A.E. judge never specified the charges on which Hamdan was convicted.

"If the government of the U.A.E. thought that Mr. Hamdan was a threat to anyone's security, he would not have been ordered released on time served," said Ahilan Arulanantham, director of immigrant rights and national security at ACLU/SC.

Hamdan has become an unfortunate example of the Obama administration's willingness to continue the Bush-era practice of using foreign governments -- often those with abysmal human rights records -- to detain and interrogate suspects based on little if any evidence while subverting the U.S. judicial process.

Last year U.A.E. state security forces, at the apparent behest of the U.S. government, detained Hamdan in a secret prison for three months, during which time officials interrogated and tortured him until he agreed to confess to whatever the officials wanted. Hamdan believes that at least one American official was present during a torture session, when the interrogator spoke to him in American English while he remained blindfolded.

It was not until the American Civil Liberties Union filed a lawsuit alleging that the U.S. government was responsible for Hamdan's detention that he was transferred from the secret prison into a regular prison in the U.A.E. and charged with having committed unspecified terrorist offenses.

"The United States is not safer today because Naji Hamdan was imprisoned in the U.A.E." said Jennie Pasquarella, an ACLU/SC staff attorney. "But if the Obama administration continues Bush-era policies that tolerate arbitrary detention and torture of suspects on behalf of the U.S., Mr. Hamdan's story is destined to be repeated itself."

**Judge Grants Injunction in Landmark Education Lawsuit That Will Prevent Further Teacher Layoffs at Three LAUSD Schools (05/12/2010)**

**Overcrowded Men's Central Jail Plagued by Violence and Hazardous Living Conditions, New ACLU Report Finds (05/05/2010)**

more releases ...



### UP FRONT

**Criminal Justice**

Report: *Racial Profiling and the LAPD: Reform & Resistance*

**Economic Justice**

Suit Against Santa Monica for Throwback Treatment of Disabled Homeless

**Educational Equality**

Pushing Back Against LAUSD Layoffs: Equal Education For All

Get Help Fixing California's Broken Classrooms

**Freedom of Speech**

Suit to Protect Veteran's Free Speech Rights

**Immigrant Rights**

Immigrants with Mental Disabilities Lost in Detention for Years

ACLU - Hamdan-100

Case 2:10-cv-06149-DSF-JEM   Document 29-28   Filed 08/10/11   Page 43 of 75   Page ID
#:1094
Tortured U.S. Citizen Sentenced to 18 Months Time Served in U.A.E. on Unspecified Ch...   Page 2 of 2

Hamdan lived for two decades in the Los Angeles area, where he ran an auto-parts business and helped manage the Islamic Center of Hawthorne, a mosque and community center. His nightmare began in 2006 when he relocated his family and business to the U.A.E. As the Hamdans tried to board a flight at Los Angeles International Airport, FBI agents separated him from his wife and children, detained him and questioned him for hours. He was eventually released and allowed to travel, but when he returned to Los Angeles in early 2007 to check on his business, he was subject to further intensive FBI surveillance.

Then, in the summer of 2008, FBI agents traveled from Los Angeles to the U.A.E. to question Hamdan further. Shortly thereafter he was detained incommunicado by U.A.E. state security agents.

"I don't understand why my father was taken away from me," said Hamdan's 17 year-old son Khaled Hamdan. "This is so painful. I grew up in the United States, but I feel like my government abandoned me, my family and my father."

Since Hamdan's arrest, both U.S. and U.A.E. officials have refused to deny that the U.S. is responsible for his detention. However, the charges against him, which included visiting Islamic websites, are for alleged "crimes" that were not committed in the U.A.E. There is no appeal to the court's decision.

"The United States betrayed the values of justice and due process at the expense of a beloved leader, father and friend. Everything Naji's children believed this country stood for was turned upside down and in the process they were separated from their father," said Hossam Hemdan, the brother of Naji Hamdan who lives in Los Angeles. "We are grateful today, that Hamdan can return to his family."

**Jails Project**

Jails Project Helps LA County Inmates and Families

**LGBT Equality**

Prop 8: Focusing on the Wrong Question

Why We Must Wait To Win

News, Updates and More

**Religious Liberty**

Blocking Faith, Freezing Charity

**Orange County**

Visit our Orange County page

home | contact us | volunteer | jobs | privacy policy | legal intake | chapter calendar | RSS/feeds

This is the web site of the American Civil Liberties Union of Southern California and the ACLU Foundation of Southern California.
Learn more about the distinction between these two components of the ACLU. Copyright 2007 The ACLU of Southern California.

ACLU - Hamdan-101

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 03-07-2011 BY 65179/DMH/BAW/STP/bls

Westlaw.

128 S.Ct. 2207                                                                      Page 1
128 S.Ct. 2207, 171 L.Ed.2d 1, 76 USLW 4392, 08 Cal. Daily Op. Serv. 7135, 2008 Daily Journal D.A.R. 8633, 21
Fla. L. Weekly Fed. S 250
(Cite as: 128 S.Ct. 2207)

**H**

Supreme Court of the United States
Mohammad MUNAF, et al., Petitioners,
v.
Pete GEREN, Secretary of The Army, et al.
Pete Geren, Secretary of The Army, et al., Petition-
ers,
v.
Sandra K. Omar and Ahmed S. Omar, as next
friends of Shawqi Ahmad Omar.
Nos. 06-1666, 07-394.

Argued March 25, 2008.
Decided June 12, 2008.

**Background:** Habeas petitioners, two American
citizens who voluntarily traveled to Iraq and al-
legedly committed crimes there, sought to enjoin
transfer from a detainee camp operated by the Mul-
tinational Force-Iraq, to the custody of the Central
Criminal Court of Iraq (CCCI). The United States
District Court for the District of Columbia, Ricardo
M. Urbina, J., 416 F.Supp.2d 19, granted first peti-
tioner's motion for preliminary injunction. The
United States appealed and the Court of Appeals
for the District of Columbia Circuit, Tatel, Circuit
Judge, 479 F.3d 1, affirmed. The United States Dis-
trict Court for the District of Columbia, Royce C.
Lamberth, J., held that it lacked jurisdiction and
dismissed the petition of second petitioner. The
Court of Appeals, Sentelle, Circuit Judge, 482 F.3d
582, affirmed. Cases were consolidated and certior-
ari was granted.

**Holdings:** The Supreme Court, Chief Justice
Roberts, held that:
(1) United States courts had jurisdiction over
habeas corpus petitions filed on behalf of American
citizens held overseas in detainee camp operated by
the Multinational Force-Iraq (MNF-I);
(2) federal district courts may not exercise their
habeas jurisdiction to enjoin the United States from
transferring individuals alleged to have committed

crimes and detained within the territory of a foreign
sovereign to that sovereign for criminal prosecu-
tion; and
(3) prior to granting a preliminary injunction pro-
hibiting the United States from transferring Amer-
ican citizen detained in Iraq to Iraqi custody, the
district court had to consider the merits of the un-
derlying habeas petition.

Vacated and remanded.

Justice Souter, with whom Justice Ginsburg and
Justice Breyer joined, concurred and filed opinion.

West Headnotes

**[1] Habeas Corpus 197 €══258**

197 Habeas Corpus
   197I In General
      197I(B) Necessity, Nature, and Sufficiency
of Restraint or Detention
         197k258 k. Armed Services. Most Cited
Cases
United States courts had jurisdiction over habeas
corpus petitions filed on behalf of American cit-
izens held overseas in detainee camp operated by
the Multinational Force-Iraq (MNF-I); even though
American forces were acting as a part of a multina-
tional coalition, those forces were operating subject
to an American chain of command. 28 U.S.C.A. §
2241(c)(1).

**[2] Habeas Corpus 197 €══252**

197 Habeas Corpus
   197I In General
      197I(B) Necessity, Nature, and Sufficiency
of Restraint or Detention
         197k252 k. "In Custody" Requirement, in
General. Most Cited Cases
For habeas corpus purposes, an individual is held
"in custody" by the United States when the United
States official charged with his detention has "the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ACLU - Hamdan-102

128 S.Ct. 2207                     Page 2
128 S.Ct. 2207, 171 L.Ed.2d 1, 76 USLW 4392, 08 Cal. Daily Op. Serv. 7135, 2008 Daily Journal D.A.R. 8633, 21 Fla. L. Weekly Fed. S 358
(Cite as: 128 S.Ct. 2207)

power to produce" him. 28 U.S.C.A. § 2241(c)(1).

**[3] Habeas Corpus 197 ☞252**

197 Habeas Corpus
 197I In General
  197I(B) Necessity, Nature, and Sufficiency of Restraint or Detention
   197k252 k. "In Custody" Requirement, in General. Most Cited Cases
The disjunctive "or" in habeas corpus statute makes clear that actual custody by the United States suffices for jurisdiction, even if that custody could be viewed as "under color of" another authority. 28 U.S.C.A. § 2241(c)(1).

**[4] Habeas Corpus 197 ☞208**

197 Habeas Corpus
 197I In General
  197I(A) In General
   197I(A)1 Nature of Remedy in General
    197k206 Purpose and Use of Writ
     197k208 k. Other Objectives; Damages, Etc. Most Cited Cases

**Habeas Corpus 197 ☞520**

197 Habeas Corpus
 197II Grounds for Relief; Illegality of Restraint
  197II(C) Relief Affecting Particular Persons or Proceedings
   197k520 k. In General. Most Cited Cases
Federal district courts may not exercise their habeas jurisdiction to enjoin the United States from transferring individuals alleged to have committed crimes and detained within the territory of a foreign sovereign to that sovereign for criminal prosecution. 28 U.S.C.A. § 2241(c)(1).

**[5] Injunction 212 ☞138.18**

212 Injunction
 212IV Preliminary and Interlocutory Injunctions
  212IV(A) Grounds and Proceedings to Procure
   212IV(A)2 Grounds and Objections

    212k138.18 k. Likelihood of Success on Merits. Most Cited Cases
A party seeking a preliminary injunction must demonstrate, among other things, a likelihood of success on the merits.

**[6] Habeas Corpus 197 ☞679**

197 Habeas Corpus
 197III Jurisdiction, Proceedings, and Relief
  197III(C) Proceedings
   197III(C)1 In General
    197k678 Operation and Effect of Writ or Application
     197k679 k. Supersedeas or Stay of Proceedings. Most Cited Cases
Prior to granting a preliminary injunction prohibiting the United States from transferring American citizen detained in Iraq to Iraqi custody, the district court had to consider the merits of the underlying habeas petition. 28 U.S.C.A. § 2241(c)(1).

**[7] Federal Courts 170B ☞460.1**

170B Federal Courts
 170BVII Supreme Court
  170BVII(B) Review of Decisions of Courts of Appeals
   170Bk460 Review on Certiorari
    170Bk460.1 k. In General. Most Cited Cases
Review of a preliminary injunction is not confined to the act of granting the injunction, but extends as well to determining whether there is any insuperable objection, in point of jurisdiction or merits, to the maintenance of the bill, and, if so, to directing a final decree dismissing it.

**[8] Habeas Corpus 197 ☞204**

197 Habeas Corpus
 197I In General
  197I(A) In General
   197I(A)1 Nature of Remedy in General
    197k204 k. Equitable Considerations. Most Cited Cases

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ACLU - Hamdan-103

128 S.Ct. 2207                                                                    Page 3
128 S.Ct. 2207, 171 L.Ed.2d 1, 76 USLW 4392, 08 Cal. Daily Op. Serv. 7135, 2008 Daily Journal D.A.R. 8633, 21
Fla. L. Weekly Fed. S 358
(Cite as: 128 S.Ct. 2207)

Habeas corpus is governed by equitable principles.

**[9] Habeas Corpus 197 ⚖206.1**

197 Habeas Corpus
    197I In General
        197I(A) In General
            197I(A)1 Nature of Remedy in General
                197k206 Purpose and Use of Writ
                    197k206.1 k. In General. Most
Cited Cases
Prudential concerns, such as comity and the orderly
administration of criminal justice, may require a
federal court to forgo the exercise of its habeas cor-
pus power. 28 U.S.C.A. § 2241(c)(1).

**[10] International Law 221 ⚖10.11**

221 International Law
    221k10.8 Domestic Effect of Foreign Acts and
Laws
        221k10.11 k. Personal Status, Rights and Li-
abilities. Most Cited Cases
Iraq had a sovereign right to prosecute American
citizens for crimes committed on its soil.

**[11] International Law 221 ⚖7**

221 International Law
    221k7 k. Extraterritorial Rights and Jurisdiction.
Most Cited Cases
When an American citizen commits a crime in a
foreign country he cannot complain if required to
submit to such modes of trial and to such punish-
ment as the laws of that country may prescribe for
its own people.

*2209 Syllabus[FN*]

FN* The syllabus constitutes no part of the
opinion of the Court but has been prepared
by the Reporter of Decisions for the con-
venience of the reader. See *United States v.
Detroit Timber & Lumber Co.,* 200 U.S.
321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

The Multinational Force-Iraq (MNF-I) is an inter-

national coalition force composed of 26 nations, in-
cluding the United States. It operates in Iraq under
the unified command of U.S. military officers, at
the Iraqi Government's request, and in accordance
with United Nations Security Council Resolutions.
Pursuant to the U.N. mandate, MNF-I forces detain
individuals alleged to have committed hostile or
warlike acts in Iraq, pending investigation and pro-
secution in Iraqi courts under Iraqi law.

Shawqi Omar and Mohammad Munaf (hereinafter
petitioners) are American citizens who voluntarily
traveled to Iraq and allegedly committed crimes
there. They were each captured by military forces
operating as part of the MNF-I; given hearings be-
fore MNF-I Tribunals composed of American of-
ficers, who concluded that petitioners posed threats
to Iraq's security; and placed in the custody of the
U.S. military operating as part of the MNF-I. Fam-
ily members filed next-friend habeas corpus peti-
tions on behalf of both petitioners in the United
States District Court for the District of Columbia.

In Omar's case, after the Department of Justice in-
formed Omar that the MNF-I had decided to refer
him to the Central Criminal Court of Iraq for crim-
inal proceedings, his attorney sought and obtained a
preliminary injunction from the District Court bar-
ring Omar's removal from United States or MNF-I
custody. Affirming, the D.C. Circuit first upheld
the District Court's exercise of habeas jurisdiction,
finding that *Hirota v. MacArthur,* 338 U.S. 197, 69
S.Ct. 197, did not preclude review because Omar,
unlike the habeas petitioners in *Hirota,* had yet to
be convicted by a federal tribunal.

Meanwhile, the District Court in Munaf's case dis-
missed his habeas petition for lack of jurisdiction.
The court concluded that *Hirota* controlled and re-
quired that the petition be dismissed for lack of jur-
isdiction because the American forces holding
Munaf were operating as part of an international
force-the MNF-I. The D.C. Circuit agreed and af-
firmed. It distinguished its prior decision in *Omar,*
which upheld jurisdiction over Omar's habeas peti-
tion, on the grounds that Munaf had been convicted

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ACLU - Hamdan-104

128 S.Ct. 2207                                                                                                                        Page 4
128 S.Ct. 2207, 171 L.Ed.2d 1, 76 USLW 4392, 08 Cal. Daily Op. Serv. 7135, 2008 Daily Journal D.A.R. 8633, 21
Fla. L. Weekly Fed. S 358
(Cite as: 128 S.Ct. 2207)

by a foreign tribunal while Omar had not.

