350 F.Supp.2d 28
350 F.Supp.2d 28
(Cite as: 350 F.Supp.2d 28)

Page 7

call, Abu Ali's mother says that he told her that he had been told that the U.S. government was waiting for the relevant Supreme Court rulings before deciding whether or not to declare him an "enemy combatant." Aff. of Faten Abu Ali, Aug. 13, 2004, ¶ 6.

Abu Ali's father, who works as a system analyst at the Royal Embassy of Saudi Arabia in Washington, D.C., prevailed on his contacts in the Saudi government to assist him in his search for information regarding the detention of his son. *See* Aff. of Omar Abu Ali, Sept. 20, 2004, ¶ 1. He claims that unidentified officials in the Saudi Embassy "consistently told me that Ahmed has not violated Saudi laws, and that there are no plans to prosecute him in Saudi Arabia." Aff. of Omar Abu Ali, Sept. 20, 2004, ¶ 2. He also says that he spoke "to several high-ranking officials at the Saudi Embassy who are familiar with Ahmed's case, and whom I am unable to name for security and privacy concerns." *Id.* He claims that they "have described Ahmed's arrest and detention as an 'American case' that Saudi Arabia has no control over due to strong political pressure from the U.S. government to keep Ahmed in Saudi custody." *Id.* ¶ 2.

Petitioners allege that they were receiving other indications at the time as well that the United States was behind the detention of their son. Abu Ali's father asserts that in September 2003 he asked a high-ranking government official in Saudi Arabia to visit his son in order to check on his safety. The official returned with the information that he "was instructed to 'stay away' because the U.S. was behind the case." *Id.* ¶ 3. Abu Ali's parents also describe a November 2003 phone call in which Abu Ali told them that Consul Charles Glatz of the United States Embassy in Saudi Arabia had informed him that his case was in the hands of Washington, not the Saudi government. *See* Aff. of Faten Abu Ali, August 13, 2004, ¶ 2. Petitioners claim that Consul Glatz told Abu Ali (who then told them) that he had received this information from the FBI. *See id.*

### III. The *Royer* Proceedings

Meanwhile, the *Royer* prosecution was proceeding forward in the United States. *34 In a hearing on a motion to suppress certain statements that he had made while being questioned in Saudi Arabia, Sabri Benkhala-one of the three Americans who had been arrested in Saudi Arabia and then extradited-testified that Saudi officials, while interrogating him, had shown him pictures of people who appeared to have been physically tortured. *See* Aff. of Omar Abu Ali, Sept. 20, 2004, ¶ 9. Benkhala also testified that when he was visited for the first time by a U.S. Consul in the Saudi prison, the consul told Benkhala that he had been arrested at the request of the FBI. *See id.* Finally, according to Benkhala, a Saudi General who was present at his meeting with the U.S. Consul officer apologized to him afterwards and told him "you have not broken any laws in Saudi Arabia, and we know you're a good person ... we were requested by the FBI to arrest you." The presiding judge in *Royer* concluded that the statements Benkhala had made during the Saudi interrogation were coerced and excluded them from trial. *See* Aff. of Omar Abu Ali, Sept. 20, 2004, ¶ 9.

Six of the defendants in the *Royer* proceedings entered pleas, three were convicted at trial, and two were acquitted (one of the acquittals was Benkhala). Abu Ali's father states in an affidavit that members of the FBI and the U.S. Attorney's Office told his former attorney, Martin McMahon, that a grand jury had considered the case against Abu Ali and had found no evidence to indict him. *See* Aff. of Omar Abu Ali, Sept. 20, 2004, ¶ 10. Abu Ali's father also says that friends and family members who were called as witnesses by the grand jury have confirmed that the grand jury deliberated from July 2003 through the first few months of 2004. *See id.*

Petitioners state that in May 2004 they reached an agreement with the prosecutor leading the *Royer* investigation through which Abu Ali would be released in exchange for a final "exit interview" at

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ACLU - Hamdan-134

350 F.Supp.2d 28
350 F. Supp 2d 28
(Cite as: 350 F.Supp.2d 28)

Page·8

which counsel would be present for Abu Ali. Aff. of Omar Abu Ali, Sept. 20, 2004, ¶ 9. Petitioners say that their then-counsel sent a letter to the U.S. Ambassador in Saudi Arabia requesting his intervention in securing the arrangement. *Id.* For reasons that are unclear from the record, this arrangement fell through.

Nevertheless, Abu Ali's mother avers that in a May 20, 2004, meeting between the FBI and her now ex-counsel, Stanley Cohen, the FBI told· Cohen that they would release Abu Ali if he revoked his U.S. citizenship and lived in· another country. *See* Aff. of Omar Abu Ali, Sept. 20, 2004, ¶ 6. At the same time, petitioners claim that the Washington Field Office of the FBI began stating publicly that the office had no further interest in Abu Ali's detention.[FN3] Aff. of Omar Abu Ali, Sept. 20, 2004, ¶ 9. The Assistant Director in charge of the FBI Washington Field Office is quoted in a June 18, 2004, Washington Post article as saying that he doesn't "speak for the entire U.S. government," but that when he asked agents in his office whether they have a "continuing interest in this individual ... the answer I got was no." He also said that he thought Abu Ali was "within a week of being released" in early May 2004. Caryle Murphy, *Protesters*35 Seek Release of Saudi Prisoner,* Washington Post, June 18, 2004, at B3.

> FN3. According to petitioners, this is the office that had led the United States investigation of Abu Ali. *See* Aff. of Omar Abu Ali, Sept. 20, 2004, ¶ 13. Petitioners relate one instance where eight senior agents from the Washington Field Office met with fifty members of a mosque in the Washington, D.C. area. The Assistant Director of the FBI Washington Field Office explained at this meeting: "The one thing I'll tell you that Pat Cook and I, who['s] about to address this issue, he and I, I ask him every third day is he going to be released? Is he going to be released?" *See id.*

## IV. The May 14, 2004, Meeting with Consul Gillen

Petitioners, accompanied by their then-counsel Ashraf Nubani, and the Executive Director and the Governmental Relations Coordinator of the Council on American Islamic Relations, met with Consul Gillen on May 14, 2004. *See* Aff. of Faten Abu Ali, Aug. 13, 2004, ¶ 3; Aff. of Faten Abu Ali, Sept. 20, 2004, ¶ 1; Aff. of Omar Abu Ali, Sept. 20, 2004, ¶ 15. Consul Gillen showed petitioners two documents: a May 10, 2004, email from Consul Glatz to Consul Gillen, and an undated cable from the United States Embassy in Riyadh to the State Department. *See* Aff. of Faten Abu Ali, Aug. 13, 2004, ¶ 3; Aff. of Faten Abu Ali, Sept. 20, 2004, ¶ 1. Petitioners attest that Consul Gillen refused to give them copies of the documents, but allowed them to copy the documents manually. *See* Aff. of Faten Abu Ali, Aug. 13, 2004, ¶ 3; Aff. of Faten Abu Ali, Sept. 20, 2004, ¶ 1

Abu Ali's mother has submitted an affidavit in which she transcribes the contents of these documents. *See* Aff. of Faten Abu Ali, Sept. 20, 2004. As reproduced by Abu Ali's mother, the email from Consul Glatz to· Consul Gillen states that Abu Ali declined to see Glatz during his most recent consul visit, and that the Saudi Colonel who is the prison director refused to take him into the cell block to see Abu Ali. *See* Aff. of Faten Abu Ali, Sept. 20, 2004, ¶ 1a. The cable continues: "The colonel said that he understood that we could have him rendered to the U.S. at anytime. He added that Abu Ali is saying that he would not voluntarily go back to the U.S., but was interested in going to Sweden." *Id.* As transcribed by Abu Ali's mother, the cable states:

SBU Col Al-Qahtani commented to Conoff [consular officer] that he understood that Abu-Ali could be rendered to American authorities at any time if the USG [US Government] made a formal request. He added that he understood that if Abu-Ali were deported from Saudi Arabia he would not want to return to the U.S. but has been thinking of

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ACLU - Hamdan-135

350 F.Supp.2d 28
350 F.Supp.2d 28
(Cite as: 350 F.Supp.2d 28)

Page 9

traveling to Sweden.

Aff. of Faten Abu Ali, Sept. 20, 2004, ¶ 1b.[FN4]

> FN4. Abu Ali's mother explains that she asked Abu Ali during a phone call whether he had ever requested to go to Sweden. She says that he "expressed surprise and confusion regarding my questions, and replied that he did not ever make such a request." Aff. of Faten Abu Ali, Sept. 20, 2004, ¶ 4. She told Abu Ali that if he were released, he should not go to Sweden or any other country, but instead should come home to clear his name. She says he replied, "No, nothing is in my hands, I'll go wherever they tell me to ... I have no free will to decide, no one has ever consulted me." Aff. of Omar Abu Ali, Sept. 20, 2004, ¶ 11.

Petitioners state that Consul Gillen told them at the meeting that "there were no charges against [Abu Ali] and no current investigation of him." Aff. of Faten Abu Ali, Aug. 13, 2004, ¶ 3. According to petitioners, Consul Gillen also told them that he would personally send a formal request for Ahmed's release. Aff. of Faten Abu Ali, Aug. 13, 2004, ¶ 3; Aff. of Omar Abu Ali, Aug. 13, 2004, ¶ 6. A month later, however, in a meeting attended by Abu Ali's father and Gillen, petitioners say that Gillen explained that he would be unable to send the letter because there was an ongoing investigating of Abu Ali in the United States Department of Justice. Aff. of Omar Abu Ali, Aug. 13, 2004, ¶ 6.

Abu Ali's family appealed to their political representatives for assistance. On July 21, 2004, Congressman David Woo's office wrote to Abu Ali's uncle that the *36 State Department "has indicated that they are prepared to take action on Ahmed's behalf once he receives final clearance" from the Department of Justice. Likewise, in a June 2, 2004, meeting, Ann Rust, Department of Constituent Services from Congressman Tom Davis's office, informed Abu Ali's parents that the State Department

had told her that Abu Ali's release would take place "once all government agencies were no longer interested in him." Aff. of Omar Abu Ali, Sept. 20, 2004, ¶ 14.

In the meantime, Abu Ali's parents continued pressing their connections with Saudi officials. Abu Ali's father attests that in May 2004, an official at the Saudi embassy told him that if he ever wanted his son to come back home, he should pressure U.S. officials to request his release. Aff. of Omar Abu Ali, Sept. 20, 2004, ¶ 3.

## V. Allegations of Torture

Petitioners relate their growing concern that Abu Ali has been subjected to torture during his detention in Saudi Arabia. They maintain that they have received information from an unidentified eyewitness in Saudi Arabia who said that he saw Abu Ali experiencing so much pain in his hands that he was unable to pick up a pen to sign documents. Aff. of Faten Abu Ali, Aug. 18, 2004, ¶ 2.

At the same time, petitioners cite two instances where the Assistant U.S. Attorney leading the *Royer* prosecution has allegedly made comments indicating that Abu Ali has had his fingernails removed. Aff. of Faten Abu Ali, Sept. 17, 2004, ¶¶ 3, 6. The first of these instances was allegedly in a meeting between the Assistant U.S. Attorney and the defendants in the *Royer* prosecution. According to petitioners, Seifullah Chapman, one of the defendants, reported to them in August 2004 that the prosecutor had said that Abu Ali "doesn't have to worry about clipping his fingernails anymore." Aff. of Faten Abu Ali, Sept. 17, 2004, ¶ 3.

Salim Ali, a lawyer for one of the *Royer* defendants, describes in an affidavit a conversation that he claims he had with the same prosecutor while they were waiting at a courthouse in June 2003 after a hearing in the *Royer* case. Salim Ali says that he asked the prosecutor whether Abu Ali should be returned to the United States to face charges. He ex-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ACLU - Hamdan-136

350 F.Supp.2d 28
350 F.Supp.2d 28
(Cite as: 350 F.Supp.2d 28)

Page 10

plains that the prosecutor "smirked and stated that 'he's no good for us here, he has no fingernails left." ' Aff. of Salim Ali, Oct. 12, 2004, ¶ 6. In a September 2004 phone call with Abu Ali, his parents mentioned the prosecutor's comments, to which Abu Ali replied, "there are hidden things which you don't know about that are even worse." FN5 Aff. of Fatim Abu Ali, Sept. 17, 2004, ¶ 6.

> FN5. One of the FBI agents who interrogated Abu Ali in September 2004 delivered a letter to Abu Ali's parents in which Abu Ali described the FBI agent as a "great person," and said that he did not write the letter under "any pressure." When Abu Ali's mother asked Abu Ali about the letter, Abu Ali replied, "don't ask me these questions, it hurts me when you ask these questions." Abu Ali's mother asked him, "do they hurt you?", and he replied, "yes." Aff. of Faten Abu Ali, Aug. 18, 2004, ¶ 3.

Petitioners also provide an affidavit from a specialist for Saudi Arabia from Amnesty International USA who testifies that Abu Ali is at a serious risk of torture while he remains detained in Saudi Arabia. He describes many instances of torture recounted by Westerners who have been arrested in Saudi Arabia, and notes that the U.S. Department of State itself describes "credible reports" that Saudi authorities have "abused detainees, both citizens and foreigners." Aff. of Brian Evans, Sept. 17, 2004, at 1-2.

**\*37 VI. The Proceedings in this Action**

On July 28, 2004, Abu Ali's parents filed in this Court a petition for a writ of habeas corpus on behalf of their son. The petition challenges his detention under the United States Constitution and other sources of domestic and international law, and names as respondents the Attorney General of the United States, the Director of the FBI, and several other United States officials ("respondents" or "United States"). The petition seeks a variety of

different forms of relief, but the essence of the request is that the Court determine whether Abu Ali's rights are being violated by his detention in a Saudi prison and, if they are, issue a writ requiring the United States to release Abu Ali, or obtain his release, and bring him before the Court for further proceedings. *See* Petition at 24-25.

A few hours after filing the petition, Abu Ali's parents claim to have received a call from an official at the State Department saying that the United States had been informed by the Saudi government that they were planning shortly to bring charges against Abu Ali. *See* Mot. Prelim. Inj. at 1. Within a week of that call, petitioners filed a motion for a preliminary injunction or a temporary restraining order asking this Court to instruct the United States government to refrain from pressuring the Saudi government to bring charges against Abu Ali. The United States responded with declarations from the State Department official who placed the call to petitioners and from the Deputy Assistant Director of Operations in the Counterterrorism Division of the FBI, stating that Saudi authorities had told the FBI as early as July 18, 2004-more than a week before petitioners filed this action-that they intended to bring criminal charges against Abu Ali. According to the declarations, this information was forwarded to the State Department in a cable from the U.S. embassy in Riyadh dated July 26, 2004, and Abu Ali's parents were informed two days later. *See* Decl. of Leigh Rieder ¶¶ 2-4; Decl. of Willie T. Hulon ¶ 2.

This Court denied petitioners' motion for a preliminary injunction. *See* Mem. Op. & Order, dated Aug. 31, 2004. The Court explained that the jurisdictional basis for the habeas petition was uncertain, *id.* at 5-10, and that the particular relief petitioners sought in their motion-an order instructing the United States government to refrain from communicating anything to the Saudi government that would lead the Saudi government to press charges against Abu Ali-was problematic, *id.* at 11-14. Such an order would have entangled the judiciary in the

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ACLU - Hamdan-137

350 F.Supp.2d 28                                                        Page 11
350 F.Supp.2d 28
(Cite as: 350 F.Supp.2d 28)

diplomatic communications between the United States and an ally on the one hand, and would not have remedied any discernible irreparable harm to Abu Ali on the other, inasmuch as even complete silence by the United States would have left the Saudi government free to continue to detain and interrogate Abu Ali, and even to press charges if they wished. *See id.*

Some time earlier, the Court had issued an order requiring the United States to show cause why the petition for a writ of habeas corpus should not be granted. In response, the United States filed papers in which it asks the Court to dismiss the habeas petition as a matter of law. The United States does not offer any evidence (or even contentions) rebutting petitioners' claims regarding its role in the detention of their son. Instead, the United States seeks dismissal on the theory that a federal court lacks jurisdiction to issue a writ of habeas corpus where the prisoner is currently being held by a foreign custodian, no matter what role the United States allegedly has played in his detention. *See* Resp'ts' Supplemental Filing at 1-2.

*38 In response, petitioners submitted additional legal arguments and affidavits to support the legal claims advanced and relief sought in their habeas petition. The government's request to dismiss the petition is now fully briefed and ready for decision by the Court. To the Court's knowledge, the Saudi government has not brought any charges against Abu Ali.

VII. Summary of Factual Allegations

At this time and juncture, then, the facts before this Court consist essentially of petitioners' allegations, supported by several affidavits and other materials. In brief, those well-supported factual allegations paint the following picture. This is merely a recitation of the allegations and reasonable inferences that the Court must at this stage in the proceedings take as true; the Court is not at this time finding the allegations to be true.

Abu Ali is a citizen of the United States who was born and raised in this country. He was arrested by Saudi officials while taking an examination at the university he was attending in Saudi Arabia. The United States orchestrated the detention and was intimately involved from the very beginning. FBI agents attended his interrogation by Saudi officials mere days after his arrest; FBI agents raided his parents' home in Virginia at roughly the same time; and three other United States citizens living in Saudi Arabia were arrested almost simultaneous with Abu Ali and extradited to the United States to stand trial, where one of them testified that he was told by United States and Saudi officials that he was arrested at the behest of the United States. Abu Ali has said that he was told the same thing by an official from the United States Embassy.

Saudi officials have described the detention privately as a United States matter, have acknowledged publicly that the United States has been involved throughout his detention, and have told United States officials that they would release Abu Ali at the request of the United States. FBI agents have interrogated Abu Ali at length in the Saudi prison. United States officials have also indicated to Abu Ali and to his parents on several occasions that they could release him if he cooperated or, if he did not, either keep him in the Saudi prison where he would be tried without counsel or send him to Guantanamo Bay where he would be detained as an "enemy combatant." More recently, officials from the State Department and from the United States Embassy in Saudi Arabia have indicated to Abu Ali's parents and to others that Abu Ali would be released as soon as the Department of Justice completed its investigation of him. An agreement between Abu Ali's parents and the United States on the terms of Abu Ali's release was nearly reached on more than one occasion, but it has fallen through each time.

According to petitioners, the United States has chosen to keep Abu Ali in Saudi Arabia because a grand jury refused to return an indictment against

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ACLU - Hamdan-138

350 F.Supp.2d 28
350 F.Supp.2d 28
(Cite as: 350 F.Supp.2d 28)

Abu Ali in the United States, and because United States officials want to continue to obtain information from him in a context that is free of constitutional scrutiny. There is at least some circumstantial evidence that Abu Ali has been tortured during interrogations with the knowledge of the United States. FBI agents have despaired at his continued detention and more than one United States official has stated that Abu Ali is no longer a threat to the United States and there is no active interrogation. Nonetheless, he has been held indefinitely without charge, explanation for his detention, or access to counsel since the time of his arrest in June 2003.

## ANALYSIS

There is no principle more sacred to the jurisprudence of our country or more essential*39 to the liberty of its citizens than the right to be free from arbitrary and indefinite detention at the whim of the executive. As recently as this year, the Supreme Court reaffirmed "the fundamental nature of a citizen's right to be free from involuntary confinement by his own government without due process of law." *Hamdi*, 124 S.Ct. at 2647; *see also id.* at 2661 (Scalia, J., dissenting) ("The very core of liberty secured by our Anglo-Saxon system of separated powers has been freedom from indefinite imprisonment at the will of the Executive."); *Rasul*, 124 S.Ct. at 2692 ("Executive imprisonment has been considered oppressive and lawless since John, at Runnymede, pledged that no free man should be imprisoned, dispossessed, outlawed, or exiled save by the judgment of his peers or by the law of the land.") (quotation omitted).

This right draws its force from-and would be meaningless without-the ability of the citizen to challenge his detention through a petition for a writ of habeas corpus. *See, e.g., Lonchar v. Thomas,* 517 U.S. 314, 322, 116 S.Ct. 1293, 134 L.Ed.2d 440 (1996) (describing the writ as the "highest safeguard of liberty") (quotation omitted); *Harris v. Nelson,* 394 U.S. 286, 290-91, 89 S.Ct. 1082, 22 L.Ed.2d 281 (1969) ("The writ of habeas corpus is

the fundamental instrument for safeguarding individual freedom against arbitrary and lawless state action."). The writ of habeas corpus-often termed the Great Writ-arose from the common law of England, was shaped in the forge of the early colonial experience, received recognition in the United States Constitution (the only common law writ to be so recognized) and the first Judiciary Act, and has evolved in countless legislative enactments and judicial rulings since. Throughout, the writ has stood as an indispensable safeguard of the freedom of citizens and a constant remedy against wrongful detention at the whim of the executive. *See Rasul,* 124 S.Ct. at 2692 ("The judges of England developed the writ of habeas corpus largely to preserve these immunities from executive restraint.") (quotation omitted), *Morgan,* 346 U.S. at 506 n. 3, 74 S.Ct. 247 ("The writ of habeas corpus commands general recognition as the essential remedy to safeguard a citizen against imprisonment by State or Nation in violation of his constitutional rights.") (quotation omitted); *Ex parte Yerger,* 75 U.S. (8 Wall.) 85, 95, 19 L.Ed. 332 (1868) ("The great writ of *habeas corpus* has been for centuries esteemed the best and only sufficient defence of personal freedom") (emphasis in original).

Consistent with its high purpose, courts have given the writ an exceptionally broad reach. "[M]odern habeas jurisprudence emphasizes the breadth and flexibility of the Great Writ in vindicating the fundamental concern in a democratic society of checking the powers of the state vis-a-vis an individual in custody." *Chatman-Bey v. Thornburgh,* 864 F.2d 804, 807 (D.C.Cir.1988) (en banc); *see Ex parte McCardle,* 73 U.S. (6 Wall.) 318, 325-26, 18 L.Ed. 816 (1867) (affirming that the habeas scheme is "of the most comprehensive character"); *Johnson v. Avery,* 393 U.S. 483, 485, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969) ("The Court has steadfastly insisted that there is no higher duty than to maintain [the writ] unimpaired.") (quotation omitted).

The writ has accordingly been applied to a wide range of detentions of American citizens. *See Ra-*

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ACLU - Hamdan-139

350 F.Supp.2d 28
350 F.Supp.2d 28
(Cite as: 350 F.Supp.2d 28)

Page 13

*sul,* 124 S.Ct. at 2692 ("Consistent with the historic purpose of the writ, this Court has recognized the federal courts' power to review applications for habeas relief in a wide variety of cases involving Executive detention."); *Maleng v. Cook,* 490 U.S. 488, 492, 109 S.Ct. 1923, 104 L.Ed.2d 540 (1989) ("[W]e have very liberally construed the 'in custody'*40 requirement for purposes of federal habeas."); *see also* 3 William Blackstone, *Commentaries* 131 (describing habeas as "the great and efficacious writ, in all manners of illegal confinement"). The D.C. Circuit, sitting *en banc,* has emphasized the "strong High Court disapproval of formalistic analysis in the context of habeas corpus" and instructed a court assessing whether the habeas statute applies to a particular form of custody to "cut[ ] through all forms" and affirm the purpose of the writ as a "fundamental safeguard against unlawful custody." *Chatman-Bey,* 864 F.2d at 807 (quotation omitted); *see Hensley v. Municipal Court,* 411 U.S. 345, 350, 93 S.Ct. 1571, 36 L.Ed.2d 294 (1973) (explaining that the Court has "consistently rejected interpretations of the habeas corpus statute that would suffocate the writ in stifling formalisms").

