Embassy in Abu Dhabi, which Hamdan indicated was a 2 ½ hour drive from his UAE residence.

7.      (U) The Petition claims that the interview occurred in August and three weeks prior to Hamdan's detention in the UAE. In fact, this interview occurred on July 16, 2008, approximately six weeks before his detention in the UAE. This interview was entirely voluntary and Hamdan was free to leave whenever he wanted.

8.      [REDACTED]

9.      (U) The FBI did not direct the UAE to investigate Hamdan or direct actions taken by the UAE during their investigation.

10.     (U) At no time did the FBI request that the UAE detain or arrest Hamdan.

11.     (U) The FBI has neither interrogated nor observed any interrogation of Hamdan while he has been in UAE custody.

12.     (U) The FBI has not expressed any opinion to the UAE about Hamdan's continued detention or trial by the UAE.

B.      (U)     Basis for Classification and Harm to National Security that Would Result from Disclosure.

13.     [REDACTED]

14.     [REDACTED]

15.     [REDACTED]

(U) Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 12, 2009

Michael J. Heimbach
Assistant Director
Counterterrorism Division
Federal Bureau of Investigation

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 03-10-2011 BY 65179/DMH/BAW/STP/bls

## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

MONA MALLOUK
Mar Elyis Street
Dar El Baydaa Building, 8th Floor
Beirut, Lebanon

HOSSAM HEMDAN
12636 Truro Ave
Hawthorne, CA

       Petitioners,

   v.

GEORGE W. BUSH
President of the United States
The White House
1600 Pennsylvania Ave, NW
Washington, DC 20500

MICHAEL MUKASEY
United States Attorney General
US Department of Justice
950 Pennsylvania Ave, NW
Washington, DC 20530

ROBERT MUELLER
Director, Federal Bureau of Investigation
J. Edgar Hoover Building
935 Pennsylvania Ave, NW
Washington, DC 20530

DOE I
Employee of the United States Government
Name and address unknown

DOE II
Employee of the United States Government
Name and address unknown.

       Respondents.

No. _____

b5 -1
b6 -1,6
b7C -1,6

## PETITION FOR WRIT OF HABEAS CORPUS

ACLU - Hamdan-226

## PETITION FOR WRIT OF HABEAS CORPUS

## INTRODUCTORY STATEMENT

1.    This case involves the detention of an American citizen at the behest of the

United States government.  The FBI intensively surveilled and interrogated

Naji Hamdan, an American citizen, over a two year period, during most of

which he lived in the United Arab Emirates.   The culmination of this

surveillance occurred in August 2008, when two FBI agents flew from Los

Angeles to the United Arab Emirates to interrogate him at the U.S. Embassy

there.   Approximately three weeks later, the Emirati State Security forces

arrested him at his house.  He has been detained ever since – for eighty days

– largely incommunicado and without access to any legal process at an

undisclosed location in that nation.

2.    Mr. Hamdan's family and others acting on his behalf have gone to

extraordinary lengths to learn the reason for his detention and the nature of the

U.S. government's involvement in it, but their attempts have met with little

success.   Most telling, the U.S. government has never denied that it is

responsible for Mr. Hamdan's detention, despite repeated queries to various

government officials.

3.    In response to this horrifying turn of events, Petitioners Mona Mallouk ("Ms.

1

ACLU - Hamdan-227

Mallouk") and Hossam Hemdan ("Hossam" or "Mr. Hemdan") seek a Writ of Habeas Corpus on behalf and as next friends of Naji Hamdan ("Naji" or "Mr. Hamdan"). Ms. Mallouk is Mr. Hamdan's wife; Mr. Hemdan is his brother.

4.      The most elemental legal principles by which we govern ourselves cannot countenance the lawless detention of a United States citizen at the behest of his own government.    Our Constitution, consistent with bedrock rules of international law, does not permit our government to effect the arrest of its citizens without cause and imprison them indefinitely without legal process. Yet that is precisely what has happened here.  Mr. Hamdan is now imprisoned by the authority of the United States, but without any of the protections that the Constitution requires for U.S. citizens detained at the behest of their government.  For nearly three months he has been imprisoned without cause that he has committed any crime, without presentment before any judicial officer, without charge of any kind, without access to counsel, and without any explanation as to when or how his detention will end.  Apart from one short monitored phone call to his wife and one monitored visit from an American consular official, he has had no contact with the outside world for eighty days.

5.      That the nominal detaining authority here is the government of the United Arab Emirates does not alter these basic rules.  Our government cannot evade its

2

ACLU - Hamdan-228

obligations under the Constitution by enlisting other governments to act as its

proxies, thereby rendering the Constitution's protections obsolete. If, as

Petitioners allege, the United States government has caused Mr. Hamdan's

detention, then the Constitution's protections, including the protection of the

Great Writ, must apply.

6.     Therefore, Petitioners now respectfully request that this Court order

Respondents – the federal officials who caused Mr. Hamdan's detention and

those responsible for supervising those officials – to refrain from requesting

or otherwise causing Mr. Naji Hamdan's continued detention and interrogation,

and, instead, to request his release.

## JURISDICTION AND VENUE

7.     Petitioners allege that Mr. Hamdan is detained under or by color of the

authority of the United States, and that his detention violates 18 U.S.C. §

4001(a) ("the Non-Detention Act"), the Fourth Amendment, the Fifth

Amendment, customary international law and the International Covenant on

Civil and Political Rights (ICCPR) and, possibly, the Convention Against

Torture (CAT). This Court has jurisdiction to entertain such claims under the

general federal habeas statute codified at 28 U.S.C. § 2241. Section 2241(c)(1)

establishes jurisdiction for prisoners held in custody under or by color of the

3

ACLU - Hamdan-229

authority of the United States, and Section 2241(c)(3) establishes jurisdiction for prisoners held in custody who allege violations of federal statutory or constitutional law.  Here, this Court has jurisdiction under either jurisdictional requirement.  *Cf. Rasul v. Bush*, 542 U.S. 466, 483-84 (2004) ("Petitioners contend that they are being held in federal custody in violation of the laws of the United States. . . . Section 2241, by its terms, requires nothing more.").

8.      This Court also has federal question jurisdiction over all the claims presented here under 28 U.S.C. § 1331, and jurisdiction at least with respect to the Non-Detention Act claim under 28 U.S.C. § 1343(a)(4).  The Court also has additional authority to grant all appropriate relief in this case under the mandamus statute, 28 U.S.C. § 1361, the All Writs Act, 28 U.S.C. § 1651, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.  To the extent that the federal officials responsible for Mr. Hamdan's detention work for an administrative agency such as the FBI, this Court also has authority to grant relief under the Administrative Procedures Act, 5 U.S.C. § 702.

9.      Were none of the above-mentioned statutes to confer jurisdiction, several provisions of the Constitution itself would require that Petitioner have some federal judicial forum in which to raise his claims.  Those provisions include the Suspension Clause (Article I § 9, cl. 2), the separation of powers principles

4

ACLU - Hamdan-230

established in Article III, the Petition Clause of the First Amendment, and the Due Process Clause of the Fifth Amendment. *See generally Boumediene v. Bush*, 128 S. Ct. 2229, 2259 (2008) (holding that the government could not avoid Suspension Clause constraints by detaining petitioner outside United States territory at Guantanamo Bay because "the writ of habeas corpus is itself an indispensable mechanism for monitoring the separation of powers. The test for determining the scope of this provision must not be subject to manipulation by those whose power it is designed to restrain."). *See also Hamdi v. Rumsfeld*, 542 U.S. 507, 536-37 (2004) (plurality opinion of O'Connor, J.) (holding that even an alleged enemy combatant captured abroad must be afforded judicial process to contest the validity of his detention because "it would turn our system of checks and balances on its head to suggest that a citizen could not make his way to court with a challenge to the factual basis for his detention by his government, simply because the Executive opposes making available such a challenge. Absent suspension of the writ by Congress, a citizen detained as an enemy combatant is entitled to this process.").

10.  Petitioners Mallouk and Hemdan have power to act as "next friends" of Naji Hamdan pursuant to 28 U.S.C. § 2242. Naji Hamdan cannot file or even authorize this petition because his captors have refused to let his family and his

5

ACLU - Hamdan-231

attorneys speak with him. *See* Exh. 1 (Declaration of Jennie Pasquarella) (documenting attempts to communicate with Mr. Hamdan through both the U.S. government and the U.A.E. government); Exh. 1 Sub-Exh. F (ACLU letter to the Ambassador of the United Arab Emirates); Exh. 1 Sub-Exh. A (Mona Mallouk's letter to the government of the United Arab Emirates); Exh. 2 at ¶ 54-70 (Declaration of Mona Mallouk) (documenting her attempts to communicate with her husband); Exh. 3 at ¶ 37-44 (Declaration of Hossam Hemdan) (documenting his attempts to communicate with his brother).

11.    Because Mr. Hamdan is held incommunicado, Petitioners' special relationship with him entitles them to act on his behalf. Petitioner Mallouk is his wife and the mother of his children, *see* Exh. 2 at ¶ 3-4, and Petitioner Hemdan is his brother and closest relative in the United States, *see* Exh. 3 at ¶ 6. *See generally Whitmore v. Arkansas*, 495 U.S. 149, 163 (1990) (describing prerequisites for next friend standing).

12.    The fact that Mr. Hamdan's physical custodian may be an employee of the government of the United Arab Emirates does not deprive this Court of jurisdiction over this petition, for several reasons. First, the text of the statute itself – Section 2241(c)(3) – requires only that the petitioner be in custody and that he allege a violation of U.S. law, it does not require custody by the United

6

ACLU - Hamdan-232

States.  Federal courts routinely exercise jurisdiction under the statute where

the petitioner is not in federal custody, most obviously when the petitioner is

in state custody.   Similarly, the Supreme Court has held that a prisoner

detained at the behest of U.S. officials may test the validity of his detention by

habeas corpus even if the detaining agent himself is not a government official.

*See United States v. Jung Ah Lung*, 124 U.S. 621, 622, 626 (1888) (holding

that the petitioner was "in custody" for habeas purposes where he was detained

"by the master of a steamship" who "held him in custody by direction of the

customs authorities" of the United States).

13.   Second, our government cannot simply "contract away" the Constitution's

constraints by directing another government to act as its agent to detain a U.S.

citizen.   *Cf. Boumediene*, 128 S.Ct. at 2258 (noting problem arising if

government could "contract[] away" the Suspension Clause, and holding that

"the political branches [do not] have the power to switch the Constitution on

or off at will").

14.   Third, a number of courts have held in the Fourth and Fifth Amendment

contexts that actions against criminal defendants by foreign government

officials must be subject to constitutional constraints where, *inter alia*, U.S.

officials are acting in a "joint venture" with the foreign agents, or where the

7

ACLU - Hamdan-233

foreign officials' involvement is designed to circumvent constitutional constraints. *See, e.g.*, *United States v. Maturo*, 982 F.2d 57, 61 (2d Cir. 1992); *United States v. Karake*, 443 F. Supp. 2d 8, 52 n.74, 93 n.114 (D.D.C. 2006). As this Court has already held, analogous principles serve to establish habeas jurisdiction where the U.S. government has caused the detention of one of its own citizens. *Abu Ali v. Ashcroft*, 350 F. Supp. 2d 28, 41 (D.D.C. 2004) (holding that "the United States may not avoid the habeas jurisdiction of the federal courts by enlisting a foreign ally as an intermediary to detain the citizen.").

15.    Venue is proper in this district because one or more of the Respondents reside within the jurisdiction of this Court and are accordingly amenable to service of process in this district. *Braden v. 30th Judicial Circuit Court of Ky.*, 410 U.S. 484, 499-500 (1973); *Rumsfeld v. Padilla*, 542 U.S. 426, 436 n.9 (2004) (noting that a longstanding exception to the immediate custodian rule authorizes venue in the District Court of the District of Columbia for people detained abroad). Venue is also proper because at least one of the Respondents resides in this district and because a substantial part of the events giving rise to the claim occurred in this district. 28 U.S.C. § 1391(e).

## PARTIES

8

ACLU - Hamdan-234

16.   Petitioner Mona Mallouk is a United States citizen and the wife of Naji
Hamdan.   Because Mr. Naji Hamdan has been denied access to any legal
process, Ms. Mallouk acts as his next friend.  She has repeatedly sought to
contact her husband, but has only been permitted one extremely brief phone
call, which occurred shortly after his detention.  *See* Exh. 2 at ¶ 60-70.  She has
also repeatedly sought to learn information concerning her husband's
detention, including the reason for it, but neither the federal government nor
anyone else has provided her an explanation as to why he is detained.  *Id.*

17.    Petitioner Hossam Hemdan is a United States citizen and the brother of Naji
Hamdan.   He is a resident of Los Angeles, California.   Because Mr. Naji
Hamdan has been denied access to any legal process, Mr. Hemdan acts as his
next friend.  Mr. Hemdan has repeatedly sought to contact his brother and to
learn information concerning his detention, including the reason for it.
However, the American authorities have largely ignored his requests, and have
refused to provide to Mr. Hemdan the reasons for his brother's continued
detention.  *See* Exh. 3 at ¶ 37-42.[1]

18.    Respondent George W. Bush ("President Bush") is the President of the United

------

[1] The different spellings of the two brothers' names is the result of
transliteration between Arabic and English – they share the same last name
notwithstanding the spelling difference.

9

ACLU - Hamdan-235

States and Commander-in-Chief of the United States Military. Mr. Naji Hamdan is being detained pursuant to President Bush's ultimate authority to enforce all federal law and to conduct foreign relations. He has authority to rescind the request directing Mr. Hamdan's detention. Accordingly, President Bush is responsible for Mr. Hamdan's unlawful detention. He is sued in his official capacity.

19.   Respondent Michael Mukasey is the Attorney General of the United States. Respondent Mukasey has been charged with enforcing the laws of the United States. Upon information and belief, he too has authority to rescind the request directing Mr. Hamdan's detention. Accordingly, Attorney General Mukasey is responsible for Mr. Hamdan's unlawful detention. He is sued in his official capacity.

