29. Mr. Hamdan also elaborated on what the F.B.I. agents asked him about when they met with him in the U.S. Embassy in Abu Dhabi. He stated that the agents questioned him for over two hours. The agents took his passport and Lebanese identification card. They asked him not only about his detention in Lebanon, but also many personal questions including the full name, address, contact information, date of birth and professions of his family members, including his brothers and sister. They asked him about his business in the U.S., and about his brother, Hossam Hemdan, and business partner, Jehad Suliman. They asked him if he was tied or connected with any terrorist organizations and whether he had any weapons in the U.A.E. They also asked him if he had the same ideology as al-Qaeda. He denied having any connection to any terrorist organization, any weapons, and any ideological or other involvement with al-Qaeda.

30. In the declaration of Michael J. Heimbach, Assistant Director of the F.B.I., he states that this meeting was entirely voluntary and that Mr. Hamdan was free to leave whenever he wanted. However, Mr. Hamdan told me that he felt compelled to meet with the agents out of fear of further surveillance and interrogation if he were to return to the U.S. Given previous surveillance he experienced in the U.S., Mr. Hamdan feared that if he did not cooperate with the F.B.I. he would be further harassed.

31. Additionally, contrary to Mr. Heimbach's representation, Mr. Hamdan was not free to leave the meeting because the F.B.I. agents had confiscated his passport and identification card at the start of the meeting.

32. Mr. Hamdan also spoke to me about his first consular visit with Mr. Cooper on October 19, 2008. From the time Mr. Hamdan was detained on August 26, 2008 to the time of the consular visit, Mr. Hamdan stated that State Security officials tortured him on a near

7

ACLU - Hamdan-299

daily basis. When Mr. Hamdan met with Mr. Cooper officials threatened him to not

speak about any of the torture that he had undergone. In addition to the threats, three

State Security agents sat in the room with Mr. Hamdan and Mr. Cooper and monitored

the conversation.

33. In the declaration of Michelle Bernier-Toth, Director of American Citizen Services of the

Department of State, she states that "the consular official who personally visited Mr.

Hamdan reported that there were no obvious signs of mistreatment during the visit."

However, according to Mr. Hamdan, he tried to show Mr. Cooper signs of distress, while

at the same time trying to avoid being punished by the State Security officials who were

present at the time. He said that he deliberately flinched when asked about whether he

was mistreated, and made facial expressions to try to indicate his distress.

34. Mr. Hamdan stated during our meeting that he was not engaged in any political or

religious activity in the U.A.E. Mr. Hamdan told me that he has spent very little

cumulative time in the U.A.E. because he was constantly flying back and forth from the

U.A.E. to Lebanon, where his wife and children live. In addition, Mr. Hamdan was very

busy at work. He normally arrived at work around 8 a.m. and would stay at his work

until 10 p.m. Mr. Hamdan stated that he barely had time to pray in the mosque, much

less engage in any criminal activity.

ACLU - Hamdan-300

35. When I asked him why the U.A.E. had imprisoned him, he stated that he believed unequivocally that the U.S. government was responsible.  Mr. Hamdan also stated that he found it odd that both the U.A.E. and the Lebanese interrogators asked very similar questions, which in both cases were focused on Mr. Hamdan's time in the U.S.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct.  Executed this 3rd day of March, 2009, in Los Angeles, California.

REEM SALAHI

9

ACLU - Hamdan-301

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MONA MALLOUK, *et al.*,        )
                               )
    Petitioners,        )
                               )
    v.                  )
                               )
GEORGE W. BUSH, *et al.*,      )
    Respondents.        )
                               )

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 03-10-2011 BY 65179/DMH/BAW/STP/bls

08-cv-2003 (JR)

(FILED UNDER SEAL)

## MEMORANDUM IN SUPPORT OF RESPONDENTS' MOTION TO DISCHARGE THE ORDER TO SHOW CAUSE AND DISMISS PETITION FOR WRIT OF HABEAS CORPUS

ACLU - Hamdan-302

## INTRODUCTION

The Court should dismiss the Petition for Writ of Habeas Corpus filed by Petitioners on behalf of Naji Hamdan ("Hamdan") for lack of jurisdiction or, alternatively, lack of redressibility under controlling precedent. All parties agree that Hamdan is currently being held in custody by the United Arab Emirates ("UAE") awaiting trial on domestic UAE criminal charges. Despite the fact that the immediate custodian, a separate and independent sovereign nation, is beyond this Court's habeas jurisdiction, Petitioners, relying on a constructive custody theory, ask this Court for extraordinary relief in the form of an order that, among other things, would attempt to require Respondents somehow to obtain the release of Hamdan, effectively seeking this Court to collaterally attack the domestic criminal process of another sovereign nation. The Court should dismiss the Petition for several independent reasons.

First, the Petition and materials in support thereof themselves utterly fail to establish sufficient jurisdictional facts to support a theory of "constructive custody," even assuming *arguendo* that a constructive custody theory of habeas jurisdiction could exist vis-a-vis a foreign sovereign; the actual facts before the Court establish that there is no such custody in this case. Second, as a legal matter, case law establishes that a "constructive custody" theory is not available to challenge a foreign sovereign's detention of an individual within its own borders. Finally, consistent with the Supreme Court's decision in *Munaf v. Geren*, 128 S. Ct. 2207 (2008), federal courts lack authority to redress habeas claims of persons in custody awaiting trial for criminal charges under the authority of a foreign sovereign; under *Munaf*, a writ of habeas corpus cannot issue here, where such a writ would interfere with the UAE's exclusive sovereign right to prosecute Hamdan for alleged violations of the criminal laws of the UAE.

At bottom, the UAE's sovereignty and this Court's lack of jurisdiction require dismissal

1

ACLU - Hamdan-303

of the petition.  For all these reasons, the order to show cause should be discharged and the Petition dismissed.[1]

## STATEMENT OF THE CASE

All parties agree that officers of the UAE Government arrested Hamdan in August 2008 and that the UAE is currently detaining him in that country, *see* Petition, ¶¶ 1, 36.  Further, all parties agree that Hamdan is in local police custody and that he has been charged with several terrorism-related offenses under the domestic criminal laws of the UAE.  *See* Petitioners' Notice ("Pets.' Notice"), Dkt. 3 at 1; *see also* Declaration of Michelle Bernier-Toth, Director of the Office of American Citizens Services and Crisis Management, United States Department of State, ¶ 12 ("Bernier-Toth Decl."), attached hereto as Exhibit A.[2]  Petitioners, Hamdan's wife and brother,[3] have brought this Petition for Writ of Habeas Corpus, naming as Respondents various officials of the United States Government.  *See* Petition, *passim.*

While Respondents submit that, for several independent reasons, the Petition should be dismissed as a matter of law on the basis of these facts alone, Respondents also submit for this

---

[1] The Petition cites jurisdictional provisions aside from the habeas statute, *see* Petition ¶ 8, and makes various other detention claims, *see id.* ¶¶ 49-65, that are derivative of the core question of habeas jurisdiction before the Court.  Based upon the arguments below and the facts before the Court, the Petition in its entirety must be dismissed.  A petition may be dismissed and judgment may be entered if respondents establish that petitioners are not entitled to the relief they seek.  *See Lonchar v. Thomas,* 517 U.S. 314, 325 (1996) (noting that "[t]he Habeas Corpus Rules themselves provide district courts with ample discretionary authority to tailor the proceedings" in habeas cases); *White v. Lewis,* 874 F.2d 599, 603 (9th Cir. 1989) (approving a general motion to dismiss as a vehicle to show cause why the writ should not issue, and noting that "responding to a habeas petition with a motion to dismiss is common practice").

[2] As is the case with this memorandum, the public declarations in this case have been filed under seal consistent with the Privacy Act, to the extent it applies.

[3] Petitioners purport to act as next friends for Hamdan, Petition ¶ 3, but are not denominated as next friends for Hamdan in the caption of the Petition.

2

ACLU - Hamdan-304

Court's review additional facts by way of a redacted declaration from Michael J. Heimbach, Assistant Director, Counterterrorism Division of the Federal Bureau of Investigation ("FBI"), ("Heimbach Decl."), attached hereto as Exhibit B.[4] These submissions establish that Hamdan is not being held at the behest of Respondents or at their direction, and that habeas jurisdiction is absent.

## ARGUMENT

I.  **THIS COURT LACKS JURISDICTION OVER A HABEAS CORPUS PETITION CHALLENGING A FOREIGN SOVEREIGN'S DETENTION OF ITS PRISONERS IN A FOREIGN COUNTRY.**

   A.  **Even Assuming *Arguendo* That A Constructive Custody Theory Of Habeas Jurisdiction Exists Vis-A-Vis A Foreign Sovereign, The Jurisdictional Facts And Allegations Necessary For Such A Claim Are Absent.**

In *Abu Ali v. Ashcroft*, 350 F. Supp. 2d 28 (D.D.C. 2004), while deferring the ultimate question of whether habeas jurisdiction actually existed, *id.* at 68, Judge Bates concluded, given the specific posture of that case, that it was possible, in certain limited circumstances, for a court to exercise statutory habeas jurisdiction to challenge the detention of an American citizen in the physical custody of a foreign sovereign on a constructive custody theory.[5]  Although none of the factors identified by Judge Bates was alone sufficient to establish jurisdiction, he determined that

---

[4] An *in camera, ex parte* version of this declaration including certain classified facts has also been lodged with the Court Security Officer and is available for the Court's review.  Should the Court have additional questions in the event it reviews the declaration, Respondents would ask for an opportunity to submit an additional *ex parte, in camera* submission, as necessary.

[5] Judge Bates himself has emphasized the limited nature of *Abu Ali*'s reach in both the opinion itself, *see* 350 F. Supp. 2d at 41 (noting as "exceptional" the instances where habeas jurisdiction could exist under a constructive custody theory as to a foreign sovereign), and in subsequent opinions. *See Al-Anazi v. Bush*, 370 F. Supp. 2d 188, 197 n.9 (D.D.C. 2005) (finding *Abu Ali* "not instructive" because of inadequacies in petitioners' evidence, "strong rebuttal evidence" submitted by the Government, and petitioners' status as non-U.S.-citizens).

3

ACLU - Hamdan-305

constructive custody would exist over an American citizen detained by a foreign sovereign in a situation in which the following factors were present:

> (i) [the citizen] was detained at the behest of United States officials; (ii) [the citizen's] ongoing detention is at the direction of the United States enlisting a foreign state as an agent or intermediary who is indifferent to the detention of the prisoner; (iii) [the citizen] is being detained in the foreign state to deny him an opportunity to assert his rights in a United States tribunal; and (iv) [the citizen] would be released upon nothing more than a request by the United States.

*Id.* (citations omitted). Moreover, Judge Bates permitted the case to proceed only after identifying several considerations that lent weight to the petitioners' allegations. First, Judge Bates found that the "evidence that petitioners have supplied is considerable in the absence of discovery, and speaks to each of these points." *Id.* Second, and importantly, Judge Bates noted that with a narrow exception, "the United States has not offered evidence to rebut any of the information supplied and inferences reasonably raised by petitioners, even though such evidence is in many instances directly in its control." *Id.* Finally, Judge Bates concluded that if the allegations in Abu Ali's petition were true, "there would be habeas jurisdiction." *Id.*

While, as discussed below, Respondents respectfully disagree with Judge Bates' legal conclusions in *Abu Ali*, that case and this case are entirely distinguishable because: (i) Respondents here have submitted evidence that unequivocally rebuts Petitioners' allegations regarding the factors and considerations that Judge Bates found to be critical; and (ii) whereas the *Abu Ali* petitioners supplied a "considerable" quantum of evidence, Petitioners' evidence here is lacking.

### 1.   Respondents' Factual Submissions Confirm that Habeas Jurisdiction is Absent.

Respondents have submitted declarations from two officials addressing, *inter alia*, the four factors identified by Judge Bates. The declaration of Michelle Bernier-Toth of the

4

ACLU - Hamdan-306

Department of State demonstrates that Hamdan is being detained by a foreign sovereign and "has been formally charged with three terrorism related offenses by the UAE: promoting terrorism, participating in the work of a terrorist organization, and assisting a terrorist organization." *See* Bernier-Toth Decl. ¶ 12. Indeed, Petitioners have conceded that Hamdan is in "criminal pre-trial detention . . . [and] has been charged with several terrorism-related offenses." *See* Pets.' Notice, Dkt. 3. Moreover, Hamdan has "met with several local attorneys and is in the process of selecting his legal counsel in the UAE and . . . the UAE legal process is ongoing." *Id.* This state of affairs does not reflect actions of a foreign sovereign that is "indifferent to the detention of the prisoner." *See Abu Ali*, 350 F. Supp. 2d at 68.

Rather, the record is clear that the UAE appears highly interested in and responsible for Hamdan's detention. The UAE is actively pursuing the enforcement of its domestic criminal laws in accordance with its own procedures,[6] *see* Bernier-Toth Decl. ¶ 12, which is a matter committed to the UAE's "'exclusive jurisdiction to punish offenses against its laws committed within its borders.'" *Munaf*, 128 S. Ct. at 2221-22 (quoting *Wilson v. Girard*, 354 U.S. 524, 529 (1957)). Moreover, the UAE legal process is ongoing and Hamdan has the opportunity to access counsel and is actively in the process of selecting legal counsel to defend himself in those proceedings. *See* Bernier-Toth Decl. ¶ 12.

These facts alone, and the allegations pled by Petitioners, are worlds away from the allegations in *Abu Ali*. There, as Judge Bates recounted, the detention occurred in June 2003 by

---

[6] While Petitioners' Notice concerning the transfer to police custody alleges that the timing of this transfer "suggests" American involvement in his continuing detention, *see* Pets.' Notice at 2, the Department of State declaration states that, given that Hamdan's initial detention occurred in late August, his detention appears consistent with the authority of the UAE "to detain persons for questioning for extended periods of time and specifically to detain individuals for up to 90 days without further proceedings[.]" *See* Bernier-Toth Decl. ¶ 8.

5

ACLU - Hamdan-307

Saudi security officers who "detained [him] indefinitely in a Saudi prison without charge or access to counsel." *Abu Ali*, 350 F. Supp. 2d at 32. Moreover, in *Abu Ali* the habeas petition itself was filed over a year after his detention, *id.* at 37, and even by the time of Judge Bates' decision—over 18 months after his detention—no charges had been filed by Saudi authorities. *Id.* at 38. In contrast, the Petition in the instant case has been pending for a matter of a few weeks. Moreover, Hamdan was subject to detention for approximately three months, transferred to local police custody, charged under domestic UAE law with specific offenses, and provided the ability to retain counsel, which he is pursuing, to defend himself in the ongoing domestic UAE criminal proceedings. *See* Bernier-Toth Decl. ¶ 12. At bottom, the facts establish conclusively that the UAE is not "indifferent" to Hamdan's detention, and consequently there is no habeas jurisdiction even under the constructive custody theory set forth by Judge Bates. *See Abu Ali*, 350 F. Supp. 2d at 68.

Beyond the declaration of the Department of State, Respondents have also submitted herewith the Declaration of Michael J. Heimbach, Assistant Director, Counterterrorism Division of the FBI, that addresses jurisdictional facts. Mr. Heimbach's declaration states, among other things, that the FBI did not: (i) "direct the UAE to investigate Hamdan" or direct the UAE's investigation; (ii) "request that the UAE detain or arrest Hamdan;" (iii) "interrogate[] [] or observe[] any interrogation of Hamdan while he has been in UAE custody;" or (iv) "express[] any opinion to the UAE about Hamdan's continued detention or trial by the UAE." *See* Heimbach Decl. ¶¶ 9-12. In the face of the foregoing, there can be no question that jurisdiction is lacking and that this action should be immediately dismissed.

Finally, because the facts sworn to by Ms. Bernier-Toth and Mr. Heimbach go to the four factors identified by Judge Bates as being necessary to create habeas jurisdiction, *i.e.* that which

ACLU - Hamdan-308

creates judicial power in this instance, they are appropriately considered at the motion to dismiss stage. The Supreme Court has been clear that "the requirement that jurisdiction be established as a threshold matter 'springs from the nature and limits of the judicial power of the United States' and is 'inflexible and without exception.'" *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998) (quoting *Mansfield, C. & L.M. Ry. Co. v. Swan*, 111 U.S. 379, 382 (1884)). Indeed, "[w]ithout jurisdiction the court cannot proceed at all in any cause. Jurisdiction is the power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." *Id.* at 94 (quoting *Ex parte McCardle*, 74 U.S. 506, 514 (1868)). Indeed, in reviewing a motion to dismiss under Rule 12(b)(1), "the court may consider . . . the complaint supplemented by undisputed facts plus the *court's* resolution of disputed facts." *Coalition for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003) (emphasis added); *see also Koutny v. Martin*, 530 F. Supp. 2d 84, 87 (D.D.C. 2007) (in resolving a motion to dismiss under Rule 12(b)(1), a court "may also consider 'undisputed facts evidenced in the record'") (internal citations omitted). Dismissal of this case, in light of the established jurisdictional facts, is the only proper outcome.

> 2. **Petitioners' Evidence and Allegations Going to the Relevant Factors Do Not Meet the Standard Set in *Abu Ali*.**

The Petition suggests that this case is just like *Abu Ali*, where, as discussed above, Judge Bates concluded that a constructive custody theory of habeas jurisdiction might exist—under the specific facts alleged there and with the "considerable" evidence provided by those petitioners. But on its face, the instant Petition and supporting materials, though long on allegations and innuendo, paint a radically different picture than what was before the Court in *Abu Ali*. Indeed, even in the absence of Respondents' declarations, Petitioners' evidence and unsupported

7

ACLU - Hamdan-309

allegations would not meet the standard of *Abu Ali*, rendering habeas jurisdiction absent.

As already discussed in the prior section, *see supra* Part I.A.1, the specifics of Abu Ali's arrest and 18 months in detention without charge are markedly different than Hamdan's three-month detention and subjection to charges of terrorism offenses under UAE domestic criminal law. *Compare Abu Ali*, 350 F. Supp. 2d at 32, 37-38, *with* Petition ¶¶ 36-37 and Pets.' Notice. But there is more. Significantly, the *Abu Ali* Petition alleged (and provided a copy of a supporting search warrant) that "FBI agents raided Abu Ali's home in Virginia . . . less than a week after he was arrested in Saudi Arabia" and "instructed the agents to look for weapons, cellular phones, and documents tending to show a conspiracy between Abu Ali and four of the defendants in the *Royer* case."[7] *Abu Ali*, 350 F. Supp. 2d at 32 (citing Abu Ali Petition ¶ 31 and Ex. B thereto (Search Warrant)). Moreover, Judge Bates noted the specific allegations that "about the same time as the raid on his home took place, *FBI agents* visited the Saudi prison and watched as he was interrogated by Saudi officials." *Id.* (emphasis added) (citing Abu Ali Petition. ¶ 32 & Aff. of Omar Abu Ali, Sept. 20, 2004, ¶ 5). The inference from such allegations in *Abu Ali* was that the United States Government influenced and participated in the detention of the petitioner. By contrast, as noted above, the Heimbach Declaration makes clear that the United States Government did not request that the UAE detain or arrest Hamdan or direct the UAE to investigate him. Heimbach Decl. ¶¶ 9-10.

---

[7] As Judge Bates detailed, other Americans were detained around the time of Abu Ali's detention and each was extradited a month later to the United States where "they were charged, along with eight other Northern Virginia men, with undertaking paramilitary training to wage a terrorist jihad on behalf of Muslims," making Abu Ali "the only American citizen not extradited to the United States and charged with a crime." *Abu Ali*, 350 F. Supp. 2d at 32. Judge Bates went on to note that "a prosecutor in the *Royer* proceedings would acknowledge that the search of Abu Ali's home was conducted 'in connection with' the *Royer* prosecution." *Id.* (citing Abu Ali Petition ¶ 32 & Aff. of Omar Abu Ali, Sept. 20, 2004, ¶ 10).

