ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 03-14-2011 BY 65179/DMH/BAW/STP/bls

# Exhibit 1F

ACLU - Hamdan-493



**LIBERTY | JUSTICE | EQUALITY**

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 03-14-2011 BY 65179/DHH/BAW/STP/b18

**Chair**
Jari Mohn

**President**
Douglas Mirell

**Chairs Emeriti**
Danny Goldberg
Allan K. Jonas
Burt Lancaster*
Irving Lichtenstein, MD*
Laurie Ostrow*
Stanley K. Sheinbaum
*deceased

**Chief Executive Officer**
Ramona Ripston

**Chief Operating Officer**
Heather Carrigan

**Communications Director**
Gordon Smith

**Development Director**
Jenni Luke

**Field Director**
Susanne Savage

**Director of Finance & Administration**
Brenda Maull

**Legal Director**
Mark D. Rosenbaum

**Managing Attorney & Manheim Family Attorney for First Amendment Rights**
Peter J. Eliasberg

**Director of Program Support**
Elizabeth Schroeder

November 4, 2008

His Excellency Ambassador Yousef Al Otaiba
Embassy of the United Arab Emirates
3522 International Court, NW Suite #400
Washington, DC 20008
FAX: 202.243.2432
EMAIL: info@uaeembassy-usa.org

**BY FACSIMILE AND E-MAIL**

Re:   **Detention of Mr. Naji Hamdan**
      **URGENT RESPONSE REQUESTED**

Dear Ambassador Al Otaiba:

We are writing to inquire about Mr. Naji Hamdan, an American citizen, who was detained over two months ago by UAE State Security Service in Abu Dhabi. We are attorneys from the American Civil Liberties Union of Southern California in Los Angeles, California and we represent Mr. Hamdan and his family.

Mr. Hamdan has been detained for more than two months, after being taken from his home by members of the UAE State Security Service in front of his wife and children on August 29, 2008. During this time, Mr. Hamdan's wife and family members have received no information from your government regarding Mr. Hamdan's detention. To our knowledge, Mr. Hamdan has been detained without charge, access to legal counsel, timely consular access, ability to communicate with the outside world, or due process of law.

Absent any information whatsoever from your government, we are extremely concerned that State Security Services have arbitrarily detained Mr. Hamdan and are holding him incommunicado in violation of his rights under UAE, American and international law. Under international law, the secret and incommunicado nature of his detention gives rise to concern that Mr. Hamdan could be subject to torture and other cruel, inhuman or degrading treatment.

As you know, customary international law, binding on the UAE, prohibits States from committing acts of torture and other forms of cruel, inhuman and degrading treatment in any circumstance, including matters of "national security." This prohibition is absolute and non-derogable and in addition to prohibiting acts of torture requires, inter alia, that States announce and acknowledge a person's

Exh. 1 Sub-Exh F
53

H.E. Ambassador Al Otaiba
Re: Detention of Mr. Naji Hamdan
November 4, 2008, page 2

detention to relatives and interested parties, hold a detainee only in officially-recognized places of detention, and make publicly available the detainee's name and the location of his detention. The failure to do so constitutes an "enforced disappearance" under international law and a presumption that the person is being held outside the protection of the law. Further, international law prohibits arbitrary arrest and detention and obliges States to promptly provide a detainee with independent review of his detention by a competent judicial authority, access to independent legal counsel, and information as to the reason for his arrest and the charges against him.

In light of these obligations and the basic right of Mr. Hamdan's family to information about his detention, we respectfully request that you promptly provide us information about Mr. Hamdan's detention. In particular, we ask that you:

(1)     Acknowledge or deny that UAE State Security Services or other UAE officials arrested and detained Mr. Hamdan;

(2)     Acknowledge or deny that UAE State Security Services or other UAE officials continue to detain Mr. Hamdan;

(3)     Inform us as to the location of Mr. Hamdan's detention, the official name of the detention facility, and the name of the authority that controls the detention facility;

(4)     Inform us as to the nature of his detention, including the UAE law that authorizes his detention;

(5)     Inform us as to the charges brought against Mr. Hamdan, or, if no charges have been filed, the legal justification for holding him without charge;

(6)     Inform us as to whether Mr. Hamdan has had an opportunity for a competent and independent judicial authority to review his detention, or, if no such opportunity has been provided, when he will be provided such an opportunity;

(7)     Inform us as to whether Mr. Hamdan has access to independent legal counsel, or, if no such access has been provided, when he will be provided such access;

(8)     Inform us as to how long Mr. Hamdan will be detained and when we can expect Mr. Hamdan will be released; and

(9)     Inform us as to the role, if any, that the United States government has played and/or continues to play in Mr. Hamdan's arrest and detention, and the nature of the cooperation of the UAE with the United States, if any, in relation to Mr. Hamdan's detention.



ACLU
AMERICAN CIVIL LIBERTIES UNION
of SOUTHERN CALIFORNIA
LIBERTY | JUSTICE | EQUALITY

ACLU - Hamdan-495

Exh. 1 Sub-Exh F
54

H.E. Ambassador Al Otaiba
Re: Detention of Mr. Naji Hamdan
November 4, 2008, page 3

As his attorneys, we request immediate and detailed information about the detention of Mr. Hamdan. We would appreciate your timely cooperation in this process. We can be reached at +1-213-977-5211 or +1-213-977-5236, or at ahilan@aclu-sc.org or jpasquarella@aclu-sc.org.

We very much appreciate your assistance.

Regards,

Ahilan Arulanantham
Director, Immigrants' Rights and National Security

Jennie Pasquarella
Staff Attorney

cc:

Dr. Fathallah Mesrawe
Legal Officer
Embassy of the United Arab Emirates
FAX: 202.243.2432
EMAIL: info@uaeembassy-usa.org

His Highness Sheikh Mohammed bin Rashid Al Maktoum
UAB Vice President, Prime Minister and Ruler of Dubai
Dubai Office
Fax: 04 3968430

His Highness Sheikh Mansoor bin Zayed Al Nahyan
The Minister of Presidential Affairs
Fax: 02 6268033

His Highness Major-General Sheikh Saif bin Zayed Al Nahyan
The Minister of Interior
Abu Dhabi Office
Email: moi@uae.gov.ae

Mr. Mohammed Bin Nekhaira al Dhaheri
Minister of Justice
Abu Dhabi Office
E-mail: moj@uae.gov.ae

**ACLU**
AMERICAN CIVIL LIBERTIES UNION
of SOUTHERN CALIFORNIA
FOUNDATION
LIBERTY | JUSTICE | EQUALITY

His Excellency Mohammed Abdullah Al Gargawi
The Minister of State for Cabinet Affairs
Abu Dhabi Office
Email: csb@csb.ae

His Excellency Sheikh Abdullah bin Zayed Al Nahyan
Foreign Minister
Ministry for Foreign Affairs
Fax: 02 4447766
Email: mofa@uae.gov.ae

Dr. Mohammed Anwar Gargash
Minister of State
Ministry for Foreign Affairs
Fax: 04 2280979
Email: mofa@uae.gov.ae

Mr. R. Sean Cooper
Consular Chief
Embassy of the United States of America in Abu Dhabi, UAE
Fax: (+971) 2 414 2241
E-mail: abudhabiACS@state.gov

Ms. Christine Tadros
U.S. Department of State
Office of Overseas Citizen's Services/
          American Citizen Services
Fax: (202) 647-3732
tadroscf@state.gov

ACLU
AMERICAN CIVIL LIBERTIES UNION of SOUTHERN CALIFORNIA   FOUNDATION
LIBERTY J JUSTICE I EQUALITY

ACLU - Hamdan-497          Exh. 1 Sub-Exh F
                                      56

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 03-14-2011 BY 65179/DMH/BAW/STP/bls

# Exhibit 1G

ACLU - Hamdan-498

HH Sheikh Khalifa Bin Zayed Al Nahyan
President, United Arab Emirates

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 03-14-2011 BY 65179/DMH/BAW/STP/bls

Nov 10, 2008

Dear HH Sheikh Khalifa Bin Zayed Al Nahyan, President of UAE,

Assalamu Alaykum Warahmatullahi Wabarakatuh,

On behalf of the Muslim community in Southern California, USA, we send you our warm greetings and respect to you and your family. We value and appreciate the significant role that the UAE is taking in promoting understanding of Islam, the protection of Muslims, and the promotion of world peace. We ask Allah to empower you to continue the work in promoting regional and world peace and freedoms.

We would like to bring your attention to an unfortunate matter. Mr. Naji Hamdan, a US Citizen born in Lebanon has been detained by the UAE Security Forces (Amn Al-Dawla) on August 29, 2008. Mr. Naji Hamdan has a good reputation as one of the leaders in the Muslim Community of Southern California and is known for his moderate views, support for respecting the laws of the land, and a long term vision. He is well known and well respected by many in Southern California region. Mr. Hamdan has a wife and three children waiting for him for over two months now. His wife has not been able to know what is happening to her husband. To the best of our knowledge Mr. Hamdan has not been charged with any crime.

We kindly request your Highness to expedite the release of Mr. Naji Hamdan from UAE Abu Dhabi holding facility or providing official charges to him so he is able to defend himself and his family to get closure on where he is.

Our community here has been frustrated from this matter and has held back the idea of going out to the media stations until we hear your response. We are confident that you will take all necessary steps to stop the indefinite detention of a US citizen.

We appreciate your immediate attention to this urgent matter.


Sincerely
CAIR-Los Angeles.
MAS Freedom Foundation
Islamic Shura Council of Southern California

CC: Ministry of Foreign Affairs, The Foreign Minister : H.E. Muhammad Husayen Al Shali, Email:mofa@mofa.gov.ae, Fax: 971-2 4449100
CC: Ministry of Presidential Affairs, fax 971-2 6222228
CC: Congresswoman Maxine Waters, fax 202-225-7854

ACLU - Hamdan-499

Exh. 1 Sub-Exh G
57

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 03-14-2011 BY 65179/DMH/BAW/STP/bls

# Exhibit 1H

ACLU - Hamdan-500

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 03-14-2011 BY 65179/DMH/BAW/STP/bls

Beirut, Lebanon
10/27/2008

In the Name of God Most Gracious Most Merciful

Assalamu Alaikum wa Rahmat Allah wa Barakatu

To His Majesty Sheikh Khalifa Bin Zayed Al Nahyan, the respected:

May God maintain your goodness, your kindness and your life. I am a woman from Southern Lebanon from the village of Shebaa. I am seventy years old. I have six children: five sons and one daughter. Three of my sons are engineers, one a doctor, and the last the university professor and my daughter's husband is an engineer. My fourth son is Naji who was educated by the martyr, the deceased Rafik Hariri, the former Prime Minister. Naji was very gifted in Lebanon and the United States and he finished his studies in three years rather than four. As destiny had it, he worked in America for twenty-one years and he got married and has three children.

Naji became a successful business man and he opened a business in America and in that he has large ambitions, he thought of moving to the United Arab Emirates where he invested in real estate on a small scale—a few apartments—and in a car exhibit and a repair shop. He used to travel between the UAE and America and Lebanon until one day, before the start of Ramadan by four days, the U.S. Embassy in the UAE called to meet with him and question him. He asked why all these questions and he was told it was standard procedure.

And then they left him alone. A week later, I received a telephone call from his wife telling me that Naji was taken by the State Security Forces for interrogation and up till now, approximately three months later, I have no news from my son.

Like a mother afraid for her son, I do not sleep during the night or during the day and I am an elderly woman with no means or power and all his brothers are busy with their work. The trip to the UAE requires one to provide them with a power of attorney and one to provide them with a visa and this is not available. Furthermore, they do not know where Naji is being held so that they can see him or so that we can hire an attorney to represent him. His father is eighty years old and due to his sadness and worry over his son, he had a heart attack and he died from his grief over his son.

I beg of you, in a passionate plea, please please, from your mercy and compassion and high character to—through any means—allow Naji to speak with me so that I know something of him. We are law-abiding. Our children are noble and pure. Their father served in the army for thirty years and he raised them to respect law and order. But it is the cursed evil-doers who are found in all places. I beg of you. I need your justice to expose his innocence. I thank you with the most immense thankfulness until the Day of Judgment.

ACLU - Hamdan-501          Exh. 1 Sub-Exh H
                                              58

Thank you always and greatly,

The mother of Naji Hamdan
Southern Lebanon
Wedad Abd-Allah Delal
[signature]

ACLU - Hamdan-502

Exh. 1 Sub-Exh H
59

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 03-14-2011 BY 65179/DMH/BAW/STP/bls

را ك بيروت لبنان ٢٧/١/٢٠٠

بسم الله الرحمن الرحيم .

السلام عليكم ورحمة الله وبركاته .

الى حضرة صاحب السمو الشيخ خليفة بن زايد آل نهيان
المحترم اخاني الله فضلكم و كرمتم و عمرتم
اما بعد انا اجئ من جنوب لبنان من بلدة شبعا .

عمري سبعين سنة . عندي ستة اولاد وخمسة شباب
وبنت . والبنة شهادات مهندسين وحكيم ودكتور جامعي
والابنة سنة . وولدي الرابع اخي علمه
الشهيد المرحوم رفيق الحريري رئيس الوزراء
سابقة . وكان اخي مشغوف في لبنان وامريكا وانهى
دراسته نلاث سنوات مدى اربع
شاد القدر واشتغل في افريقيا واخذ وعشرون
سنة وتزوج وعنده ثلاثة اولاد
انه عنده طموح كبير فتح شركة في امريكا وما
واستشب في العقار ايضا حتى حفي صفر .

(٣ر) ألم تثبقه ٥ مبعرضى سيارت ٥ وكراح قطعاً .
أوأن يشتقى بين الامارات وامريكا و لبنان ؟
والى أن يعود قبل رمضان بـ ٤ أيام بتشدعه
القاء ٥ الا مركمه٥ عندكم فى الامارت وبستجوبه ٥
حال لماذا هذه الاسئله توقبيل له
ا ٥ذربة بسيطه وشه .

٥ من تهم جمعته ٥ شأنه . والاسو سيون
أتين طلفه ٥ مزرفته بانة لامى أضواءمن الزمان
لتحقيق معه ٥دلى الاذن بعد تشدبت اشر تقريسل ؟
كم امرمن حول انفى ولا مر .

كلم طائفه على ا تنشف ٧ أنام لالبل لكا ٨ و اناارم صنه
لا هوى فى هك بقعه ٥ راهضةكى فى تشغله ، والذهاب الى
الامارت بليفتج من سكفلارهم ٥من نفى مزهم فبرا وصذا فرمشوؤ
٥لا مفرضوا أنى ٥دموذ من بتا الموذ ٥ نضع له فاى ذنب .
٥ماكدة ٥ جوة فجانها سنه ٥من برعله على اينة ٥تلقفحليه
ا حباته سكفته قلفنته٥ ٥ تونى بست هجز انه .
أر مول ك ٥ مات رشعاث مارح بفطفئن ٥ حما نا ٥ كرم أملا وليد
لولو بأن طربقه تشتق له أن تشتكم معى متى امرف عنه حى ٥
انى فتت القانون او كدناا ترات ونزماد اليوم كان فى
البحسى ٢٠ سنبه ٥ مرباش حتى النظام والقانون ٥ دكون
المفر جيس عابباد اكرام حوجو داطلانى كل مكان ...
أر موذ بربا جلاي٥ هترنظهر مراشه .
٥ انا بتكهلبه هزني التخار الى يوئر القيامه ٥
٥ شكر٤ مزبلا ٥ د هشم .

دا٥ نامى هران لبان الجنوبى

٥ د اد عبد الله ذلال

Exh. 1 Sub-Exh H
61
ACLU - Hamdan-504

## CERTIFICATION BY TRANSLATOR

I, Reem Salahi, hereby certify that I am fluent in the English and Arabic languages, and that I translated the attached letter from Wedad Abd-Allah Delal to His Majesty Sheikh Khalifa Bin Zayed Al Nahyan from the Arabic language to the English language. The translation is true and accurate to the best of my abilities.

Date: ___11/17/2008___           Translator: _____

Reem Salahi
American Civil Liberties Union of
Southern California
1313 W. 8th Street
Los Angeles, CA 90017

ACLU - Hamdan-505      Exh. 1 Sub-Exh H
62

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 03-14-2011 BY 65179/DMH/BAW/STP/bls

# Exhibit 1i

ACLU - Hamdan-506

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 03-14-2011 BY 65179/DMH/BAW/STP/bls

Attention Ms. Blanca Jimenez, fax 323-757-9506

Dear Honorable Congresswoman Maxine Waters

My name is Ms. Mona Hamdan and my husband is Mr. NAJI HAMDAN (Date of Birth 5-26-1966). We are both US citizens and residents of Hawthorne, CA.

I was with my husband and our children for a work trip to the United Arab Emirates, when on Aug 31st or Sep 1st, the top UAE security force came home and detained my husband without any arrest or legal proceeding. He was allowed one phone call in which he told me of his health and that there are no charges. I contacted the US Embassy in Abu Dhabi, and spoke with an under Consul, Saeed Mooter. He was helpful in letting me know that my husband is well treated and being provided with the medicine to treat his liver and cholesterol condition. I asked for information regarding the case, and he said because of the religious holidays investigations are taking more time. He also assured that "its just a matter of time when Mr. Hamdan will be released". I was not provided with a list of attorneys, but advised to just wait.