*Held:*

1. The habeas statute extends to American citizens held overseas by American forces operating subject to an American chain of command. The Government's argument that the federal courts lack jurisdiction over the detainees' habeas petitions in such circumstances because the American forces holding Omar and Munaf operate as part of a multinational force is rejected. The habeas statute, 28 U.S.C. § 2241(c)(1), applies to persons held "in custody under or by color of the authority of the United States." The disjunctive "or" in § 2241(c)(1) makes clear that actual Government custody suffices for jurisdiction, even if that custody could be viewed as "under ... color of" another authority, such as the MNF-I

**\*2210** The Court also rejects the Government's contention that the District Court lacks jurisdiction in these cases because the multinational character of the MNF-I, like the multinational character of the tribunal at issue in *Hirota,* means that the MNF-I is not a United States entity subject to habeas. The present cases differ from *Hirota* in several respects. The Court in *Hirota* may have found it significant, in considering the nature of the tribunal established by General MacArthur, that in that case the Government argued that General MacArthur was not subject to United States authority, that his duty was to obey the Far Eastern Commission and not the U.S. War Department, and that no process this Court could issue would have any effect on his action. Here, in contrast, the Government acknowledges that U.S. military commanders answer to the President. These cases also differ from *Hirota* in that they concern American citizens, and the Court has indicated that habeas jurisdiction can depend on citizenship. See *e.g., Johnson v. Eisentrager,* 339 U.S. 763, 781, 70 S.Ct. 936, 94 L.Ed. 1255. Pp. 2216  2218.

2. Federal district courts, however, may not exercise their habeas jurisdiction to enjoin the United States from transferring individuals alleged to have committed crimes and detained within the territory of a foreign sovereign to that sovereign for criminal prosecution. Because petitioners state no claim in their habeas petitions for which relief can be granted, their habeas petitions should have been promptly dismissed, and no injunction should have been entered. Pp. 2218 - 2228.

(a) The District Court abused its discretion in granting Omar a preliminary injunction, which the D.C. Circuit interpreted as prohibiting the Government from (1) transferring Omar to Iraqi custody, (2) sharing with the Iraqi Government details concerning any decision to release him, and (3) presenting him to the Iraqi courts for investigation and prosecution, without even considering the merits of the habeas petition. A preliminary injunction is an "extraordinary and drastic remedy." It should never be awarded as of right, *Yakus v. United States,* 321 U.S. 414, 440, 64 S.Ct. 660, 88 L.Ed. 834, and requires a demonstration of, *inter alia,*"a likelihood of success on the merits," *Gonzales v. O Centro Espírita Beneficente União do Vegetal,* 546 U.S. 418, 428, 126 S.Ct. 1211, 163 L.Ed.2d 1017. But neither the District Court nor the D.C. Circuit considered the likelihood of success as to the merits of Omar's habeas petition. Instead, the lower courts concluded that the "jurisdictional issues" implicated by Omar's petition presented difficult and substantial questions. A difficult question as to jurisdiction is, of course, no reason to grant a preliminary injunction.

The foregoing analysis would require reversal and remand in each of these cases: The lower courts in Munaf erred in dismissing for want of jurisdiction, and the lower courts in Omar erred in issuing and upholding the preliminary injunction. Our review of a preliminary injunction, however, "is not confined to the act of granting the injunctio[n]." *City and County of Denver v. New York Trust Co.,* 229 U.S. 123, 136, 33 S.Ct. 657, 57 L.Ed. 1101. Rather, a reviewing court has the power on appeal from an interlocutory order "to examine the merits of the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ACLU - Hamdan-105

128 S.Ct. 2207                                                                    Page 5
128 S.Ct. 2207, 171 L.Ed.2d 1, 76 USLW 4392, 08 Cal. Daily Op. Serv. 7135, 2008 Daily Journal D.A.R. 8633, 21 Fla. L. Weekly Fed. S 358
(Cite as: 128 S.Ct. 2207)

case ... and upon deciding them in favor of the defendant to dismiss the bill." *North Carolina R. Co. v. Story,* 268 U.S. 288, 292, 45 S.Ct. 531, 69 L.Ed. 959. In short, there are occasions when it is appropriate for a court reviewing a preliminary injunction to proceed to the merits; given that the present cases implicate sensitive foreign policy issues in the context of ongoing military *2211 operations, this is one of them. Pp. 2218 - 2220.

(b) Petitioners argue that they are entitled to habeas relief because they have a legally enforceable right not to be transferred to Iraqi authorities for criminal proceedings and because they are innocent civilians unlawfully detained by the Government. With respect to the transfer claim, they request an injunction prohibiting the Government from transferring them to Iraqi custody. With respect to the unlawful detention claim, they seek release but only to the extent it would not result in unlawful transfer to Iraqi custody. Because both requests would interfere with Iraq's sovereign right to "punish offenses against its laws committed within its borders," *Wilson v. Girard,* 354 U.S. 524, 529, 77 S.Ct. 1409, 1 L.Ed.2d 1544, petitioners' claims do not state grounds upon which habeas relief may be granted. Their habeas petitions should have been promptly dismissed and no injunction should have been entered. Pp. 2220 - 2228.

(1) Habeas is governed by equitable principles. Thus, prudential concerns may "require a federal court to forgo the exercise of its habeas ... power." *Francis v. Henderson,* 425 U.S. 536, 539, 96 S.Ct. 1708, 48 L.Ed.2d 149. Here, the unusual nature of the relief sought by petitioners suggests that habeas is not appropriate. Habeas is at its core a remedy for unlawful executive detention. *Hamdi v. Rumsfeld,* 542 U.S. 507, 536, 124 S.Ct. 2633, 159 L.Ed.2d 578. The typical remedy is, of course, release. See, *e.g., Preiser v. Rodriguez,* 411 U.S. 475, 484, 93 S.Ct. 1827, 36 L.Ed.2d 439. But the habeas petitioners in these cases do not want simple release; that would expose them to apprehension by Iraqi authorities for criminal prosecution-precisely

what they went to federal court to avoid.

The habeas petitioners do not dispute that they voluntarily traveled to Iraq, that they remain detained within the sovereign territory of Iraq today, or that they are alleged to have committed serious crimes in Iraq. Indeed, Omar and Munaf both concede that, if they were not in MNF-I custody, Iraq would be free to arrest and prosecute them under Iraqi law. Further, Munaf is the subject of ongoing Iraqi criminal proceedings and Omar would be but for the present injunction. Given these facts, Iraq has a sovereign right to prosecute them for crimes committed on its soil, even if its criminal process does not come with all the rights guaranteed by the Constitution, see *Neely v. Henkel,* 180 U.S. 109, 123, 21 S.Ct. 302, 45 L.Ed. 448. As Chief Justice Marshall explained nearly two centuries ago, "[t]he jurisdiction of the nation within its own territory is necessarily exclusive and absolute." *Schooner Exchange v. McFaddon,* 7 Cranch 116, 136, 3 L.Ed. 287.

This Court has twice applied that principle in rejecting claims that the Constitution precludes the Executive from transferring a prisoner to a foreign country for prosecution in an allegedly unconstitutional trial. *Wilson, supra,* at 529-530, 77 S.Ct. 1409; *Neely, supra,* at 112-113, 122, 21 S.Ct. 302. Omar and Munaf concede that Iraq has a sovereign right to prosecute them for alleged violations of its law. Yet they went to federal court seeking an order that would allow them to defeat precisely that sovereign authority. But habeas corpus does not bar the United States from transferring a prisoner to the sovereign authority he concedes has a right to prosecute him. Petitioners' "release" claim adds nothing to their "transfer" claim and fails for the same reasons, given that the release they seek is release that would avoid transfer.

*2212 There is of course even more at issue here: *Neely* involved a charge of embezzlement and *Wilson* the peacetime actions of a serviceman. The present cases concern individuals captured and detained within an ally's territory during ongoing hos-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ACLU - Hamdan-106

128 S.Ct. 2207                                                                    Page 6
128 S.Ct. 2207, 171 L.Ed.2d 1, 76 USLW 4392, 08 Cal. Daily Op. Serv. 7135, 2008 Daily Journal D.A.R. 8633, 21
Fla. L. Weekly Fed. S 358
(Cite as: 128 S.Ct. 2207)

tilities involving our troops. It would be very odd to
hold that the Executive can transfer individuals
such as those in the *Neely* and *Wilson* cases, but
cannot transfer to an ally detainees captured by our
Armed Forces for engaging in serious hostile acts
against that ally in what the Government refers to
as "an active theater of combat." Pp. 2220 - 2225.

(2) Petitioners' allegations that their transfer to Iraqi
custody is likely to result in torture are a matter of
serious concern but those allegations generally
must be addressed by the political branches, not the
judiciary. The recognition that it is for the demo-
cratically elected branches to assess practices in
foreign countries and to determine national policy
in light of those assessments is nothing new. As
Chief Justice Marshall explained in the *Schooner
Exchange*,"exemptions from territorial jurisdiction
... must be derived from the consent of the sover-
eign of the territory" and are "rather questions of
policy than of law, ... they are for diplomatic, rather
than legal discussion." 7 Cranch, at 143, 146, 3
L.Ed. 287. In the present cases, the Government
explains that it is the policy of the United States not
to transfer an individual in circumstances where
torture is likely to result and that the State Depart-
ment has determined that the Justice Ministry-the
department which has authority over Munaf and
Omar-as well as its prison and detention facilities,
have generally met internationally accepted stand-
ards for basic prisoner needs. The judiciary is not
suited to second-guess such determinations. Pp.
2225 - 2227.

(3) Petitioners' argument that, under *Valentine v.
United States ex rel. Neidecker*, 299 U.S. 5, 57
S.Ct. 100, 81 L.Ed. 5, the Executive lacks discre-
tion to transfer a citizen to Iraqi custody unless
"legal authority" to do so "is given by act of Con-
gress or by the terms of a treaty," *id.*, at 9, 57 S.Ct.
100, is rejected. *Valentine* was an extradition case;
the present cases involve the transfer to a sover-
eign's authority of an individual captured and
already detained in that sovereign's territory.
*Wilson, supra,* also forecloses petitioners' conten-

tion. A Status of Forces Agreement there seemed to
give the habeas petitioner a right to trial by an
American military tribunal, rather than a Japanese
court, 354 U.S., at 529, 77 S.Ct. 1409, but this
Court found no "constitutional or statutory" imped-
iment to the Government's waiver of its jurisdiction
in light of Japan's sovereign interest in prosecuting
crimes committed within its borders, *id.,* at 530, 77
S.Ct. 1409. Pp. 2226 - 2228.

No. 06-1666, 482 F.3d 582; No. 07-394, 479 F.3d
1, vacated and remanded.

ROBERTS, C. J., delivered the opinion for a unan-
imous Court. SOUTER, J., filed a concurring opin-
ion, in which GINSBURG and BREYER, JJ., joined.

Gregory G. Garre, for Petitioners in No. 07-394 and
for Respondents in No. 06-1666.
Joseph Margulies, Chicago, IL, for Petitioners in
No. 06-1666 and for Respondents in No. 07-394.
Paul D. Clement, Solicitor General, Washington,
D.C., for Federal Parties.
Aziz Z. Huq, Jonathan Hafetz, New York, NY, Eric
M. Freedman, New York, NY, Joseph Margulies,
Chicago, IL, Susan L. Burke, Katherine Hawkins,
Burke O'Neil LLC, Philadelphia, PA, Vincent Moc-
cio, Amy Hanf, Robins, Kaplan, Miller *2213 &
Ciresi L.L.P., Minneapolis, MN, for the Habeas Pe-
titioners.
Paul D. Clement, Solicitor General, Jeffrey S.
Bucholtz, Acting Assistant Attorney General,
Gregory G. Garre, Deputy Solicitor General, Daryl
Joseffer, Assistant to the Solicitor General, Douglas
N. Letter, Jonathan H. Levy, Lewis S. Yelin, Wash-
ington, D.C., for Federal Parties.For U.S. Supreme
Court briefs, see:2008 WL 503592 (Pet.Brief)2008
WL  205089  (Pet.Brief)2008  WL  727815
(Reply.Brief)

Chief Justice ROBERTS delivered the opinion of
the Court.
The Multinational Force-Iraq (MNF-I) is an inter-
national coalition force operating in Iraq composed
of 26 different nations, including the United States.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ACLU - Hamdan-107

128 S.Ct. 2207                                                                                         Page 7
128 S.Ct. 2207, 171 L.Ed.2d 1, 76 USLW 4392, 08 Cal. Daily Op. Serv. 7135, 2008 Daily Journal D.A.R. 8633, 21 Fla. L. Weekly Fed. S 358
(Cite as: 128 S.Ct. 2207)

The force operates under the unified command of United States military officers, at the request of the Iraqi Government, and in accordance with United Nations (U.N.) Security Council Resolutions. Pursuant to the U.N. mandate, MNF-I forces detain individuals alleged to have committed hostile or warlike acts in Iraq, pending investigation and prosecution in Iraqi courts under Iraqi law.

These consolidated cases concern the availability of habeas corpus relief arising from the MNF-I's detention of American citizens who voluntarily traveled to Iraq and are alleged to have committed crimes there. We are confronted with two questions. *First,* do United States courts have jurisdiction over habeas corpus petitions filed on behalf of American citizens challenging their detention in Iraq by the MNF-I? *Second,* if such jurisdiction exists, may district courts exercise that jurisdiction to enjoin the MNF-I from transferring such individuals to Iraqi custody or allowing them to be tried before Iraqi courts?

We conclude that the habeas statute extends to American citizens held overseas by American forces operating subject to an American chain of command, even when those forces are acting as part of a multinational coalition. Under circumstances such as those presented here, however, habeas corpus provides petitioners with no relief.

I

Pursuant to its U.N. mandate, the MNF-I has " 'the authority to take all necessary measures to contribute to the maintenance of security and stability in Iraq.' App. G to Pet. for Cert. in 07-394, p. 74a, ¶ 10 (quoting U.N. Security Council, U.N. Doc. S/Res/1546, ¶ 10 (June 2004)). To this end, the MNF-I engages in a variety of military and humanitarian activities. The multinational force, for example, conducts combat operations against insurgent factions, trains and equips Iraqi security forces, and aids in relief and reconstruction efforts.

MNF-I forces also detain individuals who pose a threat to the security of Iraq. The Government of Iraq retains ultimate responsibility for the arrest and imprisonment of individuals who violate its laws, but because many of Iraq's prison facilities have been destroyed, the MNF-I agreed to maintain physical custody of many such individuals during Iraqi criminal proceedings. MNF-I forces are currently holding approximately 24,000 detainees. An American military unit, Task Force 134, oversees detention operations and facilities in Iraq, including those located at Camp Cropper, the detention facility currently housing Shawqi Omar and Mohammad Munaf (hereinafter petitioners). The unit is under the command of United States *2214 military officers who report to General David Petraeus.