Notwithstanding these principles, however, the United States argues that the habeas petition for Abu Ali should be dismissed as a matter of law, no matter how extensive a role the United States might have played and continues to play in his detention, for the sole reason that he is presently in a foreign prison. A federal court, they claim, "simply lacks jurisdiction to grant habeas relief where the prisoner seeking the writ is being held by a foreign custodian, even where the United States allegedly has been involved in the prisoner's incarceration in the first place." Resp'ts' Supplemental Filing at 1-2. This argument rests on one fact and one fact alone: Abu Ali is presently being held by a foreign government. The moment this is the case, the United States claims, the courts are immediately stripped of jurisdiction over any habeas claim.[FN6]

FN6. Respondents also *mention,* on occa-

sion, that Abu Ali was not just detained but also arrested by the Saudi authorities, *see* Resp'ts' Resp. Order Show Cause ("Resp. Show Cause") at 2, but at no point do their arguments appear to turn on that fact, *see id.* at 3-15. Instead, their entire brief rests on the assertion that an American citizen loses any right to habeas once he is in the hands of a foreign power.

This position is as striking as it is sweeping. The full contours of the position would permit the United States, at its discretion and without judicial review, to arrest a citizen of the United States and transfer her to the custody of allies overseas in order to avoid constitutional scrutiny; to arrest a citizen of the United States through the intermediary of a foreign ally and ask the ally to hold the citizen at a foreign location indefinitely at the direction of the United States; or even to deliver American citizens to foreign governments to obtain information through the use of torture.[FN7] In short, the United States is in effect arguing for nothing less than the unreviewable power to separate an American citizen from the most fundamental of his constitutional rights merely by choosing where he will be detained or who will detain him.

FN7. The Court does not mean to suggest that torture has been used in this or in any other case; merely that the ability to enlist a foreign body to use torture against a United States citizen, free of any judicial scrutiny, is encompassed by the position advanced by the United States in this case.

This Court simply cannot agree that under our constitutional system of government the executive retains such power free from judicial scrutiny when the fundamental rights of citizens have allegedly been violated. As the Supreme Court stated in *Reid v. Covert,* 354 U.S. 1, 6, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957), "we reject the idea that when the United States acts against citizens abroad it can do so free of the Bill of Rights.... When the Government reaches out to punish a citizen who is abroad,

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ACLU - Hamdan-140

350 F.Supp.2d 28
350 F.Supp.2d 28
(Cite as: 350 F.Supp.2d 28)

Page 14

the shield which the Bill of Rights *41 and other parts of the Constitution provide to protect his life and liberty should not be stripped away just because he happens to be in another land."

The United States premises its claim to this power on three arguments of law: (i) what they perceive to be an "implicit territorial restriction on the Great Writ"; (ii) the contention that jurisdiction over the petition in this case is foreclosed by the Supreme Court's decision in *Hirota v. General of the Army MacArthur,* 338 U.S. 197, 69 S.Ct. 197, 93 L.Ed. 1902 (1948) (per curiam), and the D.C. Circuit's decision in *U.S. ex rel. Keefe v. Dulles,* 222 F.2d 390 (D.C.Cir.1954); and (iii) the suggestion that federal jurisdiction over the habeas claim in this case would run afoul of the act of state, separation of powers, and political question doctrines. The Court will address each of these arguments in turn in the sections below.

[1] To briefly summarize its conclusions here, however, the Court holds that the United States may not avoid the habeas jurisdiction of the federal courts by enlisting a foreign ally as an intermediary to detain the citizen. The instances where the United States is correctly deemed to be operating through a foreign ally as an intermediary for purposes of habeas jurisdiction will be exceptional, and a federal court's inquiry in such cases will be substantially circumscribed by the separation of the powers. Nonetheless, the executive's authority over foreign relations has never in our nation's history been deemed to override entirely the most fundamental rights of a United States citizen-the right to challenge as arbitrary and unlawful his detention allegedly at the will of the executive. This authority likewise has never been held to eliminate the essential remedy against such unlawful detentions-the Great Writ of habeas corpus.

**I. Standard of Review**

[2][3] On a motion to dismiss for lack of jurisdiction, the petitioner bears the burden of establishing

the jurisdiction of the Court. *See Dist. of Columbia Ret. Bd. v. United States,* 657 F.Supp. 428, 431 (D.D.C.1987); *Gordon v. Ashcroft,* 283 F.Supp.2d 435, 437 (D.Mass.2003). Where, as here, the respondents challenge only the legal sufficiency of the petitioners' jurisdictional allegations, the district court should take the petitioners' factual allegations as true, and draw all reasonable inferences in the petitioners' favor. *See Hawk v. Olson,* 326 U.S. 271, 272, 66 S.Ct. 116, 90 L.Ed. 61 (1945); *Phoenix Consulting, Inc. v. Republic of Angola,* 216 F.3d 36, 39 (D.C.Cir.2000).

The court need not limit itself to the allegations of the petition. *See United States,* 782 F.2d 227, 241 (D.C.Cir.1986), *vacated on other grounds,* 482 U.S. 64, 107 S.Ct. 2246, 96 L.Ed.2d 51 (1987). Instead, the court may consider any materials outside the pleadings as it deems appropriate to determine whether it has jurisdiction over the case. *See Herbert v. Nat'l Acad. of Scis.,* 974 F.2d 192, 197 (D.C.Cir.1992).

**II. The Habeas Statute**

The federal district courts, as courts of limited jurisdiction, possess only such authority as is conferred by an act of Congress. *See Kokkonen v. Guardian Life Ins. Co. of Am.,* 511 U.S. 375, 377, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994); *Friends of the Earth v. United States Envtl. Prot. Agency,* 333 F.3d 184, 187 (D.C.Cir.2003); *Commodity Futures Trading Comm'n v. Nahas,* 738 F.2d 487, 492 (D.C.Cir.1984). As a consequence, the Court must look, at least in the first instance, to the habeas statute to determine whether it has jurisdiction over the habeas petition in this case. *See* *42Rasul,* 124 S.Ct. at 2694-96; *Muhammad v. Bureau of Prisons,* No. 04-1114, 2004 WL 2191631, at *1 (D.C.Cir. Sept.24, 2004).

The relevant sections of the habeas statute for present purposes are located in 28 U.S.C. §§ 2241-43. The authority of the district courts to issue the writ is set out in section 2241. That section

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ACLU - Hamdan-141

350 F.Supp.2d 28
350 F.Supp.2d 28
(Cite as: 350 F.Supp.2d 28)

Page 15

provides, in relevant part:

(a) Writs of habeas corpus may be granted by the Supreme Court, any justice thereof, the district courts and any circuit judge within their respective jurisdictions. The order of a circuit judge shall be entered in the records of the district court or the district wherein the restraint complained of is had.

....

(c) The writ of habeas corpus shall not extend to a prisoner unless—

(1) He is in custody under or by color of the authority of the United States or is committed for trial before some court thereof; or

(2) He is in custody for an act done or omitted in pursuance of an Act of Congress, or an order, process, judgment or decree of a court or judge of the United States; or

(3) He is in custody in violation of the Constitution or laws or treaties of the United States ....

28 U.S.C. § 2241. Section 2242 contains several rules regarding the information that must be placed in the application for the writ of habeas corpus, including that the application "shall allege the facts concerning the applicant's commitment or detention, the name of the person who has custody over him and by virtue of what claim or authority, if known." *Id.* § 2242. Finally, section 2243 addresses the issuance of a writ by the court and provides, inter alia, that the writ "shall be directed to the person having custody of the person detained," and the "person to whom the writ is directed shall be required to produce at the hearing the body of the person detained." *Id.* § 2243.

**A. The Supposed "Implicit Territorial Limitation" on the Writ**

The United States argues that these sections contain what they call an "implicit territorial limitation of

the Great Writ."Resp. Show Cause at 3. They insist that threaded through the provisions excerpted above is an absolute requirement that a citizen's habeas petition name as a respondent the immediate custodian who is exercising physical control over the petitioner, and that this immediate custodian be "within the[ ] respective jurisdiction" of the district court. *See id.* Where the immediate custodian does not lie in the jurisdiction of the district court, the United States maintains, then the district court lacks habeas jurisdiction; and where there is no immediate custodian within the territorial jurisdiction of any district court, then no court has jurisdiction of the citizen's petition at all. *See id.*

This position is foreclosed by a line of precedent culminating in two recent Supreme Court cases. In the first of those cases, *Rumsfeld v. Padilla,* 542 U.S. 426, 124 S.Ct. 2711, 159 L.Ed.2d 513 (2004), the Court dismissed the habeas petition of an American citizen detained in a Naval Brig in Charleston, South Carolina, that was filed in the Southern District of New York and named as respondents several government officials who were outside of the jurisdiction of that court. The Court based its conclusion on two principles that confine habeas: the "immediate custodian" and the "district of confinement" rules. *Id.* at 2718-21, 2724-25. Together, the Court explained, these rules stand for the proposition that "in habeas challenges to present physical confinement-'core challenges'-the default rule is that the proper *43 respondent is the warden of the facility where the prisoner is being held, not the Attorney General or some other remote supervisory official," and that the petitioner must file the petition in the district court for the district in which he is confined. *Id.* at 2717, 2724-25.

The Court explained, however, that there is a "recognized" exception to these rules in cases where

"American[ ] citizens confined overseas (and thus outside the territory of any district court) have sought relief in habeas corpus." *Braden [v. 30th Judicial Circuit Court of Ky.,* 410 U.S. 484, 498, 93

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ACLU - Hamdan-142

350 F.Supp.2d 28
350 F.Supp.2d 28
(Cite as: 350 F.Supp.2d 28)

Page 16

S.Ct. 1123, 35 L.Ed.2d 443 (1973) ] (citing cases). In such cases, we have allowed the petitioner to name as respondent a supervisory official and file the petition in the district where the respondent resides.

*Id.* at 2718, 2725 n. 16; *see also id.* at 2718 n. 9. The Court cited two cases where it allowed American citizens overseas to challenge the legality of their detention in habeas in the United States District Court for the District of Columbia notwithstanding the immediate custodian and district of confinement rules: *Burns v. Wilson,* 346 U.S. 137, 73 S.Ct. 1045, 97 L.Ed. 1508 (1953), where a court-martial convict incarcerated in Guam sued the Secretary of Defense, and *United States ex rel. Toth v. Quarles,* 350 U.S. 11, 76 S.Ct. 1, 100 L.Ed. 8 (1955), where a court-martial convict incarcerated in Korea sued the Secretary of the Air Force.

The same day that it decided *Padilla,* the Supreme Court held in *Rasul v. Bush* that this Court-the United States District Court for the District of Columbia-had jurisdiction to entertain the habeas petition of a non-resident alien detained at Guantanamo Bay, Cuba. 124 S.Ct. at 2698. In reaching that conclusion, the Supreme Court was required to consider whether the presence of the petitioner outside the jurisdiction of any district court divested the federal district courts of jurisdiction. As it had done in *Padilla,* the Court read *Braden v. 30th Judicial Circuit Court of Ky.*[FN8] to hold that the presence of the petitioner in the territorial jurisdiction of the district court is not " 'an invariable prerequisite' " to habeas jurisdiction. *Rasul,* 124 S.Ct. at 2695 (quoting *Braden,* 410 U.S. at 495, 93 S.Ct. 1123). *Rasul* noted that *Braden* had been a departure from prior precedent in this regard, and that *Braden* had explained the departure by citing developments in the law that "had a profound impact on the continuing vitality" of that precedent. *Id.Rasul* observed that these developments "notably" included cases where the Court found habeas jurisdiction over the petitions of individuals " 'confined overseas (and thus outside the territory

of any district court).' " *Id.* at 2695 (quoting *Braden,* 410 U.S. at 498, 93 S.Ct. 1123 (citing *Burns* and *Toth* )).

> FN8. The petitioner in *Braden* was a prisoner in Alabama who had filed a habeas petition in Kentucky challenging an indictment that had been filed against him in Kentucky. The Court concluded that Braden was in custody in Kentucky for purposes of the habeas statute because Kentucky had lodged a detainer against petitioner and Alabama was acting as the "agent" of Kentucky in holding Braden pursuant to the Kentucky detainer. *Braden,* 410 U.S. at 498-99 & n. 4, 93 S.Ct. 1123; *see* discussion *infra* at 49.

Continuing to rely upon *Braden,* *Rasul* explained that "the writ of habeas corpus does not act upon the prisoner who seeks relief, but upon the person who holds him in what is alleged to be unlawful custody," a district court acts "within its respective jurisdiction within the meaning of § 2241 as long as the custodian can be reached by service of process." *Id.* (quotation and alteration omitted). Therefore, the mere presence of the petitioner in *Rasul* (and, it *44 follows, his immediate custodian) outside the jurisdiction of any district court did not preclude him from bringing a habeas petition in the United States District Court for the District of Columbia, and from naming as respondents various "custodians," who included the President of the United States, the Secretary of Defense and others.[FN9] *See id.* at 2695, 2698. It is noteworthy that these were precisely the kind of "remote supervisory official[s]" that *Padilla* had explained the same day could not be named as respondents under the "immediate custodian" rule unless some exception to that rule applied.

> FN9. *See also Al Odah v. United States,* 321 F.3d 1134, 1136 (D.C.Cir.2003) (listing the respondents in the *Rasul* action), *rev'd sub nom, Rasul v. Bush,* 542 U.S. 466, 124 S.Ct. 2686, 159 L.Ed.2d 548

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ACLU - Hamdan-143

350 F.Supp.2d 28                                                                                    Page 17
350 F.Supp.2d 28
(Cite as: 350 F.Supp.2d 28)

(2004).

The United States' arguments cannot plausibly sur-
vive these cases. The decisions of the Court finding
an absence of jurisdiction in *Padilla* and the exist-
ence of jurisdiction in *Rasul* share at least one com-
mon feature: both recognize an exception to the
"immediate custodian" and "district of confine-
ment" rules when the petitioner and his immediate
custodian are "outside the territory of any district
court." *Braden*, 410 U.S. at 498, 93 S.Ct. 1123.
Where that is the case, the petitioner may name as
respondents any of his custodians (not just the im-
mediate custodians) and may file the claim in the
court that has jurisdiction over those respondents.
*See, e.g., Gherebi v. Bush,* 338 F.Supp.2d 91, 95
(D.D.C.2004) (citing *Padilla* and *Rasul* for the con-
clusion that individuals detained in Guantanamo
Bay may bring a habeas petition in the United
States District Court for the District of Columbia
that names Secretary Rumsfeld as a respondent un-
der the exception to the "immediate custodian" and
"district of confinement" rules).[FN10]

> FN10. *See also Gherebi v. Bush,* 374 F.3d
> 727, 738 (9th Cir.2004) (citing *Padilla* and
> *Rasul* for the proposition that there is an
> "exception to the immediate custodian and
> district of confinement rules where an
> American citizen is detained outside the
> territorial jurisdiction of any district
> court") (quotation omitted).

Respondents struggle mightily to respond to this
exception. They suggest that the passages in *Pa-
dilla* discussing the exception can be ignored as
dicta, because neither *Padilla* nor *Braden* in fact in-
volved petitioners who were outside of the United
States, and because *Burns* and *Toth,* the two de-
cisions cited in *Padilla,* do not specifically address
the jurisdiction of the Court. Resp. Show Cause at
12-13. At the outset, this description of the law is
wrong. *Burns* stated quite explicitly that there was
habeas jurisdiction under 28 U.S.C. § 2241 to re-
view the constitutional claims of an American cit-
izen court-martialed in Guam:

[W]e are dealing with habeas corpus applicants
who assert-rightly or wrongly-that they have been
imprisoned and sentenced to death as a result of
proceedings which denied them basic rights guaran-
teed by the Constitution. The federal civil courts
have jurisdiction over such applications. By statute,
Congress has charged them with the exercise of that
power.

*Burns,* 346 U.S. at 139, 73 S.Ct. 1045 (citing 28
U.S.C. § 2241). At any rate, this Court cannot dis-
regard a rule of law that the Supreme Court de-
scribed as "recognized" in one recent decision (*Pa-
dilla* ): that was at the heart of both the reasoning
and the outcome in another recent decision (*Rasul*
); that it discussed in some detail in an earlier de-
cision (*Braden* ); and that was necessary to the
holding of one decision involving an American cit-
izen detained overseas (*ex rel. Toth,* where the
Court *45 affirmed the district court's issuance of
the writ), and to the analysis of another (*Burns,*
where the Court declined to issue the writ, but nev-
ertheless addressed its jurisdiction over, and then
the merits of, the petitioner's claim). This is far
more than the concept of "dicta" can bear.

[4] Respondents also maintain that the exception
"abandons" the "immediate custodian" and "district
of confinement" rules and treats them as nothing
more than a "policy rule." Resp'ts' Opp'n Mot. Pre-
lim. Inj. at 13. That is far from the truth. The rules
have continuing vitality and are rigorously applied.
As *Rasul* explained, however, they are "strictly rel-
evant only to the question of the appropriate forum,
not to whether the claim can be heard at all." *Ra-
sul,* 124 S.Ct. at 2695. In *Padilla,* for example, the
Supreme Court concluded that the United States
District Court for the Southern District of New
York lacked jurisdiction to hear the habeas petition
of an individual incarcerated in a Naval Brig in
South Carolina, and that the petitioner would there-
fore need to re-file his petition in the United States
District Court for the District of South Carolina in-
stead. *See* 124 S.Ct. at 2727.[FN11] The
"immediate custodian" and "district of confine-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ACLU - Hamdan-144

ment" rules continue to play an important role in channeling a habeas petition into the court with jurisdiction over the petitioner and his immediate custodian, when possible. That said, the law is clear that the scattered references in the habeas statute to "the person having custody of the person detained" and the courts exercising jurisdiction "within their respective jurisdictions" simply do not add up to a jurisdictional wall against habeas petitions for citizens detained overseas, implicit (as the United States would have it) or otherwise.[FN12]

> FN11. *See also Stokes v. United States Parole Comm'n,* 374 F.3d 1235, 1237 (D.C.Cir.2004) (dismissing habeas petition because "immediate custodian" and "district of confinement" rules require petitioner incarcerated in Ohio to file his petition in the United States District Court for the District of Ohio and name the warden of his prison as respondent).

> FN12. That is, where a petitioner can name a respondent who is "within the[ ] respective jurisdiction" of the district court, 28 U.S.C. § 2241(a), and the respondent has "custody of the person detained" and the ability "to produce at the hearing" such person if necessary, 28 U.S.C. § 2243, the cases in this section indicate that the habeas statute is satisfied, and that the courts should not strain to read into the statute a barrier to habeas review, at least for the claims of citizens, that is not apparent on the face of the statute.

To be sure, this is just the beginning of the jurisdictional inquiry. The absence of a broad rule precluding federal jurisdiction over the habeas petition of a citizen held overseas (regardless of who is holding him) leaves remaining the question whether there ever can be habeas jurisdiction over the petition of a citizen held overseas in the specific circumstance where he is held by a foreign state. That issue raises serious and important questions of law that require careful assessment of the text of the habeas statute,

decades of precedent regarding the meaning of the term "custody" in the statute, and important constitutional considerations on both sides of the ledger. It is to those questions that the Court now turns.

**B. "In Custody"**

[5] The turnkey of the habeas statute is the requirement of custody. The statute provides specifically that a district court cannot issue a writ of habeas corpus to an individual unless the individual "is in custody" either "under or by color of the authority of the United States" or "in violation of the Constitution or laws or treaties of the United States," or in several other respects that are not claimed to be *46 relevant here. 28 U.S.C. § 2241(c). This case requires the Court to determine whether an individual is "in custody" within the meaning of one or both of these provisions when he is allegedly arrested and held by a foreign agent at the behest or direction of the United States.

An analysis of the "in custody" language of the habeas statute must start with the proposition that the Supreme Court has "very liberally construed the 'in custody' requirement for purposes of federal habeas." *Maleng,* 490 U.S. at 492, 109 S.Ct. 1923; *see also Peyton v. Rowe,* 391 U.S. 54, 64, 88 S.Ct. 1549, 20 L.Ed.2d 426 (1968) (holding that the "in custody" requirement of the habeas statute "should be liberally construed" because of the remedial goals of the statute). In fact, the Court has explained that although the habeas statute limits "its availability to those 'in custody,' the statute does not attempt to mark the boundaries of 'custody' nor in any way other than by use of that word attempt to limit the situations in which the writ can be used." *Jones v. Cunningham,* 371 U.S. 236, 243, 83 S.Ct. 373, 9 L.Ed.2d 285 (1963); *see also Hensley,* 411 U.S. at 350, 93 S.Ct. 1571 ("The custody requirement of the habeas corpus statute is designed to preserve the writ of habeas corpus as a remedy for severe restraints on individual liberty.").

When determining whether a petition falls within

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ACLU - Hamdan-145

350 F.Supp.2d 28
350 F.Supp.2d 28
(Cite as: 350 F.Supp.2d 28)

Page 19

the "in custody" language of the habeas statute, courts must avoid "legalistic" and "formalistic" distinctions and honor the "breadth and flexibility of the Great Writ." *Morgan,* 346 U.S. at 506 n. 3, 74 S.Ct. 247 (quotation omitted); *Chatman-Bey,* 864 F.2d at 807. The Supreme Court has often underscored the "most comprehensive character" of the habeas statute and advised that "there is no higher duty than to maintain" the writ "unimpaired." *Johnson,* 393 U.S. at 485, 89 S.Ct. 747; *Ex parte McCardle,* 73 U.S. (6 Wall.) at 325-26, 18 L.Ed. 816; *see also Burns,* 346 U.S. at 148, 73 S.Ct. 1045 (statement of Frankfurter, J.) ("The right to invoke habeas corpus to secure freedom is not to be confined by any a priori or technical notions of 'jurisdiction.' ...And so, if imprisonment is the result of a denial of due process, it may be challenged no matter under what authority of Government it was brought about.").

[6] Although it devotes somewhat less attention to this theory than to its "immediate custodian" argument, the United States appears to contend that the statutory phrase "in custody" only encompasses cases where the individual is in the actual physical custody of a United States official. *See* Resp. Show Cause at 3, 7 n. 5. The text of the statute, however, is not nearly so limiting. Section 2241(c)(1) expressly expands the compass of habeas jurisdiction to any petitioner who is "in custody *under or by color of the authority* of the United States," not just to those strictly in the custody of the United States.[FN13] 28 U.S.C. § 2241(c)(1) (emphasis added). Section 2241(c)(3) sweeps even more broadly, encompassing any individual who is "in custody"--without the limitation of "under or by color of the authority of the United States"-so long as the custody is "in violation of the Constitution or laws or treaties of the United States." [FN14] *4728 U.S.C. § 2241(c)(3). No one doubts that there must be some involvement of United States officials under either provision to satisfy the "in custody" requirement. However, any attempt to read a requirement that the individual be in the actual physical custody of the United States does not find footing in the text of the statute itself.

> FN13. The language in section 2241(c)(1) can be traced to the first authorization of habeas in section 14 of the Judiciary Act of 1789, which in language practically identical to the modern text authorized federal courts to issue the writ of habeas corpus to those "in custody, under or by colour of the authority of the United States, or committed for trial before some court of the same." Act of Sept. 24, 1789, ch. 20, § 14, 1 Stat. 82.

> FN14. Section 2241(c)(3) was first added in 1867 to expand the ambit of the writ to state prisoners. Historians have explained that the section was phrased expansively in part to address the problem of newly freed slaves who were still held by masters under the pretext of apprenticeship laws. *See* Clarke D. Forsythe, *The Historical Origins of Broad Federal Habeas Review Reconsidered,* 70 Notre Dame L.Rev. 1079, 1112 (1995) (habeas statute was designed to "encompass all the myriad ways in which freedmen might be 'restrained,' " including by private parties pursuant to state statutes). In fact, in its original form, the section did not have any "in custody" requirement at all. *See* Act of Feb. 5, 1867, ch. 28, § 1, 14 Stat. 385 (authorizing habeas relief in "all cases where any person may be restrained of his or her liberty in violation of the constitution, or of any treaty or law of the United States").