20.   Respondent Robert Mueller is the Director of the Federal Bureau of Investigation (FBI). As the federal official ultimately responsible for the conduct of the FBI's field officers, he was responsible for the FBI's investigation of Mr. Naji Hamdan. Upon information and belief, he too has authority to rescind the request directing Mr. Hamdan's detention. Accordingly, Director Mueller is responsible for Mr. Hamdan's unlawful detention. He is sued in his official capacity.

10

ACLU - Hamdan-236

21.     Respondent Doe I is an employee of the United States federal government. He or she is the person who requested that the authorities of the United Arab Emirates detain Mr. Naji Hamdan on behalf of the United States government or otherwise caused the U.A.E. to detain him. He or she is sued in his or her official capacity.

22.     Respondent Doe II is an employee of the United States federal government. He or she is the highest-ranking federal official who authorized and approved Mr. Hamdan's detention. He or she is sued in his or her official capacity.

## STATEMENT OF FACTS

### Biographical Information

23.     Naji Hamdan was born in Lebanon on May 26, 1966. He grew up in Lebanon, and moved to the United States in the early 1980s. He has five siblings, including Hossam Hemdan. *See* Exh. 2 at ¶ 3-5; Exh. 3 at ¶ 5.

24.     After living here for several years, Mr. Hamdan became a United States citizen. *See* Exh. 1, Sub-Exh. B (Ambassador's letter acknowledging his citizenship).[2] He subsequently married Mona Mallouk. The couple have three children — Khaled, 16, Hamza, 8, and Noor, 2. Ms. Mallouk and the children are also

---

[2]Mr. Hamdan's passport and citizenship papers are in the possession of either the United States government or the United Arab Emirates government.

11

ACLU - Hamdan-237

U.S. citizens. *See* Exh. 2 at ¶ 2-4.

25.     Mr. Hamdan studied in the United States. He then started and ran a highly-successful auto parts business. *See* Exh. 2 at ¶ 10-14; Exh. 3 at ¶ 9. He also was active in the Islamic Center of Hawthorne, a mosque community in Los Angeles, California. *See* Exh. 4 at ¶ 6 (Declaration of Jehad Suleiman); Exh. 5 at ¶ 9-11 (Declaration of Ahmed Azam).

**FBI Surveillance and Interrogation**

26.     Starting in 1999, the FBI began to target Mr. Hamdan. They approached him for interrogation at his house on the morning of December 30, 1999, at which time they asked him, among other things, if he knew Osama bin Laden. Exh. 7 (Teresa Watanabe & Eric Lichtblau. *FBI Accused of Terror Overreaction*, L.A. TIMES, Jan. 10, 2000, at B-1, *available at* http://articles.latimes.com/2000/jan/10/local/me-52684.). The FBI approached him again shortly after September 11, 2001. Exh. 3 at ¶ 21; Exh. 5 at ¶ 13. In the next few years, they returned to interrogate him on several occasions. Exh. 2 at ¶ 17-18; Exh. 4 at ¶ 11-12.

27.     Mr. Hamdan and his wife decided to move to the Middle East in 2006, primarily because they preferred to raise the children there. After that time, the FBI greatly increased the intensity of its surveillance and targetting of Mr.

12

ACLU - Hamdan-238

Hamdan.

28.     In August 2006, at the time of Mr. Hamdan's departure for the Emirates, federal officials intercepted the family at the airport and interrogated them for several hours prior to their departure.  As a result, they missed their flight and had to leave the next day.  Exh. 2 at ¶ 22-24; Exh. 3 at ¶ 23; Exh. 4 at ¶ 15.

29.     When he arrived in the U.A.E., Mr. Hamdan opened an auto business and helped to establish his family there.  After several months, however, his family found it difficult to remain in the U.A.E., primarily because of the weather.  So Mona and the children moved to Lebanon, which allowed them to be nearer to the couples' extended families, and Naji began to fly back and forth between his business in the U.A.E. and Lebanon.  Exh. 2 at ¶ 26.

30.     Several months later, Mr. Hamdan returned to the United States for a brief visit.  During that visit, he was subject to constant and intensive FBI surveillance.  He again endured extensive questioning upon arrival at the airport.  Agents also followed him throughout his trip, and also followed at least some of those with whom he met.  *See* Exh. 3 at ¶ 26-29; Exh. 4 at ¶ 17-19; Exh. 5 at ¶ 14-17.

31.     Upon his return to the Middle East after this trip, Mr. Hamdan's problems became more severe.  Happily, his wife Mona gave birth to their daughter,

13

ACLU - Hamdan-239

Noor, in Lebanon in August 2007. However, when he submitted his passport
to the U.S. Embassy in Lebanon in order to obtain proof of her citizenship, the
Embassy inexplicably failed to return his passport for approximately two
weeks. Exh. 2 at ¶ 30.

32.     Several months after this, on a return trip from Lebanon to the U.A.E.,
Lebanese intelligence officers detained Mr. Hamdan for no apparent reason.
They interrogated him for several days in Beirut, during which time they hit
him and even detained his teenage son for questioning about him. *See* Exh. 2
at ¶ 31-43; Exh. 6 (Declaration of Khaled Hamdan). When he went with his
wife to the U.S. embassy shortly after his release, embassy officials
interrogated him still further. *See* Exh. 2 at ¶ 44-45.

33.     At around the same time, the U.S. government began to question Mr.
Hamdan's associates about him.   Mr. Hamdan's brother Hossam was
repeatedly questioned about his brother when he traveled to and from the
United States. FBI agents also specifically sought Hossam out at his business,
where they interrogated him concerning Naji shortly after Naji's release from
detention in Lebanon.   Exh. 3 at ¶ 32-33.   The FBI also sought out and
interrogated Mr. Hamdan's friend and business associate Jehad Suleiman at the
same time. Exh. 4 at ¶ 20.

14

ACLU - Hamdan-240

34.     A friend of Hossam's later learned from a friend of his who was a general in

the Lebanese Military Intelligence Services that a foreign power was

responsible for Mr. Hamdan's detention there.   That official spoke on

condition of anonymity and declined to reveal his identity or to name the

particular foreign power because he feared for his own safety for speaking out

about Mr. Hamdan's detention.  Exh. 3 at ¶ 43.

35.     Shortly after Mr. Hamdan's detention in Lebanon, in July 2008, Mr. Hamdan's

family moved back to be with him in the U.A.E.  Around the beginning of

August – the following month – the FBI contacted Mr. Hamdan's brother

Hossam again. . The FBI official told Hossam that FBI agents wanted to

interrogate Mr. Hamdan at the U.S. Embassy in Abu Dhabi.  Exh. 3 at ¶ 34.

Hossam contacted Naji, who agreed to meet with the agents.  Two agents,

Joshua Stone and Jerry Price, both of whom work for the FBI in Los Angeles,

then flew from Los Angeles to the U.A.E. to interrogate him.  They met Mr.

Hamdan there and interrogated him for several hours.  Exh. 2 at ¶ 50; Exh. 3

at ¶ 35.

**Detention in the U.A.E.**

36.     Approximately three weeks later, on August 29, 2008, the State Security

forces of the United Arab Emirates (the "Amn al-Dawla") arrested Mr.

15

ACLU - Hamdan-241

Hamdan at his house, in the presence of his family, for no apparent reason. He has remained detained without charge ever since.   Exh. 1 at Sub-Exh. B (Ambassador's letter to Mona Hamdan); Exh. 2 at ¶ 51-52; Exh. 3 at ¶ 36-45.

37.    Approximately one week later, Ms. Mallouk received a brief call from Naji. In the call, which she sensed was monitored, he told her to go to Lebanon with their children and not to come back to the U.A.E. That conversation, now over two months ago, was the last time she spoke with her husband. Exh. 2 at ¶ 60, ¶ 70.

## Post-Detention Attempts to Obtain Information

38.    Since Mr. Hamdan's detention, all attempts to learn of the reasons for the detention, the nature of the U.S. government's involvement, and what if anything the U.S. government is doing in response to it have met with remarkably little success.

39.    Ms. Mallouk called the U.S. Embassy the day after he was detained seeking information about her husband, but the officials who responded claimed not to know of his detention.   She called repeatedly over the next few days, and eventually spoke to Saeed Mootar, another Embassy employee.   He told her that the Embassy had known of her husband's detention from the day it occurred. Exh. 2 at ¶ 54, 58.  Similarly, in written responses to queries made

16

ACLU - Hamdan-242

on Mr. Hamdan's behalf, both Richard G. Olson, Jr., the American

Ambassador to the United Arab Emirates, and R. Sean Cooper, Consul, stated

that the United States Embassy learned of his detention on the date it occurred:

August 29, 2008. Exh. 1 at Sub-Exh. B (Ambassador's letter to Mona

Hamdan).

40.     Nearly two months after Naji's detention, an American consular official finally

visited him. Exh. 1 at Sub-Exh. B. That official, R. Sean Cooper, then spoke

to Naji's family and his attorneys about the visit. Mr. Cooper related that Naji

had told him that he was being questioned by his captors every day. Exh. 1 at

¶ 10.

41.      In response to a question from an attorney concerning whether or not the U.S.

government had caused Mr. Hamdan's detention, Mr. Cooper stated that he

would not know if the U.S. government were responsible for the detention

because such information would be "above his pay grade." Mr. Cooper

implicitly acknowledged the fact that the U.S. had caused such detentions in

the past, but added that he was unaware of any U.S. involvement. Exh. 1 at ¶

11. Mr. Cooper claimed to have no information as to why Mr. Hamdan was

detained and what procedures, if any, were available to obtain his release. Id.

17

ACLU - Hamdan-243

at ¶ 7.

42.    In a desperate attempt to find more information, Mr. Hamdan's aging father planned a trip to the U.A.E.  He died, apparently of a heart attack, shortly before the trip. His family believed that the stress of his son's detention caused his death.  Exh. 2 at ¶ 69.

43.    In a similarly desperate attempt to find more information, Hossam Hemdan contacted a friend of his who has a connection to the ruling family of the U.A.E. The friend, who wished to remain anonymous out of fear for his own safety, contacted someone in the U.A.E., who also wished to remain anonymous.  That person made inquiries and confirmed that Naji Hamdan had been detained at the behest of a foreign government, and that the U.A.E. itself had no independent desire to detain him.  Exh. 3 at ¶ 44.

44.    Responding to queries from a reporter, a spokesman for the FBI's Los Angeles Office named Alonzo Hill described Mr. Hamdan's case as "a counter-terrorism case," but declined to comment further.  Another FBI spokesman responding to the reporter's query asserted that the FBI does not ask foreign nations to detain U.S. citizens in order to circumvent their rights. *See* Exh. 19 (Jonathan S. Landay, *FBI Questions American Held Without Charges in Gulf State*, McClatchy Washington Bureau, Nov.

18

ACLU - Hamdan-244

17, 2008, *available at*

http://www.mcclatchydc.com/homepage/story/56051.html.)  However, as

shown below, the U.S. government has repeatedly asked foreign

~~governments to detain people on its behalf as part of its counter-terrorism~~

activities.

**Proxy Detention Practices by the U.S. and U.A.E.**

45.     Mr. Hamdan's case would not present the first instance in which the U.S.

government has relied on another country to detain someone who could not

be detained under American law.  On the contrary, "[m]edia, foreign

governments, human rights organizations, and inter-governmental entities,

have reported on the use of proxy detention, or detention by foreign

authorities at the behest of the United States."  Exh. 8 at 17 (CTR. FOR

HUMAN RIGHTS AND GLOBAL JUSTICE, ON THE RECORD: U.S. DISCLOSURES

ON RENDITION, SECRET DETENTION, AND COERCIVE INTERROGATION

(2008).) (describing several cases of proxy detention as part of broader

report on rendition practices).  *See also* Exh. 9 at 1-2, 9-10 (HUMAN RIGHTS

WATCH, GHOST PRISONER: TWO YEARS IN SECRET CIA DETENTION (Feb.

2007)) (describing account of prisoner subject to proxy detention in

Pakistan, where Pakistani authorities detained him at the behest of the

19

ACLU - Hamdan-245

United States);[3] Exh. 10 at 1 [(Michelle Shephard, *U.S. Put Bounty on
Abdullah Khadr, Court Records Show*, THESTAR.COM, May 12, 2008,
*available at* http://www.thestar.com/comment/columnists/article/424585.)
(describing how U.S. officials paid the Pakistani government to detain a
Canadian man, whom the FBI then interrogated in Pakistan).  In these cases,
the U.S. government has worked with other governments that served as
proxies to detain people whom the U.S. government seeks to interrogate
(either directly or through proxy interrogators), but who apparently cannot
lawfully be held under U.S. law.

46.    Even U.S. citizens have been subject to such proxy detention.  *See* Exh. 11
(Jonathan S. Landay & Shashank Bengali, *CIA Didn't Try to Stop Secret
Deportation of U.S. Citizen, Officials Say*, MCCLATCHY WASHINGTON
BUREAU, Mar. 19, 2007, *available at*
http://www.mcclatchydc.com/staff/shashank_bengali/story/15813.html;
Shashank Bengali & Jonathan S. Landay, *American's Rendition May Have
Broken International, U.S. Laws*, MCCLATCHY WASHINGTON BUREAU, Mar.

---

[3]Because the report is lengthy, only the relevant pages are appended.  The
entire report is available online at
http://www.hrw.org/en/reports/2007/02/26/ghost-prisoner.  Counsel will file the
complete report if the Court so directs.

20

ACLU - Hamdan-246

21, 2007, *available at*

http://www.mcclatchydc.com/staff/shashank_bengali/story/15827.html;

Jonathan S. Landay, *Imprisoned American Denies Being Al-Qaida*

*Operative*, MCCLATCHY WASHINGTON BUREAU, Mar. 24, 2007, *available*

*at* http://www.mcclatchydc.com/homepage/story/23032.html; Jonathan S.