ACLU - Hamdan-310

Moreover, in *Abu Ali*, the Petitioners specifically alleged that after several months of detention "FBI agents traveled to Saudi Arabia and interrogated Abu Ali for at least four days," and, among other things allegedly "threatened to declare him an enemy combatant and send him to Guantanamo Bay, Cuba, if he did not cooperate" or "put him on trial in Saudi Arabia without counsel." *Id.* at 33 (citing Abu Ali Petition ¶ 36 & Aff. of Faten Abu Ali, Aug. 18, 2004, ¶ 1). Again, there are no analogous claims in the instant Petition (or in the factual evidence) regarding any FBI interrogation of Hamdan after his detention.[8] *See* Petition ¶¶ 36-44. Indeed, the Heimbach Declaration unequivocally resolves this point and makes clear that the "FBI has neither interrogated nor observed any interrogation of Hamdan while he has been in UAE custody." *See* Heimbach Decl. ¶ 11. Yet the Petition apparently attempts to draw some sort of inference by referencing a voluntary meeting at the U.S. Embassy between Hamdan and the FBI *before* his detention by UAE authorities. *See* Petition ¶ 35. In particular, the Petition, in distinctively specific language, highlights the alleged timing between that FBI interview and Hamdan's detention, claiming that "[a]round the beginning of August [2008]– the following month [after Hamdan's family moved to UAE] – the FBI contacted Mr. Hamdan's brother" about a meeting and that "[a]pproximately three weeks [after]" the meeting occurred, Hamdan was

---

[8] Petitioners' Notice, filed December 22, 2008, includes as an exhibit Hamdan's handwritten statement. Hamdan's only relevant allegation is that at some point while in UAE custody, he was interrogated by a single unidentified "man [who] spoke to me in perfect english [sic], I thought he was American (no accent)" who said "you are not the only person here with Masters Degree." Exhibit to Pets.' Notice at 6. Putting aside that the FBI denies it participated in any interrogation of Hamdan while he was in UAE custody, *see* Heimbach Decl. ¶ 11, at a minimum, these allegations lack the specificity and factual support of those in *Abu Ali* where it was alleged, with supporting evidence, that "FBI agents" were involved in four days of interrogation and allegedly made specific threats to keep Abu Ali out of the reach of U.S. courts. *Compare Abu Ali*, 350 F. Supp. 2d at 33. Beyond this, not even the most favorable inference would establish that the man referenced in Hamdan's statement was *an FBI agent*, as in *Abu Ali*, simply because he spoke English without an accent.

9

ACLU - Hamdan-311

detained by UAE. *See* Petition ¶¶ 35-36 (citing declarations specifically referencing August 2008). But this timing is simply wrong. As set forth in the Heimbach Declaration, in early July 2008, the FBI sought to interview Hamdan concerning his detention in Lebanon. Heimbach Decl. ¶¶ 6-7. This meeting occurred at the U.S. embassy – requiring Hamdan to drive some 2 ½ hours from his residence – on July 16, 2008, approximately six weeks before his detention by UAE authorities. *See id.* Plainly, there are material differences with respect to these allegations and those that Judge Bates faced in *Abu Ali*.

Furthermore, the allegations and evidence submitted in *Abu Ali* concerning the alleged involvement of the FBI in Abu Ali's detention are radically distinct from the allegations and evidence submitted by Petitioners here. Beyond the forgoing, Petitioners here point to an alleged comment by Chief Consul Sean Cooper that "he would not know if the U.S. government were responsible for the detention [of Hamdan] because such information would be 'above his pay grade.'" Petition ¶ 41. But that comment has been taken out of context in the Petition. *See* Bernier-Toth Decl. ¶ 13 (explaining Chief Consul Cooper's specific recollection of that conversation and noting that the statement "was not made in reference to Mr. Hamdan's arrest and detention" but rather "referred to the impropriety of him commenting on behalf of the United States government on global issues" such as Petitioners' counsel's assertion that the U.S. government was involved in renditions and extra-judicial imprisonment). Indeed, Petitioners concede that the Chief Consul stated that "he was unaware of any U.S. involvement" concerning Hamdan's detention. *See* Petition ¶ 41. Finally, Petitioners point to a news article where an FBI spokesman allegedly characterized "Mr. Hamdan's case as 'a counter-terrorism case,'" but where another FBI spokesman stated that the FBI "does not ask foreign nations to detain U.S. citizens in

10

ACLU - Hamdan-312

order to circumvent their rights."[9]  *See* Petition ¶ 44.  These allegations utterly fail to set out the most basic factual allegations necessary to even state a constructive custody claim.

In contrast to Petitioners' allegations, in *Abu Ali*, Judge Bates recounted news reports "quot[ing] a Saudi Embassy spokesman as saying that the United States Legal Attache office — the name for the FBI overseas station — 'had full and complete and direct access' to Abu Ali from the moment of his arrest." 350 F. Supp. 2d at 32.  Judge Bates also noted declarations by a petitioner in *Abu Ali* who worked at the Saudi Embassy in the United States who, unlike petitioners here, *see* Petition ¶ 43, claimed to have *personally* spoken with Saudi Officials who allegedly "'described [Abu Ali's] arrest and detention as an 'American case' that Saudi Arabia has no control over due to strong political pressure from the U.S. government to keep Ahmed in Saudi custody.'" *Id.* at 33 (quoting declaration of one petitioner).[10]  Indeed, one of the petitioner's claimed to be in possession of an intergovernment cable where a Saudi official "'commented to [a consular officer] that he understood that Abu-Ali could be rendered to

---

[9]. And while one of the Petitioners alleges he contacted an unnamed friend who contacted an unnamed person in the UAE who made inquiries that confirmed Hamdan had been detained at the request of an unnamed foreign government, *see* Petition ¶ 43, Hemdan Decl., Ex. 3 ¶ 44, it is a baseless allegation that is unconnected with Respondents. *See also* Petition ¶ 34, Hemdan Decl., Ex. 3 ¶ 43 (alleging that, with respect to Hamdan's detention in Lebanon, one of the Petitioners contacted an unnamed person with an alleged connection with an unnamed general in the Lebanese military intelligence service who claims that the detention was due to an unnamed foreign agency of an unnamed foreign power).  These allegations are not evidence, nor are they even allegations that *Respondents* are the foreign power referenced.  Indeed, the FBI specifically contradicts any such inference. *See* Heimbach Decl. ¶¶ 5, 10.  Moreover, the ongoing criminal terrorism charges under the UAE's domestic law squarely contradict Petitioners' contention that the UAE has "no independent desire to detain [Hamdan]." *See* Petition ¶ 43.

[10]  *See also id.* (citing another petitioner's declaration for the claim that a Saudi official told Abu Ali that "his case was in the hands of Washington, not the Saudi government"); *see also id.* (citing claims of a *Royer* defendant who asserted that a Saudi General who allegedly told him that "you have not broken any laws in Saudi Arabia . . . we were requested by the FBI to arrest you.").

11

ACLU - Hamdan-313

American authorities at any time if the [U.S. government] made a formal request.'" *Id.* at 35 (quoting declaration of a petitioner). Similarly, in *Abu Ali*, the petitioners' interactions with U.S. government officials were of a far different character than those here. *Compare id.* at 33-34 (making allegations and submitting declarations alleging, *inter alia*, that there was a grand jury that refused to bring charges against Abu Ali, and "the FBI told [petitioners' former counsel] that they would release Abu Ali if he revoked his U.S. citizenship and lived in another country"), *with* Petition ¶ 41 (allegations concerning conversation with Chief Consul Cooper) *and* Bernier-Toth Decl. ¶ 13 (explaining Chief Consul Cooper's conversation with Petitioners' counsel).

* * *

Simply put, the differences between this case and *Abu Ali* are stark indeed. The facts in this case, indeed even Petitioners' allegations, bear no resemblance whatsoever to what Judge Bates faced in *Abu Ali*. There is simply no basis to conclude that Petitioners here have even come close to what the *Abu Ali* Petitioners alleged or that they have provided the "considerable evidence" that Judge Bates thought was sufficient to consider the possibility that constructive custody might exist in *Abu Ali*. Indeed, the evidence in the record demonstrates that habeas jurisdiction does not exist. The habeas petition, therefore, should be dismissed.

### B. Habeas Jurisdiction Does Not Lie Where A Foreign Sovereign Possesses Actual Custody of a Person.

The Petition in this case should also be dismissed because habeas jurisdiction do not exist where a foreign sovereign possesses actual custody of the individual seeking habeas relief. Writs of habeas corpus may be granted by district courts "within their respective jurisdictions." 28 U.S.C. § 2241(a). A habeas corpus proceeding brought in federal court must name as a respondent "the person who has custody over [the individual on whose behalf the petition is

12

ACLU - Hamdan-314

filed]." 28 U.S.C. § 2242.  Similarly, the writ or order to show cause "shall be directed to the person having custody of the person detained." 28 U.S.C. § 2243.  The habeas statute further provides that, to the extent the writ is granted, "the person to whom the writ is directed shall be required to produce at the hearing the body of the person detained." *Id.*  The statutory scheme is clearly premised on the fact that habeas relief is available in United States courts only to challenge the detention of petitioners who are in the custody of custodians subject to the laws of the United States and only where the actual custodians are subject to the jurisdictions of United States courts.  *Cf. Rasul v. Bush*, 542 U.S. 466, 481-82 (2004) (describing historical reach of the writ to those places "under the sovereign's control").  Indeed, "habeas corpus" derives from the Latin phrase meaning "you have the body," *see, e.g.*, Random House Dictionary of the English Language at 856 (2d ed. unabridged 1987), and refers to the sovereign's power to order production of the body before the Court.

A writ of habeas corpus cannot be issued where the petitioner is in the custody of a foreign sovereign outside of the United States for the simple reason that a separate sovereign and its officials are not subject to the direction of the United States.  Indeed, in this case, as a independent sovereign, the UAE may choose to ignore or refuse *any* request from the United States, whereas federal, state, military, and private officials subject to federal jurisdiction have no such freedom.  It is in the very nature of sovereignty that this case should be resolved.  As Chief Justice Marshall posited long ago, a foundational principal of sovereignty is that:

> The jurisdiction of the nation within its own territory is necessarily exclusive and absolute.  It is susceptible of no limitation not imposed by itself. . . .  All exceptions, therefore, to the full and complete power of a nation within its own territories, must be traced up to the consent of the nation itself.  They can flow from no other legitimate source.

*The Schooner Exchange v. McFaddon*, 11 U.S. (7 Cranch) 116, 137 (1812).  Just as other

13

ACLU - Hamdan-315

instruments of federal power are bound by the Constitution, the courts have consistently construed habeas jurisdiction in a manner that respects the coequal sovereignty of nations.

*United States ex rel. Keefe v. Dulles*, 222 F.2d 390 (D.C. Cir. 1954), is instructive in this regard. In *Keefe*, the D.C. Circuit considered whether habeas corpus could lie for an American soldier stationed overseas who was held by French authorities on charges brought by the French Government. Much like the allegations in the instant case, the habeas petitioner (the captive's wife) claimed that U.S. Government officials—there, the Secretaries of State, Defense, and the Army—had conspired to deprive the soldier of his rights in connection with his incarceration in a French prison. *Id.* at 391. Despite these allegations, the D.C. Circuit rejected any jurisdiction to grant habeas relief because "[t]he petition shows on its face that Keefe is not in the custody of the respondents" and that "because it alleges he is detained by French civil authorities, that there is no one within the jurisdiction of the court who is responsible for his detention and who would be an appropriate respondent." *Id.* at 392. Notwithstanding the allegations of conspiracy between the American respondents and the French authorities in *Keefe*, the Court concluded that it had no jurisdiction over the habeas petition in that case.

Here, the mere fact that the Petition now before the Court makes similar claims that the United States is responsible for Hamdan's detention does not alter the fact that the Petition "shows on its face that [Hamdan] is not in the custody of the respondents," just as Keefe was not. *See also Duchow v. United States*, No. Civ. 95-2121, 1995 WL 425037, at *1, *3 (E.D. La. 1995) (concluding that a U.S. citizen detained by the Bolivian government was not entitled to habeas relief where it was alleged that detention was based on a false complaint filed by an American official stationed at the American Embassy). Fundamentally, where detention results from the actions of a foreign sovereign, it simply cannot be that a federal court may exercise habeas

14

ACLU - Hamdan-316

jurisdiction upon mere allegations of a conspiracy orchestrated by United States officials. To conclude otherwise would have a court conclude that a foreign sovereign was a mere puppet of the United States, which is impermissible for numerous reasons, *see infra* Part II.B & C, particularly in a case such as this where Petitioners themselves recognize that Hamdan is being held for prosecution under UAE's domestic criminal authority. *See also supra* Part I.A.1.

The nature of the relief Petitioners seek here suggests that habeas relief is not appropriate in this case. At its core, habeas is "a remedy for unlawful executive detention." *Munaf,* 128 S. Ct. at 2221. "The typical remedy for such detention is, of course, release." *Id.* (citing *Preiser v. Rodriguez,* 411 U.S. 475, 484 (1973) ("[T]he traditional function of the writ is to secure release from illegal custody")). Here, however, Petitioners do not request an order compelling Hamdan's release. *See* Petition, Prayer for Relief. Rather, Petitioners seek, *inter alia,* an order compelling Respondents "to rescind their request that Naji Hamdan be detained, and instead to request his release." *Id.* The requested relief underscores the fact that Hamdan is not seeking to remedy executive detention, nor could he, as he is currently detained under the custody of a foreign sovereign. Traditional habeas relief, therefore, is unavailable to Hamdan.

Indeed, even when a petitioner is held by a foreign sovereign at the request of U.S. authorities and subject to extradition, no habeas relief may lie. In *United States v. Sinclair,* 702 F. Supp. 477 (D. Del. 1989), a prisoner held by a foreign government at the express direction and request of the United States could not obtain habeas relief in federal court. The petitioner in that case had been tried, convicted, and sentenced to prison in a federal court, but he left the country before reporting to serve his sentence. Ten years later, he was arrested in Great Britain (where he had established residency) pursuant to an extradition request issued by the American authorities. He then filed a motion in federal court opposing his arrest and seeking relief from his conviction.

15

ACLU - Hamdan-317

The Court denied his petition on the ground that he was not "in custody," even though it acknowledged that the "in custody" concept has been interpreted broadly. The Court reasoned that "inherent in a federal habeas remedy is the ability of a federal court to direct the release of the person in custody. The remedy is only available for a person in custody under federal, state, or military authority." 702 F. Supp. at 478. Even though the petitioner was being held at the express direction of the U.S. government, the Court lacked jurisdiction to adjudicate his habeas petition because "Sinclair's restraint [was] being imposed by a foreign sovereign." *Id.* at 479.

Under this case law, habeas relief is unavailable against the Respondents in this case. At bottom, Hamdan's restraint is imposed by a foreign sovereign, and United States courts lack jurisdiction over the matter because the Respondents lack authority to order his production by UAE authorities; that fact alone–indeed, the clear limits of the sovereignty of the United States–is markedly different from the authority of federal officials to order the production of those detained in federal, state, or military custody or even private custody under color of federal law.[11] Here, of course, it is established that Hamdan is being held under the authority of the UAE

---

[11] Two factors when taken together clearly establish the lack of jurisdiction in this case: the lack of actual custody by Respondents and the sovereign nature of the UAE's detention. Here both are undisputed. In none of the cases that Judge Bates considered, *see Abu Ali*, 350 F. Supp. 2d at 46-49, was habeas jurisdiction found to exist where both factors were present. Detention by a sovereign for offenses committed in violation of the sovereign's laws, as is the case here, *see* Bernier-Toth Decl. ¶ 12, simply changes the calculus. The unique nature of detention by foreign sovereigns has long been recognized. Indeed, habeas jurisdiction is even lacking over prisoners held by a sovereign within a prize vessel within the territorial jurisdiction of the United States because of the *sovereign* nature of their detention, provided that they remain on the vessel. *Compare The Sitka*, Belligerent Asylum, 7 U.S. Op. Atty. Gen. 122 (1855), *with United States v. Jung ah Lung*, 124 U.S. 621 (1888) (custody established for individual detained by master of a steam ship obeying federal customs authorities). Of critical importance in Attorney General Cushing's analysis of the legal issue was the sovereign nature of the detention at issue in *The Sitka* and the limits on the habeas jurisdiction of courts of the United States that necessarily result from foreign sovereignty. *See* 7 U.S. Op. Atty. Gen. 122 (1855).

16

ACLU - Hamdan-318

for crimes he is alleged to have committed in the UAE, for which he may be subject to the

ongoing UAE criminal process, and for which he is in the process of retaining local UAE

counsel. *See* Bernier-Toth Decl. ¶ 12.   The Petition itself establishes that "it is the [UAE]

government who has custody over [Hamdan] and would be required to produce the body."

*Duchow*, 1995 WL 425037 at *3.  Thus, the Petition "shows on its face that [Hamdan] is not in

the custody of the respondents," and it is "therefore necessary to dismiss the petition."[12] *Keefe*,

222 F.2d at 392.

## II.   THIS COURT LACKS AUTHORITY TO ISSUE THE WRIT UNDER *MUNAF* BECAUSE THE UAE HOLDS HAMDAN UNDER ITS DOMESTIC CRIMINAL LAW, AND HE IS SUBJECT TO THE UAE'S ONGOING CRIMINAL PROCESS.

Even if jurisdiction existed in this matter, controlling precedent is clear that the Court

lacks the authority to grant the relief petitioners request, and the Petition should be dismissed.

Petitioners seek, *inter alia*, an order compelling the Executive Branch of the United States

Government to request Hamdan's release from UAE custody.  *See* Petition, Prayer for Relief ¶ 3.

Such relief would intrude on both the exclusive jurisdiction of a foreign sovereign to prosecute

alleged criminal offenses committed within its borders, and the Executive's authority with

respect to foreign policy.  Granting the requested relief would also implicate principles of

international comity, which counsel against intrusion into the pending criminal proceedings of a

foreign sovereign.  The UAE is currently exercising its sovereign right to prosecute Hamdan for

alleged criminal conduct.  This Court cannot interfere with that prosecution, and Petitioners

---

[12] Nor is the Court faced, as Judge Bates feared, *see Abu Ali*, 350 F. Supp. 2d at 31, with a Petition that alleges that an American citizen was first detained by officials answering to Respondents but was then *transferred* to a foreign sovereign. *Cf. Ex parte Endo*, 323 U.S. 283 (1944) (transfer of physical custody did not defeat court where jurisdiction first attached). Here, the Petition is clear that UAE officials arrested and continuously detained Hamdan.

17

ACLU - Hamdan-319

cannot use the habeas statute either as a means of avoiding the criminal justice system of a foreign sovereign with undoubted prosecutorial authority or collaterally attacking the foreign sovereign's actions. Indeed, the Petition's claims are essentially unredressible in light of controlling Supreme Court precedent, and the Petition should be promptly dismissed.

### A. The UAE Has Criminal Jurisdiction Over Persons Within Its Borders, Including United States Citizens.

The United States Supreme Court recently reaffirmed the well-established principle that a "sovereign nation has exclusive jurisdiction to punish offenses against its laws committed within its borders, unless it expressly or impliedly consents to surrender its jurisdiction." *Munaf*, 128 S. Ct. at 2221-22 (quoting *Wilson v. Girard*, 354 U.S. 524, 529 (1957)); *see also Kinsella v. Krueger*, 351 U.S. 470, 479 (1956) (nations have a "sovereign right to try and punish for offenses committed within their borders"); *Reid v. Covert*, 354 U.S. 1, 15 n.29 (1957) (plurality opinion) ("[A] foreign nation has plenary criminal jurisdiction, of course, over all Americans . . . who commit offenses against its laws within its territory."); *The Schooner Exchange*, 11 U.S. at 136 ("The jurisdiction of the nation within its own territory is necessarily exclusive and absolute.").