It has been almost one month now, and I need information about my husband: what are the charges, and if there are none, I request your assistance in having him released.

I currently moved with our kids to Lebanon where my family lives, and would greatly appreciate your assistance on this matter. You may reach me on my cell phone 011-961-70233527, or you may reach Mr. Ammar Kahf, a family friend at 1-310-430-8663.

Sincerely

Mona Hamdan
12636 Truro Ave
Hawthorne, CA

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 03-14-2011 BY 65179/DHH/BAW/STP/bls

# Exhibit 2

ACLU - Hamdan-508

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 03-14-2011 BY 65179/DMH/BAW/STP/bls

## DECLARATION OF MONA MOUHAMAD MALLOUK

I, Mona Mallouk, hereby declare:

1.  I make this declaration based on my own personal knowledge. If called to testify I could and would do so competently as follows:

2.  My name is Mona Mouhamad Mallouk. I am a naturalized citizen of the United States. I was born on August 8, 1970.

3.  I am married to Naji Hamdan. He is a naturalized citizen of the United States. He was born on May 26, 1966.

4.  Naji and I have three children, two boys and one girl. Khaled Hamdan, our son, was born on June 14, 1992. Hamza Hamdan, our second son, was born on December 29, 2000. Noor Hamdan, our daughter, was born on August 7, 2007. All of our children are U.S. citizens. They all live with us.

5.  Naji left Lebanon to move to the United States to study when he was approximately eighteen or nineteen years of age. He moved to California.

6.  After Naji lived in California for some time, he applied for and received his citizenship. I do not know the details of how he obtained his citizenship.

7.  I married Naji Hamdan in 1987. He was twenty-one years of age and I was seventeen years of age. We met through our brothers.

1

ACLU - Hamdan-509

Exhibit 2
64

8.   After I married Naji, I left Lebanon and moved to the United States.

9.   I applied for my lawful permanent residence through Naji after we were married. Several years after that, I became a U.S. citizen.

10.   During the first few years of our marriage, Naji worked different odd jobs in order to start up his life. He worked as a security guard, a gas station attendant, at the community college, and in car companies. Naji worked many shifts, during both the day and night. A few years after our marriage, Naji earned his bachelor's degree in aviation engineering from Northrop Rice Aviation Institute of Technology. He subsequently went to work for Continental Airlines as an aviation engineer.

11.   For the next few years we moved a number of different times, as Naji worked in different jobs.

12.   Around 1996, Naji opened up a small Honda auto parts business in Los Angeles. As I understood the business, a man in Japan sent Naji containers of car parts to his business in Los Angeles. Naji sold the car parts or used the parts to fix other cars.

13.   Naji would go to Japan practically every year to attend the car convention and auctions in order to get ideas for his business and to select the car parts that he needed. He would spend a few weeks there before returning.

14.   Naji's business grew between 1996 and 2006 and Naji became successful.

2

ACLU - Hamdan-510

Exhibit 2
65

15.   In addition to traveling to Japan, Naji traveled to other places during the time we were in the United States. Naji used to travel every few years to visit his family in Lebanon. He also went to Saudi Arabia for the Islamic pilgrimage, and traveled there another time on business. He also traveled to Jordan for business as well.

16.   At some point while we were living in Los Angeles, Naji was put under FBI surveillance. As I understand it, this surveillance took many forms, including direct visits to Naji, interrogations of people that worked with him, and other kinds of surveillance.

17.   I specifically remember two times when the FBI visited Naji. I am not sure if there were other visits that I don't remember or that Naji never told me about. The first time I know that the FBI questioned Naji, FBI agents came to our apartment and interrogated him at our home. On another occasion I remember that they came to his business. I do not remember the exact dates of these visits. I believe the FBI spent approximately one hour talking to him each time.

18.   When the FBI came to our apartment, my English was still very poor and I was afraid to sit in the same room as the FBI. I stayed with Naji in the room for a few minutes and then left. I do not remember if he told me what they asked him about, either that time or the second time.

19.   Naji also complained to me that the FBI would follow him in their vehicles. I know this bothered him very much.

3

ACLU - Hamdan-511

Exhibit 2
66

20.   Naji and I decided in 2006 that we wanted to move to the U.A.E.  Naji was becoming increasingly bothered by the continuous FBI surveillance.  We were also afraid for our son who was getting older.  We did not want him to be influenced by the kids in high school who were using drugs and acting promiscuously.

21.   We spent more than six months planning our move.  We chose to move to the U.A.E. because Naji had contacts and friends there.  Also the U.A.E. had low import taxes as compared to Lebanon and other Middle Eastern countries.  This was important so that Naji could open a car business there for less money.

b5 -1

22.   We left from the Los Angeles airport in August 2006 to go to the U.A.E.  The FBI stopped us after we went through security and entered the gate area.  They announced themselves as FBI agents, and then took us in their car to a different part of the airport.  The FBI separated Naji from me and the kids.  They then took me into a private room and made me undress.  After I took off my headscarf (hijab), the FBI searched my hair.  They searched my clothes and the linings of my bra and underwear.  The agents also searched our luggage very carefully.  They emptied all of our items from our bags and looked through every item.

23.   They also separately questioned Naji for nearly seven hours.  After all that time, they said that he had broken some rule about some money that he was taking and took it from him.  Yet he was not charged with any crime.

4

ACLU - Hamdan-512                    Exhibit 2
                                    67

24.  The airplane had long left by the time the questioning was over.  We
returned home that night.  Naji flew the next day with our son Khaled, while
I flew with our other son on a later flight.

25.  In the U.A.E., Naji opened another shop for cars.  He collaborated with his
brother, Hossam, in California and a friend, Jehad Suliman.  As I understood
the business, Jehad would send Naji used or wrecked cars from the United
States to the U.A.E.  Naji would then fix the cars and sell them in a car
show.

26.  I stayed with Naji in the U.A.E. for two to three months but the kids and I
did not like it there.  It was very hot and the kids were very unhappy.  Naji
and I decided it would be better for the kids and me to move to Lebanon
close to our families.  So we bought a house in Lebanon and moved there.
Naji would come and go between the U.A.E. and Lebanon every month or
two to visit us.  I sometimes traveled to the U.A.E. to see Naji.  When I was
pregnant with our daughter, Noor, Naji would travel more often to see us
and would stay for longer periods.

27.  After a short while from the time we had moved to the U.A.E., Naji returned
to the United States.  By that time, the children and I had moved to Lebanon.

28.  Naji planned on staying in California for at least a month, but he left more
quickly because of the FBI harassment.  The FBI followed him much more
than ever before.  He told me that they followed him with multiple cars at
the same time and followed him wherever he went.  The surveillance was so

5

ACLU - Hamdan-513

Exhibit 2
68

apparent that Naji's friends and colleagues at the Islamic Center of Hawthorne distanced themselves from Naji. As a result, Naji cut his trip short and returned to the U.A.E.

29.   Naji did not return to the United States after his trip in 2006, but he continued to go back and forth between the U.A.E. and Lebanon.

30.   After our daughter, Noor, was born in Lebanon, Naji and I applied for her U.S. citizenship and a U.S. passport. At the U.S. Embassy in Lebanon, they asked for Naji's passport in order to process the paperwork. They took Naji's passport and kept it for approximately two weeks, far longer than we originally expected. Even when Naji needed to leave to the U.A.E., they would not return his passport; they told him that it was being held up. We do not know why this happened.

31.   Approximately nine months ago, after one of Naji's trips to visit us in Lebanon, my father and I took Naji to the airport in Beirut at 10 P.M. for him to catch his flight to the U.A.E. After Naji entered the gate area, he was detained by Lebanese intelligence officers. He was held for four days. Because this happened after we had left him in the airport, I did not know about it at first, as I had gone home.

32.   At around 1:15 A.M. that night, I heard banging at the door of my house. I also heard the clanking of weapons. I looked through the peephole and saw approximately twenty men dressed in army fatigues standing outside. I panicked and went to the balcony to see what all the commotion was. I saw

6

ACLU - Hamdan-514

Exhibit 2
69

dozens of men from the army and massive army transporters outside. In total, there were forty to fifty men. The men were fully-armed and they had barricaded off the street. I felt very weak and afraid. I asked what they wanted and they told me to open the door because they had orders to search the house. They told me that they had detained Naji at the airport a few hours earlier. I opened the door and told the men that they could search our house.

33.    The men ransacked the house. They went through everything, threw our clothes on the floor, flipped over the furniture, and opened all the drawers and closets. It was complete chaos. They took our papers, computers, photos, play station, CDs, and personal items.   The army stayed in our home for two to three hours.

34.    After the army left, I had an anxiety attack. My father and brother called the ambulance and I spent five hours at the hospital. When I was released, I called the U.S. Embassy in Lebanon and told them that my husband was a U.S. citizen and that he had been detained. Two U.S. Embassy consular officials called me several times over the next few days to give me updates. They told me that my husband was being held in the Ministry of Defense in Lebanon.

35.    Naji's brother, Bassam Hamdan, also got involved and used his contacts and connections with Lebanese government officials and the intelligence officers to find out information about Naji's detention. Bassam is the Rafik Hariri party representative in our town, Shebaa. Bassam told me that he heard that

7

ACLU - Hamdan-515

Exhibit 2
70

Naji was being interrogated about all kinds of things, including about being an Israeli or American spy.

36. On the second day of Naji's detention, the intelligence officers returned to our house, apparently because Naji had told them that he had a rifle stored in our house. The rifle was registered and belonged to Bassam - many people in Lebanon keep guns at their home due to the wars and the constant problems in the country.

37. During Naji's detention, the intelligence officers called me at my home and told me that they were going to take our son, Khaled, for questioning. I got very upset and started crying. I told them that Khaled is very young and I did not want him to go. The intelligence officers said that I could bring Khaled and wait for him. So I took Khaled to the Ministry of Defense. Khaled and I waited our turn for an hour and a half. When the intelligence officers came to take Khaled, they would not let me sit in on the questioning. They took him upstairs to the second floor and questioned Khaled for about an hour. I was terrified as I waited for him. After about an hour and a half, they brought him back.

38. That night, Khaled woke up screaming at night. He kept saying in his sleep that the intelligence officers are going to take his father. I slept next to him to calm him down. For a week, Khaled was afraid to go to school. He was constantly paranoid and would look behind him to see that nobody was following him.

8

ACLU - Hamdan-516

Exhibit 2
71

39. Naji was released after four days. An intelligence officer drove him to our house at around 11 P.M. Naji told me that before he was released, one of the interrogators asked him if he has any enemies. Naji told them that he had none that he knew of. The interrogator told him that they did not find anything on him and that he was innocent. He apologized for having kept him without reason.

40. When Naji arrived at the house, he looked very tired, and was very cold and pale. He was wearing a heavy coat. He told me that they had kept him in a room underground and kept the air conditioner on the entire time. He was extremely cold. He told me to give him a blanket and he lay down on the couch. He told me to sit next to him. We did not talk much that night. Naji only stayed a few days in Lebanon after being released and then returned to the U.A.E. He was concerned about his business and needed to go check on it.

41. Naji later told me that during his entire detention in Lebanon, he was put in solitary confinement in a room under the ground. During the interrogation sessions, the police blindfolded Naji so he couldn't see who was interrogating him and placed him in shackles. Naji was always interrogated by two men. Naji told me that one man would talk and he believed the other was writing what was being said. Despite Naji's good character and demeanor, the interrogators would curse him and push him around. They slapped him a couple of times and gave him spoiled food. The whole time the air conditioning was blasting very cold air.

9

ACLU - Hamdan-517

Exhibit 2
72

42.   Naji also told me that he could hear men screaming out of pain. He thinks
      they were being tortured. All the prisoners were given a number and
      whenever the interrogator would call the prisoner's number, the prisoner was
      taken to a different room and would start screaming. When Naji told me
      about this he cried out of sadness that others were being tormented like this.
      Naji was always afraid that the interrogators would call his number.

43.   Naji told me that on around the third day of his detention, the interrogator
      called Naji's number. The interrogator blindfolded and shackled Naji. Naji
      was taken to the room and was asked by the interrogator what the
      interrogator was holding. Naji told him that he was blindfolded and could
      not see. The man hit Naji with something hard and told him that he was
      holding a hardened piece of bread and now it had fallen on the floor. He
      told Naji to pick up the bread and Naji said that he could not see it. The
      interrogator told him to get on his hands and feet and try to find it.

44.   After being released from detention and before leaving to the U.A.E., Naji
      and I contacted the U.S. Embassy in Lebanon to thank them for helping us
      during Naji's detention. We set up a time to meet with the two officials at
      the Embassy and thank them in person. Naji and I went to the U.S. Embassy
      and met with them. A third man also attended the meeting. I am not sure
      who he was or what his name was. The meeting made us very
      uncomfortable. We had gone there to thank them for their help, but they
      asked so many questions that it felt like another interrogation. After the
      meeting, they told us that they would relay all the information they had
      obtained to people in the United States.

                                    10

ACLU - Hamdan-518

Exhibit 2
73

45.    At first they asked Naji about the detention and what happened. They asked
       him what questions the interrogators asked him and how Naji was treated
       while in detention. They then asked me what happened when the army
       ransacked our house. After that, the three men started taking turns and
       asking Naji the same questions. They asked him why he left his business in
       the U.S. and came to Lebanon, especially since his business was so
       successful in the U.S. Then the second man asked the same questions and
       then the third man asked the same questions. Both Naji and I thought this
       was very odd. We felt very uncomfortable and sensed that the U.S.
       Embassy officials were pushing us for different answers. We did not
       understand why the men were being so pushy and asking the same questions
       over and over again. We wondered if the U.S. had a role in Naji's detention
       in Lebanon, since they seemed to know a lot about Naji.

46.    Three or four months after Naji was released, the Lebanese intelligence
       officers notified him that he had a court hearing in Lebanon. Naji flew from
       the U.A.E. to Lebanon for the hearing.   I accompanied Naji and waited for
       him in the car with our daughter, Noor, during the hearing. Naji told me that
       at the hearing the judge told him that his rifle's registration had expired. The
       judge told Naji that he either had to go to prison for fifteen days or else pay
       ten dollars per day for a total of one hundred and fifty dollars. Naji paid the
       one hundred and fifty dollars. The hearing lasted less than an hour.

47.    Naji also told me that during the trial, the judge looked at Naji's file and
       expressed concern that his detention was a set-up. The judge was surprised
       when he saw Naji's file and asked him who hates him so much to call for his

11

ACLU - Hamdan-519

Exhibit 2
74

detention for no apparent reason. The judge asked Naji if he had any enemies or if anyone had a vendetta against him. Naji told the judge that he did not. The judge said that the situation was very strange.

48.    After his detention in Lebanon, Naji kept traveling back and forth between Lebanon and the U.A.E. At that time, Naji and I discussed moving back to the United States because neither one of us was happy about the separation and distance. Also, the kids missed their father and wanted him to be close by.

49.    In approximately July 2008, the children and I moved to the U.A.E. to be close to Naji. I was tired of being so far from him. We decided that Naji would spend the next few months finishing up his business in the U.A.E. and then we would either move as a family to Lebanon or else back to the United States.

50.    The FBI contacted Naji in August 2008 through his brother Hossam in Los Angeles. Naji was in the U.A.E. at the time. The FBI told Hossam that they wanted to fly out and meet with Naji at the U.S. Embassy in Abu Dhabi. Naji agreed to meet with the agents. I do not know exactly what happened at that meeting, but I know that the agents spent several hours questioning him. After the meeting with the FBI agents, Naji came home and had lunch. He spoke very briefly to me about his meeting with the FBI, and told me not to be concerned.

12

ACLU - Hamdan-520

Exhibit 2
75

51.   Approximately three weeks later, on August 29, 2008, Naji came home from
work at lunchtime. We ate lunch and Naji laid down to rest. As he was
resting, he received a phone call around 3:00 P.M. The man told him that he
was a police officer and that someone had just hit Naji's parked car and
notified the police. He said that he wanted Naji to come downstairs to talk
to him. I had a very uneasy feeling about the phone call and told Naji not to
go downstairs. Naji told me to not worry and he went downstairs. Ten
minutes later, Naji came upstairs and told me to open the door. I looked
through the peephole and saw ten people with him including a cameraman
and a woman. Naji looked sad and surprised. I opened the door and let
them in. Naji told me that these were State Security Forces and they needed
to question him. The woman took me to a separate room while the
cameraman went around the house videotaping. I could not hear what they
were asking Naji. I asked the woman what these men wanted from Naji.
She said she knows nothing and that they are the State Security Forces. She
was mean and curt. The men spent approximately twenty minutes with Naji.

52.   After twenty minutes, the State Security Forces told me that they needed to
take Naji to the Ajman Police Station. They said there was confusion about
his identity and they needed Naji to sign a document. They told me that he
would be back within fifteen minutes. After Naji left, I was very scared. I
had a very bad feeling about the situation especially since the State Security
Forces lied to Naji about being the police and about someone hitting his car.
I waited for a few hours and Naji did not come back. At about 6:00 P.M., I
called Naji's workers, Bah'a and Salim. I told them what happened and they
immediately came over to see me.

13

ACLU - Hamdan-521

Exhibit 2
76

53.   At around 6:30 P.M., when Bah'a and Salim were at my house, Bah'a received a phone call from one of the workers at Naji's business. He told Bah'a that the State Security Forces just came to the business with Naji. They took his car papers, business papers, and computer from the business. They then left.