A

Petitioner Shawqi Omar, an American-Jordanian citizen, voluntarily traveled to Iraq in 2002. In October 2004, Omar was captured and detained in Iraq by U.S. military forces operating as part of the MNF-I during a raid of his Baghdad home. Omar is believed to have provided aid to Abu Musab al-Zarqawi-the late leader of al Qaeda in Iraq-by facilitating his group's connection with other terrorist groups, bringing foreign fighters into Iraq, and planning and executing kidnappings in Iraq. MNF-I searched his home in an effort to capture and detain insurgents who were associated with al-Zarqawi. The raid netted an Iraqi insurgent and four Jordanian fighters along with explosive devices and other weapons.

The captured insurgents gave sworn statements implicating Omar in insurgent cell activities. The four Jordanians testified that they had traveled to Iraq with Omar to commit militant acts against American and other Coalition Forces. Each of the insurgents stated that, while living in Omar's home, they had surveilled potential kidnap victims and conducted weapons training. The insurgents explained that Omar's fluency in English allowed him to lure foreigners to his home in order to kidnap and sell them

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ACLU - Hamdan-108

128 S.Ct. 2207                                                                                          Page 8
128 S.Ct. 2207, 171 L.Ed.2d 1, 76 USLW 4392, 08 Cal. Daily Op. Serv. 7135, 2008 Daily Journal D.A.R. 8633, 21
Fla. L. Weekly Fed. S 358
(Cite as: 128 S.Ct. 2207)

for ransom.

Following Omar's arrest, a three-member MNF-I Tribunal composed of American military officers concluded that Omar posed a threat to the security of Iraq and designated him a "security internee." The tribunal also found that Omar had committed hostile and warlike acts, and that he was an enemy combatant in the war on terrorism. In accordance with Article 5 of the Geneva Convention, Omar was permitted to hear the basis for his detention, make a statement, and call immediately available witnesses.

In addition to the review of his detention by the MNF-I Tribunal, Omar received a hearing before the Combined Review and Release Board (CRRB)-a nine-member board composed of six representatives of the Iraqi Government and three MNF-I officers. The CRRB, like the MNF-I Tribunal, concluded that Omar's continued detention was necessary because he posed a threat to Iraqi security. At all times since his capture, Omar has remained in the custody of the United States military operating as part of the MNF-I.

Omar's wife and son filed a next-friend petition for a writ of habeas corpus on Omar's behalf in the District Court for the District of Columbia. *Omar v. Harvey,* 479 F.3d 1, 4 (C.A.D.C.2007). After the Department of Justice informed Omar that the MNF-I had decided to refer him to the Central Criminal Court of Iraq (CCCI) for criminal proceedings, his attorney sought and obtained a preliminary injunction barring Omar's "remov[al] ... from United States or MNF-I custody." App. to Pet. in No. 07-394, *supra,* at 59a. The order directed that

> "the [United States], their agents, servants, employees, confederates, and any persons acting in concert or participation with them, or having actual or implicit knowledge of this Order ... shall not remove [Omar] from United States or MNF-I custody, or take any other action inconsistent with this court's memorandum opinion." *Ibid.*

The United States appealed and the Court of Appeals for the District of Columbia Circuit affirmed. *Omar,* 479 F.3d 1. The Court of Appeals first upheld the District Court's exercise of habeas jurisdiction, finding that this Court's decision in *Hirota v. MacArthur,* 338 U.S. 197, 69 S.Ct. 197, 93 L.Ed. 1902 (1948) (*per curiam\*2215* ), did not preclude review. The Court of Appeals distinguished *Hirota* on the ground that Omar, unlike the petitioner in that case, had yet to be convicted by a foreign tribunal. 479 F.3d, at 7-9. The Court of Appeals recognized, however, that the writ of habeas corpus could not be used to enjoin release. *Id.,* at 11. It therefore construed the injunction only to bar transfer to Iraqi custody and upheld the District Court's order insofar as it prohibited the United States from: (1) transferring Omar to Iraqi custody, *id.,* at 11-13; (2) sharing details concerning any decision to release Omar with the Iraqi Government, *id.,* at 13; and (3) presenting Omar to the Iraqi Courts for investigation and prosecution, *id,* at 14.

Judge Brown dissented. She joined the panel's jurisdictional ruling, but would have vacated the injunction because, in her view, the District Court had no authority to enjoin a transfer that would allow Iraqi officials to take custody of an individual captured in Iraq-something the Iraqi Government "undeniably h[ad] a right to do." *Id.,* at 19. We granted certiorari. 552 U.S. ----, 128 S.Ct. 741, 169 L.Ed.2d 578 (2007).

B

Petitioner Munaf, a citizen of both Iraq and the United States, voluntarily traveled to Iraq with several Romanian journalists. He was to serve as the journalists' translator and guide. Shortly after arriving in Iraq, the group was kidnapped and held captive for two months. After the journalists were freed, MNF-I forces detained Munaf based on their belief that he had orchestrated the kidnappings.

A three-judge MNF-I Tribunal conducted a hearing to determine whether Munaf's detention was war-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ACLU - Hamdan-109

128 S.Ct. 2207                                                                                    Page 9
128 S.Ct. 2207, 171 L.Ed.2d 1, 76 USLW 4392, 08 Cal. Daily Op. Serv. 7135, 2008 Daily Journal D.A.R. 8633, 21
Fla. L. Weekly Fed. S 358
(Cite as: 128 S.Ct. 2207)

ranted. The MNF-I Tribunal reviewed the facts surrounding Munaf's capture, interviewed witnesses, and considered the available intelligence information. Munaf was present at the hearing and had an opportunity to hear the grounds for his detention, make a statement, and call immediately available witnesses. At the end of the hearing, the tribunal found that Munaf posed a serious threat to Iraqi security, designated him a "security internee," and referred his case to the CCCI for criminal investigation and prosecution.

During his CCCI trial, Munaf admitted on camera and in writing that he had facilitated the kidnapping of the Romanian journalists. He also appeared as a witness against his alleged co-conspirators. Later in the proceedings, Munaf recanted his confession, but the CCCI nonetheless found him guilty of kidnapping. On appeal, the Iraqi Court of Cassation vacated Munaf's conviction and remanded his case to the CCCI for further investigation. *In re Hikmat,* No. 19/Pub. Comm'n/2007, p. 5 (Feb. 19, 2008). The Court of Cassation directed that Munaf was to "remain in custody pending the outcome" of further criminal proceedings. *Ibid.*

Meanwhile, Munaf's sister filed a next-friend petition for a writ of habeas corpus in the District Court for the District of Columbia. *Mohammed v. Harvey,* 456 F.Supp.2d 115, 118 (2006). The District Court dismissed the petition for lack of jurisdiction, finding that this Court's decision in *Hirota* controlled: Munaf was "in the custody of coalition troops operating under the aegis of MNF-I, who derive their ultimate authority from the United Nations and the MNF-I member nations acting jointly." 456 F.Supp.2d, at 122.

The Court of Appeals for the District of Columbia Circuit affirmed. 482 F.3d 582 (2007) (hereinafter *Munaf*). The Court of Appeals, "[c]onstrained by precedent," agreed with the District Court that *Hirota* controlled and dismissed Munaf's petition *2216 for lack of jurisdiction. 482 F.3d, at 583. It distinguished the prior opinion in *Omar* on the ground that Munaf, like the habeas petitioner in

*Hirota* but unlike Omar, had been convicted by a foreign tribunal. 482 F.3d, at 583-584.

Judge Randolph concurred in the judgment. *Id.,* at 585. He concluded that the District Court had improperly dismissed for want of jurisdiction because "Munaf is an American citizen ... held by American forces overseas." *Ibid.* Nevertheless, Judge Randolph would have held that Munaf's habeas petition failed on the merits. *Id.,* at 586. He relied on this Court's holding in *Wilson v. Girard,* 354 U.S. 524, 529, 77 S.Ct. 1409, 1 L.Ed.2d 1544 (1957), that a "sovereign nation has exclusive jurisdiction to punish offenses against its laws committed within its borders," and concluded that the fact that the United States was holding Munaf because of his conviction by a foreign tribunal was conclusive. *Ibid.*[FN1]

> FN1. As noted above, Munaf's conviction was subsequently vacated by an Iraqi appellate court, and he is awaiting a new tri- al.

We granted certiorari and consolidated the *Omar* and *Munaf* cases. 552 U.S. ----, 128 S.Ct. 741, 169 L.Ed.2d 578 (2007).

II

[1] The Solicitor General argues that the federal courts lack jurisdiction over the detainees' habeas petitions because the American forces holding Omar and Munaf operate as part of a multinational force. Brief for Federal Parties 17-36. The habeas statute provides that a federal district court may entertain a habeas application by a person held "in custody under or by color of the authority of the United States," or "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. §§ 2241(c)(1), (3). MNF-I forces, the argument goes, "are not operating solely under United States authority, but rather ·as the agent of· a multinational force." Brief for Federal Parties 23 (quoting *Hirota, supra,* at 198, 69 S.Ct.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ACLU - Hamdan-110

128 S.Ct. 2207                                                                                                    Page 10
128 S.Ct. 2207, 171 L.Ed.2d 1, 76 USLW 4392, 08 Cal. Daily Op. Serv. 7135, 2008 Daily Journal D.A.R. 8633, 21
Fla. L. Weekly Fed. S 358
(Cite as: 128 S.Ct. 2207)

197). Omar and Munaf are thus held pursuant to international authority, not "the authority of the United States,"§ 2241(c)(1), and they are therefore not within the reach of the habeas statute. Brief for Federal Parties 17-18.[FN2]

> FN2. These cases concern only American citizens and only the statutory reach of the writ. Nothing herein addresses jurisdiction with respect to alien petitioners or with respect to the constitutional scope of the writ.

The United States acknowledges that Omar and Munaf are American citizens held overseas in the immediate " 'physical custody' " of American soldiers who answer only to an American chain of command. Id., at 21. The MNF-I itself operates subject to a unified American command. Id., at 23. "[A]s a practical matter," the Government concedes, it is "the President and the Pentagon, the Secretary of Defense, and the American commanders that control what ... American soldiers do," Tr. of Oral Arg. 15, including the soldiers holding Munaf and Omar. In light of these admissions, it is unsurprising that the United States has never argued that it lacks the authority to release Munaf or Omar, or that it requires the consent of other countries to do so.

[2][3] We think these concessions the end of the jurisdictional inquiry. The Government's argument- that the federal courts have no jurisdiction over American citizens held by American forces operating as multinational agents-is not easily reconciled with the text of § 2241(c)(1). See *2217 *Duncan v. Walker,* 533 U.S. 167, 172, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001) ("We begin, as always, with the language of the statute"). That section applies to persons held "in custody under or by color of the authority of the United States."§ 2241(c)(1). An individual is held "in custody" by the United States when the United States official charged with his detention has "the power to produce" him. *Wales v. Whitney,* 114 U.S. 564, 574, 5 S.Ct. 1050, 29 L.Ed. 277 (1885); see also § 2243 ("The writ ... shall be

directed to the person having custody of the person detained"). The disjunctive "or" in § 2241(c)(1) makes clear that actual custody by the United States suffices for jurisdiction, even if that custody could be viewed as "under ... color of" another authority, such as the MNF-I.

The Government's primary contention is that the District Courts lack jurisdiction in these cases because of this Court's decision in *Hirota.* That slip of a case cannot bear the weight the Government would place on it. In *Hirota,* Japanese citizens sought permission to file habeas corpus applications directly in this Court. The petitioners were noncitizens detained in Japan. They had been convicted and sentenced by the International Military Tribunal for the Far East-an international tribunal established by General Douglas MacArthur acting, as the Court put it, in his capacity as "the agent of the Allied Powers." 338 U.S., at 198, 69 S.Ct. 197. Although those familiar with the history of the period would appreciate the possibility of confusion over who General MacArthur took orders from, the Court concluded that the sentencing tribunal was "not a tribunal of the United States." *Ibid.* The Court then held that, "[u]nder the foregoing circumstances," United States courts had "no power or authority to review, to affirm, set aside or annul the judgments and sentences" imposed by that tribunal. *Ibid.* Accordingly, the Court denied petitioners leave to file their habeas corpus applications. without further legal analysis. *Ibid.*

The Government argues that the multinational character of the MNF-I, like the multinational character of the tribunal at issue in *Hirota,* means that it too is not a United States entity subject to habeas. Reply Brief for Federal Parties 5-7. In making this claim, the Government acknowledges that the MNF-I is subject to American authority, but contends that the same was true of the tribunal at issue in *Hirota.* In *Hirota,* the Government notes, the petitioners were held by the United States Eighth Army, which took orders from General MacArthur, 338 U.S., at 199, 69 S.Ct. 197 (Douglas, J., concur-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ACLU - Hamdan-111

128 S.Ct. 2207                                                                    Page 11

128 S.Ct. 2207, 171 L.Ed.2d 1, 76 USLW 4392, 08 Cal. Daily Op. Serv. 7135, 2008 Daily Journal D.A.R. 8633, 21 Fla. L. Weekly Fed. S 358

(Cite as: 128 S.Ct. 2207)

ring), and were subject to an "unbroken" chain of U.S. command, ending with the President of the United States, *id.*, at 207, 69 S.Ct. 197.

The Court in *Hirota*, however, may have found it significant, in considering the nature of the tribunal established by General MacArthur, that the Solicitor General expressly contended that General MacArthur, as pertinent, was not subject to United States authority. The facts suggesting that the tribunal in *Hirota* was subject to an "unbroken" United States chain of command were not among the "foregoing circumstances" cited in the *per curiam* opinion disposing of the case, *id.*, at 198, 69 S.Ct. 197. They were highlighted only in Justice Douglas's belated opinion concurring in the result, published five months after that *per curiam. Id.*, at 199, n. *, 69 S.Ct. 197. Indeed, arguing before this Court, Solicitor General Perlman stated that General MacArthur acted "under the Joint Chiefs of Staff," that his duty was "to obey the directives of the Far Eastern Commission and not our War Department," and that "no process that could be issued from this court ... would have any effect on his action." Tr. of Oral Arg. *2218 in *Hirota v. MacArthur*, O.T.1948, No. 239, pp. 42, 50, 51. Here, in contrast, the Government acknowledges that our military commanders do answer to the President.

Even if the Government is correct that the international authority at issue in *Hirota* is no different from the international authority at issue here, the present "circumstances" differ in another respect. These cases concern American citizens while *Hirota* did not, and the Court has indicated that habeas jurisdiction can depend on citizenship. See *Johnson v. Eisentrager*, 339 U.S. 763, 781, 70 S.Ct. 936, 94 L.Ed. 1255 (1950); *Rasul v. Bush*, 542 U.S. 466, 486, 124 S.Ct. 2686, 159 L.Ed.2d 548 (2004) (KENNEDY, J., concurring in judgment). See also *Munaf*, 482 F.3d, at 584 ("[W]e do not mean to suggest that we find the logic of *Hirota* especially clear or compelling, particularly as applied to American citizens"); *id.*, at 585 (Randolph, J., concurring in judgment).[FN3] "Under the foregoing

circumstances," we decline to extend our holding in *Hirota* to preclude American citizens held overseas by American soldiers, subject to a United States chain of command from filing habeas petitions.