Indeed, consistent with the broad language in the statute, courts have universally held that actual physical custody of an individual by the respondent is unnecessary for habeas jurisdiction to exist. *See Justices of Boston Municipal Ct. v. Lydon,* 466 U.S. 294, 300, 104 S.Ct. 1805, 80 L.Ed.2d 311 (1984) ("Our cases make clear that the use of habeas corpus has not been restricted to situations in which the applicant is in actual, physical cus-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ACLU - Hamdan-146

350 F.Supp.2d 28
350 F.Supp.2d 28
(Cite as: 350 F.Supp.2d 28)

Page 20

tody.") (quotation omitted); *Galaviz-Medina v. Wooten,* 27 F.3d 487, 492 (10th Cir.1994) (the custody concept "includes many situations where the petitioner is not in actual physical custody"). Courts instead have read the language of the statute to provide for habeas jurisdiction where the official possesses either actual or "constructive" custody of the petitioner. *See LoBue v. Christopher,* 82 F.3d 1081, 1082 (D.C.Cir.1996) (individual released on bail pending his challenge to the federal extradition statute was "in the constructive custody of the U.S. Marshall for the Northern District of Illinois" and therefore could "challenge the statute through a petition for habeas corpus there"); *Keefe,* 222 F.2d at 392 (question of habeas jurisdiction turns on whether the petitioner "is held in actual or constructive custody by the respondents named in the petition, or by any other person or persons subject to the jurisdiction of the District Court"). The Sixth Circuit has described the concept of constructive custody as follows:

In order to maintain a habeas corpus action, the petitioner must be "in custody." His custody must be the result of the respondent's action from which he seeks habeas corpus relief. However, the Supreme Court has given the custody requirement a liberal construction, and it is not necessary that the petitioner be in physical control of the respondent. It is enough that the imprisoning sovereign is the respondent's agent; that his liberty is restrained by the respondent's parole action; or that he can point to some continuing collateral disability which is the result of the respondent's action.

*Steinberg v. Police Court of Albany, N.Y.,* 610 F.2d 449, 453 (6th Cir.1979) (citations omitted).

There are, in fact, many circumstances in which courts have found actual or constructive custody notwithstanding the fact that the petitioner was not in the physical custody of the respondent government official. These include cases where the petitioner is imprisoned in one state and subject to a detainer in the respondent's state, *see* *48*Braden,* 410 U.S. at 484, 93 S.Ct. 1123 [FN15]; the petitioner is in

federal or state prison and is subject to a final order of deportation by the respondent Immigration and Naturalization Service, *see* *Galaviz-Medina,* 27 F.3d at 493 [FN16]; the petitioner is on probation or parole and is restrained by conditions imposed by the respondent officials, *see* *Jones v. Cunningham,* 371 U.S. 236, 243, 83 S.Ct. 373, 9 L.Ed.2d 285 (1963) [FN17]; the petitioner is released on his own recognizance awaiting trial or sentencing, *see* *Justices of Boston Municipal Ct.,* 466 U.S. at 300-01, 104 S.Ct. 1805 [FN18]; and the petitioner is denied entry to a tribe or to the United States but is otherwise a free man, *see* *Subias v. Meese,* 835 F.2d 1288, 1289 (9th Cir.1987); *Poodry v. Tonawanda Band of Seneca Indians,* 85 F.3d 874, 894 (2d Cir.1996).[FN19]

> FN15. *See also, e.g., Tinghitella v. California,* 718 F.2d 308, 310 n. 3 (9th Cir.1983) ("The district court had habeas corpus jurisdiction because the California detainer placed the petitioner in the constructive custody of California although he was physically in custody in Texas.").

> FN16. *See* *Galaviz-Medina,* 27 F.3d at 493 ("Since Appellant has a detainer plus a final order of deportation against him, we must conclude that he is 'in custody' of the INS for purposes of habeas review.").

> FN17. *See* *Jones,* 371 U.S. at 243, 83 S.Ct. 373 ("While petitioner's parole releases him from immediate physical imprisonment, it imposes conditions which significantly confine and restrain his freedom; this is enough to keep him in the 'custody' of the members of the Virginia Parole Board within the meaning of the habeas corpus statute....").

> FN18. *See* *Justices of Boston Municipal Ct.,* 466 U.S. at 300-01, 104 S.Ct. 1805 (holding that "a person released on personal recognizance is in custody for purposes of the federal habeas corpus statutes" as

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ACLU - Hamdan-147

350 F.Supp.2d 28
350 F.Supp.2d 28
(Cite as: 350 F.Supp.2d 28)

Page 21

long as he is subjected to "restraints not shared by the public generally") (quotation omitted); *Dry v. CFR Court of Indian Offenses for Choctaw Nation,* 168 F.3d 1207, 1208-09 (10th Cir.1999) ("Although Appellants are ostensibly free to come and go as they please, they remain obligated to appear for trial at the court's discretion. This is sufficient to meet the 'in custody' requirement of the habeas statute.") (citing cases).

FN19. *See Jones,* 371 U.S. at 239, 83 S.Ct. 373 ("This Court itself has repeatedly held that habeas corpus is available to an alien seeking entry into the United States, although in those cases each alien was free to ·go anywhere else in the world."); *but see Samirah v. O'Connell,* 335 F.3d 545, 549-50 (7th Cir.2003) (declining to hold that an individual denied entry to the United States but otherwise with no restraints on his liberty is in the custody of the United States).

In some of these cases, the petitioner was not in the physical control of the petitioner, but was in the physical control of some other entity. In others, the petitioner was not in the physical control of any entity at all. Nevertheless, in all of these decisions, the petitioner was found to be in the actual or constructive custody of the respondent within the meaning of the habeas statute because the respondent was responsible for significant restraints on the petitioner's liberty. *See Hensley,* 411 U.S. at 351, 93 S.Ct. 1571 ("The custody requirement of the habeas corpus statute is designed to preserve the writ of habeas corpus as a remedy for severe restraints on individual liberty."); *Poodry,* 85 F.3d at 894 (habeas jurisdiction exists not just in physical custody by the executive but in all circumstances in which "federal adjudication is necessary to guard against governmental abuse in the imposition of severe restraints on individual liberty.") (quotation omitted).

Of a piece with this well-settled law are several decisions in which a court has found a petitioner to be in the actual or constructive custody of a respondent official who was working through an intermediary or an agent to detain the prisoner. *49 For example, in *Braden,* the Supreme Court held that a petitioner was "in custody" of the Commonwealth of Kentucky even though he was incarcerated by the State of Alabama, because Kentucky had issued a detainer that was being executed against the petitioner by Alabama. In those circumstances, the Court explained, the Alabama warden was acting "as the agent of the Commonwealth of Kentucky in holding the petitioner pursuant to the Kentucky detainer," and the Court therefore had "no difficulty concluding" that petitioner was in the custody of Kentucky for purposes of a habeas petition challenging the charge underlying the Kentucky detainer. *Braden,* 410 U.S. at 489 n. 4, 93 S.Ct. 1123; *see also id.* at 498-99, 93 S.Ct. 1123 ("In such a case, the State holding the prisoner in immediate confinement acts as agent for the demanding State, and the custodian State is presumably indifferent to the resolution of the prisoner's attack on the detainer.").

Likewise, in *United States v. Jung Ah Lung,* 124 U.S. 621, 8 S.Ct. 663, 31 L.Ed. 591 (1888), the Supreme Court found that a Chinese citizen who had been detained by the master of a steamship in San Francisco was in the custody of the United States for purposes of habeas jurisdiction. The master explained that he had held the petitioner "in custody by direction of the customs authority of the port, under the provision of the Chinese restriction act," an Act of Congress. *Id.* at 626, 8 S.Ct. 663. The Court therefore found that the petitioner was "in custody under or by color of the authority of the United States" within the meaning of the habeas statute. *Id.*

Finally, it is beyond cavil that an individual who is delivered by the executive to a private prison for detention is not stripped of his opportunity to challenge his incarceration through habeas. *See, e.g., Stokes,* 374 F.3d at 1238 (Ohio federal court has

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ACLU - Hamdan-148

350 F.Supp.2d 28
350 F.Supp.2d 28
(Cite as: 350 F.Supp.2d 28)

Page 22

habeas jurisdiction to consider habeas petition filed by individual in private prison in Ohio). The government may not deny an individual his right to challenge the legality of his conviction by shipping that individual to a private prison, and the private party is acting under color of state law after it receives the prisoner. *Skelton v. Pri-Cor, Inc.,* 963 F.2d 100, 102 (6th Cir.1991) ("To act 'under color' of law does not require that the accused be an officer of the State.... There is a sufficiently close nexus between the State and the challenged action of [the private prison] so that the action of the latter may be fairly treated as that of the State itself.") (quotation and alteration omitted).

In summary, then, given the accepted breadth of the habeas statute, the imperative to construe the "in custody" requirement expansively in favor of the petitioner and without regard for formalisms, the absence of any language in the text that carves out an exception where the physical custodian is a foreign body, the many circumstances in which habeas jurisdiction has been found where the individual was not in the immediate possession of the respondent, and the decisions in which habeas jurisdiction was found when the executive or some other government official was working through the intermediary of a State (*Braden* ), a private individual (*Jung Ah Lung* ) or a private corporation (*Stokes* ), the Court cannot find any basis *in the habeas statute* for denying jurisdiction merely because the executive is allegedly working through the intermediary of a foreign ally. To be sure, there are important distinctions between domestic bodies and foreign states that place considerable limitations on the inquiry (and authority) of a United States court in this setting. That work, however, must be done by principles of separation of powers and related considerations (to which the *50 Court will turn in a moment), not by the text of the statute itself, which draws no such distinctions.

One final point bears emphasis here. At this time, the Court is concerned with its *jurisdiction* to entertain the habeas petition of Abu Ali, not with the

*merits* of the habeas petition itself. As Justice Scalia has explained, "a federal habeas court has jurisdiction over any claim that a prisoner is 'in custody in violation of the Constitution or laws' of the United States. While that jurisdiction does require a claim of legal error in the original proceedings, it is otherwise sweeping in its breadth." *Withrow v. Williams,* 507 U.S. 680, 715, 113 S.Ct. 1745, 123 L.Ed.2d 407 (1993) (Scalia, J., concurring and dissenting) (citation omitted). Therefore, it would be a somewhat strained reading of section 2241(c)(3) in particular that would require the United States to play a significantly greater role in an individual's detention for purposes of the Court's *jurisdiction* than would be necessary to support a claim *on the merits* that the petitioner is "in violation of the Constitution, laws, or treaties of the United States." [FN20]

> FN20. *See also Burns,* 346 U.S. at 149, 73 S.Ct. 1045 ("[W]e are dealing with habeas corpus applicants who assert-rightly or wrongly-that they have been imprisoned and sentenced to death as a result of proceedings which denied them basic rights guaranteed by the Constitution. The federal civil courts have jurisdiction over such applicants."); *Ex parte McCardle,* 73 U.S. (6 Wall.) at 325-26, 18 L.Ed. 816 ("This legislation is of the most comprehensive character. It brings within the *habeas corpus* jurisdiction of every court and of every judge every possible case of privation of liberty contrary to the National Constitution, treaties, or laws. It is impossible to widen this jurisdiction.").

[7] As reviewed earlier, petitioners in this case have pled at least a colorable claim that Abu Ali is being held "in violation of the Constitution, laws, or treaties of the United States." They allege that the United States has worked through Saudi officers to detain Abu Ali-a United States citizen-indefinitely without due process of law. As the D.C. Circuit explained sitting *en banc,* "teaming up with foreign

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ACLU - Hamdan-149

350 F.Supp.2d 28
350 F.Supp.2d 28
(Cite as: 350 F.Supp.2d 28)

Page 23

agents cannot exculpate officials of the United States from liability to United States citizens for the *United States* officials' unlawful acts." *Ramirez de Arellano v. Weinberger,* 745 F.2d 1500, 1506-09 (D.C.Cir.1984) (en banc) (emphasis in original), *rev'd on other grounds,* 471 U.S. 1113, 105 S.Ct. 2353, 86 L.Ed.2d 255 (1985).[FN21] This is not to say that petitioners will be able to prove a constitutional violation; or even that they will be able to demonstrate following jurisdictional discovery that they are in the actual or constructive custody of the United States. It is merely to note that petitioners' unrebutted pleadings allege detention "in violation of the Constitution, laws, or treaties of the United States" for purposes of section 2241(c)(3). *See 5i Rasul,* 124 S.Ct. at 2698 ( Petitioners contend that they are being held in federal custody in violation of the laws of the United States. No party questions the District Court's jurisdiction over petitioners' custodians. *Cf. Braden,* 410 U.S., at 495[ ], 93 S.Ct. 1123. Section 2241, by its terms, requires nothing more.").[FN22]

> FN21. *See also Reid,* 354 U.S. at 6, 77 S.Ct. 1222 (Fifth and Sixth Amendments protect United States citizens abroad); *United States v. Maturo,* 982 F.2d 57, 61 (2d Cir.1992) ("constitutional requirements may attach in two situations: (1) where the conduct of foreign law enforcement officials rendered them agents, or virtual agents, of United States law enforcement officials; or (2) where the cooperation between the United States and foreign law enforcement agencies is designed to evade constitutional requirements applicable to American officials"); *United States v. Karake,* 281 F.Supp.2d 302, 308 (D.D.C.2003) ("A defendant may move to suppress statements made to agents of foreign governments when the conduct of foreign law enforcement officials renders them agents, or virtual agents, of United States officials."); *Berlin Democratic Club v. Rumsfeld,* 410 F.Supp. 144, 155

(D.D.C.1976) (holding that involvement of United States officials in the electronic surveillance by German officials of United States citizens in Germany raises constitutional concerns).

FN22. The Supreme Court in *Rasul* explained that the allegations of the Guantanamo Bay detainees that they had been unlawfully "held in Executive detention for more than two years ... without access to counsel and without being charged with any wrongdoing-unquestionably describe 'custody in violation of the Constitution or laws or treaties of the United States' within the meaning of section 2241(c)(3). *Id.* at 2697 n. 15. The United States has taken the view, in its filings regarding the habeas petitions of the Guantanamo Bay detainees presently before judges of this Court, that this language is not an assessment by the Supreme Court of the merits of the petitioners' claims, but instead "merely conveys that the pleading requirements for jurisdiction under 28 U.S.C. § 2241(c)(3) had been met." Resp'ts' Reply Mem. Supp. Mot. Dismiss at 1, *In re Guantanamo Detainee Cases* (D.D.C.). Although there is an obvious dispute in this case over whether the detention is by the executive, petitioners have otherwise pled a violation of rights very similar to that sufficient to establish jurisdiction even under the United States' reading of *Rasul.*

## C. Constitutional Considerations

The relevant text of the habeas statute, therefore, fully supports jurisdiction here. As was discussed earlier, however, and as hardly needs repeating, the writ of habeas corpus "commands general recognition as the essential remedy to safeguard a citizen against imprisonment by State or Nation in violation of his constitutional rights." *Morgan,* 346

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ACLU - Hamdan-150

350 F.Supp.2d 28
350 F.Supp.2d 28
(Cite as: 350 F.Supp.2d 28)

Page 24

U.S. at 506 n. 3, 74 S.Ct. 247 (quotation omitted). Consistent with this principle, the Supreme Court has identified a constitutional component to the right of a United States citizen to file a habeas petition, one that favors a liberal construction of the habeas statute to avoid constitutional doubt, and one that might even in certain circumstances fill any gaps in the habeas statute that would leave an unconstitutional detention of a United States citizen without any redress. Were there any ambiguity as to the habeas jurisdiction of this Court here, these constitutional considerations would also weigh strongly in favor of jurisdiction.

A constitutional right to habeas for United States citizens was first suggested in *Johnson v. Eisentrager,* 339 U.S. 763, 70 S.Ct. 936, 94 L.Ed. 1255 (1950). Petitioners in that case were German citizens who were captured by United States forces in China, tried and convicted of war crimes by an American military commission headquartered in Nanking, and incarcerated in the Landsberg Prison in occupied Germany. The D.C. Circuit had concluded that there was jurisdiction in the district court to consider the habeas claims of the German citizens, reasoning that "if a person has a right to a writ of habeas corpus, he cannot be deprived of the privilege by an omission in a federal jurisdictional statute." *Eisentrager v. Forrestal,* 174 F.2d 961, 965 (D.C.Cir.1949). The D.C. Circuit therefore resorted to "fundamentals," stating:

if it be held that no court has jurisdiction to issue a writ of habeas corpus upon petition of a person confined outside the territorial United States, the ruling would deny the protection of the Constitution to citizens of the United States confined abroad by action and in custody of officials of the United States. The only escape from that conclusion would be to distinguish between citizens and aliens. We think that the constitutional prohibitions apply directly to acts of Government, or Government officials, *52 and are not conditioned upon persons or territory.

*Id.* FN23

FN23. The D.C. Circuit in *Eisentrager* also anticipated the modern exception to the "immediate custodian" rule by explaining that "when a person is deprived of his liberty by the act of an official of the United States outside the territorial jurisdiction of any District Court of the United States, that person's petition for a writ of habeas corpus will lie in the District Court which has territorial jurisdiction over the officials who have directive power over the immediate jailer." 174 F.2d at 966. The court rested this holding on an expansive definition of "in custody" in the habeas statute: "We perceive nothing singular in the application of judicial authority to those who have directive power, if such application is the only means of enforcing the prohibitive clauses of the Constitution." *Id.* at 967.

The Supreme Court reversed. The Court explained that it was "confronted with a decision whose basic premise is that these prisoners are entitled, as a constitutional right, to sue in some court of the United States for a writ of habeas corpus." 339 U.S. at 777, 70 S.Ct. 936. The Court explained that the right to habeas rests on an "ascending scale," with citizens at the highest point and the rights of aliens descending from there on the basis of several variables. *Id.* at 770, 70 S.Ct. 936. "With the citizen we are now little concerned," the *Eisentrager* Court noted, "except to set his case apart as untouched by this decision and to take measure of the difference between his status and that of all categories of aliens." *Id.* at 769, 70 S.Ct. 936. *Eisentrager* then concluded that a military prisoner is not "constitutionally entitled to the writ" where, as in that case, "(a) he is an enemy alien; (b) has never been or resided in the United States; (c) was captured outside of our territory and there held in military custody as a prisoner of war; (d) was tried and convicted by a Military Commission sitting outside the United States; (e) for offenses against laws of war committed outside the United States; (f) and is

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ACLU - Hamdan-151

350 F.Supp.2d 28
350 F.Supp.2d 28
(Cite as: 350 F.Supp.2d 28)

Page 25

at all times imprisoned outside the United States."
*Id.*

Each of the three opinions in *Rasul* considered the reasoning of *Eisentrager* at length. The majority opinion concluded that *Eisentrager* had implicitly held that there was no jurisdiction under the habeas statute, and therefore had turned to "fundamentals" to assess whether there was a constitutional right to habeas. *Rasul,* 124 S.Ct. at 2694. "Because subsequent decisions of this Court have filled the statutory gap that occasioned *Eisentrager* 's resort to fundamentals," the majority explained, "persons detained outside the territorial jurisdiction of any federal district court no longer need rely on the Constitution as the source of their right to federal habeas review." *Id.* (quotation omitted).

Justice Kennedy, in his concurring opinion, opined that *Eisentrager* itself provides a framework for the analysis of habeas jurisdiction. Reading *Eisentrager* to hold that "citizenship provides a long-standing basis for jurisdiction, and among aliens physical presence within the United States also 'gave the Judiciary power to act,' "*id.*(quoting *Eisentrager,* 339 U.S. at 769, 70 S.Ct. 936) (Kennedy, J., concurring), Justice Kennedy would have applied the six factors identified by *Eisentrager* to conclude that there was jurisdiction over the habeas petitions of the non-resident aliens held at Guantanamo Bay, *id.* at 2699.

Finally, the dissent in *Rasul* viewed both the D.C. Circuit and the Supreme Court in *Eisentrager* as undertaking a statutory analysis that was guided by the canon of constitutional avoidance. *See id.* at 2702 (Scalia, J., dissenting). The dissent explained that the holding of the Supreme Court in *Eisentrager* that there was no statutory right to jurisdiction for non-resident aliens even accounting for *53 constitutional considerations controlled the question of the right to habeas for the detainees in Guantanamo Bay. *See id.* The dissent emphasized, however, that the "constitutional doubt that the Court of Appeals had erroneously attributed to the lack of habeas for an alien abroad might indeed ex-

ist with regard to a *citizen* abroad-justifying a strained construction of the habeas statute, or (more honestly) a determination of constitutional right to habeas." *Id.* at 2705 (emphasis in original).

Each of the opinions in *Rasul,* then, held-or at a minimum indicated-that a United States citizen has a right to habeas that flows in some degree from the Constitution. The majority decision recognized that *Eisentrager* had resorted to constitutional fundamentals to fill the gaps in the habeas statute. The concurring decision viewed *Eisentrager* as holding that there is an inherent judicial authority to grant habeas relief and that "citizenship provides a long-standing basis for jurisdiction." And the dissent suggested that there "might indeed exist" a constitutional dimension to the right of habeas for a citizen abroad, one that either would inform an analysis of the statute or "more honestly" would stand alone as a constitutional basis for habeas jurisdiction.

Even the United States has recently acknowledged that a citizen has a constitutional right to file a habeas petition that extends beyond the reaches of the statute. Although it argued in *Rasul* that there was no statutory habeas jurisdiction for the non-resident alien detainees at Guantanamo Bay, the United States acknowledged several times during oral arguments that the courts would have jurisdiction over the petitions of a United States citizen at Guantanamo because of the unique "constitutional circumstances" of citizens and the "enhanced respect" they were afforded under *Eisentrager.*[FN24] These statements do not control the result in this case, of course; the circumstances of this petition are far removed from those of a United States citizen detained at Guantanamo. Nonetheless, it would appear that it was the position of the United States as recently as this year that a United States citizen possesses a constitutional right to habeas even where habeas jurisdiction is lacking under the habeas statute.[FN25]

> FN24. *See* Tr. of Oral Argument in *Rasul v. Bush,* Apr. 20, 2004, *available at* 2004

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ACLU - Hamdan-152

350 F.Supp.2d 28
350 F.Supp.2d 28
(Cite as: 350 F.Supp.2d 28)

Page 26

WL 943637, at *22-*23 ("Question: What if one of the Plaintiffs were an American citizen here, being held at Guantanamo.... General Olson: We would acknowledge that there would be jurisdiction ...-Question: Why? General Olson:-under the Habeas Corpus Statute for the reasons that are explained in Eisentrager itself, that citizenship is a foundation for a relationship between the nation and the individual and a foundation for-"); *id.* at *23-*24 ("Question: What if the American citizen was in the middle of the battlefield in Iraq? General Olson: We would still argue that the jurisdiction under the habeas statute would not extend under these circumstances to a wartime situation, Justice Stevens, but that the-what the *Eisentrager* Court said, that there is enhanced respect with respect to the power of the Court under the habeas court jurisdiction with respect to questions involving citizenship."); *id.* at *33 ("General Olson: Our answer to that question, Justice Souter, is that citizens of the United States, because of their constitutional circumstances, may have greater rights with respect to the scope and reach of the Habeas Statute as the Court has or would interpret it.").

FN25. Both the majority and dissent in *Rasul* relied on this position in reaching their respective conclusions. *See Rasul,* 124 S.Ct. at 2696 (emphasizing that respondents "themselves concede that the habeas statute would create federal-court jurisdiction over the claims of an American citizen held at the base"); *id.* at 2696 (Scalia, J., dissenting) ("Neither party to the present case challenges the atextual extension of the habeas statute to United States citizens held beyond the territorial jurisdictions of the United States courts.").