Landay, *Ethiopia Frees an American Detained Fleeing Somalia*,

MCCLATCHY WASHINGTON BUREAU, May 26, 2007, *available at*

http://www.mcclatchydc.com/staff/jonathan_landay/story/16490.html;

Dafna Linzer, *U.S. Presses for Release of American Held in Ethiopia*,

WASHINGTONPOST.COM, Mar. 23, 2007, at A14,*available at*

http://www.washingtonpost.com/wp-dyn/content/article/2007/03/22/AR200

7032202128.html.) (several articles describing account of two U.S. citizens

in Kenya and Ethiopia who were interrogated by the FBI while in foreign

detention, apparently at behest of U.S. government). One of those U.S.

citizens, Amir Meshal, was ultimately permitted to return to the United

States and was not charged with any crime, even though FBI officials had

accused him of being associated with al-Qaeda. *See id.* at 1.

47.     The U.A.E. in particular has cooperated with the U.S. government in its

proxy detention program on at least a few occasions in the past. Each of

21

ACLU - Hamdan-247

these proxy detentions was similarly carried out by the U.A.E. State

Security forces ("Amn al-Dawla"). A report written by the New York

University Center for Human Rights and Global Justice, Amnesty

International, and other human rights organizations stated that U.A.E.

officials detained a Pakistani man because the U.S. wanted to interrogate

him in 2004. *See* Exh. 12 at 18 (AMNESTY INT'L ET AL., OFF THE RECORD:

U.S. RESPONSIBILITY FOR ENFORCED DISAPPEARANCES IN THE "WAR ON

TERROR".). The U.A.E. government publicly acknowledged assisting in the

arrest of another man whom the U.S. government wanted to interrogate

because they believed he was an al Qaeda operative. *See* Exh. 13 at 4

(Kenneth Katzman, CRS REPORT FOR CONGRESS, *The United Arab*

*Emirates (UAE): Issues for U.S. Policy*, May 9, 2005, *available at*

http://www.libertyparkusafd.org/lp/Hale/Special%20Reports%5COutsourci

ng%20US%20Ports%5CUAE%20and%20Military%20Purchases%20from

%20USA.pdf.). The State Department has stated that the U.A.E. has

engaged in such arrests on behalf of the U.S. as well. *See* Exh. 14 at 3-4

(Kenneth Katzman, CRS REPORT FOR CONGRESS, *The United Arab*

*Emirates (UAE): Issues for U.S. Policy*, July 31, 2008, *available at*

22

ACLU - Hamdan-248

http://fas.org/sgp//crs/mideast/RS21852.pdf.).[4]

48.    At least some of the men subject to proxy detention in the U.A.E. faced torture while in detention. This is unsurprising, as torture by the U.A.E. State Security forces is a regular, if not widespread, occurrence. *See* Exh. 17 at 3 ("Amnesty International raises with the authorities around three to five times per year reports of persons – both Emirati and foreign – arbitrarily arrested and held incommunicado for prolonged periods of time, commonly in undisclosed locations where they face torture and other ill treatment. Those responsible are usually said to be members of *Amn al-Dawla* (State Security).") (AMNESTY INT'L, UNITED ARAB EMIRATES: AMNESTY INTERNATIONAL SUBMISSION TO THE U.N. UNIVERSAL PERIODIC REVIEW (Dec. 2008).); Exh. 18 at ¶ 1

---

[4]The U.A.E. also appears to have been willing to serve as a proxy detaining authority for the British government, and to have tortured a detainee at the behest of the U.K. during that incident. *See* Exh. 15 at 46-47 (CAGEPRISONERS, FABRICATING TERRORISM: BRITISH COMPLICITY IN RENDITIONS AND TORTURE 1-2, 46-7 (Mar. 2006).); *see also* Exh. 16 at 1 [*Britain 'Ordered Torture of 9/11 Suspect'*, GUARDIAN.CO.UK, *available at* http://www.guardian.co.uk/world/2006/jan/24/terrorism.september11/print.]. Because the complete "Fabricating Terrorism" report is lengthy, counsel undersigned have appended only the relevant pages. The full report is available online at http://www.cageprisoners.com/downloads/FabricatingTerrorism_Report.pdf. Counsel will file the whole report if the Court so directs.

ACLU - Hamdan-249

(AMNESTY INT'L, UAE - AMNESTY INTERNATIONAL REPORT 2008:  HUMAN

RIGHTS IN UNITED ARAB EMIRATES (2008).).

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
### Unlawful Detention under the Non-Detention Act

49. Petitioners reallege and incorporate by reference each and every allegation

contained in the preceding paragraphs as if set forth fully herein.

50. The Non-Detention Act forbids the detention of United States citizens absent

legal authorization from Congress. *See* 18 U.S.C. § 4001(a) ("No citizen shall

be imprisoned or otherwise detained by the United States except pursuant to

an Act of Congress.").

51. Mr. Naji Hamdan's detention is "by the United States" insofar as U.S. officials

caused the government of the U.A.E. to detain him.  No Act of Congress

authorizes the detention of a United States citizen for eighty days without any

charge or other process.  Therefore, his detention violates the Act.

### SECOND CLAIM FOR RELIEF
### Unlawful Detention Under the Fourth Amendment

52. Petitioners reallege and incorporate by reference each and every allegation

contained in the preceding paragraphs as if set forth fully herein.

53. The Fourth Amendment protects United States citizens subject to action by the

24

United States government while abroad. *See Best v. United States*, 184 F.2d 131, 138 (1st Cir. 1950) ("For present purposes we assume, and we think it is probably so, that the protection of the Fourth Amendment extends to United States citizens in foreign countries under occupation by our armed forces"). The federal government has conceded in prior litigation that the Fourth Amendment protects United States citizens on foreign soil. *See United States v. Bin Laden*, 126 F. Supp. 2d 264, 270 (S.D.N.Y. 2000) ("The Government seems to concede the general applicability of the Fourth Amendment to American citizens abroad"). The government's conduct here violates the Fourth Amendment in two ways.

54.   First, the Fourth Amendment forbids the government from arresting United States citizens abroad absent some cause, if not probable cause. *Chambers v. Maroney*, 399 U.S. 42, 51 (1970) (probable cause is in general the minimum requirement for reasonable seizures in the domestic context). Here, Mr. Hamdan was arrested even though there is no probable cause, or indeed any cause, that he has committed a crime. Thus, whatever the precise quantum of proof required to justify the detention of a U.S. citizen abroad, that level of proof does not exist here.

55.   Second, the Fourth Amendment requires the government to "present" the

25

arrested individual to a neutral judicial officer for an independent determination that the arrest is justified. *County of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991) (requiring "presentment" within forty-eight hours of arrest in domestic context). This Court has strongly suggested that the presentment requirement applies to U.S. citizens detained by the U.S. military in war zones, and has suggested that forty-eight days was too long to wait for such a presentment hearing. *Kar v. Rumsfeld*, 2008 U.S. Dist. LEXIS 73974, *11 (No. 07-cv-984 (JR)) (D.D.C. Sept. 26, 2008). Here, Mr. Hamdan has been imprisoned for eighty days without any kind of hearing.

## THIRD CLAIM FOR RELIEF
## Unlawful Detention Under the Due Process Clause of the Fifth Amendment

56. Petitioners reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

57. The Due Process Clause protects United States citizens detained at the behest of the United States government, even if the detention occurs abroad. *Reid v. Covert*, 354 U.S. 1, 5-6 (1957) (holding that Due Process Clause protects citizens abroad) (plurality opinion); *United States v. Toscanino*, 500 F.2d 267, 280 (2d Cir. 1974) ("That the Bill of Rights has extraterritorial application to the conduct abroad of federal agents directed against United States citizens is

26

justification for Mr. Hamdan's detention, nor explained how long it will last; he has not been declared to be dangerous to anyone or an enemy of this country or its security in any way. He has received no notice of charges, no hearing, nor any other process of any kind. Indeed, apart from one extremely short phone call to his wife over two months ago and one visit from an American consular official in the presence of his captors, he has had no contact with the outside world. This complete absence of any process violates the Due Process Clause.; completely unjustified detention is paradigmatically arbitrary.

60.   Mr. Hamdan's detention also violates the Due Process Clause because he has been subject to unusually coercive interrogation. *See, e.g., Darwin v. Connecticut*, 391 U.S. 346 (1968) (holding that officials violated Due Process Clause by interrogating suspect for 48 hours while keeping him incommunicado and denying him access to counsel). Here, upon information and belief, Mr. Hamdan has been interrogated nearly every day for eighty days while being held incommunicado without access to counsel. *See* Exh. 1 at ¶10. The interrogation independently violates the Due Process Clause.

61.   Finally, Mr. Hamdan's detention also violates the Due Process Clause because he has been denied access to counsel. *See Hamdi*, 124 S.Ct. at 2652 (holding

28

ACLU - Hamdan-253

that Hamdi "unquestionably has the right to access to counsel in connection with the proceedings" concerning the validity of his detention).[5]

### FOURTH CLAIM FOR RELIEF
### Prolonged Arbitrary Detention in Violation of Customary International Law and the International Covenant on Civil and Political Rights

62.  Petitioners reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

63.  Customary international law prohibits prolonged arbitrary detention. Respondents have breached and continue to breach their obligations under customary international law, accepted by and binding on the United States, by causing the seizure and indefinite imprisonment of Mr. Hamdan, a U.S. citizen, without charge or any other judicial process. Respondents have violated and continue to violate Mr. Hamdan's right to be free from prolonged arbitrary detention under customary international law.

64.  Prolonged arbitrary detention is one of only seven universally condemned

---

[5]Independent of the requirements established by the Fourth and Fifth Amendments, the Suspension Clause itself may also create substantive constraints on the government's power to engage in detention absent some kind of legal process for review of that detention. *See Boumediene v. Bush*, 128 S. Ct. 2229, 2270 (2008) ("Even if we were to assume that the CSRTs satisfy due process standards, it would not end our inquiry. . . . Even when the procedures authorizing detention are structurally sound, the Suspension Clause remains applicable and the writ relevant.").

29

ACLU - Hamdan-254

wrongs that the Restatement (Third) of Foreign Relations describes as violating customary international law (Rest. 3d Foreign Relations § 702), and is prohibited by, *inter alia*, Article 9 of the Universal Declaration of Human Rights, Article 9 of the International Covenant on Civil and Political Rights ("ICCPR"). 999 U.N.T.S 171, ratified by the United States on June 8, 1992, and by numerous other international treaties and documents. The United States has repeatedly affirmed its acceptance of this norm of customary international law, including, *inter alia*, in its submissions to the International Court of Justice during the Iranian hostages case.

65.     In addition, to the extent that the government asserts that its detention of Mr. Hamdan is somehow authorized by some aspect of its war power, the customary international law of armed conflict prohibits the arbitrary deprivation of liberty in both international and non-international armed conflicts. *See* Jean-Marie Henkaerts & Louise Doswald-Beck, eds., *Int'l Committee for the Red Cross, Customary International Humanitarian Law, Volume I: Rules*, 344-52 (2005) (stating the rule and collecting citations to U.N. Security Council resolutions, national legislation, national military manuals, and international and national jurisprudence supporting the rule); *id.* at 347 ("No official contrary practice was found with respect to either

30

international or non-international armed conflicts. Alleged cases of unlawful deprivation of liberty have been condemned."). The United States has officially endorsed this rule—even in "military operations other than war." U.S. Judge Advocate General, Operational Law Handbook 59 (2003) ("*No one shall be subject to arbitrary arrest or detention.*") (emphasis in original).[6]

## PRAYER FOR RELIEF

WHEREFORE, petitioners respectfully pray for relief as follows:

1.     Order Respondents to Show Cause, within three days, why the Writ should not issue in this action, pursuant to 28 U.S.C. § 2243.

2.     If Respondents deny that they caused Mr. Naji Hamdan's detention, permit Petitioners to conduct expedited, limited discovery on that issue. *See Abu Ali v. Ashcroft*, 350 F. Supp. 2d 28, 67-69 (D.D.C. 2004) (ordering jurisdictional

---

[6] While Petitioners have no specific evidence by which to confirm or deny that Naji Hamdan has been subject to torture, circumstantial evidence suggests that possibility. The United Arab Emirates' State Security forces have a history of torturing detainees arrested under similar circumstances. *See* Exh. 17 at 3; Exh. 18 at 1. As a result, Petitioners reserve the right to raise claims under customary international law and the Convention Against Torture and its implementing statute, once this Court orders discovery on this issue. *See* Foreign Affairs Restructuring and Reform Act § 2242(a) ("It shall be the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger . . . regardless of whether the person is physically present in the United States.").

31

ACLU - Hamdan-256

discovery in proxy detention case involving U.S. citizen detained by Saudi authorities at the behest of the United States); *Harris v. Nelson*, 394 U.S. 286, 299 (1969) (holding that habeas courts had power to "fashion appropriate modes of procedure" including with respect to discovery).

3.  Order Respondents to rescind their request that Naji Hamdan be detained, and instead to request his release;[7]

4.  Order Respondents to request permission to allow counsel to meet and confer with Naji Hamdan, in private and unmonitored attorney-client conversations, both by phone and in person;

5.  Order Respondents to request the cessation of all interrogations of Naji Hamdan, direct or indirect, while this litigation is pending;

6.  Declare that Mr. Hamdan's detention at the behest of the United States violates the Non-Detention Act;

---

[7]Petitioner acknowledges that, in general, the federal courts should not dictate the substance of the requests that the U.S. government should make to foreign governments.  However, where the U.S. has affirmatively created the danger that Petitioner now faces at the hands of the U.A.E.'s State Security forces, the Due Process Clause creates an obligation on the government to take steps to ameliorate the danger that it has created. *See Butera v. District of Columbia*, 235 F.3d 637, 651 (D.C. Cir. 2001) (holding "that, under the State endangerment concept, an individual can assert a substantive due process right to protection by the [state] from third party violence when [state] officials affirmatively act to increase or create the danger that ultimately results in the individual's harm.")