In *Munaf*, the Supreme Court affirmed the plenary criminal jurisdiction of a foreign sovereign and rejected the availability of habeas relief for two American citizens detained in Iraq in the immediate physical custody of American soldiers operating as part of the Multinational Force-Iraq ("MNF-I").[13] 128 S. Ct. at 2216. The *Munaf* detainees had voluntarily traveled to

---

[13] Pursuant to its United Nations mandate to "take all necessary measures to contribute to the maintenance of security and stability in Iraq," MNF-I forces detained individuals who posed a threat to the security of Iraq and maintained physical custody of many such individuals during Iraqi criminal proceedings. *See Munaf*, 128 S. Ct. at 2213 (quoting U.N. Doc. S/Res/1546 ¶ 10 (June 2004)). The Government of Iraq "retain[ed] ultimate responsibility for the arrest and imprisonment" of such individuals. *Id.*

18

ACLU - Hamdan-320

Iraq, were alleged to have engaged in criminal conduct in Iraq, and faced criminal prosecution in Iraqi courts. *Id.* at 2221. Like the petitioners in the instant case, the detainees in *Munaf* sought a court order essentially requiring the United States to intervene in a foreign criminal proceeding and, in effect, to "shelter [the detainees] from the sovereign government seeking to have them answer for alleged crimes committed within that sovereign's borders." *Id.* The Supreme Court held that a foreign sovereign's right to prosecute crimes committed in its territory extended to "American citizens who travel abroad and commit crimes in another nation whether or not the pertinent criminal process comes with all the rights guaranteed by our Constitution." *Id.* at 2222 (citing *Neely v. Henkel*, 180 U.S. 109, 123 (1901) and *Wilson*, 354 U.S. at 529-30). The *Munaf* Court acknowledged that even "*some* interference with a foreign criminal system is too much." *Id.* at 2224 (emphasis in original). Thus, the Supreme Court rejected the detainees' attempts to use the habeas statute to prevent their transfer to Iraqi custody, holding that "habeas is not a means of compelling the United States to harbor fugitives from the criminal justice system of a sovereign with undoubted authority to prosecute them." *Id.* at 2223.

Likewise, in *Neely*, the Supreme Court denied habeas relief to an American citizen who sought to block his extradition to Cuba on the grounds that Cuban law failed to provide him with protections guaranteed under the United States Constitution. 180 U.S. 109, 122 (1901). Finding that "those [constitutional] provisions have no relation to crimes committed without the United States against the laws of a foreign country[,]" *id.*, the Supreme Court "held that habeas corpus was not available to defeat the criminal jurisdiction of a foreign sovereign, even when application of that sovereign's law would allegedly violate the Constitution." *Munaf*, 128 S. Ct. at 2221; *see also Neely*, 180 U.S. at 123 ("[C]itizenship does not give [the petitioner] an immunity to commit crime in other countries, nor entitle him to demand, of right, a trial in any other mode than that

19

allowed to its own people by the country whose laws he has violated and from whose justice he
has fled").

The holdings of *Munaf* and *Neely* warrant dismissal of the habeas petition in the instant
case. Hamdan voluntarily traveled to the UAE, *see* Petition ¶ 35, and is accused of engaging in
criminal activity in violation of the laws of the UAE. *See* Pets.' Notice at 1-2; Bernier-Toth
Decl. ¶ 12. Even more importantly, the UAE has initiated formal criminal proceedings against
Hamdan by charging him with three separate counts of criminal conduct. *See* Pets.' Notice at 1-
2; Bernier-Toth Decl. ¶ 12. Indeed, this case presents an even more compelling situation for
denying the availability of habeas relief than *Munaf*. Unlike the detainees in *Munaf* who were
held in the immediate physical custody of American soldiers, Hamdan was apprehended by the
UAE and has remained in UAE custody throughout the course of his detention. *A fortiori*, *Munaf*
confirms that no relief is available. Indeed, the criminal charges brought against Hamdan
confirm the UAE's independent interest in the prosecution of Hamdan. Granting petitioners the
relief they seek would attempt to interfere with that interest and would run counter to the clear
Supreme Court precedent confirming a foreign sovereign's right to criminal prosecution. *See*,
*e.g.*, *Munaf*, 128 S. Ct. at 2228; *Neely*, 180 U.S. at 123; *Wilson*, 354 U.S. at 529. Accordingly,
Hamdan's habeas petition must be dismissed.

B.     The Relief Sought Would Violate Principles Of Separation Of Powers.

Principles of separation of powers also foreclose this Court from granting petitioners the
relief they seek. Under separation of powers principles, "it is beyond the judicial function for a
court to review foreign policy decisions of the Executive Branch." *People's Mojahedin Org. v.
U.S. Dep't of State*, 182 F.3d 17, 23 (D.C. Cir. 1999) (citing *Chicago & Southern Air Lines, Inc.
v. Waterman Steamship Corp.*, 333 U.S. 103, 111 (1948)); *see also Holmes v. Laird*, 459 F.2d

20

ACLU - Hamdan-322

1211, 1215 (D.C. Cir. 1972) ("[I]n situations such as this, '[t]he controlling considerations are the interacting interests of the United States and of foreign countries, and in assessing them we must move with the circumspection appropriate when [a court] is adjudicating issues inevitably entangled in the conduct of our international relations.'") (quoting *Romero v. Int'l Terminal Operating Co.*, 358 U.S. 354, 383 (1959)).

Petitioners ask this Court to order the Executive Branch to request that the Government of the UAE release Hamdan from custody, despite the fact that Hamdan is currently the subject of an ongoing criminal prosecution in the UAE. Such relief would require this Court to inject itself into foreign policy decisions which fall within the discretion of the Executive Branch. *See Chicago & Southern Air Lines, Inc.*, 333 U.S. at 111 (finding that decisions relating to the foreign policy of the United States "are wholly confided by our Constitution to the political departments of the government, Executive and Legislative"); *Harisiades v. Shaughnessy*, 342 U.S. 580, 589 (1952) (finding that matters relating "to the conduct of foreign relations . . . are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference"). The order petitioners seek would impugn the actions of the Government of the UAE and would compromise the Executive's substantial interest in conductiong relations with a foreign sovereign. *See, e.g., Smith v. Reagan*, 844 F.2d 195, 198 (4th Cir. 1988) ("A charge that a foreign government has 'unjustly deprived' an American citizen of liberty is likely to have far-reaching and unforeseeable effects on the conduct of foreign relations."). Because the Government of the UAE is in no way subject to the jurisdiction of this Court, the relief suggested by petitioners would needlessly complicate and potentially harm the Executive's relations with the UAE, and this Court should refrain from granting such relief.

C.   The Relief Sought Would Violate Principles Of International Comity.

21

ACLU - Hamdan-323

Principles of international comity also counsel against providing petitioners their
requested relief. These principles instruct federal courts to avoid inserting themselves in the
middle of pending foreign criminal proceedings. *See Hilton v. Guyot*, 159 U.S. 113, 164 (1895)
("No law has any effect, of its own force, beyond the limits of the sovereignty from which its
authority is derived. The extent to which the law of one nation . . . shall be allowed to operate
within the dominion of another nation, depends upon what our greatest jurists have been content
to call 'the comity of nations.'"); *Munaf*, 128 S. Ct. at 2220 (recognizing that "prudential
concerns . . . such as comity and the orderly administration of criminal justice, may require a
federal court to forgo the exercise of its habeas corpus power") (internal quotations and citations
omitted); *Holmes v. Laird*, 459 F.2d 1211, 1216 (rejecting U.S. citizen service members'
requests to examine the fairness of their treatment by the West German courts and declining to
prevent the United States from surrendering them to West German authorities to serve sentences
for convictions by West German courts on criminal charges relating to their conduct while
stationed in West Germany).

The *Munaf* Court relied on comity principles in rejecting the ability of a United States
court to "intervene in an ongoing foreign criminal proceeding and pass judgment on its
legitimacy[.]" 128 S. Ct. at 2224; *see also id.* (finding that "the same principles of comity and
respect for foreign sovereigns that preclude judicial scrutiny of foreign convictions necessarily
render invalid attempts to shield citizens from foreign prosecution") (quoting *Omar v. Harvey*,
479 F.3d 1, 17 (D.C. Cir. 2007) (Brown, J., dissenting in part)); *Banco Nacional de Cuba v.
Sabbatino*, 376 U.S. 398, 417-18 (1964) ("To permit the validity of the acts of one sovereign
State to be reexamined and perhaps condemned by the courts of another would very certainly
imperil the amicable relations between governments and vex the peace of nations.") (internal

22

ACLU - Hamdan-324

quotations omitted)); *cf. Worldwide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154, 1164-65 (D.C. Cir. 2002) ("The act of state doctrine precludes the courts of this country from inquiring into the validity of the public acts of a recognized foreign sovereign power committed within its own territory.") (internal quotations and citation omitted). These principles apply with equal force to Hamdan, who is the subject of an ongoing foreign criminal proceeding. Comity requires the dismissal of Petitioners' attempts to have this Court intervene in that proceeding and pass judgment on its legitimacy.

### CONCLUSION

For the foregoing reasons, the Court should discharge the order to show cause and dismiss with prejudice the Petition for Writ of Habeas Corpus.

Dated: January 12, 2009

Respectfully submitted,

GREGORY G. KATSAS
Assistant Attorney General

JOHN C. O'QUINN
Deputy Assistant Attorney General

TERRY M. HENRY
Assistant Branch Director

/s/ Alexander K. Haas
ALEXANDER K. HAAS (CA Bar 220932)

/s/ Stephen H. Buckingham
STEPHEN H. BUCKINGHAM (MD Bar)
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue N.W.
Washington, DC 20530
Tel: (202) 305-9334—Fax: (202) 305-3138
*Attorneys for Respondents*

23

ACLU - Hamdan-325

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MONA MALLOUK, *et al.*,  )
)
Petitioners,  )
)
v.  )  08-cv-2003 (JR)
)
GEORGE W. BUSH, *et al.*,  )
Respondents.  )

ALL FBI INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 03-10-2011 BY 65179/DMH/BAW/STP/bls

## DECLARATION OF MICHELLE BERNIER-TOTH

I, Michelle Bernier-Toth, hereby make the following declaration with respect to the above-captioned matter:

1.  I am a Civil Service employee, employed by the United States Department of State. At present, I am the Director of the Office of American Citizens Services and Crisis Management in the Office of Overseas Citizens Services, which is in the Department of State's Bureau of Consular Affairs, in Washington, D.C. I oversee the provision of overseas citizens services by U.S. consular officers worldwide. I make this declaration based upon my personal knowledge and information made available to me in the performance of my official duties.

2.  One of the primary functions of a U.S. consular officer, as reflected in Article 5(a) and (e) of the Vienna Convention on Consular Relations, is to protect and assist U.S. nationals who are visiting or residing in foreign countries. As one aspect of this responsibility, consular officers routinely visit U.S. citizens who are detained in foreign prisons to check on their welfare, provide any needed consular assistance, and monitor

1

ACLU - Hamdan-326

the progress of their cases.

3.   In the UAE, it is standard practice for consular services to attempt to meet with detained Americans at least approximately every 30 days while they are in pretrial detention, and approximately quarterly upon conviction and sentencing.  The timing of visits are wholly dependent upon the agreement of the host Government and the frequency and ease of consular access depends upon, among other things, whether the individual is detained in regular police custody and the location of detention.

3.   Mr. Hamdan's spouse, petitioner Mallouk, contacted the duty officer at the U.S. Consulate General in Dubai on August 29, 2008 to report Mr. Hamdan's detention by the United Arab Emirates Government (UAEG), specifically the State Security Department (SSD). The Department of State has been in regular contact with Mr. Hamdan's family during the period of his detention.

4.   After learning of his detention, the Department of State made a series of requests for consular access to Mr. Hamdan.  Consular access was granted after extensive engagement with the UAEG, including the direct intervention of U.S. Ambassador Richard Olson.

5.   The initial consular visit occurred on October 19, 2008 and took place in the offices of the SSD with SSD officials present during the meeting.  During that meeting, Mr. Hamdan reported that he was in good health, received his medications, and had access to a doctor.  The consular official who personally visited Mr. Hamdan reported that there were no obvious physical signs of mistreatment during the visit.  Mr. Hamdan also reported that he was in solitary confinement.  In this context, the United States does not consider solitary confinement, by itself, to constitute mistreatment.

2

ACLU - Hamdan-327

6. During the October 19, 2008 consular visit, Mr. Hamdan executed a limited Privacy Act waiver covering only his brother Hussam "Sam" Hemdan, wife Mona Mallouk (Hamdan), and members of Congress. He did not provide a waiver covering any other interested parties or groups. This limited waiver did not permit the Department of State to discuss the matter directly with Mr. Hamdan's attorneys.

7. Shortly after the initial consular visit, in mid-to-late October 2008, a second consular visit was requested for late November 2008, consistent with the practice set forth above.

8. On December 1, 2008, the Department of State was advised that Mr. Hamdan had been transferred to local police custody from SSD detention on November 26, 2008. We understand that UAE local law permits the SSD greater authority to detain persons for questioning for extended periods of time and specifically to detain individuals for up to 90 days without further proceedings so the length of this extended detention was not itself inconsistent with the laws of the UAE. Mr. Hamdan's transfer to local police custody in late November, given his initial detention in late August, appears consistent with that authority.

9. As a result of the transfer, we understand that Mr. Hamdan is now permitted regular weekly telephone calls with his family. In addition, the ease and availability of consular access has improved.

10. On December 3, 2008, following the transfer from SSD custody, the second consular visit occurred at Al Wathba Prison. Mr. Hamdan advised that the conditions of confinement were improved at Al Wathba. During the second consular visit, Mr. Hamdan made his first claims of mistreatment and initially requested that the Department not formally

3

ACLU - Hamdan-328

protest the matter to the UAE. In light of these allegations, the Embassy requested additional consular access and visited Mr. Hamdan on December 11, December 16 and December 23. Mr. Hamdan did provide a written statement during the December 16 meeting and authorized sharing it with his brother, Hussam; I understand it has been filed with the Court. Mr. Hamdan also has now removed his objection to a formal protest's being lodged concerning his treatment and the U.S. Embassy has now formally engaged with the UABG concerning these reports of mistreatment. On December 11, Mr. Hamdan also expanded his Privacy Act waiver to cover his brother Hussam "Sam" Hemdan, wife Mona Mallouk (Hamdan), members of Congress, local attorney (as designated) and the American Civil Liberties Union. It remains a limited Privacy Act waiver.

11.    During the period of SSD custody, the UAEG did not provide the Department of State with specific information regarding the cause of the investigation. The Department of State has been told by Mr. Hamdan that he made a formal written statement to the UAEG while he was in SSD custody.

12.    The Department of State can now confirm that Mr. Hamdan has been formally charged with three terrorism related offenses by the UAE: promoting terrorism, participating in the work of a terrorist organization, and assisting a terrorist organization. We have provided Mr. Hamdan with a list of local attorneys to assist in his defense. We understand that he has met with several local attorneys and is in the process of selecting his legal counsel in the UAE and that the UAE legal process is ongoing.

13.    Consul R. Sean Cooper has reviewed the Petition and supporting materials and has

4

ACLU - Hamdan-329

communicated the following to me. Mr. Cooper does recall that on or about October 23, 2008, he had a telephone conversation with Mr. Hamdan's brother, and ACLU attorneys, Jennie Pasquarella and Ahilan Arulanantham. Mr. Cooper asserts that Petitioner's supporting documents do not accurately reflect the context of the statements he made during that conversation. Mr. Cooper's recollection is that Mr. Arulanantham asserted that reports of the United States government's involvement in renditions and extra-judicial imprisonment were widely known and asked for Mr. Cooper to comment. Mr. Cooper recalls that his response to the request for his comment was that he would not be able to respond to such reports because addressing such issues would be, to use his words, above his pay grade. Mr. Cooper recalls that this particular statement referred to the impropriety of him commenting on behalf of the United States government on global issues. Mr. Cooper further recalls that this particular statement was not made in reference to Mr. Hamdan's arrest and detention.

14. Finally, the petition references Mr. Hamdan's detention by the Government of Lebanon. The Consular Section of the U.S. Embassy in Lebanon shows that Mr. Hamdan's spouse contacted the Embassy about that detention on January 8, 2008.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 09 January, 2009

Michelle Bernier-Toth

5

ACLU - Hamdan-330

OPCA-20 (12-3-96)

XXXXXX
XXXXXX
XXXXXX

# FEDERAL BUREAU OF INVESTIGATION
## FOIA/PA DELETED PAGE INFORMATION SHEET

__19__      Page(s) withheld entirely at this location in the file.  One or more of the following
statements, where indicated, explain this deletion.

☒Deletions were made pursuant to the exemptions indicated below with no segregable
material available for release to you.

| Section 552 | Section 552a | |
|---|---|---|
| ☐(b)(1) | ☐(b)(7)(A) | ☐(d)(5) |
| ☐(b)(2) | ☐(b)(7)(B) | ☐(j)(2) |
| ☐(b)(3)_____ | ☐(b)(7)(C) | ☐(k)(1) |
| _____ | ☐(b)(7)(D) | ☐(k)(2) |
| _____ | ☐(b)(7)(E) | ☐(k)(3) |
| _____ | ☐(b)(7)(F) | ☐(k)(4) |
| ☐(b)(4) | ☐(b)(8) | ☐(k)(5) |
| ☒(b)(5)-1,2 | ☐(b)(9) | ☐(k)(6) |
| ☐(b)(6) | | ☐(k)(7) |

☐  Information pertained only to a third party with no reference to the subject of your request
or the subject of your request is listed in the title only.

☐  Document(s) originated with another Government agency(ies).  These documents were
referred to that agency(ies) for review and direct response to you.

_____   Page(s) contain information furnished by another Government agency(ies).  You will be
advised by the FBI as to the releasability of this information following our consultation with the
other agency(ies).

_____   Page(s) withheld inasmuch as a final release determination has not been made.  You will be
advised as to the disposition at a later date.

_____   Page(s) were not considered for release as they are duplicative of_____.

_____   Page(s) withheld for the following reason(s):_____

_____

_____

☒ The following number(s) is (are) to be used for reference regarding these pages:

FBI-ACLU-331-349_____

XXXXXXXXXXXXXXXXXX
X    Deleted Page(s)    X
X    No Duplication Fee  X
X    for this page      X
XXXXXXXXXXXXXXXXXX

XXXXXX
XXXXXX

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 03-10-2011 BY 65179/DMH/BAW/STP/bls

MONA MALLOUK, *et al.*,

           Petitioners,

    v.

BARACK H. OBAMA, *et al.*,

           Respondents.

No. 08-cv-2003 (JR)

## NOTIFICATION REGARDING NAJI HAMDAN
## AND REQUEST FOR EXPEDITED DECISION

       Petitioners file this supplemental memorandum both to inform the Court of new information relevant to the resolution of this case and to urge the Court to proceed on an expedited basis in light of that information.

       Three new pieces of information have come to light since Petitioners' last filing. First, and most important, on May 18, 2009, Petitioners learned that the United Arab Emirates Supreme Court scheduled Naji Hamdan's criminal trial in the U.A.E. for June 14, 2009. Exh. 26 at ¶ 2 (Second Declaration of Jennie Pasquarella) (attached). Petitioners have argued that this Court should order the United States government to present information concerning Naji Hamdan's torture to the U.A.E. authorities prior to or during that trial, if in fact an employee of the U.S. government was present for any part of his torture. *See* Petitioners' Response to Motion to Dismiss (hereinafter "Pet. Resp. MTD") at 18-21. For this reason, the new information concerning the impending trial date warrants expedited consideration by the Court.

ACLU - Hamdan-350

Second, Petitioners also recently learned that the FBI has issued another subpoena to Daniel K. Sieu for documents relating to financial transactions in which Naji Hamdan engaged. Petitioners also learned that the FBI issued the subpoena in connection with a grand jury investigation. Ex. 26 at ¶¶ 3-4 (Second Declaration of Jennie Pasquarella). *See also* Exh. 23 (Declaration of Daniel K. Sieu to Petitioners' Response to Motion to Dismiss) (referring to an earlier subpoena that the FBI issued for documents relating to a loan his company gave Naji Hamdan). This information provides further support to Petitioners' claim that the United States government remains highly interested in Hamdan's continued detention.