54.   The next morning I called the U.S. Embassy. The man who answered asked me for Naji's name and his passport number. I told him that I did not know Naji's passport number but I gave him his name. The man said that the U.S. Embassy did not know where Naji was. I kept calling the U.S. Embassy every day and would ask whoever answered if they knew of my husband's whereabouts. The answer was always and consistently no.

55.   I also started calling Naji's friends to see if they had heard anything from Naji. They did not know anything. When Naji's friends found out that the State Security Forces took Naji, they stopped calling me and stopped taking my calls.

56.   I began going to the local police stations. It was very taxing because the temperature was well over 100 degrees Fahrenheit. I would ask the police officers if they had seen my husband. I also asked them to look his name up in the database. None of the police had seen Naji. They told me that his name and picture appeared in the database but there was no information under his name.

14

Exhibit 2
77

57.  My daughter became very sick because she would accompany me on these trips. She was young and started throwing up because of the heat.

58.  Six or seven days after Naji's disappearance, a woman called me from the U.S. Embassy and told me that Saeed Mootar, from the Citizen's Services Division, wanted to talk to me. She told me that he would call me the following day and she also gave me his number. He did not call, but I called him and he answered. Saeed told me that Naji was in Abu Dhabi but he had no other information on him. I asked Saeed why nobody told me earlier of Naji's whereabouts. In a later conversation, Saeed told me that the U.S. Embassy knew of Naji's detention from the first day. He did not answer me when I asked him why they kept this information from me.

59.  After a few days of Naji's detention, the State Security Forces called me and told me that Naji wanted to get me some money. When Naji was detained, I had no cash. When the Security Forces called me, I was at the mall running errands. The Security Force agent told me to stay in the mall and he met me there. He handed me a paper with Naji's handwriting. As I remember it, it said that Naji Hamdan is giving several hundred dollars to Mona Mallouk with his signature at the bottom. I do not remember how much money it was exactly. After he gave me the money, I signed the paper. I asked him about Naji and he told me that he doesn't know why the State Security Forces took him but he is okay and he sends his greetings.

60.  I spent over a week in the U.A.E. trying to track my husband down. On the seventh day of Naji's disappearance, I received a phone call. It was Naji.

15

ACLU - Hamdan-523          Exhibit 2
78

He told me that he was in Abu Dhabi and that he was okay. He said it was only a matter of time before he would be released. He told me that the interrogation was normal procedure. He then told me to go to Lebanon and made me promise him to never come back to the U.A.E. He told me to put the kids in school in Lebanon and stay close to my family there. He told me that God-willing he will be released soon and not to be worried. I was crying. I asked him if they had given him his medicine. He told me that the medicine had arrived. He asked me if I received the money and I told him that I did. During this call, Naji talked quickly, and it seemed as if someone was telling him to hurry. He seemed very uncomfortable. We were only on the phone for about five minutes. Naji did not tell me where he was or why he was being detained. I told him that I was going to Lebanon with the children, and that afterward I was going to come back with his father to help him. He told me not to come back to the U.A.E. with his father. He then told me that he had to get off the phone. I have not heard my husband's voice since that call.

61.  I call Naji's cell phone often hoping he might answer it. Every time I call, it goes straight to voicemail.

62.  Since Naji was arrested, I have been trying day and night to obtain information about his whereabouts and the reason he has been taken from me. I have contacted the State Department in Washington, D.C. and the U.S. Embassy in Abu Dhabi numerous times-too many times to count. I call the U.S. Embassy nearly every day but they hardly respond or answer my messages.

16

ACLU - Hamdan-524

Exhibit 2
79

63.  I have also sought the assistance of other organizations in the United States,
including the American Civil Liberties Union of Southern California. I have
tried to get in touch with the U.A.E. Government officials directly. I went
on the U.A.E. Government website and called and emailed every official on
the website. Not a single government official has responded; and I have
never received any information about my husband's detention from the
U.A.E. government.

64.  Officials from the U.S. Embassy have provided me with minimal
information and assistance. In total, they have only called me about four
times and have only provided me very general information. The Embassy
has not told me why Naji was detained or when he will be released, and they
have not spoken to him privately about his health and treatment.

65.  When I returned to Lebanon, Saeed Mootar told me that I needed to contact
his boss, Sean Cooper, Consular Chief at the U.S. Embassy in Abu Dhabi,
for updates on Naji. When I contacted Sean Cooper after arriving in
Lebanon, he told me that he had no new information about Naji.

66.  On or about October 20, 2008, Sean Cooper called me and told me that he
visited Naji on October 19. He told me that Naji is getting his medications
and his health is okay. Sean Cooper told me that he asked Naji to stand up
and walk and that Naji did not display any physical mistreatment. He told
me that Naji was in solitary confinement. He said that Naji asked him for an
annotated Koran with an English translation. He said that he could not ask
Naji about his detention conditions and treatment because the State Security

17

ACLU - Hamdan-525

Exhibit 2
80

Forces were in the room and he had no privacy. I asked Sean Cooper whether Naji looked like he was around 215 pounds, which is how much he weighed before he was detained. Sean Cooper said that he was less than that. Sean Cooper also told me that he would visit Naji in about another month. He did not tell me why Naji was being imprisoned or when he would be released.

67. On October 13, 2008, I sent a letter to the Ambassador of the U.S. Embassy to express my frustration that the Embassy has not been more helpful in providing me timely information and pushing for Naji's release. I received a response dated October 29, 2008 from the Ambassador that confirmed only the same information I had already received.

68. I do not understand why the U.S. Embassy has not done more to assist Naji. It is also very strange that they are not able to pressure the U.A.E. government to provide them with more information regarding his detention.

69. Naji's father, Jawdat Hamdan, and I were going to go to the U.A.E. in the beginning of October to try to track down Naji and to rescue his business. We both applied for international driver's licenses and were waiting for the paperwork to come through from the Foreign Ministry. Before leaving, however, Jawdat, died. I am sure that Jawdat's grief and anxiety over his son caused his death. He cried every night over Naji's disappearance and always talked about him. Naji's disappearance and detention was a huge strain on Jawdat's health and heart.

18

ACLU - Hamdan-526

Exhibit 2
81

70.  For the last two months, I have lived in fear for my husband's life.  I do not
know what to tell my children about when their father is coming back.  I do
not know why he is being detained.  Naji has always been a law-abiding
U.S. citizen, and I know that he would never harm anyone.

I declare under penalty of perjury under the laws of the Unites States of America
that the foregoing is true and correct.  Executed this fifteenth day of November,
2008, in Shebaa, Lebanon.

*Mona mallouk*          مونا ملوك

Mona Mouhamad Mallouk

19

ACLU - Hamdan-527          Exhibit 2
82

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 03-14-2011 BY 65179/DMH/BAW/STP/bls

# Exhibit 3

ACLU - Hamdan-528

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 03-14-2011 BY 65179/DMH/BAW/STP/bls

## Declaration of Hossam Hemdan

I, Hossam Hemdan, hereby declare:

1.     I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.     On August 29, 2008, United Arab Emirates State Security officials took my brother, Naji Hamdan, from his home.  Ever since then, my brother has been detained incommunicado.  We have not heard from him except for one brief phone call he made to his wife shortly after his arrest, and one conversation we learned about through a consular official.

3.     I was born on April 4, 1970 in Beirut, Lebanon.  I am an American citizen.  I have lived in the United States since approximately 1987.  I have four children who are American citizens.  I currently reside at 12636 Truro Ave, Hawthorne, CA with my girlfriend Teresa Cruz, who is a police officer with the Sheriff's Department.

4.     My family is from the village of Shebaa, Lebanon, which is currently a disputed territory on the border between Lebanon and Israel.

5.     My mother and three of my siblings still reside in Lebanon.  I have a sister who lives in Montreal, Canada.  Naji and I are the only members of our family who moved to the United States.  My father, Jawdat Hamdan, passed away on October 22, 2008.  He was so stressed about Naji that he suffered a heart attack just days before he was planning to travel to the United Arab Emirates to try to help Naji.

6.     My brother Naji Hamdan is four years older than me.  We are very close.  We did business together and own property together.  Until his detention, we communicated on almost a daily basis.

7.     Naji originally came to the United States to study at Northrop University in Inglewood, CA, sometime in the early 1980s.  After graduating from Northrop, Naji worked for a living, mostly in Los Angeles, although he lived for short periods elsewhere.

8.     When I first arrived in the United States around 1987, I worked for four or five years as a security guard at the private home of a movie producer.  At night, I went to school in

1

ACLU - Hamdan-529

Exhibit 3
83

1   Torrance, CA for auto mechanics, paint, and body work. After I left my job, I studied automotive

2   mechanics at El Camino College. During this time, I bought and sold old cars – mostly

3   government and law enforcement cars – on the side. Around 1997 or 1998, after I graduated

4   from college, I opened my first business: a junkyard in Southgate, CA. I currently own and

5   manage Redondo Smog, an emission testing shop.

6          9.     In the late-1990's Naji started an auto parts business. The company, now called

7   Hapimotors, buys vehicles to be dismantled and re-sold. The business is very successful.

8          10.    Before Naji left the United States in 2006, Naji traveled a lot for his business. He

9   frequently traveled to Japan and Taiwan for business. I remember that he also traveled to Saudi

10  Arabia with my parents for the Islamic pilgrimage, and traveled to Lebanon to see our family.

11         11.    Naji is a religious person. Sometimes he led the prayer at his mosque because he

12  knew the Koran well. I am not religious, but I know that Naji was a well-known and well-

13  respected figure in the Muslim community in Hawthorne, CA.

14         12.    Sometime in 2006, Naji decided to move his family to the United Arab Emirates.

15  Naji was worried about his oldest son, Khaled, being exposed to the drugs, gangs and other vices

16  of high school. The schools in Hawthorne, in particular, have a lot of problems. Naji decided

17  that the schools in the Middle East would serve his children better. Naji also wanted to be closer

18  to our elderly parents and the rest of our family in Lebanon.

19         13.    Before Naji left for the U.A.E., he sold his home in Hawthorne to me, where I

20  currently reside. Also, around this time, Naji sold two properties to me that are on the same

21  block as his business. He subsequently sold his business to me as well. It is run by Naji's friend

22  Jehad Suliman.

23         14.    Within a couple months of moving to the U.A.E., Naji opened an auto business

24  there. My understanding is that through his business he bought a lot of cars in the U.S., often in

25  on-line auctions, and then Hapimotors shipped the cars to the U.A.E. for Naji to sell. Up until

26  Naji's detention, Hapimotors regularly sent Naji containers of cars and auto parts for his business

27  there.

28         15.    Naji was subject to a lot of FBI surveillance, as are many Muslims in Hawthorne,

2

Exhibit 3
84

1  CA, and probably elsewhere. Although the surveillance bothered me and my brother a lot, over
2  the years we grew accustomed to it. It was not until around 2006, that I noticed a significant
3  change in the surveillance. Suddenly the FBI seemed much more interested in Naji, so much so
4  that it worried me and other people.

5       16.    The FBI approached me, my brother and many other Arab-Americans in the
6  Hawthorne area sometime at the end of 1999. About four FBI agents came to my house early in
7  the morning one day; it was probably around 5:30 A.M. They stayed for about one hour and
8  asked me all sorts of questions, including about Hezbollah and whether I knew of anyone who
9  wants to harm the U.S. I did not have any information to give them, but I cooperated in
10  answering all their questions as best I could.

11       17.    Naji was also approached by the FBI at that same time. He told me that FBI
12  agents questioned him at his house.

13       18.    That same day, there was an FBI car - a Ford Crown Victoria - parked outside my
14  shop. I knew it was an FBI car because I used to buy and sell law enforcement cars, so I knew
15  the cars they drove. The FBI car was parked outside my shop for one or two days, and the agents
16  made their presence very obvious by parking close to the shop and at times driving back and
17  forth in front of the entrance. I know Naji also had a car sitting outside his shop for a day or two
18  at that time because we discussed it.

19       19.    The second time I was approached by the FBI was right after 9/11. A couple days
20  after 9/11, two FBI agents came to my shop. They showed me photos of fourteen to eighteen
21  bearded men, the same photos I remember that were shown a lot on TV at the time. They asked
22  me if I could identify them. They also asked me if my brother Naji knew them. The agents
23  asked me if I knew anyone who wanted to do something bad to the United States. Again, I had
24  no information to give the agents, but I tried to help them as much as possible.

25       20.    A few months later, two FBI agents came to my shop again. I don't remember
26  exactly what they asked me, but the questions were very similar to the questions they asked me
27  previously.

28       21.    Naji told me that he was also approached by the FBI around the same time,

3

ACLU - Hamdan-531       Exhibit 3
85

1   although I do not remember exactly when he said this happened.

2       22.    Since 9/11, I have always had trouble at the airports when I fly. I must be on

3   some kind of list because I am taken aside and questioned at the airport whenever I return to the

4   U.S. Naji also received the same treatment at airports. Starting in 2006, however, after Naji left

5   the United States, I became subject to much more intense scrutiny at the airports. I am now

6   searched extensively before I board planes, and whenever I return from an international flight I

7   am subject to extensive questioning. Even for domestic flights, I often have to be "cleared"

8   before I can board. Each time I have been questioned since Naji left in 2006, the agents have

9   asked me about him; in fact, they questioned me about almost nothing other than Naji. They

10   would ask me if I had seen him in my travels, or if I had spoken to him. They also asked me for

11   details about his businesses and property.

12       23.    Sometime around August 2006, Naji and his family moved to the U.A.E. Naji

13   told me that at the LAX airport on their way out they were pulled aside, separated, and

14   interrogated for many hours. I do not know how long they were questioned, but I know that they

15   missed their flight. Naji called me late at night to pick them up from the airport, and I remember

16   when I arrived there to pick them up that there was an agent in civilian clothes who was still with

17   Naji on the sidewalk at the airport. I think Naji's friend Jehad was there also, although I do not

18   remember for sure.

19       24.    Also in 2006, I began to have problems receiving my mail. I bought Naji's house

20   from him in 2006 before he moved to the U.A.E. After Naji and his family left for the U.A.E., I

21   hired a man to do work on the house. When my girlfriend, Teresa Cruz, and I traveled to

22   Lebanon around September 2006, Teresa asked the postman to leave our mail in a box while we

23   were gone. The postman refused to leave our mail for us. It was very frustrating when we

24   returned from our trip to find that the postman had not left us any mail. Then, the man who was

25   working on the house told me that the postman told him that the FBI had instructed him to watch

26   over Naji Hamdan's mail and that he knew that the FBI was watching the "terrorist" that lived

27   there.

28       25.    Teresa complained to the postman that she was a cop and that she needed to

4

ACLU - Hamdan-532

Exhibit 3
86

1    receive her mail. The postman said that he had nothing against her and began delivering her

2    mail. I, however, still did not receive mail at the house. This situation forced me to have all of

3    my mail sent to my business. To this day I do not receive my mail at my house.

4            26.     Sometime in 2007, Naji returned to the U.S. to check up on his business. First,

5    Naji commented that agents questioned and searched him at the airport even more intensively

6    than usual. Second, agents followed him everywhere he went during his trip. Sometimes as

7    many as three or four cars trailed behind him. I saw the cars myself; they were always there.

8            27.     The fact that he was being followed was apparent to everyone. Our friends and

9    business colleagues were talking about the FBI cars following him everywhere. People were

10   very alarmed. One day I met him at a Denny's and we discussed the situation for some time.

11           28.     Some people that were associating with Naji during this trip also became FBI

12   targets. After Naji met one day with one of the Imams from his mosque, the cars started to

13   follow that Imam too. Naji told me that the Imam was very upset by this and asked Naji to keep

14   his distance. He told me that other people distanced themselves from him for this same reason

15   during his visit.

16           29.     Naji also has a friend who he knows from his soccer team. Naji met with this

17   friend during his visit in 2007. This friend recently told me that after that meeting with Naji, he

18   began to be pulled aside, searched, and questioned at the airport for the first time. He believes

19   that he was put on a list after being seen with Naji during the 2007 visit.

20           30.     After Naji left, he never came back to the United States again.

21           31.     In 2008, Naji was returning to the U.A.E. after a visit to his wife and children in

22   Lebanon. At the airport in Beirut, Naji was detained by some kind of intelligence officers in

23   Lebanon. Naji told me that he was detained for about four or five days. He told me that during

24   this detention, he was questioned a lot and accused of various things. He did not tell me very

25   much about it afterwards, I believe out of fear of talking about it over the phone.

26           32.     Sometime shortly after Naji was released from Lebanese detention, I was visited

27   by two FBI agents at my shop. One agent was named Agent Joshua Stone and I think the other

28   one was Agent Jerry Price. These agents told me that they wanted to know what happened to

5

ACLU - Hamdan-533

Exhibit 3
87

1  Naji in Lebanon. The longer I spoke to these FBI agents, however, the more I realized that the
2  agents already knew everything about what had happened to Naji. The way they asked the
3  questions made it clear that they knew far more than me.

4      33.    These agents also asked me all sorts of other questions about Naji. They kept
5  telling me that "I was the one who knew the most about Naji." They asked me questions like
6  "has he ever broken the law," and asked me about his political opinions and whether he supports
7  the war in Iraq. They asked me if he was a member of any militia in Lebanon, such as
8  Hezbollah. They also asked me about how religious he was. I told them what I knew about Naji.
9  I told them that he is a religious person who has his opinions, like anyone else, but he was not a
10 member of any militant organizations in Lebanon or anywhere else. I always told them that Naji
11 had never broken the law, and that if they knew what kind of person Naji was, they would want
12 every American to be like him.