> FN3. The circumstances in *Hirota* differ in yet another respect. The petitioners in that case sought an original writ, filing their motions for leave to file habeas petitions "in this Court." 338 U.S., at 198, 69 S.Ct. 197. There is, however, some authority for the proposition that this Court has original subject-matter jurisdiction only over " 'cases affecting ambassadors, other public ministers and consuls, and those in which a state shall be a party,' " *Marbury v. Madison*, 1 Cranch 137, 174, 2 L.Ed. 60 (1803) (quoting U.S. Const., Art. III, § 2, cl. 2), and Congress had not granted the Court appellate jurisdiction to review decisions of the International Military Tribunal for the Far East.

III

[4] We now turn to the question whether United States district courts may exercise their habeas jurisdiction to enjoin our Armed Forces from transferring individuals detained within another sovereign's territory to that sovereign's government for criminal prosecution. The nature of that question requires us to proceed "with the circumspection appropriate when this Court is adjudicating issues inevitably entangled in the conduct of our international relations." *Romero v. International Terminal Operating Co.*, 358 U.S. 354, 383, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959). Here there is the further consideration that those issues arise in the context of ongoing military operations conducted by American Forces overseas. We therefore approach these questions cognizant that "courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs." *Department of Navy v. Egan*, 484 U.S. 518, 530, 108 S.Ct. 818, 98 L.Ed.2d 918 (1988).

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ACLU - Hamdan-112

128 S.Ct. 2207                                                                     Page 12
128 S.Ct. 2207, 171 L.Ed.2d 1, 76 USLW 4392, 08 Cal. Daily Op. Serv. 7135, 2008 Daily Journal D.A.R. 8633, 21 Fla. L. Weekly Fed. S 358
(Cite as: 128 S.Ct. 2207)

In *Omar*, the District Court granted and the D.C. Circuit upheld a preliminary injunction that, as interpreted by the Court of Appeals, prohibited the United States from (1) effectuating "Omar's transfer *in any form*, whether by an official handoff or otherwise," to Iraqi custody, 479 F.3d, at 12; (2) sharing details concerning any decision to release Omar with the Iraqi Government, *id.*, at 13; and (3) "presenting Omar to the [Iraqi courts] for trial," *id.*, at 14. This is not a narrow injunction. Even the habeas petitioners do not defend it in its entirety. They acknowledge the authority of the Iraqi courts to begin criminal proceedings against Omar and wisely concede that any injunction "clearly need not include a bar on 'information-sharing.' " Brief for Habeas Petitioners 61. As Judge Brown noted in her dissent, such a bar would impermissibly "enjoin the *2219 United States military from sharing information with an allied foreign sovereign in a war zone." *Omar, supra,* at 18.

[5] We begin with the basics. A preliminary injunction is an "extraordinary and drastic remedy," 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2948, p. 129 (2d ed.1995) (hereinafter Wright & Miller) (footnotes omitted); it is never awarded as of right, *Yakus v. United States,* 321 U.S. 414, 440, 64 S.Ct. 660, 88 L.Ed. 834 (1944). Rather, a party seeking a preliminary injunction must demonstrate, among other things, "a likelihood of success on the merits." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,* 546 U.S. 418, 428, 126 S.Ct. 1211, 163 L.Ed.2d 1017 (2006) (citing *Mazurek v. Armstrong,* 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997) (*per curiam*); *Doran v. Salem Inn, Inc.,* 422 U.S. 922, 931, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975)). But one searches the opinions below in vain for any mention of a likelihood of success as to the merits of Omar's habeas petition. Instead, the District Court concluded that the *"jurisdictional* issues" presented questions "so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberative investigation." *Omar v. Harvey,* 416 F.Supp.2d 19,

23-24, 27 (DC 2006) (internal quotation marks omitted; emphasis added).

The D.C. Circuit made the same mistake. In that court's view, the "only question before [it] at th[at] stage of the litigation relate[d] to the district court's jurisdiction." 479 F.3d, at 11. As a result, the Court of Appeals held that it "need not address" the merits of Omar's habeas claims: those merits had "no relevance." *Ibid.*

[6] A difficult question as to jurisdiction is, of course, no reason to grant a preliminary injunction. It says nothing about the "likelihood of success on the merits," other than making such success more *unlikely* due to potential impediments to even reaching the merits. Indeed, if all a "likelihood of success on the merits" meant was that the district court likely had jurisdiction, then preliminary injunctions would be the rule, not the exception. In light of these basic principles, we hold that it was an abuse of discretion for the District Court to grant a preliminary injunction on the view that the "jurisdictional issues" in Omar's case were tough, without even considering the merits of the underlying habeas petition.

What we have said thus far would require reversal and remand in each of these cases: The lower courts in *Munaf* erred in dismissing for want of jurisdiction, and the lower courts in *Omar* erred in issuing and upholding the preliminary injunction. There are occasions, however, when it is appropriate to proceed further and address the merits. This is one of them.

[7] Our authority to address the merits of the habeas petitioners' claims is clear. Review of a preliminary injunction "is not confined to the act of granting the injunctio[n], but extends as well to determining whether there is any insuperable objection, in point of jurisdiction or merits, to the maintenance of [the] bill, and, if so, to directing a final decree dismissing it." *City and County of Denver v. New York Trust Co.,* 229 U.S. 123, 136, 33 S.Ct. 657, 57 L.Ed. 1101 (1913). See also *Deckert v. In-*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ACLU - Hamdan-113

128 S.Ct. 2207          Page 13
128 S.Ct. 2207, 171 L.Ed.2d 1, 76 USLW 4392, 08 Cal. Daily Op. Serv. 7135, 2008 Daily Journal D.A.R. 8633, 21
Fla. L. Weekly Fed. S 358
(Cite as: 128 S.Ct. 2207)

*dependence Shares Corp.,* 311 U.S. 282, 287, 61 S.Ct. 229, 85 L.Ed. 189 (1940) (" 'If insuperable objection to maintaining the bill clearly appears, it may be dismissed and the litigation terminated' " (quoting *Meccano, Ltd. v. John Wanamaker, N. Y.,* 253 U.S. 136, 141, 40 S.Ct. 463, 64 L.Ed. 822 (1920))). This has long been the rule: "By the ordinary practice in equity as *2220 administered in England and this country," a reviewing court has the power on appeal from an interlocutory order "to examine the merits of the case ... and upon deciding them in favor of the defendant to dismiss the bill." *North Carolina R. Co. v. Story,* 268 U.S. 288, 292, 45 S.Ct. 531, 69 L.Ed. 959 (1925). Indeed, "[t]he question whether an action should be dismissed for failure to state a claim is one of the most common issues that may be reviewed on appeal from an interlocutory injunction order." 16 Wright, Miller & Cooper, Jurisdiction and Related Matters, § 3921.1, at 32 (2d ed.1996).

Adjudication of the merits is most appropriate if the injunction rests on a question of law and it is plain that the plaintiff cannot prevail. In such cases, the defendant is entitled to judgment. See, *e.g., Deckert, supra,* at 287, 61 S.Ct. 229; *North Carolina R. Co.,supra,* at 292, 45 S.Ct. 531; *City and County of Denver, supra,* at 136, 33 S.Ct. 657.

Given that the present cases involve habeas petitions that implicate sensitive foreign policy issues in the context of ongoing military operations, reaching the merits is the wisest course. See *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 584-585, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (finding the case ripe for merits review on appeal from stay of preliminary injunction). For the reasons we explain below, the relief sought by the habeas petitioners makes clear under our precedents that the power of the writ ought not to be exercised. Because the Government is entitled to judgment as a matter of law, it is appropriate for us to terminate the litigation now.

IV

The habeas petitioners argue that the writ should be granted in their cases because they have "a legally enforceable right" not to be transferred to Iraqi authority for criminal proceedings under both the Due Process Clause and the Foreign Affairs Reform and Restructuring Act of 1998 (FARR Act), div. G, 112 Stat. 2681-761, and because they are innocent civilians who have been unlawfully detained by the United States in violation of the Due Process Clause. Brief for Habeas Petitioners 48-52. With respect to the transfer claim, petitioners request an injunction prohibiting the United States from transferring them to Iraqi custody. With respect to the unlawful detention claim, petitioners seek "release"-but only to the extent that release would not result in "unlawful" transfer to Iraqi custody. Tr. of Oral Arg. 48. Both of these requests would interfere with Iraq's sovereign right to "punish offenses against its laws committed within its borders." *Wilson,* 354 U.S., at 529, 77 S.Ct. 1409. We accordingly hold that the detainees' claims do not state grounds upon which habeas relief may be granted, that the habeas petitions should have been promptly dismissed, and that no injunction should have been entered.

A

[8][9] Habeas corpus is "governed by equitable principles." *Fay v. Noia,* 372 U.S. 391, 438, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963). We have therefore recognized that "prudential concerns," *Withrow v. Williams,* 507 U.S. 680, 686, 113 S.Ct. 1745, 123 L.Ed.2d 407 (1993), such as comity and the orderly administration of criminal justice, may "require a federal court to forgo the exercise of its habeas corpus power," *Francis v. Henderson,* 425 U.S. 536, 539, 96 S.Ct. 1708, 48 L.Ed.2d 149 (1976).

The principle that a habeas court is "not bound in every case" to issue the writ, *2221Ex parte Royall,* 117 U.S. 241, 251, 6 S.Ct. 734, 29 L.Ed. 868 (1886), follows from the precatory language of the habeas statute, and from its common-law origins. The habeas statute provides only that a writ of

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ACLU - Hamdan-114

128 S.Ct. 2207                                                    Page 14
128 S.Ct. 2207, 171 L.Ed.2d 1, 76 USLW 4392, 08 Cal. Daily Op. Serv. 7135, 2008 Daily Journal D.A.R. 8633, 21 Fla. L. Weekly Fed. S 358
(Cite as: 128 S.Ct. 2207)

habeas corpus *"may* be granted," § 2241(a) (emphasis added), and directs federal courts to "dispose of [habeas petitions] as law and justice require," § 2243. See *Danforth v. Minnesota,* 552 U.S. ----, ----, 128 S.Ct. 1029, 1040, 169 L.Ed.2d 859 (2008). Likewise, the writ did not issue in England "as of mere course," but rather required the petitioner to demonstrate why the "extraordinary power of the crown" should be exercised, 3 W. Blackstone, Commentaries on the Laws of England 132 (1768); even then, courts were directed to "do as to justice shall appertain," 1 *id.,* at 131 (1765). The question, therefore, even where a habeas court has the power to issue the writ, is "whether this be a case in which [that power] ought to be exercised." *Ex parte Watkins,* 3 Pet. 193, 201, 7 L.Ed. 650 (1830) (Marshall, C. J.).

At the outset, the nature of the relief sought by the habeas petitioners suggests that habeas is not appropriate in these cases. Habeas is at its core a remedy for unlawful executive detention. *Hamdi v. Rumsfeld,* 542 U.S. 507, 536, 124 S.Ct. 2633, 159 L.Ed.2d 578 (2004) (plurality opinion). The typical remedy for such detention is, of course, release. See, *e.g., Preiser v. Rodriguez,* 411 U.S. 475, 484, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973) ("[T]he traditional function of the writ is to secure release from illegal custody"). But here the last thing petitioners want is simple release; that would expose them to apprehension by Iraqi authorities for criminal prosecution-precisely what petitioners went to federal court to avoid. At the end of the day, what petitioners are really after is a court order requiring the United States to shelter them from the sovereign government seeking to have them answer for alleged crimes committed within that sovereign's borders.



The habeas petitioners do not dispute that they voluntarily traveled to Iraq, that they remain detained within the sovereign territory of Iraq today, or that they are alleged to have committed serious crimes in Iraq. Indeed, Omar and Munaf both concede that, if they were not in MNF-I custody, Iraq would be

free to arrest and prosecute them under Iraqi law. See Tr. in *Omar,* No. 06-5126 (CADC), pp. 48-49, 59 (Sept. 11, 2006); Tr. in *Mohammed,* No. 06-1455(DC), pp. 15-16 (Oct. 10, 2006). There is, moreover, no question that Munaf is the subject of ongoing Iraqi criminal proceedings and that Omar would be but for the present injunction. Munaf was convicted by the CCCI, and while that conviction was overturned on appeal, his case was remanded to and is again pending before the CCCI. The MNF-I referred Omar to the CCCI for prosecution at which point he sought and obtained an injunction that prohibits his prosecution. See 479 F.3d, at 16, n. 3 (Brown, J., dissenting in part) (" '[Omar] has not yet had a trial or even an investigative hearing in the CCCI due to the district court's unprecedented injunction' " (citing Opposition to Petitioner's Emergency Motion for Injunctive Relief 18-19, in *Munaf v. Harvey,* No. 06-5324 (CADC, Oct. 25, 2006))).

[10] Given these facts, our cases make clear that Iraq has a sovereign right to prosecute Omar and Munaf for crimes committed on its soil. As Chief Justice Marshall explained nearly two centuries ago, "[t]he jurisdiction of the nation within its own territory is necessarily exclusive and absolute." *Schooner Exchange v. McFaddon,* 7 Cranch 116, 136, 3 L.Ed. 287 (1812). See *Wilson, supra,* at 529, 77 S.Ct. 1409 ("A sovereign nation has exclusive jurisdiction to punish offenses against its *2222 laws committed within its borders, unless it expressly or impliedly consents to surrender its jurisdiction"); *Reid v. Covert,* 354 U.S. 1, 15, n. 29, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957) (opinion of Black, J.) ("[A] foreign nation has plenary criminal jurisdiction ... over all Americans ... who commit offenses against its laws within its territory"); *Kinsella v. Krueger,* 351 U.S. 470, 479, 76 S.Ct. 886, 100 L.Ed. 1342 (1956) (nations have a "sovereign right to try and punish [American citizens] for offenses committed within [their] borders," unless they "have relinquished [their] jurisdiction" to do so).

[11] This is true with respect to American citizens

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ACLU - Hamdan-115

128 S.Ct. 2207                                                              Page 15
128 S.Ct. 2207, 171 L.Ed.2d 1, 76 USLW 4392, 08 Cal. Daily Op. Serv. 7135, 2008 Daily Journal D.A.R. 8633, 21
Fla. L. Weekly Fed. S 358
(Cite as: 128 S.Ct. 2207)

who travel abroad and commit crimes in another nation whether or not the pertinent criminal process comes with all the rights guaranteed by our Constitution. "When an American citizen commits a crime in a foreign country he cannot complain if required to submit to such modes of trial and to such punishment as the laws of that country may prescribe for its own people." *Neely v. Henkel,* 180 U.S. 109, 123, 21 S.Ct. 302, 45 L.Ed. 448 (1901).

The habeas petitioners nonetheless argue that the Due Process Clause includes a "[f]reedom from unlawful transfer" that is "protected *wherever* the government seizes a citizen." Brief for Habeas Petitioners 48. We disagree. Not only have we long recognized the principle that a nation state reigns sovereign within its own territory, we have twice applied that principle to reject claims that the Constitution precludes the Executive from transferring a prisoner to a foreign country for prosecution in an allegedly unconstitutional trial.