*54 The Court need not rely on a constitutional

right to habeas to resolve the threshold jurisdictional question in this case. The Court observes merely that, to the extent there is any ambiguity in the "custody" requirement, *Eisentrager* and *Rasul* counsel at the very least that the habeas statute should be interpreted expansively to avoid the constitutional question whether a citizen of the United States would be deprived of his constitutional rights if he were denied any opportunity whatsoever to challenge the legality of a detention alleged to be at the behest of the executive. It bears mention that of the six factors that *Eisentrager* identified as relevant to the constitutional inquiry, all but one favor a right to habeas in this case. Unlike in *Eisentrager,* Abu Ali is a citizen of the United States; he has resided in the United States for most of his life; he was not convicted by a United States military commission; he is not being held in military custody as a prisoner of war; and he was never tried for offenses against laws of war committed outside the United States (indeed, he has not been tried for any offenses at all). *See Rasul,* 124 S.Ct. at 2700 (Kennedy, J., concurring) (fact that petitioner is "being held indefinitely, and without benefit of any legal proceeding," weighs in favor of habeas jurisdiction). The only factor present in *Eisentrager* that is also present in this case is that Abu Ali has "at all times been imprisoned outside the United States," but as discussed earlier, that alone does not suffice to deny habeas jurisdiction to a United States citizen.

One final atextual consideration that further supports habeas jurisdiction in this case is the allegation that respondents are deliberately shielding Abu Ali from constitutional scrutiny by keeping him outside the United States. *See, e.g.,* Petition ¶¶ 1-5. There is at least some factual information in the record to support this claim, including the fact that similarly situated citizens were returned to the United States to be indicted and tried in federal court, the contention that United States officials have told petitioners that a grand jury refused to return an indictment against him; and the allegation, weak as it is on the evidence in the current record,

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ACLU - Hamdan-153

350 F.Supp.2d 28
350 F.Supp.2d 28
(Cite as: 350 F.Supp.2d 28)

that petitioner has been tortured to obtain information and that the United States is aware of this torture. It is well-established that "the federal courts may and should take such action as will defeat attempts to wrongfully deprive parties entitled to sue in the Federal courts for the protection of their rights in those tribunals." *Alabama Great S. R. Co. v. Thompson,* 200 U.S. 206, 218, 26 S.Ct. 161, 50 L.Ed. 441 (1906); *see also Maturo,* 982 F.2d at 61 (citing cases suppressing evidence in criminal cases where "cooperation between the United States and foreign law enforcement agencies is designed to evade constitutional requirements applicable to American officials").

That principle distinguishes this case from the circumstance where the United States requests that a foreign government extradite a citizen to the United States. On the issue of whether there is habeas jurisdiction in that setting, the Court expresses no opinion. An obvious distinction between the extradition context and the present situation, however, is that when an individual is extradited to the United States, following the extradition he will have a full opportunity to assert his rights in a United States court. In the present case, just the opposite is true: The United States is alleged to be taking steps that specifically deny Abu Ali an opportunity to "sue in the Federal courts for the protection of [his] rights." *Alabama Great S. R. Co.,* 200 U.S. at 218, 26 S.Ct. 161.

Therefore, this case is not at all like *55United States v. Sinclair,* 702 F.Supp. 477 (D.Del.1989), where the court held that it lacked jurisdiction to consider the habeas petition of an individual arrested by British authorities pursuant to a United States demand for his extradition to this country, after he had been tried and convicted for mail fraud but then fled the country. Here, a citizen is allegedly being detained at the direction of the United States in another country without any opportunity at all to vindicate his rights. As the cases in this section suggest, if true, this is an exceptional situation that demands particular attention to the rights of the

citizen. *See Hamdi,* 124 S.Ct. at 2650 ("[I]t would turn our system of checks and balances on its head to suggest that a citizen could not make his way to court with a challenge to the factual basis for his detention by his government, simply because the Executive opposes making available such a challenge."); *Eisentrager,* 339 U.S. at 795, 70 S.Ct. 936 (Black. J.. dissenting) ("The Court is fashioning wholly indefensible doctrine if it permits the executive branch, by deciding where its prisoners will be tried and imprisoned, to deprive all federal courts of their power to protect against a federal executive's illegal incarcerations.").

### III. *Hirota* and *Keefe*

Respondents attempt to rebut the statutory and constitutional arguments for habeas jurisdiction by claiming that the result here is determined by the decisions in *Hirota v. General of the Army MacArthur,* 338 U.S. 197, 69 S.Ct. 197, 93 L.Ed. 1902 (1948) (per curiam), and *U.S. ex rel. Keefe v. Dulles,* 222 F.2d 390 (D.C.Cir.1954). Those decisions, however, do not remotely stand for the proposition that a United States citizen in the hands of a foreign government has no right to file a petition for habeas corpus regardless of the involvement of the United States in his ongoing detention.

In *Hirota,* the Supreme Court rejected the habeas petition filed on behalf of several Japanese citizens who had been convicted and sentenced by a military tribunal in the aftermath of World War II. *See* 338 U.S. at 198, 69 S.Ct. 197. Although Japan at the time was "occup[ied] and control[led]" by the United States, the Court explained that the tribunal was a construct of the Allied Powers and not a court of the United States. *Id.* The Court therefore concluded, in a brief *per curiam* opinion, that it had no authority to set aside the judgments and sentences of the tribunal, and therefore dismissed the habeas petition. *See id.*

The United States can hardly rely on a decision involving *non-resident aliens* challenging the sen-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ACLU - Hamdan-154

350 F.Supp.2d 28
350 F.Supp.2d 28
(Cite as: 350 F.Supp.2d 28)

tence of a foreign military tribunal as controlling precedent for a rule that *citizens* lack any rights in habeas to challenge their detention (without charges, much less convictions) by a foreign government allegedly at the behest of the United States. The differences between the rights of citizens and the rights of aliens are considerable in this context, and the Supreme Court has expressly declined to enter the debate on the rights of citizens to habeas in cases involving the rights of aliens. As the Court explained in *Eisentrager* fewer than two years after its decision in *Hirota*:

With the citizen we are now little concerned, except to set his case apart as untouched by this decision and to take measure of the difference between his status and that of all categories of aliens. Citizenship as a head of jurisdiction and a ground of protection was old when Paul invoked it in his appeal to Caesar. The years have not destroyed nor diminished the importance of citizenship nor have they sapped the vitality of a citizen's claims upon his government for protection.

*56 339 U.S. at 768, 70 S.Ct. 936; *see also Hamdi,* 124 S.Ct. at 2647 ("We reaffirm today the fundamental nature of a citizen's right to be free from involuntary confinement by his own government without due process of law ...."); *Rasul,* 124 S.Ct. at 2705 (Kennedy, J., concurring) (*Eisentrager* recognized an "ascending scale of rights" with "[c]itizenship provid[ing] a longstanding basis for jurisdiction") (quotation omitted); *id.* at 2706 (Scalia, J., dissenting) ("Neither party to the present case challenges the atextual extension of the habeas statute to United States citizens held beyond the territorial jurisdictions of the United States courts; but the possibility of one atextual exception thought to be required by the Constitution is no justification for abandoning the clear application of the text to a situation in which it raises no constitutional doubt.").

The United States has itself recently acknowledged the important differences with regard to habeas jurisdiction between the rights of a citizen and the

rights of a non-resident alien. *See id.* at 2696 ("Respondents themselves concede that the habeas statute would create federal-court jurisdiction over the claims of an American citizen held at the base."). The precise nature of the differences in the rights of citizens and aliens need not be decided here. It suffices to recognize that in determining the rights of certain non-resident aliens to challenge the judgment of a foreign military tribunal in a brief *per curiam* opinion in *Hirota* two years prior to *Eisentrager,* it is inconceivable that the Supreme Court also intended to rule that a citizen will not have any rights in the circumstances alleged here.

Petitioners also rely heavily on *Keefe v. Dulles,* a case that at least involved an American citizen. Keefe was a private in the United States army stationed in France who had pled guilty to a charge that he had beaten a cab driver and stolen his taxi. *See* 222 F.2d at 391. He was serving a five year sentence in French prison pursuant to the sentence of a French court. *Id.* Keefe's wife filed a habeas petition against several United States officials challenging the failure of the officials to obtain his release. The court assumed that the only role the United States was alleged to have played in the case was in "not preventing the French from taking, trying, convicting, and confining him." *Id.* The court then framed the relevant legal question as "whether Keefe is held in actual or constructive custody by the respondents named in the petition, or by any other person or persons subject to the jurisdiction of the District Court." *Id.* at 392. In a brief, two-sentence discussion, the court concluded that his detention by French authorities meant that Keefe was not in the custody of the respondents, or any other individual within the jurisdiction of the federal courts, and therefore denied the habeas petition. *See id.*

The holding in *Keefe* that there was no "custody or constructive custody" where the only involvement of the United States is assumed to be its refusal to intervene on behalf of a citizen held by a foreign government can hardly be read as precedent for the

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ACLU - Hamdan-155

350 F.Supp.2d 28
350 F.Supp.2d 28
(Cite as: 350 F.Supp.2d 28)

notion that there can never be "custody or con-
structive custody" even if (as petitioners allege
here) the United States is actively involved in ar-
ranging the arrest and ongoing detention of a cit-
izen. The result in *Keefe* is unassailable. If the mere
failure of the United States to exercise its diplomat-
ic powers to obtain the release of a citizen held in a
foreign prison sufficed to vest habeas jurisdiction in
a United States court, there would be jurisdiction in
practically every case in which a citizen is im-
prisoned in a foreign land, even if (as was assumed
in *Keefe* ) the United States was not involved in the
detention at all. To read *Keefe* to also hold *57 *sub
silentio* that habeas jurisdiction can never exist
even if the United States actively works to separate
a citizen from his constitutional rights is to read far
more into the two-sentence discussion in *Keefe* than
it can plausibly support.

The cursory analysis in *Hirota* and *Keefe* simply
cannot sustain the broad immunity the United
States seeks here from habeas actions filed by cit-
izens. It is worth adding that to the extent *Hirota*
and *Keefe* provide even marginal support for the
position advanced by the United States, more than
five decades of intervening law has transpired since
those cases were decided, during a time of great
change in habeas jurisprudence. *Hirota* not only
pre-dated *Eisentrager,* but both *Hirota* and *Keefe*
also pre-date *Braden* and *Rasul* and the narrowing
of the "immediate custodian" rule. *Hirota* and
*Keefe* arose at a time when, as the Supreme Court
explained in *Rasul,* the prisoner's presence in the
territorial jurisdiction of the district court was an
"invariable prerequisite" to the exercise of district
court jurisdiction. *Rasul,* 124 S.Ct. at 2694-95
(quotation omitted). The point is not so much that
interceding cases have overruled *Hirota* and *Keefe,*
but rather that any attempt to tease a broad jurisdic-
tional bar out of the brief discussion of narrow
facts of either decision must account for the juris-
dictional backdrop against which they were de-
cided. *See generally Chatman-Bey,* 864 F.2d at
809 ("The modern history of habeas corpus is a
story of steady expansion of the Great Writ ....");

*Fuller v. I.N.S.,* 144 F.Supp.2d 72, 85
(D.Conn.2000) ("The traditional strict custody re-
quirement has been greatly expanded over the last
several decades, as 'stifling formalisms' and 'arcane
and scholastic procedural requirements' have given
way.").[FN26]

> FN26. There is yet another distinction
> between *Hirota* and *Keefe* and the present
> case. In both *Hirota* and *Keefe,* there was a
> judgment and sentence by a foreign
> tribunal. As *Hirota* explained, a United
> States court has "no power or authority to
> review, to affirm, set aside or annul the
> judgments and sentences imposed" by a
> foreign tribunal. 338 U.S. at 198, 69 S.Ct.
> 197. Here, there is no tribunal at all. The
> act of a foreign state in arresting an indi-
> vidual, entering judgment against him, and
> sentencing him in a court of law is of a dif-
> ferent order altogether than the decision by
> the executive to hold him through the in-
> tercession of another country. The former
> acts require the United States courts to sit
> as a court of appeals over the court of a
> former country. The latter is an act by the
> executive that is readily susceptible to con-
> sideration by a United States tribunal and
> does not require review of a decision of a
> foreign tribunal.

## IV. The Act of State, Separation of Powers, and Political Question Doctrines

Unable to find support for the rule they propose in
either the text of the habeas statute or controlling
precedent, the United States appeals to three
weighty principles: the act of state, separation of
powers, and political question doctrines. Each is an
important consideration in this case. None,
however, extinguishes the fundamental right of a
citizen to challenge his detention colorably alleged
to be at the behest of the executive.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ACLU - Hamdan-156

350 F.Supp.2d 28
350 F.Supp.2d 28
(Cite as: 350 F.Supp.2d 28)

A. Act of State

[8] The act of state doctrine "precludes the courts of this country from inquiring into the validity of the public acts a recognized foreign sovereign power committed within its own territory." *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 401, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964). "Act of state issues only arise when a court *must decide*—that is, when the outcome of the case turns upon-the-effect of official action by a foreign sovereign." *58W.S. Kirkpatrick & Co., Inc. v. Envt'l Tectonics Corp., Int'l,* 493 U.S. 400, 407-10, 110 S.Ct. 701, 107 L.Ed.2d 816 (1990) ("*Kirkpatrick* ") (emphasis in original). Respondents maintain that the habeas petition implicates the act of state doctrine because it calls into question the motivations of the Saudi government in detaining Abu Ali and implies that the Saudi government is a "puppet" that will "do the bidding" of the United States. *See* Resp'ts' Supplemental Filing at 3; Resp'ts' Opp'n Mot. Prelim. Inj. at 16.

For several reasons, respondents' reliance on the act of state doctrine is misplaced. At least two of those reasons are highlighted by the Supreme Court's decision in *Kirkpatrick.* There, the Court considered a claim brought by one company against a competitor under the RICO Act and the Robinson-Patman Act claiming that the rival had obtained a government contract with the Republic of Nigeria by offering bribes to Nigerian officials. The defendants argued that the suit was barred by the act of state doctrine because to prevail on its claims, the plaintiff would have to prove facts that would call into question the legality of the Nigerian officials' actions and embarrass the Nigerian government. In a unanimous decision, the Supreme Court concluded that the doctrine had no application to the case.

The Court first addressed the defendants' argument that the plaintiff would have to prove that Nigerian officials received bribes in order to prevail, a finding that would suggest the illegality of the contract. The Court reasoned that regardless of "what the

[lower] court's factual findings may suggest as to the legality of the Nigerian contract, its legality is simply not a question to be decided." *Id.* at 406, 110 S.Ct. 701. "Nothing in the present suit," the Court explained, "requires the Court to declare invalid, and thus ineffective as a rule of decision for the courts of this country, the official act of a foreign sovereign." *Id.* (quotation omitted).

*Kirkpatrick* contrasted the suit before it with *Underhill v. Hernandez,* 168 U.S. 250, 254, 18 S.Ct. 83, 42 L.Ed. 456 (1897), in which the act of state doctrine was found to apply to a tort action brought by the plaintiff against a foreign military official for unlawfully detaining him during a revolution in Venezuela. *Kirkpatrick* explained that a holding that the detention was tortious "would have required a court in the United States to declare invalid" and deny "legal effect to acts of a military commander representing the ... government." 493 U.S. at 405, 110 S.Ct. 701 (quotation omitted). By contrast, *Kirkpatrick* explained, the plaintiff in the case before it was not attacking the legality of the conduct of a foreign government, but instead was challenging the acts of a third party in "obtaining" or "procur[ing]" the conduct. *See Kirkpatrick,* 493 U.S. at 406-07, 110 S.Ct. 701.

*Kirkpatrick* cited favorably to an earlier decision of the Court holding that "the defendant's actions in obtaining Mexico's enactment of 'discriminating legislating' could form part of the basis for suit under the United States antitrust laws." *Id.* at 407, 110 S.Ct. 701 (quoting *United States v. Sisal Sales Corp.,* 274 U.S. 268, 276, 47 S.Ct. 592, 71 L.Ed. 1042 (1927)). Likewise, *Kirkpatrick* explained, the plaintiff in the case before it was challenging the defendants' actions in procuring certain conduct by a foreign government, not the conduct of the foreign government itself. *Id.* At most, such a suit "may cast doubt upon the validity of foreign sovereign acts," but it would not require the court to hold those acts invalid. *Id.* at 406-07, 110 S.Ct. 701.

*59 The Court then turned to the defendants' contention that, even if the acts of a foreign state were

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ACLU - Hamdan-157

350 F.Supp.2d 28
350 F.Supp.2d 28
(Cite as: 350 F.Supp.2d 28)

Page 31

not being directly challenged, "a determination that Nigerian officials demanded and accepted a bribe would impugn or question the nobility of a foreign nation's motivations and would result in embarrassment to the sovereign." *Id.* at 408, 110 S.Ct. 701 (quotation omitted). Again emphasizing that the act of state doctrine applies only where the act of a foreign sovereign would be "invalidated," not just "impugned," *id.* at 407, 110 S.Ct. 701, the Court explained that the "act of state doctrine does not establish an exception for cases and controversies that may embarrass foreign governments, but merely requires that, in the process of deciding, the acts of foreign sovereigns taken within their own jurisdictions shall be deemed valid. That doctrine has no application to the present case because the validity of no foreign sovereign act is at issue," *id.* at 409-10, 110 S.Ct. 701.

[9] In its present posture, this case maps onto *Kirkpatrick.* Petitioners are not challenging the legality of the actions of the Saudi government in tort or otherwise, *see Underhill,* but rather are suing non-foreign entities-here, United States officials-for the role they allegedly played in obtaining the actions of the Saudi government, *see Kirkpatrick.* The "validity" or "legality" of the Saudi detention is not at issue; rather, the issue is whether the United States ran afoul of its constitutional obligations to Abu Ali in "obtaining" the detention from the Saudis. This inquiry might cast doubt on the integrity of the acts of Saudi officials, but that does not require the Court to declare invalid or illegal any such act.[FN27] Respondents instead emphasize that the suit might embarrass the Saudi government by suggesting that it is the "puppet" of the United States. *Kirkpatrick* makes clear that this concern does not implicate the act of state doctrine.[FN28] *See also Lamb v. Phillip Morris, Inc.,* 915 F.2d 1024, 1026 (6th Cir.1990) (reading *Kirkpatrick* to hold that "the act of state doctrine does not bar a court in the United States from entertaining a cause of action that ... requires imputing to foreign officials an unlawful motivation (the obtaining of bribes) in the performance of ... an official act")

(quotation and alteration omitted).

FN27. It is not entirely clear what it would mean for Saudi acts to be declared "illegal" in this context; unlike even in *Kirkpatrick,* where it was undisputed "that Nigerian law prohibits both the payment and the receipt of bribes in connection with the award of a government contract," *id.* at 401-02, 110 S.Ct. 701, there has been no claim that Saudi officials would be in violation of Saudi Arabia or United States law were they found to be holding Abu Ali at the behest of the United States.

FN28. The situation in this respect is somewhat different now than it was at the preliminary injunction stage, when petitioners were asking the Court to direct the United States to tell the Saudis not to take the legal act of charging an individual with a crime. There is an important distinction between a United States official instructing a Saudi official not to take a public act, which strikes closer to core act of state concerns, and a petition challenging specifically the role of the United States in obtaining a public act, which as *Kirkpatrick* instructs is at least one step removed from act of state concerns. The closer the case drifts to instructions the United States government-either the judiciary or the executive-must provide to the Saudi government about a legal act of the Saudi government (arrest or otherwise), the more that act of state concerns will build.

Moreover, the assertions by the United States that this habeas petition will impugn and embarrass the Saudis seem overstated and something of a red herring. The federal reporters are filled with cases where countries detain individuals at the behest of their allies. A finding that the *60 Saudis detained an individual at the request of the United States no more declares the Saudis a "puppet" of the United States than, as in *LoBue v. Christopher,* the de-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ACLU - Hamdan-158

350 F.Supp.2d 28
350 F.Supp.2d 28
(Cite as: 350 F.Supp.2d 28)

Page 32

cision of the United States to arrest two individuals in response to a request for extradition by the Canadian government indicates that the United States is a "puppet" of Canada. *See LoBue,* 82 F.3d at 1081. There is simply no warrant for respondents' suggestion that every instance in which the United States is discovered to have worked with another country is so embarrassing to the other country that litigation is barred under the act of state doctrine. *See Ramirez de Arellano,* 745 F.2d at 1542 (holding that a joint venture with foreign agents will not shield officials of the United States under the act of state doctrine from liability to citizens for the officials' acts).

Whatever limited bearing the act of state doctrine has on this case in light of the above analysis is only diminished further by the fact that the doctrine is being invoked here by the United States in an attempt to shield itself from judicial inquiry for its own allegedly unconstitutional acts against one of its citizens. The D.C. Circuit sitting *en banc* made this very point in *Ramirez de Arellano,* a case in which a United States citizen sued United States officials for their alleged role in destroying his cattle ranch in Honduras to build a military camp. The United States responded that the military camp was principally a project of the Honduran government, and invoked the act of state doctrine. Sitting *en banc,* the D.C. Circuit rejected the United States' reliance on the act of state doctrine, explaining:

The Supreme Court has never applied the act of state doctrine to bar adjudication of constitutional claims by a United States citizen against officials of the *United States* government.... It is highly questionable whether officials of the Executive are entitled to raise the act of state defense to prevent the Judiciary from exercising its role in the tripartite system of government to remedy injuries to United States citizens caused by unconstitutional activities of the United States Executive Branch.

745 F.2d at 1542 (emphasis in original). "A teaming up with foreign agents," the D.C. Circuit explained, "cannot exculpate officials of the United

States from liability to United States citizens for the *United States* official's unlawful acts." *Id.* (emphasis in original).

Respondents note that *Ramirez de Arellano* was reversed on other grounds by the Supreme Court, which is true as far as it goes. This cannot possibly be read as a criticism of the act of state analysis in the decision, however–the Supreme Court reversed because of the interceding enactment of a statute that bore on an entirely different issue in the case.[FN29] Indeed, the D.C. Circuit has since cited with approval the holding and reasoning in *Ramirez de Arellano,*[FN30] including its separation of powers[*61] analysis.[FN31] Respondents do not offer any persuasive explanation for why this Court should simply ignore the reasoning of the decision here.

> FN29. The Supreme Court remanded the case to the D.C. Circuit in light of the passage of the Foreign Assistance and Related Programs Appropriations Act, which authorized the use of funds for a U.S.-financed military training center in Honduras subject to specified conditions. *See Weinberger v. Ramirez de Arellano,* 471 U.S. 1113, 105 S.Ct. 2353, 86 L.Ed.2d 255 (1985). On remand, the D.C. Circuit, again sitting *en banc,* dismissed the case in light of the undisputed fact that all U.S. military personnel had departed from the land in question after failing to reach an agreement with the Honduran government concerning the operation of a military training center consistent with the Act's requirements. *See De Arellano v. Weinberger,* 788 F.2d 762, 763 (D.C.Cir.1986) (en banc).

> FN30. *See, e.g., Transcapital Fin. Corp. v. Dir., Office of Thrift Supervision,* 44 F.3d 1023, 1025 (D.C.Cir.1995); *Transohio Savings Bank v. Dir., Office of Thrift Supervision,* 967 F.2d 598, 613 (D.C.Cir.1992); *Antolok v. United States,*

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ACLU - Hamdan-159

350 F.Supp.2d 28
350 F.Supp.2d 28
(Cite as: 350 F.Supp.2d 28)

Page 33

873 F.2d 369, 381 (D.C.Cir.1989).

FN31. *See Committee of United States Citizens Living in Nicaragua v. Reagan,* 859 F.2d 929, 934-35 (D.C.Cir.1988); *see also Helms v. Sec'y of Treasury,* 721 F.Supp. 1354, 1359-60 (D.D.C.1989).