32

ACLU - Hamdan-257

7.     Declare that Mr. Hamdan's seizure and detention without presentment at the

behest of the United States violates the Fourth Amendment;

8.     Declare that Mr. Hamdan's detention and interrogation without access to

counsel at the behest of the United States violates the Fifth Amendment;

9.     Declare that Naji Hamdan's detention violates customary international law, and

the International Covenant on Civil and Political Rights;

10.    To the extent Respondents contest any material factual allegations in this

Petition, schedule an evidentiary hearing, at which the parties may adduce

proof in support of their allegations, and order that Naji Hamdan be made

present for that hearing telephonically or in person;

11.    Grant such other relief as the Court may deem necessary and appropriate to

protect Petitioners' rights under the United States Constitution, federal

statutory and regulatory law, and international law; and;

12.    Grant Petitioners reasonable attorneys' fees and costs.

Respectfully submitted,

Dated: November 19, 2008_____    /s/ Arthur B. Spitzer_____
                                     Arthur B. Spitzer, D.C. Bar No. 235960
                                     American Civil Liberties Union of the National
                                     Capital Area
                                     1400 20th Street, NW #119 .
                                     Washington, DC 20036
                                     Tel: (202) 457-0800
                                     Fax: (202) 452-1868

33

ACLU - Hamdan-258

AHILAN T. ARULANANTHAM*
Email:  aarulanantham@aclu-sc.org
JENNIE PASQUARELLA*
Email:  jpasquarella@aclu-sc.org
ACLU Foundation of Southern California
1313 West Eighth Street
Los Angeles, CA 90017
Tel:  (213) 977-9500
Fax:  (213) 977-5297
* Application for *admission Pro Hac Vice*
forthcoming

Attorneys for Petitioners

ACLU - Hamdan-259

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 03-10-2011 BY 65179/DMH/BAU/STP/bls







HOME    NEWS & FEATURES    TAKE ACTION    SUPPORT US    EVENTS    LEGAL    ABOUT US

## Case of Tortured U.S. Citizen Tests Obama Administration on Human Rights

Tuesday, June 2, 2009 permalink

By Ahilan Arulanantham *Director of Immigrants' Rights & National Security for the ACLU of Southern California.*

In only two weeks a U.S. citizen will go on trial in the United Arab Emirates. The American man, who lived in Los Angeles for the better part of 20 years and built his family and business there, reports having been severely tortured while in the custody of the State Security forces of the United Arab Emirates. Yet, his own government has said nothing publicly to inquire about or protest his treatment. There is only one plausible explanation for the federal government's silence on the issue: our nation was complicit in the detention and torture that took place.

The case presents a simple yet profound question for the Obama Administration: whether it will actually end the human rights abuses of the Bush Administration, or instead simply stand silent while they continue.

More than eight months ago Naji Hamdan was arrested by State Security forces in the U.A.E. He was detained without charges or access to a lawyer until the ACLU filed a lawsuit in U. S. court seeking his release from incommunicado detention. One week later, he was transferred into U.A.E. criminal custody, officials disclosed his location and the torture stopped.

In criminal custody, Mr. Hamdan told both his family and the U.S. consular officer who visited him that he had been severely tortured: repeatedly beaten on his head, kicked on his sides, stripped and held in a freezing cold room, placed in an electric chair and made to believe that he would be electrocuted, and held down in a stress position while his captors beat the bottoms of his feet with a large stick. During this horrific process, he said whatever the agents wanted him to say, and those statements may now be used against him in a criminal trial in the U.A.E.

Mr. Hamdan's description of the torture and interrogation he endured strongly suggests that American agents have been involved. Although his captors blindfolded him, one of his interrogators spoke native English with an American accent and was not fluent in Arabic. In addition, the agents interrogated Mr.

**Related**

Read Arulanantham's earlier piece about this case.

### GET INVOLVED!

MEDIA & RELEASE
JOIN OUR ACTIVIST NETWORK
LEGAL CENTERS
VOLUNTEER
INTERN
SEE YOUR RIGHTS

## UP FRONT

**CRIMINAL JUSTICE**

Report: *Racial Profiling and the LAPD: Reform & Resistance*

Jails Project Helps LA County Inmates and Families

**STUDENTS & EDUCATION**

Military Recruiting in Our Public Schools

Get Help Fixing California's Broken Classrooms

**IMMIGRANT RIGHTS**

U.S. Citizen Illegally Detained and Deported Latest Victim of Unconstitutional Immigration Enforcement Policy

**LGBT EQUALITY**

Prop. 8 News, Updates and More

ACLU - Hamdan-260

Hamdan on topics about which only federal agents could have knowledge, such as a meeting he had with FBI agents at the U.S. Embassy in Abu Dhabi. His interrogators also asked him in extreme detail about his life and activities when he lived in the United States.

FBI

Only a few weeks before his arrest, FBI agents from Los Angeles had flown to the U.A.E. and interrogated Mr. Hamdan at the embassy for several hours. This interrogation and the subsequent arrest were only the latest episodes in a two-year period during which the FBI intensively surveilled Mr. Hamdan. Yet throughout his subsequent ordeal in the U.A.E., the U.S. government claimed to know nothing about why Mr. Hamdan was detained or tortured. Indeed, documents filed with the Court show that the federal government has continued to investigate Hamdan's businesses in the U.S. even while it has denied any involvement in his detention in the U.A.E.

It appears that Mr. Hamdan is the latest victim of the U.S. government's practice of asking foreign governments to detain terrorism suspects whom the federal government cannot itself detain and interrogate under U.S. law — a practice known as "proxy detention." By asking other countries to detain on our behalf, the U.S. government apparently believes it can avoid the constraints of the U.S. Constitution, allowing federal agents to interrogate individuals held in secret, incommunicado detention, without charge or access to a lawyer, and subject to torture. The countries the U.S. partners with in this practice, including the U.A.E., typically have poor human rights records and weak protections against prolonged arbitrary detention. In fact, a document submitted in Mr. Hamdan's case make clear that the United States has used the U.A.E. previously as its proxy to detain people subject to the rendition program. The proxy detention program has also been documented by groups such as the NYU Center for Human Rights and Global Justice.

An ironic twist in this case is that Mr. Hamdan was more than willing to talk to FBI agents. He voluntarily submitted to their interrogation several times over the last few years. Obviously if Mr. Hamdan has done something wrong, he should be charged with a crime. But the basis for those charges cannot be statements obtained under torture. If there is no evidence against him, he should be released.

The ACLU's lawsuit demands the federal government seek his release and reveal the nature and extent of its involvement. President Barack Obama won election amidst promises to restore our nation's commitment to the rule of law. Surely he believes that our country owes its own citizens the right to learn what role our government has played in detaining and torturing them.

b6 −1
b7C −1

« previous
May 7, 2009

news index

This is the web site of the American Civil Liberties Union of Southern California and the ACLU Foundation of Southern California. Learn more about the distinction between these two components of the ACLU. Copyright 2007 The ACLU of Southern California.

ACLU - Hamdan-261

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 03-10-2011 BY 65179/DMH/BAW/STP/bls

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MONA MALLOUK, *et al.*,

     Petitioners,

  v.           No. 08-cv-2003 (JR)

BARACK H. OBAMA, *et al.*,

      Respondents.

## PETITIONERS' RESPONSE TO MOTION TO DISMISS

### Introduction

As of the time of this writing, an American citizen has been detained abroad for over seven months by a close ally of our government without explanation as to what he has done to deserve this fate, other than entirely vague allegations that he has been involved in terrorism. Petitioners credibly allege that he was tortured, that an American official was present during the torture, and now also that his detention continues only at the behest of the U.S. government.

In response, Respondents have failed to submit a declaration stating that no agency of the U.S. government requested Mr. Hamdan's detention. Instead, they assert without evidence that the U.A.E. is solely responsible because it charged Mr. Hamdan through its criminal process, one week after this case was filed. But the timing of his transfer to criminal custody speaks louder than the government's half-hearted denial, as does the fact that his case remains in limbo -- he remains detained without having been told when he will go to trial, what conduct of his was criminal, and what evidence the government will offer against him.

ACLU - Hamdan-262

Under these circumstances, Petitioners have credibly alleged that Mr. Hamdan remains detained at the behest of the U.S. government, and alternatively that the U.S. government has placed Mr. Hamdan in danger insofar as it contributed to his torture and the resulting interrogation. This Court should allow discovery in order to determine the extent of the U.S. government's involvement in Mr. Hamdan's detention, interrogation, and torture. Indeed, doing so may be the only way to prevent a grave injustice against a U.S. citizen, perpetrated by his own government.

I.    **Petitioners Have Adequately Pled Constructive Custody for Purposes of Habeas Jurisdiction.**

The government first argues that Petitioners have failed to "establish" sufficient jurisdictional facts in order to support a theory of constructive custody. Respondents' Motion to Dismiss (hereinafter "Resp. MTD") at 1. This argument is incorrect for several reasons. First, it mistakes what Petitioners must ultimately "establish" with what they have to *allege*, at the motion to dismiss stage. Petitioners have undoubtedly alleged constructive custody sufficient to survive this motion to dismiss. Second, even if something more than mere allegations were required in cases such as this, Petitioners have provided substantial evidence in addition to the allegations, and certainly have presented enough to show that the claims are "colorable" and therefore merit at least limited discovery. [1]

---

[1] Petitioners recognize that, as in *Abu Ali*, their allegations have necessarily evolved as the factual circumstances have changed and as they have learned more about Mr. Hamdan's plight. *See Abu Ali v. Ashcroft*, 350 F.Supp. 2d 28, 67-69 (D.D.C. 2004). Petitioners request that the Court treat the allegations and evidence that they have submitted in the briefs and pleadings filed after the petition as incorporated into the original document. For example, just as the government has treated its motion to dismiss as a return to the writ, Petitioners request that the Court treat the allegations in this brief as though they were part of a traverse. Should the Court be inclined to

2

ACLU - Hamdan-263

### A. Petitioners Need Only Allege Facts Supporting Jurisdiction.

Although the government cites no cases that stand for the proposition, it appears to

suggest that Petitioners must actually *prove* the jurisdictional facts *prior to discovery* in order to

state a proxy detention claim. *See* Resp. MTD at 7.  This is obviously incorrect; this Court may

not dismiss the petition by resolving disputed facts without permitting discovery concerning

those facts. "To avoid dismissal of his complaint under Fed. R. Civ. P. 12(b)(6), [plaintiff] need

not plead the facts sufficient to prove his allegations and evidence that will ultimately be used at

trial." *In re Sealed Case*, 494 F.3d 139, 148 (D.C. Cir. 2007).  This is the rule in habeas cases as

well. *See generally Harris v. Nelson*, 394 U.S. 286, 300 (1969) ("where specific allegations

before the court show reason to believe that the petitioner may, if the facts are fully developed,

be able to demonstrate that he is confined illegally and is therefore entitled to relief, it is the duty

of the court to provide the necessary facilities and procedures for an adequate inquiry."); *Al Ansi

v. Bush*, 585 F. Supp. 2d 121, 124 (D.D.C. 2008) (authorizing discovery in Guantanamo habeas

petition).

That this case involves a motion to dismiss for lack of jurisdiction does not alter this rule.

Indeed, it has long been the law in the D.C. Circuit that the district court should not resolve a

---

accept the arguments presented here, but nonetheless feel compelled to dismiss the petition
because it does not explicitly incorporate the allegations contained in Petitioners' more recent
filings, Petitioners request an opportunity to amend the petition to incorporate both the factual
allegations and legal theories set forth in the subsequent pleadings, including this one.  If the
Court grants this request, Petitioners will also amend the petition to name Naji Hamdan as the
Petitioner, given that he has now explicitly authorized this lawsuit. *See* Exh. 20 at 5, ¶ 21 (Dec.
of Reem Salahi) (attached as Exhibit to Reply to Respondents' Opposition to Petitioners' Motion
to Disclose *Ex Parte* Evidence).

3

ACLU - Hamdan-264

motion to dismiss for lack of jurisdiction by deciding disputed facts without allowing the parties

an opportunity to discover the relevant facts.

> [S]hould the trial court look beyond the pleadings, it must bear in mind what
> procedural protections could be required to assure that a full airing of the
> facts pertinent to a decision on the jurisdictional question may be given to
> all parties. Indeed, this Court has previously indicated that ruling on a Rule
> 12(b)(1) motion may be improper before the plaintiff has had a chance to
> discover the facts necessary to establish jurisdiction. . . . In many instances
> it may be necessary to hold evidentiary hearings in resolving particularly
> complicated factual disputes rather than to rely on affidavits alone.

*Herbert v. National Academy of Sciences*, 974 F.2d 192, 198 (D.C. Cir. 1992) (citing, *inter alia*,

*Collins v. New York Central System*, 327 F.2d 880 (D.C. Cir. 1963)).

Not surprisingly, the cases the government cites to support its radical position that the

Court should dismiss this case on disputed facts without conducting discovery provide no

support for its position. The government cites *Steel Co. v. Citizens for a Better Env't*, 523 U.S.

83, 94-95 (1998), however, that case establishes only that jurisdiction is a threshold issue. That

the Court must resolve jurisdiction before the merits says nothing about whether or not the Court

may allow discovery on the jurisdictional question before resolving it.

The government also cites cases holding that a court may consider facts outside the

complaint and may resolve disputed facts when deciding a motion to dismiss for lack of

jurisdiction under Fed. R. Civ. Proc. 12(b)(1), but these cases do not support the view that such

disputed facts may be resolved *without discovery*. Resp. MTD at 7 (citing *Coalition for*

*Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003) and *Koutny v. Martin*,

530 F. Supp. 2d 84, 87 (D.D.C. 2007)). Indeed, *Coalition for Underground Expansion* explicitly

did *not* approve of the practice of resolving a motion to dismiss on disputed facts without

4

discovery, and instead decided the case on the ground that those facts, even if proven true, could

not have established jurisdiction. *See id.* at 198 ("As for the lack of discovery, the Coalition has

made no allegation which, if substantiated, would establish standing to sue under the APA.").[2]

Thus, the caselaw in this Circuit clearly establishes that Petitioners are entitled to

discovery as long as they have provided detailed and specific allegations to support their

jurisdictional theory. As explained below, Petitioners have met that burden.