Third, Petitioners continue to learn of close cooperation between the U.A.E. and the U.S. in counter-terrorism efforts, as well the U.A.E.'s brutal state-sanctioned torture practices. Specifically, on April 20, 2009, counsel for Petitioners received a document obtained through a Freedom of Information Act (FOIA) request that describes the U.A.E.'s proxy detention of an individual for the U.S., pending the ability of the U.S. to "do a Extraordinary Rendition." *See* Exh. 27 (E-mail communication from U.S. Immigration and Customs Enforcement (ICE) to INTERPOL) (attached) (stating "At this time [redacted] is the only one we can get to. He is currently being held by the UAE pending our ability to do a Extraordinary Rendition."). This lends further plausibility to Petitioners' allegation that the U.A.E. detained Mr. Hamdan at the behest of the U.S. government, as the document refers to another individual who was detained at the behest of the U.S. government pending an "extraordinary rendition." Furthermore, the U.A.E.'s torture practices have recently received widespread attention, as well as the scrutiny of the U.S. Congress and State Department, because of the release of video footage showing a member of the U.A.E.'s royal family torturing another man. *See* Exh. 28 (news articles concerning the incident) (attached).

2

ACLU - Hamdan-351

Petitioners in this case have requested jurisdictional discovery regarding the United States government's participation in Naji Hamdan's detention, interrogation, torture and prosecution in the U.A.E. *See, e.g.,* Pet. Resp. MTD at 2, 27. Considering the ample evidence of U.S. government interest in Mr. Hamdan, jurisdictional discovery may well reveal facts that would disclose that the U.S. government continues to be the driving force behind Mr. Hamdan's detention and prosecution in the U.A.E. Because the U.A.E. trial of Naji Hamdan will commence in less than one month, Petitioners respectfully request that this Court expeditiously deny the government's motion to dismiss, and that it subsequently authorize limited expedited discovery.

Respectfully submitted,

/s/ *Ahilan Arulanantham*

Ahilan Arulanantham
Jennie Pasquarella
ACLU of Southern California
1313 West 8th Street
Los Angeles, CA 90017
Tel: (213) 977-9500
Fax: (213) 977-5297

/s/ *Arthur B. Spitzer*

Arthur B. Spitzer (D.C. Bar No. 235960)
American Civil Liberties Union
 of the National Capital Area
1400 20th Street NW, Suite 119
Washington DC 20036
Tel (202) 457-0804
Fax (202) 452-1868

Counsel for Petitioners

May 19, 2009

3

ACLU - Hamdan-352

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 03-10-2011 BY 65179/DMH/BAW/STP/bls

# EXHIBIT
# 26

ACLU - Hamdan-353

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 03-10-2011 BY 65179/DMH/BAW/STP/bls

### Declaration of Jennie Pasquarella

1     I, Jennie Pasquarella, hereby declare:

2

3     1.      I make this declaration based on my own personal knowledge and if called to

4  testify I could and would do so competently as follows:

5     2.      On May 18, 2009, I learned that the U.A.E. Supreme Court scheduled Mr.

6  Hamdan's trial for June 14, 2009.  Sean Cooper, Consul at the U.S. Embassy in the United Arab

7  Emirates called the Court and confirmed that this was true.

8     3.      On April 16, 2009, Daniel K. Sieu informed me that the Federal Bureau of

9  Investigations (FBI) served him with a subpoena seeking additional records relating to a loan that

10  his organization granted Naji Hamdan.

11     4.      On May 15, 2009, I spoke with Mr. Sieu about the subpoena notice.  Ahilan

12  Arulanantham, another attorney working with me on this case, was also present during the

13  conversation.  Subsequently, Mr. Sieu informed Mr. Arulanantham that the subpoena notice

14  stated that it had been issued in connection with a grand jury investigation.

15

16     I declare under penalty of perjury of the laws of the State of California and the United

17  States that the foregoing is true and correct.  Executed this 18th day of May, 2009 in Los

18  Angeles, California.

19

20                        Jennie Pasquarella

21

22

23

24

25

26

27

28

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 03-10-2011 BY 65179/DMH/BAW/STP/bls

# EXHIBIT

# 27

ACLU - Hamdan-355

ALL FBI INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 03-10-2011 BY 65179/DMH/BAW/STP/b1s

0002-inc.txt

```
Priority:      Normal
Date Sent:     Wed 3/2/2005 5:14 PM
Sender: Federal FL Federal, Other Federal, Other
Sender Ref:    NONE
Case Number:                      b2  INTERPOL - USNCB
Subject:       KM09 - ICE (FL)
```

FROM: ICE, ASAC FORT.LAUDERDALE
TO: INTERPOL WASHINGTON SSA AL MATHALON
DATE: 02/28/2005

b7C  INTERPOL - USNCB

Attached are the affidavit, warrants, and applications for Red Notice for ███
█████████████. At this time ████ is the only one we can get to. He is
currently being held by the UAE pending our ability to do a Extraordinary Rendition.

ICE Attaché' ████████ is going to work with the Emirate airlines to allow us
b(7)(C) to transport him back to the U.S. I will coordinate getting three escorts since SEIF
will be unrestrained on the Emirate flight until we get to the United States.
Regards,

██████████

INTERPOL RED NOTICE APPLICATION FORM
FOR USE BY U.S. AUTHORITIES

PUBLICATION OF AN INTERNATIONAL WANTED NOTICE
WITH A VIEW TO ARREST AND EXTRADITION

DATE:  23 February 2005

SUBJECT: Wanted Person - ████████ born 10 January 1954

NOTICE REQUESTED FOR INFORMATION CONCERNING A
Fugitive wanted for prosecution

PHOTOGRAPH ENCLOSED: NO

FINGERPRINTS ENCLOSED: NO

1.1    PRESENT FAMILY NAME:

b(7)(C) 1.2    FAMILY NAME AT BIRTH / PREVIOUS FAMILY NAMES:

1.3 FORENAMES:

1.4 SEX: Male

1.5    DATE AND PLACE OF BIRTH:
05 June 1969

Iran

1.6    ALSO KNOWN AS:

Page 1

ACLU - Hamdan-356

Exhibit 27
Page 6

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 03-10-2011 BY 65179/DMH/BAW/STP/bls

# EXHIBIT

# 28 ACLU - Hamdan-357



ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 03-10-2011 BY 65179/DMH/BAW/STP/bls

# ABC News Exclusive: Torture Tape Implicates UAE Royal Sheikh

**Police in Uniform Join in as Victim Is Whipped, Beaten, Electrocuted, Run Over by SUV**

**By VIC WALTER, REHAB EL-BURI, ANGELA HILL and BRIAN ROSS**

**April 22, 2009—**

A video tape smuggled out of the <u>United Arab Emirates</u> shows a member of the country's royal family mercilessly torturing a man with whips, electric cattle prods and wooden planks with protruding nails.

A man in a UAE police uniform is seen on the tape tying the victim's arms and legs, and later holding him down as the Sheikh pours salt on the man's wounds and then drives over him with his Mercedes SUV.

In a statement to ABC News, the UAE Ministry of the Interior said it had reviewed the tape and acknowledged the involvement of Sheikh Issa bin Zayed al Nahyan, brother of the country's crown prince, Sheikh Mohammed.

"The incidents depicted in the video tapes were not part of a pattern of behavior," the Interior Ministry's statement declared.

The Minister of the Interior is also one of Sheikh Issa's brother.

The government statement said its review found "all rules, policies and procedures were followed correctly by the Police Department."

"If this is their complete reply, then sadly it's a scam and it's a sham," said Sarah Leah Whitson of Human Rights Watch.

"It is the state that is torturing them," she said, "if the government does not investigate and prosecute these officers, and those commanding those officers."

The 45-minute long tape was smuggled out of the country by Bassam Nabulsi, of Houston, Texas, a former business associate of Sheikh Issa.

Nabulsi is now suing the Sheikh in federal court in Houston, alleging he also was tortured by UAE police when he refused to turn over the videos to the Sheikh following their falling out.

"They were my security, really, to make my case that this man is capable of doing what I say he can do," said Nabulsi in an interview to be broadcast Wednesday on the ABC News program Nightline.

ACLU - Hamdan-358

Nabulsi says the video tapes were recorded by his brother, on orders from the Sheikh who liked to watch the torture sessions later in his royal palace.

The Sheikh begins by stuffing sand down the man's mouth, as the police officers restrains the victim.

Then he fires bullets from an automatic rifle around him as the man howls incomprehensibly.

## Sadistic Torture by Sheikh

At another point on the tape, the Sheikh can be seen telling the cameraman to come closer.

"Get closer. Get closer. Get closer. Let his suffering show," the Sheikh says.

Over the course of the tape, Sheikh Issa acts in an increasingly sadistic manner.

He uses an electric cattle prod against the man's testicles and inserts it in his anus.

At another point, as the man wails in pain, the Sheikh pours lighter fluid on the man's testicles and sets them aflame.

Then the tape shows the Sheikh sorting through some wooden planks. "I remember there was one that had a nail in it," he says on the tape.

The Sheikh then pulls down the pants of the victim and repeatedly strikes him with board and its protruding nail. At one point, he puts the nail next to the man's buttocks and bangs it through the flesh.

"Where's the salt," asks the Sheikh as he pours a large container of salt on to the man's bleeding wounds.

The victim pleads for mercy, to no avail.

The final scene on the tape shows the Sheikh positioning his victim on the desert sand and then driving over him repeatedly. A sound of breaking bones can be heard on the tape.

Sheikh Issa's lawyer, Daryl Bristow of Baker Botts in Houston, told ABC News "the tape is the tape."

The torture victim was identified by Nabulsi as an Afghan grain dealer, Mohammed Shah Poor, who the Sheikh accused of short changing on a grain delivery to his royal ranch on the outskirts of Abu Dhabi.

The UAB government, in its statement, says the matter was settled privately between the Sheikh and the grain dealer, "by agreeing not to bring formal charges against each other, i.e., theft on the one hand and assault on the other hand."

Nabulsi says Sheikh Issa became increasing violent and sadistic following the 2004 death of his father, the UAE's first and only president until that time, Sheikh Zayed bin Sultan Al Nahyan.

"It's like you flipped a switch and the man took a wrong turn in his life and started getting violent," said Nabulsi.

Sheikh Issa is one of the country's 22 royal sheikhs but does not hold an official position in the UAE

ACLU - Hamdan-359

government.

## Man Says U.S. Embassy Officials in Abu Dhabi Knew of Torture Tape

Nabulsi first met Sheikh Issa when he traveled to Houston for medical reasons. Nabulsi provided hotel and limousine services and their relationship grew into a business partnership, he says.

Nabulsi, in his lawsuit, says he was falsely arrested on narcotics trafficking charges by Abu Dhabi police when he refused to turn over the tapes and mistreated in prison, where he was held for three months.

"They would stick a finger up his anus and say, 'this is from Sheik Issa, are you going to give us the tapes,'" said Nabulsi's Houston lawyer, Tony Buzbee.

"They would keep him from sleeping, deny him his medications, tell him they were going to rape his wife, kill his child. They made him pose naked while they took pictures," the lawyer alleges.

The UAE government said its review "also confirmed that Mr. Nabulsi was in no way mistreated during his incarceration for drug possession."

After a short trial, Nabulsi was convicted of having prescription medicine without a prescription from a local doctor. Evidence at the trail showed his doctor in Houston had prescribed the medicine.

Nabulsi was expelled from the country and his passport is stamped with the notation "Not Allowed to Return to the UAE."

Nabulsi says officials at the U.S. Embassy in Abu Dhabi were aware of the torture tapes but took no action to protest the Sheikh's action.

The UAE is considered a stalwart U.S. ally in the region, with close cooperation in working against al Qaeda. The U.S. Navy has an important base outside Dubai.

Nabulsi says he even showed portions of the tape to a Department of Homeland Security official stationed in Abu Dhabi to train UAE police, Bill Wallrap.

Nabulsi says after the U.S. official watched the tapes, he advised Nabulsi to "gather your family and get out of the country as soon as possible for your own safety."

A spokesman for DHS said neither Wallrap nor the DHS would have any comment on the torture tapes.

In its 2008 Human Rights report, the U.S. State Department referred to "reports that a royal family member tortured a foreign national who had allegedly overcharged him in a grain deal." The State Department made no reference to the video tapes played for the U.S. official.

## Rep. McGovern Weighs In

Other U.S. embassy employees did help, says Nabulsi, who credits them with keeping him alive by their visits to the prison.

Asked why neither he nor his brother didn't report the torture he saw on the tape to authorities in the

ACLU - Hamdan-360

UAE, Nabulsi said, "I mean the whole government is all brothers. I mean the president is al Nahyan, the crown prince is al Nahyan, the foreign minister is al Nahyan, the foreign minister is al Nahyan. What can you do?"

The co-chairman of the House Human Rights Commission, Rep. James McGovern (D-MA), said the existence of the tape requires the U.S. to take action.

"Granted that they're strategically located in a key part of the world, but it's hard to imagine that we're going to keep going on as if it' business as usual when this kind of stuff happens," said McGovern. "My guess is that this is just the tip of the iceberg."

Sheikh Issa's lawyer, Bristow, has moved to have the case, which also involves allegations surrounding their business dealings, transferred to courts in the UAE.

Wherever it is heard, said Bristow, "You may be assured that in due course the one-sided "story" being told to ABC by the Nabulsi's and their lawyers will be completely addressed and the Nabulsi's will be discredited," he said in a letter to ABC News.

The "'story that we think ABC is being told is grossly misleading; it is in large measure demonstrably untrue; and it is defamatory to Sheikh Issa." Bristow represented George W. Bush in the Florida recount case in 2000. Among the firm's partners is former Secretary of State James Baker.

Click Here for the Investigative Homepage.

Copyright © 2009 ABC News Internet Ventures

ACLU - Hamdan-361

Exhibit 28
Page 10

# The Washington Post

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 03-10-2011 BY 65179/DMH/BAW/STP/bls

## UAE: tribal justice or trial into torture claims?

Advertisement

By BARBARA SURK
The Associated Press
Monday, May 18, 2009 1:23 AM

DUBAI, United Arab Emirates -- The public disgrace has been without precedent for a member of this Gulf country's ruling family: First, the government publicly acknowledged that the half brother of the president had appeared in a torture video. Then it ordered his detention while a civil lawsuit moves ahead in the United States.

But it's the private deliberations over Sheik Issa bin Zayed Al Nahyan that could bring the biggest test for the Emirates' long-enshrined two-tier system of justice.

The dilemma for Emirates officials is whether to break tradition and order a courtroom trial for a member of the ruling elite as demanded by international rights groups, or whether to remain loyal to tribal codes and render any possible punishment away from the public eye, experts say.

The case is just the latest here to cast a spotlight on the friction between this country's desert customs and its desire to adapt to Western standards of fairness and openness as it seeks to become a modern business giant.

Some U.S. lawmakers have suggested the torture tape could hurt congressional support for a tentative deal with the Emirates to open the door for American nuclear technology as part of the country's goal to build energy-producing reactors. Rep. James McGovern, D-Mass., co-chairman of the House Human Rights Commission, viewed the tape and said he "would feel very uncomfortable" about the nuclear cooperation.

Perhaps because of that, the torture allegations against Sheik Issa have forced a groundbreaking flurry of damage control with much at stake.

International rights groups have demanded a full and open inquiry into the five-year-old video, released by one of Issa's former business partners as part of a lawsuit filed in Houston. The suit charges Issa and other members of the ruling Al Nahyan family with false imprisonment and torture in an attempt to get back the tapes.

The former partner, Texas businessman Bassam Nabulsi, says the video shows the sheik sodomizing and brutally beating an Afghan merchant who Issa claims cheated him on a grain deal. UAE officials later acknowledged that Sheik Issa was in the video.

Issa is the half brother of Abu Dhabi's ruler and UAE president, Sheik Khalifa bin Zayed Al Nahyan. He also has the same relationship with Sheik Mohammed bin Zayed al Nahyan, crown prince of Abu Dhabi and deputy supreme commander of the UAE armed forces.

The torture allegations have been around for years, but they gained prominence after Nabulsi filed the suit. Issa had entrusted Nabulsi, the sheik's personal business manager, with the tapes, his financial records and investment documents before their falling out.

ACLU - Hamdan-362

Exhibit 28
Page 11

Case 1:08-cv-02683-JR   Document 23-2   Filed 05/19/2009   Page 11 of 13   Page 2 of 3

Parts of the video have since aired on television stations and the Internet, but have been blocked in the Emirates by its censors. The UAE press has not reported the scandal, even after the state news agency WAM in early May said Issa had been detained while authorities investigated the torture allegations.

"The report of the arrest was reassuring, but now the government needs to make the details public," said Sarah Leah Whitson of the New York-based Human Rights Watch. "Secretive prosecutions will not deter further abuses and torture."

Under the country's tribal traditions, punishments for members of ruling clans are handled within the families and rarely enter the normal judicial system _ part of Gulf customs to avoid public embarrassments and discord.

But the uproar over the tapes may force the rulers to sacrifice one of their own to an open prosecution, said Christopher Davidson, an expert in Emirates affairs and a lecturer at Durham University in Britain.

"The government and the ruling family now have no option but to expose Issa to a public trial, as painful as this will feel," Davidson said. "Without this, the UAE's critics cannot be appeased and the massive nuclear deal will remain stalled."

Although most of Issa's 18 brothers hold the Emirates' presidency and important posts in the government, he has never held an official position. That could be the loophole needed to send him to a public trial, said Khalifa al-Shaali, a veteran of the Emirates' federal police and now the dean of the law faculty at the University of Ajman.

"The rulers are immune from normal criminal procedures," he said. But he added that wouldn't protect Issa if the Abu Dhabi rulers decide to allow a trial.

But Nabulsi's U.S.-based lawyer is convinced the sheik's case will never get to court and doubts Issa will ever be punished.

The attorney, Anthony Buzbee, has offered to share with Abu Dhabi judicial authorities depositions from three people who claim they witnessed Issa's brutality. Buzbee also claims to have more than two hours of video footage showing Issa torturing 25 people.

Buzbee said he has never heard back from any official. Attempts by The Associated Press to obtain comments from UAE officials on the case were unsuccessful.

"They claim to do a comprehensive investigation, but the truth is they have not done so and I don't expect them to," Buzbee said. "Sheik Issa will never be prosecuted and the whole thing is a farce and a joke."

© 2009 The Associated Press

| Ads by Google |

**Teach English in Korea**
Adventure, Good Pay, Great Schools. Visit our site to learn more!
www.AClipse.net

**Jobs in Abu Dhabi**
Looking to Teach English abroad? Find thousands of vacancies online!
www.abudhabi.ae

**Teach English Overseas**
Accredited certificates with job placement abroad

ACLU - Hamdan-363

Exhibit 28
Page 12

# The Washington Post

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 03-10-2011 BY 65179/DMH/BAU/STP/b13

## UAE nuclear deal may stall as U.S. condemns torture

Advertisement - Your Ad Here

By Sue Pleming
Reuters
Wednesday, May 13, 2009 6:02 PM

WASHINGTON (Reuters) - The United States said on Wednesday it was very concerned by video of a member of the ruling family of Abu Dhabi allegedly torturing an Afghan man, footage that could stall a civilian nuclear deal with the United Arab Emirates.

State Department spokesman Ian Kelly said the department was consulting with Congress about the agreement, which could be blocked if an outcry over the video grows. The deal could be worth billions of dollars to U.S. energy companies that build and operate nuclear power plants.

"We, of course, are very concerned by this video," Kelly told reporters when asked whether the 2004 torture video was holding up implementation of the agreement, which was signed in the final days of the former Bush administration and has to be sent to Congress for review by President Barack Obama.

"We think it's an important agreement, but, as I said, we are right now in the stage of having consultations with Congress," Kelly said. "At the appropriate time, we'll make the decision," he told reporters.

In part of the video, which has been shown on U.S. television networks as well as at a congressional hearing on Wednesday, an Afghan man is shown being abused with an electric cattle prod, beaten with whips and a plank of wood with a nail on it and driven over by a car at a desert location in 2004.

Kelly declined to draw a link between the video and possible stalling on the deal.

But another U.S. official, who declined to be named, confirmed the graphic footage was an issue.