13     34.    The next time I interacted with the FBI was when I received a call from someone
14 at the FBI. This person instructed me to tell Naji that Agents Stone and Price wanted to meet
15 with him at the U.S. Embassy in Abu Dhabi on a particular day in August 2008. I don't
16 remember the exact date. He gave me the date and instructed me to call him back if Naji could
17 not be there that day. He was very insistent about it.

18     35.    Naji agreed to meet with Agents Stone and Price at the U.S. Embassy in Abu
19 Dhabi at the scheduled time. During that meeting, the agents questioned him for many hours.
20 After this meeting, Naji did not want to talk about it with me, but he did say that he was very
21 disturbed by the questions that the FBI agents asked him and the way they interrogated him. I
22 remember very clearly that he told me that they knew things about him "that you wouldn't
23 believe."

24     36.    On August 29, 2008, a few weeks after he met with the FBI agents, Naji was
25 taken from his home in the U.A.E. by State Security forces.

26     37.    As soon as I found out, I called Agent Stone to tell him that Naji had disappeared
27 and ask if he knew anything about it. Agent Stone pretended as if he did not know. When I told
28 him what happened to Naji, he said "oh, really?" But as the conversation progressed, he began

6

ACLU - Hamdan-534          Exhibit 3
                                           88

1   asking me more and more questions. I was the one calling for help, but he turned the

2   conversation into an interrogation. I remember he actually made me take an oath on the phone

3   that I swore to "tell him the whole truth, nothing but the truth." I told him that I always told them

4   the full truth, but I wanted the truth from them too. He asked me questions about who Naji

5   socialized with, about whether he was involved in politics in Lebanon, and other questions.

6   Again, I answered all the questions truthfully. I spoke with Agent Stone for about forty-five

7   minutes to one hour.

8      38. After Naji called Mona during his detention, I called Agent Stone again to let him

9   know of this development. Agent Stone was very cold on the phone. He told me not to call him

10   anymore about Naji, and that Naji's detention was now a matter for the U.S. Embassy in Abu

11   Dhabi.

12      39. Since Naji was detained in the U.A.E., I have done everything I can think of to

13   find out information about Naji's detention, with very little success. I have contacted U.S.

14   government officials at various levels. I also have contacted the U.A.E. government. I have

15   spoken to friends and family in Lebanon and people that work in the Lebanese government. I

16   have also spoken to friends with connections to the U.A.E. government.

17      40. Shortly after I learned of Naji's detention, I searched on the internet for the phone

18   numbers of police stations in and around Dubai. I called every police station I could find a phone

19   number for and inquired about whether they were holding Naji or had heard of him. None of the

20   stations gave me information about his whereabouts.

21      41. I also sought assistance from the U.S. government. After FBI Agent Stone

22   refused to help, I called the U.S. Embassy in Abu Dhabi. Since then I have spoken to Sean

23   Cooper, the Chief Consul in the Embassy, as well as Christine Tadros, the U.A.E. Desk Officer

24   at the U.S. State Department in Washington, D.C. Mr. Cooper told me that he visited Naji in

25   detention, but only after nearly two months had passed since he was first detained. Mr. Cooper

26   also told me that he could not ask Naji too much about his treatment in detention because State

27   Security officials were present in the room. He also told me that the U.A.E. State Security forces

28   would not allow a lawyer to have access to Naji. Mr. Cooper did not tell me why Naji was

7

1  arrested and when he might be released. I cannot believe that the U.S. government cannot find

2  out why one of its own citizens is being detained by another government, especially when that

3  government is a close ally of the United States.

4      42.    Most recently, I spoke to Christine Tadros, who similarly did not provide any

5  additional information about Naji's detention. She also would not tell me why he was detained

6  or when he would be released.

7      43.    I spoke to a friend from Lebanon whose friend is an army general in the Lebanese

8  Military Intelligence Services. At my request, my friend asked this person to look into the

9  reasons behind Naji's arrest in Lebanon. This person confirmed that Lebanon had no reason to

10  detain him, and that Naji's detention was at the behest of a "prominent foreign agency." He was

11  nervous about his own security so he would not say over the telephone the name of the foreign

12  agency. This person also added that Naji was released by Lebanese authorities after the Lebanese

13  authorities found no grounds for the allegations of the foreign agency.

14      44.    I also spoke to a friend here in Los Angeles whose family lives in Dubai and who

15  has a connection to the ruling family in the U.A.E. At my request, my friend — who wishes to

16  remain anonymous for safety reasons — contacted a friend of his in the U.A.E. to inquire about

17  the reasons for Naji's arrest. This friend confirmed that Naji was arrested by the State Security

18  forces at the request of a foreign government, and that the U.A.E. has no independent motivation

19  to detain him.

20      45.    I am deeply concerned about the safety of my brother Naji. He is a very good

21  person who would never cause harm to anyone. He has always been a law-abiding citizen. I

22  know this is a terrible mistake, and I hope he is freed soon.

23

24      I declare under penalty of perjury of the laws of the State of California and the United

25  States that the foregoing is true and correct. Executed this 16 of November, 2008 in Los

26  Angeles, California.

27                                                Hossam Hemdan

28

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 03-14-2011 BY 65179/DMH/BAW/STP/bls

# Exhibit 4

ACLU - Hamdan-537

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 03-14-2011 BY 65179/DMH/BAW/STP/bls

## DECLARATION OF JEHAD SULIMAN

I, Jehad Suliman, hereby declare:

1.  I make this declaration based on my own personal knowledge.  If called to testify I could and would do so competently as follows:

2.  My name is Jehad Suliman.  I am a naturalized United States citizen.  I was born on September 29, 1963.  I reside at 14107 Ramona Ave., Hawthorne, CA 90250.

3.  I came to the United States on December 30, 1982. I moved to Los Angeles, California in approximately January 1988.

4.  I am the current Manager of Hapimotors, the business that Naji Hamdan started.  Its current location is in downtown Los Angeles.  Before his current detention, I would communicate with Naji at least two to three times a week over the phone and more often over email.

5.  I consider Naji one of my closest friends.  I do not remember exactly when I first met him, but I believe it was around 1993.  I remember Naji was the prayer leader at al-Huda Mosque in Northrop.

6.  I have been very active at the Islamic Center of Hawthorne since its inception in 1994.  Naji was also active in the Center, so we would see each other a lot there.

1

7.   Over time, Naji and I became very good friends.

8.   I started working for Naji in around 2002 at HondAcura Palace (renamed Hapimotors) in 2004 or 2005. I had no official title but I served as his right hand man. In 2003 or 2004, I started managing the business. I ran all daily operations. When Naji left in 2006 to move to the U.A.E., I kept serving as the business manager.

9.   Naji has always been a hard working man. As a result, his business is now worth two to three million dollars.

10.  I do not remember when the FBI surveillance started exactly. I never really paid much attention to it. It seemed that the FBI was questioning everyone at one point.

11.  The FBI came to our business a couple of times. In approximately 2002 or 2003, four to six agents came to the business, and they introduced themselves as from some branch of the FBI. They had no warrants. They asked Naji if they could look at the inventory of the business. Naji told them that that was fine. I thought it was standard procedure. The agents had a laptop with them. They went through the junkyard and looked at the car parts. They looked like they were typing some of the VIN numbers located on the parts into their laptop. They also entered the office area. I am not sure what they did in the office as I was standing outside. I did not want to cause problems so I let them do whatever they wanted. The agents asked all

2

ACLU - Hamdan-539          Exhibit 4
                                          92

the employees for our identification. I gave them mine, as did everyone else. They stayed for at least an hour.

12.    The second time that I knew of was in approximately 2005. They came for a shorter period, and again went through the yard looking at the car parts. I do not think that they had a laptop the second time.

13.    During the same time period, we also had a lot of city inspectors come and check the business. They came to check for building safety, fire safety, etc. I again thought this was just normal procedure. Yet I do not believe we have had many inspectors come to the business to do these kinds of checks ever since Naji left to the U.A.E.

14.    In July 2006, federal agents interrogated me about many things, including Naji, when I was stopped at the airport. At the time, Naji had not yet moved to the U.A.E. When I returned from a trip, two agents met me outside the plane. They took me to a room. They questioned me for a long time and did a full body search. They photocopied every single paper that I had with me. They asked me about my work and all the details of my personal life. They also asked about Naji and the business.

15.    In August 2006, Naji and his family went to the airport to catch their flight to the U.A.E. They missed their flight because FBI agents interrogated them for several hours. I knew this because Naji called me and asked me to pick him up from the airport, and when I arrived there was an agent still there.

3

ACLU - Hamdan-540

Exhibit 4
93

Naji left the following day with his son Khaled. His wife, Mona, and their son, Hamza, left a few days later.

16.   Sometime in 2006, before Naji left to the U.A.E., we went to a workshop put on by lawyers from the American Civil Liberties Union at the Islamic Center of Hawthorne. The lawyers told us how to file Freedom of Information Act requests to see what the FBI had on file about us. Afterwards, Naji filed a FOIA request. Six or nine months after filing his request, Naji received his file and found that nearly all the information was redacted. I remember he showed me his file and almost all the writing was completely blacked out.

17.   When Naji came back for a visit to the United States after moving to the U.A.E., he was subject to a lot of surveillance. He was planning on staying in the U.S. for a month or longer to check on the business, but cut his trip short due to the surveillance. He was being followed wherever he went. The agents would follow him from his motel to his business. Even the neighbors of our business told me that they noticed the cars following him. During his visit, there was always at least one car posted outside of our business watching. Naji told me that he was pretty sure the agents following him were from the FBI.

18.   The people at the Islamic Center of Hawthorne also noticed the surveillance. One or two people commented to me that they saw the cars following Naji around.

4

ACLU - Hamdan-541

Exhibit 4
94

19.   Before Naji left, he contacted a lawyer and told the lawyer that he was being watched and followed. The lawyer asked Naji if the FBI was approaching him or interrogating him. Naji said they weren't. The lawyer said that there was nothing he could do.

20.   A month or two after Naji was detained in Lebanon in 2008, two FBI agents came to the business to talk to me. They introduced themselves and told me that they wanted to help Naji. They told me that the U.S. Embassy in Lebanon had informed them of his detention. I told the FBI agents that I knew very little about Naji's detention. They asked me if he has any relatives in the United States. I told them that he has a brother. They asked me for his address. I did not give it to them. They told me that they could get it anyway. The meeting lasted ten to fifteen minutes. I thought it was very strange that the FBI was asking me questions when they already knew the answers, and also strange that they claimed to want to help him when he has already been released.

21.   Since Naji's visit to the United States, we have had problems with the containers that carry goods from the United States to the U.A.E. After Naji's visit to the United States, two containers were x-rayed and reloaded at the U.S. dock. Most of our containers were also held up for an unusually long time in the U.A.E. While we have had small problems with the containers from time to time, after Naji's trip the problems became much more severe.

22.   Naji is a peaceful man who does not want to hurt anyone. Naji has always been a very good and solid person. If there is a word greater than excellent

5

ACLU - Hamdan-542

Exhibit 4
95

to describe someone, I would use that word to describe Naji. Everyone that knows Naji from his business companions to the people in the community respects him very highly.

I declare under penalty of perjury under penalty of perjury that the foregoing is true and correct. Executed this seventeenth day of November, 2008, in Los Angeles, California.

Jehad Suliman

ACLU - Hamdan-543          Exhibit 4
96

6

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 03-14-2011 BY 65179/DMH/BAW/STP/bls

# Exhibit 5

ACLU - Hamdan-544

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 03-14-2011 BY 65179/DMH/BAU/STP/bls

### Declaration of Ahmed Azam

1    I, Ahmed Azam, hereby declare:

2        1.    I make this declaration based on my own personal knowledge and if called to

3    testify I could and would do so competently as follows:

4        2.    I was born on February 2, 1963 in Jordan. I am a citizen of the United States. I

5    currently reside at 4304 W 149th St, Lawdale, CA 90260 with my wife and six children.

6        3.    I am one of the founders of the Islamic Center of Hawthorne. I work as a Senior

7    Professor of information systems and engineering at Devry University. I am also pursuing a

8    Ph.D. in information science at Claremont Graduate University.

9        4.    I have known Naji Hamdan for over fifteen years. He has played a vital role in

10   our community for many years. He is an honorable person, who is also a very devoted father and

11   husband.

12       5.    I first met Naji sometime around 1990 through a mosque we both attended.

13       6.    At that time, I believe Naji was a student at Northrop University. Naji came to the

14   United States to study at Northrop University because he received a scholarship given to

15   Lebanese people to study abroad. Around that time, I believe Naji worked as a mechanic for an

16   airline at Los Angeles International airport.

17       7.    In the mid-nineties, Naji and his family lived in the same apartment building

18   where I lived with my family and my wife and I saw them frequently. My wife and I moved out

19   of that apartment building when our quadruplets were born.

20       8.    The Islamic Center of Hawthorne (ICH) was established in 1994, and I was one of

21   its founders. I served as President of the ICH from 1994-1997. Naji was elected President in

22   1997, after I ended my term. While Naji served as President, I served on the Board of Trustees

23   and had the chance to work with him.

24       9.    Naji served as President for about one and a half years. Naji stepped down as

25   President before completing his two-year term because the position demanded more time than he

26   had. Naji had a lot of competing responsibilities at that time between his studies, his young

27   family and managing his business. When Naji stepped down as President, he joined the Board of

ACLU - Hamdan-545

Exhibit 5
97

1  Trustees.  He served on the Board of Trustees until he moved to the United Arab Emirates.

2  During that time, we worked closely together because we were both members of the Board of

3  Trustees.

4        10.  Naji was one of the most well-known and respected members of our mosque and

5  community center.  People respected and trusted him a great deal.

6        11.  Because of Naji's knowledge of the Koran, he sometimes led the prayers during

7  the month of Ramadan.  During the rest of the year, Naji did not spend time at the Center on a

8  daily basis.  His schedule was so busy with work and family that it prevented him from being

9  more active in the life of the Center.

10        12.  Naji owns an auto parts business here in Los Angeles.  His friend, Jehad Suliman,

11  runs Naji's business here for him.

12        13.  Naji is one of the many Muslim leaders in our community whom the FBI has

13  approached.  Naji was interviewed by the FBI in 2000, around the time of Y2K, when many

14  people in our community were approached, including myself.  I remember hearing that the FBI

15  were aggressive when they approached Naji – Naji told me that they banged loudly on his door.

16  By contrast, I have always had polite interactions with the FBI.  I also believe Naji was

17  interviewed by the FBI after 9/11, as were many Muslim people in our community.

18        14.  After Naji moved to the United Arab Emirates, he returned to the U.S. for a short

19  period.  During this visit, I heard that the FBI monitored him with alarming intensity.  I never

20  saw the cohort of cars that were following Naji around during that visit, but members of our

21  Center reported to me that they saw the cars following him everywhere he went and they

22  expressed to me their concern.

23        15.  During this visit, sometime soon after Naji arrived, Naji got together with Imam

24  Othman, one of the Imams at the Center.  They got together to exercise their memory of the

25  Koran.  After this meeting, Imam Othman noticed that cars that looked like they belonged to law

26  enforcement agents were following him everywhere he went.  He noticed there was always a

27  strange car parked across the street from his house.  Despite the fact that the agents made

28  themselves so obvious, they never spoke to him.

ACLU - Hamdan-546

Exhibit 5
98

2

1        16.      Imam Othman was extremely frightened by this surveillance. Because he only

2    experienced the surveillance right after meeting with Naji, he believed that they must be

3    interested in him because of Naji. Alarmed, Imam Othman tried to stay away from Naji. Imam

4    Othman was so rattled by this surveillance that I personally took him to speak with an attorney,

5    Ranjana Natarajan, at the American Civil Liberties Union of Southern California about what he

6    could do to stop the surveillance. The surveillance, however, stopped as soon as Naji left and

7    returned to the United Arab Emirates.

8        17.      I remember that Naji described to me that when he flew into the Los Angeles

9    International airport he was questioned and searched more than usual. It is not unusual for

10    members of our community to be separated from other passengers and questioned and searched

11    at the airport, especially when flying overseas. Naji commented that it was not very smooth and

12    that they questioned him about a lot of things, but he did not tell us the details.

13        18.      I still have no idea why the agents are so interested in Naji. His situation

14    continues to be a major concern for me. Naji's surveillance and subsequent disappearance in the

15    United Arab Emirates remains a very upsetting development for our community.

16        19.      I provide this declaration not only because Naji is my friend, but also because Naji

17    is an honorable person who would never wish harm on anyone. I have known him for more than

18    fifteen years, and I am certain that he is not a violent person and does not want to harm this

19    country or any other country. He is an upstanding citizen of the United States, who made great

20    sacrifices and contributions to his community.