In *Wilson,* 354 U.S. 524, 77 S.Ct. 1409, 1 L.Ed.2d 1544, we reversed an injunction similar to the one at issue here. During a cavalry exercise at the Camp Weir range in Japan, Girard, a Specialist Third Class in the United States Army, caused the death of a Japanese woman. *Id.,* at 525-526, 77 S.Ct. 1409. After Japan indicted Girard, but while he was still in United States custody, Girard filed a writ of habeas corpus in the United States District Court for the District of Columbia. *Ibid.* The District Court granted a preliminary injunction against the United States, enjoining the "proposed delivery of [Girard] to the Japanese Government." *Girard v. Wilson,* 152 F.Supp. 21, 27 (DC 1957). In the District Court's view, to permit the transfer to Japanese authority would violate the rights guaranteed to Girard by the Constitution. *Ibid.*

We granted certiorari, and vacated the injunction. 354 U.S., at 529-530, 77 S.Ct. 1409. We noted that Japan had exclusive jurisdiction "to punish offenses against its laws committed within its borders," unless it had surrendered that jurisdiction. *Id.,* at 529, 77 S.Ct. 1409. Consequently, even

though Japan had ceded some of its jurisdiction to the United States pursuant to a bilateral Status of Forces Agreement, the United States could waive that jurisdiction-as it had done in Girard's case-and the habeas court was without authority to enjoin Girard's transfer to the Japanese authorities. *Id.,* at 529-530, 77 S.Ct. 1409.

Likewise, in *Neely v. Henkel,supra,* this Court held that habeas corpus was not available to defeat the criminal jurisdiction of a foreign sovereign, even when application of that sovereign's law would allegedly violate the Constitution. Neely-the habeas petitioner and an American citizen-was accused of violating Cuban law in Cuba. *Id.,* at 112-113, 21 S.Ct. 302. He was arrested and detained in the United States. *Id.,* at 113, 21 S.Ct. 302. The United States indicated its intent to extradite him, and Neely filed suit seeking to block his extradition on the grounds that *2223 Cuban law did not provide the panoply of rights guaranteed him by the Constitution of the United States. *Id.,* at 122, 21 S.Ct. 302. We summarily rejected this claim: "The answer to this suggestion is that those [constitutional] provisions have no relation to crimes committed without the jurisdiction of the United States against the laws of a foreign country." *Ibid.* Neely alleged no claim for which a "discharge on *habeas corpus*" could issue. *Id.,* at 125, 21 S.Ct. 302. Accordingly, the United States was free to transfer him to Cuban custody for prosecution.

In the present cases, the habeas petitioners concede that Iraq has the sovereign authority to prosecute them for alleged violations of its law, yet nonetheless request an injunction prohibiting the United States from transferring them to Iraqi custody. But as the foregoing cases make clear, habeas is not a means of compelling the United States to harbor fugitives from the criminal justice system of a sovereign with undoubted authority to prosecute them.

Petitioners' "release" claim adds nothing to their "transfer" claim. That claim fails for the same reasons the transfer claim fails, given that the release

b5 −1

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ACLU - Hamdan-116

128 S.Ct. 2207                                                                                           Page 16
128 S.Ct. 2207, 171 L.Ed.2d 1, 76 USLW 4392, 08 Cal. Daily Op. Serv. 7135, 2008 Daily Journal D.A.R. 8633, 21
Fla. L. Weekly Fed. S 358
(Cite as: 128 S.Ct. 2207)

petitioners seek is release in a form that would avoid transfer. See Tr. of Oral Arg. 47-48; App. 40 (coupling Munaf's claim for release with a request for order requiring the United States to bring him to a U.S. court); App. 123 (same with respect to Omar). Such "release" would impermissibly interfere with Iraq's "exclusive jurisdiction to punish offenses against its laws committed within its borders," *Wilson, supra,* at 529, 77 S.Ct. 1409; the "release" petitioners seek is nothing less than an order commanding our forces to smuggle them out of Iraq. Indeed, the Court of Appeals in Omar's case took the extraordinary step of upholding an injunction that prohibited the Executive from releasing Omar-the quintessential habeas remedy-if the United States shared information about his release with its military ally, Iraq. 479 F.3d, at 13. Habeas does not require the United States to keep an unsuspecting nation in the dark when it releases an alleged criminal insurgent within its borders.

Moreover, because Omar and Munaf are being held by United States Armed Forces at the behest of the Iraqi Government pending their prosecution in Iraqi courts, *Mohammed,* 456 F.Supp.2d, at 117, release of *any* kind would interfere with the sovereign authority of Iraq "to punish offenses against its laws committed within its borders," *Wilson, supra,* at 529, 77 S.Ct. 1409. This point becomes clear given that the MNF-I, pursuant to its U.N. mandate, is authorized to "take all necessary measures to contribute to the maintenance of security and stability in Iraq," App. G to Pet. for Cert. in No. 07-394, p. 74a, ¶ 10, and specifically to provide for the "internment [of individuals in Iraq] where this is necessary for imperative reasons of security,"*id.,* at 86a.

While the Iraqi Government is ultimately "responsible for [the] arrest, detention and imprisonment" of individuals who violate its laws, S.C. Res. 1790, Annex I, ¶ 4, p. 6, U.N. Doc. S/ RES/1790 (Dec. 18, 2007), the MNF-I maintains physical custody of individuals like Munaf and Omar while their cases are being heard by the

CCCI, *Mohammed, supra,* at 117. Indeed, Munaf is currently held at Camp Cropper pursuant to the express order of the Iraqi Courts. See *In re Hikmat,* No. 19/Pub. Comm'n/2007, at 5 (directing that Munaf "remain in custody pending the outcome" of further Iraqi proceedings). As that court order makes clear, MNF-I detention is an integral part of the Iraqi system of criminal justice. MNF-I forces *2224 augment the Iraqi Government's peacekeeping efforts by functioning, in essence, as its jailor. Any requirement that the MNF-I release a detainee would, in effect, impose a release order on the Iraqi Government.

The habeas petitioners acknowledge that *some* interference with a foreign criminal system is too much. They concede that "it is axiomatic that an American court does not provide collateral review of proceedings in a foreign tribunal." Brief for Habeas Petitioners 39 (citing *Republic of Austria v. Altmann,* 541 U.S. 677, 700, 124 S.Ct. 2240, 159 L.Ed.2d 1 (2004)). We agree, but see no reason why habeas corpus should permit a prisoner detained within a foreign sovereign's territory to prevent a trial from going forward in the first place. It did not matter that the habeas petitioners in *Wilson* and *Neely* had not been convicted. 354 U.S., at 525-526, 77 S.Ct. 1409, 180 U.S., at 112-113, 21 S.Ct. 302. Rather, "the same principles of comity and respect for foreign sovereigns that preclude judicial scrutiny of foreign convictions necessarily render invalid attempts to shield citizens from foreign prosecution in order to preempt such nonreviewable adjudications." *Omar,* 479 F.3d, at 17 (Brown, J., dissenting in part).

To allow United States courts to intervene in an ongoing foreign criminal proceeding and pass judgment on its legitimacy seems at least as great an intrusion as the plainly barred collateral review of foreign convictions. See *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 417-418, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964) (" 'To permit the validity of the acts of one sovereign State to be reexamined and perhaps condemned by the courts of another

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ACLU - Hamdan-117

128 S.Ct. 2207                                                                                    Page 17
128 S.Ct. 2207, 171 L.Ed.2d 1, 76 USLW 4392, 08 Cal. Daily Op. Serv. 7135, 2008 Daily Journal D.A.R. 8633, 21
Fla. L. Weekly Fed. S 358
(Cite as: 128 S.Ct. 2207)

would very certainly "imperil the amicable rela-
tions between governments and vex the peace of
nations" ' " (quoting *Oetjen v. Central Leather Co.*,
246 U.S. 297, 303-304, 38 S.Ct. 309, 62 L.Ed. 726
(1918); punctuation omitted)).[FN4]

> FN4. The habeas petitioners claim that the
> injunction only bars Omar's presentation to
> the Iraqi courts and that the CCCI trial can
> go forward in Omar's absence. The injunc-
> tion is not so easily narrowed. It was
> entered on the theory that Omar might be
> "presented to the CCCI and in that same
> day, be tried, [and] convicted," thus de-
> priving the United States district courts of
> jurisdiction. *Omar v. Harvey,* 416
> F.Supp.2d 19, 29 (DC 2006). Petitioners'
> interpretation makes no sense under that
> theory: If a conviction would deprive the
> habeas court of jurisdiction, a trial, with or
> without the defendant, could result in just
> such a jurisdiction-divesting order.

There is of course even more at issue here: Neither
*Neely* nor *Wilson* concerned individuals captured
and detained within an ally's territory during ongo-
ing hostilities involving our troops. *Neely* involved
a charge of embezzlement; *Wilson* the peacetime
actions of a serviceman. Yet in those cases we held
that the Constitution allows the Executive to trans-
fer American citizens to foreign authorities for
criminal prosecution. It would be passing strange to
hold that the Executive lacks that same authority
where, as here, the detainees were captured by our
Armed Forces for engaging in serious hostile acts
against an ally in what the Government refers to as
"an active theater of combat." Brief for Federal
Parties 16.

Such a conclusion would implicate not only con-
cerns about interfering with a sovereign's recog-
nized prerogative to apply its criminal law to those
alleged to have committed crimes within its bor-
ders, but also concerns about unwarranted judicial
intrusion into the Executive's ability to conduct mil-
itary operations abroad. Our constitutional frame-

work "requires that the judiciary be as scrupulous
not to interfere with legitimate Army matters as the
*2225 Army must be scrupulous not to intervene in
judicial matters." *Orloff v. Willoughby,* 345 U.S.
83, 94, 73 S.Ct. 534, 97 L.Ed. 842 (1953). Those
who commit crimes within a sovereign's territory
may be transferred to that sovereign's government
for prosecution; there is hardly an exception to that
rule when the crime at issue is not embezzlement
but unlawful insurgency directed against an ally
during ongoing hostilities involving our troops.

B

1

Petitioners contend that these general principles are
trumped in their cases because their transfer to Iraqi
custody is likely to result in torture. This allegation
was raised in Munaf's petition for habeas, App. 39,
¶ 46, but not in Omar's. Such allegations are of
course a matter of serious concern, but in the
present context that concern is to be addressed by
the political branches, not the judiciary. See M.
Bassiouni, International Extradition: United States
Law and Practice 921 (2007) ("*Habeas corpus* has
been held not to be a valid means of inquiry into
the treatment the relator is anticipated to receive in
the requesting state").

This conclusion is reflected in the cases already
cited. Even with respect to claims that detainees
would be denied constitutional rights if transferred,
we have recognized that it is for the political
branches, not the judiciary, to assess practices in
foreign countries and to determine national policy
in light of those assessments. Thus, the Court in
*Neely* concluded that an American citizen who
"commits a crime in a foreign country" "cannot
complain if required to submit to such modes of tri-
al and to such punishment as the laws of that coun-
try may prescribe for its own people," but went on
to explain that this was true "unless a different
mode be provided for by treaty stipulation between

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ACLU - Hamdan-118

128 S.Ct. 2207                                                                                          Page 18
128 S.Ct. 2207, 171 L.Ed.2d 1, 76 USLW 4392, 08 Cal. Daily Op. Serv. 7135, 2008 Daily Journal D.A.R. 8633, 21
Fla. L. Weekly Fed. S 358
(Cite as: 128 S.Ct. 2207)

that country and the United States." 180 U.S., at
123, 21 S.Ct. 302. Diplomacy was the means of ad-
dressing the petitioner's concerns.

By the same token, while the Court in *Wilson* stated
the general principle that a "sovereign nation has
exclusive jurisdiction to punish offenses against its
laws committed within its borders," it recognized
that this rule could be altered by diplomatic agree-
ment in light of particular concerns-as it was in that
case-and by a decision of the Executive to waive
jurisdiction granted under that agreement-as it was
in that case. 354 U.S., at 529, 77 S.Ct. 1409. See
also *Kinsella,* 351 U.S., at 479, 76 S.Ct. 886
(alteration of jurisdictional rule through "carefully
drawn agreements"). This recognition that it is the
political branches that bear responsibility for creat-
ing exceptions to the general rule is nothing new; as
Chief Justice Marshall explained in the *Schooner
Exchange,* "exemptions from territorial jurisdiction
... must be derived from the consent of the sover-
eign of the territory" and are "rather questions of
policy than of law, that they are for diplomatic,
rather than legal discussion." 7 Cranch, at 143,
146, 3 L.Ed. 287. The present concerns are of the
same nature as the loss of constitutional rights al-
leged in *Wilson* and *Neely,* and are governed by the
same principles.[FN5]

> FN5. The United States has in fact entered
> into treaties that provide procedural protec-
> tions to American citizens tried in other
> nations. See, *e.g.,* North Atlantic Treaty:
> Status of Forces, June 19, 1951, 4 U.S.T.
> 1802, T.I.A.S. No. 2846, Art. VII, ¶ 9
> (guaranteeing arrested members of the
> Armed Forces and their civilian depend-
> ents, *inter alia,* an attorney, an interpreter,
> and a prompt and speedy trial, as well as
> the right to confront witnesses, obtain fa-
> vorable witnesses, and communicate with a
> representative of the United States).

*2226 The Executive Branch may, of course, de-
cline to surrender a detainee for many reasons, in-
cluding humanitarian ones. Petitioners here allege

only the possibility of mistreatment in a prison fa-
cility; this is not a more extreme case in which the
Executive has determined that a detainee is likely to
be tortured but decides to transfer him anyway. In-
deed, the Solicitor General states that it is the
policy of the United States *not* to transfer an indi-
vidual in circumstances where torture is likely to
result. Brief for Federal Parties 47; Reply Brief for
Federal Parties 23. In these cases the United States
explains that, although it remains concerned about
torture among some sectors of the Iraqi Govern-
ment, the State Department has determined that the
Justice Ministry-the department that would have
authority over Munaf and Omar-as well as its pris-
on and detention facilities have " 'generally met in-
ternationally accepted standards for basic prisoner
needs.' " *Ibid.* The Solicitor General explains that
such determinations are based on "the Executive's
assessment of the foreign country's legal system
and ... the Executive['s] ... ability to obtain foreign
assurances it considers reliable." Brief for Federal
Parties 47.

The Judiciary is not suited to second-guess such de-
terminations-determinations that would require fed-
eral courts to pass judgment on foreign justice sys-
tems and undermine the Government's ability to
speak with one voice in this area. See The Federal-
ist No. 42, p. 279 (J. Cooke ed. 1961) (J. Madison)
("If we are to be one nation in any respect, it
clearly ought to be in respect to other nations"). In
contrast, the political branches are well situated to
consider sensitive foreign policy issues, such as
whether there is a serious prospect of torture at the
hands of an ally, and what to do about it if there is.
As Judge Brown noted, "we need not assume the
political branches are oblivious to these concerns.
Indeed, the other branches possess significant dip-
lomatic tools and leverage the judiciary lacks."
479 F.3d, at 20, n. 6 (dissenting opinion).