More to the point, however, respondents never offer any response to the reasoning of the decision itself. In particular, they do not explain why the act of state doctrine-a "prudential" rule of decision, *see Kirkpatrick,* 493 U.S. at 406, 110 S.Ct. 701; *Honduras Aircraft Registry, Ltd. v. Gov't of Honduras,* 129 F.3d 543, 550 (11th Cir.1997)-should be applied to deny a United States citizen any ability at all to challenge his incarceration allegedly at the behest of his own government. They certainly do not cite any decision by the Supreme Court or any court of appeals that has applied the doctrine in this manner.[FN32] In fact, inasmuch as the D.C. Circuit in *Ramirez de Arellano* held that the act of state doctrine has no bearing on a case involving the *property rights* of citizens, that reasoning can only apply with far greater force to a case implicating the *fundamental due process rights* of a citizen to be free from arbitrary and indefinite detention without charge at the direction of his own government. *See Immigration and Naturalization Service v. St. Cyr,* 533 U.S. 289, 301, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001) ("At its historical core, the writ of habeas corpus has served as a means of reviewing the legality of Executive detention, and it is in that context that its protections have been strongest").

FN32. Respondents place much reliance on a single district court decision in which the court found that the act of state doctrine foreclosed the habeas petition of a citizen who was arrested by Bolivian officials because jurisdiction would require a finding that the Bolivian government was a "puppet" of the United States. *See Duchow v. United States,* 1995 WL 425037, at *3 (E.D.La. July 19, 1995), *aff'd,* 114 F.3d

1181 (5th Cir.1997). This Court concludes that the act of state analysis in *Duchow* is inconsistent with the holding of the Supreme Court in *Kirkpatrick* and the guidance of the D.C. Circuit sitting *en banc* in *Ramirez de Arellano,* and therefore declines to follow it.

**B. Separation of Powers**

A similar analysis applies to petitioner's reliance on the separation of powers. The Supreme Court has instructed that matters "vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations ... are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." *Harisiades v. Shaughnessy,* 342 U.S. 580, 588-89, 72 S.Ct. 512, 96 L.Ed. 586 (1952). The authority of the executive in diplomatic relations with other countries is considerable, and it will cabin the Court's inquiry moving forward and counsel caution at every step. *See Holmes v. Laird,* 459 F.2d 1211, 1215 (D.C.Cir.1972) ("[T]he controlling considerations are the interacting interests of the United States and of foreign countries, and in assessing them we must move with the circumspection appropriate when a court is adjudicating issues inevitably entangled in the conduct of our international relations.") (quotation and alteration omitted)

[10] There is simply no authority or precedent, however, for respondents' suggestion that the executive's prerogative over foreign affairs can overwhelm to the point of extinction the basic constitutional *62 rights of citizens of the United States to freedom from unlawful detention by the executive. The competing interests of the executive to manage foreign affairs and the judiciary to protect the due process rights of citizens have never been resolved wholly in the executive's favor. *See, e.g., Hamdi,* 124 S.Ct. at 2650 ("[W]e have made clear that, unless Congress acts to suspend it, the Great Writ of habeas corpus allows the Judicial Branch to play a

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ACLU - Hamdan-160

350 F.Supp.2d 28
350 F.Supp.2d 28
(Cite as: 350 F.Supp.2d 28)

Page 34

necessary role in maintaining this delicate balance of governance, serving as an important judicial check on the Executive's discretion in the realm of detentions."); *Committee of United States Citizens,* 859 F.2d at 935 (" '[T]he Executive's power to conduct foreign relations free from the unwarranted supervision of the Judiciary cannot give the Executive *carte blanche* to trample the most fundamental liberty and property rights of this country's citizenry.' ") (quoting *Ramirez de Arellano,* 745 F.2d at 1515). Instead, "individual rights are protected carefully, although within a framework that takes account of the broad substantive powers of other branches." 13A Wright, Miller & Cooper, *Federal Practice and Procedure* § 3534.2 at 504 (2d ed. 1984 & Supp.2004) ("[R]espect for the political branches affects, but does not preclude, decision on the merits.").[FN33]

> FN33. Significantly, the United States does not claim that its alleged actions against Abu Ali can be justified under the President's war powers. The United States has confined its separation of powers argument to the contention that the involvement of the judiciary infringes on the power of the executive to manage the "bilateral relationship" between the United States and Saudi Arabia. *See* Resp'ts' Resp. Mot. Prelim. Inj. at 30.

The reasoning of the D.C. Circuit in *Ramirez de Arellano* is again instructive. The court explained that the plaintiffs sought "adjudication of the narrow issue whether the United States defendants may run military exercises throughout the plaintiff's private pastures when their land has not been lawfully expropriated." 745 F.2d at 1500. The plaintiffs did not, the court emphasized, "challenge the United States military presence in Honduras or in Central America, nor do they object to United States sponsorship of a Regional Military Training Center in Honduras." Instead, the claim was "narrowly focused on the lawfulness" of the defendants' alleged occupation of their ranch. *Id.* at

1512.

As the D.C. Circuit explained it, this is a "paradigmatic issue for resolution by the Judiciary. The federal courts historically have resolved disputes over land, even when the United States military is occupying the property at issue." *Id.* More broadly, the court explained:

> While separation of powers concerns may outweigh judicial adjudication in the typical case involving a foreign act of state, the prudential balance may shift decidedly when United States citizens assert constitutional violations by United States officials. A balancing of the roles of the Executive and the Judiciary may produce a different outcome in those cases in which the Judiciary is called upon to curb unconstitutional excesses of *its own* Executive Branch.

*Id.* (emphasis in original). Of course, the alleged "excesses" are even greater here than they were in *Ramirez de Arellano.*

Respondents' reliance on the act of state and separation of powers doctrines would conceivably have greater force were it not for the fact that the inquiry to be undertaken here-a determination of the relative involvement of the United States and Saudi Arabia in the detention of a United States citizen-is precisely the inquiry that federal courts conduct in any criminal case where a defendant alleges that evidence *63 the United States intends to use against him was obtained by foreign governments at the behest of the United States in violation of his constitutional rights. *See Karake,* 281 F.Supp.2d at 308 ("A defendant may move to suppress statements made to agents of foreign governments when the conduct of foreign law enforcement officials renders them agents, or virtual agents, of United States officials."); *United States v. Yousef,* 327 F.3d 56, 145 (2d Cir.2003) ("statements elicited during overseas interrogation by foreign police in the absence of *Miranda* warnings must be suppressed whenever United States law enforcement agents actively participate in questioning conducted

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ACLU - Hamdan-161

350 F.Supp.2d 28
350 F.Supp.2d 28
(Cite as: 350 F.Supp.2d 28)

Page 35

by foreign authorities").

To take one example, Judge Huvelle of this Court only a year ago held in *Karake* that the defendants in the case were "entitled to evidence that may demonstrate cooperation between the United States and Rwandan governments sufficient to reveal an agency relationship so that they can, if appropriate, raise constitutional challenges." 281 F.Supp.2d at 309. She therefore ordered that the

government must disclose any evidence it has, or can obtain by good faith efforts, that Rwandan officials or any other foreign officials were operating as agents of the United States government, including but not limited to information that defendants were held at U.S. officials' request or were questioned at U.S. officials' direction.

*Id.* at 308-09; *see also, e.g., Yousef,* 327 F.3d at 123 (describing the disclosure of evidence and the "thorough suppression hearing" concerning whether the United States "participated in or condoned Murad's incarceration in the Philippines and the alleged torture that occurred there"). The inquiry undertaken in *Karake* and similar cases is not even unique to the suppression context. A similar inquiry is conducted in criminal cases where the defendant alleges that the district court lacks jurisdiction because he was brought into the jurisdiction of the court through abduction or torture (often allegedly by foreign officials at the direction of United States officials),[FN34] and in civil cases where United States citizens overseas challenge the alleged joint involvement of the United States and a foreign government in an ongoing violation of the citizens' constitutional rights that falls short of outright detention.[FN35]

> FN34. *See United States v. Toscanino,* 500 F.2d 267, 281 (2d Cir.1974) (remanding to district court to hold an evidentiary hearing with respect to defendant's allegations of forcible abduction at hands of foreign officials allegedly at the behest of United States officials if defendant is able to

"offer[ ] some credible supporting evidence ... that the action was taken by or at the direction of United States officials"); *Yousef,* 327 F.3d at 138 (considering and rejecting defendant's offering under *Toscanino* ); *United States v. Lambros,* 65 F.3d 698, 701 (8th Cir.1995) (district court should make specific factual finding under *Toscanino* with regard to the alleged United States involvement in abduction of defendant by foreign officials); *United States v. Orsini,* 402 F.Supp. 1218 (E.D.N.Y.1975) (holding hearing under *Toscanino* to consider defendant's sworn affidavit "setting forth ... allegations of acts of torture, brutality, and inhumanity committed against him by or at the direction of American Agents").

> FN35. *See Berlin Democratic Club,* 410 F.Supp. at 147 (holding, in case where United States citizens in Germany challenged the alleged involvement of the United States Army in inducing German authorities to wiretap them in violation of their constitutional rights, that plaintiffs were "entitled to discovery of facts which would demonstrate that the FRG simply carries out the suggestions of the United States Army without meaningful review").

The United States argues strenuously that *any* discovery in this case would "not possibly constitute a proper subject" of *64 discovery and would involve the courts "in matters of the most delicate diplomacy," Resp. Show Cause at 19-20, but as *Karake* indicates, these are not inquiries that are unusual for the courts. As indicated earlier, the Court will proceed forward with care. *See* 13A Wright et al., *supra,* § 3534.2 at 504; *see also Flynn v. Shultz,* 748 F.2d 1186, 1191 (7th Cir.1984) ("It is clear, therefore, that it is proper for this Court to consider whether the defendant's policies or actions violate the Constitution. Our review, however, must proceed fully cognizant of the

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ACLU - Hamdan-162

350 F.Supp.2d 28
350 F.Supp.2d 28
(Cite as: 350 F.Supp.2d 28)

Page 36

constitutionally committed powers of the executive in the area of foreign affairs."); *United States v. Angulo-Hurtado,* 165 F.Supp.2d 1363, 1371 (N.D.Ga.2001) ("The 'joint venture' doctrine is a purposefully limited exception, and this Circuit accordingly has set a high threshold for a defendant to invoke it."). The deference due the executive in the management of foreign relations will limit any discovery that will occur and will narrow the Court's inquiry.[FN36] The separation of powers cannot eliminate entirely, however, the right of a citizen to challenge his allegedly unlawful detention at the direction of the executive.

> FN36. In particular, act of state and separation of powers considerations may bear strongly on the nature of the relief that petitioners will be able to obtain in this ac- tion.

**C. Political Question**

[11][12] Finally, respondents invoke the closely related political question doctrine. "The political question doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n v. Am. Cetacean Soc.,* 478 U.S. 221, 230, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986). The argument respondents raise is essentially the same as their separation of powers argument, and it is met with the same answer. As one treatise explains, "the pervasive influence of political question doctrine in fields touching on foreign affairs has not led courts to surrender their power to protect individuals against government action. To the contrary, individual rights are protected carefully, although within a framework that takes account of the broad substantive powers of other branches." 13A Wright et al., *supra,* § 3534.2 at 504.

Respondents cite to cases in which courts have held that there is no role for the judiciary in ordering the

executive to take steps to obtain an accounting from Vietnam of the status of United States veterans of the Vietnam War, *see Smith v. Reagan,* 844 F.2d 195, 197 (4th Cir.1988), or in ordering the United States to demand the release of an American convicted in Mexico, *Flynn,* 748 F.2d at 1186. These are cases, however, where the plaintiffs argued that the United States was obliged under the Hostage Act to intercede on behalf of citizens who allegedly were being detained unlawfully at the hands of a foreign government. The courts concluded that the Hostage Act did not contain cognizable standards, and that the other various forms of relief sought were free-floating, without any manageable standards at all.

This case is far different. Here, petitioners challenge not the failure of the United States to act on behalf of a citizen in accordance with certain claimed statutory duties, but the United States' alleged actions against a citizen in violation of certain constitutional duties. In this setting, even these cases hold, the political question doctrine wanes. *See, e.g., Smith,* 844 F.2d at 198 ("Not every suit that touches on foreign relations is beyond judicial cognizance. A cause of action under the Hostage Act, however, would inescapably*65 involve courts in matters of the most delicate diplomacy."); *Flynn,* 748 F.2d at 1191 (an "area concerning foreign affairs that has been uniformly found appropriate for judicial review is the protection of individual or constitutional rights from government action"; this "protection of the individual unquestionably extends to cases involving United States Government action taken against our own citizens abroad").

The charge advanced by the plaintiffs in *Smith* and *Flynn* was that "a foreign government ha[d] 'unjustly deprived' an American citizen of liberty" and that the United States was obliged to take a vaguely defined role in obtaining his release. *Smith,* 844 F.2d at 198. The claim here, on the other hand, is that the United States has unjustly deprived an American citizen of liberty through acts it

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ACLU - Hamdan-163

has already taken, precisely what courts are accustomed to assessing. Although both situations involve the detention of United States citizens overseas, that is where the similarities end. *See Baker v. Carr,* 369 U.S. 186, 211, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) (court must undertake a "discriminating inquiry into the precise facts and posture" of each case; "it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance").

At any rate, the D.C. Circuit has left little doubt that the political question doctrine will not trump the due process rights that lie at the heart of this dispute. *See Committee of United States Citizens,* 859 F.2d at 934-35 (holding that claims of United States citizens living in Nicaragua that funding of the Nicaraguan contras by the United States unconstitutionally deprived them of liberty and property without due process of law "are serious allegations and not ones to be dismissed as nonjusticiable") (quotation omitted); *Ramirez de Arellano,* 745 F.2d at 1515 (rejecting political question defense where property rights of United States citizen are directly implicated because the "Executive's power to conduct foreign relations" cannot give the Executive "*carte blanche* to trample the most fundamental liberty and property rights of this country's citizenry").

Hence, once again, although this case will proceed in the shadow of the political question doctrine, the right of Abu Ali to challenge his alleged detention at the behest of the executive will not be eliminated altogether by the doctrine. Instead, bearing respondents' concerns founded in the principles of the political question, separation of powers, and act of state doctrines firmly in mind, the Court will carefully construct the future course of this proceeding.

**V. Writ of Mandamus**

Petitioners also request that the Court issue a writ of mandamus under 28 U.S.C. § 1361. *See* Pet'rs' Reply Br. to Habeas Petition ¶¶ 21-22. Section

1361 provides that the "district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." Courts interpreting section 1361 have held that a writ of mandamus may issue only where "the duty to be performed is ministerial and the obligation to act peremptory, and clearly defined. The law must not only authorize the demanded action, but require it; the duty must be clear and undisputable." *Shoshone Bannock Tribes v. Reno,* 56 F.3d 1476, 1479 (D.C.Cir.1995) (quotation omitted).

[13] For the source of the duty that they maintain is owed to Abu Ali, petitioners look to 22 U.S.C. § 1732, known as the Hostage Act:

*66 Whenever it is made known to the President that any citizen of the United States has been unjustly deprived of his liberty by or under the authority of any foreign government, it shall be the duty of the President forthwith to demand of that government the reasons of such imprisonment; and if it appears to be wrongful and in violation of the rights of American citizenship, the President shall forthwith demand the release of such citizen, and if the release so demanded is unreasonably delayed or refused, the President shall use such means, not amounting to acts of war and not otherwise prohibited by law, as he may think necessary and proper to obtain or effectuate the release; and all the facts and proceedings relative thereto shall as soon as practicable be communicated by the President to Congress.

22 U.S.C. § 1732. Petitioners argue that the Act gives rise to a mandatory duty on the part of the President to demand the Saudi Government to release Abu Ali.

The Court cannot agree that the Act creates any duty enforceable by a writ of mandamus. The operation of the statute depends on it being "made known to the President" that a citizen was "unjustly deprived" of his liberty. Once the President makes

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ACLU - Hamdan-164

350 F.Supp.2d 28
350 F.Supp.2d 28
(Cite as: 350 F.Supp.2d 28)

Page 38

this determination, the statute provides that the President can demand the release of a citizen "if it appears to be wrongful"; he can use means "as he may think necessary" to obtain the release "if the release so demanded is unreasonably delayed or refused"; and all of this information "as soon as practicable" shall be communicated by the President to Congress. None of this can be regarded as ministerial. The statute is run through with discretion, starting at the very outset with the "unjustly deprived" determination on which all of the other provisions are conditioned.

Every court to consider the statute has reached the same conclusion. *See Smith,* 844 F.2d at 199-200 ("The Act's vagueness suggests that Congress intended the President to exercise broad discretion, and intended to foreclose traditional judicial review in this area.") (quotation omitted); *Flynn,* 748 F.2d at 1193 ("Not only would it be inappropriate for us to scrutinize the defendant under such a vague and subjective standard, but the vagueness of the term itself indicates to us that ... Congress seems to have contemplated that the President would make a subjective judgment."); *Redpath v. Kissinger,* 415 F.Supp. 566, 569 (W.D.Tex.1976) ("The official actions sought are not ministerial, are clearly of a diplomatic nature involving the exercise of discretion by the Executive, or under his direction."). Petitioners thus cannot look to the Hostage Act for any affirmative duty of the respondents to assist Abu Ali that is enforceable by the judiciary. *See Smith,* 844 F.2d at 199 ("Accountability lies in oversight by Congress or in criticism from the electorate, but not in the judgments of the courts. The Hostage Act sets the terms of political debate, not the standards of adjudication. The adversary process here is more political than litigious.").[FN37]

> FN37. The Court is aware that *Flynn,* after concluding that the "unjustly deprived" determination is a subjective judgment committed to the President, and that the executive therefore bore no judicially reviewable duty under the statute to take steps to

obtain the release of a citizen detained overseas, nonetheless went on to suggest that the Act "placed a judicially enforceable duty on the Executive to inquire into the circumstances of an American citizen's extended detention abroad." *Flynn,* 748 F.2d at 1195. This Court believes that this is a misreading of the statute. As *Flynn* held, and this Court agrees, the determination of "unjustly deprived" is committed to the executive. *See id.* at 1194 ("any duty under § 1732 is contingent upon the preliminary determination of 'unjustly deprived' since this Court cannot make that determination itself"). There is no basis for the Court to issue a writ of mandamus for any duty that is conditioned on that determination, including the duty of inquiry.

\*67 One would hope that either independent from or because of the Hostage Act the United States would make reasonable inquiry of a foreign government as to the reasons for the imprisonment of a United States citizen, and take any appropriate diplomatic follow-up to the response obtained. Indeed, it may be that such events have transpired here. But the question before the Court is not whether such diplomatic inquiries and actions are wise or appropriate, but whether they are clearly and indisputably compelled by the Act. The Court concludes that no such enforceable duty is created by the statute.

## VI. Jurisdictional Discovery

Petitioners have not only alleged, but have presented some unrebutted evidence, that Abu Ali's detention is at the behest and ongoing direction of United States officials. Specifically, petitioners have alleged and introduced at least some evidence suggesting that (i) the United States initiated the arrest of Abu Ali in Saudi Arabia; (ii) the United States has interrogated Abu Ali in Saudi Arabia; (iii) the United States is controlling events in Saudi Arabia; (iv) the United States is keeping Abu Ali in Saudi Arabia to avoid constitutional scrutiny by American

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ACLU - Hamdan-165

ACLU - Hamdan-166

350 F.Supp.2d 28                                                Page 39
350 F.Supp.2d 28
(Cite as: 350 F.Supp.2d 28)

courts; (v) Saudi Arabia would immediately release Abu Ali to United States officials upon a request by the United States government; and (vi) Abu Ali has been subjected to torture with the knowledge of the United States.

The evidence that petitioners have supplied to the Court to date can be characterized as considerable in light of the unavailability of Abu Ali himself, and the location of most of the remainder of the information regarding Abu Ali's detention in the hands of the United States or the Saudi governments. Petitioners have filed affidavits in which they relate their conversations with several named United States officials, copy verbatim cables and emails that have been shown to them, and describe in detail the extrinsic evidence of the nature of Abu Ali's detention (including newspaper articles in which reporters queried Saudi officials), their conversations with Abu Ali and Saudi officials, and information they have received from their political representatives. This evidence stands unrebutted, as respondents have chosen not to engage petitioners on their factual contentions.

Still, some of the evidence petitioners identify in their affidavits is not sufficiently competent by itself to serve as the basis for a judicial determination of jurisdiction. For example, discussions with Saudi officials familiar with the case or eyewitnesses to Abu Ali's detention who not only fail to come forward with their own affidavits, but whom petitioners decline to name, are not particularly persuasive. Other evidence consists of the petitioners' accounts of things that were told to them by their attorneys (relating conversations those attorneys allegedly had with the government) or by defendants in the *Royer* case or by others; these individuals are as available to petitioners as they are to the United States, and petitioners would do well to obtain competent evidence from the individuals themselves. Petitioners' documentation also occasionally refers to letters or other materials that should, by the account of petitioners, be in their possession, but that they have not submitted to the Court.

*68 Nonetheless, much of the strongest evidence submitted by petitioners consists of conversations they and their supporters claim to have had with various agents of the United States. Petitioners have identified in their papers specific individuals-members of the Federal Bureau of Investigation, the State Department, the United States Attorney's Office, and others-whom petitioners say communicated information that is directly relevant to the question of the involvement of the United States in Abu Ali's detention. These individuals are United States officials under the control of respondents who can speak to the specific question of the involvement of the United States in the detention without injecting this Court into discovery from Saudi officials. As indicated earlier, although the discovery will be limited by considerations of the separation of powers, the legal questions at issue in this case and the discovery they necessitate are not unique, or even uncommon, for the federal judiciary.

The evidence in the record at this stage certainly is not sufficient for this Court to deny habeas jurisdiction, but neither is it sufficient conclusively to find habeas jurisdiction in the circumstances of this case. The jurisdiction of this Court requires a finding that Abu Ali is in the actual or constructive custody of the United States. The case law indicates that this inquiry will entail a consideration of several factors, including whether: (i) Abu Ali was detained at the behest of United States officials [FN38]; (ii) his ongoing detention is at the direction of the United States enlisting a foreign state as an agent or intermediary who is indifferent to the detention of the prisoner [FN39]; (iii) he is being detained in the foreign state to deny him an opportunity to assert his rights in a United States tribunal [FN40]; and (iv) he would be released upon nothing more than a request by the United States.[FN41]

> FN38. *See, e.g., Jung Ah Lung,* 124 U.S. at 626, 8 S.Ct. 663; *Eisentrager,* 174 F.2d at 967; *Karake,* 281 F.Supp.2d at 308.

> FN39. *See, e.g., Braden,* 410 U.S. at 488,

b5 -1

350 F.Supp.2d 28
350 F.Supp.2d 28
(Cite as: 350 F.Supp.2d 28)

Page 40

93 S.Ct. 1123; *Steinberg,* 610 F.2d at 453; *Karake,* 281 F.Supp.2d at 308; *Berlin Democratic Club,* 410 F.Supp. at 147.

FN40. *See, e.g., Alabama Great Southern,* 200 U.S. at 218, 26 S.Ct. 161; *Johnson,* 339 U.S. at 795, 70 S.Ct. 936 (Black, J., dissenting); *Yousef,* 327 F.3d at 145-46.

FN41. *See, e.g.,* 28 U.S.C. § 2243 ("[T]he person to whom the writ is directed shall be required to produce at the hearing the body of the person detained.").