### B. Petitioners' Allegations and Evidence Are Substantial Enough to Warrant Discovery.

The Petition for Writ of Habeas Corpus along with the supplemental pleadings to date

unequivocally allege that Mr. Hamdan was detained at the behest of the U.S. government, was

interrogated and tortured with the knowledge of and participation of U.S. government officials,

and remains detained now, ostensibly awaiting trial, still at the behest of the U.S. government.

The initial petition clearly alleged detention at the behest of the U.S. government. *See*

Petition for Writ of Habeas Corpus (hereinafter "Pet.") at 1, ¶ 1 ("This case involves the

detention of an American citizen at the behest of the United States government."); *id.* at 2, ¶ 4

("The most elemental legal principles by which we govern ourselves cannot countenance the

lawless detention of a United States citizen at the behest of his own government."); *see also id.* at

24, ¶ 51; *id.* at 26, ¶ 57.

---

[2] It is unclear why Respondents cite *Koutny*, given that the plaintiffs in that case prevailed
against a motion to dismiss on jurisdictional grounds under Fed. R. Civ. Proc. 12(b)(1). *Koutny*,
530 F. Supp. 2d at 88. Plaintiffs lost only on the ground that they did not allege a constitutional
violation. The case is wholly inapposite.

ACLU - Hamdan-266

Petitioners also alleged, based on the subsequent pleadings and accompanying declarations, that Mr. Hamdan's interrogation and torture while detained by the U.A.E.'s State Security forces occurred with the knowledge and participation of U.S. officials. *See* Notice Regarding Status of Naji Hamdan (hereinafter "Notice of Status") at 2-3. Petitioners allege that at least one agent of the U.S. government participated in Mr. Hamdan's interrogation and witnessed his torture. Notice of Status at 2; Exh. 13A at 6 (Naji Hamdan's Statement to Mr. Cooper – Consul) (attached as Exhibit to Notice of Status); Exh. 20 at 5-6; ¶¶ 22-23 (Dec. of Reem Salahi) (stating that Mr. Hamdan "firmly believes that the interrogator was an American" and that the interrogator "spoke native American English, and he did not speak in Arabic.").

In addition, Petitioners now allege that Mr. Hamdan's continued detention in the U.A.E., pursuant to a criminal proceeding that has never specified what conduct was illegal and now appears to have inexplicably stalled, is also occurring at the behest of the U.S. government. Petitioners make this allegation based on several newly-discovered facts. First, a U.A.E. government official who does not wish to reveal his name has stated that Mr. Hamdan's detention was at the behest of the U.S. government. *See* Exh. 25 at ¶ 4 (Dec. of Mohamed-Idris Traina) (attached). Second, the U.S. government continues to investigate Mr. Hamdan's financial transactions in the United States. In late December 2008, the FBI subpoenaed Daniel Sieu, Mr. Hamdan's loan officer in Los Angeles, for his file on a loan he gave to Mr. Hamdan. Exh. 23 at ¶ 5 (Dec. of Daniel K. Sieu) (attached). Third, upon information and belief, the prosecutor responsible for convicting Mr. Hamdan in the U.A.E. has communicated with U.S. officials about the situation. In February 2009, the U.A.E. head prosecutor assigned to Mr. Hamdan's case, Mr. Khaled Al Sha'ali, traveled to the United States. Exh. 20 at 1, ¶ 6; 2-3, ¶ 10 (Dec. of Reem Salahi). Finally, Petitioners' research into U.A.E. law confirms that the timing of

6

ACLU - Hamdan-267

Mr. Hamdan's transfer strongly suggests that U.S. government officials, in response to the filing

of this lawsuit against the United States, participated in the decision to transfer Mr. Hamdan into

U.A.E. criminal custody.  Contrary to the government's assertion, under U.A.E. law, the U.A.E.

State Security forces had authority to continue Mr. Hamdan's incommunicado imprisonment for

a total of six months.  Exh. 21 at Art. 35 (Decree by Federal Law No. 1 of 2004 on Combating

Terrorism Offences (U.A.E.)) (attached); Exh. 22 at ¶¶ 13-14 (Dec. of Abou El Fadl) (attached).[3]

The fact that the U.A.E. officials released Mr. Hamdan one week after Petitioners sued U.S.

officials in this case, thereby ending Mr. Hamdan's incommunicado detention by State Security

forces, but continuing his indefinite detention through the U.A.E.'s criminal process, strongly

suggests U.S. involvement.  Notice of Status at 2-3.  Petitioners allege that the purpose of this

transfer was in part to shield Mr. Hamdan's continued detention from the scrutiny of the

American judicial system.[4]

---

[3] Respondents contend that the timing of Mr. Hamdan's charging and transfer from U.A.E. State
Security to criminal custody is consistent with U.A.E. law.  Michelle Bernier-Toth's declaration
claims that, based on her understanding, U.A.E. law allows for detention for "questioning for
extended periods of time and specifically to detain individuals for up to 90 days without further
proceedings" and that Mr. Hamdan's "extended detention was not itself inconsistent with the
laws of the U.A.E."  Dec. of Michelle Bernier-Toth at 3, ¶ 8.  Petitioners have found no such
support in U.A.E. law for Ms. Bernier-Toth's claim.  In fact, the counter-terrorism law under
which Mr. Hamdan is charged allows the government to detain terrorism suspects for
questioning and without charge for up to *six months*.  Petitioners can locate no such ninety day
requirement in governing U.A.E. law.  *See* Exh. 22 at ¶ 14 (Dec. of Khaled Abou El Fadl)
(stating "There is no legal requirement that necessitates further proceedings or release after
ninety days of detention in state security cases in the U.A.E.").

[4] As noted *supra* at note 1, this Court should treat this brief as a traverse to the extent that it
chooses to treat the government's motion to dismiss as a return to the writ.  As such, this
document is also a pleading.

ACLU - Hamdan-268

As explained *supra* Section I(A), Petitioners disagree with the government's suggestion that they have to prove facts sufficient to establish this Court's jurisdiction without the benefit of discovery. While Petitioners accept that their allegations must be colorable, Petitioners have already established sufficient facts to support a finding that their allegations are colorable, and therefore warrant further discovery. The Petition itself describes how Mr. Hamdan was closely scrutinized by the Federal Bureau of Investigations (FBI) for many years, beginning in 1999, apparently for counterterrorism-related reasons. Pet. at 12-15, ¶¶ 26-35; Exh. 3 at 2-7, ¶¶ 15-38 (Dec. of Hossam Hemdan) (attached as Exhibit to Petition). The Petition further describes that once Mr. Hamdan relocated to the United Arab Emirates, he was arbitrarily detained in Lebanon by the Lebanese intelligence service at the behest of a "prominent foreign agency." Pet. at 14-15, ¶¶ 32, 34. Subsequently, the Petition states (and the government has confirmed) that two FBI agents flew to the U.A.E. to interrogate Mr. Hamdan at the U.S. Embassy there. Pet. at 15, ¶ 35. Approximately six weeks later, according to the dates supplied by the Public Declaration of Michael J. Heimbach, Assistant Director, Counterterrorism Division, FBI, *see* Dec. of Michael J. Heimbach at 3, ¶ 7 (attached as Exhibit to Resp. MTD), Mr. Hamdan was arrested and detained by the U.A.E. State Security forces (the "Amn Al-Dawla"). Pet. at 15-16, ¶ 36.

Finally, Mr. Hamdan's detention at the behest of the U.S. government falls squarely within a well-documented pattern and practice of proxy detention, whereby the U.S. government requests that foreign governments detain terrorism suspects, so as to avoid the constraints on such detention created by our judicial system. Petitioners alleged this in the original petition, *see* Pet. at 19-23; ¶¶ 45-48; *id.* at 21-22, ¶ 47, and have also provided further support for those allegations through the Declaration of Khaled Abou El Fadl. Exh. 22 at ¶¶ 15-24 (attached).

8

ACLU - Hamdan-269

The government never responds directly to this evidence, but argues instead that its own declarations are sufficient to establish the absence of any U.S. involvement, without further discovery. However, as explained in the briefing concerning the government's classified evidence, the declarations do not come close to establishing the absence of U.S. involvement. While the government asserts that "the Heimbach Declaration makes clear that the *United States Government* did not request that the UAE detain or arrest Hamdan," *see* Resp. MTD at 8 (emphasis added), that assertion finds no support in the Heimbach Declaration, which mentions only the FBI and does nothing to disclaim the involvement of the other United States agencies that might have been involved, such as the CIA or various components of the Department of Defense. Respondents' Motion to Dismiss also repeatedly conflates the FBI's involvement with the involvement of any U.S. government official. *See, e.g.*, Resp. MTD at 9 n.8 (asserting that Petitioners have to prove that the official present during Mr. Hamdan's torture was "an FBI agent").[5] In addition, wholly apart from the fact that the declarations do not deny that other U.S. officials have caused Mr. Hamdan's detention, the Heimbach Declaration does not foreclose the possibility that the FBI itself "requested" that the UAE investigate him or that it "expressed an[] opinion" favoring his detention. Dec. of Michael Heimbach at 3.[6]

---

[5] This conflation is particularly striking given that the petition and subsequent filings in this case made repeated reference to proxy detention at behest of the "United States," and did not limit the claim to detention at the behest of the FBI. *See, e.g.*, Pet. at ¶¶ 4, 51. *See also* Notice of Status at 3 (referring to the "role of any United States government employees or contractors in his interrogation and torture").

[6] To be precise, the Heimbach Declaration states that "[t]he FBI did not direct the UAE to investigate Hamdan or direct actions taken by the UAE during their investigation" (¶ 9), but does not deny that the FBI requested, suggested, encouraged, or facilitated that investigation. Likewise, the Heimbach Declaration states that the FBI did not "request that the UAE detain or arrest Hamdan" (¶ 10), but does not deny that the FBI suggested, encouraged, or facilitated that

9

ACLU - Hamdan-270

Taken together, Petitioners' detailed allegations, the facts they have already adduced, and
the obvious gaps in the government's declarations suffice to allege that Mr. Hamdan is in the
constructive custody of the United States. At this stage of the proceedings, Petitioners must do
nothing more to defeat the government's motion to dismiss. As explained more fully *infra*, this
Court has jurisdiction over a habeas petition as long as the petitioner alleges either that he is
detained by or under color of authority of the United States, or that he is in custody in violation
of the Constitution, laws, or treaties of the United States. Petitioners have pled facts sufficient to
establish habeas jurisdiction.

### C. *Abu Ali* Supports Petitioners' Jurisdictional Theory.

The government also argues that this Court's decision in *Abu Ali* establishes a threshold
set of factors for finding constructive custody, and that Petitioners have failed to meet that
standard. *See* Resp. MTD at 4 (suggesting that *Abu Ali* required a finding of four factors); *id*. at
7-8 ("even in the absence of Respondents' declarations, Petitioners' evidence and unsupported
allegations would not meet the standard of *Abu Ali*, rendering habeas jurisdiction absent").

This argument distorts the holding of *Abu Ali*. In the passage on which the government
relies, the *Abu Ali* decision makes clear that it is not creating any new threshold set of
requirements. The full quotation is as follows:

> The jurisdiction of this Court requires a finding that Abu Ali is in the actual or
> constructive custody of the United States. The case law indicates that this

---

detention. Most curiously, the Heimbach Declaration states that "[t]he FBI has not expressed
any opinion to the UAE about Hamdan's *continued* detention or trial by the UAE" (¶ 12)
(emphasis added), but does not deny that the FBI had "expressed an opinion" to the UAE
regarding Mr. Hamdan's *initial* detention or his detention prior to the filing of the petition for
habeas corpus.

ACLU - Hamdan-271

> inquiry will entail a consideration of several factors, including whether: (i) Abu
> Ali was detained at the behest of United States officials; (ii) his ongoing
> detention is at the direction of the United States enlisting a foreign state as an
> agent or intermediary who is indifferent to the detention of the prisoner; (iii) he
> is being detained in the foreign state to deny him an opportunity to assert his
> rights in a United States tribunal; and (iv) he would be released upon nothing
> more than a request by the United States. . . . Any one of these factors may not
> be sufficient to establish jurisdiction.

*Abu Ali v. Ashcroft*, 350 F. Supp. 2d 28, 68 (D.D.C. 2004) (internal citations omitted).

As the context makes abundantly clear, *Abu Ali* held that the court would have

jurisdiction upon a showing of "actual or constructive custody," and set forth the factors solely as

issues to consider, none of which would necessarily be dispositive. *See Abu Ali,* 350 F. Supp. 2d

at 68 n. 42 ("The Court does not mean to imply that it has set out a comprehensive list of the

factors that are relevant to the inquiry."). As set forth in detail *supra*, Petitioners have

established jurisdiction under a constructive custody theory. A close reading of the relevant

passage reveals that *Abu Ali* requires nothing more. Indeed, this Court has found constructive

custody in the absence of all four of these factors in at least one other case. *See Idema v. Rice*,

478 F. Supp. 2d 47, 52-53 (D.D.C. 2007) (denying motion to dismiss in suit challenging

detention under color of foreign conviction where petitioner alleged, *inter alia*, that U.S. officials

exerted "undue influence" over Afghan judicial process).

In any event, Petitioners here have alleged the same set of factors present in *Abu Ali*;

indeed, this case poses the precise problem that Judge Bates described in that case. Just as with

*Abu Ali*, Petitioners here allege that Mr. Hamdan was initially detained at the behest of the U.S.

government, that his detention remains at the behest of the U.S. government and would cease but

for the U.S. government's continued involvement, that he is being denied access to American

courts both to contest the assertion that he has engaged in any kind of terrorist activity and to

ACLU - Hamdan-272

obtain redress for his torture, and that he would be released upon the request of the U.S. government. While all of these factors (particularly the third) are not required to find constructive custody, they are present in this case.