Some lawmakers also believe the UAE is not doing enough to curb Iran's atomic ambitions. They also want more transparency over the nuclear deal that establishes a legal framework for commerce in nuclear energy between the United States and UAE.

NO TIMELINE FOR NUCLEAR DEAL

A senior U.S. official, who spoke on condition of anonymity as the issue is sensitive, said the video was "shocking" and that the Obama administration had discussed it with the UAE.

"We have urged them to have a thorough and prompt review and to take appropriate follow-up action," said the official.

The senior official refused to speculate on when Obama might sign off on it. "I will not comment on internal deliberations or speculate about timing," the official said.

Abu Dhabi's judicial department said on Monday that prosecutors had detained Sheikh Issa bin Zayed

ACLU - Hamdan-364

Exhibit 28
Page 13

al-Nahyan, a brother of the UAE crown prince, pending an outcome of an investigation into the video.

The UAE is a federation of seven emirates, each run by a ruling family. The reported investigation is the first of a ruling family member of Abu Dhabi, the capital of the UAE.

Lawmakers aired a 10-minute video at a Capitol Hill hearing on Wednesday showing three incidents of abuse involving the royal family member.

One of the men in the video, whom the U.S. network ABC said last month was Sheikh Issa, is seen pouring what the network said was salt into the man's wounds. A man in police uniform takes part too.

"In each case, Sheikh Issa is seen beating and terrorizing his victims -- and in each case, he is assisted by uniformed individuals, some of whom, especially in the group incident, appear to be official uniformed security or police members," Rep. James McGovern, a Democrat from Massachusetts, said in a statement at the hearing.

McGovern wrote to Secretary of State Hillary Clinton last month urging her to hold off on the nuclear deal until the issue over the video was resolved.

In his April 23 letter, McGovern urged a temporary hold on "further U.S. expenditures of funds, training, sales or transfers of equipment or technology including nuclear until a full review" of the torture video.

As a step toward implementing the deal, Obama has to issue a presidential determination over the agreement saying it is in the country's interests to proceed.

Once Obama has signed the determination, Congress is then notified by Clinton and a 90-day review period begins after which the deal comes into force unless there are objections.

McGovern, who urged any minors in the hearing room to leave before the video was shown, said it had been a hard decision to show the video publicly.

"I cannot describe the horror and revulsion I felt when witnessing what is on this video," said McGovern at the hearing, which was called to look into abuses in the UAE.

(Editing by Terry Wade)

© 2009 Reuters

Ads by Google

**Little Caesars PizzaPizza**
Nationwide Franchise Opportunities Available for Eager Self Starters.
Franchise.LittleCaesars.com

**Washington Dc Singles**
Browse Photos and Meet Singles Free Search and Profiles
www.True.com

**Crime & Punishment Museum**
Natl. Museum of Crime & Punishment Notorious history of American crime
www.crimemuseum.org

ACLU - Hamdan-365

Exhibit 28
Page 14

**The New York Times**

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 03-10-2011 BY 65179/DMH/BAW/STP/bls



This copy is for your personal, noncommercial use only. You can order presentation-ready
copies for distribution to your colleagues, clients or customers here or use the "Reprints" tool
that appears next to any article. Visit www.nytreprints.com for samples and additional
information. Order a reprint of this article now.

May 2, 2009

# Videotape Complicates U.S. Deal With Emirates

By ROBERT F. WORTH

BEIRUT, Lebanon — A gruesome videotape showing a member of the Abu Dhabi ruling family torturing an Afghan grain merchant has begun casting a lurid new light on allegations of human rights abuses in a city-state better known for skyscrapers and global finance.

The 45-minute videotape shows Sheik Issa bin Zayed al-Nahyan, assisted by uniformed police officers, torturing the merchant with whips, cattle prods and a wooden plank with a protruding nail, and finally driving over him with an S.U.V.

The videotape — first shown last week by ABC News — has provoked outrage from members of Congress, who said it could add fuel to lawmakers' reservations about a pending civilian nuclear agreement between the United States and the United Arab Emirates, the seven-member federation on the Persian Gulf to which Abu Dhabi belongs.

The controversy comes at a delicate time for the oil-rich Emirates, whose reputation for tolerance and soaring financial success has already been tarnished in recent months by a collapsing real estate boom and a crackdown on the foreign news media. Web sites with links to the torture tape have been blocked in the Emirates, in violation of the Emirates' own policies. No local news media reported on it until the Abu Dhabi government issued a short statement on Wednesday condemning the acts shown on the video.

Still, outrage has been quietly growing among citizens of the Emirates, where the prestige of the ruling family is important to political stability.

"They've put a lot of political capital into this nuclear deal; they have to push it through," said Christopher M. Davidson, a scholar who has written extensively on the Emirates. "But to do so, they may have to sacrifice one of their own, and that will damage the myth of the ruling family."

The videotape, made in 2004, emerged in a separate lawsuit filed by Bassam Nabulsi, a former business partner of Sheik Issa. Mr. Nabulsi, an American citizen from Houston, claims he was later tortured by Emirates police officers after he refused to hand over the videotape.

The tape was made by Mr. Nabulsi's brother on orders from Sheik Issa, who liked to film torture sessions and watch them later in his palace, said Anthony G. Buzbee, Mr. Nabulsi's lawyer.

In its statement, the government of Abu Dhabi — the emirate to whose ruling family Sheik Issa belongs — promised a "comprehensive review" of the matter. It also said the government "understands that the matter depicted on the video was resolved between the two parties and that no criminal charges were brought by

ACLU - Hamdan-366

Exhibit 28
Page 15

either party."

The man being tortured in the video is Mohammed Shah Poor, an Afghan grain merchant who Sheik Issa believed had cheated him, Mr. Buzbee said. Mr. Poor was gravely injured but survived, Mr. Buzbee said.

ABC News reported that the Abu Dhabi authorities had acknowledged Sheik Issa's role in the torture, and that they had said it was "not part of a pattern of behavior."

A spokesman for the Abu Dhabi government declined to comment, and sent a text message saying, "All we have is now public knowledge."

Mr. Buzbee says he has two additional videos showing Sheik Issa torturing other men, including Sudanese immigrants. In those tapes, 15 to 20 Abu Dhabi police officers can be seen assisting in the torture, he says.

"These videotapes capture behavior that went on for some time and was well known to Sheik Issa's brothers," who include the president, interior minister and foreign minister of the Emirates as well as other high-ranking officials, Mr. Buzbee said. Sheik Issa does not hold a government position.

Daryl Bristow, Sheik Issa's lawyer, said in a statement that "Bassam Nabulsi and his lawyer are attempting to use a videotape of a third party to influence the court and public opinion" about the lawsuit. He added that he could not comment on details because of the suit, but that "when all the facts are known, the one-sided 'story' being told by Nabulsi and his lawyer will be completely addressed and Nabulsi will be discredited."

Last year, another member of the ruling family, Falah bin Zayed al-Nahyan, was convicted by a Swiss court of beating an American man with a belt in a Geneva hotel bar in 2003. He has appealed that verdict.

Under the pending nuclear agreement, the United States would share expertise, technology and fuel in exchange for a promise by the Emirates to abide by international safeguards and the Nuclear Nonproliferation Treaty. The United States has already signed agreements with India, Egypt and Morocco, and is planning nuclear pacts with other states in the Middle East even as it leads efforts to stop Iran's nuclear program.

Some American lawmakers have concerns about the deal, saying Dubai — one of the seven parts in the Emirates federation — has been used as a transit point for technology bound for Iran. The torture video could add to those reservations.

"How can we move forward with such a delicate agreement in the face of such an atrocious human rights violation?" said Representative James P. McGovern, Democrat of Massachusetts, the co-chairman of the House Human Rights Commission. "If it were brought to Congress now, I would certainly ask that it be rejected."

Copyright 2009 The New York Times Company

ACLU - Hamdan-367

Exhibit 28
Page 16

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 03-10-2011 BY 65179/DHH/BAW/STP/b13

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MONA MALLOUK, *et al.*,

Petitioners,

v.                                                          No. 08-cv-2003 (JR)

GEORGE W. BUSH, *et al.*,

Respondents.

## NOTIFICATION REGARDING STATUS OF NAJI HAMDAN

Counsel for the petitioners have learned that, on or about November 26, 2008 –

approximately one week after filing this suit – Naji Hamdan was transferred from the custody

of the State Security forces of the United Arab Emirates (U.A.E.), where he had been held

virtually incommunicado in a secret location, into criminal pre-trial detention at the Al

Wathba prison in Abu Dhabi, U.A.E. He has been charged with several terrorism-related

offenses.

Since his transfer, Mr. Hamdan has been able to speak briefly with his brother,

petitioner Hossam Hemdan, his wife, petitioner Mona Mallouk, and counsel Ahilan

Arulanantham. He has also been able to receive visits from R. Sean Cooper, a consular

official of the United States. During one visit with Mr. Cooper, Naji Hamdan provided him a

sworn statement that is attached to this filing as Exhibit 13.[*]

---

[*] Exhibits 1 through 12 were filed with the petition.

ACLU - Hamdan-368

In his sworn statement, Mr. Hamdan reports that he was severely tortured during his time in State Security custody, and that a man who appeared to be an American was present during his interrogation and torture. For example, he states that someone "pulled me down to the floor, face down, took my arms towards my back, sat on them with his knees, then another person lift [sic] my legs up and another one with a stick started the whiping [sic] of my feet." Exh. 13 at 5. He also reports that he was repeatedly punched and slapped in the head, kicked in the side, strapped in to an electric chair, and subjected to other forms of brutality; his captors tortured him so severely that he lost consciousness. *Id.* at 3-6. He was told that unless he confessed to being "a member of alquaeda," he would not be allowed to contact the U.S. Embassy. *Id.* at 6. In great pain and in fear of his life, he confessed to a variety of false allegations, *id.* at 7-8, which apparently formed the basis for the charges now leveled against him.

Mr. Hamdan also states that at least one man present during his interrogation and torture appeared to be an American, based on his un-accented "perfect english." *Id.* at 6. The American advised him, "Do what they want or these people 'will fuck you up.'" *Id.*

Mr. Hamdan swears that he is innocent of the charges. He states, "I am not a terrorist, I never was, I am a regular American Muslim who's looking to raise his kids and live a comfortable life with his family." *Id.* at 8.

The petition in this case alleges that Mr. Hamdan was arrested and detained by the U.A.E. State Security forces at the behest of the United States government. The timing of Mr. Hamdan's transfer into criminal custody – shortly after the filing of this petition – the apparent participation of an American during his interrogation and torture, and the subject matter of his interrogation all suggest the continuing involvement of the United States

ACLU - Hamdan-369

government in his current detention and prosecution.  For these reasons, petitioners continue to press their petition for habeas corpus and complaint for injunctive relief.  They also maintain their request for discovery regarding the role of the United States government in Mr. Hamdan's initial and continuing detention, including the role of any United States government employees or contractors in his interrogation and torture and the resulting confession and prosecution.

Respectfully submitted,

/s/ *Ahilan Arulanantham*

Ahilan Arulanantham
Jennie Pasquarella
ACLU of Southern California
1313 West 8th Street
Los Angeles, CA 90017
Tel:  (213) 977-9500
Fax:  (213) 977-5297

/s/ *Arthur B. Spitzer*

Arthur B. Spitzer (D.C. Bar No. 235960)
American Civil Liberties Union
  of the National Capital Area
1400 20th Street NW, Suite 119
Washington DC 20036
Tel (202) 457-0804
Fax (202) 452-1868

Counsel for Petitioners

December 22, 2008

ACLU - Hamdan-370

①-⑧

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 03-10-2011 BY 65179/DMH/BAW/STP/bls

Naji HAMDAN statement to Mr. Cooper - Consul -

Ⓔ Detention:

I was detained August-26th- 2008  By state security officers in
Ajman UAE while I was Resting During the Lunch Break @ my Home.
I received a call to my cell phone first saying that my parked
car was Hit (Accident) by another car, and that I should come
Down to take care of the Matter.
When I came down to the parking Lot, I was surprised by
several, white Dressed men, surrounding me, then one Hand-
cuffed my Right wrist to his, and said we need to search
your home. I asked about the problem and who they were,
I Received No answer.
they took me upstairs to my apt. and they searched every inch
of the House; they took my Laptop & other Papers & files
(work Related). - for about 3-4 Hours.
then they brought me down to their vehicle, black suburban
tinted windows, they Hand cuffed me & blind folded me then took
me to my Garage (Repair shop) & Did the same as to my
apt.
after that, they put me back in the same vehicle handcuffed
& blind folded; I asked where we'll be going; they said Just
stay quiet you'll know Later.
they Drove about one & a half Hour, I DiD NoT KNow where
we were going or what is Going on. I was extremely scared
but I stayed as calm as I could.
when we reached to the place (later I learned from consul,
Mr. cooper that I was in AbuDHABi state security, after almost 2 months),
I was Received by uniformed men, still blind folded but could see
through the nose (Down) side a little bit; they took me
in to a small cell that only Hamdan 371 Mattress (on the floor),
Blanket, and a Pillow. the cell's light were extremely Bright as
if you Have a camera flash in your eyes 24 HRs. (Video Camera on
ceiling)



the wall and floor were painted Glossy White to Reflect the light more & more.

I was I do not leave that cell except to the bathroom or to meet interrogators and always Blind folded when leaving the cell. I Do Not Know Day from Night except When they call for prayers times. Did not see the sun or smell fresh air till I left the torture:

① the first Day, interrogator met me, said that they knew everything about me and that I should tell them everything! I said concerning what?! and I asked if they were from the Detectives or Who they were. I Did Not Know anything about state security. I thought that it was some What related to my job, and possibly someone bought one of my cars and was not satisfied or related problems.

He kicked me to the knee (left side), and said you should admit to everything because we (they) already know it. I said, please Don't hurt me or beat me, I Have Health problems and can't receive any hits or kicks. I said what Do you want to Know, He said you tell me. then came to my mind the FBI visit to the embassy (ABU DHABI). I told him are you inquiring about the FBI visit and meeting. He said: exactly, that is one of them. I told him exactly what happened to me in Lebanon, and why the FBI came for and what the meeting was about. He was not satisfied, at all time I felt that there were other people in the Room 3-4, some times one talks sometimes I just feel their presence.

He called the police man outside and ordered him to Remove my mattress from cell. by the time I got Back to my cell

(3)—(8)

I founded it empty, completely !
They had the A/c up and I stayed in the corner trying to
keep myself a bit warm, but wasn't able, the rest of the
day and night till next day.
I wasn't able to sleep or eat.

next day arround noon time or so. I was taken to interrogate
again. they sat me on an electric chair; they told
me you are sitting on an electric chair, they strapped
my wrists to it but they did not turn it on.
the shape of the chair (from the way I sat on it) is
very weird. because it's higher from the front. It pokes
the back side of the knees and weak the circulation
stops to the feet and below the knees. after ten minutes
or so I started to feel num on my legs and after that
I felt I had no legs.   the same thing happens to the
lower back (which is still hurts up until this minute, &
my taking panadol daily to keep the pain down @ night).
then shortly after I was left with one person in the
room (the way I felt it). and He started punching
me on the sides of my Head, and slapping me
straight to my Head from the top. using cussing
words and swearing that He will make me loose my
weight & loosing one or more organs of my body.
and I'm begging him to stop and telling him that
I will sign anything he wants or admit to anything
He wants. but He never stopped. I started to sweat
then I lost conscience, I did not wake till later on
his & another guy's slafs to my face & the pouring of
water to my face. when I ACLU- Hamdan-373 I was drowned
with my sweat. I told the guy please Don't beat me any more
He said No one beat you, you are lying, I said can't

4-8

stand up please, I beg you let me Put my Head to the floor for couple minutes, he said NO, & called policemen to carry me to my cell.

they Put back Mattress and Blanket, threw me on mattress and afte 1½-2 HRs they pick me up. I was Sliding my feet and carried by two men to the clinic (Blind Folded). Doctor checks my vitals & says all is good He is fine. Interrogator yells in my ear DiDn't I say that you were lying ?!!
I told the Doctor please, I passed out!
He said you're OK!

was taken back to my Cell, and mattress and other stuff were Removed again for the Rest of the Day. I was almost fainted in the cell I DiD Not feel anything, I Could Not Raise my head or any part of my body.

- Next Day I was taken again to interrogation Room. I was sat on the same Chair, & I was asked to admit! I said I ADmit to everything you want. I Received a kick. the man said admit to what you did!
they asked me about internet sites, I told them what I Know & which sites I Browse, and Gave them passwords & my email address with user & password.

later in another day
- they asked if was assigned by FBI for a special assignment IN U.A.E
- they asked About my investments IN U.A.E
ACLU - Hamdan-374
- they asked if I met or financed any terrorist organizations

(5) (8)

I was always answering to the best of my knowledge & with full honesty.

they started to take my statement since I was Born, till I traveled to the U.S.A till I came ~~back~~ to U.A.E in full details.
I Gove them truthfull answers to the best of my knowledge along with Dates etc.__

- I was surprised one night in Ramadan that when I was with an interrogator called Abu Khaled, that his boss called to another office angryly, then came back to me and said you need to change your statement or you'll be going to the 2nd office & you'll be tortured !!
i said change what ?)!
He took me to the second office & to my surprise there wee at least 10 people (from what I could sneak a peek through the Blind fold).
I wae told that I should admit that I am a member of Alquaeda's! I said I am Not !!
& that I am a member of Hamas !! I said I am Not !!
One man said Give him 5 minutes to admit or else !!.
2 minutes passed, the He came into the Room said did He admit ?! someone said No; then some one caught me & pulled me Down to the floor, face Down, took My arms towards my Back, sat on them with his Knees, then another person held- mandah up & another one with a stick started the whiping of my feet !!.)

(6)(8)

I screamed hard, I was so hurt!
they stopped for one minute, gave me water & said
Drink, since when the sheep drinks water.
It'll be easier to skin it !!
I drank a sip, then they repeat the beating the same
way at least 3 times.
I am begging & screaming, but no one listens!

I said please give me to my embassy, I need to see
the ambassador. they said; you sign a paper that
you are a member of alquaeda with your finger
print on it, then we'll let you go or meet the
ambassador !!
I said I can't sign it !
they started to slap me, hard slaps to my face
and left ear. I'm holding the man's leg &
begging him to stop. every slap I fall to the
floor & a person picks me up to receive another
slapound so on several times.

one man spoke to me in perfect english, I thought
He was American (no accent). He said you are not
the only person here with masters Degree. I spoke
Back to him in ENGlish, I said Sure, I know
that, please help me out. He said Do what they
want or these people " will fuck you up" !!
I said If Do you promise to help me out of here ?!
He said it Does not matter what I promise just Do it.
I said ok.

ACLU - Hamdan-376

— While I was sitting on the floor crying & waiting for



the Second Round of Beating, a man approaches me
& says (in arabic), Did you Break his Nose already?
the said No. I covered my Knows & begged them Not
to Do It.

While Doing that, He comes arround & kicks me
as hard as a kick could be to the Right side
of my Stomach!

I felt that was ded, I lost my breath for few
seconds, I could Not here or feel what was
Arround me for few seconds. them I hear them
laughing & he is Saying teat they should only
Kick me to Right side since all the organs on
the Right side are Replaceable !!

I said I have Liver Problem, he said that is
Replaceable & he Repeats the Kiks at least
twice after that to the same spot !!!

I was Hurt Really bad, may side stomach kept
Hurting for at least couple of weeks after that,
& my wrist (Right) & lower back still Hurt me
till this minute.

I was asked few questions at the spot & I
answered them the way they want, them I
was taken to interrogation Room & asked other
Questions & I admitted to what ever they asked to
admit to!!    But they Did Not ack me about being
alquaed member or Hamas member with their questions
at that time, I was surprised Later after 2½ months
that they changed the statement again and Twisted It
iN an unbelevable way that I cannot immagine,
& they changed the questions & Twisted the answers

ACLU Hamdan-3741

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 03-10-2011 BY 65179/DMH/BAW/STP/bls



b6
b7C

CALL
ME
REG. TNS.