21

22        I declare under penalty of perjury of the laws of the State of California and the United

23    States that the foregoing is true and correct. Executed this 17th day of November, 2008 in Los

24    Angeles, California.

25

26                                                    Ahmed Azam

27

28

ACLU - Hamdan-547                Exhibit 5
                                                    99

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 03-14-2011 BY 65179/DNH/BAW/STP/bls

# Exhibit 6

ACLU - Hamdan-548

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 03-14-2011 BY 65179/DMH/BAW/STP/bls

## DECLARATION OF KHALED HAMDAN

I, Khaled Hamdan, hereby declare:

1.    I make this declaration based on my own personal knowledge.  If called to
      testify I could and would do so competently as follows:

2.    My name is Khaled Hamdan.  I am a United States citizen.  I was born on
      June 14, 1992.

3.    I am the oldest son of Naji Hamdan.  I have a younger brother, Hamza
      Hamdan, and a younger sister, Noor Hamdan.

4.    My mother, brother and I moved to Lebanon in approximately 2006.  My
      sister, Noor, was not born at that time.  My father, Naji, lived in Dubai for
      his work but would come to visit us in Lebanon often.

5.    Earlier this year, my father was visiting us in Lebanon.  My mother and
      grandfather took my father to the airport to drop him off to catch his flight to
      Dubai.  While at the airport, my father was detained by the Lebanese
      intelligence officers.  They detained him for four days.

6.    On the second day of my father's detention, my mother received a phone call
      from the intelligence officers at approximately 4:00 P.M.  I had just returned
      from school forty-five minutes earlier.  The intelligence officers asked if I
      had any tests or quizzes that day or the following day.  My mother told them

1

Exhibit 6
100

that I didn't. They then told her that they wanted to take me to the Ministry of Defense, where my father was being held, for questioning. My mother started crying on the phone. She told them that I was only a child and she did not want them to come take me. They told her that she could bring me and wait for me but threatened that if we did not arrive within an hour and a half, they would come get me. My mother immediately called my two uncles. She called her brother, Mahmoud, and my father's brother, Mirhaj. They immediately came over and accompanied us in the car.

7.  When we arrived at the Ministry of Defense, we waited for an hour and a half to two hours. Then, a red car came and took me. My mother and uncles stayed in the waiting area. Only a driver was inside the car. He drove me to a building about five minutes away from the waiting area. When we arrived at the building, the driver entered with me. There were two soldiers with AK-47s at the door of the building. We waited fifteen minutes in the waiting area of that building. The building was very cold.

8.  After fifteen minutes, a bald man dressed in jeans and a brown jacket came to get me. He told me to follow him. He walked in front of me. Eight soldiers accompanied us. Four soldiers walked in front of me and four behind me. All eight soldiers carried AK-47s. I was petrified. We went up the stairs to a room on the second floor. When we reached the second floor, some of the soldiers dispersed. Only three soldiers continued to accompany me to the room, one on each side and one soldier behind me. The bald man walked in front of me. I was so scared that I started to walk very slowly. The soldier behind me pushed me and told me to hurry.

2

ACLU - Hamdan-550

Exhibit 6
101

9.   The bald man and the soldiers took me to a room. They soldiers stayed
     outside the room and the bald man closed the outer door and the inner door.
     Inside the room was another bald man dressed in a suit and a man with long
     hair. The man with the long hair was sitting at a computer. The bald man
     with the suit began to ask me questions. Since he spoke Arabic and my
     Arabic is weak, the man with the long hair translated for him into English
     and typed up my responses. The other bald man who walked me to the room
     did not speak the entire time.

10.  The bald man interrogated me for approximately one hour. He mainly asked
     me about my father's business. I do not remember everything he asked me,
     especially because the situation was very traumatizing for me. He wanted to
     know what my father did, how his business functioned, who worked with
     my father, what their jobs were, etc.

11.  Then, the interrogator showed me a car bidding website, http://copart.com.
     He asked me what my father and I did on this website. I told him that when
     I worked with my father, we would both get on the website and bid on cars.
     If we won the bid, we would have the cars delivered to his business and we
     would take the cars apart and use their parts. The bald interrogator asked me
     a few follow-up questions while he was looking at the website.

12.  After looking at the website, I remember the bald interrogator showed me a
     number of email addresses: my email address, my mother's email address,
     my father's email address and some of my cousins' email addresses. After

3

showing me each email address, he asked me who the email addresses
belonged to. I told him who the emails belonged to.

13.   Then, the interrogator asked me for the password to my email account. I
      gave it to him. The man with the long hair opened my email and scanned
      through my emails. He only looked at my emails for a few minutes and then
      closed it. He did not ask me questions about my email. Then he opened my
      mother's email account. I don't know how he had her password but he also
      looked at her email briefly. Then he opened my father's email. He
      somehow had my father's email password also. The bald man began to ask
      me questions about my father's emails. He asked me why my father called
      his friend and business partner, Jehad Suliman, "Juju." I told him that in
      America, the word 'jihad' has a very bad connotation and so Jehad goes by
      the name of Juju. He then asked me why my father calls his brother,
      Hossam, "Husu." I told him that I think it is just his nickname.

14.   I do not remember the other questions that he asked me while looking
      through my father's email, but I remember that I thought the questions were
      silly. But I stayed calm and answered all his questions because I was so
      afraid. Most of the questions the interrogators asked me were related to my
      father's business.

15.   After questioning me for about one hour, the bald man took me to another
      room. One of the soldiers walked in front of us and another walked behind
      me. The room was very warm and looked comfortable. It had a bed in it.
      The room was much warmer than the rest of the building, which was very

                                        4

ACLU - Hamdan-552          Exhibit 6
                                         103

cold. In the room was my father. There were no soldiers with him. My father was handcuffed. I think the men wanted me to think that my father was staying in this room, but it was obvious that this was not true.

16.  The bald man stood in the back of the room. He did not say anything. When I saw my father I greeted him with the Islamic greeting. I said 'Hey Babba (father), Assalamu alaikum (peace be upon you).' My father told me to come hug and kiss him. I noticed that he had a scratch over his eyebrow. It looked like it was bleeding, although I can't remember exactly. My father was wearing a light coat and felt cold when I hugged him.

17.  My father then began to ask me the same questions that the bald interrogator asked me. I could tell by the questions that he had been told what to ask me. I do not remember all the questions, but I remember that my father asked me about his business. He asked me about his email addresses. He asked me about his personal email account and his business email account. He asked me about the website and what happens when we win the bid on a car. After about ten or fifteen minutes of questioning, my father told me to give him another hug and not to worry about anything. At that point, I started crying. I felt helpless because I could not do anything to help him.

18.  After I was taken out of the room where my father was, the bald man and the soldiers took me to the room downstairs where I was initially waiting. Then, they took me to a room where they took my picture. At that point there were eight soldiers accompanying me: four in front and four behind. When they took my picture, the bald man made me hold a card with my name written

5

ACLU - Hamdan-553

Exhibit 6
104

on it in both English and Arabic. I held the card to my chest. The
cameraman then took mug shots of me. He took a photo of my front and
two photos of my sides. I was terrified by this.

19.   When they let me leave, I saw my mother and uncles in the room waiting for
      me. I don't know how they got to the building. They took us all back to the
      front of the Ministry in the red car.

20.   I had nightmares that night. I remember waking up with tears in my eyes.
      When I woke up, I found myself on the other side of the bed and I had the
      pillow and blanket over me. My mother told me that I had been screaming
      in my sleep. She said I was screaming that the intelligence officials were
      going to take my father away.

21.   For two weeks after I was taken in for interrogation, I was scared to go to
      school by myself. My mother started dropping me off and picking me up
      from school in the car. She continued to take me to school and pick me up
      for a whole week after my father was released because I was still afraid.

22.   After four days, my father was released. He told me a little bit about what
      happened to him. He said that he was always very cold. He said that the
      soldiers did not give him a pillow or blanket. They put him in a room
      underground by himself with the air conditioner on full-blast. He only had a
      very thin jacket. When he slept, he would take his shoes off and use them as
      his pillow. The soldiers woke him up at random times for any reason. The
      soldiers also barely fed him. They only gave him a sandwich of rice every

6

ACLU - Hamdan-554

Exhibit 6
105

day. Once my father dropped the sandwich on accident and one of the soldiers or interrogators got angry and slapped him on his face. He said that the interrogators threatened to put him in an electric chair. My father could hear people screaming very loudly from the electric chair. Luckily, he was never put in the electric chair.

23.    On August 29, 2008, my father disappeared. My mother, siblings, and I had just moved back from Lebanon to the U.A.E. a few months before that. We had just had lunch and I had fallen asleep. My mother later told me that while I was asleep, someone called my father on his cell phone and told him to come downstairs because his car had been hit. After my father went downstairs, the doorbell rang. My mother woke me up. She had looked through the peephole and got scared when she saw that my father was accompanied by the State Security Forces. There were about ten men and one woman. All of them were dressed in traditional Arab clothing and the woman wore a head covering. There was also a cameraman who videotaped the house. The men took my father to his bedroom and the woman told us to come into the living room and sit with her. I could not hear what was happening in the bedroom. The woman said she was part of the State Security Forces and that she knew nothing. She did not tell us anything more. After a short period, the men came and told us that they were going to take my father down to the police station to have him sign a document. I wanted to go with him but they said that he would only be gone for fifteen minutes and he would be back. My father never came back and he is still missing. I wish I knew where he was and why he is being detained.

7

ACLU - Hamdan-555

Exhibit 6
106

24. I recently went to the doctor. I sometimes have extreme heart palpitations. The doctor took x-rays of my chest and told my mother that I seemed very stressed. The doctor did not know what has happened to us. The doctor told her that my heartbeats are very quick and I need to be careful, otherwise I may have major heart problems when I get older. He wanted to give me medication but my mother told him that she didn't want me to take medication. He told her to give me Advil, Tylenol or Panadol whenever my heartbeats increased. If my health does not improve in another month, I will have to take daily doses of medication. My heart problems are recent. I am sure that they are due to the stress of my father's detention.

25. My family and I have been living in constant fear and sadness. I miss my father and wish he were with me. I do not understand why he keeps being detained. I especially don't understand why my siblings and I are being deprived of our father, a father we deeply love and greatly miss.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this fifteenth day of November, 2008, in Shebaa, Lebanon.

Khaled Hamdan

8

Exhibit 6
107

ACLU - Hamdan-556

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 03-14-2011 BY 65179/DMH/BAW/STP/bls

# Exhibit 7

ACLU - Hamdan-557

Case 2:10-cv-06149-DSF-JEM   Document 29-32   Filed 08/10/11   Page 66 of 100   Page ID
#:1442
FBI Accused of Terror Overreaction - Los Angeles Times    Filed 11/19/2008    Page 31 of 34    Page 1 of 4
Case 1:08-cv-02063-JR - Document 1-3



## Los Angeles Times | California | Local

Return to your last page

Archive for Monday, January 10, 2000

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 03-14-2011 BY 65179/DMH/BAW/STP/bls

# FBI Accused of Terror Overreaction

By Teresa Watanabe and Eric Lichtblau
January 10, 2000 *in print edition B-1*

The knock on the door came about 7:20 a.m. Dec. 30. It was so loud and insistent that neighbors in a Hawthorne apartment building poked their heads out of their doors to hear FBI agents rouse Naji Hamdan and ask the auto parts dealer: "Do you know Osama bin Laden?"

Carol Brunetti got a knock on the door that day too--as did at least 16 of her friends in Southern California. The Anaheim fund-raiser for an Islamic charitable organization says that two FBI agents, in dark suits and red ties, asked her if she knew anyone with ties to Ahmed Ressam, the Algerian man arrested near Seattle on Dec. 14 for allegedly trying to enter the United States with explosives in his car.

The questions shocked and annoyed Hamdan and Brunetti, who say they know no terrorists and wonder why they were selected for questioning. "Who do they think we are?" asked Brunetti, who converted to Islam 10 years ago. "That we Muslims have a terrorist in every family? Sometimes it just gets ridiculous."

The episode--and similar ones like it, played out several dozen times recently across the nation--revealed the aggressive and sometimes controversial tactics the FBI employed to head off the threat of a millennial terrorist attack.

The FBI won't say why it questioned Hamdan and others. But agents in Los Angeles acknowledged last week that their interviews turned up no evidence linking anyone in the area to terrorist activity or Bin Laden, the Saudi exile suspected of masterminding the bombing against two U.S. embassies in East Africa. Two Algerians arrested in Boston as part of the recent terrorism-related roundup, meanwhile, were cleared of all links to violence.

FBI supporters credit the government's aggressive posture with averting any much-feared millennial attacks, and argue that the extraordinary threats of the last few weeks required extraordinary measures. Beginning the day before New Year's Eve, FBI agents in at least seven states interviewed about 70 people across the country in connection with Ressam's arrest.

Although FBI officials refuse to discuss details of their investigation, they insist that they had reason to believe that each person they contacted might have information about the case--suspicions that were based in part, they say, on telephone logs seized in the case.

"We'd be doing ourselves a disservice if we didn't follow every possible lead," said Los Angeles-based FBI Agent Ramiro Escudero. Defending the line of questioning about Bin Laden, he added: "He's a terrorist, so I think it's a pertinent subject to ask, even if it's a dead end."

But critics say that the FBI went too far. "I think they probably overreacted," said Amy Baron-Evans, a federal public

ACLU - Hamdan-558

Exhibit 7
108

11/17/2008

Case 2:10-cv-06149-DSF-JEM   Document 29-32   Filed 08/10/11   Page 67 of 100   Page ID #:1443

FBI Accused of Terror Overreaction - Los Angeles Times   Case 1:08-cv-02063-JR - Document 1-5   Filed 11/19/2008   Page 32 of 34   Page 2 of 4

defender who represented one of the Algerian men cleared in Boston of terrorism-related allegations last week. "I think they made mistakes and they went to wrong doors and they just charged ahead."

For the main targets of the millennial terrorism probes—the American Muslim and Arab communities—the FBI visits renewed their decade-long struggle to ensure that legitimate actions to safeguard national security don't trample on their civil rights. Over the years, the same issues have repeatedly surfaced among Irish, Italians, Sikhs, Central Americans and other targets of counter-terrorism probes.

But the 1990s thrust Arabs and Muslims into the spotlight with the Persian Gulf War, the World Trade Center explosion in New York, the bombings of two U.S. embassies in East Africa and the most recent millennial threats.

Muslims today, however, are responding in ways that few would have dared even a few years ago. Buoyed by a discernible new confidence and feeling of political empowerment, they are speaking out about the FBI visits. They also are talking about other ways in which they assert that national counter-terrorism efforts are unfairly targeting their community and provoking a backlash of resentment among Muslims.

From the use of secret evidence in immigration cases to airport security checks to increased scrutiny of Islamic fund-raising here, American Muslims and Arabs are protesting a host of counter-terrorism tools they say have been selectively used against them. Their allegations are backed by such civil rights attorneys as David Cole of Georgetown University, who helped win recent victories against secret evidence laws and co-wrote the 1999 book "Terrorism and the Constitution: Sacrificing Civil Liberties in the Name of National Security."

In October, a federal district judge in New Jersey ruled unconstitutional the detention of Palestinian immigrant Hany Kiareldeen. It was based on secret evidence purporting to link him to terrorism—evidence that his lawyers say appears to consist largely of allegations by a disgruntled ex-wife. So far, a coalition to abolish the laws—which permit authorities to use evidence that neither the defendants nor their lawyers have the right to see—has enlisted the support of 63 members of Congress.

Media Coverage Seen as Highly Biased

Muslims have also aggressively fought to restrain the public from bias in treating issues of terrorism and Islam. Late last month, the quick protests of Muslim leaders led the State Department to stop linking potential terrorist attacks with the holy season of Ramadan in its millennial warning alerts.

And in a new report, the Council on American-Islamic Relations documented the enormous difference between U.S. media coverage of the Algerian scare—which generated 129 stories by the day after Ressam's arrest, including 21 on front pages—and similar millennium-related incidents involving non-Muslims. The arrest of two suspected militia members for allegedly plotting to blow up two propane tanks outside Sacramento, for instance, produced just one front page story nationwide.

"We Muslims are fed up with being used as punching bags," said Shukri Abu Baker, who heads the Dallas-based Holy Land Foundation for Relief and Development, the nation's largest American Muslim charity. "We have become empowered."

U.S. law enforcement officials stress that their efforts to protect Americans from terrorism do not target any group of people or focus on protected 1st Amendment activities, such as attending rallies or criticizing U.S. policies.

"Probably one of the more frustrating elements of the backlash are charges that we target groups based on race, religion, etc.," said Mike Rolince, chief of the FBI international terrorism operations section. "We investigate based on allegations or instances of violations of U.S. law. Law-abiding Muslims and Arab Americans have nothing to fear from the FBI."

Those assurances don't assuage everyone, however. The relentless focus on Islamic-related terrorism over the past decade, many Muslims say, has created a climate of intimidation that has chilled even legal political and humanitarian activity.

ACLU - Hamdan-559

Exhibit 7
109

Case 2:10-cv-06149-DSF-JEM Document 29-32 Filed 08/10/11 Page 68 of 100 Page ID #:1444

FBI Accused of Terror Oversreaction - Los Angeles Times  Case 1:05-cv-02003-JR - Document 1-3  Filed 11/19/2008  Page 33 of 34  Page 3 of 4

Some mosque leaders say that they will no longer give a forum to speakers who use "vitriolic rhetoric"--in criticizing, for instance, U.S. policy against Iraq. Controversial speech has not disappeared, however. A Northern California Islamic conference last year featured speakers who invoked a hadith, or narrative attributed to the Prophet Muhammad, that some Jews interpret as calling on Muslims to kill them.