Petitioners briefly argue that their claims of poten-
tial torture may not be readily dismissed on the
basis of these principles because the FARR Act
prohibits transfer when torture may result. Brief for

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ACLU - Hamdan-119

128 S.Ct. 2207            Page 19
128 S.Ct. 2207, 171 L.Ed.2d 1, 76 USLW 4392, 08 Cal. Daily Op. Serv. 7135, 2008 Daily Journal D.A.R. 8633, 21
Fla. L. Weekly Fed. S 358
(Cite as: 128 S.Ct. 2207)

Habeas Petitioners 51-52. Neither petitioner asserted a FARR Act claim in his petition for habeas, and the Act was not raised in any of the certiorari filings before this Court. Even in their merits brief in this Court, the habeas petitioners hardly discuss the issue. *Id.,* at 17, 51-52, 57-58. The Government treats the issue in kind. Reply Brief for Federal Parties 24-26. Under such circumstances we will not consider the question.[FN6]

> FN6. We hold that these habeas petitions raise no claim for relief under the FARR Act and express no opinion on whether Munaf and Omar may be permitted to amend their respective pleadings to raise such a claim on remand. Even if considered on the merits, several issues under the FARR Act claim would have to be addressed. First, the Act speaks to situations where a detainee is being "returned" to "a country." FARR Act § 2242(a), 112 Stat. 2681-822 ("It shall be the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture, regardless of whether the person is physically present in the United States"); see also Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, 1465 U.N.T.S. 85, Art. 3, S. Treaty Doc. No. 20, 100th Cong., 2d Sess., p. 6 (1988) ("No State Party shall expel, return ('refouler') or extradite a person *to another State* where there are substantial grounds for believing that he would be in danger of being subjected to torture" (emphasis added)). It is not settled that the Act addresses the transfer of an individual located in Iraq to the Government of Iraq; arguably such an individual is not being "returned" to "a country"-he is already there.

Second, claims under the FARR Act may be limited to certain immigration proceedings. See § 2242(d), 112 Stat. 2681-822 ("[N]othing in this section shall be construed as providing any court jurisdiction to consider or review claims raised under the Convention or this section, or any other determination made with respect to the application of the policy set forth in [this section], except as part of the review of a final order of removal pursuant to [8 U.S.C. § 1252 (2000 ed. and Supp. V])").

*\*2227 2*

Finally, the habeas petitioners raise the additional argument that the United States may not transfer a detainee to Iraqi custody, not because it would be unconstitutional to do so, but because the "[G]overnment may not transfer a citizen without legal authority." Brief for Habeas Petitioners 54. The United States, they claim, bears the burden of "identify[ing] a treaty or statute that permits it to transfer the[m] to Iraqi custody." *Id.,* at 49.

The habeas petitioners rely prominently on *Valentine v. United States ex rel. Neidecker,* 299 U.S. 5, 57 S.Ct. 100, 81 L.Ed. 5 (1936), where we ruled that the Executive may not extradite a person held within the United States unless "legal authority" to do so "is given by act of Congress or by the terms of a treaty," *id.,* at 9, 57 S.Ct. 100.But *Valentine* is readily distinguishable. It involved the extradition of an individual from the United States; this is not an extradition case, but one involving the transfer to a sovereign's authority of an individual captured and already detained in that sovereign's territory. In the extradition context, when a "fugitive criminal" is found within the United States " 'there is no authority vested in any department of the government to seize [him] and surrender him to a foreign power,' " in the absence of a pertinent constitutional or legislative provision. *Ibid.* But Omar and Munaf voluntarily traveled to Iraq and are being held there. They are therefore

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ACLU - Hamdan-120

128 S.Ct. 2207                                                                Page 20
128 S.Ct. 2207, 171 L.Ed.2d 1, 76 USLW 4392, 08 Cal. Daily Op. Serv. 7135, 2008 Daily Journal D.A.R. 8633, 21
Fla. L. Weekly Fed. S 358
(Cite as: 128 S.Ct. 2207)

subject to the territorial jurisdiction of that sovereign, not of the United States. Moreover, as we have explained, the petitioners are being held by the United States, acting as part of MNF-I, at the request of and on behalf of the Iraqi Government. It would be more than odd if the Government had no authority to transfer them to the very sovereign on whose behalf, and within whose territory, they are being detained.

The habeas petitioners further contend that this Court's decision in *Wilson* supports their argument that the Executive lacks the discretion to transfer a citizen absent a treaty or statute. Brief for Habeas Petitioners 54-55. Quite the opposite. *Wilson* forecloses it. The only "authority" at issue in *Wilson*-a Status of Forces Agreement-seemed to give the habeas petitioner in that case a right to be tried by an American military tribunal, not a Japanese court. 354 U.S., at 529, 77 S.Ct. 1409. Nevertheless, in light of the background principle that Japan had a sovereign interest in prosecuting crimes committed within its borders, this Court found no "constitutional or statutory" impediment to the United States's waiver of its jurisdiction under the agreement. *Id.,* at 530, 77 S.Ct. 1409.

* * *

Munaf and Omar are alleged to have committed hostile and warlike acts within the sovereign territory of Iraq during ongoing hostilities there. Pending their criminal prosecution for those offenses, Munaf and Omar are being held in Iraq by American forces operating pursuant to a U.N. Mandate and at the request of the Iraqi Government. Petitioners concede that Iraq has a sovereign right to prosecute\*2228 them for alleged violations of its law. Yet they went to federal court seeking an order that would allow them to defeat precisely that sovereign authority. Habeas corpus does not require the United States to shelter such fugitives from the criminal justice system of the sovereign with authority to prosecute them.

For all the reasons given above, petitioners state no claim in their habeas petitions for which relief can be granted, and those petitions should have been promptly dismissed. The judgments below and the injunction entered against the United States are vacated, and the cases are remanded for further proceedings consistent with this opinion.

*It is so ordered.*

Justice SOUTER, with whom Justice GINSBURG and Justice BREYER join, concurring.

The Court holds that "[u]nder circumstances such as those presented here, ... habeas corpus provides petitioners with no relief." *Ante,* at 2213.The Court's opinion makes clear that those circumstances include the following: (1) Omar and Munaf "voluntarily traveled to Iraq." *Ante,* at 2221. They are being held (2) in the "territory" of (3) an "all[y]" of the United States, *ante,* at 2224, (4) by our troops, see *ante,* at 2216 - 2217, (5) "during ongoing hostilities" that (6) "involv[e] our troops," *ante,* at 2224. (7) The government of a foreign sovereign, Iraq, has decided to prosecute them "for crimes committed on its soil." *Ante,* at 2221. And (8) "the State Department has determined that ... the department that would have authority over Munaf and Omar ... as well as its prison and detention facilities have generally met internationally accepted standards for basic prisoner needs." *Ante,* at 2226 (internal quotation marks omitted). Because I consider these circumstances essential to the Court's holding, I join its opinion.

The Court accordingly reserves judgment on an "extreme case in which the Executive has determined that a detainee [in United States custody] is likely to be tortured but decides to transfer him anyway." *Ante,* at 2225 - 2226. I would add that nothing in today's opinion should be read as foreclosing relief for a citizen of the United States who resists transfer, say, from the American military to a foreign government for prosecution in a case of that sort, and I would extend the caveat to a case in which the probability of torture is well documented, even if the Executive fails to acknowledge it. Al-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ACLU - Hamdan-121

128 S.Ct. 2207

Page 21

128 S.Ct. 2207, 171 L.Ed.2d 1, 76 USLW 4392, 08 Cal. Daily Op. Serv. 7135, 2008 Daily Journal D.A.R. 8633, 21 Fla. L. Weekly Fed. S 358
(Cite as: 128 S.Ct. 2207)

though the Court rightly points out that any likelihood of extreme mistreatment at the receiving government's hands is a proper matter for the political branches to consider, see *ante*, at 2225 - 2226, if the political branches did favor transfer it would be in order to ask whether substantive due process bars the Government from consigning its own people to torture. And although the Court points out that habeas is aimed at securing release, not protective detention, see *ante*, at 2221, habeas would not be the only avenue open to an objecting prisoner; "where federally protected rights [are threatened], it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief," *Bell v. Hood*, 327 U.S. 678, 684, 66 S.Ct. 773, 90 L.Ed. 939 (1946).

U.S.,2008.
Munaf v. Geren
128 S.Ct. 2207, 171 L.Ed.2d 1, 76 USLW 4392, 08 Cal. Daily Op. Serv. 7135, 2008 Daily Journal D.A.R. 8633, 21 Fla. L. Weekly Fed. S 358

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ACLU - Hamdan-122

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 03-07-2011 BY 65179/DMH/BAW/STP/bls

Westlaw.

482 F.3d 582
482 F.3d 582, 375 U.S.App.D.C. 490
(Cite as: 482 F.3d 582, 375 U.S.App.D.C. 490)

Page 1

United States Court of Appeals,
District of Columbia Circuit.
Mohammad MUNAF and Maisoon Mohammed, as
Next Friend of Mohammad Munaf,
Appellants
v.
Pete GEREN, Acting Secretary of the U.S. Army,
et al., Appellees.
No. 06-5324.

Argued Feb. 16, 2007.
Decided April 6, 2007.

**Background:** American citizen, held in Iraq in custody of multi-national military force on charges that he engaged in conspiracy to engage in kidnapping in violation of Iraqi law, petitioned for writ of habeas corpus in order to secure his release. The United States District Court for the District of Columbia, Royce C. Lamberth, J., held that it lacked jurisdiction and dismissed the petition. Petitioner appealed.

**Holding:** The Court of Appeals, Sentelle, Circuit Judge, held that district court lacked jurisdiction to consider petition.
Affirmed.

Randolph, Circuit Judge, concurred in the judgment and filed an opinion.

West Headnotes

**Habeas Corpus** ☞522.1
197k522.1 Most Cited Cases
Central Criminal Court of Iraq (CCCI), which sentenced an American citizen to death following his conviction on kidnapping charges, was not a tribunal of the United States, and thus, district court had no power or authority to hear habeas petition brought by citizen, which named the Secretary of the Army and others as respondents, notwithstanding that citizen was being held in Iraq by United States military personnel serving as part of the

Multi-National Force-Iraq (MNF-I) authorized by the United Nations Security Council; CCCI was an Iraqi criminal court of nationwide jurisdiction administered by the government of Iraq.
*582 Appeal from the United States District Court for the District of Columbia (No. 06cv01455).

Joseph Margulies argued the cause for appellants. With him on the briefs were Jonathan L. Hafetz, Aziz Z. Huq, Eric M. Freedman, and Susan L. Burke.

Gregory G. Garre, Deputy Solicitor General, U.S. Department of Justice, argued the cause for appellees. With him on the brief were Peter D. Keisler, Assistant Attorney General, Jeffrey A. Taylor, U.S. Attorney, David B. Salmons, Assistant to the Solicitor General, Douglas N. Letter, Litigation Counsel, and Lewis Yelin, Attorney.

Before: SENTELLE, RANDOLPH and KAVANAUGH, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE.

Opinion filed by Circuit Judge RANDOLPH, concurring in the judgment.

SENTELLE, Circuit Judge.

**490 Mohammad Munaf, an American citizen, traveled to Iraq in 2005. In October 2006 he was convicted on kidnapping charges and sentenced to death by the Central Criminal Court of Iraq ("CCCI"). He is **491 *583 being held, in Iraq, by United States military personnel serving as part of the Multi-National Force-Iraq ("MNF-I"). Munaf sought a writ of habeas corpus in the United States District Court for the District of Columbia, naming the Secretary of the Army and others as respondents. Soon after Munaf's conviction by the Iraqi criminal court, the district court held that it lacked jurisdiction and dismissed the petition. *Mohammed v. Harvey,* 456 F.Supp.2d 115 (D.D.C.2006).

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ACLU - Hamdan-123

482 F.3d 582
482 F.3d 582, 375 U.S.App.D.C. 490
(Cite as: 482 F.3d 582, 375 U.S.App.D.C. 490)

Page 2

Munaf appeals. Constrained by precedent, we hold that the district court does not have the power or authority to entertain Munaf's petition and we therefore affirm.

Our result is required by the Supreme Court's decision in *Hirota v. MacArthur,* 338 U.S. 197, 69 S.Ct. 197, 93 L.Ed. 1902 (1948), as that decision has been applied by this court in *Flick v. Johnson,* 174 F.2d 983 (D.C.Cir.1949), and interpreted by *Omar v. Harvey,* 479 F.3d 1 (D.C.Cir.2007). In *Hirota,* Japanese citizens sought permission to file petitions for writs of habeas corpus directly in the United States Supreme Court. The petitioners were held in Japan, where they had been tried by a military tribunal authorized by General Douglas MacArthur acting as the Supreme Commander for the occupying Allied Powers, *Hirota,* 338 U.S. at 198, 69 S.Ct. 197. In a short per curiam opinion the Supreme Court concluded that the sentencing tribunal "[was] not a tribunal of the United States" and held that "[u]nder the foregoing circumstances the courts of the United States have no power or authority to review, to affirm, set aside or annul the judgments and sentences imposed on these petitioners." *Id.*

*Flick* involved a habeas petition filed in the United States District Court for the District of Columbia by a German citizen held in Germany by American forces after he was convicted by a military tribunal. 174 F.2d 983. Relying on *Hirota,* we framed the jurisdictional question as follows: "Was the court which tried and sentenced Flick a tribunal of the United States? If it was not, no court of this country has power or authority to review, affirm, set aside or annul the judgment and sentence imposed on Flick." *Id.* at 984. Finding that the military tribunal was not a U.S. court, we held that the district court lacked jurisdiction to review Flick's habeas petition. *Id.* at 986.

Our recent decision in *Omar* involved a habeas petition filed on behalf of a United States citizen being held in Iraq by U.S. forces acting as part of the MNF-I. *Omar,* 479 F.3d at 2. As in *Hirota* and *Flick, Omar* involved detention overseas and a mul-

tinational force. But unlike the petitioners in *Hirota* and *Flick,* Omar had not been charged or convicted by a non-U.S. court. We distinguished *Hirota* and *Flick* on this basis and went on to hold that the district court had jurisdiction to hear Omar's habeas claim. Slip op. at 12-14.

Unlike *Omar,* the instant case is controlled by *Hirota* and *Flick.* The MNF-I is a multinational force, authorized by the United Nations Security Council, that operates in Iraq in coordination with the Iraqi government. The CCCI is an Iraqi criminal court of nationwide jurisdiction and is administered by the government of Iraq; it is not a tribunal of the United States. Accordingly, the district court has no power or authority to hear this case.