Any one of these factors may not be sufficient to establish jurisdiction. *Cf. Yousef,* 327 F.3d at 146 ("[E]vidence that the United States may have solicited the assistance of a foreign government in the arrest of a fugitive within its border is insufficient ... to constitute United States participation under the joint venture doctrine."); *Keefe,* 222 F.2d at 392 (allegation that United States officials did not intervene to "prevent[ ] the French from taking, trying, convicting and confining him" is insufficient to establish actual or constructive custody). Where all of these factors are present, however, it blinks reality to conclude that the detainee is anything other than in the custody of the United States for purposes of habeas jurisdiction.[FN42]

FN42. The Court does not mean to imply that it has set out a comprehensive list of the factors that are relevant to the inquiry. For instance, the presence of a formal relationship between the countries that governs the detention, in the nature of a treaty or otherwise, may bear on the jurisdictional question.

The evidence that petitioners have supplied is considerable in the absence of discovery, and speaks to each of these points. *69 What is more, with a single narrow exception,[FN43] the United States has not offered evidence to rebut any of the information supplied and inferences reasonably raised by petitioners, even though such evidence is in many in-

stances directly in its control. Most important, if the facts alleged in the Petition were shown to be true, there would be habeas jurisdiction in this matter. The Court will therefore authorize jurisdictional discovery in this case. This discovery will be expeditious but cautious, consistent with the substantial and delicate interests of foreign relations potentially involved. *See Phoenix Consulting,* 216 F.3d at 40 ("jurisdictional discovery" involving foreign sovereigns "should be carefully controlled and limited"); *Prakash v. American Univ.,* 727 F.2d 1174, 1179-80 (D.C.Cir.1984) (district court possesses "considerable latitude in devising the procedures it will follow to ferret out the facts pertinent to jurisdiction"). Nonetheless, petitioners will have an opportunity to establish the jurisdiction of this Court over their habeas petition and, if jurisdiction lies, to challenge the legality of Abu Ali's continuing detention through their petition for a writ of habeas corpus. An accompanying order initiates the process of defining the scope of that discovery.

FN43. The United States submitted evidence only on the issue of the timing of the information received by the State Department regarding alleged Saudi plans to charge Abu Ali.

***ORDER***

Upon consideration of petitioners' [1] Petition for Writ of Habeas Corpus, respondents' [14] Response to Order to Show Cause Supporting Dismissal of the Petition and Opposition to Petitioners' Motion to Compel Discovery and Production (treated herein as a "Motion to Dismiss"), the various memoranda of the parties and the entire record herein, and for the reasons explained in the accompanying Memorandum Opinion issued on this date, it is this 16th day of December, 2004, hereby

ORDERED that respondents' Motion to Dismiss is DENIED; and it is further

ORDERED that the parties shall meet and discuss

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ACLU - Hamdan-167

350 F.Supp.2d 28
350 F.Supp.2d 28
(Cite as: 350 F.Supp.2d 28)

Page 41

the scope and process of jurisdictional discovery and submit a proposed order (or orders) governing jurisdictional discovery by not later than January 10, 2005; and it is further

ORDERED that a status conference is scheduled for January 13, 2005, at 9:00 a.m.

D.D.C.,2004.
Abu Ali v. Ashcroft
350 F.Supp.2d 28

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ACLU - Hamdan-168

OPCA-20 (12-3-96)

XXXXXX
XXXXXX
XXXXXX

## FEDERAL BUREAU OF INVESTIGATION
## FOIA/PA DELETED PAGE INFORMATION SHEET

__2__      Page(s) withheld entirely at this location in the file.  One or more of the following statements, where indicated, explain this deletion.

⊠Deletions were made pursuant to the exemptions indicated below with no segregable material available for release to you.

|                  Section 552            |                   |  Section 552a  |
|-----------------|--------------------|----------------|
| ☐(b)(1)         | ☐(b)(7)(A)         | ☐(d)(5)        |
| ☐(b)(2)         | ☐(b)(7)(B)         | ☐(j)(2)        |
| ☐(b)(3)_____ | ☐(b)(7)(C)         | ☐(k)(1)        |
| _____  | ☐(b)(7)(D)         | ☐(k)(2)        |
| _____  | ☐(b)(7)(E)         | ☐(k)(3)        |
| _____  | ☐(b)(7)(F)         | ☐(k)(4)        |
| ☐(b)(4)         | ☐(b)(8)            | ☐(k)(5)        |
| ⊠(b)(5)-1       | ☐(b)(9)            | ☐(k)(6)        |
| ☐(b)(6)         |                    | ☐(k)(7)        |

☐  Information pertained only to a third party with no reference to the subject of your request or the subject of your request is listed in the title only.

☐  Document(s) originated with another Government agency(ies).  These documents were referred to that agency(ies) for review and direct response to you.

_____    Page(s) contain information furnished by another Government agency(ies).  You will be advised by the FBI as to the releasability of this information following our consultation with the other agency(ies).

_____    Page(s) withheld inasmuch as a final release determination has not been made.  You will be advised as to the disposition at a later date.

_____    Page(s) were not considered for release as they are duplicative of _____.

_____    Page(s) withheld for the following reason(s):_____

_____

_____

⊠ The following number(s) is (are) to be used for reference regarding these pages:

 FBI-ACLU-169-170 _____

XXXXXXXXXXXXXXXXXXX
X    Deleted Page(s)      X
X    No Duplication Fee   X
X    for this page        X
XXXXXXXXXXXXXXXXXXX

XXXXXX
XXXXXX

**(OGC) (FBI)**

| | |
|---|---|
| From: | (OGC) (FBI) |
| Sent: | Monday, March 23, 2009 2:14 PM |
| To: | (CTD) (FBI) (WF) (FBI) |
| | (CTD) (FBI); (OGC) (FBI); |
| | (OGC) (FBI); OGC) (FBI); (AD) (FBI) |
| Subject: | Naji Hamdan article in today's Post |

b6 -1
b7C -1

UNCLASSIFIED
NON-RECORD

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 03-07-2011 BY 65179/DMH/BAW/STP/bls

**American Muslim's Case Poses A Test**

U.S. Role Alleged In Detention In UAE

The Washiongton Post

By Karl Vick

March 23, 2009

LOS ANGELES, CA -- One day last July, Naji Hamdan was summoned to the U.S. Embassy in the United Arab Emirates.

He drove two hours through the desert heat from Dubai to answer questions from FBI agents who had arrived from Los Angeles, where Hamdan had gone to school, started a family, built a successful auto-parts business and become a U.S. citizen. At his apartment six weeks later, he was awakened from a nap by men who bundled him into a black Chevrolet Suburban with tinted windows. Hamdan was told he was a prisoner of the UAE and was held in a cell painted glossy white to reflect the lights that burned round the clock, according to a note he wrote from prison. Between interrogations, he wrote, he was confined in a frigid room overnight, strapped into "an electric chair" and punched in the head until he lost consciousness.

In one session, the blindfolded prisoner recalled hearing a voice that sounded American. The voice said, "Do what they want or these people will [expletive] you up," Hamdan wrote. The prisoner obliged, signing a confession that he later said meant only that he would do anything to make the pain stop. The case might have ended there but for Hamdan's U.S. citizenship and his American attorney's assertion that he was tortured "at the behest" of his own government. "This is torture by proxy," said Ahilan Arulanantham, an American Civil Liberties Union staff lawyer representing Hamdan through his brother and wife.

Noting that the UAE had shown no interest in Hamdan before arresting him, Arulanantham filed a habeas corpus petition in November in U.S. District Court in Washington. The petition alleges that the federal government used its influence to have Hamdan arrested and insists that it should use that influence to free him. The evidence of U.S. involvement is circumstantial and sometimes ambiguous. Arulanantham said the UAE prosecutor in the case traveled to the United States in February.

He said that a week after the habeas petition made public Hamdan's detention, custody was transferred to the UAE criminal justice system, where he faces nonspecific charges of "promoting terrorism." Justice Department lawyers say the transfer lines up with the expiration of a 90-day UAE limit on secret detention. The FBI issued a statement saying it does not ask other governments to arrest people on its behalf, but in court papers it stops short of denying the involvement of any U.S. agency in Hamdan's

1

detention. "In terrorism matters, we routinely work with foreign counterparts," Richard Kolko, a bureau spokesman, said in a statement.

The United Arab Emirates' embassy in Washington declined to comment "since this is a police-security matter, which involves a U.S. citizen," a spokeswoman said in an e-mail. In the long list of individuals accused, renditioned, arrested or otherwise detained since the Sept. 11, 2001, attacks, the Hamdan case stands out. Three Americans are known to have been arrested by foreign governments at the apparent direction of U.S. authorities, each amid circumstances more suspicious than those surrounding Hamdan. In 2007, Kenyan authorities detained Amir Meshal of Tinton, N.J., and Daniel Joseph Maldonado of Houston after they were captured among Islamist fighters fleeing a U.S.-backed offensive in Somalia.

And Saudi Arabian security officers provided the bulk of the evidence against Ahmed Omar Abu Ali, a Falls Church man convicted in 2005 of plotting with al-Qaeda. Though the events detailed by Hamdan's attorney occurred before President Obama was sworn in, human rights groups and others said they will monitor his response. Obama has declared that "the United States will not torture," and CIA Director Leon Panetta said in his confirmation hearings that the United States will not turn over suspects to governments that will abuse them.

Deborah Manning, an attorney for Alkarama, a human rights organization focused on the Middle East, said the case "bridges the practices of the past, and we hope we're in a new era, but this is a litmus test." The torture accusations are from Hamdan's accounts to relatives and a handwritten eight-page note carried out of Abu Dhabi's Al Wathba prison by a U.S. diplomat required to check on the suspect's welfare. After being beaten on the soles of his feet and kicked in the liver, Hamdan said, "I admitted to whatever they asked."

"Sometimes when he talks to me, he's crying," said Mona Mallouk, his wife, by phone from Beirut, where she went after the arrest with their two children, born in Los Angeles. "When they beat him hard . . . his voice changed. I said 'Naji? Are you okay?' He said, 'No, I'm not okay. They hit me, badly. I don't know why, Mona.' " Hamdan's family and associates said they are perplexed by the FBI's interest. The businessman was known to be religious, but in the mainstream vein of fellow Muslim students who set aside a dorm room as a mosque at Northrop-Rice University, where Hamdan studied aviation engineering in the 1980s. After the worship space moved to downtown Hawthorne, Hamdan often presided during the holy month of Ramadan.

The FBI knocked on Hamdan's door in December 1999, when several other local Muslims were approached after the discovery of the "millennium plot" targeting Los Angeles International Airport. After Sept. 11, 2001, official attention became more routine, often in airport security lines. "We get used to it," said Hossam Hemdan, Hamdan's brother, who runs a smog-inspection shop. "They always, always, always ask the same questions: How long you been living here? What's your business? What's the phone number?" Hemdan said that as many as three Crown Victorias began following his brother in 2006.

Jehad Suleman, a friend and business associate of Hamdan's in Los Angeles, said it was around that time when his own airport interrogators began asking him about Hamdan. No one claims to know why. The ACLU encouraged Muslim residents to request their FBI files, and Hamdan was surprised to find that the agency had started his file in the mid-1990s, his relatives said. The attention on Hamdan came from several directions. FBI agents visited his business, jotting down serial numbers on an acre of car parts. The IRS audited him twice. Hamdan, 42, chafed at the surveillance, so conspicuous that the imam at the Hawthorne mosque asked him to keep his distance.

But confidants said his decision to return to the Middle East was equally grounded in unease with Hawthorne's schools, where gangs and drugs remain problems. In August 2006, Hamdan moved the family to Dubai. At the Los Angeles airport, he was questioned for so long that he missed his flight. When

he returned in 2007 for a visit, the FBI surveillance was continuous, associates said. Things were not going smoothly abroad, either. In early 2008, while waiting for a flight in Beirut, Hamdan was arrested and interrogated for four days by Lebanese authorities. Hamden said a lawyer the family later hired to examine the court file said his detention was at the request of "outside influences."

Last July, FBI agents passed a request to Hamdan to report to the embassy in Abu Dhabi, the UAE capital, then flew there to question him. "What did they want?" his brother recalled asking Hamdan, who he said replied: " 'Whatever they ask at the airport, same thing. You can't imagine how much they know about us. If you ever forget something in your life, a certain spot, call them. They'll tell you.' " Six weeks later, the security police took him away, then returned to carry away all things electronic. In Los Angeles, Hamdan's banker, Dan Suie, of the Asian Pacific Revolving Loan Fund, said an FBI agent delivered a subpoena in early January.

The bureau wanted paperwork on loans for Hamdan's business, records the banker said contained nothing suspicious. "I deal with people who, you know, shake their hands and count your fingers," Suie said. "But [Hamdan] was a very decent person, a very nice guy." The mosque has mounted a campaign demanding Hamdan's return to the United States to face whatever charges he is suspected of.

Classified Litigation Support Unit
National Security Law Branch
Office of the General Counsel

b6 -1
b7C -1

THIS IS A PRIVILEGED ATTORNEY-CLIENT WORK PRODUCT/COMMUNICATION AND IS NOT TO BE DISTRIBUTED OUTSIDE OF OGC WITHOUT PRIOR APPROVAL

UNCLASSIFIED

ACLU - Hamdan-173

SECRET

OGC) (FBI)                              (S)

b1
b5 -2
b6 -1
b7C -1

**From:**                    AD) (FBI)
**Sent:** Saturday, January 03, 2009 11:55 PM
**To:**                    (OGC) (FBI)
**Subject:** RE: Naji Hamdan habeas corpus petition

(S)

SECRET
RECORD 315

Can we talk sometime?

**From:**                    (OGC) (FBI)
**Sent:** Wednesday, December 31, 2008 7:55 PM
**To:**                    (AD) (FBI)          (SU) (FBI)
**Cc:**                    (OGC) (FBI)          (OGC) (FBI)          (OGC) (FBI)
        (OGC) (FBI)          (CTD) (FBI);          (CTD) (FBI)          (OGC) (FBI)
**Subject:** Naji Hamdan habeas corpus petition

SECRET//ORCON,NOFORN
RECORD xxx

Hi

b5 -2
b6 -1
b7C -1

b5 -2
b6 -1
b7C -1

b1

(S)

b5 -2
b6 -1
b7C -1

DATE: 03-08-2011
CLASSIFIED BY 65179/DMH/BAW/STP/b1s
REASON: 1.4 (c,d)
DECLASSIFY ON: 03-08-2036

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED EXCEPT
WHERE SHOWN OTHERWISE

OPCA-20 (12-3-96)

XXXXXX
XXXXXX
XXXXXX

# FEDERAL BUREAU OF INVESTIGATION
## FOIA/PA DELETED PAGE INFORMATION SHEET

___1___   Page(s) withheld entirely at this location in the file.  One or more of the following statements, where indicated, explain this deletion.

⊠Deletions were made pursuant to the exemptions indicated below with no segregable material available for release to you.

|  Section 552 | | Section 552a |
|---|---|---|
| ⊠(b)(1) | ☐(b)(7)(A) | ☐(d)(5) |
| ☐(b)(2) | ☐(b)(7)(B) | ☐(j)(2) |
| ☐(b)(3)_____ | ☐(b)(7)(C) | ☐(k)(1) |
| _____ | ☐(b)(7)(D) | ☐(k)(2) |
| _____ | ☐(b)(7)(E) | ☐(k)(3) |
| _____ | ☐(b)(7)(F) | ☐(k)(4) |
| ☐(b)(4) | ☐(b)(8) | ☐(k)(5) |
| ☐(b)(5) | ☐(b)(9) | ☐(k)(6) |
| ☐(b)(6) | | ☐(k)(7) |

☐  Information pertained only to a third party with no reference to the subject of your request or the subject of your request is listed in the title only.

☐  Document(s) originated with another Government agency(ies).  These documents were referred to that agency(ies) for review and direct response to you.

_____   Page(s) contain information furnished by another Government agency(ies).  You will be advised by the FBI as to the releasability of this information following our consultation with the other agency(ies).

_____   Page(s) withheld inasmuch as a final release determination has not been made.  You will be advised as to the disposition at a later date.

_____   Page(s) were not considered for release as they are duplicative of _____.

_____   Page(s) withheld for the following reason(s):_____

_____

_____

⊠ The following number(s) is (are) to be used for reference regarding these pages:

FBI-ACLU-175 _____

XXXXXXXXXXXXXXXXXX
X    Deleted Page(s)    X
X    No Duplication Fee   X
X       for this page       X
XXXXXXXXXXXXXXXXXX

XXXXXX
XXXXXX

SECRET

Thanks,

Classified Litigation Support Unit
National Security Law Branch
Office of the General Counsel

THIS IS A PRIVILEGED ATTORNEY-CLIENT WORK PRODUCT/COMMUNICATION AND IS NOT TO BE DISTRIBUTED OUTSIDE OF OGC
WITHOUT PRIOR APPROVAL

# ACLU Suing To Free U.S. Citizen

Contracostatimes.com

10:54:25 PM PST

By Denise Nix

November 18, 2008

b5 -2
b6 -1
b7C -1

## WASHINGTON, DC -- An American citizen who helped manage the Islamic Center in Hawthorne is in custody overseas, possibly for alleged terrorist activity, and the ACLU is expected to sue today to force his release.

**Auto parts dealer Naji Hamdan, 42, was arrested Aug. 29 by security agents for the United Arab Emirates, who were working under the direction of the U.S. government, according to the American Civil Liberties Union of Southern California. A lawsuit expected to be filed today in Washington, D.C., by the ACLU claims that, because Hamdan is a U.S. citizen in U.S. custody and has not been charged with any crimes, he must be released. The federal suit, which names President George W. Bush, Attorney General Michael Mukasey and FBI Director Robert Mueller as defendants, claims U.S. officials are ignoring the Constitution by continuing Hamdan's detention and not allowing him to contact a lawyer or his family.**

**"United States government officials cannot escape the requirement of the Constitution by asking a foreign government to detain an American whom they couldn't arrest themselves," said Ahilan Arulanantham, director of immigrants' rights and national security for the ACLU of Southern California. "If our government thinks an American has done something wrong, it has to charge him with it or allow him to go free," Arulanantham added. Special Agent Richard Kolko at FBI headquarters in Washington said in a statement that the agency does not generally confirm details of ongoing investigations. However, he added: "In terrorism matters, we routinely work with foreign counterparts and, in some cases with the permission of the host government, FBI agents have been permitted to interview people who may possess relevant information.**

**"Being interviewed by the FBI does not mean the person is in U.S. custody," the**

2



SECRET

ACLU - Hamdan-176

**SECRET**

statement added. "When the FBI conducts these interviews, we adhere to the Constitution, U.S. laws, the attorney general guidelines and FBI policies." The statement said the FBI does not ask foreign nations to detain U.S. citizens at the government's behest in order to circumvent the citizens' rights. He referred questions about U.S. citizens in custody by foreign nations to the U.S. State Department. Joanne Moore, a State Department spokeswoman, said the agency is aware of the detention of a U.S. citizen in the U.A.E. and that a member of the U.S. consulate there met with him on Oct. 19. However, she could not comment further because of privacy issues.

The consulate official, though, told Hamdan's family that Hamdan told him he was being questioned by his captors daily, according to the ACLU. The official said he did not know who was responsible for Hamdan's detention or why he was being held. Hamdan was born in Lebanon but lived for two decades in the Hawthorne area, beginning in the early 1980s. He established and still owns an auto parts business there. He became a U.S. citizen several years after arriving in the United States. In 2006, he decided to relocate his family and business to the U.A.E. However, when he and his family tried to board their flight at Los Angeles International Airport, he was separated, detained and questioned for hours, according to the ACLU. He eventually was released and allowed to travel. Hamdan and his family established themselves in the U.A.E., but decided to move to Lebanon to escape the difficult weather there.

Hamdan split his time between his business in the U.A.E. and family in Lebanon, which included his wife and children, who are now 16, 8 and 2. However, when he returned to the South Bay a year later to check on his business, he was put under surveillance by FBI agents, the ACLU claims. Hamdan continued to have problems with the authorities after his return to the Middle East. At one point, he was detained in Beirut on a return trip to Lebanon from the U.A.E., during which he was hit during several days of interrogation and his eldest son was detained as well, according to the ACLU. At the same time, Hamdan's associates and family members in the U.S. were being questioned by agents.

During the summer, FBI agents traveled to the U.A.E. to question Hamdan. He was arrested three weeks later by U.A.E. security agents, the ACLU says. "I am so scared for my husband," said Hamdan's wife, Mona Mallouk, who is staying with relatives in Lebanon. "We are Americans, but the U.S. government won't tell us why he is arrested and when he will be released." Mallouk and Hamdan's brother, Hossam Hemdan, said Hamdan is a good, peaceful person who would not be involved in terrorism. However, Hemdan, a Hawthorne resident and U.S. citizen who is dating a sheriff's deputy, said he helped arrange the meeting between his brother and the agents at the U.S. Embassy in Abu Dhabi, according to an affidavit that will be submitted with the lawsuit.

Afterward, Hamdan declined to discuss the meeting with his brother, except to say that he was disturbed by the interrogation and that the FBI knew things about him "that you wouldn't believe," his brother said. According to his brother, Hamdan came to the United States to attend Northrop University in Inglewood. He started his auto parts business, Hapimotors, which he still owns. Hamdan decided to leave the United States because he

3

ACLU - Hamdan-177

**SECRET**

SECRET

was worried about his children, especially his teenage son, and their exposure to such things as gangs and drugs in the Hawthorne schools, according to his brother. Before he left the U.S. in 2006, Hamdan traveled a lot for business, but also for religious purposes, including an Islamic pilgrimage to Saudi Arabia with his parents, his brother said.

Hamdan is very religious, and sometimes led prayers at the mosque in Hawthorne, where he also served on the board. Ahmed Azam, Hamdan's friend from the Islamic Center, said Hamdan is a well- respected member of the community and a caring family man. "He would never promote violence or do anything to harm America," Azam said. "This is a terrible mistake." It seemed government officials had their eye on Hamdan as early as 1999. In a Los Angeles Times article published Jan. 10, 2000, Hamdan said FBI agents knocked on the door of his Hawthorne apartment a couple of weeks before to ask if he knew Osama bin Laden.

The inquiry came almost two years before bin Laden's terrorist group, al-Qaida, claimed responsibility for the 9-11 bombings, and just days after an Algerian man was arrested near Seattle for trying cross the border with explosives in his car. Arulanantham said Hamdan's case brings up issues about a disturbing U.S. government practice of disregarding the constitutional rights of citizens by having overseas governments make their arrests. "That the government has done this to a U.S. citizen using a country that has a record of torturing prisoners, as the U.A.E. does, is particularly frightening," Arulanantham added.

DERIVED FROM: Multiple Sources
DECLASSIFY ON: 20331230
SECRET//ORCON,NOFORN

DERIVED FROM: G-3 FBI Classification Guide G-3, dated 1/97, Foreign Counterintelligence Investigations
DECLASSIFY ON: 20340104
SECRET

ACLU - Hamdan-178

4



SECRET

OPCA-20 (12-3-96)

XXXXXX
XXXXXX
XXXXXX

### FEDERAL BUREAU OF INVESTIGATION
### FOIA/PA DELETED PAGE INFORMATION SHEET

___1___    Page(s) withheld entirely at this location in the file.  One or more of the following statements, where indicated, explain this deletion.