## II.   That a Foreign Sovereign is Mr. Hamdan's Nominal Custodian Does Not Undermine This Court's Jurisdiction.

The government's alternative argument that this Court lacks jurisdiction because Mr. Hamdan remains detained in the nominal custody of the United Arab Emirates, although at the behest of the United States government, is meritless. Indeed, most of the defects in the argument were clearly described by this Court in *Abu Ali*, which rejected this "sweeping" argument. *Abu Ali*, 350 F. Supp. 2d at 31.

As an initial matter, the text of the federal habeas statute does not require that a detainee be held in U.S. custody. This is obvious from the many state post-conviction habeas cases heard in federal court, and also from the fact that habeas petitions have long been brought against private actors detaining people at the behest of the federal government. *See, e.g., U.S. v. Jung Ah Lung*, 124 U.S. 621 (1888).

That the statute does not require detention by U.S. officials is also plain from its terms. Section 2241 provides jurisdiction *either* if the detainee is in the custody of the United States *or* if the detainee is held in violation of the Constitution, laws, or treaties of the United States. *Compare* 28 U.S.C. 2241(c)(1) (writ for prisoners held in U.S. custody) *with* 28 U.S.C. 2241(c)(3) (writ for prisoners held in violation of U.S. law). *See also* Pet. at ¶ 12; *Abu Ali v. Ashcroft*, 350 F. Supp. 2d 28, 45 (D.D.C. 2004) ("a district court cannot issue a writ of habeas corpus to an individual unless the individual 'is in custody' either 'under or by color of the authority of the United States' or 'in violation of the Constitution or laws or treaties of the

12

ACLU - Hamdan-273

United States'"). The historical provenance of the two provisions makes clear that this

distinction is no accident. While the federal courts have had jurisdiction over cases involving

prisoners in U.S. custody since their creation in 1789 under what is now Section 2241(c)(1),

jurisdiction for people held in violation of U.S. law arose when Congress expanded the statute in

1866, and is now codified in Section 2241(c)(3). *See generally Flores-Miramontes v. INS*, 212

F.3d 1133, 1141 (9th Cir. 2000) (citing, *inter alia*, WILLIAM F. DUKER, A CONSTITUTIONAL

HISTORY OF HABEAS CORPUS (1980); Henry M. Hart, Jr., *The Power of Congress to Limit the

Jurisdiction of Federal Courts: An Exercise in Dialectic*, 66 Harv. L.Rev. 1362, 1395-7 (1953)).

Here, Petitioners have alleged that Mr. Hamdan's ongoing detention violates several

statutory and Constitutional requirements, including the Due Process Clause. Under these

circumstances, this Court has jurisdiction even though his nominal custodian remains the United

Arab Emirates.

The government cannot and does not explicitly dispute that this Court retains habeas

jurisdiction even in cases where a detainee is not in U.S. custody (whether real or nominal).

Instead, it argues for an implicit limitation in the federal habeas scheme, asserting that the statute

"is clearly premised on the fact that habeas relief is available in United States courts only to

challenge the detention of petitioners who are in the custody of custodians subject to the laws of

the United States and only where the actual custodians are subject to the jurisdictions of United

States courts." Resp. MTD at 13.

However, the only citation provided for the government's asserted implicit limitation on

the habeas statute is the Supreme Court's decision in *Rasul v. Bush*, 542 U.S. 466, 481-82

(2004), which does not adopt such a rule, even in dicta. Indeed, the section of *Rasul* cited by the

13

ACLU - Hamdan-274

government does not appear relevant for purposes of determining jurisdiction in this case; it does not discuss detention by actors other than United States agents and does not purport to describe the outer limits of the habeas statute's reach. To the extent it is relevant, *Rasul* notes that the government conceded that the territorial constraint it argued for would not apply to U.S. citizens (such as Mr. Hamdan), *id.* at 481, and that at common law (when there was no authority analogous to that set forth in Section 2241(c)(3)) the focus rested "on the practical question of the exact extent and nature of the jurisdiction or dominion exercised in fact by the Crown." *Id.* at 482 (internal citations omitted). Here, Petitioners allege that, as a "practical" matter, Mr. Hamdan is detained by the United States insofar as the United States government is the cause of his detention and could cause his release by ceasing its support for his continued detention. To the extent *Rasul*'s discussion is even relevant, it requires nothing more. To be clear, Petitioners do not dispute that this Court must be able to grant effective relief. However, it can do so in this case, as explained *infra* Section III. Given that relief is available, nothing in the text or caselaw concerning the habeas statute supports the government's new-found additional restriction on its scope.

The government also argues that, as a general matter, this Court lacks habeas corpus jurisdiction whenever the petitioner is in the custody of a foreign sovereign because "a separate sovereign and its officials are not subject to the direction of the United States." Resp. MTD at 13. But this obviously begs the very question at the heart of this case. Petitioners contend that the U.A.E. authorities detaining Mr. Hamdan *are* acting at the direction or behest of the United States. Thus, the Court cannot dismiss this case for lack of jurisdiction without determining whether or not Petitioner is in the constructive custody of the United States, even if he is detained under the criminal laws of the U.A.E. Petitioners believe that discovery will confirm

14

ACLU - Hamdan-275

that the United States is responsible for the U.A.E.'s actions, and that the U.A.E. would release

Mr. Hamdan absent U.S. requests that he remain detained.  If these facts are true, this Court has

jurisdiction.

The government cites several cases in support of its rule, none of which require dismissal

here.  The first case, which Petitioners discussed in their Reply Brief concerning the classified

evidence (*see* Reply to Respondents' Opposition to Petitioners' Motion to Disclose *Ex Parte*

Evidence) (discussing both *Keefe* and *Wilson v. Girard*, 354 U.S. 524 (1957)) actually

acknowledged the possibility of a constructive custody theory of habeas jurisdiction.  *United*

*States ex rel. Keefe v. Dulles*, 222 F.2d 390, 392 (D.C. Cir. 1954) (describing the first question

presented as "whether Keefe is held in actual or constructive custody by the respondents named

in the petition, or by any other person or persons subject to the jurisdiction of the District

Court").  *Keefe* involved an American serviceman who was tried and convicted of a crime by

French authorities.  *Id.* at 391.  While his wife's habeas petition challenged the failure by the

United States to obtain his release, it did not allege that the United States was responsible for his

detention.  *Id.*  As this Court explained in *Abu Ali*, "[t]he holding in *Keefe* that there was no

'custody or constructive custody' where the only involvement of the United States is assumed to

be its refusal to intervene on behalf of a citizen held by a foreign government can hardly be read

as precedent for the notion that there can never be 'custody or constructive custody' even if (as

petitioners allege here) the United States is actively involved in arranging the arrest and ongoing

detention of a citizen."  *Abu Ali v. Ashcroft*, 350 F. Supp. 2d 28, 56 (D.D.C. 2004).  *See also id.*

at 55 ("[*Hirota* and *Keefe*] do not remotely stand for the proposition that a United States citizen

in the hands of a foreign government has no right to file a petition for habeas corpus regardless

of the involvement of the United States in his ongoing detention.").

15

ACLU - Hamdan-276

That *Keefe* acknowledged the possibility of a constructive custody theory is hardly surprising, given that "[t]here are, in fact, many circumstances in which courts have found actual or constructive custody notwithstanding the fact that the petitioner was not in the physical custody of the respondent government official. . . . In some of these cases, the petitioner was not in the physical control of the petitioner, but was in the physical control of some other entity.  In others, the petitioner was not in the physical control of any entity at all.  Nevertheless, in all of these decisions, the petitioner was found to be in the actual or constructive custody of the respondent within the meaning of the habeas statute because the respondent was responsible for significant restraints on the petitioner's liberty." *Abu Ali*, 350 F. Supp. 2d at 47 (collecting cases from a variety of contexts).

The government also cites a district court case from Delaware in support of its rule.  *See* Resp. MTD at 15 (citing *United States v. Sinclair*, 702 F. Supp. 477 (D. Del. 1989)).  However, *Sinclair* involved a petition to collaterally attack a federal criminal conviction under 28 U.S.C. 2255.  Even if it were otherwise controlling, it could not as a technical matter resolve the issue in this case, as it involves a different statute.  *Id.* at 479.  In addition, there was no suggestion in *Sinclair* that the detention was being done to evade lawful processes otherwise available to the U.S. citizen.  On the contrary, the petitioner was detained pursuant to a demand for his extradition.  *Id.*  Here, in contrast, Petitioners credibly allege that Mr. Hamdan was tortured in the presence of an American official who participated in his interrogation during that torture, and that he is unable to seek redress for that egregious harm because he remains detained in the U.A.E. at the behest of the U.S. government.  This Court found *Sinclair* distinguishable on that basis in *Abu Ali*, and the same rationale applies here.  *Abu Ali*, 350 F. Supp.2d at 55 (stating that "this case is not at all like [Sinclair] . . . [because] a citizen is allegedly being detained at the

16

ACLU - Hamdan-277

direction of the United States in another country without any opportunity at all to vindicate his
rights.").[7]

Finally, apart from a cryptic footnote, *see* Resp. MTD at 2 n.1, the government never
discusses the other bases for jurisdiction that Petitioners properly pled in the petition. Petitioners
asserted jurisdiction under 28 U.S.C. 1331, 28 U.S.C. 1343 (with respect to his Non-Detention
Act claim), 28 U.S.C. 1361, and 28 U.S.C. 1651. Pet. at 4, ¶ 8. In addition, the petition alleges
violations of the Constitution, including the claim that Respondents have violated the Due
Process Clause by causing and then participating in Mr. Hamdan's coercive interrogation and
torture. Pet. at 26-29, ¶¶ 56-61; *see also infra* Section III.[8]

Whatever the merits of the government's other claims, this Court must have jurisdiction
to consider Petitioners' claims that the U.S. government continues to violate Mr. Hamdan's Due
Process rights. While this Court could reject those claims on the merits at an appropriate time,
such as on summary judgment after discovery, it cannot do so now. As the Court explained in
*Abu Ali*, "[a]t this time, the Court is concerned with its *jurisdiction* to entertain the habeas
petition of Abu Ali, not with the *merits* of the habeas petition itself. . . . Therefore, it would be a
somewhat strained reading of section 2241(c)(3) in particular that would require the United

---

[7] *Duchow v. United States* is also inapposite. That case, from the District Court in the Eastern
District of Louisiana, involves an action by a U.S. official charged in a Bolivian drug
prosecution. *Duchow v. United States*, No. Civ. 95-2121, 1995 WL 425037 (E.D. La. 1995),
*aff'd,* 114 F.3d 1181 (5th Cir. 1997). He sought an order requiring the U.S. officials who
apparently accused him of illegal activity to withdraw their accusations. *Id.* at *2. The court
found no jurisdiction, citing none of the cases involving constructive custody discussed here or
in *Abu Ali*. *Id.* at *5.

[8] If the government makes new arguments concerning these jurisdictional bases in its Reply Brief
in support of this motion, Petitioners will request an opportunity to respond to them at that time.

17

ACLU - Hamdan-278

States to play a significantly greater role in an individual's detention for purposes of the Court's
*jurisdiction* than would be necessary to support a claim *on the merits* that the petitioner is 'in
violation of the Constitution, laws, or treaties of the United States.'" *Abu Ali v. Ashcroft*, 350 F.
Supp. 2d 28, 50 (D.D.C. 2004).

### III.    The Court Has Authority to Grant Effective Relief in This Case.

The Court has authority to grant effective relief in this case, notwithstanding the fact that
Mr. Hamdan remains in U.A.E. custody.  The Court can grant relief by ordering the U.S.
officials who have caused Mr. Hamdan's detention to explicitly withdraw their request that he be
detained, and in so doing to make clear that the United States has no interest in or desire that his
detention continue.  The Court can also grant relief by ordering U.S. officials to un-do the danger
they have created by causing his detention and, upon information and belief, participating in his
interrogation and torture.  Officials could un-do this state-created danger by informing the
authorities of the U.A.E. of the circumstances under which Mr. Hamdan was interrogated and
tortured, if in fact U.S. officials were present during that interrogation and torture.  They could
also ameliorate the damage by informing this Court, Mr. Hamdan, and his counsel of those
circumstances, thus allowing counsel to use that information to protect Mr. Hamdan through
other advocacy.  The government cites no authority that would bar this Court from granting those
two forms of relief.

#### A. The Court Has Authority to Order U.S. Officials to Make Clear That They
#### No Longer Request Mr. Hamdan's Detention and Torture.

The Court has authority to grant effective relief in this case, notwithstanding the fact that
Mr. Hamdan remains in U.A.E. custody, in at least two ways.

18

ACLU - Hamdan-279

First, Petitioners allege that the U.A.E. continues to detain Mr. Hamdan ostensibly for criminal prosecution only because the United States government has requested his detention. If discovery confirms this allegation, this Court would have the authority to order the U.S. officials who illegally caused his detention to reverse that result by withdrawing their request that he be detained. Both *Abu Ali* and *Idema* presuppose the availability of such relief. *See Idema v. Rice*, 478 F. Supp. 2d 47, 53 (D.D.C. 2007) (ordering the U.S. government to respond to a habeas petition where the petitioner, detained in Afghanistan pursuant to Afghan criminal law, alleged that U.S. officials ordered his arrest and torture, stole exculpatory evidence during his trial and appeal, exerted undue influence over Afghan judges, and ordered judges not to release him); *Abu Ali v. Ashcroft*, 350 F. Supp. 2d 28, 69 (D.D.C. 2004) (granting jurisdictional discovery where petitioner's habeas petition alleged his detention in Saudi Arabia by Saudi officials was at the behest of the U.S.). The possibility of this straightforward relief is sufficient to defeat the government's argument concerning the impossibility of relief.