ACLU - Hamdan-378

(8)-(8)

to fit what they want & wish, & I was told that I'll be leaving for 3 days Home, and asked me what I wish to do when I leave Home & whom I miss from my family the most and All these kind words Etc.

& Due to the fact that was under tremendous stress, 3 months of Solitary confinement & torture, I just signed a statement that is fully false and doesn't represent what I am or what I told them.

I am NOT a terrorist, I never was, I am a regular american muslim who's looking to Raise his kids and live a comfortable life with his family. Why this Happened to me ?! I DO NOT KNOW, but I believe that the truth will prevail soon, God willing.

note: there might be additional information that I'm missing at this moment Due to the time & place where I'm writing this statement; one of which, they threatened to bring my wife and torture here before my eyes if I DID Not sign or admit, and occasional slapping & kicking during NORMAL interrogations.

NAME: NAJI HAMDAN

Signature: [signature]

Date: 12/16/2008

I swear that all the information on this Document is true to the best of My Knowledge.

[signature]

ACLU - Hamdan-379

OPCA-20 (12-3-96)

XXXXXX
XXXXXX
XXXXXX

## FEDERAL BUREAU OF INVESTIGATION
## FOIA/PA DELETED PAGE INFORMATION SHEET

_____    Page(s) withheld entirely at this location in the file.  One or more of the following
statements, where indicated, explain this deletion.

☐Deletions were made pursuant to the exemptions indicated below with no segregable
material available for release to you.

| Section 552 | | Section 552a |
|---|---|---|
| ☐(b)(1) | ☐(b)(7)(A) | ☐(d)(5) |
| ☐(b)(2) | ☐(b)(7)(B) | ☐(j)(2) |
| ☐(b)(3)_____ | ☐(b)(7)(C) | ☐(k)(1) |
| _____ | ☐(b)(7)(D) | ☐(k)(2) |
| _____ | ☐(b)(7)(E) | ☐(k)(3) |
| _____ | ☐(b)(7)(F) | ☐(k)(4) |
| ☐(b)(4) | ☐(b)(8) | ☐(k)(5) |
| ☐(b)(5) | ☐(b)(9) | ☐(k)(6) |
| ☐(b)(6) | | ☐(k)(7) |

☐  Information pertained only to a third party with no reference to the subject of your request
or the subject of your request is listed in the title only.

☐  Document(s) originated with another Government agency(ies).  These documents were
referred to that agency(ies) for review and direct response to you.

_____    Page(s) contain information furnished by another Government agency(ies).  You will be
advised by the FBI as to the releasability of this information following our consultation with the
other agency(ies).

_____    Page(s) withheld inasmuch as a final release determination has not been made.  You will be
advised as to the disposition at a later date.

__10__    Page(s) were not considered for release as they are duplicative of <u>FBI-ACLU-368-377</u>____.

_____    Page(s) withheld for the following reason(s):_____

_____

_____

☒ The following number(s) is (are) to be used for reference regarding these pages:

<u>FBI-ACLU-380-389</u>_____

XXXXXXXXXXXXXXXXXX
X    Deleted Page(s)        X
X    No Duplication Fee    X
X       for this page        X
XXXXXXXXXXXXXXXXXX

XXXXXX
XXXXXX

OPCA-20 (12-3-96)

XXXXXX
XXXXXX
XXXXXX

### FEDERAL BUREAU OF INVESTIGATION
### FOIA/PA DELETED PAGE INFORMATION SHEET

_____    Page(s) withheld entirely at this location in the file.  One or more of the following statements, where indicated, explain this deletion.

☐Deletions were made pursuant to the exemptions indicated below with no segregable material available for release to you.

| Section 552 | | Section 552a |
|---|---|---|
| ☐(b)(1) | ☐(b)(7)(A) | ☐(d)(5) |
| ☐(b)(2) | ☐(b)(7)(B) | ☐(j)(2) |
| ☐(b)(3)_____ | ☐(b)(7)(C) | ☐(k)(1) |
| _____ | ☐(b)(7)(D) | ☐(k)(2) |
| _____ | ☐(b)(7)(E) | ☐(k)(3) |
| _____ | ☐(b)(7)(F) | ☐(k)(4) |
| ☐(b)(4) | ☐(b)(8) | ☐(k)(5) |
| ☐(b)(5) | ☐(b)(9) | ☐(k)(6) |
| ☐(b)(6) | | ☐(k)(7) |

☐  Information pertained only to a third party with no reference to the subject of your request or the subject of your request is listed in the title only.

☐  Document(s) originated with another Government agency(ies).  These documents were referred to that agency(ies) for review and direct response to you.

_____    Page(s) contain information furnished by another Government agency(ies).  You will be advised by the FBI as to the releasability of this information following our consultation with the other agency(ies).

_____    Page(s) withheld inasmuch as a final release determination has not been made.  You will be advised as to the disposition at a later date.

___1___    Page(s) were not considered for release as they are duplicative of <u>FBI-ACLU-379</u>_____.

_____    Page(s) withheld for the following reason(s):_____

_____

_____

☒ The following number(s) is (are) to be used for reference regarding these pages:

<u>FBI-ACLU-390</u>_____

XXXXXXXXXXXXXXXXXX
X    Deleted Page(s)      X
X    No Duplication Fee   X
X    for this page        X
XXXXXXXXXXXXXXXXXX

XXXXXX
XXXXXX

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MONA MALLOUK, *et al.*,

              Petitioners,

    v.

GEORGE W. BUSH, *et al.*,

              Respondents.

No. 2008-cv-2003 (JR)

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 03-10-2011 BY 65179/DMH/BAW/STP/bls

## STATUS REPORT REGARDING GOVERNMENT'S RESPONSE TO THE ORDER TO SHOW CAUSE

On December 2, 2008, the Court ordered the government to show cause for the detention of Naji Hamdan, and ordered the government to file its response to the petition for a writ of habeas corpus within thirty days of service of the Court's order. Petitioners received the Court's order on December 2, 2008, thirty days from which was January 2, 2009. However, as of the date of this status report, the government has not filed its response.

On January 5, 2009, one of Petitioner's undersigned counsel called the Department of Justice to inquire as to the status of the government's response. Trial Attorney Alexander Haas of the Civil Division returned the call and explained that, although he knew of the Court's order, the Court had not yet effected service on the government, and therefore the government's response was not due. Mr. Haas declined to say when he had learned of the Court's order. After further conversation, Mr. Haas indicated that he would file his response on Monday, January 12, 2009.

Petitioners therefore believe that the government will file its response on Monday, January 12, 2009.

ACLU - Hamdan-391

Respectfully submitted,

/s/ *Arthur B. Spitzer*

Arthur B. Spitzer (D.C. Bar No. 235960)
American Civil Liberties Union
  of the National Capital Area
1400 20th Street, N.W., Suite 119
Washington, DC 20036
Tel: (202) 457-0800
Fax: (202) 452-1868

/s/ *Ahilan T. Arulanantham*

Ahilan T. Arulanantham
Jennie Pasquarella
ACLU Foundation of Southern California
1313 West Eighth Street
Los Angeles, CA 90017
Tel: (213) 977-9500
Fax: (213) 977-5297

Attorneys for Petitioners


## CERTIFICATE OF SERVICE

I hereby certify that I served a copy of the foregoing Status Report upon

    Alexander Haas, Esq.
    Department of Justice
    Civil Division
    950 Pennsylvania Avenue, N.W.
    Washington, DC 20004

by first-class mail, postage prepaid, this 8th day of January, 2009, and that I also sent a
copy to him by e-mail at alexander.haas@usdoj.gov.

/s/ *Arthur B. Spitzer*

Arthur B. Spitzer

2

ACLU - Hamdan-392

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 03-11-2011 BY 65179/DMH/BAW/STP/bls

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

MONA MALLOUK, *et al.*,          :
                                 :
          Petitioners,           :
                                 :
     v.                          :    Civil Action No. 08-2003 (JR)
                                 :
GEORGE W. BUSH, *et al.*,        :
                                 :
          Respondents.           :

**ORDER TO SHOW CAUSE**

# FILED

### DEC - 2 2008

**NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT**

It is **ORDERED** that the respondents shall, within thirty days of service of a copy of this order, file with the Court and serve on the petitioners a statement showing why their petition for writ of habeas corpus should not be granted.

The Clerk is directed to furnish a copy of the petition and a certified copy of this order to the United States Attorney for the District of Columbia and the Attorney General of the United States.

_____
**JAMES ROBERTSON**
United States District Judge

ACLU - Hamdan-393

OPCA-20 (12-3-96)

XXXXXX
XXXXXX
XXXXXX

## FEDERAL BUREAU OF INVESTIGATION
## FOIA/PA DELETED PAGE INFORMATION SHEET

___23___        Page(s) withheld entirely at this location in the file.  One or more of the following
statements, where indicated, explain this deletion.

⊠Deletions were made pursuant to the exemptions indicated below with no segregable
material available for release to you.

| Section 552 | Section 552a | |
|---|---|---|
| ☐(b)(1) | ☐(b)(7)(A) | ☐(d)(5) |
| ☐(b)(2) | ☐(b)(7)(B) | ☐(j)(2) |
| ☐(b)(3)_____ | ☐(b)(7)(C) | ☐(k)(1) |
| _____ | ☐(b)(7)(D) | ☐(k)(2) |
| _____ | ☐(b)(7)(E) | ☐(k)(3) |
| _____ | ☐(b)(7)(F) | ☐(k)(4) |
| ☐(b)(4) | ☐(b)(8) | ☐(k)(5) |
| ⊠(b)(5)-1,2 | ☐(b)(9) | ☐(k)(6) |
| ☐(b)(6) | | ☐(k)(7) |

☐  Information pertained only to a third party with no reference to the subject of your request
or the subject of your request is listed in the title only.

☐  Document(s) originated with another Government agency(ies).  These documents were
referred to that agency(ies) for review and direct response to you.

_____    Page(s) contain information furnished by another Government agency(ies).  You will be
advised by the FBI as to the releasability of this information following our consultation with the
other agency(ies).

_____    Page(s) withheld inasmuch as a final release determination has not been made.  You will be
advised as to the disposition at a later date.

_____    Page(s) were not considered for release as they are duplicative of_____.

_____    Page(s) withheld for the following reason(s):_____

_____

_____

⊠ The following number(s) is (are) to be used for reference regarding these pages:

FBI-ACLU-394-416 _____

XXXXXXXXXXXXXXXXXXX
X    Deleted Page(s)      X
X    No Duplication Fee   X
X       for this page     X
XXXXXXXXXXXXXXXXXXX

XXXXXX
XXXXXX

OPCA-20 (12-3-96)

XXXXXX
XXXXXX
XXXXXX

## FEDERAL BUREAU OF INVESTIGATION
## FOIA/PA DELETED PAGE INFORMATION SHEET

__1__        Page(s) withheld entirely at this location in the file.  One or more of the following
             statements, where indicated, explain this deletion.

             ☒Deletions were made pursuant to the exemptions indicated below with no segregable
             material available for release to you.

|              Section 552              |                          |            Section 552a            |
|---------------------------------------|--------------------------|------------------------------------|
| ☒(b)(1)                               | ☐(b)(7)(A)               | ☐(d)(5)                            |
| ☐(b)(2)                               | ☐(b)(7)(B)               | ☐(j)(2)                            |
| ☐(b)(3)_____                | ☐(b)(7)(C)               | ☐(k)(1)                            |
| _____         | ☐(b)(7)(D)               | ☐(k)(2)                            |
| _____         | ☐(b)(7)(E)               | ☐(k)(3)                            |
| _____         | ☐(b)(7)(F)               | ☐(k)(4)                            |
| ☐(b)(4)                               | ☐(b)(8)                  | ☐(k)(5)                            |
| ☒(b)(5)-1,2                           | ☐(b)(9)                  | ☐(k)(6)                            |
| ☐(b)(6)                               |                          | ☐(k)(7)                            |

☐  Information pertained only to a third party with no reference to the subject of your request
or the subject of your request is listed in the title only.

☐  Document(s) originated with another Government agency(ies).  These documents were
referred to that agency(ies) for review and direct response to you.

_____    Page(s) contain information furnished by another Government agency(ies).  You will be
          advised by the FBI as to the releasability of this information following our consultation with the
          other agency(ies).

_____    Page(s) withheld inasmuch as a final release determination has not been made.  You will be
          advised as to the disposition at a later date.

_____    Page(s) were not considered for release as they are duplicative of_____.

_____    Page(s) withheld for the following reason(s):_____

_____

_____

        ☒ The following number(s) is (are) to be used for reference regarding these pages:

  FBI-ACLU-417 _____

XXXXXXXXXXXXXXXXXX
X    Deleted Page(s)      X
X    No Duplication Fee   X
X        for this page    X
XXXXXXXXXXXXXXXXXX

XXXXXX
XXXXXX

OPCA-20 (12-3-96)

XXXXXX
XXXXXX
XXXXXX

### FEDERAL BUREAU OF INVESTIGATION
### FOIA/PA DELETED PAGE INFORMATION SHEET

__1__       Page(s) withheld entirely at this location in the file.  One or more of the following statements, where indicated, explain this deletion.

⊠Deletions were made pursuant to the exemptions indicated below with no segregable material available for release to you.

|  | **Section 552** | **Section 552a** |
|---|---|---|
| ☐(b)(1) | ☐(b)(7)(A) | ☐(d)(5) |
| ☐(b)(2) | ☐(b)(7)(B) | ☐(j)(2) |
| ☐(b)(3)_____ | ☐(b)(7)(C) | ☐(k)(1) |
| _____ | ☐(b)(7)(D) | ☐(k)(2) |
| _____ | ☐(b)(7)(E) | ☐(k)(3) |
| _____ | ☐(b)(7)(F) | ☐(k)(4) |
| ☐(b)(4) | ☐(b)(8) | ☐(k)(5) |
| ⊠(b)(5)-1,2 | ☐(b)(9) | ☐(k)(6) |
| ☐(b)(6) |  | ☐(k)(7) |

☐  Information pertained only to a third party with no reference to the subject of your request or the subject of your request is listed in the title only.

☐  Document(s) originated with another Government agency(ies).  These documents were referred to that agency(ies) for review and direct response to you.

_____       Page(s) contain information furnished by another Government agency(ies).  You will be advised by the FBI as to the releasability of this information following our consultation with the other agency(ies).

_____       Page(s) withheld inasmuch as a final release determination has not been made.  You will be advised as to the disposition at a later date.

_____       Page(s) were not considered for release as they are duplicative of_____.

_____       Page(s) withheld for the following reason(s):_____

_____

_____

⊠ The following number(s) is (are) to be used for reference regarding these pages:

_FBI-ACLU-418_ _____

XXXXXXXXXXXXXXXXXX
X     Deleted Page(s)        X
X     No Duplication Fee   X
X       for this page         X
XXXXXXXXXXXXXXXXXX

XXXXXX
XXXXXX

OPCA-20 (12-3-96)

XXXXXX
XXXXXX
XXXXXX

## FEDERAL BUREAU OF INVESTIGATION
## FOIA/PA DELETED PAGE INFORMATION SHEET

__1__       Page(s) withheld entirely at this location in the file.  One or more of the following statements, where indicated, explain this deletion.

☒Deletions were made pursuant to the exemptions indicated below with no segregable material available for release to you.

| **Section 552** | | **Section 552a** |
|---|---|---|
| ☒(b)(1) | ☐(b)(7)(A) | ☐(d)(5) |
| ☐(b)(2) | ☐(b)(7)(B) | ☐(j)(2) |
| ☐(b)(3)_____ | ☒(b)(7)(C)-1 | ☐(k)(1) |
| _____ | ☐(b)(7)(D) | ☐(k)(2) |
| _____ | ☐(b)(7)(E) | ☐(k)(3) |
| _____ | ☐(b)(7)(F) | ☐(k)(4) |
| ☐(b)(4) | ☐(b)(8) | ☐(k)(5) |
| ☒(b)(5)-1,2 | ☐(b)(9) | ☐(k)(6) |
| ☒(b)(6)-1 | | ☐(k)(7) |

☐  Information pertained only to a third party with no reference to the subject of your request or the subject of your request is listed in the title only.

☐  Document(s) originated with another Government agency(ies).  These documents were referred to that agency(ies) for review and direct response to you.

_____      Page(s) contain information furnished by another Government agency(ies).  You will be advised by the FBI as to the releasability of this information following our consultation with the other agency(ies).

_____      Page(s) withheld inasmuch as a final release determination has not been made.  You will be advised as to the disposition at a later date.

_____      Page(s) were not considered for release as they are duplicative of_____.

_____      Page(s) withheld for the following reason(s):_____

_____

_____

☒ The following number(s) is (are) to be used for reference regarding these pages:

FBI-ACLU-419 _____

XXXXXXXXXXXXXXXXXX
X     Deleted Page(s)     X
X     No Duplication Fee   X
X     for this page         X
XXXXXXXXXXXXXXXXXX

XXXXXX
XXXXXX

OPCA-20 (12-3-96)

XXXXXX
XXXXXX
XXXXXX

### FEDERAL BUREAU OF INVESTIGATION
### FOIA/PA DELETED PAGE INFORMATION SHEET

__7__          Page(s) withheld entirely at this location in the file.  One or more of the following
statements, where indicated, explain this deletion.

⊠Deletions were made pursuant to the exemptions indicated below with no segregable
material available for release to you.

| Section 552 | | Section 552a |
|---|---|---|
| ⊠(b)(1) | ☐(b)(7)(A) | ☐(d)(5) |
| ☐(b)(2) | ☐(b)(7)(B) | ☐(j)(2) |
| ☐(b)(3)_____ | ☐(b)(7)(C) | ☐(k)(1) |
| _____ | ☐(b)(7)(D) | ☐(k)(2) |
| _____ | ☐(b)(7)(E) | ☐(k)(3) |
| _____ | ☐(b)(7)(F) | ☐(k)(4) |
| ☐(b)(4) | ☐(b)(8) | ☐(k)(5) |
| ⊠(b)(5)-1,2 | ☐(b)(9) | ☐(k)(6) |
| ☐(b)(6) | | ☐(k)(7) |

☐  Information pertained only to a third party with no reference to the subject of your request
or the subject of your request is listed in the title only.

☐  Document(s) originated with another Government agency(ies).  These documents were
referred to that agency(ies) for review and direct response to you.

_____     Page(s) contain information furnished by another Government agency(ies).  You will be
advised by the FBI as to the releasability of this information following our consultation with the
other agency(ies).

_____     Page(s) withheld inasmuch as a final release determination has not been made.  You will be
advised as to the disposition at a later date.

_____     Page(s) were not considered for release as they are duplicative of_____.

_____     Page(s) withheld for the following reason(s):_____

_____

_____

⊠ The following number(s) is (are) to be used for reference regarding these pages:

FBI-ACLU-420-426_____

XXXXXXXXXXXXXXXXXX
X     Deleted Page(s)        X
X     No Duplication Fee   X
X       for this page          X
XXXXXXXXXXXXXXXXXX

XXXXXX
XXXXXX

OPCA-20 (12-3-96)

XXXXXX
XXXXXX
XXXXXX

## FEDERAL BUREAU OF INVESTIGATION
## FOIA/PA DELETED PAGE INFORMATION SHEET

__1__       Page(s) withheld entirely at this location in the file.  One or more of the following statements, where indicated, explain this deletion.

☒Deletions were made pursuant to the exemptions indicated below with no segregable material available for release to you.

| Section 552 | | Section 552a |
|---|---|---|
| ☒(b)(1) | ☐(b)(7)(A) | ☐(d)(5) |
| ☐(b)(2) | ☐(b)(7)(B) | ☐(j)(2) |
| ☐(b)(3)_____ | ☒(b)(7)(C)-1 | ☐(k)(1) |
| _____ | ☐(b)(7)(D) | ☐(k)(2) |
| _____ | ☐(b)(7)(E) | ☐(k)(3) |
| _____ | ☐(b)(7)(F) | ☐(k)(4) |
| ☐(b)(4) | ☐(b)(8) | ☐(k)(5) |
| ☒(b)(5)-1,2 | ☐(b)(9) | ☐(k)(6) |
| ☒(b)(6)-1 | | ☐(k)(7) |

☐  Information pertained only to a third party with no reference to the subject of your request or the subject of your request is listed in the title only.