In some cases, Muslims have canceled humanitarian projects to nations out of favor with the United States, such as a book drive for Sudan. Other Muslims say their applications for green cards and citizenship are being held up, and wonder if the delays are linked to their political activity.

Muslim charitable activity has emerged as one of the most controversial topics in the counter-terrorism debate. A 1996 counter-terrorism law criminalized donations to designated terrorist organizations for the first time.

The Washington Post has reported that the FBI targeted 20 Islamic organizations to see if any were covertly funneling donations to support terrorist activities. Rolince said only that none of those being investigated have been shut down--and that it was "immaterial" whether they were Islamic or not.

The focus on fund-raising has produced at least two effects. Some communities find it harder to raise money now. Southern California Muslims, for instance, could raise only $300,000 for Kosovars last year compared to nearly $1 million for Bosnians in 1994--a drop that Minaret Magazine editor Aslam Abdullah attributes in part to more wariness about charitable giving.

Other charities report increased contributions as Muslims become more savvy about direct mail and other fund-raising techniques--but more caution in how donors give. Brunetti, for instance, said people now tend to request tax identification numbers, give cash, shun receipts and avoid leaving a paper trail in supporting her organization, which is affiliated with the United Nations and raises about $2.5 million a year to supply food and medicine to the needy in Iraq.

Future Bin Laden Ally Raised Money in U.S.

The charges that radical Islamists may be using subterfuges to raise money among law-abiding Muslims for devious purposes are not entirely groundless, however. In a case that created an uproar last year, a respected Northern California Muslim leader was extensively questioned by the FBI, then subpoenaed to testify before a New York grand jury after helping the U.S. fund-raising efforts of a man who turned out to be a top ally of Bin Laden.

The Muslim leader, who spoke on condition of anonymity, said the bearded, soft-spoken man called himself Dr. Abdel Muez and came to him in 1991, claiming to be raising money for Afghan widows, orphans and other refugees displaced in the long war against Soviet occupation of Afghanistan. Because the U.S. government supported the Islamic fighters at the time, including Bin Laden, the American Muslim says he thought nothing of taking the man around to three mosques in Northern California.

But the doctor turned out to be Ayman Al-Zawahiri, who was indicted last year by a New York federal grand jury on charges of conspiring to bomb two American embassies in East Africa.

Al-Zawahiri, thought to be in Afghanistan with Bin Laden, was active in Jihad, a terrorist organization believed responsible for the assassination of President Anwar Sadat of Egypt. Both Al-Zawahiri and Bin Laden became known as enemies of the United States in the mid-1990s.

Jihad leader Sheik Omar Abdel Rahman was convicted in 1995 in a plot to bomb New York City landmarks, including the World Trade Center.

Al-Zawahiri associates arrested last year in Egypt named the California Muslim as one of those who had helped the terrorist leader raise funds in the United States.

The California Muslim, a philanthropist who helped start several Islamic centers across the nation, has not been

ACLU - Hamdan-560    Exhibit 7
110

Case 2:10-cv-06149-DSF-JEM Document 29-32 Filed 08/10/11 Page 69 of 100 Page ID #:1445

FBI Accused of Terror Overreaction - Los Angeles Times Filed 11/19/2008 Page 34 of 34 Case 1:08-cv-02003-JR - Document 1-3 Page 4 of 4

charged with any wrongdoing, but says the experience "ruined my life." Both his business and family life have suffered. But he agreed to share his story to warn American Muslims about what he says are the perils they face from both Islamic radicals and overzealous law enforcement officials.

The Islamic Supreme Council of America has urged all Muslim organizations to open their books to avoid even the perception of wrongdoing. And the Muslim Public Affairs Council of Los Angeles, in a detailed position paper on U.S. counter-terrorism policy, is urging Muslim organizations to adopt greater financial transparency for fund-raising activities, more vociferously condemn terrorism and monitor and resist violent infiltrators.

The paper also urges the U.S. government to explore the causes of terrorism, condemn violence consistently--whether committed by foreign friend or foe--and improve relations between Muslims and law enforcement.

On that last score, FBI agents couldn't agree more.

"We are trying to reach out to Muslims and Arab Americans and let them know we truly do believe we need their help to solve these cases," Rolince said.

**Related Articles**
- Leadership Faulted on Bioterror Front Jun 18, 1998
- 2 Agents Say L.A. Police Abused Them May 27, 2005
- FBI Monitors for Radiation at Some Mosques Dec 24, 2005
- FBI Lawyer Tells of Terror 'Roadblock' May 24, 2002
- Courts Likely to Endorse FBI Policy, Experts Say May 31, 2002

**More articles by Teresa Watanabe and Eric Lichtblau**
**More articles from the California | Local section**

---

California and the world. Get the Times from $1.35 a week

---

Copyright 2008 Los Angeles Times

ACLU - Hamdan-561

Exhibit 7
111

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 03-14-2011 BY 65179/DMH/EAW/STP/bls

# Exhibit 8

ACLU - Hamdan-562

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 03-14-2011 BY 65179/DMH/BAU/STP/bls



# ON THE RECORD:

## U.S. DISCLOSURES ON RENDITION, SECRET DETENTION, AND COERCIVE INTERROGATION



CHR&GJ
center for human rights and global justice
nyu school of law

Exhibit 8
112

*On the Record: U.S. Disclosures on Rendition, Secret Detention, and Coercive Interrogation*

## ABOUT THE AUTHORS

The Center for Human Rights and Global Justice (CHRGJ) brings together and expands the rich array of teaching, research, clinical, internship, and publishing activities undertaken within New York University (NYU) School of Law on international human rights issues. Philip Alston is the Center's Faculty Chair; Smita Narula and Margaret Satterthwaite are Faculty Directors; Jayne Huckerby is Research Director; Veerle Opgenhaffen is Program Director; and Lama Fakih is Center Fellow.

The International Human Rights Clinic at NYU School of Law (a program of the Center) provides high-quality, professional human rights lawyering services to individual clients and non-governmental and intergovernmental human rights organizations, partnering with groups based in the United States and abroad. Working as legal advisers, counsel, co-counsel, or advocacy partners, clinic students work side-by-side with human rights activists from around the world. The Clinic is co-directed by Professor Smita Narula and Professor Margaret Satterthwaite of the NYU faculty; and Michelle Williams is Clinic Administrator.

This report should be cited as: Center for Human Rights and Global Justice, *On the Record: U.S. Disclosures on Rendition, Secret Detention, and Coercive Interrogation* (New York: NYU School of Law, 2008).

© NYU SCHOOL OF LAW CENTER FOR HUMAN RIGHTS AND GLOBAL JUSTICE

ACLU - Hamdan-564

Exhibit 8
113

Center for Human Rights and Global Justice

## ACKNOWLEDGEMENTS

The Center for Human Rights and Global Justice (CHRGJ) at New York University (NYU) School of Law is enormously grateful to the following individuals for their work and/or assistance in the preparation of this Report:

Principal Authors and Researchers
Jayne Huckerby, Research Director, CHRGJ, NYU School of Law
Margaret Satterthwaite, Faculty Director, CHRGJ and International Human Rights Clinic, NYU School of Law

Review and Editorial
Lama Fakih, Fellow, CHRGJ, NYU School of Law
Veerle Opgenhaffen, Program Director, CHRGJ, NYU School of Law

Additional Research, Writing, Production and/or Other Assistance
Amna Akbar, Clinical Contract Attorney, International Human Rights Clinic, NYU School of Law
Nicholas Enrich, Summer 2008 Intern, CHRGJ, NYU School of Law
Priyanka Ghosh, Summer 2008 Intern, CHRGJ, NYU School of Law
Gitanjali S. Gutierrez, Staff Attorney, Center for Constitutional Rights
Mattie Johnstone, Clinical Fellow, International Human Rights Clinic, NYU School of Law
Michele Lampach, Summer 2008 Intern, CHRGJ, NYU School of Law
Emi MacLean, Staff Attorney, Center for Constitutional Rights
Kyle Marler, Summer 2008 Intern, CHRGJ, NYU School of Law
Kelly Ryan, Program Assistant, CHRGJ, NYU School of Law
Michelle Williams, Clinic Administrator International Human Rights Clinic, NYU School of Law

ACLU - Hamdan-565

Exhibit 8
114

*On the Record: U.S. Disclosures on Rendition, Secret Detention, and Coercive Interrogation*

## TABLE OF CONTENTS

Table of Acronyms and Terms ....................................................................................iii

Introduction ....................................................................................................................1

I.    U.S. Government Statements about the Existence of the Post-9/11 Rendition,
      Secret Detention, and Coercive Interrogation Program .................................4

A.    Secret Detention and Interrogation .........................................................................4
B.    Rendition ..................................................................................................................4

II.   Other Publicly Available Information about the Existence of the Post- 9/11
      Rendition, Secret Detention, and Coercive Interrogation Program ...........6

A.    Authorization and Debate over the Program ...........................................................6
B.    Rendition for Coercive Interrogation ......................................................................6

III.  Government Statements about the Number and Identities of Individuals Rendered,
      Secretly Detained, and Coercively Interrogated by the CIA .......................8

A.    Number of Secret Detainees ....................................................................................8
B.    Identities of Secret Detainees ..................................................................................8
C.    Scope of Post-9/11 Rendition Program ...................................................................9

IV.   Other Publicly Available Information about the Number and Identities of
      Individuals Rendered, Secretly Detained, and Coercively Interrogated by the CIA 10

A.    Identities and Number of Secret Detainees ...........................................................10
B.    Identities and Number of Individuals Rendered Post-9/11 ...................................10
C.    Identities of CIA Personnel Involved ....................................................................11

V.    Government Statements about Apprehension, Transfer, and Interrogation in the
      Rendition, Secret Detention, and Coercive Interrogation Program .........12

A.    Apprehension, Transfer, and the Role of Foreign Partners ...................................12
B.    Detention Outside of Judicial Process ...................................................................12
C.    "Alternative Set of Procedures"—Authorization, Nature, and Scope ..................12
D.    CIA Interrogators ...................................................................................................13

VI.   Other Publicly Available Information about Apprehension, Transfer, and
      Interrogation in the Rendition, Secret Detention, and Coercive Interrogation
      Program .............................................................................................................14

A.    Authorization and Use of Coercive Interrogation Techniques ..............................14
B.    Typical Rendition Procedures and Handling of Detainees ....................................14
C.    *Incommunicado* Detention ..................................................................................16

i

ACLU - Hamdan-566

Exhibit 8
115

Center for Human Rights and Global Justice

D.     Locations of CIA Secret Detention Facilities ........................................................16
E.     Day-to-day Operations of CIA Secret Detention Facilities ...............................16
F.     Proxy Detention by Foreign Authorities ..............................................................17

VII.   Government Statements about Attempts to Shield from Scrutiny the Rendition, Secret Detention, and Coercive Interrogation Program .............................................19

A.     Lack of Congressional Oversight ...........................................................................19
B.     Dissemination of Inaccurate Information and Destruction of Evidence .............20
C.     Denial of Information to other U.S. Agencies or Bodies .....................................20
D.     Restrictions on Former CIA Detainees' Testimonies ...........................................20
E.     Over-classification Practices in Respect to the "War on Terror"........................21

VIII.  Other Publicly Available Information About Attempts to Shield from Scrutiny the Rendition, Secret Detention, and Coercive Interrogation Program.........................22

A.     Destruction of Evidence..........................................................................................22
B.     CIA Limitations on Internal and External Oversight ...........................................22
C.     Improper Classification Generally..........................................................................22

IX.    Government Statements about Illegality and Improper Acts in the Rendition, Secret Detention, and Coercive Interrogation Program .............................................24

A.     The Impact of *Hamdan* v. *Rumsfeld* .......................................................................24
B.     U.S. Officials' Concerns about the CIA Program.................................................25
C.     Legal Reviews and Investigations ...........................................................................26
D.     Recognition of Public Concern ...............................................................................27

X.     Other Publicly Available Information about Illegality and Improper Acts in the Rendition, Secret Detention, and Coercive Interrogation Program.........................28

A.     The Impact of *Hamdan* v. *Rumsfeld* .......................................................................28
B.     CIA Inspector-General Investigations....................................................................28
C.     CIA Concerns about Illegality.................................................................................29
D.     U.S. Government Concerns About Illegality of Post-9/11 Rendition and Coercive Interrogation Outside the CIA ................................................................................31
E.     Additional Concerns of the U.S. Government........................................................32
F.     Findings of UN Human Rights Bodies ..................................................................32
G.     Investigations by Foreign Governments ................................................................33
H.     Investigations by the Council of Europe and European Parliament ....................33
I.     Public Concern with the CIA's Activities and Mistakes ......................................34

Endnotes ..............................................................................................................................35

ACLU - Hamdan-567                    Exhibit 8
                                     116

*On the Record: U.S. Disclosures on Rendition, Secret Detention, and Coercive Interrogation*

## TABLE OF ACRONYMS AND TERMS

| | |
|---|---|
| ACLU: | American Civil Liberties Union |
| AI: | Amnesty International |
| AIUSA: | Amnesty International USA |
| CCR: | Center for Constitutional Rights |
| CHRGJ: | Center for Human Rights and Global Justice at New York University School of Law |
| CIA: | Central Intelligence Agency |
| DOD: | U.S. Department of Defense |
| DOJ: | U.S. Department of Justice |
| DOJ OIG: | U.S. Department of Justice Office of Inspector General |
| DTA: | *Detainee Treatment Act* |
| FBI: | U.S. Federal Bureau of Investigation |
| FOIA: | Freedom of Information Act |
| HRF: | Human Rights First |
| HRW: | Human Rights Watch |
| IHRC/ CHRGJ: | International Human Rights Clinic at NYU School of Law's Center for Human Rights and Global Justice |
| ODNI: | Office of the Director of National Intelligence |
| TDIP: | European Parliament's Temporary Committee on the alleged use of European countries by the CIA for the transport and illegal detention of prisoners |
| UN: | United Nations |
| U.S.: | United States |

ACLU - Hamdan-568

Exhibit 8
117

ACLU - Hamdan-569

Exhibit 8
118

*On the Record: U.S. Disclosures on Rendition, Secret Detention, and Coercive Interrogation*

## INTRODUCTION

According to the United States (U.S.) government, shortly after September 11, 2001, the Central Intelligence Agency (CIA) was tasked with planning a "separate" program to begin secretly detaining and interrogating individuals outside of the United States.[1]  At that time, the CIA was also reportedly authorized to forcibly transfer individuals to foreign countries for interrogation in a practice commonly known as "rendition" or "extraordinary rendition."[2]  Starting with the rendition of Ibn al-Shaykh al-Libi to Egypt in January 2002,[3] and the detention and interrogation of Abu Zubaydah in March 2002,[4] the U.S. post-9/11 rendition, secret detention, and coercive interrogation program has since swept up many individuals, the vast majority of whom are still unaccounted for by the United States.

Between 2001 and September 2006, information about CIA rendition, secret detention, and coercive interrogation operations emerged piecemeal.  The U.S. government was the source of some of this information: officials discussed rendition in the media and on Capitol Hill, but gave only partial accounts; they announced the capture of individuals, but refused to disclose their whereabouts; and they informed the National Commission on Terrorist Attacks Upon the U.S. (the 9/11 Commission) that certain individuals were "currently in U.S. custody," but refused to give the Commission the access it sought to the detainees themselves.  The U.S. government also provided "statements" culled from interrogations on behalf of certain secret CIA detainees in the cases of *United States* v. *Paracha* and *United States* v. *Moussaoui*.  Media, inter-governmental bodies (such as the Council of Europe and the United Nations (UN)), human rights organizations, and former detainees also provided comprehensive insights into the CIA's activities.