Munaf contends that *Hirota* and *Flick* do not control because, like Omar and unlike the petitioners in *Hirota* and *Flick,* Munaf is a United States citizen. [FN1] *See, e.g., Johnson v. Eisentrager,* 339 U.S. 763, 769, 70 S.Ct. 936, 94 L.Ed. 1255 (1950) (describing citizenship as "a head of jurisdiction and a ground of protection"). But **492 *584 Munaf's citizenship does not take his case out of the ambit of *Hirota* and *Flick. Hirota* did not suggest any distinction between citizens and noncitizens who were held abroad pursuant to the judgment of a non-U.S. tribunal. Indeed, Justice Douglas wrote a separate opinion criticizing the *Hirota* majority for seeming to foreclose habeas review even for American citizens held in such circumstances. *See* 338 U.S. at 204-05, 69 S.Ct. 1238 (Douglas, J., concurring) (1949). In *Omar,* we held that "**the critical factor in *Hirota* was the petitioners' convictions by an international tribunal.**" 479 F.3d at 7. We explained that, because *Hirota* "articulates no general principle at all," the decision is controlling as a matter of precedent if the circumstances important to the Court's decision are present here. *Id.* at 6. As in *Hirota,* Munaf's case involves an international force, detention overseas, and a conviction by a non-U.S. court. As we noted in *Omar,* conducting habeas proceedings in the face of such a conviction risks judicial second-guessing of a non-U.S. court's

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ACLU - Hamdan-124

482 F.3d 582
482 F.3d 582, 375 U.S.App.D.C. 490
(Cite as: 482 F.3d 582, 375 U.S.App.D.C. 490)

Page 3

judgments and sentences, and we explained that *Hirota's* repeated references to the petitioners' sentences "demonstrate[ ] that the Court's primary concern was that the petitions represented a collateral attack on the final judgment of an international tribunal." *Id.* at 7-8. Whether a habeas petition represents a collateral attack on a conviction by a non-U.S. court is not dependent on the petitioner's citizenship. In light of the precedent established by *Hirota,* specifically as interpreted in *Flick* and *Omar,* American citizenship cannot displace the fact of a criminal conviction in a non-United States court and permit the district court to exercise jurisdiction over Munaf's habeas petition.

> FN1. Munaf was born in Iraq and was naturalized as a United States citizen in 2000.

Munaf also argues that he does not challenge his conviction by the Iraqi court but rather the lawfulness of his detention at the hands of United States military personnel. As with Munaf's citizenship argument, we do not think that *Hirota* and *Flick* can be distinguished on this ground. In *Hirota* and *Flick,* as in this case, U.S. forces who were operating as part of a multinational force detained the petitioners. And as in those cases, continued confinement is dependent on a conviction by a court not of the United States-- specifically, a multinational tribunal in *Hirota* and *Flick* and, in this case, the CCCI, which is a foreign tribunal. The fact that the MNF-I is not an arm of the Iraqi government but rather cooperates with Iraq and its courts in matters of detention does not bring this case outside the scope of *Hirota.* Munaf states in his brief that "[e]ven if the Iraqi charges were dismissed tomorrow the United States does not suggest [Munaf] would be released." But the district court's jurisdiction to inquire into such matters is precisely the issue; if the charges were dismissed, and United States forces were to continue to hold Munaf, this would be a different case. Under *Omar* the district court arguably *would* have jurisdiction over Munaf's habeas claim. [FN2] *See Omar,* 479 F.3d at 9-10.

> FN2. Munaf's conviction was automatically appealed to the Iraqi Court of Cassation. At oral argument, Munaf's counsel stated that the status of that appeal is unclear.

* * * * * *

One final point deserves emphasis. In holding that the district court lacks jurisdiction, we do not mean to suggest that we find the logic of *Hirota* especially clear or compelling, particularly as applied to American citizens. In particular, Hirota does not explain why, in cases such as this, the fact of a criminal conviction in a non-U.S. court is a fact of jurisdictional significance under the habeas statute. And as we acknowledged in *Omar,* the Supreme Court's recent decisions in **493*585*Hamdi v. Rumsfeld,* 542 U.S. 507, 124 S.Ct. 2633, 159 L.Ed.2d 578 (2004), and *Rasul v. Bush,* 542 U.S. 466, 124 S.Ct. 2686, 159 L.Ed.2d 548 (2004), are grounds for questioning *Hirota's* continued vitality. *Omar,* 479 F.3d at 6. But we are not free to disregard *Hirota* simply because we may find its logic less than compelling. "If a precedent of [the Supreme] Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions." *Id.* at 6 (quoting *Rodriguez de Quijas v. Shearson/American Express, Inc.,* 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989)).

For the reasons discussed above, the judgment of the district court is

*Affirmed.*

RANDOLPH, Circuit Judge, concurring in the judgment.

I believe the district court had jurisdiction over Munaf's habeas corpus petition. The critical considerations are that Munaf is an American citizen and that he is held by American forces overseas. *Hirota*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ACLU - Hamdan-125

482 F.3d 582
482 F.3d 582, 375 U.S.App.D.C. 490
(Cite as: 482 F.3d 582, 375 U.S.App.D.C. 490)

Page 4

*v. MacArthur,* 338 U.S. 197, 69 S.Ct. 197, 93 L.Ed. 1902 (1948) (per curiam), in which the habeas petitioners were Japanese citizens held in Japan, therefore does not apply. There is a longstanding jurisdictional distinction between citizens and aliens detained outside the sovereign territory of the United States. In *Johnson v. Eisentrager,* 339 U.S. 763, 781, 70 S.Ct. 936, 94 L.Ed. 1255 (1950), decided two years after *Hirota,* the Court held that it lacked jurisdiction to issue writs of habeas corpus for German prisoners held by the United States in Germany. But the Court stated that its holding did not apply to American citizens, to whom the "Court long ago extended *habeas corpus*" when they were held outside the United States. *See id.* at 769-70, 70 S.Ct. 936 (citing *Chin Yow v. United States,* 208 U.S. 8, 28 S.Ct. 201, 52 L.Ed. 369 (1908)).

It is hardly surprising then that eight of the nine Justices in *Rasul v. Bush,* 542 U.S. 466, 124 S.Ct. 2686, 159 L.Ed.2d 548 (2004), explicitly agreed that American citizens held by American officials overseas could invoke habeas jurisdiction. For himself and four other Justices, Justice Stevens wrote that "[a]liens held at the [Guantanamo Bay Naval] base, no less than American citizens, are entitled to invoke the federal courts' authority under [28 U.S.C.] § 2241." *Id.* at 481, 124 S.Ct. 2686. Justice Scalia, joined by Chief Justice Rehnquist and Justice Thomas, stated that "[n]either party to the present case challenges the atextual extension of the habeas statute to United States citizens held beyond the territorial jurisdictions of the United States courts," "[a]nd *that* position--the position that United States citizens throughout the world may be entitled to habeas corpus rights--is precisely the position that this Court adopted in *Eisentrager* ... even while holding that aliens abroad *did not have* habeas corpus rights." *Id.* at 497, 502, 124 S.Ct. 2686 (Scalia, J., dissenting) (citation omitted).

It is true that *Omar v. Harvey,* 479 **F.3d** 1, 7 (D.C.Cir.2007), distinguished *Hirota* and *Flick v. Johnson,* 174 F.2d 983 (D.C.Cir.1949), on the ground that in both cases the alien petitioners held

overseas had been convicted by an international tribunal. But *Omar* did not speak to the jurisdictional issue confronting us here. To extend *Hirota* to habeas petitions filed by American citizens not only would contradict *Eisentrager* and the majority and dissenting opinions in *Rasul,* but also would constitute an unwarranted extension of an opinion that "articulates no general legal principle at all," *Omar,* 479 F.3d at 6.

**\*586 \*\*494** Habeas petitions test the legality of detention. The fact that the United States is holding Munaf because of his conviction by a foreign tribunal thus goes to the question whether he is entitled to the writ, not to the question whether the court has jurisdiction to consider the petition. *See Bell v. Hood,* 327 U.S. 678, 681, 66 S.Ct. 773, 90 L.Ed. 939 (1946). As to the merits, I believe *Wilson v. Girard,* 354 U.S. 524, 77 S.Ct. 1409, 1 L.Ed.2d 1544 (1957), is conclusive. After Japan indicted a United States soldier for killing a Japanese woman in Japan, the soldier sought a writ of habeas corpus in the United States District Court for the District of Columbia to prevent his transfer to Japanese authorities. *Id.* at 525-26, 77 S.Ct. 1409. The district court denied the writ on the merits but issued a preliminary injunction against the soldier's transfer. *Girard v. Wilson,* 152 F.Supp. 21, 27 (D.D.C.1957). Referring to a Security Treaty between the United States and Japan, the Supreme Court upheld the denial of the writ but reversed the grant of the injunction, 354 U.S. at 530, 77 S.Ct. 1409, reasoning that a "sovereign nation has exclusive jurisdiction to punish offenses against its laws committed within its borders, unless it expressly or impliedly consents to surrender its jurisdiction," *id.* at 529, 77 S.Ct. 1409 (citing *Schooner Exchange v. M'Faddon,* 11 U.S. (7 Cranch) 116, 136, 3 L.Ed. 287 (1812)). In Munaf's case, the Congressional Authorization for Use of Military Force Against Iraq, Pub. L. No. 107-243, 116 Stat. 1498 (2002), in conjunction with United Nations Security Council Resolutions 1546, U.N. Doc. S/RES/1546 (June 8, 2004), and 1637, U.N. Doc. S/RES/1637 (Nov. 11, 2005), commands the same result. *Cf. Holmes v.*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ACLU - Hamdan-126

482 F.3d 582
482 F.3d 582, 375 U.S.App.D.C. 490
(Cite as: 482 F.3d 582, 375 U.S.App.D.C. 490)

Page 5

*Laird,* 459 F.2d 1211, 1219 n. 59 (D.C.Cir.1972).

482 F.3d 582, 375 U.S.App.D.C. 490

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ACLU - Hamdan-127

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 03-07-2011 BY 65179/DMH/BAW/STP/bls

Westlaw.

350 F.Supp.2d 28
350 F.Supp.2d 28
(Cite as: 350 F.Supp.2d 28)

Page 1

▷

United States District Court, District of Columbia.
Omar ABU ALI, et al., Petitioners,
v.
John ASHCROFT, et al., Respondents.
No. CIV.A. 04-1258JDB.

Dec. 16, 2004.

**Background:** Petitioner, a citizen of the United States, through his parents, filed a petition for a writ of habeas corpus against several officials of the United States challenging his ongoing detention in a prison of the Kingdom of Saudi Arabia allegedly at the behest and ongoing supervision of the United States.

**Holdings:** On government's motion to dismiss, the District Court, Bates, held that:
(1) judicial review was not precluded by fact that petitioner was being held by a foreign country;
(2) question of whether petitioner was in the actual or constructive custody of the United States, as required for jurisdiction, could not be resolved on motion to dismiss because of factual disputes;
(3) act of state doctrine did not bar adjudication of habeas petition;
(4) separation of powers doctrine did not foreclose adjudication of habeas petition;
(5) political question doctrine did not bar adjudication of habeas petition; and
(6) Hostage Act did not create a duty on the part of the President to demand the Saudi Government to release petitioner.

Motion denied.

West Headnotes

**[1] Habeas Corpus 197 ☞253**

197 Habeas Corpus
   197I In General
      197I(B) Necessity, Nature, and Sufficiency
of Restraint or Detention
         197k253 k. Particular Issues and Problems. Most Cited Cases
Judicial review of habeas petition brought by petitioner, a citizen of the United States, through his parents, against several officials of the United States challenging his ongoing detention in a prison of the Kingdom of Saudi Arabia, allegedly at the behest and ongoing supervision of the United States, was not precluded by fact that petitioner was being held by a foreign country. 28 U.S.C.A. §§ 2241-2243.

**[2] Habeas Corpus 197 ☞705.1**

197 Habeas Corpus
   197III Jurisdiction, Proceedings, and Relief
      197III(C) Proceedings
         197III(C)2 Evidence
            197k705 Burden of Proof
               197k705.1 k. In General. Most
Cited Cases
On a motion to dismiss for lack of jurisdiction, a habeas petitioner bears the burden of establishing the jurisdiction of the Court. 28 U.S.C.A. § 2241.

**[3] Habeas Corpus 197 ☞670(1)**

197 Habeas Corpus
   197III Jurisdiction, Proceedings, and Relief
      197III(C) Proceedings
         197III(C)1 In General
            197k665 Petition or Application
               197k670 Particular Issues and Problems, Sufficiency of Petition
                  197k670(1) k. In General. Most
Cited Cases
Where respondents to a petition for habeas corpus challenge only the legal sufficiency of the petitioners' jurisdictional allegations, the district court should take the petitioners' factual allegations as true, and draw all reasonable inferences in the petitioners' favor. 28 U.S.C.A. § 2241.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ACLU - Hamdan-128

350 F.Supp.2d 28
350 F.Supp.2d 28
(Cite as: 350 F.Supp.2d 28)

Page 2

**[4] Habeas Corpus 197 ☞632.1**

197 Habeas Corpus
   197III Jurisdiction, Proceedings, and Relief
      197III(B) Jurisdiction and Venue
         197III(B)2 Personal Jurisdiction and Venue
           197k632 Federal Courts
             197k632.1 k. In General. Most Cited Cases
References in the habeas statute to "the person having custody of the person detained" and the courts exercising jurisdiction "within their respective jurisdictions" do not create a jurisdictional wall against habeas petitions for citizens detained overseas, implicit or otherwise; that is, where a petitioner can name a respondent who is within the respective jurisdiction of the district court, and the respondent has custody of the person detained and the ability to produce at the hearing such person if necessary, courts should not strain to read into the statute a territorial barrier to habeas review, at least for the claims of citizens, that is not apparent on the face of the statute. 28 U.S.C.A. §§ 2241, 2243.

**[5] Habeas Corpus 197 ☞670(2)**

197 Habeas Corpus
   197III Jurisdiction, Proceedings, and Relief
      197III(C) Proceedings
         197III(C)1 In General
           197k665 Petition or Application
             197k670 Particular Issues and Problems, Sufficiency of Petition
               197k670(2) k. Identity of Custodian and Place of Custody. Most Cited Cases
For purposes of habeas petition brought by petitioner, a citizen of the United States, through his parents, against several officials of the United States challenging his ongoing detention in a prison of the Kingdom of Saudi Arabia, the question of whether petitioner was in the actual or constructive custody of the United States, as required for jurisdiction under the habeas statute, could not be resolved on United States' motion to dismiss because of factual disputes as whether petitioner was detained at the behest of United States officials, whether his ongoing detention was at the direction of the United States enlisting a foreign state as an agent or intermediary who was indifferent to the detention of the prisoner, whether he was being detained in the foreign state to deny him an opportunity to assert his rights in a United States tribunal, and whether he would be released upon nothing more than a request by the United States. 28 U.S.C.A. §§ 2241-2243.

**[6] Habeas Corpus 197 ☞632.1**

197 Habeas Corpus
   197III Jurisdiction, Proceedings, and Relief
      197III(B) Jurisdiction and Venue
         197III(B)2 Personal Jurisdiction and Venue
           197k632 Federal Courts
             197k632.1 k. In General. Most Cited Cases
Question of habeas jurisdiction turns on whether the petitioner is held in actual or constructive custody by the respondents named in the petition, or by any other person or persons subject to the jurisdiction of the District Court. 28 U.S.C.A. §§ 2241-2243.