☒Deletions were made pursuant to the exemptions indicated below with no segregable material available for release to you.

| Section 552 | | Section 552a |
|---|---|---|
| ☐(b)(1) | ☐(b)(7)(A) | ☐(d)(5) |
| ☐(b)(2) | ☐(b)(7)(B) | ☐(j)(2) |
| ☐(b)(3)_____ | ☐(b)(7)(C) | ☐(k)(1) |
| _____ | ☐(b)(7)(D) | ☐(k)(2) |
| _____ | ☐(b)(7)(E) | ☐(k)(3) |
| _____ | ☐(b)(7)(F) | ☐(k)(4) |
| ☐(b)(4) | ☐(b)(8) | ☐(k)(5) |
| ☒(b)(5)-1,2 | ☐(b)(9) | ☐(k)(6) |
| ☐(b)(6) | | ☐(k)(7) |

☐   Information pertained only to a third party with no reference to the subject of your request or the subject of your request is listed in the title only.

☐   Document(s) originated with another Government agency(ies).  These documents were referred to that agency(ies) for review and direct response to you.

_____    Page(s) contain information furnished by another Government agency(ies).  You will be advised by the FBI as to the releasability of this information following our consultation with the other agency(ies).

_____    Page(s) withheld inasmuch as a final release determination has not been made.  You will be advised as to the disposition at a later date.

_____    Page(s) were not considered for release as they are duplicative of _____.

_____    Page(s) withheld for the following reason(s):_____

_____

_____

☒ The following number(s) is (are) to be used for reference regarding these pages:

FBI-ACLU-179 _____

XXXXXXXXXXXXXXXXXXX
X     Deleted Page(s)        X
X     No Duplication Fee     X
X     for this page          X
XXXXXXXXXXXXXXXXXXX

XXXXXX
XXXXXX

TRY    to

RE-ESTABLISH   BRIDGE

AGAIN?

ACLU - Hamdan-180

OPCA-20 (12-3-96)

XXXXXX
XXXXXX
XXXXXX

# FEDERAL BUREAU OF INVESTIGATION
## FOIA/PA DELETED PAGE INFORMATION SHEET

___1___    Page(s) withheld entirely at this location in the file.  One or more of the following statements, where indicated, explain this deletion.

⊠ Deletions were made pursuant to the exemptions indicated below with no segregable material available for release to you.

| Section 552 | | Section 552a |
|---|---|---|
| ☐(b)(1) | ☐(b)(7)(A) | ☐(d)(5) |
| ☐(b)(2) | ☐(b)(7)(B) | ☐(j)(2) |
| ☐(b)(3)_____ | ☐(b)(7)(C) | ☐(k)(1) |
| _____ | ☐(b)(7)(D) | ☐(k)(2) |
| _____ | ☐(b)(7)(E) | ☐(k)(3) |
| _____ | ☐(b)(7)(F) | ☐(k)(4) |
| ☐(b)(4) | ☐(b)(8) | ☐(k)(5) |
| ⊠(b)(5)-1,2 | ☐(b)(9) | ☐(k)(6) |
| ☐(b)(6) | | ☐(k)(7) |

☐  Information pertained only to a third party with no reference to the subject of your request or the subject of your request is listed in the title only.

☐  Document(s) originated with another Government agency(ies).  These documents were referred to that agency(ies) for review and direct response to you.

_____    Page(s) contain information furnished by another Government agency(ies).  You will be advised by the FBI as to the releasability of this information following our consultation with the other agency(ies).

_____    Page(s) withheld inasmuch as a final release determination has not been made.  You will be advised as to the disposition at a later date.

_____    Page(s) were not considered for release as they are duplicative of _____.

_____    Page(s) withheld for the following reason(s):_____

_____

_____

⊠ The following number(s) is (are) to be used for reference regarding these pages:

FBI-ACLU-181 _____

XXXXXXXXXXXXXXXXXX
X      Deleted Page(s)      X
X      No Duplication Fee   X
X          for this page      X
XXXXXXXXXXXXXXXXXX

XXXXXX
XXXXXX

WE        CANNOT

UNDERSTAND

WHAT      ANYBODY

IS     SAYING

-2a-
ACLU - Hamdan-182

SECRET

EMAILS From

(OGC) (FBI)

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED EXCEPT
WHERE SHOWN OTHERWISE

| From: | | (CTD) (FBI) | | |
|---|---|---|---|---|
| Sent: | Tuesday, January 06, 2009 5:45 PM | | | b6 -1 |
| To: | (OGC) (FBI) | (CTD) (FBI) | | b7C -1 |

(CTD) (FBI); (AD) (FBI); (SU) (FBI);
(CG) (FBI); (LA) (FBI); (LA)
(OGA); (LA) (FBI) (LA) (FBI)

Cc: (OGC) (FBI); (CG) (FBI);
(CTD) (FBI); (CTD) (FBI); (OGC) (FBI);
(OGC) (FBI); (OGC) (FBI)

Subject: RE: Hamdan Stuff

Attachments:

SECRET//ORCON,NOFORN
RECORD 315

b5 -1
b6 -1
b7C -1

DATE: 03-08-2011
CLASSIFIED BY 65179/DMH/BAW/STP/bls
REASON: 1.4 (c,d)
DECLASSIFY ON: 03-08-2036

Here are some more emails regarding

As for changes to your PDF - would you like us to fax it to you or go over it on the phone?

Intelligence Analyst

NSTS
Open
Cell
SIPR
TS

| From: | | (OGC) (FBI) | | | b6 -1 |
|---|---|---|---|---|---|
| Sent: | Tuesday, January 06, 2009 7:16 AM | | | | b7C -1 |
| To: | (CTD) (FBI) | (CTD) (FBI); | (AD) (FBI) | (SU) |

(LA)
(FBI); (CG) (FBI); (LA) (FBI); (LA) (OGA);
(FBI); (LA) (FBI)

Cc: (OGC) (FBI); (CG) (FBI); (CTD) (FBI); (CTD)
(FBI); (CTD) (FBI) (OGC) (FBI); (OGC) (FBI)
(OGC) (FBI)

Subject: RE: Hamdan Stuff

SECRET//ORCON,NOFORN
RECORD 315

ACLU - Hamdan-183

1

SECRET

~~SECRET~~

All,

A,

b1
b5 -1
b6 -1
b7C -1

(S)

(S)

(S)

(S)

(S)

Please feel free to call me if you have any questions.

Thanks,

<< File: Hamdan Heimbach declaration (1-6-09).wpd.pdf >>

| From: | (OGC) (FBI) |
|---|---|
| Sent: | Friday, January 02, 2009 4:30 PM |
| To: | (CTD) (FBI); (CTD) (FBI) |
| Cc: | (OGC) (FBI) (CG) (FBI) (CTD) (FBI) (CTD) (FBI) (CTD) (FBI) (OGC) (FBI) |
| Subject: | RE: Hamdan Stuff |

SECRET//ORCON,NOFORN
RECORD 315

b1
b5 -1
b6 -1,6
b7C -1,6

All,

(S)

ACLU - Hamdan-184

~~SECRET~~

~~SECRET~~

Thanks to everybody for all of their efforts in pulling this material together.

| | |
|---|---|
| **From:** | (CTD) (FBI) |
| **Sent:** | Friday, January 02, 2009 10:35 AM |
| **To:** | (OGC) (FBI) | (CTD) (FBI) |
| **Cc:** | (OGC) (FBI) | (CG) (FBI) | (CTD) (FBI) | (CTD) |
| | (FBI); | (CTD) (FBI) | (OGC) (FBI) | (OGC) (FBI) |
| **Subject:** | RE: Hamdan Stuff |

~~SECRET~~//ORCON,NOFORN
**RECORD 315**

b5 -1
b6 -1
b7C -1
b7E -1

Yes for #1 and finding for #1

A/UC

| | |
|---|---|
| **From:** | (OGC) (FBI) |
| **Sent:** | Friday, January 02, 2009 9:14 AM |
| **To:** | (CTD) (FBI) |
| **Cc:** | (OGC) (FBI) | (CG) (FBI) | (CTD) (FBI): |
| | (CTD) (FBI) | (CTD) (FBI) | (CTD) (FBI) | (OGC) (FBI) |
| | (OGC) (FBI) |
| **Subject:** | RE: Hamdan Stuff |

~~SECRET~~//ORCON,NOFORN
**RECORD 315**

Okay, these are great.  I have two follow-up questions:

b1
b5 -1
b6 -1,5
b7C -1,5

(S)

Thanks,

| | |
|---|---|
| **From:** | (OGC) (FBI) |
| **Sent:** | Friday, January 02, 2009 7:46 AM |
| **To:** | (CTD) (FBI) |
| **Cc:** | (OGC) (FBI) | (CG) (FBI) | (CTD) (FBI) |
| | (CTD) (FBI); | (CTD) (FBI) | (CTD) (FBI) | (OGC) (FBI) |

~~SECRET~~ ACLU - Hamdan-185

~~SECRET~~

**Subject:** ☐ (OGC) (FBI)
RE: Hamdan Stuff

~~SECRET~~//ORCON,NOFORN
RECORD 315

I'm still going through all of these and will likely have some follow-up questions later this morning, but these are very helpful.  Thanks.

Thanks,

b1
b5 -1
b6 -1
b7C -1
b7E -1

**From:** ☐ (CTD) (FBI)
**Sent:** Wednesday, December 31, 2008 2:40 PM
**To:** ☐ (OGC) (FBI)
**Cc:** ☐ (OGC) (FBI) ☐ (CG) (FBI); ☐ (CTD) (FBI); ☐
☐ (CTD) (FBI) ☐ (CTD) (FBI) ☐ (CTD) (FBI)
**Subject:** Hamdan Stuff

~~SECRET~~//ORCON,NOFORN
RECORD 315

(S)

(S)

Thanks,

DERIVED FROM: G-3 FBI Classification Guide G-3, dated 1/97, Foreign CounterIntelligence Investigations
DECLASSIFICATION EXEMPTION 1
SECRET//ORCON,NOFORN

DERIVED FROM: G-3 FBI Classification Guide G-3, dated 1/97, Foreign CounterIntelligence Investigations
DECLASSIFICATION EXEMPTION 1
SECRET//ORCON,NOFORN

DERIVED FROM: G-3 FBI Classification Guide G-3, dated 1/97, Foreign CounterIntelligence Investigations
DECLASSIFICATION EXEMPTION 1
SECRET//ORCON,NOFORN

ACLU - Hamdan-186

4
~~SECRET~~

DERIVED FROM: G-3 FBI Classification Guide G-3, dated 1/97, Foreign CounterIntelligence Investigations
DECLASSIFICATION EXEMPTION 1
SECRET//ORCON,NOFORN

DERIVED FROM: G-3 FBI Classification Guide G-3, dated 1/97, Foreign CounterIntelligence Investigations
DECLASSIFICATION EXEMPTION 1
SECRET//ORCON,NOFORN

DERIVED FROM: G-3 FBI Classification Guide G-3, dated 1/97, Foreign CounterIntelligence Investigations
DECLASSIFICATION EXEMPTION 1
SECRET//ORCON,NOFORN

DERIVED FROM: G-3 FBI Classification Guide G-3, dated 1/97, Foreign CounterIntelligence Investigations
DECLASSIFICATION EXEMPTION 1
SECRET//ORCON,NOFORN

ACLU - Hamdan-187

2009_Abu_Dhabi_844_-_Hamdan_Aug_24th_trial[1]
Erinn C Stott  08/25/2009 08:27:50 AM  From  DB/Inbox:  Erinn C Stott

Cable
Text:

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 03-08-2011 BY 65179/DMH/BAW/STP/bls

UTE7699
ACTION OCS-00

INFO  LOG-00   CA-00     DS-00    UTED-00  H-00     TEDE-00  L-00
      NEA-00   PPT-00    DSCC-00  SAS-00    /000W
      ------------------A390AC  241049Z /38
P 241040Z AUG 09
FM AMEMBASSY ABU DHABI
TO SECSTATE WASHDC PRIORITY 2863

UNCLAS ABU DHABI 000844


For CA/OCS/ACS/NESA - Erinn Stott, NEA/ARP - Bridget McGovern

Sensitive

E.O. 12958: N/A
TAGS: CASC, AE (HAMDAN, NAJI JAWDAT)
SUBJECT: Update - Arrest Case of Naji Hamdan - Trial - Prosecution
Rebuttal

REF:  (A) Abu Dhabi 738
-  (B) Abu Dhabi 625

1. (SBU) On August 24, 2009, Consul and Conasst attended the trial
of Amcit Naji Jawdat Hamdan before the UAE Federal Supreme Court.
The hearing was open to the public. (Previous session was held in
judge's chambers, the court said because the air conditioning in the
courtroom was not functioning. Details ref A.) The prosecution
reiterated the charges against Hamdan. (Reported reftels.) The
defense will respond at the next session, scheduled for September
14. Hamdan's attorney anticipates a verdict at the session
subsequent to the September 14 hearing, perhaps in October 2009.

2. (SBU) Hamdan appeared well and seemed to be in good spirits. Also
present at the hearing were reporters from Abu Dhabi's The National
newspaper and the Associated Press.

3. (U) Post will continue to provide all appropriate consular
assistance to Mr. Hamdan.

OLSON


NNNN



End Cable Text

Erinn C Stott  08/25/2009 08:27:50 AM  From  DB/Inbox:  Erinn C Stott


Recipient/Profile Information
Cable Recipients:

Page 1

ACLU - Hamdan-188

2009_Abu_Dhabi_844_-_Hamdan_Aug_24th_trial[1]

Yvon Accius
Casey K Ahn
Kirit M Amin
Stephanie E Anderson
Brian M Angell
Assiya Ashraf-Miller
Vivian B Barnes
Paul A Bassar
Dawn E Beaupain
Joseph K Bey
Robert S Billings
Robyn M Bishop
Brian E Bolton
Scott D Boswell
Susan M Bozinko
Melanie L Brandt
Ruth N Branson
Joanne BrooksLindsay
Sueli M Burkhart
Hudson L Byrd
Vera L Campbell
Sharon L Carper
Thomas E Cherry
Steven A Christian
Rhonda M Clegg
SeBryna T Coffey
Shirl D Coley
Franckel Constant
Emily C Cooperman
Erica N Cooper
Shirley S Crawford
Zelda M Daley
Pharas L Davis
Stuart J Davis
Stuart R Denyer
Rebecca E Dodds
Steven A Donlon
Thomas A Elrod
Emeka J Eni
Alejandro Escoto
Stefanie B Eye
Shannon B Farrell
Colleen B Flood
William P Fritzlen
Gerry W Fuller
Janine P Gannon
Tamika L Garrett
Wanda D Gholson
Elizabeth M Gracon
Ryan D Haley
Tracy L Henderson
Richard C Hermann
Patricia K Hickey
Amanda A Hickman
Eliana P Holmes
Stephanie M Holzman
Ryika Hooshangi
Roksana K Houge
Jayne A Howell
Steven H Hunsucker
Susan S Jacobs
Damon P Kitterman
Alex B Konick

Page 2

ACLU - Hamdan-189

2009_Abu_Dhabi_844_-_Hamdan_Aug_24th_trial[1]

Andrew J Lalka
Maria V Lane
Rodney S LeGrand
Christina A Leone
Viktoria Lopatkiewicz
Paul V Mazzaferro
Anne C McDonagh
Ann B McGahuey
Barbara T Messmer
Eric C Moore
Traci L Moran
Carrie L Muntean
Janell Myers
Yomaris C Nunez
Shalah M Obando
Chianwu Obianwu
Armando Olivarez
Ryan L Palsrok
Yolanda A Parra
Zlatko Pasalic
Katerina Y Poletes
Benjamin P Porterfield
Kevin D Pritchard
Susan E Randolph
Frank S Renfroe
Kim B Richter
John A Ritchie
Derek A Rivers
Stephanie L Robinson
Shante R Ross
Chistopher D Scheffman
Sandra J Schmierer
Virginia G Schoales
David A Serna
Sarah E Sexton
Sarah F Shaffer
Shaunda R Sharpe
Brykyta K Shelton
Nadia Shepherd
Sandra J Shipshock
Paul T Soma
Joan E Stewart
Erinn C Stott
David E Thomas
Robert W Thomas
Eliot C Toy
Christopher E Tremann
George T Turner
Reggie Turner
Michelle M Urbancic
Virginia Vause
Maria J Vazquez
Ruth R Wynn      LMDS Profiles/Office Symbols:
          CA_CSD_A1
CA_EX_RES_A1
CA_FO_A1
CA_OCS_A1
CA_OCS_A2
CA_OCS_A3
CA_OCS_A9
CA_P_A1
CA_VO_A14      CableXpress Folders:
          - No Folders -

Page 3

ACLU - Hamdan-190

```
UNCLASSIFIED    ABU DHABI    00000738
VZCZCXYZ0009
PP RUEHWEB
```

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 03-08-2011 BY 65179/DMH/BAW/STP/bls

```
DE RUEHAD #0738 2011308
ZNR UUUUU ZZH
P 201308Z JUL 09
FM AMEMBASSY ABU DHABI
TO SECSTATE WASHDC PRIORITY 2746
BT
```

UNCLAS ABU DHABI 000738

For CA/OCS/ACS/NESA - Erinn Stott, NEA/ARP - Barbara Masilko

Sensitive

E.O. 12958: N/A
TAGS: CASC, AE (HAMDAN, NAJI JAWDAT)
SUBJECT: Update - Arrest Case of Naji Hamdan - Trial - Presentation of Defense

REF:  Abu Dhabi 625 and previous

1. (SBU) SUMMARY: On July 20, 2009, Consul and Conasst attended the trial of
Amcit Naji Jawdat Hamdan before the UAE Federal Supreme Court. The hearing was
held in the judge's chambers, as the court said the air conditioning in the
courtroom is not functioning.
(Note: Local temperatures exceeded 110 degrees. End Note.) Citing the small size
of judge's chambers, the court did not allow representatives of the American
Civil Liberties Union, Al Karama for Human Rights, or news media to observe the
proceedings, despite previous assurances the hearing would be open. Consul and
Conasst, upon presentation of a diplomatic note from the MFA, were allowed to
observe. Hamdan's attorney presented his defense; prosecution will likely respond
at the next hearing. END SUMMARY.

2. (SBU) Hamdan, through his attorney Abdulkader Al Haythami, professed his
innocence to three terrorism-related charges (promoting terrorism, participating
in the work of a terrorist organization, and assisting a terrorist organization)
and claimed he confessed due to mistreatment while in UAE State Security custody.
(Allegations reported reftels.) His attorney said that the state had failed to
establish that Hamdan had committed any of the alleged crimes. The attorney said
that Hamdan had been subject to mistreatment while in custody, including being
struck physically, being forced to sleep in a cold room, and deprivation of
sleep. The attorney told the court that Hamdan had informed the prosecutor of the
mistreatment. Following presentation of the defense, Al Haythami gave a written
version of his arguments to both the court and the prosecution. The prosecution
will now have a chance to respond in a future hearing, the date of which should
be announced within days.
Post is in contact with the court and plans to attend.

3. (SBU) American Civil Liberties Union (ACLU) of Southern California attorneys
Jennie Pasquarella and Reem Salahi were present at the courthouse, having

ACLU - Hamdan-191

-1-

traveled to Abu Dhabi from California to witness the trial. Also present was Sultan Khalifah Al-Khulaifi, the General Secretary of Al Karama for Human Rights, a Geneva-based human rights organization. Consul spoke with all three and informed the judge of their presence, noting the previously provided information that the case would be held in open session and the fact that Pasquarella and Salahi had travelled a great distance. Consul encouraged the ACLU representatives to further pursue the ability to observe through Hamdan's defense attorney. In the end, only Consul and Conasst were admitted to observe.

4. (SBU) Consul and Conasst made a concerted effort to encourage the court to allow the international human rights officials to observe the hearing, but were unsuccessful. (COMMENT: While post cannot speak to court or UAEG motivations, the judge's chambers were crowded, with several court officials, guards, and representatives from the prosecution and defense in attendance. No seats were left unfilled. All cases today were held in chambers and one attorney was overheard to exasperatedly ask, "The air conditioning still isn't working? Why hasn't this been fixed?" END COMMENT.)

5. (SBU) Hamdan appeared well and seemed to be in good spirits. In addition to the ACLU and Al Karama representatives, Hamdan's minor son was also present at the courthouse. Also present were reporters from Abu Dhabi's The National newspaper and the Associated Press.
Following the hearing, the ACLU and Al Karama representatives were allowed to visit with Hamdan.

6. (U) Post will continue to provide all appropriate consular assistance to Mr. Hamdan.

GREENE
BT
#0738

ACLU - Hamdan-192

-2-

OPCA-20 (12-3-96)

XXXXXX
XXXXXX
XXXXXX

# FEDERAL BUREAU OF INVESTIGATION
## FOIA/PA DELETED PAGE INFORMATION SHEET

_____   Page(s) withheld entirely at this location in the file.  One or more of the following statements, where indicated, explain this deletion.

☐ Deletions were made pursuant to the exemptions indicated below with no segregable material available for release to you.

| Section 552 | | Section 552a |
|---|---|---|
| ☐(b)(1) | ☐(b)(7)(A) | ☐(d)(5) |
| ☐(b)(2) | ☐(b)(7)(B) | ☐(j)(2) |
| ☐(b)(3)_____ | ☐(b)(7)(C) | ☐(k)(1) |
| _____ | ☐(b)(7)(D) | ☐(k)(2) |
| _____ | ☐(b)(7)(E) | ☐(k)(3) |
| _____ | ☐(b)(7)(F) | ☐(k)(4) |
| ☐(b)(4) | ☐(b)(8) | ☐(k)(5) |
| ☐(b)(5) | ☐(b)(9) | ☐(k)(6) |
| ☐(b)(6) | | ☐(k)(7) |

☐ Information pertained only to a third party with no reference to the subject of your request or the subject of your request is listed in the title only.

☐ Document(s) originated with another Government agency(ies).  These documents were referred to that agency(ies) for review and direct response to you.

_____   Page(s) contain information furnished by another Government agency(ies).  You will be advised by the FBI as to the releasability of this information following our consultation with the other agency(ies).

_____   Page(s) withheld inasmuch as a final release determination has not been made.  You will be advised as to the disposition at a later date.

__10__   Page(s) were not considered for release as they are duplicative of ̲A̲C̲L̲U̲-̲H̲A̲M̲D̲A̲N̲-̲8̲4̲-̲9̲3̲ .

_____   Page(s) withheld for the following reason(s):_____

_____

_____

☒ The following number(s) is (are) to be used for reference regarding these pages:

̲F̲B̲I̲-̲A̲C̲L̲U̲-̲1̲9̲3̲-̲2̲0̲2̲_____

XXXXXXXXXXXXXXXXXX
X    Deleted Page(s)    X
X    No Duplication Fee  X
X       for this page     X
XXXXXXXXXXXXXXXXXX

XXXXXX
XXXXXX

FD-448 (Rev. 5-2-97)



DECLASSIFIED BY 65179/DMH/BAU/STP/bls
ON 03-09-2011

# FBI FACSIMILE

## COVER SHEET

# SECRET

| PRECEDENCE | CLASSIFICATION | |
|---|---|---|
| ☒ Immediate | ☐ Top Secret | Time Transmitted: _____ |
| ☐ Priority | ☒ Secret | Sender's Initials: _____ |
| ☐ ...ne | ☐ Confidential | Number of Pages: __6__ |
| | ☐ Sensitive | (including cover sheet) |
| | ☐ Unclassified | |

To: __State Department, Office of the Legal Adviser__    Date: __4/28/2008__
    Name of Office

Facsimile Number: __202-647-6132__

Attn: __Patricia McDonough__    __202-647-6194__
        Name            Room    Telephone

From: [ ]    __FBI Office of General Counsel__
        Name of Office

Subject: __Hamdan habeas petition__

_____

_____

Special Handling Instructions: __Please do not disseminate without approval from FBI__
__Headquarters. Thank you.__

Originator's Name: [ ]    Telephone: [ ]

Originator's Facsimile Number: [ ]    b6 -1
                                      b7C -1

Approved: _____

Brief Description of Communication Faxed: __As requested, here is the classified FBI__
__declaration.__

# SECRET

WARNING ACLU - Hamdan-203

Information attached to the cover sheet is U.S. Government Property. If you are not the intended recipient of this information, disclosure, reproduction, distribution, or use of this information is prohibited (18.USC, § 641). Please notify the originator or the local FBI Office immediately to arrange for proper disposition.