Second, even if the Court cannot conclude that its order to U.S. officials would result in Mr. Hamdan's release, Petitioners allege that at least one American official was present during Mr. Hamdan's interrogation and torture, and that the false information obtained through that interrogation and torture will be used against him in his criminal trial in the U.A.E., should that trial ever occur. The Due Process Clause requires that, where an American official participates in the torture of an American citizen and the American citizen subsequently becomes subject to imprisonment based on that torture, the U.S. official has an obligation to inform the relevant authorities of the circumstances surrounding the torture, so as to prevent danger to the U.S. citizen in the form of unjust imprisonment based on the use of information obtained through torture. While Petitioners are unaware of cases that explicitly establish this precise obligation, it

19

ACLU - Hamdan-280

follows logically from prior cases concerning the state-created danger doctrine and U.S. involvement in foreign criminal investigations.

The D.C. Circuit has already recognized a substantive due process right to be free from state-created danger. "We join the other circuits in holding that, under the State endangerment concept, an individual can assert a substantive due process right to protection by the District of Columbia from third-party violence when District of Columbia officials affirmatively act to increase or create the danger that ultimately results in the individual's harm." *Butera v. District of Columbia*, 235 F.3d 637, 651 (D.C. Cir. 2001) (citing *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 201 (1989)). Here, U.S. government officials have dramatically increased the likelihood of harm to Mr. Hamdan by causing the U.A.E. to detain him at their behest and then, on information and belief, by participating in his torture. Petitioners allege both that Mr. Hamdan's initial detention and torture occurred at the behest of the U.S. government and that his trial, if and when it occurs, will rely largely on information obtained through his initial detention and torture. Exh. 24 at 2, ¶ 9 (Supplemental Dec. of Reem Salahi) (attached). Thus, Petitioners have stated a claim under the Due Process Clause based on the state-created danger theory.

While *Butera* and the cases in the other circuits that have recognized the state-created danger theory have arisen in the damages context, nothing about their rationale suggests that they must be limited to that arena. Indeed, a number of courts have held that the Fourth and Fifth Amendments require the suppression of evidence, in criminal cases, where foreign government officials violate the Constitution while acting in a "joint venture" with U.S. officials, or where the foreign officials' involvement is designed to circumvent constitutional constraints. *See, e.g.,*

20

ACLU - Hamdan-281

*United States v. Maturo*, 982 F.2d 57, 60-61 (2d Cir. 1992) (evidence obtained abroad should be

suppressed in U.S. courts under the Fourth Amendment if methods used to obtain it shock the

conscience, the foreign officials acted as agents of the U.S. government, or if the conduct at issue

was designed to evade constitutional constraints); *United States v. Karake*, 443 F. Supp. 2d 8, 52

n.74, 93 n.114 (D.D.C. 2006) (statements obtained by foreign officials must be suppressed under

the Fifth Amendment if obtained through coercion).  These cases confirm that relief outside of

the damages context may be appropriate to remedy unconstitutional action by U.S. officials

directed at U.S. citizens abroad, even if that action occurs in concert with foreign government

officials.

Thus, even if this Court does not believe that an appropriate order to American officials

would result in Mr. Hamdan's release, it nonetheless has authority to order U.S. officials to

correct the danger in which they have placed Mr. Hamdan by disclosing to the authorities in the

U.A.E. the information they have about Mr. Hamdan's detention and torture and the United

States' role in it, and also by disclosing that information to Mr. Hamdan and his attorneys, who

may be able to advocate for his protection through the use of that information.

### B.  That Mr. Hamdan Remains in U.A.E. Criminal Custody Does Not Prevent this Court from Granting Relief.

The government relies primarily on *Munaf v. Geren*, 128 S. Ct. 2207 (2008), for the

proposition that because the Court cannot interfere with a foreign sovereign's criminal processes

it cannot grant any relief in this case.  This is incorrect for several reasons.

First, *Munaf* rejected the petitioners' claims in that case because the relief they sought

was "a court order requiring the United States to shelter them from the sovereign government

seeking to have them answer for alleged crimes committed within that sovereign's borders." *Id.*

ACLU - Hamdan-282

at 2221. *See also id.* at 2223 (noting that petitioners "request an injunction prohibiting the United States from transferring them to Iraqi custody"). Here, Mr. Hamdan seeks exactly the opposite, at least with respect to his primary claim for relief. He contends that if the U.S. government stops interfering, the U.A.E. will release him. Thus, he seeks no shelter from a foreign sovereign; the only shelter he seeks is from the United States. Alternatively, he claims that the U.S. government should provide information that it has concerning his torture to the U.A.E.'s criminal authorities, as well as to him and his attorneys, because the U.S. government created the danger in which he now finds himself, insofar as it has played a role in that country's criminal process by helping to create the confessions obtained under torture which will be used against him in the event of trial. Nothing in *Munaf* suggests that the petitioners presented allegations of this nature.

Thus, this case is far more like *Idema v. Rice*, 478 F. Supp. 2d 47, 53 (D.D.C. 2007), where this Court asserted habeas jurisdiction notwithstanding the existence of a foreign criminal process, because the petitioner alleged that the U.S. government had extensively interfered with that process. *See id.*

The government also cites *Neely v. Henkel*, 180 U.S. 109 (1901) and *Wilson v. Girard*, 354 U.S. 524 (1957) to support its argument that this Court has no power to grant any relief in this case, but those cases provide no support for the government's position. *Neely* did not involve constructive custody, and the Court did not find it lacked jurisdiction. Rather, it found on the merits that the petitioner could not escape extradition merely because the Cuban criminal justice system did not provide all of the procedural protections afforded by the U.S. Constitution. *Id.* at 122-23. Here, Mr. Hamdan's complaint is not with the U.A.E.'s criminal justice system,

ACLU - Hamdan-283

but rather with the fact that the U.S. government has interfered with that system so as to cause his indefinite detention and torture.   Similarly, the petitioner in *Wilson* did not allege that he was in the constructive custody of the U.S. government; instead he argued that his transfer to Japanese authorities had occurred in violation of a treaty between the two nations.  The Court reviewed that claim on the merits, found that the treaty authorized the transfer, and dismissed the petition on that basis.  *Wilson*, 354 U.S. at 530.  The case is wholly inapposite.[9]

Finally, even if *Munaf* and the other cases it cites could be read as broadly as the government would like, they cannot dictate the result here because those cases assume that the criminal violation being prosecuted abroad actually took place on foreign soil.  *See, e.g.*, *Munaf*, 128 S. Ct. at 2221-22 (stating that "sovereign nation has exclusive jurisdiction to punish offenses against its laws committed *within its borders*" (quoting *Wilson v. Girard*, 354 U.S. 524, 529 (1957)); *Kinsella v. Krueger*, 351 U.S. 470, 479 (1956) (referring to "sovereign right to try and punish for offenses committed *within their borders*"), *Reid v. Covert*, 354 U.S. 1, 15 n.29 (1957) (plurality opinion) (describing foreign nation's "plenary criminal jurisdiction, of course, over all Americans . . . who commit offenses against its laws *within its territory*") (emphases added).

Here, the government has presented no evidence, and Petitioners are unaware of any, establishing that the U.A.E. is prosecuting Mr. Hamdan for conduct occurring *within the U.A.E.* Petitioners' understanding, consistent with the government's own evidence submitted by State

_____

[9] In a very recent case, the D.C. Circuit noted that it had not decided the question at issue in this case – namely whether a habeas court has authority to grant relief where a detainee is held abroad at the behest of the United States.  *Kiyemba v. Obama*, --- F.3d ---, slip op. at 11 * (No. 05-5487) (D.C. Cir. April 7, 2009) (stating that this case "does not involve . . . the transfer of detainees resulting in their continued detention on behalf of the United States in places where the writ does not extend") (internal citations omitted).

23

ACLU - Hamdan-284

Department official Bernier-Toth, is that the charges are vague and say nothing even about what

terrorist group or activity is allegedly involved, let alone where the conduct at issue took place.

*See* Dec. of Michelle Bernier-Toth at 4, ¶ 12 (stating that Mr. Hamdan has been formally charged

by the U.A.E. with "promoting terrorism, participating in the work of a terrorist organization,

and assisting a terrorist organization."); Exh. 24 at 2, ¶ 9 (Supplemental Dec. of Reem Salahi)

(attached). Thus, the Court cannot dismiss this petition for this reason at this time. Finally, it is

worth reiterating that the government's reliance on the U.A.E.'s alleged interest in Mr.

Hamdan's criminal prosecution has been undermined by the fact that those criminal proceedings

appear at best to be in limbo, and at worst to have virtually stopped. Mr. Hamdan has still not

received notice of a set of final charges, and he still has no date set for trial, now over four

months since his transfer to criminal custody, and over seven months since his detention. *See*

Pet. at 15, ¶ 36; Notice of Status at 1; Exh. 24 at 3, ¶¶ 11-12 (Supplemental Dec. of Reem Salahi)

(attached). The vagueness of the charges, the absence of information about any evidence, and

the inexplicable delay, coupled with the fact that the prosecutor in his case has traveled to the

United States, undermines the government's claim that Mr. Hamdan's continued detention is a

product of the routine criminal processes of the U.A.E. *See* Resp. MTD at 20.

### C. The Relief Petitioners Seek Would Not Violate the Separation of Powers or International Comity.

Finally, the government cobbles together dicta from a number of cases that do not

involve U.S. citizens seeking habeas or similar injunctive relief, to argue that the relief sought

would violate both the separation of powers and principles of international comity. These

arguments were rejected in *Abu Ali*, and they likewise should be rejected here.

ACLU - Hamdan-285

Not one of the cases cited by the government involves a habeas petition filed by a U.S. citizen alleging constructive custody. This is unsurprising. As this Court explained in *Abu Ali*, "There is simply no authority or precedent, however, for respondents' suggestion that the executive's prerogative over foreign affairs can overwhelm to the point of extinction the basic constitutional rights of citizens of the United States to freedom from unlawful detention by the executive." *Abu Ali v. Ashcroft*, 350 F. Supp. 2d 28, 61-62 (D.D.C. 2004) (citing, *inter alia*, *Hamdi v. Rumsfeld*, 542 U.S. 507, 536 (2004) (plurality opinion). Indeed, many of the cases the government relies upon do not involve U.S. citizens deprived of their liberty at all. *See, e.g.*, *People's Mojahedin Org. v. U.S. Dep't of State*, 182 F.3d 17, 23 (D.C. Cir. 1999) (case involving the property of an organization with no presence in the United States).

The cases that do involve interests at least somewhat comparable to those at issue here make clear that the government may not merely assert that a case involves foreign affairs and thereby evade judicial consideration. As the D.C. Circuit explained, immediately after the passage quoted by the government from the same case, "[t]hat is not to say that every dispute touching our foreign relations falls outside the province of the judiciary. As the Supreme Court has characterized its decisions, they seem invariably to show a discriminating analysis of the particular question posed, in terms of history of its management by the political branches, of its susceptibility to judicial handling in the light of its nature and posture in the specific case, and of the possible consequences of judicial action." *Holmes v. Laird*, 459 F.2d 1211, 1215 (D.C. Cir. 1972) (quoting *Baker v. Carr*, 369 U.S. 186, 211-12 (1962) (internal quotations omitted).

Here, the "particular question posed" concerns the unlawful detention, interrogation, and torture of a U.S. citizen at the behest of his own government. None of the cases cited by the

ACLU - Hamdan-286

government remotely suggest that cases involving such questions would be non-justiciable,

either due to separation of powers considerations or in the name of international comity.

Nor is there merit to the government's assertion that Petitioners are asking this Court to

inject itself into U.S. foreign policy with respect to the relief they seek.  Resp. MTD at 21.  On

the contrary, Petitioners ask only that the Court direct its order to U.S. officials, and only require

them to withdraw their request for Mr. Hamdan's continued detention, and also to un-do the

effects of the danger they created for him.  *See supra* Section III(A).  Petitioners request nothing

beyond the limited remedy necessary to reverse the illegal action of U.S. actors.

Similarly meritless is the government's claim that the action would somehow impugn the

U.A.E.  Resp. MTD at 21.  This Court rejected a similar argument in *Abu Ali*, framed by

reference to the act of state doctrine.  In rejecting it, the Court stated that

> [T]he assertions by the United States that this habeas petition will impugn and
> embarrass the Saudis seem overstated and something of a red herring. The
> federal reporters are filled with cases where countries detain individuals at the
> behest of their allies. A finding that the Saudis detained an individual at the
> request of the United States no more declares the Saudis a 'puppet' of the
> United States than . . . the decision of the United States to arrest two
> individuals in response to a request for extradition by the Canadian government
> indicates that the United States is a 'puppet' of Canada.  There is simply no
> warrant for respondents' suggestion that every instance in which the United
> States is discovered to have worked with another country is so embarrassing to
> the other country that litigation is barred.

*Abu Ali v. Ashcroft*, 350 F. Supp. 2d 28, 59-60 (D.D.C. 2004) (internal citations omitted).  Judge

Bates' analysis again applies here.

*       *       *

26

ACLU - Hamdan-287

The petition credibly alleges that a U.S. citizen has been imprisoned, interrogated,

tortured, and now faces lengthy imprisonment without trial, all because of the actions of his own

government. If true, the allegations clearly state federal statutory and constitutional violations.

Petitioners are entitled to discovery to prove these allegations. The motion to dismiss should be

denied, or deferred pending jurisdictional discovery.

Respectfully submitted,

/s/ *Ahilan Arulanantham*

Ahilan Arulanantham
Jennie Pasquarella
ACLU of Southern California
1313 West 8th Street
Los Angeles, CA 90017
Tel: (213) 977-9500
Fax: (213) 977-5297

/s/ *Arthur B. Spitzer*

Arthur B. Spitzer (D.C. Bar No. 235960)
American Civil Liberties Union
  of the National Capital Area
1400 20th Street NW, Suite 119
Washington DC 20036
Tel (202) 457-0804
Fax (202) 452-1868

Counsel for Petitioners

April 9, 2009

27

ACLU - Hamdan-288

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 03-10-2011 BY 65179/DMH/BAW/STP/bls

### Declaration of Daniel K. Sieu

I, Daniel K. Sieu, hereby declare:

1.     I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.     I am the President and Executive Director of Asian Pacific Revolving Loan Fund of Los Angeles, located at 1055 Wilshire Boulevard, Los Angeles, California 90017.