☐  Document(s) originated with another Government agency(ies).  These documents were referred to that agency(ies) for review and direct response to you.

_____      Page(s) contain information furnished by another Government agency(ies).  You will be advised by the FBI as to the releasability of this information following our consultation with the other agency(ies).

_____      Page(s) withheld inasmuch as a final release determination has not been made.  You will be advised as to the disposition at a later date.

_____      Page(s) were not considered for release as they are duplicative of_____.

_____      Page(s) withheld for the following reason(s):_____

_____

_____

☒ The following number(s) is (are) to be used for reference regarding these pages:

FBI-ACLU-427 _____

XXXXXXXXXXXXXXXXXX
X    Deleted Page(s)    X
X    No Duplication Fee  X
X    for this page     X
XXXXXXXXXXXXXXXXXX

XXXXXX
XXXXXX

OPCA-20 (12-3-96)

XXXXXX
XXXXXX
XXXXXX

### FEDERAL BUREAU OF INVESTIGATION
### FOIA/PA DELETED PAGE INFORMATION SHEET

__6__

Page(s) withheld entirely at this location in the file.  One or more of the following statements, where indicated, explain this deletion.

☒Deletions were made pursuant to the exemptions indicated below with no segregable material available for release to you.

| Section 552 | | Section 552a |
|---|---|---|
| ☒(b)(1) | ☐(b)(7)(A) | ☐(d)(5) |
| ☐(b)(2) | ☐(b)(7)(B) | ☐(j)(2) |
| ☐(b)(3)_____ | ☐(b)(7)(C) | ☐(k)(1) |
| _____ | ☐(b)(7)(D) | ☐(k)(2) |
| _____ | ☐(b)(7)(E) | ☐(k)(3) |
| _____ | ☐(b)(7)(F) | ☐(k)(4) |
| ☐(b)(4) | ☐(b)(8) | ☐(k)(5) |
| ☒(b)(5)-1,2 | ☐(b)(9) | ☐(k)(6) |
| ☐(b)(6) | | ☐(k)(7) |

☐  Information pertained only to a third party with no reference to the subject of your request or the subject of your request is listed in the title only.

☐  Document(s) originated with another Government agency(ies).  These documents were referred to that agency(ies) for review and direct response to you.

_____ Page(s) contain information furnished by another Government agency(ies).  You will be advised by the FBI as to the releasability of this information following our consultation with the other agency(ies).

_____ Page(s) withheld inasmuch as a final release determination has not been made.  You will be advised as to the disposition at a later date.

_____ Page(s) were not considered for release as they are duplicative of_____.

_____ Page(s) withheld for the following reason(s):_____

_____

_____

☒ The following number(s) is (are) to be used for reference regarding these pages:

_FBI-ACLU-428-433_ _____

XXXXXXXXXXXXXXXXXX
X    Deleted Page(s)         X
X    No Duplication Fee   X
X        for this page        X
XXXXXXXXXXXXXXXXXX

XXXXXX
XXXXXX

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 03-11-2011 BY 65179/DMH/BAU/STP/bls



Here is        copy of

Hamdan    Complaint

b6  -1
b7C -1

ACLU - Hamdan-434

OPCA-20 (12-3-96)

XXXXXX
XXXXXX
XXXXXX

### FEDERAL BUREAU OF INVESTIGATION
### FOIA/PA DELETED PAGE INFORMATION SHEET

__2__      Page(s) withheld entirely at this location in the file.  One or more of the following statements, where indicated, explain this deletion.

⊠Deletions were made pursuant to the exemptions indicated below with no segregable material available for release to you.

| Section 552 | | Section 552a |
|---|---|---|
| ⊠(b)(1) | ☐(b)(7)(A) | ☐(d)(5) |
| ☐(b)(2) | ☐(b)(7)(B) | ☐(j)(2) |
| ☐(b)(3)_____ | ☐(b)(7)(C) | ☐(k)(1) |
| _____ | ☐(b)(7)(D) | ☐(k)(2) |
| _____ | ☐(b)(7)(E) | ☐(k)(3) |
| _____ | ☐(b)(7)(F) | ☐(k)(4) |
| ☐(b)(4) | ☐(b)(8) | ☐(k)(5) |
| ⊠(b)(5)-1,2 | ☐(b)(9) | ☐(k)(6) |
| ☐(b)(6) | | ☐(k)(7) |

☐  Information pertained only to a third party with no reference to the subject of your request or the subject of your request is listed in the title only.

☐  Document(s) originated with another Government agency(ies).  These documents were referred to that agency(ies) for review and direct response to you.

_____  Page(s) contain information furnished by another Government agency(ies).  You will be advised by the FBI as to the releasability of this information following our consultation with the other agency(ies).

_____  Page(s) withheld inasmuch as a final release determination has not been made.  You will be advised as to the disposition at a later date.

_____  Page(s) were not considered for release as they are duplicative of_____.

_____  Page(s) withheld for the following reason(s):_____

_____

_____

⊠ The following number(s) is (are) to be used for reference regarding these pages:

 FBI-ACLU-435-436 _____

XXXXXXXXXXXXXXXXXX
X    Deleted Page(s)      X
X    No Duplication Fee   X
X    for this page        X
XXXXXXXXXXXXXXXXXX

XXXXXX
XXXXXX

OPCA-20 (12-3-96)

XXXXXX
XXXXXX
XXXXXX

### FEDERAL BUREAU OF INVESTIGATION
### FOIA/PA DELETED PAGE INFORMATION SHEET

 1    Page(s) withheld entirely at this location in the file.  One or more of the following statements, where indicated, explain this deletion.

☒Deletions were made pursuant to the exemptions indicated below with no segregable material available for release to you.

| Section 552 | | Section 552a |
|---|---|---|
| ☒(b)(1) | ☐(b)(7)(A) | ☐(d)(5) |
| ☐(b)(2) | ☐(b)(7)(B) | ☐(j)(2) |
| ☐(b)(3)_____ | ☒(b)(7)(C)-1 | ☐(k)(1) |
| _____ | ☐(b)(7)(D) | ☐(k)(2) |
| _____ | ☐(b)(7)(E) | ☐(k)(3) |
| _____ | ☐(b)(7)(F) | ☐(k)(4) |
| ☐(b)(4) | ☐(b)(8) | ☐(k)(5) |
| ☒(b)(5)-1,2 | ☐(b)(9) | ☐(k)(6) |
| ☒(b)(6)-1 | | ☐(k)(7) |

☐  Information pertained only to a third party with no reference to the subject of your request or the subject of your request is listed in the title only.

☐  Document(s) originated with another Government agency(ies).  These documents were referred to that agency(ies) for review and direct response to you.

_____  Page(s) contain information furnished by another Government agency(ies).  You will be advised by the FBI as to the releasability of this information following our consultation with the other agency(ies).

_____  Page(s) withheld inasmuch as a final release determination has not been made.  You will be advised as to the disposition at a later date.

_____  Page(s) were not considered for release as they are duplicative of_____.

_____  Page(s) withheld for the following reason(s):_____

_____

_____

☒ The following number(s) is (are) to be used for reference regarding these pages:

FBI-ACLU-437_____

XXXXXXXXXXXXXXXXXX
X      Deleted Page(s)        X
X      No Duplication Fee    X
X        for this page          X
XXXXXXXXXXXXXXXXXX

XXXXXX
XXXXXX

OPCA-20 (12-3-96)

XXXXXX
XXXXXX
XXXXXX

# FEDERAL BUREAU OF INVESTIGATION
## FOIA/PA DELETED PAGE INFORMATION SHEET

__6__     Page(s) withheld entirely at this location in the file.  One or more of the following statements, where indicated, explain this deletion.

⊠Deletions were made pursuant to the exemptions indicated below with no segregable material available for release to you.

| Section 552 | | Section 552a |
|---|---|---|
| ⊠(b)(1) | ☐(b)(7)(A) | ☐(d)(5) |
| ☐(b)(2) | ☐(b)(7)(B) | ☐(j)(2) |
| ☐(b)(3)_____ | ☐(b)(7)(C) | ☐(k)(1) |
| _____ | ☐(b)(7)(D) | ☐(k)(2) |
| _____ | ☐(b)(7)(E) | ☐(k)(3) |
| _____ | ☐(b)(7)(F) | ☐(k)(4) |
| ☐(b)(4) | ☐(b)(8) | ☐(k)(5) |
| ⊠(b)(5)-1,2 | ☐(b)(9) | ☐(k)(6) |
| ☐(b)(6) | | ☐(k)(7) |

☐  Information pertained only to a third party with no reference to the subject of your request or the subject of your request is listed in the title only.

☐  Document(s) originated with another Government agency(ies).  These documents were referred to that agency(ies) for review and direct response to you.

_____   Page(s) contain information furnished by another Government agency(ies).  You will be advised by the FBI as to the releasability of this information following our consultation with the other agency(ies).

_____   Page(s) withheld inasmuch as a final release determination has not been made.  You will be advised as to the disposition at a later date.

_____   Page(s) were not considered for release as they are duplicative of_____.

_____   Page(s) withheld for the following reason(s):_____

_____

_____

⊠ The following number(s) is (are) to be used for reference regarding these pages:

FBI-ACLU-438-443 _____

XXXXXXXXXXXXXXXXXX
X     Deleted Page(s)        X
X     No Duplication Fee    X
X     for this page           X
XXXXXXXXXXXXXXXXXX

XXXXXX
XXXXXX

OPCA-20 (12-3-96)

XXXXXX
XXXXXX
XXXXXX

## FEDERAL BUREAU OF INVESTIGATION
## FOIA/PA DELETED PAGE INFORMATION SHEET

__1__     Page(s) withheld entirely at this location in the file.  One or more of the following statements, where indicated, explain this deletion.

☒Deletions were made pursuant to the exemptions indicated below with no segregable material available for release to you.

| Section 552 | | Section 552a |
|---|---|---|
| ☒(b)(1) | ☐(b)(7)(A) | ☐(d)(5) |
| ☐(b)(2) | ☐(b)(7)(B) | ☐(j)(2) |
| ☐(b)(3)_____ | ☒(b)(7)(C)-1 | ☐(k)(1) |
| _____ | ☐(b)(7)(D) | ☐(k)(2) |
| _____ | ☐(b)(7)(E) | ☐(k)(3) |
| _____ | ☐(b)(7)(F) | ☐(k)(4) |
| ☐(b)(4) | ☐(b)(8) | ☐(k)(5) |
| ☒(b)(5)-1,2 | ☐(b)(9) | ☐(k)(6) |
| ☒(b)(6)-1 | | ☐(k)(7) |

☐   Information pertained only to a third party with no reference to the subject of your request or the subject of your request is listed in the title only.

☐   Document(s) originated with another Government agency(ies).  These documents were referred to that agency(ies) for review and direct response to you.

_____    Page(s) contain information furnished by another Government agency(ies).  You will be advised by the FBI as to the releasability of this information following our consultation with the other agency(ies).

_____    Page(s) withheld inasmuch as a final release determination has not been made.  You will be advised as to the disposition at a later date.

_____    Page(s) were not considered for release as they are duplicative of_____.

_____    Page(s) withheld for the following reason(s):_____

_____

_____

☒ The following number(s) is (are) to be used for reference regarding these pages:

FBI-ACLU-444 _____

XXXXXXXXXXXXXXXXXXX
X    Deleted Page(s)    X
X    No Duplication Fee   X
X    for this page     X
XXXXXXXXXXXXXXXXXXX

XXXXXX
XXXXXX

OPCA-20 (12-3-96)

XXXXXX
XXXXXX
XXXXXX

### FEDERAL BUREAU OF INVESTIGATION
### FOIA/PA DELETED PAGE INFORMATION SHEET

__2__      Page(s) withheld entirely at this location in the file.  One or more of the following
statements, where indicated, explain this deletion.

⊠Deletions were made pursuant to the exemptions indicated below with no segregable
material available for release to you.

| Section 552 | | Section 552a |
|---|---|---|
| ⊠(b)(1) | ☐(b)(7)(A) | ☐(d)(5) |
| ☐(b)(2) | ☐(b)(7)(B) | ☐(j)(2) |
| ☐(b)(3)_____ | ☐(b)(7)(C) | ☐(k)(1) |
| _____ | ☐(b)(7)(D) | ☐(k)(2) |
| _____ | ☐(b)(7)(E) | ☐(k)(3) |
| _____ | ☐(b)(7)(F) | ☐(k)(4) |
| ☐(b)(4) | ☐(b)(8) | ☐(k)(5) |
| ⊠(b)(5)-1,2 | ☐(b)(9) | ☐(k)(6) |
| ☐(b)(6) | | ☐(k)(7) |

☐  Information pertained only to a third party with no reference to the subject of your request
or the subject of your request is listed in the title only.

☐  Document(s) originated with another Government agency(ies).  These documents were
referred to that agency(ies) for review and direct response to you.

_____      Page(s) contain information furnished by another Government agency(ies).  You will be
advised by the FBI as to the releasability of this information following our consultation with the
other agency(ies).

_____      Page(s) withheld inasmuch as a final release determination has not been made.  You will be
advised as to the disposition at a later date.

_____      Page(s) were not considered for release as they are duplicative of_____.

_____      Page(s) withheld for the following reason(s):_____

_____

_____

⊠ The following number(s) is (are) to be used for reference regarding these pages:

FBI-ACLU-445-446 _____

XXXXXXXXXXXXXXXXXX
X    Deleted Page(s)        X
X    No Duplication Fee   X
X        for this page        X
XXXXXXXXXXXXXXXXXX

XXXXXX
XXXXXX

OPCA-20 (12-3-96)                                                              XXXXXX
                                                                              XXXXXX
                                                                              XXXXXX

### FEDERAL BUREAU OF INVESTIGATION
### FOIA/PA DELETED PAGE INFORMATION SHEET

__3__          Page(s) withheld entirely at this location in the file.  One or more of the following
               statements, where indicated, explain this deletion.

               ⊠Deletions were made pursuant to the exemptions indicated below with no segregable
               material available for release to you.

|                  Section 552                  |                |          Section 552a          |
|---|---|---|
| ☐(b)(1)         | ☐(b)(7)(A)   | ☐(d)(5)   |
| ☐(b)(2)         | ☐(b)(7)(B)   | ☐(j)(2)   |
| ☐(b)(3)_____ | ☐(b)(7)(C)   | ☐(k)(1)   |
| _____        | ☐(b)(7)(D)   | ☐(k)(2)   |
| _____        | ☐(b)(7)(E)   | ☐(k)(3)   |
| _____        | ☐(b)(7)(F)   | ☐(k)(4)   |
| ☐(b)(4)         | ☐(b)(8)      | ☐(k)(5)   |
| ⊠(b)(5)-1,2     | ☐(b)(9)      | ☐(k)(6)   |
| ☐(b)(6)         |              | ☐(k)(7)   |

☐  Information pertained only to a third party with no reference to the subject of your request
or the subject of your request is listed in the title only.

☐  Document(s) originated with another Government agency(ies).  These documents were
referred to that agency(ies) for review and direct response to you.

_____     Page(s) contain information furnished by another Government agency(ies).  You will be
           advised by the FBI as to the releasability of this information following our consultation with the
           other agency(ies).

_____     Page(s) withheld inasmuch as a final release determination has not been made.  You will be
           advised as to the disposition at a later date.

_____     Page(s) were not considered for release as they are duplicative of_____.

_____     Page(s) withheld for the following reason(s):_____

_____

_____

               ⊠ The following number(s) is (are) to be used for reference regarding these pages:

 FBI-ACLU-447-449_____

                                                              XXXXXXXXXXXXXXXXXX
                                                              X    Deleted Page(s)      X
                                                              X    No Duplication Fee   X
                                                              X       for this page     X
                                                              XXXXXXXXXXXXXXXXXX

XXXXXX
XXXXXX

OPCA-20 (12-3-96)

XXXXXX
XXXXXX
XXXXXX

# FEDERAL BUREAU OF INVESTIGATION
## FOIA/PA DELETED PAGE INFORMATION SHEET

__1__          Page(s) withheld entirely at this location in the file.  One or more of the following statements, where indicated, explain this deletion.

☒Deletions were made pursuant to the exemptions indicated below with no segregable material available for release to you.

|  | **Section 552** | | **Section 552a** |
|---|---|---|---|
| ☒(b)(1) | ☐(b)(7)(A) | ☐(d)(5) |
| ☐(b)(2) | ☐(b)(7)(B) | ☐(j)(2) |
| ☐(b)(3)_____ | ☒(b)(7)(C)-1 | ☐(k)(1) |
| _____ | ☐(b)(7)(D) | ☐(k)(2) |
| _____ | ☐(b)(7)(E) | ☐(k)(3) |
| _____ | ☐(b)(7)(F) | ☐(k)(4) |
| ☐(b)(4) | ☐(b)(8) | ☐(k)(5) |
| ☒(b)(5)-1,2 | ☐(b)(9) | ☐(k)(6) |
| ☒(b)(6)-1 | | ☐(k)(7) |

☐  Information pertained only to a third party with no reference to the subject of your request or the subject of your request is listed in the title only.

☐  Document(s) originated with another Government agency(ies).  These documents were referred to that agency(ies) for review and direct response to you.

_____   Page(s) contain information furnished by another Government agency(ies).  You will be advised by the FBI as to the releasability of this information following our consultation with the other agency(ies).

_____   Page(s) withheld inasmuch as a final release determination has not been made.  You will be advised as to the disposition at a later date.

_____   Page(s) were not considered for release as they are duplicative of_____.

_____   Page(s) withheld for the following reason(s):_____

_____

_____

☒ The following number(s) is (are) to be used for reference regarding these pages:

FBI-ACLU-450_____

XXXXXXXXXXXXXXXXXXX
X   Deleted Page(s)        X
X   No Duplication Fee   X
X      for this page        X
XXXXXXXXXXXXXXXXXXX

XXXXXX
XXXXXX

OPCA-20 (12-3-96)

XXXXXX
XXXXXX
XXXXXX

# FEDERAL BUREAU OF INVESTIGATION
## FOIA/PA DELETED PAGE INFORMATION SHEET

__1__    Page(s) withheld entirely at this location in the file.  One or more of the following statements, where indicated, explain this deletion.

⊠Deletions were made pursuant to the exemptions indicated below with no segregable material available for release to you.

|  Section 552 |  | Section 552a |
|---|---|---|
| ⊠(b)(1) | ☐(b)(7)(A) | ☐(d)(5) |
| ☐(b)(2) | ☐(b)(7)(B) | ☐(j)(2) |
| ☐(b)(3)_____ | ☐(b)(7)(C) | ☐(k)(1) |
| _____ | ☐(b)(7)(D) | ☐(k)(2) |
| _____ | ☐(b)(7)(E) | ☐(k)(3) |
| _____ | ☐(b)(7)(F) | ☐(k)(4) |
| ☐(b)(4) | ☐(b)(8) | ☐(k)(5) |
| ⊠(b)(5)-1,2 | ☐(b)(9) | ☐(k)(6) |
| ☐(b)(6) |  | ☐(k)(7) |

☐  Information pertained only to a third party with no reference to the subject of your request or the subject of your request is listed in the title only.

☐  Document(s) originated with another Government agency(ies).  These documents were referred to that agency(ies) for review and direct response to you.

_____    Page(s) contain information furnished by another Government agency(ies).  You will be advised by the FBI as to the releasability of this information following our consultation with the other agency(ies).

_____    Page(s) withheld inasmuch as a final release determination has not been made.  You will be advised as to the disposition at a later date.

_____    Page(s) were not considered for release as they are duplicative of_____.

_____    Page(s) withheld for the following reason(s):_____

_____

_____

⊠ The following number(s) is (are) to be used for reference regarding these pages:

FBI-ACLU-451 _____

XXXXXXXXXXXXXXXXXXX
X    Deleted Page(s)      X
X    No Duplication Fee   X
X        for this page        X
XXXXXXXXXXXXXXXXXXX

XXXXXX
XXXXXX

OPCA-20 (12-3-96)

XXXXXX
XXXXXX
XXXXXX

# FEDERAL BUREAU OF INVESTIGATION
## FOIA/PA DELETED PAGE INFORMATION SHEET

__26__    Page(s) withheld entirely at this location in the file.  One or more of the following statements, where indicated, explain this deletion.