Following the decision of the U.S. Supreme Court in *Hamdan* v. *Rumsfeld* on June 29, 2006— holding that Common Article 3 of the Geneva Conventions applies to all U.S. detainee operations in the "War on Terror"—the U.S. government felt compelled to make additional disclosures on its rendition, secret detention, and coercive interrogation activities.  On September 6, 2006, President George W. Bush acknowledged that the United States was operating a secret detention program as part of its "War on Terror" and stated that the program would continue.[5]  This announcement prompted a slew of acknowledgements about the program by U.S. government personnel acting in their official capacity, ranging from President Bush to the Office of the Director of National Intelligence (ODNI), the Director of the CIA, the Department of Defense (DOD), and U.S. Secretary of State, among others.  These acknowledgements provided insights into the nature and scope of the CIA's program, including, for instance, information concerning:

- The existence and continued use of the CIA's secret detention and enhanced interrogation program;

- The existence of the government's rendition program and its use to transfer terrorism suspects to third countries;

- The CIA's use of an "alternative set of procedures", a "new interrogation program", "enhanced interrogation techniques", or "special methods of questioning" on CIA detainees and how such techniques were purportedly approved (including the role of the National Security Council Principals Committee and the Department of Justice (DOJ));

1

ACLU - Hamdan-570

Exhibit 8
119

Center for Human Rights and Global Justice

- The number of individuals detained in the program ("fewer than 100") and subject to enhanced interrogation techniques ("less than a third" of the "fewer than 100");

- The number of renditions performed by the CIA, additional to the number it has detained in secret facilities ("mid-range," "two figures");

- U.S. collaboration with foreign partners to apprehend, render, and detain individuals;

- The names of 19 individuals secretly detained by the CIA and the details regarding the apprehension of a number of these individuals;

- The CIA's use of waterboarding against at least three detainees in 2002 and 2003; and,

- The recordings of interrogations of CIA detainees and the subsequent destruction of those videotapes by the CIA in 2005.[6]

These official disclosures are complemented by a wealth of other publicly available information that has come from foreign government officials, former detainees and rendered individuals, and former U.S. officials (speaking both on and off the record) as well as current U.S. officials (speaking off the record) to media, investigatory bodies, and human rights organizations. The plethora of publicly available information highlights the extent to which U.S. government disclosures have been both highly selective and unduly secretive. Such an approach aggravates the state of uncertainty that hangs over the fate and whereabouts of those individuals who are still missing;[7] those who will be subject to the CIA's activities in the future; and those former CIA detainees who seek redress but have been prevented from pursuing claims in U.S. courts because of the U.S. government's invocation of the "state secrets" privilege.[8]

In an effort to obtain further information from the U.S. government about its rendition, secret detention, and coercive interrogation activities, in 2004, 2006, and 2007, Amnesty International USA (AIUSA), the Center for Constitutional Rights (CCR), and the International Human Rights Clinic at NYU School of Law's Center for Human Rights and Global Justice (NYU IHRC/CHRGJ)[9] submitted Freedom of Information Act (FOIA) requests to several U.S. agencies, including the CIA. Following a refusal to disclose the majority of the information sought, AIUSA, CCR, and NYU IHRC filed suit in June 2007 in federal court in the Southern District of New York. In spring 2008, the CIA admitted that it had more than 7,000 relevant documents, but sought a ruling that it did not need to disclose the vast majority of those documents, arguing, *inter alia*, that it cannot be compelled to disclose information it argues is properly classified. In response, on June 26, 2008, AIUSA, CCR, and NYU IHRC filed an opposition to the CIA's motion for summary judgment and a memorandum of law in support of a cross-motion for partial summary judgment.[10]

This filing was accompanied by an account of what is known to date about the U.S. rendition, secret detention, and interrogation program, in the form of a 78-page declaration by NYU IHRC/CHRGJ's Professor Margaret Satterthwaite.[11] The declaration—which also contains several hundred pages of exhibits—aggregates all the public information available to date about the CIA's activities, presenting both U.S. government statements and other publicly available sources, such as media accounts and reports by human rights organizations. This report—*On the Record: U.S. Disclosures on Rendition, Secret Detention, and Coercive Interrogation*—is based in large part on that

ACLU - Hamdan-571

Exhibit 8
120

*On the Record: U.S. Disclosures on Rendition, Secret Detention, and Coercive Interrogation*

declaration. It omits references to, and copies of, exhibits to the declaration, but otherwise presents the same information found in the sources cited within the declaration.

This report aims to shed light both on what has been revealed and what has been obscured by the U.S. government. It also seeks to demonstrate the enormous range of information that is in the public sphere about the nature and scope of the U.S. rendition, secret detention, and coercive interrogation activities. This exercise makes it increasingly evident that the threats of disclosure of "state secrets" and harm to national security are ill-founded, and that the real concern lays in the very fact that a program of this nature exists and continues to operate.

3

ACLU - Hamdan-572

Exhibit 8
121

Center for Human Rights and Global Justice

## I.    U.S. GOVERNMENT STATEMENTS ABOUT THE EXISTENCE OF THE POST-9/11 RENDITION, SECRET DETENTION, AND COERCIVE INTERROGATION PROGRAM

### A.    SECRET DETENTION AND INTERROGATION

President George W. Bush, the Office of the Director of National Intelligence (ODNI), and the CIA have each separately confirmed that, following September 11, 2001, the CIA operated a "separate" CIA detention and interrogation program. In a September 6, 2006 statement, President Bush first officially declared that "[i]n addition to the terrorists held at Guantanamo, a small number of suspected terrorist leaders and operatives captured during the war have been held and questioned outside the United States, in a separate program operated by the Central Intelligence Agency."[12]  On September 6, 2006, the ODNI also provided an overview of the "CIA's detention and interrogation program," and noted that "[s]hortly after 11 September 2001" there were briefings on the "authorities" for the program.[13]

On November 10, 2006, the CIA Associate General Counsel clarified what the "authorities" for the program may have included in a letter[14] sent to Plaintiffs in *ACLU et. al.* v. *DOD et. al.*, 04-Civ.-4151 (S.D.N.Y.), remanded 06-0205-cv (2nd Cir.) that stated that the CIA had "located...one document responsive to Item No. 61" of the list of responsive records specifically identified by Plaintiffs. Item No. 61 is described by Plaintiffs as a directive signed by President Bush granting the CIA the authority to set up detention facilities outside the United States and/or outlining interrogation methods that may be used against detainees. The CIA describes the document located as responsive to Item No. 61 as "a memorandum from President Bush to the Director of the CIA. Additionally, General Michael Hayden, Director of the CIA (CIA Director General Hayden) has also made numerous references to "our rendition, detention and interrogation programs" and their origins, stating in September 2007 that "[e]verything is on the table"[15] but also indicating in October 2007 that he "can't commend [sic] on any of the techniques we may or may not have used."[16]

President Bush, DOD, and CIA Director General Hayden, have confirmed that the secret detention and coercive interrogation program continues to operate.  President Bush stated on September 6, 2006 that "[t]he current transfers mean that there are now no terrorists in the CIA program.  But...having a CIA program for questioning terrorists will continue to be crucial..."[17] Following this statement, in April 2007, the Office of the Assistant Secretary of Defense announced that the DOD had taken custody of Abd al-Hadi al-Iraqi and that "prior to his arrival at Guantanamo Bay, he was held in CIA custody."[18]   CIA Director General Hayden also made reference to this transfer in an interview with Charlie Rose, making clear that the U.S. secret detention program was operational into 2007.[19]  These assertions were followed by a March 2008 statement by the Office of the Assistant Secretary of Defense in which it was announced that the DOD had taken custody of Muhammad Rahim al-Afghani and that "prior to his arrival at Guantanamo Bay, he was held in CIA custody."[20]

### B.    RENDITION

President Bush, U.S. Secretary of State Condoleezza Rice, CIA Director General Hayden, and other U.S. officials have all repeatedly acknowledged the use of rendition to transfer terrorism suspects to third countries.  For instance, at a March 2005 press conference, President Bush stated that in the "post-9/11 world" one technique of the United States is to "arrest people and send them

4

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 03-14-2011 BY 65179/DMH/BAW/STP/bls

MONA MALLOUK, *et al.*,

              Petitioners,

    v.

BARACK H. OBAMA, *et al.*,

              Respondents.

No. 08-cv-2003 (JR)

## MOTION TO DISCLOSE *EX PARTE* EVIDENCE

Although Respondents intimate in their Motion to Dismiss that the United States government has played no role in Mr. Hamdan's detention, interrogation, and torture, the declarations they submit fall far short of supporting that proposition, in at least two critical respects. First, they disclaim only the involvement of the FBI, and fail to mention any other United States agencies that may have played a role in Mr. Hamdan's detention, interrogation, and torture. Second, the government presents a portion of the FBI's declaration *ex parte*,[1] which is peculiar given that it offers that declaration to support the claim that the United States has played no role in Mr. Hamdan's detention.

Therefore, Petitioners file this motion seeking disclosure of the *ex parte* evidence relied upon by the government, subject to a suitable protective order. Petitioners also

---

[1] *See* Public Declaration of Michael J. Heimbach, Assistant Director, Counterterrorism Division, Federal Bureau of Investigation (hereinafter "Heimbach Declaration") (omitting four paragraphs of assertedly classified information), filed with Respondents' Motion to Dismiss Petition for Writ of Habeas Corpus (hereinafter "Resp. MTD").
    The Respondents' motion and the public version of the Heimbach Declaration were filed under seal. Both Petitioners and Respondents have moved the Court to unseal these filings, so that the public can be aware of the issues and arguments being made in this case.

ACLU - Hamdan-574

intend to file an opposition to the Motion to Dismiss after the Court has ruled on the

instant motion, and at that time will seek limited discovery to force the government to

disclose the full nature of the U.S. government's involvement in Mr. Hamdan's detention,

interrogation, and torture.

All parties to this suit ought to share a common interest in ensuring that the

United States government has played no role in the detention, interrogation, and torture

of a U.S. citizen abroad, particularly if the statements resulting from that torture may

form the basis of criminal charges against him. This motion seeks only to ensure that all

information potentially relevant to that issue comes to light before this Court.

### Argument

Although the government asserts that the Court can grant its Motion to Dismiss

without consideration of the *ex parte* evidence in this case, that claim is highly dubious,

given that the government's evidence on its face fails to rebut the claim that the United

States government (rather than merely the FBI) has played a role in causing Mr.

Hamdan's detention, interrogation, and torture. Thus, in substance if not in form, the

government has asked this Court to dismiss this action on the basis of the *ex parte*

evidence it has filed, and thereby seeks to extinguish a claim of unlawful detention

brought by a U.S. citizen without allowing him an opportunity to see the evidence against

him.[2]

---

[2] In its motion, the government makes an alternative argument that this Court has no habeas jurisdiction because Mr. Hamdan is in the custody of a foreign sovereign, even if, as Petitioners allege, he is detained at the behest of the U.S. government. *See* Resp. MTD at 2-3, 3 n.4, 12. As Petitioners will explain in their opposition to the Motion to Dismiss, the Court should reject that argument largely for the reasons set forth in this Court's decision in *Abu Ali v. Ashcroft*, 350 F. Supp. 2d 28 (D.D.C. 2004).

ACLU - Hamdan-575

Courts have long rejected the use of classified information to rob citizens of liberty in the name of national security. As Justice Frankfurter wrote over fifty years ago, "[t]he heart of the matter is that democracy implies respect for the elementary rights of men, however suspect or unworthy; a democratic government must therefore practice fairness; and fairness can rarely be obtained by secret, one-sided determination of facts decisive of rights." *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 170 (1951) (holding use of *ex parte* evidence unauthorized by statute in employment context) (Frankfurter, J., concurring).

The Fifth Amendment, and perhaps also the Suspension Clause itself, requires that U.S. citizens be afforded the opportunity to examine the evidence against them when the government seeks to dismiss a charge of unlawful confinement using that evidence. Therefore, the Court should reject the government's invitation and order disclosure of the evidence to Petitioners and counsel, subject to a protective order.

I.   **The Use of *Ex Parte* Evidence to Dismiss this Case Would Violate the Fifth Amendment's Due Process Clause**

The Fifth Amendment does not permit the use of *ex parte* evidence in this case, where the government seeks to dismiss a challenge to unlawful detention without allowing Petitioners or their counsel to view that evidence. The Supreme Court set forth the general test governing procedural due process in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). *See Hamdi v. Rumsfeld*, 542 U.S. 507, 528 (2004) (plurality opinion) (applying *Mathews* in challenge to procedures authorizing detention of U.S. citizen caught on battlefield); *see also United States v. Abuhamra*, 389 F.3d 309, 318 (2d Cir. 2004) (applying *Mathews* in challenge to use of *ex parte* evidence in post-trial bail proceedings); *cf. Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 206

(D.C. Cir. 2001) (hereinafter "*NCRI*") (applying *Mathews* to determine sufficiency of process for freezing assets of U.S. entities under national security statute). Under *Mathews*, "identification of the specific dictates of due process generally requires consideration of three distinct factors: first, the private interests that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedure used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail." *Mathews v. Eldridge,* 424 U.S. 319, 335 (1976).

### A.    Petitioner's Private Interest in This Case is Overwhelming.

Applying the first prong of *Mathews*' three-part test, this case implicates the strongest conceivable private interest. "Freedom from imprisonment — from government custody, detention, or other forms of physical restraint — lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). It is "the most elemental of liberty interests." *Abuhamra*, 389 F.3d at 322.

That this case involves freedom from unlawful executive detention may, on its own, be sufficient to rule out the use of *ex parte* evidence in this case. The Supreme Court's decision in *Boumediene v. Bush*, 128 S. Ct. 2229 (2008), strongly suggests that the government may not rely on *ex parte* evidence, even for non-citizens detained as enemy combatants, where those non-citizens have sought to vindicate their liberty interests. The Court indicated as much when it explained its holding that the Combatant Status Review Tribunal process is insufficient to constitute an adequate substitute for habeas corpus because, *inter alia*, it permits the use of *ex parte* evidence:

4    ACLU - Hamdan-577

> Petitioners identify what they see as myriad deficiencies in the CSRTs.
> The most relevant for our purposes are the constraints upon the
> detainee's ability to rebut the factual basis for the Government's
> assertion that he is an enemy combatant. . . . He does not have the
> assistance of counsel and *may not be aware of the most critical
> allegations that the Government relied upon to order his detention*.
> See App. to Pet. for Cert. in No. 06-1196, at 156, ¶ F(8) (noting that
> the detainee can access only the 'unclassified portion of the
> Government Information').

*Id.* at 2269 (emphasis added).[3]  *Cf. Abuhamra*, 389 F.3d at 322 ("Particularly where

liberty is at stake, due process demands that the individual and the government each be

afforded the opportunity not only to advance their respective positions but to correct or

contradict arguments or evidence offered by the other.").

As a U.S. citizen who alleges that he is unlawfully confined at the behest of the

U.S. government, and who has been and perhaps will again be subject to torture, Mr.

Hamdan's liberty interest is stronger than those of other petitioners who have prevailed

against the use of *ex parte* evidence in their cases.  The D.C. Circuit found the unfettered

use of *ex parte* evidence impermissible where citizens filed a suit to permit a non-citizen

to enter the country while abroad.  *Abourezk v. Reagan*, 785 F.2d 1043, 1060-61 (D.C.

Cir. 1986).  This Court reached a similar result in a later case, holding that summary

exclusion procedures that did not allow a returning lawful permanent resident to examine

the evidence against him violated due process.  *Rafeedie v. INS*, 795 F. Supp. 13, 19-20

(D.D.C. 1992).  Similarly, the Second Circuit held the Due Process Clause forbids the use

---

[3] This passage of the *Boumediene* decision appeared to draw from the substantive
requirements created by the Suspension Clause itself, rather than from the Due Process
Clause.  *See id.* at 2270 ("Even if we were to assume that the CSRTs satisfy due process
standards, it would not end our inquiry. . . .  Even when the procedures authorizing
detention are structurally sound, the Suspension Clause remains applicable and the writ
relevant.").  For this reason, Petitioners raise their claim in this motion under both the
Due Process Clause and the Suspension Clause itself.

   ACLU - Hamdan-578

of *ex parte* evidence absent rigorous procedures that ensure that the detainee knows the

substance of that evidence. The court reached that conclusion notwithstanding the

somewhat attenuated liberty interest at stake in that case, where the petitioner had been

convicted at trial, but sought to remain free on bond prior to sentencing. *United States v.*

*Abuhamra*, 389 F.3d 309, 328 (2d Cir. 2004). *See also American-Arab Anti-*

*Discrimination Comm. v. Reno*, 70 F.3d 1045, 1068-1069 (9th Cir. 1995) (holding that

due process forbids use of *ex parte* evidence in legalization proceeding on behalf of non-

citizen who had resided in the U.S. for several years); *Kiareldeen v. Reno*, 71 F. Supp. 2d

402, 419 (D.N.J. 1999) (holding that due process forbids use of *ex parte* evidence to

detain non-citizen pending completion of removal proceedings).

     A final feature of the particular interest at issue here also counsels in favor of

Petitioners in the *Mathews* calculus. In this case the government attempts to use *ex parte*

evidence to resolve the merits of the case. It therefore differs significantly from cases

where the government seeks to use *ex parte* evidence to resolve an evidentiary or other

ancillary issue. "It is therefore the firmly held main rule that a court may not dispose of

the merits of a case on the basis of *ex parte, in camera* submissions." *Abourezk*, 785 F.2d

at 1060-61. *See also Kinoy v. Mitchell*, 67 F.R.D. 1, 15 (S.D.N.Y. 1975) ("[T]he

government presents the Court, *in camera*, with material which it asserts must be

withheld from plaintiffs as privileged, yet which it requests the Court to consider in

ascertaining material facts and drawing legal conclusions concerning dispositive issues in

the case. In this Court's view such a course is wholly unacceptable. . . . Either the

documents are privileged, and the litigation must continue as best it can without them, or

ACLU - Hamdan-579

they should be disclosed at least to the parties, in which case the Court will rule after full

argument on the merits.").

Here, the government asks this Court (assuming it is unable to dismiss the petition

based on the public record) to rely on an *ex parte* affidavit from an FBI official as its *sole*

piece of evidence disclaiming U.S. involvement in Mr. Hamdan's unlawful detention.[4]

Its use in this context presents far more serious problems than it would in cases involving

evidentiary privilege issues. *See, e.g., Halkin v. Helms*, 598 F.2d 1, 5 (D.C. Cir. 1978)

(stating that court may review secret affidavit *ex parte* and *in camera* to evaluate a claim

of military and state secrets privilege); *In re John Doe Corp.*, 675 F.2d 482 (2d Cir. 1982)

(stating that court may review *ex parte* evidence to refute claim of attorney-client

privilege by grand jury witness).