**[7] Habeas Corpus 197 ☞670(2)**

197 Habeas Corpus
   197III Jurisdiction, Proceedings, and Relief
      197III(C) Proceedings
         197III(C)1 In General
           197k665 Petition or Application
             197k670 Particular Issues and Problems, Sufficiency of Petition
               197k670(2) k. Identity of Custodian and Place of Custody. Most Cited Cases
Habeas petition, filed by petitioner, a citizen of the United States, through his parents, pled at least a colorable claim that petitioner was being held in violation of the Constitution, laws, or treaties of the United States, as required under the habeas statute, by alleging that the United States had worked through Saudi officers to detain petitioner, a United States citizen, indefinitely without due process of

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ACLU - Hamdan-129

350 F.Supp.2d 28
350 F.Supp.2d 28
(Cite as: 350 F.Supp.2d 28)

Page 3

law. U.S.C.A. Const.Amend. 5; 28 U.S.C.A. § 2241(c).

**[8] International Law 221 ⚖➞10.9**

221 International Law
   221k10.8 Domestic Effect of Foreign Acts and Laws
      221k10.9 k. In General. Most Cited Cases
The "act of state doctrine" precludes the courts of the United States from inquiring into the validity of the public acts a recognized foreign sovereign power committed within its own territory; act of state issues only arise when a court must decide, that is, when the outcome of the case turns upon, the effect of official action by a foreign sovereign.

**[9] Habeas Corpus 197 ⚖➞461**

197 Habeas Corpus
   197II Grounds for Relief; Illegality of Restraint
      197II(B) Particular Defects and Authority for Detention in General
       197k461 k. Grounds in General. Most Cited Cases

**International Law 221 ⚖➞10.9**

221 International Law
   221k10.8 Domestic Effect of Foreign Acts and Laws
      221k10.9 k. In General. Most Cited Cases
"Act of state doctrine" did not bar adjudication of habeas petition brought by petitioner, a citizen of the United States, through his parents, against several officials of the United States challenging his ongoing detention in a prison of the Kingdom of Saudi Arabia allegedly at the behest and ongoing supervision of the United States, given that petitioners were not challenging the legality of the actions of the Saudi government in tort or otherwise, but rather were suing United States officials for the role they allegedly played in obtaining the actions of the Saudi government. 28 U.S.C.A. § 2241.

**[10] Constitutional Law 92 ⚖➞2551**

92 Constitutional Law
   92XX Separation of Powers
      92XX(C) Judicial Powers and Functions
       92XX(C)3 Encroachment on Executive
        92k2542 Particular Issues and Applications
         92k2551 k. Foreign Policy and National Defense. Most Cited Cases
   (Formerly 92k72)

**Habeas Corpus 197 ⚖➞461**

197 Habeas Corpus
   197II Grounds for Relief; Illegality of Restraint
      197II(B) Particular Defects and Authority for Detention in General
       197k461 k. Grounds in General. Most Cited Cases
Separation of powers doctrine did not foreclose adjudication of habeas petition brought by petitioner, a citizen of the United States, through his parents, against several officials of the United States challenging his ongoing detention in a prison of the Kingdom of Saudi Arabia allegedly at the behest and ongoing supervision of the United States; a determination of the relative involvement of the United States and Saudi Arabia in the detention of a United States citizen was precisely the inquiry that federal courts would conduct in any criminal case where a defendant alleged that evidence the United States intended to use against him was obtained by foreign governments at the behest of the United States in violation of his constitutional rights. 28 U.S.C.A. § 2241.

**[11] Constitutional Law 92 ⚖➞2580**

92 Constitutional Law
   92XX Separation of Powers
      92XX(C) Judicial Powers and Functions
      92XX(C)5 Political Questions
       92k2580 k. In General. Most Cited Cases
   (Formerly 92k68(1))
The "political question doctrine" excludes from judicial review those controversies which revolve

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ACLU - Hamdan-130

350 F.Supp.2d 28
350 F.Supp.2d 28
(Cite as: 350 F.Supp.2d 28)

Page 4

around policy choices and value determinations
constitutionally committed for resolution to the
halls of Congress or the confines of the Executive
Branch.

**[12] Constitutional Law 92 ☞2588**

92 Constitutional Law
   92XX Separation of Powers
      92XX(C) Judicial Powers and Functions
         92XX(C)5 Political Questions
            92k2588 k. Foreign Policy and Nation-
al Defense. Most Cited Cases
     (Formerly 92k68(1))
The "political question doctrine" did not bar adju-
dication of habeas petition brought by petitioner, a
citizen of the United States, through his parents,
against several officials of the United States chal-
lenging his ongoing detention in a prison of the
Kingdom of Saudi Arabia allegedly at the behest
and ongoing supervision of the United States, given
that the petitioners challenged not the failure of the
United States to act on behalf of a citizen in accord-
ance with certain claimed statutory duties, but the
United States' alleged actions against a citizen in
violation of certain constitutional duties. 28
U.S.C.A. § 2241.

**[13] Mandamus 250 ☞73(1)**

250 Mandamus
   250II Subjects and Purposes of Relief
      250II(B) Acts and Proceedings of Public Of-
ficers and Boards and Municipalities
         250k73 Specific Acts
            250k73(1) k. In General. Most Cited
Cases
The Hostage Act did not create a duty on the part of
the President to demand the Saudi Government re-
lease American citizen who was being detained in a
Saudi prison, allegedly at the behest and ongoing
supervision of the United States, and thus writ of
mandamus would not be issued; the vagueness of
language of the Hostage Act, including that a cit-
izen be "unjustly deprived," indicated that the stat-
ute was intended to given the President broad dis-

cretion, foreclosing judicial review. 22 U.S.C.A. §
1732.

*30 Morton Sklar, World Organization for Human
Rights USA, Washington, DC, Counsel for peti-
tioners.
Judry L. Subar, Ori Lev, United States Department
of Justice, Civil Division, Washington, DC, Coun-
sel for respondents.

*MEMORANDUM OPINION*

BATES, District Judge.
"The writ of habeas corpus commands general re-
cognition as the essential remedy to safeguard a cit-
izen against imprisonment by State or Nation in vi-
olation of his constitutional rights." *United States
v. Morgan*, 346 U.S. 502, 506 n. 3, 74 S.Ct. 247, 98
L.Ed. 248 (1954) (quotation omitted). This case re-
quires the Court to give substance to those words.
Petitioner Ahmed Abu Ali ("Abu Ali") is a citizen
of the United States who, through his parents, has
filed a petition for a writ of habeas corpus against
several officials of the United States ("respondents"
or "United States") challenging his ongoing deten-
tion since June 2003 in a prison of the Kingdom of
Saudi Arabia allegedly at the behest and ongoing
supervision of the United States.

Petitioners have provided evidence, of varying de-
grees of competence and persuasiveness, that: (i)
the United States *31 initiated the arrest of Abu Ali
in Saudi Arabia; (ii) the United States has interrog-
ated Abu Ali in the Saudi prison; (iii) the United
States is controlling his detention in Saudi Arabia;
(iv) the United States is keeping Abu Ali in Saudi
Arabia to avoid constitutional scrutiny by United
States courts; (v) Saudi Arabia would immediately
release Abu Ali to United States officials upon a re-
quest by the United States government; and (vi)
Abu Ali has been subjected to torture while in the
Saudi prison. The United States does not offer any
facts in rebuttal. Instead, it insists that a federal dis-
trict court has no jurisdiction to consider the habeas
petition of a United States citizen if he is in the

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ACLU - Hamdan-131

350 F.Supp.2d 28
350 F.Supp.2d 28
(Cite as: 350 F.Supp.2d 28)

Page 5

hands of a foreign state, and it asks this Court to dismiss the petition forthwith. The position advanced by the United States is sweeping. The authority sought would permit the executive, at his discretion, to deliver a United States citizen to a foreign country to avoid constitutional scrutiny, or, as is alleged and to some degree substantiated here, work through the intermediary of a foreign country to detain a United States citizen abroad.

The Court concludes that a citizen cannot be so easily separated from his constitutional rights. Earlier this year, the Supreme Court confirmed the fundamental right of a citizen to be free from involuntary, indefinite confinement by his government without due process. *See Hamdi v. Rumsfeld,* 542 U.S. 507, ----, 124 S.Ct. 2633, 2647, 159 L.Ed.2d 578 (2004); *id.* at 2661 (Scalia, J., dissenting); *see also Rasul v. Bush,* 542 U.S. 466, ----, 124 S.Ct. 2686, 2692, 159 L.Ed.2d 548 (2004). Abu Ali was not captured on a battlefield or in a zone of hostilities-rather, he was arrested in a university classroom while taking an exam. The United States has therefore not invoked the executive's war powers as a rationale for his detention-instead, the United States relies on the executive's broad authority to conduct the foreign affairs of the country as a basis to insulate Abu Ali's detention from judicial scrutiny. There are, to be sure, considerable and delicate principles of separation of powers that dictate caution and will narrow the inquiry in this case. Such principles, however, have never been read to extinguish the fundamental due process rights of a citizen of the United States to freedom from arbitrary detention at the will of the executive, and to access to the courts through the Great Writ of habeas corpus to challenge the legality of that detention.

The present posture of this case requires this Court to accept petitioners' well-supported allegations, to which the United States has not responded. The United States' broad assertion of authority, and corresponding contention that this Court lacks jurisdiction, cannot withstand petitioners' assertions at this time. The Court will accordingly authorize expedi-

tious jurisdictional discovery in this matter to further explore those contentions. The process of defining the scope of that discovery is set out in the accompanying order. In the meantime, the request of the United States to dismiss the petition for lack of habeas corpus jurisdiction will be denied.

## *BACKGROUND* [FN1]

> FN1. The facts set forth here are drawn from the Petition and various affidavits and other supporting materials submitted by petitioners. The government has not submitted any factual materials in response to petitioners' factual allegations. On a motion to dismiss based on insufficiency of jurisdictional allegations, such factual allegations must be taken as true, with all reasonable inferences drawn in petitioners' favor. *See infra* at 41.

## I. The Arrest of Abu Ali

Petitioner Ahmed Abu Ali ("Abu Ali") is an American citizen who was born in *32 Houston, Texas. *See* Petition ¶ 25; *id.* Ex. A (Birth Certificate). After graduating as valedictorian of his high school class in Virginia, he enrolled as a scholarship student at the Islamic University of Medina in Saudi Arabia. *See* Petition ¶¶ 26-27. On June 11, 2003, while he was taking his final exam at the university, Saudi security officers entered his classroom and arrested him. Since that day, Abu Ali has been detained indefinitely in a Saudi prison without charge or access to counsel. *See* Petition ¶¶ 26-28.

At about the same time that Abu Ali was arrested, three other Americans in Saudi Arabia were also apprehended by Saudi officials. *See id.* ¶ 29. Unlike Abu Ali, each of these individuals was extradited a month later to the United States. *See id.* Once in the United States, they were charged, along with eight other Northern Virginia men, with undertaking paramilitary training to wage a terrorist

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ACLU - Hamdan-132

350 F.Supp.2d 28
350 F.Supp.2d 28
(Cite as: 350 F.Supp.2d 28)

Page 6

jihad on behalf of Muslims. *See United States v. Royer*, Crim. No. 03-296-A (E.D.Va.). Abu Ali thus was the only American citizen not extradited to the United States and charged with a crime.

FBI agents raided Abu Ali's home in Virginia on June 16, 2003, less than a week after he was arrested in Saudi Arabia. The search warrant was issued by the United States District Court for the Eastern District of Virginia (the same court in which the *Royer* proceedings were located), and instructed the agents to look for weapons, cellular phones, and documents tending to show a conspiracy between Abu Ali and four of the defendants in the *Royer* case. *See* Petition ¶ 31; *id.* Ex. B (Search Warrant). Some time later, a prosecutor in the *Royer* proceedings would acknowledge that the search of Abu Ali's home was conducted "in connection with" the *Royer* prosecution. *See* Petition ¶ 32; Aff. of Omar Abu Ali, Sept. 20, 2004, ¶ 10.

Roughly five days after Abu Ali was arrested, and at about the same time as the raid on his home took place, FBI agents visited the Saudi prison in which Abu Ali was detained and watched as he was interrogated by Saudi officials. *See* Petition ¶ 32; Aff. of Omar Abu Ali, Sept. 20, 2004, ¶ 5. The prosecutor in the *Royer* case has acknowledged that this interrogation took place. *Id.* The prosecutor says that during the interrogation Abu Ali confessed to joining a "clandestine al Qaeda cell" and admitted that "al Qaeda told him he must either conduct terrorist operations or return to the United States and establish an al Qaeda cell." *Id.*

### II. The Months Following the Detention

Abu Ali's parents, also petitioners in this matter, assert that Abu Ali was held incommunicado for at least a month after his arrest. *See* Petition ¶ 33. They claim that they sought assistance from the State Department, but their requests were initially ignored. *See* Aff. of Omar Abu Ali, Sept. 20, 2004, ¶ 7. Later, they say, the State Department told them that Saudi Arabia did not permit the United States

Embassy to have access in the first month of his detention, and that the Saudis had failed to respond at all to several diplomatic notes regarding Abu Ali. *See id.*

Abu Ali's parents took their concerns to a newspaper reporter who had been covering the *Royer* prosecution. In a July 2003 article, that reporter quoted a Saudi Embassy spokesman as saying that the United States Legal Attache office-the name for the FBI overseas station-"had full and complete and direct access" to Abu Ali from the moment of his arrest. The Saudi *33 official explained: "For us, it was a representative of the U.S. So the U.S. Embassy had full access, as far as we were concerned." *Id.* At about this time, Abu Ali's parents say they threatened to sue the State Department for failing to secure the safety of a United States citizen. They claim that, in response, Matthew Gillen, the Director of U.S. Consular Affairs in Saudi Arabia, met with Abu Ali in the Saudi prison in early July. Abu Ali's parents also received the first of several phone calls from their son on July 31, 2003. *See id.* From that point on, they would maintain intermittent contact with Abu Ali through reports from consul visits and occasional phone conversations.

In September 2003, several FBI agents traveled to Saudi Arabia and interrogated Abu Ali for at least four days. *See* Petition ¶ 36; Aff. of Faten Abu Ali, Aug. 18, 2004, ¶ 1. According to an affidavit from Abu Ali's mother, Abu Ali told her in a phone call that the FBI agents had threatened to declare him an enemy combatant and send him to Guantanamo Bay, Cuba, if he did not cooperate.[FN2] *See* Aff. of Faten Abu Ali, Aug. 13, 2004, ¶ 1. Consul Gillen would later tell the family that Abu Ali had also told him about this threat during one of his consul visits to the prison. *See* Petition ¶ 36; Aff. of Omar Abu Ali, Aug. 13, 2004, ¶ 1. Abu Ali's mother also says that Abu Ali told her the FBI agents threatened to put him on trial in Saudi Arabia without counsel. *See* Aff. of Faten Abu Ali, Aug. 18, 2004, ¶ 1.

    FN2. Later, in a June 19, 2004, telephone

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ACLU - Hamdan-133