**U.S. Department of Justice**

Federal Bureau of Investigation

Washington, D. C. 20535-0001

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 03-09-2011 BY 65179/DMH/BAW/STP/bls

April 28, 2009

VIA SECURE FAX
Patricia E. McDonough
Attorney-Adviser
U.S. Department of State
Office of the Legal Adviser

Re:   *Mona Mallouck, et al. v. Barack H. Obama, et al.*
      (D.D.C. 08-cv-2003 (JR))

Dear Ms. McDonough:

        As requested, please find enclosed a copy of the classified FBI declaration which was submitted to the District Court presiding over the above-captioned habeas petition. Please note that some of this material is classified SECRET/NOFORN and should be handled, stored, reproduced, and disposed of in accordance with all applicable executive orders, statutes, and regulations. Given the nature of the FBI's investigation, please do not disseminate this information outside of the State Department without the prior approval of FBI Headquarters.

        If I can be of further assistance to you in this matter, please do not hesitate to contact me at

b6 -1
b7C -1

Sincerely,

Assistant General Counsel

Enclosure

ACLU - Hamdan-204

Fax

## Fax

McDonough, Patricia E [McDonoughPE@state.gov]

Sent: Tuesday, April 28, 2009 11:49 AM

To:

ALL FBI INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 03-09-2011 BY 65179/DMH/BAW/STP/bls

b6 -1
b7C -1

─ In addition to calling me, please call Naveed Khan or Elizabeth Wright at 202-647-5036 when the fax is incoming so they can retrieve it.  Please let them know how many pages to expect.

Thank you for all of your assistance,

Trish

Patricia E. McDonough

Attorney-Adviser

US Department of State

Office of the Legal Adviser (L/LEI)

2201 C Street NW

Washington, DC 20520

Telephone  (202) 647-6194

ACLU - Hamdan-205

OPCA-20 (12-3-96)

XXXXXX
XXXXXX
XXXXXX

# FEDERAL BUREAU OF INVESTIGATION
## FOIA/PA DELETED PAGE INFORMATION SHEET

___1___    Page(s) withheld entirely at this location in the file.  One or more of the following statements, where indicated, explain this deletion.

⊠Deletions were made pursuant to the exemptions indicated below with no segregable material available for release to you.

|  **Section 552** |  |  **Section 552a** |
|---|---|---|
| ☐(b)(1) | ☐(b)(7)(A) | ⊠(d)(5) |
| ☐(b)(2) | ☐(b)(7)(B) | ☐(j)(2) |
| ☐(b)(3)_____ | ☐(b)(7)(C) | ☐(k)(1) |
| _____ | ☐(b)(7)(D) | ☐(k)(2) |
| _____ | ☐(b)(7)(E) | ☐(k)(3) |
| _____ | ☐(b)(7)(F) | ☐(k)(4) |
| ☐(b)(4) | ☐(b)(8) | ☐(k)(5) |
| ⊠(b)(5)-1 Per State | ☐(b)(9) | ☐(k)(6) |
| ☐(b)(6) |  | ☐(k)(7) |

☐  Information pertained only to a third party with no reference to the subject of your request or the subject of your request is listed in the title only.

☐  Document(s) originated with another Government agency(ies).  These documents were referred to that agency(ies) for review and direct response to you.

_____    Page(s) contain information furnished by another Government agency(ies).  You will be advised by the FBI as to the releasability of this information following our consultation with the other agency(ies).

_____    Page(s) withheld inasmuch as a final release determination has not been made.  You will be advised as to the disposition at a later date.

_____    Page(s) were not considered for release as they are duplicative of_____.

_____    Page(s) withheld for the following reason(s):_____

_____

_____

⊠ The following number(s) is (are) to be used for reference regarding these pages:

FBI-ACLU-206 _____

XXXXXXXXXXXXXXXXXXX
X    Deleted Page(s)      X
X    No Duplication Fee   X
X       for this page        X
XXXXXXXXXXXXXXXXXXX

XXXXXX
XXXXXX

_____ OGC) (FBI)

**From:** _____ OGC) (FBI)                    DECLASSIFIED BY 65179/DMH/BAW/STP/b1s
**Sent:** Tuesday, April 28, 2009 12:05 PM              ON 03-09-2011
**To:** _____ (OGC) (FBI)

**Subject:** RE: Hamdan declarations -- please review ASAP

SECRET//NOFORN
RECORD xxx

                                                                              b5 -1
                                                                              b6 -1
                                                                              b7C -1

**From:** _____ (OGC) (FBI)
**Sent:** Tuesday, April 28, 2009 9:51 AM
**To:** _____ (OGC) (FBI)
**Subject:** RE: Hamdan declarations -- please review ASAP

SECRET//NOFORN
RECORD xxx

**From:** _____ (OGC) (FBI)
**Sent:** Tuesday, April 28, 2009 9:49 AM
**To:** _____ (OGC) (FBI)
**Subject:** RE: Hamdan declarations -- please review ASAP

SECRET//NOFORN
RECORD xxx

**From** _____ OGC) (FBI)
**Sent:** Tuesday, April 28, 2009 7:05 AM
**To:** _____ OGC) (FBI); _____ (CTD) (FBI); _____ (WF)
(FBI); _____ (DL) (FBI)
**Cc:** _____ (OGC) (FBI)
**Subject:** RE: Hamdan declarations -- please review ASAP
**Importance:** High

SECRET//NOFORN
RECORD xxx

**From:** [                    ]@usdoj.sgov.gov]
**Sent:** Monday, April 27, 2009 4:27 PM
**To:** [                    ](OGC) (FBI) [                    ]
**Cc:** [                    ](OGC) (FBI)
**Subject:** RE: Hamdan declarations -- please review ASAP

~~SECRET~~//NOFORN

Thanks very much for the info.

**From** [                    ](OGC) (FBI) [mailto:[                    ]
**Sent:** Monday, April 27, 2009 5:10 AM
**To:** [                    ]
**Cc:** [                    ](FBI)
**Subject:** FW: Hamdan declarations -- please review ASAP

~~SECRET~~//NOFORN
RECORD xxx

[          ]

See below, fyi, from our Legat in Abu Dhabi.

[      ]

**From:** PRICE, GARY S. (AD) (FBI)
**Sent:** Sunday, April 26, 2009 12:28 AM
**To:** [                    ](OGC) (FBI)
**Subject:** RE: Hamdan declarations -- please review ASAP

b5 -1
b6 -1
b7C -1

~~SECRET~~//NOFORN
RECORD xxx

I was out of the office last week so this information is probably too late (and you probably received it through other channels anyway) but here is some information regarding the [          ]

Gary

b1   Per Dept of State
k1

**From:** [                    ](OGC) (FBI)
**Sent:** Friday, April 17, 2009 7:20 PM
**To:** [                    ](OGC) (FBI) [                    ](OGC) (FBI);
[                    ](CTD) (FBI); [                    ](WF) (FBI); PRICE, GARY S. (AD) (FBI); [                    ](LA) (FBI);
[                    ](LA) (OGA); [                    ](LA) (FBI); [                    ](LA) (FBI) [                    ]
[                    ](AD)(FBI)
**Cc:** [                    ](DL) (FBI); [                    ](CTD) (FBI); [                    ](CTD) (FBI)
[                    ](OGC) (FBI); [                    ](OGC) (FBI); [                    ](OGC) (FBI);

ALL FBI INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 03-09-2011 BY 65179/DMH/BAU/STP/bls

April 24, 2009
UNCLASSIFIED

## INFORMATION MEMO TO THE DEPUTY SECRETARY

FROM:    CA– Michael D. Kirby, Acting

SUBJECT:   Follow-up: UAE – Details of Hamdan detention and lawsuit

On August 29, 2008, Mona Mallouk contacted the Duty Officer at Consulate General
Dubai to report the arrest of her husband, Naji Hamdan, by the UAE State Security
Department (SSD).  Post requested access to Hamdan from SSD at that time.  In addition,
post informed the authorities of Hamdan's chronic medical conditions, as related by his
wife, and requested he have access to doctors and his normal medications.  LEGATT
Abu Dhabi was able to learn from authorities that Hamdan did receive medications and
have access to doctors.  Embassy Conoffs were given periodic updates on Hamdan's
well-being, but were consistently told only that consular access would be forthcoming.
Access was only granted after extensive interaction with the host government by several
Embassy offices and direct intervention by Ambassador Olson.  Regular access was not
granted until Hamdan had been transferred to regular police custody.

UAE State Security Department is the arm of the UAE Ministry of Interior that handles
issues of national security, including cases with elements of terrorism.  They have broad
authority to detain and investigate individuals, and are often reluctant to grant visits, even
for consular access. Persons in State Security custody are not routinely allowed to
communicate with family or legal representatives during the investigatory phase of
detention.

Hamdan's lawsuit alleges the UAE government arrested, interrogated and detained him at
the U.S. government's behest. Th(S)mily states that this claim is supported by the years
of scrutiny by the FBI of Hamdan and his activities. In particular, the lawsuit highlights a
voluntary meeting between Hamdan and FBI agents at Embassy Abu Dhabi
approximately three weeks before his detention by SSD. They have updated their suit to
name President Obama vice former President Bush as party to the action in his official
capacity.  Their most recent filing alleges continued investigation of Hamdan by the FBI
in the U.S., communication between the UAE state prosecutor and the USG, and the
timing of several USG and UAE actions indicate close cooperation on his detention.

Hamdan also stated in his written account of alleged mistreatment that his interrogators
included an individual with an "American accent" who spoke fluent English.  This
person, according to Hamdan's account, spoke to him in English during questioning,
encouraging Hamdan to do what the other interrogators wanted to avoid worse treatment.
These specific allegations have not been supported by any documents held by State
Department consular offices.

ACLU - Hamdan-209

Drafted: CA/OCS/ACS/NESCA: EStott, 6-4978

Cleared: CA/OCS: MEHickey
                CA/OCS/ACS: MBernier-Toth
                CA/OCS/ACS/NESCA: VLopatkiewicz
                CA/OCS/PRI: CFerber
                NEA/ARP: BMasilko
                L/LEI: PMcDonough
                L/CA: JOsborn
                DOJ/CIV: AHaas        b6 -1  Per FBI
                FBI:              b7C -1
                INR/NESA:       b6 and PP per Dept of State
                CONS: SCooper    b7C
                DCM: DGreene          ACLU - Hamdan-210



**U.S. Department of Justice**

Office of Legislative Affairs

---

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

ALL FBI INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 03-09-2011 BY 65179/DMH/BAW/STP/bls

11/4/10

The Honorable Howard L. Berman
Chairman
Committee on Foreign Relations
U.S. House of Representatives
Washington, D.C. 20515

Dear Mr. Chairman:

This responds to your letter, dated April 7, 2009, requesting that the Attorney General investigate the case of Mr. Naji Hamdan, an American citizen detained by the United Arab Emirates ("UAE") and charged under the UAE's domestic criminal laws. We apologize for the delay in our response.

As you know, Mr. Hamdan's wife and brother filed a petition for a writ of habeas corpus alleging that the Federal Bureau of Investigation was involved in or responsible for Mr. Hamdan's detention in the UAE. The Department of Justice contested these allegations in federal district court. Enclosed is a copy of our principal filing. On June 8, 2009, the district court, after hearing argument, dismissed the petition for a writ of habeas corpus, but held off deciding whether petitioners were entitled to relief pursuant to the All Writs Act ("AWA"). On August 4, 2009, the district court rejected petitioners' AWA claim and dismissed the case in its entirety. On September 10, 2009, the petitioners appealed the district court's decision to the United States Court of Appeals for the District of Columbia. In addition, we also note that Mr. Hamdan while tried by UAE, had access to counsel in both that action and his federal court proceedings, and he received the full range of consular services from the United States Department of State.

On October 27, 2009, petitioners moved for voluntary dismissal of their appeal before the court of appeals, asserting that Mr. Hamdan had been convicted in the UAE, that his sentence was nearly completed, and that he would soon be released by the UAE authorities. On November 3, 2009, the court of appeals granted petitioners' motion and dismissed the appeal. The UAE has released Mr. Hamdan from its custody and has deported him to Lebanon.

It is my understanding

ACLU - Hamdan-211

The Honorable Howard Berman
Page Two

      We hope this information is helpful.  Please do not hesitate to contact this office if we
may be of further assistance with this, or any other matter.

                                       Sincerely,


                                       Ronald Weich
                                       Assistant Attorney General

Enclosure

cc:  The Honorable Ileana Ros-Lehtinen
      Ranking Member

ACLU - Hamdan-212

OPCA-20 (12-3-96)

XXXXXX
XXXXXX
XXXXXX

### FEDERAL BUREAU OF INVESTIGATION
### FOIA/PA DELETED PAGE INFORMATION SHEET

__2__        Page(s) withheld entirely at this location in the file.  One or more of the following
statements, where indicated, explain this deletion.

⊠Deletions were made pursuant to the exemptions indicated below with no segregable
material available for release to you.

| Section 552 | | Section 552a |
|---|---|---|
| ☐(b)(1) | ☐(b)(7)(A) | ⊠(d)(5) |
| ☐(b)(2) | ☐(b)(7)(B) | ☐(j)(2) |
| ☐(b)(3)_____ | ☐(b)(7)(C) | ☐(k)(1) |
| _____ | ☐(b)(7)(D) | ☐(k)(2) |
| _____ | ☐(b)(7)(E) | ☐(k)(3) |
| _____ | ☐(b)(7)(F) | ☐(k)(4) |
| ☐(b)(4) | ☐(b)(8) | ☐(k)(5) |
| ⊠(b)(5)-1 Per State | ☐(b)(9) | ☐(k)(6) |
| ☐(b)(6) | | ☐(k)(7) |

☐  Information pertained only to a third party with no reference to the subject of your request
or the subject of your request is listed in the title only.

☐  Document(s) originated with another Government agency(ies).  These documents were
referred to that agency(ies) for review and direct response to you.

_____        Page(s) contain information furnished by another Government agency(ies).  You will be
advised by the FBI as to the releasability of this information following our consultation with the
other agency(ies).

_____        Page(s) withheld inasmuch as a final release determination has not been made.  You will be
advised as to the disposition at a later date.

_____        Page(s) were not considered for release as they are duplicative of_____.

_____        Page(s) withheld for the following reason(s):_____

_____

_____

⊠ The following number(s) is (are) to be used for reference regarding these pages:

FBI-ACLU-213-214 _____

XXXXXXXXXXXXXXXXXX
X     Deleted Page(s)     X
X     No Duplication Fee   X
X       for this page      X
XXXXXXXXXXXXXXXXXX

XXXXXX
XXXXXX

05/19/2009 14:30 FAX                                                                    ☒002



LIBERTY | JUSTICE | EQUALITY

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 03-09-2011 BY 65179/DMH/BAW/STP/bls

May 19, 2009

Attn: Cheryl Mills, Counselor and Chief of Staff

The Honorable Hillary Clinton
Secretary of State
United States Department of State
2201 C Street NW
Washington, DC 20520
Fax: (202) 647-2283

Re:  Naji Hamdan, American Citizen Detained in the U.A.E.

To the Honorable Secretary of State Hillary Clinton:

Chair
Jarl Mohn

President
Douglas Mirell

Chairs Emeriti
Danny Goldberg
Allan K. Jonas
Burt Lancaster*
Irving Lichtenstein, MD*
Laurie Ostrow*
Stanley K. Sheinbaum
*deceased

Chief Executive Officer
Ramona Ripston

Chief Operating Officer
Heather Carrigan

Communications Director
Gordon Smith

Development Director
Tracy Rice

Chief Financial Officer
Brenda Haull

Legal Director
Mark D. Rosenbaum

Assistant Legal Director
Catherine E. Lhamon

Managing Attorney &
Ralston Family Attorney
for First Amendment Rights
Peter J. Eliasberg

The American Civil Liberties Union of Southern California (ACLU/SC) submits to you the enclosed petition signed by 1,035 individuals who are concerned about the fate of Naji Jawdat Hamdan, an American citizen who now faces trial in the United Arab Emirates on terrorism charges, apparently based solely on confessions obtained under torture.  His case requires urgent attention because the U.A.E. Supreme Court has scheduled his trial to commence on June 14, 2009.  We urge you to ensure that Mr. Hamdan receives a fair trial in the U.A.E., and that no evidence obtained under torture is used against him.

We believe the U.S. government has a particular obligation to intervene to protect Mr. Hamdan, apart from its significant obligations to protect any U.S. citizen facing charges abroad, because substantial evidence suggests that the U.A.E. detained Mr. Hamdan at the behest of the U.S. government.  During his initial detention, which occurred at the hands of the U.A.E.'s notorious State Security Forces, Mr. Hamdan was detained in a secret location where he was interrogated and severely tortured over the course of three months.  Mr. Hamdan has also stated that he believes that at least one U.S. official participated in his torture.  It was only after the ACLU/SC filed a habeas corpus petition against United States officials in federal District Court for the District of Columbia alleging that the U.S. had constructive custody over Mr. Hamdan that the U.A.E. removed him from secret detention and charged him with terrorism.

Mr. Hamdan, like every other American, has the right to the protection of his government from human rights abuse inflicted by any group or foreign state.  We request that the State Department take immediate steps to restore Mr. Hamdan's basic human rights without delay, by acting to ensure that Mr. Hamdan

313 WEST EIGHTH STREET   LOS ANGELES CA  90017  t 213.977.9500  f 213.977.5299  ACLU-SC.ORG

ACLU - Hamdan-215

05/19/2009 14:30 FAX &#9608;003

Secretary of State Hillary Clinton                                           Page 2
May 19, 2009

receives a fair trial in the U.A.E., and in particular by ensuring that no evidence obtained under torture is used against him during his trial.

        We thank you for your attention to this matter.

Sincerely,

Ramona Ripston
Executive Director

cc:

Congressman Howard L. Berman
Attn: Daniel Harsha
Chairman, House Committee on Foreign Affairs
U.S. House of Representatives
2221 Rayburn House Office Building
Washington, D.C. 20515

Senator John Kerry
Chairman, Senate Committee on Foreign Relations
U.S. Senate
Dirksen Senate Office Building
Washington, D.C. 20515

Congresswoman Maxine Waters
Attn: Andrea Martin
U.S. House of Representatives
2344 Rayburn House Office Building
Washington, D.C. 20515

Ambassador Yousef Al Otaiba
Embassy of the United Arab Emirates
3522 International Court NW, Suite #400
Washington, D.C. 20008



ACLU - Hamdan-216

OPCA-20 (12-3-96)

XXXXXX
XXXXXX
XXXXXX

# FEDERAL BUREAU OF INVESTIGATION
## FOIA/PA DELETED PAGE INFORMATION SHEET

_____    Page(s) withheld entirely at this location in the file.  One or more of the following statements, where indicated, explain this deletion.

☐ Deletions were made pursuant to the exemptions indicated below with no segregable material available for release to you.

|              Section 552              |                       |              Section 552a              |
|-------------------|-------------------|------------------|
| ☐(b)(1) | ☐(b)(7)(A) | ☐(d)(5) |
| ☐(b)(2) | ☐(b)(7)(B) | ☐(j)(2) |
| ☐(b)(3)_____ | ☐(b)(7)(C) | ☐(k)(1) |
| _____ | ☐(b)(7)(D) | ☐(k)(2) |
| _____ | ☐(b)(7)(E) | ☐(k)(3) |
| _____ | ☐(b)(7)(F) | ☐(k)(4) |
| ☐(b)(4) | ☐(b)(8) | ☐(k)(5) |
| ☐(b)(5) | ☐(b)(9) | ☐(k)(6) |
| ☐(b)(6) |  | ☐(k)(7) |

☐  Information pertained only to a third party with no reference to the subject of your request or the subject of your request is listed in the title only.

☐  Document(s) originated with another Government agency(ies).  These documents were referred to that agency(ies) for review and direct response to you.

_____    Page(s) contain information furnished by another Government agency(ies).  You will be advised by the FBI as to the releasability of this information following our consultation with the other agency(ies).

_____    Page(s) withheld inasmuch as a final release determination has not been made.  You will be advised as to the disposition at a later date.

_____    Page(s) were not considered for release as they are duplicative of_____.

___5___    Page(s) withheld for the following reason(s): Other _____

_____

_____

☒ The following number(s) is (are) to be used for reference regarding these pages:

FBI-ACLU-217-221 _____

XXXXXXXXXXXXXXXXXXX
X    Deleted Page(s)    X
X    No Duplication Fee    X
X    for this page    X
XXXXXXXXXXXXXXXXXXX

XXXXXX
XXXXXX

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 03-10-2011 BY 65179/DMH/BAW/STP/bls

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MONA MALLOUK, et al.,                    )
                                         )      1:08-cv-02003-JR
                                         )
        Petitioners,                     )
                                         )
    v.                                   )
                                         )
                                         )
GEORGE W. BUSH, et al.                   )
                                         )
        Respondents.                     )
                                         )

### PUBLIC DECLARATION OF MICHAEL J. HEIMBACH, ASSISTANT DIRECTOR, COUNTERTERRORISM DIVISION, FEDERAL BUREAU OF INVESTIGATION

I, Michael J. Heimbach, hereby declare the following:

1.      (U) I am the Assistant Director, Counterterrorism Division, Federal Bureau of

Investigation ("FBI"), United States Department of Justice. I am responsible for, among

other things, directing the conduct of FBI counterterrorism investigations. As Assistant

Director, I have official supervision and control over the files and records of the

Counterterrorism Division, FBI, Washington, DC.

2.      (U) The matters stated herein are based on my personal knowledge, my review

and consideration of the information available to me in my official capacity, and

information furnished by Special Agents and other employees of the FBI. My

conclusions have been reached in accordance therewith.

3.      (U) I submit this declaration in support of the Government's Response to this

Court's Order to Show Cause and the Government's Motion to Dismiss the above-

ACLU - Hamdan-222

captioned case and specifically to address some of the allegations set forth in the Petition

for Writ of Habeas Corpus ("Petition") filed on behalf of Naji Hamdan ("Hamdan").

4.          (U) In my capacity as Assistant Director of the FBI's Counterterrorism Division, I

have been delegated original classification authority by the Director of the FBI.  See

Executive Order 13292, § 1.3(c).  As a result, and pursuant to all applicable Executive

Orders, I am responsible for the protection of classified information within the

Counterterrorism Division, including the sources, methods, and techniques used by the

FBI in the collection of that information.  Thus, I have been authorized by the Director of

the FBI to execute declarations and other affidavits in order to protect such classified

information.   Pursuant to Executive Order 12958, as amended by Executive Order

13292, the classification "Secret" is applied to information, the unauthorized disclosure of

which reasonably could be expected to cause serious damage to the national security that

the original classification authority is able to identify or describe.

A.     (U)     **Facts Subject to This Declaration.**

5.          (U) At no time did the FBI request that the Lebanese Government detain or arrest

Hamdan.

6.          (U) The FBI sought to interview Hamdan in the United Arab Emirates ("UAE")

concerning his detention in Lebanon, which had occurred in early January 2008.  The FBI

contacted Hamdan's brother, petitioner Hossam Hemdan, on July 8, 2008, in an effort to

facilitate such an interview.  At his brother's request, Hamdan called the FBI on July 9,

2008.  During this call, Hamdan agreed to meet FBI personnel for an interview at the U.S.

-2-

ACLU - Hamdan-223