3.     I have known Naji Hamdan since on or around 1998. I first met Mr. Hamdan when I bought parts for my car from him at his Honda Acura business.

4.     Around June 2003 our organization gave Mr. Hamdan a loan for the purchase of his building at 1848 East 55th Street, Los Angeles, California, where his Honda Acura business is located.

5.     During the last week of December 2008, my office was subpoenaed by the Federal Bureau of Investigations (FBI) for our records relating to that loan. The subpoena required that we turn over the documents by January 6, 2009.

6.     We provided the FBI a copy of our file for that loan.

7.     I also learned that around the same time, Far East National Bank was subpoenaed by the FBI for their records relating to a loan they financed on the same Property owned by Mr. Hamdan.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed this 6 day of April 2009, in Los Angeles, California.

Daniel K. Sieu

ACLU - Hamdan-289     Exhibit 23

## Supplemental Declaration of Reem Salahi of April 9, 2009

I, Reem Salahi, declare as follows:

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 03-10-2011 BY 65179/DMH/BAW/STP/b1s

1. I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2. This declaration supplements my previous declaration filed as Exhibit 20 to the Reply to Respondents' Opposition to Petitioners' Motion to Disclose *Ex Parte* Evidence.

3. I am an attorney working as a Bridge Fellow at the American Civil Liberties Union (ACLU) of Southern California.

4. As described in my previous declaration, I traveled to the United Arab Emirates (U.A.E.) on February 10, 2009 to visit Mr. Naji Hamdan. I visited Mr. Hamdan on February 21, 2009 at the Al Wathba Prison in Abu Dhabi.

5. On February 15, 2009, I also met with Mr. Hamdan's U.A.E. attorney, who explained that Mr. Hamdan was charged under the U.A.E. counter-terrorism laws and is being prosecuted by the State Security forces, otherwise known as *Amn al-Dawla*. He explained that prosecutions under the counter-terrorism law proceed directly to the U.A.E. Supreme Court, allowing for no appeal.

6. While there are currently three vague terrorism-related charges against Mr. Hamdan, Mr. Hamdan's attorney explained that these charges have not been finalized. He explained that Mr. Hamdan's file remains "open" for continuing investigation by the prosecutor's office in the Ministry of State Security and that the charges can be amended so long as the file remains "open." Only once the file is closed and transferred to the U.A.E. Supreme Court will Mr. Hamdan's charges and the evidence supporting such charges be formalized and a trial date set.

1

7. Mr. Hamdan's family, as well as the prison authorities at the Al Wathba Prison,
   similarly corroborated the attorney's explanation. In fact, the Al Wathba prison
   authorities cited the fact that Mr. Hamdan's file was still "open" as one of the initial
   reasons in denying me access to Mr. Hamdan.

8. Since his transfer to Al Wathba Prison, U.A.E. officials no longer interrogate Mr.
   Hamdan. Whatever investigation continues to take place and whatever evidence is
   being gathered by U.A.E. or U.S. authorities is unknown to both Mr. Hamdan and his
   legal counsel in the U.A.E. and here in the U.S.

9. Mr. Hamdan's attorney also informed me that on one occasion the prosecutor allowed
   him to quickly review the evidence currently in Mr. Hamdan's file. The prosecutor
   would not allow the attorney to make a copy of the file, so as to carefully review it at
   greater length. According to the attorney, the prosecutor will only allow him a copy
   of the file once the file is "closed" and transferred to the Court. Mr. Hamdan's
   attorney told me that the evidence he saw in the file was nothing more than Mr.
   Hamdan's confessions made while in State Security custody and some electronic
   printouts of various websites. The attorney stated that there was nothing
   incriminating in the printouts. It was his understanding that the information in the file
   would be the basis of Mr. Hamdan's trial in the U.A.E.

10. Furthermore, the attorney explained that a note in the file stated that Mr. Hamdan was
    arrested and detained based on information received from a secret source. He
    explained to me that he does not believe the identity of this secret source will be
    revealed at trial.

2

11. Since returning to the U.S., I remain in regular contact with Mr. Hamdan's family who frequently visit Mr. Hamdan and communicate with Mr. Hamdan's attorney. According to their reports, Mr. Hamdan's file still remains "open" and the prosecutor has yet to transfer the file to the U.A.E. judge.

12. It has been over four months since Mr. Hamdan was transferred to Al Wathba Prison. Nonetheless, his charges are still subject to alteration, and it remains unclear when Mr. Hamdan's trial will begin.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed this ninth day of April, 2009, in Los Angeles, California.

Reem Salahi

## DECLARATION OF REEM SALAHI

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 03-10-2011 BY 65179/DMH/BAW/STP/bls

I, Reem Salahi, hereby declare:

1. I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2. I am an attorney working as a Bridge Fellow for the American Civil Liberties Union (ACLU) of Southern California.

3. On February 10, 2009, I traveled to the United Arab Emirates (U.A.E.) in order to meet in person with Naji Hamdan.

4. During the eleven days I spent in the U.A.E., I experienced significant difficulty obtaining access to Mr. Hamdan. I finally was able to visit with Mr. Hamdan on February 21, 2009. However, our conversation was intensely monitored by U.A.E. security officials.

### ACCESS TO NAJI HAMDAN

5. Mr. Hamdan's attorney in the U.A.E. informed me that in order to meet with Mr. Hamdan at the Al Wathba Prison, I had to obtain signed permission from the Ministry of the State Security prosecutor's office in Abu Dhabi.

6. On Thursday, February 12, 2009, I went to the office of the Ministry of State Security to obtain permission. Upon arrival, I was informed that the head prosecutor assigned to Mr. Hamdan's case, Mr. Khaled Al Sha'ali, was in the United States. Despite my inquiries, the officials would not tell me the reason for his trip to the U.S.

1

ACLU - Hamdan-293

7. I met instead with another head prosecutor, Mr. Mohammad Salim Al-Nakbi. I told him
that I was an attorney and that I had come from the United States to see Naji. Mr. Al-
Nakbi told me that I could not visit Mr. Hamdan as I was neither an immediate relative
nor a U.A.E.-registered attorney. He told me that while he could not authorize my visit, I
should attempt to go to the prison and see if the prison guards would authorize my visit.
He told me that I could also try to get a signed document from the U.S. Embassy stating
that the Embassy has no qualms with the prosecutor's office granting me permission to
visit Mr. Hamdan.

8. After leaving the Ministry of State Security, I went to the U.S. Embassy. At the
Embassy, I met with both Chief Consul Sean Cooper and Assistant Consul Saeed Mootar.
Mr. Cooper refused to provide me with the letter, but after I insisted that he assist me, he
agreed to contact the prison authorities to try to get me clearance to visit Mr. Hamdan.

9. On February 15, 2009, I went to Al Wathba Prison to see if the prison authorities would
allow me access to visit Mr. Hamdan. At the prison, I told the guards that I was an
attorney from the United States representing Mr. Hamdan and that I wanted to see him.
The guards refused to let me visit him without a signed letter from the prosecutor's
office. The guards then gave me the phone number of one of the directors of the Al
Wathba Prison, Ali Al-Khayal. After repeated attempts, I was able to speak with him by
phone. He told me that because Mr. Hamdan's case was "special" he could not grant me
access without approval from the State Security prosecutor's office.

10. After leaving the prison, I returned to the prosecutor's office at the Ministry of State
Security. I was told that the head prosecutor, Khaled Al Sha'ali, was still in the U.S. and

2

ACLU - Hamdan-294

that nobody else at the office would be able to help me until Mr. Al Sha'ali returned. Again, I was given no information on the purpose of Mr. Al Sha'ali's visit to the U.S.

11. On February 16, 2009, I was informed by one of Mr. Hamdan's relatives, who was at the Al Wathba Prison visiting Mr. Hamdan, that the prison authorities had granted me permission to visit Mr. Hamdan the following day, February 17, 2009. Mr. Hamdan later told me (when I finally met with him) that, on February 16, the prison authorities had asked Mr. Hamdan to verify that he would like to see me and he assented.

12. Shortly afterward, I received a call from Sean Cooper from the U.S. Consul's office. Mr. Cooper told me that the prison authorities had declined the request for a visit. Either in this conversation or the earlier one, Mr. Cooper suggested that I try to obtain permission from the head prosecutor Mr. Al Sha'ali once he returned from the United States. I had never told Mr. Cooper that Mr. Al Sha'ali was in the United States; he knew that information through some independent source.

13. On February 17, 2009, I returned to Al Wathba prison to see Mr. Hamdan. However, once again, the prison guards refused to permit my visit. The officials told me that under normal circumstances they would grant me access, but Mr. Hamdan's case was different.

14. I then went back to the prosecutor's office at the Ministry of State Security. Head prosecutor Mr. Khaled Al Sha'ali had returned from the U.S. by that time, and I was able to meet with him. I told him that I was an attorney and that I had come from the United States to visit Mr. Hamdan. Mr. Al Sha'ali told me that I could not visit Mr. Hamdan in my capacity as a lawyer, but that I could visit him in my capacity as a family friend. He drafted written authorization, which was signed by the President of State Security, to visit Mr. Hamdan on Sunday, February 21, 2009.

3

ACLU - Hamdan-295

### MEETING WITH MR. NAJI HAMDAN

15. On February 21, 2009, I finally was permitted to visit Mr. Hamdan. I arrived at the prison at 8 a.m. in order to spend as much time as possible with Mr. Hamdan.

16. When I arrived, I was escorted into the visitor's room of the prison. Visitors sit on opposite sides of a glass separator from the prisoners and communicate through a phone.

17. Despite arriving very early, before other visitors, I waited for nearly an hour to see Mr. Hamdan. During that hour, a number of men appeared in traditional Emirati outfits and began to lounge around the visiting area. They did not appear to be visitors and Mr. Hamdan later told me that they were members of the State Security forces.

18. After nearly one hour, Mr. Hamdan appeared and motioned for me to sit on one of the seats opposite him. We were separated by a glass partition, and spoke to each other using a phone. As soon as I sat down, the two or three men that were lounging around the visitor's room surrounded me and sat down in the adjacent seats. Mr. Hamdan advised me to move to the other side of the room and again as soon as I moved, the men followed me and surrounded me. Similarly, on Mr. Hamdan's side of the glass separator, State Security officials sat next to him, obviously eavesdropping on our conversation.

19. At one point, a woman, whose face was covered, arrived and sat in the seat next to mine. She waited there for an hour, saying nothing, and obviously listening to me. In addition to the State Security officials surrounding us, prison guards and administrators constantly stood over me as I spoke with Mr. Hamdan. The situation was very unnerving and intimidating. I was fearful for my safety and unable to freely converse with Mr. Hamdan.

4

ACLU - Hamdan-296

20. Nonetheless, because I know that it is extremely difficult to speak with Mr. Hamdan from the United States, I decided to try to gather what information I could. I spoke with Mr. Hamdan for two and a half hours.

21. During our conversation, Mr. Hamdan explicitly authorized the ACLU to bring this lawsuit on his behalf. He also verified much of the information that appears in the declarations of Mr. Hamdan's wife, Mona Mallouk, and brother, Hossam Hemdan. In particular, Mr. Hamdan spoke at length about the torture he endured in State Security custody and his reasons for believing that the U.S. government is responsible for his detention and subsequent prosecution in the U.A.E.

22. Mr. Hamdan told me about the man he called the "American interrogator," who was present during at least one of his torture and interrogation sessions in State Security custody. Mr. Hamdan stated that the interrogator was clearly American because he spoke native American English, and he did not speak in Arabic. Mr. Hamdan stated that having lived in the United States for twenty-two years, he could discern an American accent and could tell the difference between a native English speaker from the United States and a person who speaks English as a second language, even if the person speaks it well. He firmly believes that the interrogator was an American.

23. Mr. Hamdan stated that he believes the American interrogator came at least once, during the second week of Mr. Hamdan's detention. On that occasion, Mr. Hamdan remembers that State Security officials removed him from solitary confinement and brought him into the interrogation room. Mr. Hamdan could see from beneath the bottom of his blindfold that there were many people in the room. After Mr. Hamdan arrived in the room, the

5

ACLU - Hamdan-297

door was closed and no person entered or exited the room throughout the subsequent

torture session.

24. For forty-five minutes, interrogators who he believed were from the U.A.E. kicked Mr.

Hamdan in his liver area, on his back, on his feet and pushed his face in the dirt.

25. After forty-five minutes of abuse, the American interrogator approached Mr. Hamdan.

Mr. Hamdan could see from under his blindfold that the man was dressed in slacks and

dress shoes, unlike the other interrogators who were wearing traditional Emirati sandals

or military boots. The American interrogator yelled at Mr. Hamdan in English, saying

"You are not the only person here with a Masters Degree." Then, the interrogator

threatened, "Listen, do what they want otherwise they will fuck you up." Mr. Hamdan

responded, "Okay, no problem, but would you promise to help me out?" The American

stated, "Would you trust my promise?" Mr. Hamdan did not respond.

26. Then, the other interrogators yelled and kicked Mr. Hamdan, threatening to bring his wife

and torture her as well. At that point, Mr. Hamdan said that he would admit to anything

and signed and fingerprinted the confessions they had given him to sign. He did not even

read the documents before signing them.

27. Mr. Hamdan also told me that during his time in State Security custody, he was

interrogated at length about his entire time living in the United States. For example, he

was asked about Dan Sieu, Mr. Hamdan's loan officer in the U.S.

28. In addition, Mr. Hamdan confirmed that the officials asked him about why he was so

nervous when he met with the two F.B.I. agents, who he believed were named Gary Price

and Joshua Sweet, at the U.S. Embassy in Abu Dhabi, prior to being detained by the State

Security forces

6

ACLU - Hamdan-298