⊠Deletions were made pursuant to the exemptions indicated below with no segregable material available for release to you.

| Section 552 | | Section 552a |
|---|---|---|
| ☐(b)(1) | ☐(b)(7)(A) | ☐(d)(5) |
| ☐(b)(2) | ☐(b)(7)(B) | ☐(j)(2) |
| ☐(b)(3)_____ | ☐(b)(7)(C) | ☐(k)(1) |
| _____ | ☐(b)(7)(D) | ☐(k)(2) |
| _____ | ☐(b)(7)(E) | ☐(k)(3) |
| _____ | ☐(b)(7)(F) | ☐(k)(4) |
| ☐(b)(4) | ☐(b)(8) | ☐(k)(5) |
| ⊠(b)(5)-1,2 | ☐(b)(9) | ☐(k)(6) |
| ☐(b)(6) | | ☐(k)(7) |

☐  Information pertained only to a third party with no reference to the subject of your request or the subject of your request is listed in the title only.

☐  Document(s) originated with another Government agency(ies).  These documents were referred to that agency(ies) for review and direct response to you.

_____    Page(s) contain information furnished by another Government agency(ies).  You will be advised by the FBI as to the releasability of this information following our consultation with the other agency(ies).

_____    Page(s) withheld inasmuch as a final release determination has not been made.  You will be advised as to the disposition at a later date.

_____    Page(s) were not considered for release as they are duplicative of_____.

_____    Page(s) withheld for the following reason(s):_____

_____

_____

⊠ The following number(s) is (are) to be used for reference regarding these pages:

FBI-ACLU-452-477_____

XXXXXXXXXXXXXXXXXXX
X    Deleted Page(s)        X
X    No Duplication Fee   X
X       for this page         X
XXXXXXXXXXXXXXXXXXX

XXXXXX
XXXXXX

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 03-14-2011 BY 65179/DMH/BAW/STP/bls

# Exhibit 1A

ACLU - Hamdan-478

ALL FBI INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 03-14-2011 BY 65179/DMH/BAW/STP/bls

Mona Hamdan
+961-702-33527

October 13, 2008

**BY FACSIMILE AND E-MAIL**

Ambassador Richard Olson
Embassy of the United States of America in Abu Dhabi, UAE
PO Box 4009
Abu Dhabi, United Arab Emirates
Facsimile: +97- 2-414-2241
E-mail: abudhabiACS@state.gov

    Re: Naji Hamdan

Dear Ambassador Olson:

    My husband, Naji Hamdan, an American citizen, was detained in the United Arab Emirates on or around August 31 or September 1, 2008. It has been almost a month and a half and I still do not know where my husband is. I do not know where he is being detained, why he is being detained or who is detaining him. I am very worried that his life and health are in danger. He has a liver condition that is dangerous if he does not receive his medicine.

    I have spoken with Saeed Mootar and Sean Cooper at the U.S. Embassy in Abu Dhabi, but they have not been able to tell me very much about my husband's detention. As my husband is an American citizen, I trust that you are doing everything in your power to help him. I worry day and night about my husband, as do our children. I do not know about the laws of the UAE and so I have no idea what may have happened to him, why he is detained and what we can do to get him released.

    I would like you to give me all the information that you have about his situation. I know that Naji would want me to know everything about his situation. I am his wife and I need to know what is happening to my husband. I also request that you give all of the information that you have to my lawyers from the American Civil Liberties Union of Southern California, Ahilan Arulanantham and Jennie Pasquarella, because they are also trying to help get him released. I know that Naji would also want these lawyers to know everything happening in his case.

    Since Naji's detention, I have returned with our children to Lebanon to be with my family. I can be reached at +961-702-33527. My attorneys at the ACLU can be reached at +1-213-977-5211 or +1-213-977-5236, or at ahilan@aclu-sc.org and jpasquarella@aclu-sc.org.

    I very much appreciate your assistance.

    Regards,

    Mona Hamdan

    *Mona Mallouh*
    *Handan*

    معها علي رمح
    صهر اني

ACLU - Hamdan-479          Exh. 1 Sub-Exh A
                                          43

ALL FBI INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 03-14-2011 BY 65179/DMH/BAW/STP/bls

Mona Hamdan
+961-702-33527

October 13, 2008

**BY FACSIMILE AND E-MAIL**

Ambassador Richard Olson
Embassy of the United States of America in Abu Dhabi, UAE
PO Box 4009
Abu Dhabi, United Arab Emirates
Facsimile: +97- 2-414-2241
E-mail: abudhabiACS@state.gov

Re: Naji Hamdan

Dear Ambassador Olson:

My husband, Naji Hamdan, an American citizen, was detained in the United Arab Emirates on or around August 31 or September 1, 2008. It has been almost a month and a half and I still do not know where my husband is. I do not know where he is being detained, why he is being detained or who is detaining him. I am very worried that his life and health are in danger. He has a liver condition that is dangerous if he does not receive his medicine.

I have spoken with Saeed Mootar and Sean Cooper at the U.S. Embassy in Abu Dhabi, but they have not been able to tell me very much about my husband's detention. As my husband is an American citizen, I trust that you are doing everything in your power to help him. I worry day and night about my husband, as do our children. I do not know about the laws of the UAE and so I have no idea what may have happened to him, why he is detained and what we can do to get him released.

I would like you to give me all the information that you have about his situation. I know that Naji would want me to know everything about his situation. I am his wife and I need to know what is happening to my husband. I also request that you give all of the information that you have to my lawyers from the American Civil Liberties Union of Southern California, Ahilan Arulanantham and Jennie Pasquarella, because they are also trying to help get him released. I know that Naji would also want these lawyers to know everything happening in his case.

Since Naji's detention, I have returned with our children to Lebanon to be with my family. I can be reached at +961-702-33527. My attorneys at the ACLU can be reached at +1-213-977-5211 or +1-213-977-5236, or at ahilan@aclu-sc.org and jpasquarella@aclu-sc.org.

I very much appreciate your assistance.

Regards,

Mona Hamdan

ACLU - Hamdan-480         Exh. 1 Sub-Exh A
                                    44

cc:    Senator Dianne Feinstein
       United States Senate
       331 Hart Senate Office Building
       Washington, D.C. 20510
       Facsimile: (202) 228-3954

       David Grannis
       Professional Staff Member
       Senate Select Committee on Intelligence
       211 Hart Senate Office Building
       Washington, DC 20510
       Facsimile: (202) 224-1707
       d_grannis@ssci.senate.gov

       Christine Tadros
       U.S. Department of State
       Office of Overseas Citizen's Services/ American Citizen Services
       2201 "C" Street NW
       Washington, DC 20520
       Facsimile: (202) 647-3732
       tadroscf@state.gov

       Brooke Noble
       U.S. Department of State
       Office of Overseas Citizen's Services/ American Citizen Services
       2201 "C" Street NW
       Washington, DC 20520
       Facsimile: (202) 647-3732
       knoblebe@state.gov

       R. Sean Cooper
       Consular Chief
       Embassy of the United States of America in Abu Dhabi, UAE
       Facsimile: (+971) 2 414 2241
       E-mail: abudhabiACS@state.gov

       Saeed Mootar
       Citizen's Services Division
       Embassy of the United States of America in Abu Dhabi, UAE
       Facsimile: (+971) 2 414 2241
       E-mail: abudhabiACS@state.gov

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 03-14-2011 BY 65179/DMH/BAW/STP/b13

# Exhibit 1B

ACLU - Hamdan-482



*Embassy of the United States of America*
*Abu Dhabi, United Arab Emirates*

October 29, 2008

Ms. Mona Hamdan
c/o Christian Lebano
ACLU of Southern California
1313 West Eighth Street
Los Angeles, California 90017 U.S.A.
clebano@aclu-sc.org

ALL FBI INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 03-14-2011 BY 65179/DMH/BAW/STP/b13

VIA ELECTRONIC MAIL

Dear Ms. Hamdan:

I am writing in response to your email of October 29, in which you inquired about the detention of your husband, U.S. citizen Naji Hamdan.

Since learning of your husband's detention on August 29, the U.S. Embassy has been engaged on his behalf and will continue to do so. I have personally intervened on his behalf, following up the work of the Consular Section in his regard. The Department of State's Office of Overseas Citizen Services in Washington DC has also been following the case closely.

Following our representations to the Government of the United Arab Emirates, our Consul visited your husband in Abu Dhabi on October 19, 2008. Your husband said he was in good health and generally good spirits. Both he and government officials have assured us that he has daily access to a physician, and that he is receiving all of his usual preventative medications. All information suggests that he is being treated respectfully and in accordance with the laws of the United Arab Emirates.

To date, we do not have information regarding the cause of the investigation. He is being detained by United Arab Emirates State Security forces. These forces have greater authority than the regular police to detain persons for questioning for extended periods of time. There have not been any charges filed against your husband at this time. This extended detention, while very unusual from our American perspective, does not run counter to the laws of the United Arab Emirates.

This office takes our responsibility to United States citizens with the upmost in seriousness. We have reminded the Government of the United Arab Emirates of their obligations for consular access as agreed to in Article 36 of the Vienna Convention on Consular Relations. We have been assured that, should your husband's detention continue, we will be granted regular consular access in accordance with these obligations.

The U.S. Embassy in Abu Dhabi is committed to providing all possible assistance to your husband. I hope this information is useful to you. If I or my team here at the U.S. Embassy can provide any further information or assistance, please do not hesitate to call upon us.

Sincerely,

Richard G. Olson, Jr.
Ambassador

ACLU - Hamdan-483

Exh. 1 Sub-Exh B
46

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 03-14-2011 BY 65179/DMH/BAW/STP/bls

# Exhibit 1C

ACLU - Hamdan-484

**MAXINE WATERS**
MEMBER OF CONGRESS
35TH DISTRICT, CALIFORNIA

CHIEF DEPUTY WHIP

COMMITTEES:
FINANCIAL SERVICES

SUBCOMMITTEE ON HOUSING AND
COMMUNITY OPPORTUNITY
CHAIRWOMAN

JUDICIARY

SUBCOMMITTEE ON CRIME, TERRORISM
AND HOMELAND SECURITY

SUBCOMMITTEE ON IMMIGRATION,
BORDER SECURITY AND CLAIMS

ALL FBI INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 03-14-2011 BY 65179/DMH/BAU/STP/bls

# Congress of the United States
## House of Representatives
### Washington, DC 20515-0535

PLEASE REPLY TO:

WASHINGTON, DC OFFICE
2344 RAYBURN HOUSE OFFICE BUILDING
WASHINGTON, DC 20515-0635
PHONE: (202) 225-2201
FAX: (202) 225-7854

DISTRICT OFFICES:
LOS ANGELES OFFICE
10124 SOUTH BROADWAY
SUITE 1
LOS ANGELES, CA 90003
PHONE: (323) 757-8900
FAX: (323) 757-9506

WESTCHESTER OFFICE
8033 WEST CENTURY BOULEVARD
SUITE 807
LOS ANGELES, CA 90045
PHONE: (310) 642-4610
FAX: (310) 642-9160

October 3, 2008

Paul Sutphin
U.S. Consul General
Embassy of the United States
Abu Dhabi, United Arab Emirates

**VIA FACSIMILE & EMAIL: 971-2-414-2241; CONSULARABUDHA@state.gov**

Dear Mr. Sutphin:

I am writing to request your assistance in the matter of my constituent Mr. Naji Hamdan.

My office has been contacted by Mona Hamdan, Mr. Hamdan's wife, who is very concerned about her husband's detention by United Arab Emirates security forces on or about August 31, 2008. I am including Mrs. Hamdan's letter which details her account of the situation.

I am hoping your office can assist me with responding to Mrs. Hamdan who, along with her husband, is a U.S citizen. Specifically, if your office can help provide some answers regarding why Naji Hamdan is being detained and what possible efforts can be made to secure his release.

It is my intent to provide every method available to resolve the concerns of my constituents. Should you need further information or have any questions please contact my Los Angeles District Director, Blanca Jimenez, at (323) 757-8900 ext. 11 and Blanca.Jimenez@mail.house.gov.

I thank you for your time and attention to this matter of mutual concern.

Sincerely,

Maxine Waters
Member of Congress

MW:bj

Attachment

ACLU - Hamdan-485          Exh. 1 Sub-Exh C
47

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 03-14-2011 BY 65179/DMH/BAW/STP/bls

# Exhibit 1D

ACLU - Hamdan-486

Ahilan Arulanantham

| | |
|---|---|
| From: | Jennie Pasquarella |
| Sent: | Monday, November 17, 2008 11:41 AM |
| To: | Reem Salahi; Ahilan Arulanantham |
| Subject: | FW: UPDATE ON MR. HAMDAN FROM CONGRESSWOMAN OFFICE |
| Attachments: | Naji Hamdan.pdf |

ALL FBI INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 03-14-2011 BY 65179/DHH/BAW/STP/b1s

*Embassy of the United States of America*

## Abu Dhabi, United Arab Emirates

October 14, 2008

The Honorable Maxine Waters
Member of Congress
10124 South Broadway, Suite 1
Los Angeles, California 90003 U.S.A.

Attention: Blanca Jimenez

VIA ELECTRONIC MAIL

Dear Ms. Waters:

I am writing in response to your email of October 9, in which you inquire about the detention of U.S. citizen Naji Hamdan. Mr. Paul Sutphin, Consul General of the United States in Dubai, requested that I respond to your query as my office is engaged on Mr. Hamdan's behalf. Your constituent, Mona Hamdan, contacted you regarding her husband.

ACLU - Hamdan-487

Exh. 1 Sub-Exh D
48

1

Since learning of Mr. Hamdan's detention on August 29, the U.S. Embassy has been and will continue to be engaged on behalf of Mr. Hamdan. This engagement stretches from our consular team up to the personal involvement of Ambassador Richard Olson. To date, we have been frustrated by the lack of appropriate consular access to Mr. Hamdan. However, following direct intervention by Ambassador Olson, we now anticipate that consular access to Mr. Hamdan will be granted this week.

This office takes our responsibility to United States citizens with the upmost in seriousness. We have reminded the Government of the United Arab Emirates of their obligations for consular access as agreed to in Article 36 of the Vienna Convention on Consular Relations.

We remain in regular communication with Mona Hamdan, and will continue to keep her advised of all developments in this matter. As we do not currently have a Privacy Act waiver in this matter, we are unable to share many details of the case, but will request one from Mr. Hamdan during our upcoming consular visit.

The U.S. Embassy in Abu Dhabi is committed to providing all possible assistance to Mr. Hamdan, and we look forward to obtaining consular access to him within the next 48-72 hours. I hope this information is useful to you and your constituent. If I can provide any further information or assistance, please do not hesitate to call upon me.

Sincerely,

Sean Cooper
Consul

ACLU - Hamdan-488

Exh. 1 Sub-Exh D
49

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 03-14-2011 BY 65179/DMH/BAW/STP/bls

# Exhibit 1E

ACLU - Hamdan-489

From:         ICH Administrator [info@ichla.org]
Sent:         Wednesday, November 05, 2008 6:16 PM
To:           Jennie Pasquarella; Ahilan Arulanantham;
              shakeel@shuracouncil.org; AAZAM2@aol.com; 'Affad Shaikh'; 'idris
              traina'; Reem Salahi
Subject:      NEW REPLY from congress office

ALL FBI INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 03-14-2011 BY 65179/DMH/BAU/STP/bls

**From:** Abu Dhabi, ACS
**Sent:** Wednesday, November 05, 2008 1:10 AM
**To:** Jimenez, Blanca
**Cc:** Abu Dhabi, ACS
**Subject:** RE: Congressional Inquiry

Ms. Jimenez:

Since our last correspondence, the most important development here in the United Arab Emirates has
been our consular visit with Mr. Hamdan on October 19. We are also aware of the sad news from
Lebanon that Mr. Hamdan's father has passed away.

Following our representations to the Government of the United Arab Emirates, we visited Mr. Hamdan
in Abu Dhabi on October 19, 2008. Mr. Hamdan said he was in good health and generally good spirits.
Both he and government officials have assured us that he has daily access to a physician, and that he
is receiving all of his usual preventative medications. All information suggests that he is being treated
respectfully and in accordance with the laws of the United Arab Emirates. During the visit, he signed a
limited Privacy Act waiver, which allows us to communicate openly regarding his detention with his
family and Members of Congress.

To date, we do not have information regarding the cause of this investigation. He is being detained by
United Arab Emirates State Security forces. State Security, as the name suggests, generally is involved
in investigating matters that may be perceived as a threat to the overall security of the United Arab
Emirates. These forces have greater authority than the regular police to detain persons for questioning
for extended periods of time. There have not been any charges filed against Mr. Hamdan at this time.
This extended detention, while very unusual from our American perspective, does not run counter to
the laws of the United Arab Emirates. We have been assured that, should Mr. Hamdan's detention _ _ _ _

ACLU - Hamdan-490

Exh. 1 Sub-Exh E
50

continue, we will be granted regular consular access in accordance with international consular agreements.

Our office remains in regular contact with Ms. Hamdan, and we will be reaching out to Ms. Hamdan to clarify that our office has not advised her not to contact an attorney. We have pointed out that her husband does not currently face any charges before a UAE court, which may dramatically limit what an attorney may be able to accomplish, and that access to Mr. Hamdan by an attorney would not be routinely granted during detention by State Security forces, but we have also stated that a local attorney could be helpful in understanding Emirati law and procedure, particularly in regard to this detention, and may be of assistance in helping Ms. Hamdan settle some of the family's business affairs here in the UAE. We have informed her that our local attorney list is available on the embassy website, which is at http://abudhabi.usembassy.gov/attorney_list.html.

The U.S. Embassy in Abu Dhabi remains committed to providing all possible assistance to Mr. Hamdan and his family. We appreciate the interest and support of Congresswoman Waters and her office, and hope this information is useful as we work to support the Hamdan family.

Please pass my congratulations to the Congresswoman on her election victory today.

Sincerely,

Sean Cooper
Consul

R. Sean Cooper
Consul
U.S. Embassy Abu Dhabi
http://abudhabi.usembassy.gov/

---

**From:** Jimenez, Blanca [mailto:Blanca.Jimenez@mail.house.gov]
**To:** CONSULARABUDHA
**Subject:** RE: Congressional Inquiry
**Importance:** High

Greetings Mr. Cooper:

I would like to know if there have been any developments in the case of Mr. Naji Hamdan.

According to Mrs. Hamdan she was advised by the US Embassy not to hire an attorney or attempt to contact UAE government regarding her husband's detention. This raises serious concerns since we are of the understanding that US citizens are normally provided a list of local attorneys to contact when they are arrested or detained abroad. As you can imagine the family is very confused and feels utterly powerless in this situation and are looking to their government for assistance.

Unfortunately, Mrs. Hamdan informed our office that Mr. Hamdan's father passed away on October 22, 2008. It is tragic that Mr. Hamdan was unable to give his final goodbye to his father or join his family for his memorial services.

I am hoping you can help provide some comfort to the family by providing some encouraging information about the progress of Mr. Hamdan's case. Please let me know if there are any other steps we can take to help secure Mr. Hamdan's release such as contact our local UAE embassy.

I appreciate your guidance and assistance in this matter of mutual concern.

Sincerely,

ACLU - Hamdan-491          Exh. 1 Sub-Exh E
                                  51

file://\\fred\legal$\1399.NajiHamdan\Correspondence\NEW REPLY from congress office...   11/12/2008

**Blanca Jimenez**
District Director
Office of Congresswoman Maxine Waters (CA-35)
10124 S. Broadway, Suite One
Los Angeles, CA 90003
Ph: 323.757.8900 ext. 11; Fax: 323.757.9506

ACLU - Hamdan-492    Exh. 1 Sub-Exh E
52