## B. The Risk of Error Inherent in the Use of *Ex Parte* Evidence is Extremely High.

The second prong of the *Mathews* test requires assessment of the risk of error;

here, that risk is extremely high. Neither the government nor this Court can accurately

assess the quality of the evidence presented by the government in the absence of

adversarial testing of some kind, which requires that the information be disclosed to

Petitioners, Mr. Hamdan, and their counsel. The D.C. Circuit has already stated that the

use of *ex parte* evidence carries a high risk that an innocent man could be wrongly

classified as a national security threat. As the court explained when counseling against

the use of *ex parte* evidence in summary exclusion proceedings, "Rafeedie — like Joseph

K. in The Trial — can prevail before the Regional Commissioner only if he can rebut the

---

[4] The government has also submitted a declaration from a State Department
official, but that declaration does not speak to the issue of U.S. involvement in Mr.
Hamdan's detention, interrogation, and torture.

undisclosed evidence against him, *i.e.*, prove that he is not a terrorist regardless of what
might be implied by the Government's confidential information. It is difficult to imagine
how even someone innocent of all wrongdoing could meet such a burden." *Rafeedie v.
INS*, 880 F.2d 506, 516 (D.C. Cir. 1989). The Ninth Circuit reached the same conclusion
regarding the risk of error: "One would be hard pressed to design a procedure more
likely to result in erroneous deprivations. . . . Without any opportunity for confrontation,
there is no adversarial check on the quality of the information on which the INS relies. . . .
[T]he very foundation of the adversary process assumes that use of undisclosed
information will violate due process because of the risk of error." *American-Arab Anti-
Discrimination Comm. v. Reno*, 70 F.3d 1045, 1069 (9th Cir. 1995) (internal quotations
omitted).

        This case presents a paradigmatic example of the problems with the use of *ex
parte* evidence. While the government asserts that "the Heimbach Declaration makes
clear that the *United States Government* did not request that the UAE detain or arrest
Hamdan," *see* Resp. MTD at 8 (emphasis added), that assertion finds no support in the
unclassified portions of the Heimbach Declaration, which mention only the FBI and do
nothing to disclaim the involvement of the other United States agencies that might have
been involved, such as the CIA or various components of the Department of Defense.
Respondents' Motion to Dismiss also repeatedly conflates the FBI's involvement with
the involvement of any U.S. government official. *See, e.g.*, Resp. MTD at 9 n.8
(asserting that Petitioners have to prove that the official present during Mr. Hamdan's

                                         8        ACLU - Hamdan-581

torture was "an FBI agent").[5]  In addition, wholly apart from the fact that the declarations

do not deny that other U.S. officials have caused Mr. Hamdan's detention, the Heimbach

Declaration does not foreclose the possibility that the FBI itself "requested" that the UAE

investigate him or that it "expressed an[] opinion" favoring his detention.  Heimbach

Declaration at 3.[6]

  While it is conceivable the classified portions of the Declaration may resolve all

such ambiguity in a way that requires dismissal of this case, this Court cannot determine

whether or not this is so in the absence of adversarial testing of that evidence.

  **C.      The Government's Interest in Secrecy Does Not Justify Use of the *Ex
            Parte* Evidence.**

  The third prong of the *Mathews* test requires assessing the interests of the

government in protecting the classified information.

  While the government's interest in national security is obviously weighty as a

general matter, the national security concerns presented by this case do not outweigh

Petitioners' right to examine the *ex parte* evidence that (as we have explained above) the

----

[5] This conflation is particularly striking given that the complaint and subsequent
filing in this case made repeated reference to proxy detention at behest of the "United
States," and did not limit the claim to detention at the behest of the FBI.  *See ,e.g.*,
Complaint at ¶ 4, ¶ 51.  *See also* Notification Regarding Detention Status of Naji Hamdan
at 3 (referring to the "role of any United States government employees or contractors in
his interrogation and torture").

[6] To be precise, the Heimbach Declaration states that "[t]he FBI did not direct the
UAE to investigate Hamdan or direct actions taken by the UAE during their
investigation" (¶ 9),  but does not deny that the FBI requested, suggested, encouraged, or
facilitated that investigation.  Likewise, the Heimbach Declaration states that the FBI did
not "request that the UAE detain or arrest Hamdan" (¶ 11), but does not deny that the FBI
suggested, encouraged, or facilitated that detention.  Most curiously, the Heimbach
Declaration states that "[t]he FBI has not expressed any opinion to the UAE about
Hamdan's *continued* detention or trial by the UAE" (¶ 12; emphasis added), but does not
deny that the FBI had "expressed an opinion" to the UAE regarding Mr. Hamdan's *initial*
detention or his detention prior to the filing of the petition for habeas corpus.

9      ACLU - Hamdan-582

Respondents have implicitly asked the Court to rely upon in dismissing this challenge to his detention. To justify consideration of the *ex parte* evidence for that purpose, the government would have to show that the national security implications of revealing the information are so compelling as to justify denying Mr. Hamdan the most elementary of legal protections. *See Rafeedie v. INS*, 795 F. Supp. 13, 19 (D.D.C. 1992) (holding that summary exclusion procedures without allowing a returning lawful permanent resident to examine the evidence against him would violate due process, notwithstanding asserted national security interest, because "the issue in this instant case is not whether the government has such a [national security] interest, but whether that interest is so all-encompassing that it requires that Rafeedie be denied virtually every fundamental feature of due process, as he has been thus far."); *United States v. Moussaoui*, 65 Fed.Appx. 881, 887 (4th Cir. 2003) (rejecting government's request for closed appellate argument and noting that "the mere assertion of national security concerns by the Government is not sufficient reason to close a hearing or deny access to documents").

Thus, the government cannot merely invoke national security as a general concern, rather it must provide a particularized showing that disclosure of the evidence pertaining to Mr. Hamdan in particular poses a national security threat sufficient to trigger the full weight of national security deference appropriate under *Mathews*. *Cf. American-Arab Anti-Discrimination Comm. v. Reno*, 70 F.3d 1045, 1069-70 (9th Cir. 1995) (rejecting the government's invocation of national security concerns to justify use of *ex parte* evidence in legalization proceedings because "the Government has offered no evidence to demonstrate that these particular aliens threaten the national security of this country" whereas "[o]nly the most extraordinary circumstances could support one-sided

    ACLU - Hamdan-583

process."). In this case, the government has not made that showing in the unclassified

portions of the pleadings and declarations. In fact, the government suggests that it has

had no involvement in the ongoing detention of Mr. Hamdan, and provides the Heimbach

Declaration in support of this claim. Yet, if in fact the U.S. government has not been

involved in his detention in any way, it is hard to imagine how disclosure of evidence

relating to his case could present a compelling danger to U.S. national security.

Several other factors show that the government's interests are not so compelling

as to justify departing from the rule against *ex parte* evidence. First, the Court should

reject the use of *ex parte* evidence because it can safeguard the government's interests

through alternative means. Indeed, that the information is classified does not mean it

necessarily must be presented *ex parte*. Instead, the Court must consider whether

alternative means exist that will preserve Mr. Hamdan's procedural rights to access the

information, while protecting the confidentiality of information. *See Abuhamra,* 389

F.3d at 321 (stating that an exception to the rule against *ex parte* submissions "may be

made only in cases in which there is a compelling need to maintain the secrecy of certain

evidence, no alternative means of meeting that need exist other than *ex parte* submission,

and the court carefully limits its sealing order only to materials genuinely implicating the

compelling need.").

Here, if the Court finds that it should not allow public disclosure, it should grant

Petitioners access to the *ex parte* information through a protective order.[7]  Courts often

---

[7] Because Petitioners believe that the threats to Mr. Hamdan's liberty are exigent,
Petitioners request access to the *ex parte* information on a timely and expedited basis. If
the Court deems it necessary, Petitioners and counsel would be willing to seek security
clearances to view the classified information, subject to a protective order. Under such
circumstances Petitioners request that the Court direct the government to perform the

     ACLU - Hamdan-584

use protective orders in civil and criminal proceedings to provide parties access to classified information presented against them. *See, e.g.*, *In re Guantanamo Detainee Cases*, 355 F. Supp. 2d 443, 471 (D.D.C. 2005) (requiring disclosure of classified information to counsel with security clearances even in cases where petitioners were non-citizens classified as enemy combatants), *vacated on other grounds sub nom. Boumediene v. Bush*, 476 F.3d 981 (D.C. Cir. 2007), *rev'd*, 128 S. Ct. 2229 (2008); *see generally In re United States*, 872 F.2d 472, 478 (D.C. Cir. 1989) (discussing protective orders and seals among the mechanisms that may be employed to protect classified or sensitive evidence); Classified Information Procedures Act (CIPA), 18 U.S.C. app. III § 6(1)(c) (requiring district court to bar disclosure of specific classified information only if the Court finds that government's statement or summary of classified information "will provide the defendant with substantially the same ability to make his defense as would disclosure of the specific classified information").

Second, the government's interest in submitting the evidence *ex parte* is not permitted by any applicable statute. *See Abourezk v. Reagan*, 785 F.2d 1043, 1061 (D.C. Cir. 1986) (finding an exception to the general rule against *ex parte* submissions where it is permitted by statute). Indeed, as discussed above, the introduction of evidence *ex parte* is particularly abhorrent to Mr. Hamdan's due process rights given the fundamental liberty interest at stake in a habeas case. Even Congress's recent amendments to the habeas statute, some of which have been struck down by the Supreme Court, declined to allow for the consideration of *ex parte* evidence in cases arising outside of Guantanamo

---

security clearance on an expedited basis. Alternatively, if the process cannot be completed quickly, the Court could issue a protective order imposing severe sanctions on Petitioners and counsel in the event of any breach.

ACLU - Hamdan-585

Bay, Iraq, and Afghanistan. *See Boumediene v. Bush*, 128 S. Ct. 2229, 2234 (2008) (citing, *inter alia*, Section 1005 of the Detainee Treatment Act, and summarizing the history of the Detainee Treatment Act of 2005 (DTA) and the Military Commissions Act of 2006 (MCA)).

Finally, the government has not supported its interest in submitting the evidence *ex parte* by invoking the state secrets privilege. *See Abourezk*, 785 F.2d at 1061 (identifying the state secrets privilege as one of very few and narrowly construed exceptions to the general rule against *ex parte* evidence). To do so, the government must possess "a formal claim of privilege, lodged by the head of the department which has control over the matter, after actual personal consideration by that officer." *United States v. Reynolds,* 345 U.S. 1, 7-8 (1953); *see Molerio v. FBI*, 749 F.2d 815 (D.C. Cir. 1984) (requiring the head of the Department of Justice (*i.e.*, the Attorney General) to invoke the privilege in cases involving FBI evidence). Here, the government does not claim the state secrets privilege, nor does it provide the requisite documentation of its entitlement to the privilege. Whether or not the government could justify the use of such evidence where it had properly invoked state secrets, it clearly cannot do so in light of its failure to invoke that doctrine here.

## CONCLUSION

For the reasons stated above, Petitioners request that the Court order the government to disclose to Petitioners, Mr. Hamdan, and their counsel the information it submitted *ex parte*, subject to an appropriate protective order. Alternatively, the Court should order the government expeditiously to process requests for security clearances by Petitioners and their counsel so that the *ex parte* material can be disclosed to them.

13

ACLU - Hamdan-586

A proposed order is submitted herewith.

Respectfully submitted,

/s/ *Arthur B. Spitzer*

Arthur B. Spitzer (D.C. Bar No. 235960)
American Civil Liberties Union
  of the National Capital Area
1400 20th Street, N.W., Suite 119
Washington, DC 20036
Tel: (202) 457-0800
Fax: (202) 452-1868

/s/ *Ahilan T. Arulanantham*

Ahilan T. Arulanantham
Jennie Pasquarella
ACLU Foundation of Southern California
1313 West Eighth Street
Los Angeles, CA 90017
Tel: (213) 977-9500
Fax: (213) 977-5297

Attorneys for Petitioners

February 2, 2009

14        ACLU - Hamdan-587

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| MONA MALLOUK, *et al.*,<br><br>        Petitioners,<br><br>    v.<br><br>BARACK H. OBAMA, *et al.*,<br><br>        Respondents. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 03-14-2011 BY 65179/DMH/BAU/STP/bls

Civil Action No. 08-2003 (JR)

### ORDER

Petitioners have moved to disclose *ex parte* evidence filed by Respondents. (Dkt. #15)
Specifically, Petitioners seek the unredacted version of the Declaration of Michael J. Heimbach,
Assistant Director, Counterterrorism Division, Federal Bureau of Investigation, the redacted
public version of which is attached as Exhibit B to Respondents' Motion to Dismiss. (Dkt. #16)
Respondents object to disclosing the classified information, but contend that, in any event, it is
"not essential" to deciding the case. The Court has decided that it will neither review nor rely on
the classified information in considering Respondents' Motion to Dismiss at this juncture.
Therefore, it is **ORDERED** that Petitioners' motion (Dkt. #15) is DENIED WITHOUT
PREJUDICE as moot. As agreed in the Consent Motion (Dkt. #14), Petitioners shall have 14
days from the date of this Order to file their Opposition to the Motion to Dismiss. Respondents
shall have 14 days from the filing of Petitioners' Opposition to file their Reply.

                                        JAMES ROBERTSON
                                        United States District Judge

ACLU - Hamdan-588

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MONA MALLOUK, *et al.*,      :
                             :
          Petitioners,       :
                             :
     v.                      :   Civil Action No. 08-2003 (JR)
                             :
BARACK H. OBAMA, *et al.*,   :
                             :
          Respondents.       :

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 03-14-2011 BY 65179/DMH/BAW/STP/bls

MEMORANDUM

On June 8, 2009, I heard argument for and against the habeas petition filed on behalf of Naji Hamdan, an American citizen imprisoned in the United Arab Emirates (UAE). The hearing focused on two issues: whether I had jurisdiction to hear Hamdan's petition and, if I did, whether I could grant habeas relief since Hamdan has been charged with criminal offenses by the UAE, a sovereign nation. The petition prayed, not for release, but rather for a mandatory injunction requiring the United States government to "stop requesting" Hamdan's detention and to inform the UAE courts of American participation, if any, in Hamdan's alleged interrogation and torture. The government denied any participation in Hamdan's detention and interrogation.

I ruled on June 8 that the habeas petition would be dismissed, essentially because Hamdan has been charged by the UAE for domestic criminal offenses, *see Munaf v. Geren*, 128 S. Ct. 2207, 2221-24; *see also Kiyemba v. Obama*, 561 F.3d 509, 515 (D.C. Cir. 2009), but I did not dismiss the entire case because

ACLU - Hamdan-589

petitioners advanced the alternative argument that 28 U.S.C. § 1331 gave me jurisdiction over Hamdan's claim of a constitutional violation and that the All Writs Act, 28 U.S.C. § 1651, provided an avenue to grant relief on that claim.   I invited supplemental briefing on that argument.

The "state-created danger" claim goes like this: (1) the United States government caused Hamdan's arbitrary detention and torture by requesting that the UAE detain him, but (2) Hamdan had a substantive due process right to protection by the American government from known, or likely abuse by UAE security officials, so that (3) by requesting Hamdan's detention, the United States government heightened the risk of danger and violated Hamdan's substantive due process right.   *See Butera v. District of Columbia*, 235 F.3d 637, 651 (D.C. Cir. 2001) (an individual can assert a substantive due process claim against egregious conduct by District of Columbia officials who "affirmatively act to increase or create the danger" which causes the individual's harm).   The due process claim, petitioners argue, gives rise to 28 U.S.C. § 1331 federal question jurisdiction, and the All Writs Act, 28 U.S.C. § 1651, allows for any appropriate relief.

The Due Process clause provides no general right to affirmative government aid or protection, however.   The "state-created danger" or "state endangerment" concept is an exception

- 2 -

to that rule, developed in a § 1983 case involving state actors, *see Butera*, 235 F.3d at 647.  A "state endangerment" claim against the federal government has never been recognized, and the concept has been rejected by at least one judge of this Court. *See Sadowski v. Bush*, 293 F. Supp. 2d 15, 18 n.1 (D.D.C. 2003).

The assertion of 28 U.S.C. § 1331 jurisdiction fares no better.  Petitioners concede that the All Writs Act does not provide an independent ground for jurisdiction, but only allows for relief that may be "necessary or appropriate *in aid of*" the court's jurisdiction.  28 U.S.C. § 1641(a) (emphasis added). Thus, even if habeas corpus is a "civil action" for purposes of § 1331 (a proposition for which petitioners cite no case support), the dismissal of the habeas petition here leaves nothing in the "Constitution, laws or treaties of the United States" for petitioners' claim to "arise under."

Petitioners' allegations of abuse and worse at the hands of UAE security officials may well merit further political and public inquiry, but there is no basis on this record for further action by this Court.

An appropriate order accompanies this memorandum.


                              JAMES ROBERTSON
                         United States District Judge


                           - 3 -

ACLU - Hamdan-591

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

MONA MALLOUK, *et al.*,          :
                                 :     ALL INFORMATION CONTAINED
          Petitioners,           :     HEREIN IS UNCLASSIFIED
                                 :     DATE 03-14-2011 BY 65179/DMH/BAW/STP/bls
     v.                          :     Civil Action No. 08-2003 (JR)
                                 :
GEORGE W. BUSH, *et al.*,         :
                                 :
          Respondents.           :

<u>**ORDER**</u>

For the reasons set forth in the accompanying memorandum, and the petition for habeas corpus having been dismissed, this case is **dismissed.**

                         JAMES ROBERTSON
                    United States District Judge

ACLU - Hamdan-592