# EXHIBIT 3

Case 2:10-cv-06149-DSF-JEM   Document 42-5   Filed 10/12/11   Page 2 of 92   Page ID
Case 2:10-cv-06149-JHN -JEM   Document 29-2179   Filed 08/10/11   Page 2 of 75   Page ID
#:978



~~SECRET~~

# FEDERAL BUREAU OF INVESTIGATION

Precedence: ROUTINE                              Date: 05/04/1998

To:   Los Angeles

From: Los Angeles                                                    b6 -2
      NSD-5                                                          b7C -2
      Contact:  Detective [                    ]

Approved By: [                    ]                 b6 -1,2
                                                    b7C -1,2

Drafted By: [                    ] kan 𝓴𝓪𝓶

Case ID #: [                                        ]

(U)  [                                        ]      b7E -1

      (S)   199M-LA-165731   (Closed)   b7E -1

(U) ···· Title: [X] [                    ]           b6 -3
                    IT-OTHER (EGYPT)                 b7C -3
                    OO: LOS ANGELES

(U) ···· Synopsis: [X]  Asset reporting.

(U) ················[X]  Classified By:  8362, NSD-5/Los Angeles
                         Reason:        1.5e
                         Declassify On:  X1                b2
      (U) [                                        ]        b7E -3

(S)  Details: [X]  On 4/29/98, [              ] contact with whom has     b1
     been insufficient to determine reliability but who is believed to
     be in a position to know, provided the following information.

(U) ··················[X]
     [                                                                ]   b7D -2
     [                                                                ]
     [                                                                ]

~~SECRET~~

DATE: 11-17-2010                    ALL INFORMATION CONTAINED
CLASSIFIED BY 65179/DMH/lRP/bls     HEREIN IS UNCLASSIFIED EXCEPT      b7E -1
REASON: 1.4 (c)                     WHERE SHOWN OTHERWISE
DECLASSIFY ON: 11-17-2035

199M-LA-165731-42

FBI-ACLU-1

Case 2:10-cv-06149-DSF-JEM   Document 42-5   Filed 10/12/11   Page 3 of 92   Page ID
Case 2:10-cv-06149-JHN-JEM   Document 28-2780  Filed 08/10/11   Page 3 of 75   Page ID
#:979

~~SECRET~~

(U)  To:  Los Angeles  From:  Los Angeles          b7E -1
Re:                              05/04/1998

which was funded by     b6 -5
the school.  The school would give either $300 or $400 per month     b7C -5
which was used to fund the mosque activities.  Asset, a     b7D -2
did not know subject in            Asset stated that one
(NFI)                                knew
subject from                        left the United States in
1992, but believes he has a          currently living in

(U)

b7D -2

In his opinion, asset felt
subject's personal traits were inconsistent with an
Asset's opinion was based primarily on subject's
tendency to
On the other hand, subject would

In late            was living near t b6 -3,5
intersection of            Subject was  b7C -3,5
living with                                 b7D -2

(S)

b1

(U)

b6 -3
b7C -3
b7D -2

~~SECRET~~

2

FBI-ACLU-2

Case 2:10-cv-06149-DSF-JEM   Document 42-5   Filed 10/12/11   Page 4 of 92   Page ID
Case 2:10-cv-06149-JHN -JEM   Document 28-27 81 Filed 08/10/11   Page 4 of 75   Page ID
#:980

(U)  To:  Los Angeles  From:  Los Angeles
Re:  ☒                        05/04/1998          b7E -1

b7D -2

(U)          ☒ Asset stated that an ABDALLAH AZZAM (NFI) came to
the United States to promote the war in Afghanistan.  AZZAM, a
_____ would show photographs and videos while soliciting
donations for the Jihad in Afghanistan.  AZZAM was a dynamic   b6 -4,5
speaker, very much like_____.  Asset believe b7C -4,5
that AZZAM's influence is what prompted subject to go to      b7D -2
Afghanistan._____HOSSAM HEMDAN
_____and a_____
_____(NFI) went_____to Afghanistan.  AZZAM set up
avenues, bank accounts, etc., in assisting those persons who
wanted to leave the United States to fight in Afghanistan.  It is
unknown if AZZAM is associated with the organization in New York
that was mentioned previously.  Asset stated that AZZAM and two
children were killed by a car bomb in either 1992 or 1993.  The
Pakistanian government, in a conspiracy with the CIA, were
believed responsible.

(U)          ☒ Upon his return to the United States, subject told
asset that he wanted to_____

b7D -2

(U)          ☒ While living at the_____
subject heard that_____and
would visit the_____  Subject wanted to get
_____                                        b6 -3,5
_____Subject was asking for help but nobody woul b7C -3,5
help him.  Even though subject was around a lot of people, not b7D -2
many liked him.  Subject told asset that he had_____

Secret

3

FBI-ACLU-3

Case 2:10-cv-06149-DSF-JEM   Document 42-5   Filed 10/12/11   Page 5 of 92   Page ID
Case 2:10-cv-06149-JHN -JEM   Document 29-2782 Filed 08/10/11   Page 5 of 75   Page ID
#:981

(U)   To: Los Angeles  From: Los Angeles  b7E -1
      Re:                                05/04/1998

                                                                        b7D -2

(U)

                                     NAJI HAMDAN (199M-LA-165731,       b2
                                                                       b6 -3,5
closed) had belonged to AL TAWHEED, a support mechanism for            b7C -3,5
HIZBALLAH.                                                             b7D -2
                                                                       b7E -1

                          Additional influence by              NAJI
HAMDAN and

(U)          In 1991 and 1992, subject became involved in      b7D -2

                                        After late 1994, asset had
no further contact with subject.

(U)          Asset was asked to explain what he/she knew about
the founding of the Islamic Center of Hawthorne and any roll
played by HAMAS.  Asset stated that the North American Islamic
Trust (NAIT) is the organization handling the money for
establishing new mosques in America.  Any money donated for that
cause will go to NAIT who then dispenses it as needed.  Asset       b6 -5
identified a photograph of              indicating he knew him.     b7C -5
(Note: It has been reported that          is the          of       b7D -2
                   Asset became somewhat defensive about
           stating that           has no intention of doing violent
acts in America against Americans, that his interest is in the
Middle East.

(U)          Asset identified a photograph as being MOHAMMAD
ZAKY.  Asset stated that he knew ZAKY and that he had died in
Bosnia.  ZAKY was active in the Afghan War and believes he would
be involved in violence here.

                              SECRET

                                4

Case 2:10-cv-06149-DSF-JEM   Document 42-5   Filed 10/12/11   Page 6 of 92   Page ID
Case 2:10-cv-06149-JHN-JEM   Document 29-2783 Filed 08/10/11   Page 6 of 75   Page ID
#:982

(major unknown ), ░░░░░░ came to the United States in early 1990
and asset believes him to now have a green card.  Asset states
that BAKIR is no involved in his work that he has no interest in
political activities.  He has been asked to help in the past but
refused. ░░░░░ who attends a mosque in the El Toro area, might
give donations to certain causes but doesn't believe his
involvement would go beyond that.

**

SE~~CR~~ET

To:   Los Angeles  From:  Los Angeles
Re:   ░░░░░░░░░░░  05/04/1998     b7E -1

(U)        Asset identified a photograph as being
SHOHAYEB.  Asset stated that SHOHAYEB was a doctor who had a
clinic in Culver City.  SHOHAYEB came to America ░░░░░░░ in
the 1980's and associates primarily with Egyptians.  Asset
doesn't believe ░░░░░ belongs to an organization.  Asset
believes ░░░░░ is not very proficient in his work and has been
told ░░░░.

(U)        Asset identified a photograph as being ESSA OMARY
(dob 1/2/52).  Asset stated that ░░░░░░░░░░░░░░░░░░
subject.  OMARY went to Northrup University and attended the El
Huda Mosque with subject.  Asset believes OMARY to talk about
violence but would not do it.  (Note: During the arrest of subject
in ░░░░░░ stood in front of the apartment building
intently watching the search of subject's residence and vehicle.
Later that same day, ░░░░░ transported subject's ░░░░ downtown to
visit subject in jail.)

(U)        Asset identified a photograph as being ░░░░░░
HANI.  Asset stated that BANI HANI was close to subject and went
to Afghanistan with him.  Asset stated that if there is an
underground organization or if something was planned, ░░░░░░░░
would be involved.

(U)        Asset identified a photograph as being GHASSAN
░░░░░░░░░░░.  Asset stated that ░░░░░░░░░░░░░░░░░░░░░░

(U)        Asset identified a photograph as being ░░░░░░
░░░░░░░.  Asset stated that ░░░░░░░░░░░░░░░░░░░░░░░░
ALI SOUSSI, NAJI HAMDAN and HOSSAM HAMDAN have a used auto parts
business in Los Angeles.  They receive shipments of damaged cars
from Japan then sell off the parts.  The current telephone number
for this business is (213) 357-9999.

(U)        Asset stated that ░░░░░░░░░░░ (199N-LA-169451
pending) is currently living at ░░░░░░░░░░░░░░░░░░░░░░░
BAKIR is employed at Nichols Laboratory in Orange County.  Asset
is unsure of the exact location but believes it is approximately
20 miles south of Mission Viejo.  BAKIR works on the machinery
within the laboratory where he averages 60 hours per week.  Asset
stated BAKIR obtained a California Board license in the medical

SE~~CR~~ET

5                    **FBI-ACLU-5**

# EXHIBIT
# 4

Case 2:10-cv-06149-DSF-JEM Document 42-5 Filed 10/12/11 Page 8 of 92 Page ID
Case 2:10-cv-06149-JHN-JEM Document 29-2185 Filed 08/10/11 Page 21 of 75 Page ID
#:997

(01/26/1998)



~~SECRET~~

## FEDERAL BUREAU OF INVESTIGATION

**Precedence:** PRIORITY                    **Date:** 12/24/1999

To: Los Angeles

From: Los Angeles                          DECLASSIFIED BY 65179/DMH/LRP/bls
      LBRA Squad 4                       ON 11-17-2010
      Contact: [          ]

(U) **Approved By:** [                    ]       b6 -1
                                                  b7C -1

(U) **Drafted By:** [          ]

(U) **Case ID #:** (X)( 199M-LA-165731 ) (Pending)

(U) **Title:** (X) NAJI JAWADI HEMDAN
      IT - Other

(U) **Synopsis:** (X) Surveillance of 12705 Ramona Street #J,
Hawthorne, California.

(U) (X) Derived From: G-1                          b6 -2
    Declassify On: X-1                          b7C -2

(U) **Details:** (X) [          ] is a Detective with the Long Beach
Police Department and is assigned to the Long Beach component of
the Federal Bureau of Investigation (FBI) Metropolitan Violent
Crimes Task Force.

(U) (X) On 12/24/1999 at approximately 12:15 p.m.         b6 -1,2
Detective (Det.) [     ] and Special Agent (SA) [      ]   b7C -1,2
conducted a physical surveillance at 12705 Ramona Street,
Apartment #J, Hawthorne, California to determine if Hemdan
resided at the location.

(U) (X) SA [     ] and Det. [     ] observed the mail box   b6 -1,2
marked with the letter "J" to have the name Naji Hamdan affixed   b7C -1,2
to the box.

(U) (X) While walking past the apartment labeled "J", SA
[     ] and Det. [     ] observed the windows to be open and heard   b6 -1,2
voices and a television set on.                           b7C -1,2

(U) (X) During a search of the underground garage SA [     ]
and Detective [     ] observed a wooden box affixed to the wall.

~~SECRET~~

~~SECRET~~

[          ]   b7E -1

Case 2:10-cv-06149-DSF-JEM   Document 42-5   Filed 10/12/11   Page 9 of 92   Page ID
Case 2:10-cv-06149-JHN -JEM   Document 29-2/86 Filed 08/10/11   Page 22 of 75   Page ID
#:998

SECRET

(U)   To:   Los Angeles   From:   Los Angeles
Re:   (X   199M-LA-165731,  12/24/1999

with the letter "J" marked on the front and was locked with a
padlock.  No other markings were on the box.  No vehicles known
to belong to Hamden were located in the garage or parked on the
street in front of the apartment complex.  The surveillance was
concluded at that point.



SECRET

2

FBI-ACLU-26

# EXHIBIT
# 5

Case 2:10-cv-06149-DSF-JEM   Document 42-5   Filed 10/12/11   Page 11 of 92   Page ID
Case 2:10-cv-06149-JHN -JEM   Document 292288   Filed 08/10/11   Page 32 of 75   Page ID
#: 1083

(12/31/1995)

SECRET/ORCON/NOFORN

# FEDERAL BUREAU OF INVESTIGATION

Precedence: Immediate

Date: 12/30/1999

To: Counterterrorism

Attn:
    b2
    b7E -2
UC
SSA
SSA
    b6 -1
    b7C -1

New York

Seattle

From: Los Angeles
    LBRA, Squad 4
    Contact: SA
    b2 -1
    b6 -1
    b7C -1

Approved By:
    b6 -1
    b7C -1

Drafted By:

(U)

    (U)
    (U)

(U)
    b7E -1

(U) Title: (S)   USAMA BIN LADEN
    AOT-IT
    OO: NY

(U) (S)   USAMA BIN LADEN
    IT-UBL/AL-QAEDA
    OO: NY

(U) (S)
    AOT-IT
    OO: SE
    b6 -3
    b7C -3

(U) (S)
    IT-Other (Egypt)
    OO: Los Angeles
    b2
    b7E -1

SECRET/ORCON/NOFORN

FBI-ACLU-111

Case 2:10-cv-06149-DSF-JEM Document 42-5 Filed 10/12/11 Page 12 of 92 Page ID
Case 2:10-cv-06149-JHN -JEM Document 29-2 Filed 08/10/11 Page 33 of 75 Page ID
#:1084
#:2289

SECRET/ORCON/NOFORN

To: Counterterrorism From: Los Angeles
(U) Re: [X] [                    ] 12/30/1999                    b7E -1

(U) Synopsis: [X] Lead covered regarding interview of subjects in an
effort to counter Usama Bin Laden related threats to the United
States' interests during the weeks surrounding the Millennial
celebrations.

(U) [X] Derived From : S-3
Declassify On: X-1

(U) Details: [X] HOSSAM J. HEMDAN's, [                              ]
[                    ] was contacted on 12/30/1999 at approximately 5:45 am
by Special Agents [                                              ] of
the Long Beach RA Squad 4. [         ] advised that [          ] was at a
Mosque and will return in approximately 1 hour. The agents
observered HEMDAN returning to the residence at approximately    b6 -1,5
6:10 am driving a black 1991 Acura bearing California license    b7C -1,5
plate IBLVNJC, registered to [                              ]  b7E -1
Angeles, California. Also observed on the driveway was a blue    Los
Chevrolet Lumina, CA plate 3EWN897 registered to HEMDAN. HEMDAN
and [      ] were advised of the identity of the interviewing agents
and the nature of the interview, and provided the following
information.

(U) [X] HEMDAN resides at 3908 111th Street, Inglewood,
California telephone number (310) 673-7705. He is the owner of
Budget Auto Repair, located on Prairie Ave between 131st and
132nd Street, Inglewood, California, telephone number (310) 675-
5653.

(U) [X] HEMDAN stated he was returning from the Islamic
Center of Hawthorne. After some questioning about the Mosque,
[      ] stated they were not Shiite Muslims but were Sunni. HEMDAN
also added that he has not gone to the Mosque for a long time  b6 -5
because of work but was starting to go again. HEMDAN advised  b7C -5
that the Mosque does do fund raising to support Hamas.

SECRET/ORCON/NOFORN

2

Case 2:10-cv-06149-DSF-JEM  Document 42-5  Filed 10/12/11  Page 13 of 92  Page ID
Case 2:10-cv-06149-JHN -JEM  Document 29-20  Filed 08/10/11  Page 34 of 75  Page ID
#:1085

SECRET/ORCON/NOFORN

To: Counterterrorism  From: Los Angeles
(U) Re: [        ]                12/30/1999                          b7E -1

(U) ────────────(S) HEMDAN advised he was arrested for credit card
fraud and stated that the arrest should be expunged from his
records.  HEMDAN stated his role in the credit card fraud was
very limited. HEMDAN stated his associates in this fraud were
[                                        ]. HEMDAN currently has no
contact with [                ] and advised that he may have been         b6 -5
deported.  HEMDAN stated he has occasional contact with [        ]        b7C -5
while playing soccer on a team in Torrance, California.

(U) ────────────(S) HEMDAN described [            ] as a very bad man who
always expressed terrorist ideas. [            ] has brought guns to
the Mosque and has shown others how to shoot guns.  HEMDAN             b6 -5
admitted to weapons training with others from the Mosque             b7C -5
including [        ].  HEMDAN stated the training was conducted
at a public range somewhere east on the I-10 freeway in
California.  The training consisted of weapons familiarity and
safety.

(U) ────────────(S) When questioned about travel to Bosnia, HEMDAN
paused and stammered and asked if he was to tell the truth.
HEMDAN admitted he traveled to Bosnia in 1993 with a Imam named
[            ] (LNU), from the old Inglewood Mosque (now the Hawthorne   b6 -5
Mosque), for approximately 1 - 1.5 months to observe the ongoing       b7C -5
events in that area.  HEMDAN denied he fought with the Muslim
Mujahedeem or did any type of fighting.

(U) ────────────(S) HEMDAN advised he has no past or present knowledge
of any terrorist activities.

(U) ────────────(S) HEMDAN asked why he was selected to be
interviewed.  The interviewing agents told him that many others
were being interviewed and it could possibly be from his
association with [            ].

(U) ────────────(S) HEMDAN and [    ] stated they were going to be home    b6 -5
on New Year's Eve with their three children.  [    ] stated they         b7C -5
live an isolated life and do not associate with others from the
Mosque.  Without any solicitation from the interviewing agents

SECRET/ORCON/NOFORN

3

FBI-ACLU-113

Case 2:10-cv-06149-DSF-JEM  Document 42-5  Filed 10/12/11  Page 14 of 92  Page ID
Case 2:10-cv-06149-JHN -JEM  Document 29-21  Filed 08/10/11  Page 35 of 75  Page ID
#:1086

SECRET/ORCON/NOFORN

To: Counterterrorism  From:  Los Angeles
(D)——————Re:———[S][              ] 12/30/1999          b7E -1

HEMDAN stated he would cooperate with the Federal Bureau of        b6 -5
Investigation by wearing a wire into the Mosque in Hawthorne.      b7C -5
[        ] added that the tape recordings would be boring to listen to.
HEMDAN added that he would help in any way to prevent any trouble
for the New Year.

SECRET/ORCON/NOFORN

4

FBI-ACLU-114

# EXHIBIT
# 6

Case 2:10-cv-06149-DSF-JEM   Document 42-5   Filed 10/12/11   Page 16 of 92   Page ID
Case 2:10-cv-06149-JHN -JEM  Document 29-2793 Filed 08/10/11  Page 28 of 75  Page ID
#:1004

DECLASSIFIED BY 65179/DMH/lRP/bls
ON 11-19-2010



U.S. Department of Justice

Federal Bureau of Investigation

In Reply, Please Refer to
File No.

11000 Wilshire Boulevard #1700
Los Angeles, CA  90024

March 22, 2000



(U) ————————————— (S  NAJI J. HAMDAN,

IT - OTHER(EGYPT)

OO:  Los Angeles

b2
b7E -3

(U) [                                                    ]

(U).  This communication is classified SECRET in its
entirety unless otherwise marked.

<u>Identity of Subject</u>:

| | |
|---|---|
| Name: | NAJI JAWDAT HAMDAN |
| Alias: | Nagi Jamal Hemdan |
| Sex: | Male |
| Race: | White |
| DOB: | 05/26/1966 |
| POB: | Lebanon |
| SSAN: | 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 |
| Height: | 5'07" |
| Weight: | 172 lbs. |
| Hair: | Brown |
| Eyes: | Brown |
| Driver's Lic.: | CA - C6017864 |
| Marital Status: | Married |
| Address | 12705 Ramona Street, Apt. J |
| | Hawthorne, California |
| Business: | HondAcura Palace Inc. |
| | 1800 E. 55th Street |
| | Los Angeles, California, 90058 |

<u>Basis for Investigation</u>:  (S)  This investigation was predicated
upon information that the subject [                    ]
                              HOSAM HEMDAN,
                                        arrested on
February 18, 1993 by Los Angeles Police Department on charges of
credit card fraud.

b2
b6 -3
b7C -3
b7E -3

1

SECRET

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to
your agency; it and its contents are not to be distributed outside your agency.
b7E -1

Case 2:10-cv-06149-DSF-JEM   Document 42-5   Filed 10/12/11   Page 17 of 92   Page ID
Case 2:10-cv-06149-JHN-JEM   Document 29-2794   Filed 08/10/11   Page 29 of 75   Page ID
#:1005



NAJI JAWDAT HAMDAN

(U)            The captioned subject was the person paying rent                    b6 -5
for Unit #212 at 733 Hindry Ave., Inglewood California. This                       b7C -5
unit was designated as "El Huda Mosque" which in turn was visited
and used as a departure point for _____ during
his visit to Los Angeles in _____

(U)    On _____                                                                 b2
_____ The investigation was                            b6 -3,5
authorized based on information that _____ was a member of A                b7C -3,5
Gama Al-Islamiyyah (IG), a violent Islamic fundamentalist group                    b7E -3
which was responsible for the assassination of the Egyptian
president ANWAR SADAT, the WORLD TRADE CENTER bombing in New York
City in 1993. Prior to _____ arrest, he remained in contact
with _____ and other known members of the IG in
the Sudan, Jordan and the United States.

(U)                                                                                b2
_____ The investigation was                        b6 -3
authorized based on information that _____ was a member of                  b7C -3
the IG in Los Angeles.                                                             b7E -3

(U)    _____ HOSSAM HEMDAN.  HOSSAM, the brother of the
captioned subject, was one of the close circle of followers who
met with _____ during his visits to Los Angeles
in _____

(U)    _____                                                    b2
captioned subject on _____ and _____                                 b7E -3
_____ and closed on September
24, 1997.

(U)    On December 14, 1999, _____ aka _____                                 b2
_____ an Algerian national, attempted to enter the United States               b6 -3
via _____ The subject                                                  b7C -3
was ultimately questioned by U.S. Customs officials and his                        b7E -3
vehicle searched.  During the search, Customs officials
discovered explosive materials consisting of a white, powder-type
substance which was later determined to be urea sulfate and
nitroglycerine, as well as fusing components. _____ is
currently in custody.

(U)    _____ According to investigation conducted thus far,
_____ is believed to be linked to a terrorist cell identified as              b6 -3
the ALGERIAN ARMED ISLAMIC GROUP (GIA.) The GIA is suspected of                    b7C -3
having conducted numerous bombings in Algeria, as well as a
series of bombings of the Paris subway system in 1995 and

2

SECRET

FBI-ACLU-33

Case 2:10-cv-06149-DSF-JEM  Document 42-5  Filed 10/12/11  Page 18 of 92  Page ID
Case 2:10-cv-06149-JHN -JEM  Document 29-2795 Filed 08/10/11  Page 30 of 75  Page ID
#:1006

### NAJI JAWDAT HAMDAN

possibly 1996. Additionally, intelligence indicates that GIA
extremists have undergone terrorist training in Pakistan
sponsored by UBL's Islamic Army.

(U)

According to intelligence received from Legat
Ottawa, [          ] was working with an accomplice. During searches
of [                    ] a map of Los Angeles was found.
In [          ] rental vehicle where the explosive components were
found, also found were maps and tourist guides to Washington,
Oregon and California. A possible accomplice was identified as
[          ] aka [          ] who is the

b6 -3,5
b7C -3,5
b7E -3

The names, addresses and telephone numbers were found in [          ]
address book in June, 1996 and are believed to have some contact
in Long Beach R.A. territory.

(U)
The reopening of this investigation on December
22, 1999, was to try to determine if the captioned subject is
engaged in any terrorist activities stemming from the recent
events on [          ]

(U)
Investigation to Date: On December 23, 1999, a check with the
California Department of Motor Vehicles (DMV), showed that HAMDAN
lives at 12705 Ramona Street, Apt. J, Hawthorne, California,
90250, and owns a 1987 Nissan pickup truck, California license
5M14526.

(U)
On December 24, 1999, a physical surveillance of
12705 Ramona Street, Hawthorne, California, was conducted. A
mailbox at this address with the letter "J" was observed with the
name NAJI HAMDAN affixed to the box.

(U)
Checks conducted by Savannah Information
Technology Center (SITC) showed that HAMDAN has a valid Social
Security Number, 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, issued in California in 1985. No
bankruptcy, judgment or lien records were located for HAMDAN. A
record was located that showed HAMDAN as the President of
Hondacura Palace, Inc. Three border crossing records were
located for HAMDAN with the most recent being November, 27 1999.

(U)
(S) On December 30, 1999, NAJI JAWADI HAMDAN, aka NAJI
JAWADI HEMDAN, born 05/26/1966, in Lebanon, address 12705 Ramona
Street, Apt. J, Hawthorne, California, was interviewed at his
residence by FBI and U.S. Custom Service Special Agents (SAs).
After being advised of the identity of the interviewing agents
and the nature of the interview, he provided the following
information:

3


SECRET

FBI-ACLU-34

Case 2:10-cv-06149-DSF-JEM   Document 42-5   Filed 10/12/11   Page 19 of 92   Page ID
Case 2:10-cv-06149-JHN-JEM   Document 29-2106 Filed 08/10/11   Page 31 of 75   Page ID
#:1007

NAJI JAWDAT HAMDAN ~~SECRET~~

(U)

(X)    HAMDAN advised that he was born in Lebanon and
came to the U.S. in 1985.  HAMDAN said that he went to school in
the U.S. and had previously worked at Northrop.  HAMDAN stated
that he currently owns his own business selling new and used
Honda and Accura parts.  A business card handed to the agents
shows that his business is HondAcura Palace Inc., 1800 E. 55th
Street, Los Angeles, California, 90058, telephone number 323-357-
9999, FAX number 323-357-0406, e-mail addresses
info@hondacura.com and naji@mainnet.net, web site
http://www.hondacura.com.

(U)

(X)    HAMDAN advised that he has never met USAMA BIN
LADEN and does not know anyone who knows USAMA BIN LADEN.  HAMDAN
also stated that he was unaware of anyone, either in the United
States or overseas, that had plans of disrupting the Millennium
or committing terrorist acts.  HAMDAN indicated that he is only
aware of the name, USAMA BIN LADEN, and any disruption of the
Millennium from what he has seen on television.  HAMDAN said that
he attends the Islamic Center of Hawthorne which he indicated is
a family oriented mosque.

(U)

(X)    There was no information obtained in this
investigation that indicated that HAMDAN was involved with the
events that took place on December 14, 1999.  Therefore, Los
Angeles is closing this investigation.  Should any information be
discovered that shows that captioned subject has been engaging in
terrorist activities, Los Angeles will review the information and
determine if this case should be reopened.

4
~~SECRET~~



FBI-ACLU-35

# EXHIBIT
# 7

Case 2:10-cv-06149-DSF-JEM  Document 42-5  Filed 10/12/11  Page 21 of 92  Page ID
Case 2:10-cv-06149-JHN -JEM  Document 29-2798 Filed 08/10/11  Page 32 of 75  Page ID
#:1008

SECRET

FEDERAL ▓▓▓▓▓▓ INVESTIGATION

Precedence:  ROUTINE                                    Date:  03/22/2000

To:  National Security        Attn:  NS-3C

From:  Los Angeles                       DECLASSIFIED BY 65179/DMH/LRP/bls
       Long Beach/Squad 4                ON 11-17-2010
       Contact:  SA                                                      b2 -1
                                                                         b6 -1
Approved By                              b6 -1                           b7C -1
                                    and  b7C -1
(U)  Drafted By:                    :afg

     Case ID #:   X    199M-LA-165731  (Closed)
(U)
     Title:  X    NAJI J. HAMDAN;
                  IT - OTHER (EGYPT)

(U)  Synopsis:  X  Close case.  Closing LHM for National Security on
     captioned subject.
(U)
        X  Derived From : G-3
           Declassify On: X-1

     (U)                                                                  b2
(U)                                                                       b7E -3
     Enclosures:  X  For National Security, five (5) copies of
     closing LHM for review.

(U)  Details:  X  Enclosed for National Security are five copies of
     the closing LHM for review.

     ••

SECRET

                                                                         b7E -1

SECRET

FBI-ACLU-36        FROM LA 165731-A8

# EXHIBIT
# 8

Case 2:10-cv-06149-DSF-JEM   Document 42-5   Filed 10/12/11   Page 23 of 92   Page ID
Case 2:10-cv-06149-JHN -JEM   Document 29-30   Filed 08/10/11   Page 30 of 75   Page ID
#:1081

(Rev. 10-01-1999)

~~SECRET~~

## FEDERAL BUREAU OF INVESTIGATION

Precedence:   ROUTINE                              Date:   10/08/2001

To:   Los Angeles

From:  Los Angeles
         NSD-5/JTTF
         Contact: _____        b2 -1
                                                     b6 -1
Approved By: _____                 b7C -1
                                      b6 -1
Drafted By: _____ sml     b7C -1

(S) _____
                                                     b1
                                                     b7E -1
(S) ~~Title:~~ ~~(S)~~ _____        b1
         OO: LA

(U) ~~Synopsis:~~ ~~(S)~~ Interview of Hossam J. HEMDAN.

   (U) ~~(S)~~       Classified By: 5973, NSD-5/LA
                     Reason      : 1.5(c)
                     Declassify On:  X1

Administrative:  (U)  Attached is a copy of the e-mail given to the
FBI.

Details: ~~(S)~~                                      b1
(S) _____               b6 -1
                                                     b7C -1
_____ by writer and SA_____
_____ at his place of business, Redondo Smog Check.

(U) ~~(S)~~   HEMDAN had no information concerning Usama Bin
Laden and did not know of anyone who might be planning any
terrorist acts or engaging in any radical fundamentalist
activity.  HEMDAN advised he had not visited or fought in
Afghanistan during the 1980s or at any other time.  When asked if
he had ever fought in Beirut, Lebanon (the place of his birth) he
stated that he was young, sixteen or eighteen years old (Note:
HEMDAN would not elaborate and the interviewing agents believe
HEMDAN's response and body language implied he may have fought in

~~SECRET~~

FBI-ACLU-109

Case 2:10-cv-06149-DSF-JEM Document 42-5 Filed 10/12/11 Page 24 of 92 Page ID
Case 2:10-cv-06149-JHN -JEM Document 29228 1 Filed 08/10/11 Page 31 of 75 Page ID
#:1082

SECRET

(S) — To: Los Angeles  From: Los Angeles
Re: ☒ _____ 10/08/2001

b1

Lebanon in the 1980s and was trying to explain it as youthful indiscretion).

(U) ☒ HEMDAN did mention the names of _____
and _____ as possible people to watch. HEMDAN referred
to _____ as being a crazy person. _____ was arrested   b6 -5
and deported several years ago. HEMDAN did not know the                        b7C -5
whereabouts of _____.

(U) ☒ HEMDAN was friendly and understood why the FBI
wanted to talk to him. He offered to talk to the FBI again if
any more questions arose or if the FBI wanted any clarification
on Islamic/Muslim customs. HEMDAN is a U.S. citizen, married and
has four children. He works Monday-Saturday, 8am-5pm.

Descriptive Data (U):

| | |
|---|---|
| Last Name: | HEMDAN |
| First Name: | Hossam |
| Middle Initial: | J |
| A.K.A. | Sammy Hemdan |
| DOB: | 04/04/1970 |
| POB: | Beirut, Lebanon |
| Citizenship: | U.S., 09/14/00 |
| SSN#: | 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 |
| CDL#: | A5174762 |
| FBI#: | 955201TA8 |
| CII#: | A10330533 |
| Height: | 5'8" |
| Weight: | 200 lbs. |
| Hair: | Brown |
| Eyes: | Brown |
| Home Address: | 3908 W. 111th St. |
| | Inglewood, CA, 90303 |
| Home Telephone: | 310-673-7705 |
| Cell Telephone: | 213-944-4491 |
| Business: | Redondo Smog Check |
| | (co-located with |
| | Hawthorne Muffler) |
| Business Address: | 13737 S. Hawthorne Blvd., |
| | Hawthorne, CA, 90250 |
| Business Telephone: | 310-644-9099. |

◆◆

SECRET

2

FBI-ACLU-110

# EXHIBIT
# 9

## UNCLASSIFIED

# RELEASE TO CERTAIN PARTIES G 5

| | |
|---|---|
| **From:** | Tadros, Christine F. |
| **To:** | Cooper, Sean |
| **Subject:** | RE: Arrested AmcIt |
| **Date:** | Friday, October 03, 2008 7:27:17 PM |

Sean,

Can you please give me any updates you have on this case? ACLU now calling with inquiries.  Please let me know when consular access is granted and who he lists on his PAW.

Thanks!

**Christine F. Tadros**
CA/OCS/ACS/NESCA
Telephone: 202.736.4995

**From:** Cooper, Sean
**Sent:** Thursday, October 02, 2008 6:02 AM
**To:** Tadros, Christine F
**Subject:** RE: Arrested AmcIt

Christine:

Post is aware of Mr. Hamdan's arrest. We, with assistance from our Legatt office, believe we will finally have consular access in the next week or ten days. Mr. Hamdan is currently being held by state security forces. (Thus the great difficulty in gaining access.) Charges are unknown.

We initially received a call from Ms. Hamdan on August 28 to our Dubai duty officer. She reported her husband's arrest, and mentioned that she was likely to be leaving the country (at the time she reported that she was in the UAE) as her visa was expiring.

We were quickly able to confirm Mr. Hamdan's detention, and were also able to pass information regarding his chronic medical conditions and medications (according to his wife, high blood pressure and "kidney medication.") Through our legal attaché office, we were able to confirm that state security is aware of Mr. Hamdan's conditions and is making sure he gets his regular medications.

We have been in touch with Ms. Hamdan on at least two subsequent occasions, and were able to pass the information about his reported well being and that he was receiving his medications. We have worked consistently, both directly with the host government and – more effectively – through other Embassy offices, to gain consular access to Mr. Hamdan. As mentioned above, we now have been informed that such access is forthcoming and will visit him at the earliest opportunity.

We're, of course, closed for the Eid holiday here, but I will attempt to call you today (Thursday) to discuss this case.

Sean

**From:** Tadros, Christine F
**Sent:** Tuesday, September 30, 2008 8:58 PM

UNITED STATES DEPARTMENT OF STATE
REVIEW AUTHORITY: FRANK TUMMINIA
DATE/CASE ID: 15 APR 2011  201000711

## UNCLASSIFIED

DOS 001730

# UNCLASSIFIED

**To:** Mutair, Saeed ; Cooper, Sean; Niazi, Sadia
**Subject:** Arrested Amcit

Got a call from a representative from CAIR, inquiring on behalf of the wife of an arrested Amcit, Naji HAMDAN. His case is already in ACS+ - looks like Beirut entered it. The wife was in Lebanon at the time of his arrest. Per CAIR, Mr. Hamdan has been working in the Emirates, and on or around August 31st – September 1st, security forces came into his home and he was taken away.

Can post reach out to the wife please?
Wife: Muna Hamdan
Phone: 011 961 702 33527

Any additional information on this case would be helpful for me too. Was there a consular visit made? Have we requested consular access? What is the background of the case? The notes in ACS+ are sparse.

Affad Sheikh – CAIR contact
714.776.1847


Thanks!

Christine


Christine F. Tadros
Office of Overseas Citizens Services
CA/OCS/ACS/NESCA
Phone: (202) 736-4995
Fax: (202) 647-3732
tadroscf@state.gov
This message is UNCLASSIFIED based on the definitions provided in E.O. 12958.

# UNCLASSIFIED

DOS 001731

# EXHIBIT
# 10

**E21**

UNCLASSIFIED

CLASSIFICATION: UNCLASSIFIED
SENSITIVITY: Non Sensitive
Page 1 of 5

# RELEASE TO CERTAIN PARTIES

| From: | svcSMARTMFI |
|---|---|
| Sent: | 12/4/2008 5:05:56 AM |
| To: | svcSMARTHBTSPOP5 |
| Subject: | Update: ARREST CASE OF NAJI HAMDAN - Allegations of Mistreatment |
| Attachments: | Metadata.dat |

**UNCLASSIFIED**



| MRN: | 08 ABU DHABI 1383 |
|---|---|
| Released (DTG): | Dec 04, 2008 / 1005Z (040948Z DEC 08) |
| From: | AMEMBASSY ABU DHABI |
| Action: | SECSTATE WASHDC,*ROUTINE* |
| E.O.: | 12958 |
| TAGS: | CASC, AE |
| Sensitivity: | Non Sensitive |
| Reference: | Abu Dhabi 1175 |
| Pass Line: | Department for CA/OCS/ACS/NESA - Erinn Stott, NEA/ARP - Barbara Masilko Sensitive |
| Subject: | Update: ARREST CASE OF NAJI HAMDAN - Allegations of Mistreatment |

| From: | svcSMARTMFI |
|---|---|
| Sent: | 12/4/2008 5:05:56 AM |
| To: | svcSMARTHBTSPOP5 |
| Subject: | Update: ARREST CASE OF NAJI HAMDAN - Allegations of Mistreatment |
| Attachments: | Metadata.dat |

DE RUEHAD #1383/01 3390948
ZNR UUUUU ZZH
R 040948Z DEC 08
FM AMEMBASSY ABU DHABI
TO RUEHC/SECSTATE WASHDC 1851
INFO RUEHDE/AMCONSUL DUBAI 8067

UNCLAS ABU DHABI 001383

Department for CA/OCS/ACS/NESA - Erinn Stott, NEA/ARP - Barbara Masilko

Sensitive

UNITED STATES DEPARTMENT OF STATE
REVIEW AUTHORITY: ROBERT R STRAND
DATE/CASE ID: 29 OCT 2010  201000711

CLASSIFICATION: UNCLASSIFIED
SENSITIVITY: Non Sensitive
Page 1 of 5

UNCLASSIFIED

## UNCLASSIFIED

E.O. 12958: N/A
TAGS: CASC, AE (HAMDAN, NAJI JAWDAT)
SUBJECT: Update: ARREST CASE OF NAJI HAMDAN - Allegations of.
Mistreatment

REF: Abu Dhabi 1175

1. On December 3, 2008, Consul and conasst met with Naji Hamdan at Al Wathba Prison, Abu Dhabi. Hamdan was transferred to Al Wathba on November 26, 2008 after spending three months in UAE State Security (SSD) custody. This was the second consular visit, following an initial visit at SSD headquarters on October 19. We understand from Hamdan that the UAE has proffered four terrorism-related charges against him. We are working to obtain specifics on the individual charges. Hamdan claims that SSD instructed him not to discuss the specific charges with the embassy, and will only state that the charges are for "terrorism" and "the internet." During the December 3 visit, which extended almost two hours, Hamdan made allegations of mistreatment while in SSD custody. At this time, he has requested we not protest this alleged mistreatment to the UAEG, as he fears it may negatively impact his situation.

2. Hamdan was detained on August 28, 2008. From that day until September 17 or 18, he claims to have been subject to daily interrogation and mistreatment. Hamdan requests that these allegations and information be handled in a very sensitive manner, as he is fearful that - should this information "get back to State Security" - he will suffer as a result. He was particularly concerned that the FBI might share this information with SSD.

3. Hamdan reports that during the first week of custody he was placed in a room with the air conditioning "on full cold" for 24 hours and deprived of any bedding or blankets, left with only light pajamas for warmth. The next day, they placed him in the same room for 3-4 hours.

4. Hamdan says that during the second week, he was placed in a very uncomfortable chair that his captors told him was an "electric chair." This chair, according to Hamdan, pressed on his thighs and the center of his back, causing extreme discomfort and the loss of circulation in his lower legs. Hamdan states that his forearms were secured with Velcro straps and he was blindfolded in this chair for hours while being struck in the head by his captors. He claims that they beat his head with hands and fists, but never left a mark. Hamdan reports that at no time was he electrically shocked. At one point, Mr. Hamdan says he lost consciousness, waking to find himself on the floor and "soaked with sweat." He says that his captors accused him of faking this loss of consciousness. They carried him to his cell. An hour later, a doctor checked on him, declaring him "fine."

5. In the third week of custody, Hamdan says he was brought to a room with 10-15 persons in it (he could see feet and legs through

## UNCLASSIFIED

DOS 002143

2,2

UNCLASSIFIED

the bottom of his blindfold, as well as hear many voices) and seated
in a chair. After several minutes seated, he claims that he was
slapped by an unseen assailant "from nowhere." Hamdan says that he
was then taken from the chair, placed face down on the floor: He
explains that one person sat on his back while another raised his
bare feet behind him. A third person then, according to Hamdan,
proceeded to beat Hamdan's bare feet with a large stick, which
Hamdan describes as "half baseball (bat) size." Hamdan explains that
they hit his feet about ten times, then allowed him some water, then
began beating his feet again. This cycle was repeated at least
twice. Hamdan claims that his feet felt "like they were twice normal
size." Hamdan says he reflexively struggled as he was struck,
causing another person to seize Hamdan's wrists behind his back and
place a knee directly on his wrists. Hamdan claims to still have
some pain in his right wrist from this incident.

6. Hamdan said that after being struck with the stick several times,
he grabbed the lower leg of one of his captors, begging for the
beating to stop. The captor then, according to Hamdan, slapped him
"severely" in the face, knocking him to the ground. This cycle of
Hamdan begging and being struck was repeated 5-6 times.

7. Following these strikes to the face, Hamdan then says he was
suddenly kicked in the right abdomen by someone wearing a "military
boot." The kick was delivered with such force that Hamdan feared he
would die. He has suffered from liver problems in the past, which
added to this fear. The assailant then proceeded to kick him two
more times in the right abdomen. As Hamdan asked his attacker to
stop, he claims that the assailant asked him whether they (SSD)
should bring Hamdan's wife and subject her to similar treatment.
Fearing for his life, Hamdan asked to see a doctor, complaining of
distinct pain at two places in his right side. The doctor performed
a quick check with his hands and declared that Hamdan was "fine."

8. Hamdan says that he was blindfolded any time that he left his
holding room, including during questioning/interrogation sessions.
At all sessions he claims to have faced physical mistreatment,
including slaps and strikes to the face and body. He claims that at
one point he was beaten for perceived links to the FBI - claiming
that his captors thought "maybe he was assigned by FBI to do
something on UAE soil."

9. Hamdan reports that after approximately three weeks in custody,
the daily questioning/interrogation and physical attacks suddenly
ceased. He says he was left in his solitary cell; his only contact
with jailers was as they delivered his food and medicines, until
approximately October 16 - three days before initial visit by US
consular officials (reftel). At that time, he says that SSD
officials came to his cell, asked his clothing sizes, and said he
would be released "in a few days." On October 19, the day of the
consular visit, Hamdan says he was taken in a truck from the holding
cell to the visitors' area at SSD Headquarters. During that drive,

UNCLASSIFIED

DOS 002144

24

CLASSIFICATION: UNCLASSIFIED
SENSITIVITY: Non Sensitive
Page 4 of 5

UNCLASSIFIED

he claims to have been instructed not to provide any details of his
treatment to the visiting consular officer, under implied threat of
further mistreatment.

10. Following the consular visit that was observed by three SSD
officials, and during which Hamdan repeatedly denied any
mistreatment, Hamdan says he was returned to his cell, where the
isolation treatment continued until around November 23. At that
time, Hamdan claims that questioning sessions began again, with
particular focus on his written statement. Hamdan claims that SSD
officials took his initial statement, gathered under duress over the
first weeks of his custody, and then "twisted", "warped", and
"stretched" it to be incriminating. He says that they claimed "We're
going let you go," but that they just needed to get the paperwork
finished. The original statement, which Hamdan says was about 4
pages in length, grew to about 20 pages. Hamdan signed the
statement, explaining that he felt that he had no other choice and
felt desperate after three months of detention and mistreatment.

11. Since his transfer to Al Wathba Prison, Hamdan has been in brief
telephone contact with both his brother, Hossam "Sam" Hemdan, and
wife, Mona Hamdan. Hamdan's brother, who spells his last name
differently, has contacted a local UAE attorney on Naji Hamdan's
behalf. (Ali Al Mannal, who appears on embassy lawyer list.) Hamdan
expects to meet with this attorney in mid-December, following the
local Eid and National Day holidays, and after the attorney has time
to speak with the State Security prosecutor who is handling his
case. Hamdan will then determine whether he will proceed with using
this attorney as his legal representative. Post will then again seek
to visit Mr. Hamdan to seek further input on how he and his attorney
prefer that we handle these serious allegations of mistreatment.

12. Hamdan reports that conditions at Al Wathba Prison are much
improved. Upon his request, he is currently being housed in a
non-smoking unit. He has access to books and newspapers and "there
is even a television in the lounge." He is able to make brief,
weekly telephone calls. (He called his brother and wife on December
2, and intends to call his wife again on December 9.) He has access
to a doctor, and told conoff that the doctor recently drew blood at
Hamdan's request to check his cholesterol level and liver function.
Hamdan says that he is eating well and receiving all his normal
preventative medications. After claiming to suffer from severe
insomnia during his detention with State Security, Hamdan says he is
now sleeping well.

13. Hamdan executed a new Privacy Act waiver during this visit,
limited to his wife, brother, attorney, and Members of Congress. He
declined to extend the waiver to media or, even after being
specifically asked, the ACLU. Post communicated information on this
December 3 visit to Hamdan's wife and brother. While Hamdan
requested that we not discuss details of his allegations with his
wife, we did discuss these details with Hossam Hemdan. Based on a
request from Hossam Hemdan, post will attempt to visit with Mr.

UNCLASSIFIED

DOS 002145

CLASSIFICATION: UNCLASSIFIED
SENSITIVITY: Non Sensitive
Page 5 of 5

UNCLASSIFIED

Hamdan in the coming week to relay his brother's request that the Privacy Act waiver be expanded to include the ACLU.

14. A newspaper article in which Hossam Hemdan outlines accusations of his brother's mistreatment appeared in the December 2 edition of the Miami Herald. (http://www.miamiherald.com/news/politics/ AP/story/796609.html)

OLSON

---

**Drafted By:**
**Info:**                      AMCONSUL DUBAI,*ROUTINE*

**Dissemination Rule:**        NONE

UNCLASSIFIED

CLASSIFICATION: UNCLASSIFIED
SENSITIVITY: Non Sensitive
Page 5 of 5

UNCLASSIFIED

DOS 002146

2.6

# EXHIBIT
# 11

UNCLASSIFIED

## PARTIAL RELEASE TO CERTAIN PARTIES

Greene, Douglas C B5, D5, B1, 1.4(B), 1.4(D), K1                    D92

| From: | Greene, Douglas C |
|---|---|
| Sent: | Monday, December 15, 2008 4:42 PM |
| To: | Cooper, Sean |
| Cc: | Olson, Richard G |
| Subject: | RE: Abu Dhabi - Hamdan: Charges and Moving Forward on Mistreatment Allegations |

B5, D5

I'm copying the Ambassador just to see if he has any additional thoughts.

Please copy Barbara when you send.

Thanks,
Doug

UNITED STATES DEPARTMENT OF STATE
CLASSIFIED BY DEPT. OF STATE, M. GRAFELD, DAS, A/GIS
REVIEW AUTHORITY: ROBERT R STRAND
CLASSIFICATION: CONFIDENTIAL   REASON: 1.4(B), 1.4(D)
DECLASSIFY AFTER: 14 DEC 2033
DATE/CASE ID: 25 MAR 2011  201000711

**From:** Cooper, Sean
**Sent:** Monday, December 15, 2008 4:29 PM
**To:** Greene, Douglas C
**Subject:** Abu Dhabi – Hamdan: Charges and Moving Forward on Mistreatment Allegations

B5, D5

Erinn and Co.:

Per our update on Thursday, we're moving ahead with engaging the UAEG on Hamdan's allegations of mistreatment while in State Security custody. We have also obtained some details on the charges Mr. Hamdan currently faces.

Engaging UAEG on Allegations of Mistreatment

We have scheduled another consular visit with Hamdan for tomorrow (Dec 16.) During this visit, I intend to request that Hamdan provide a formal, sworn statement as to the accuracy of his claims as outlined in Abu Dhabi 1383 (per guidance in 7 FAM 425.2-1). Due to the time that has passed since the alleged mistreatment, post does not see that a medical examination by private medical doctor (as suggested in 7 FAM 425.2-2) would be of any clear benefit. Please advise if CA believes otherwise.

Once we have this formal statement from Hamdan, and now that the UAEG has returned from its extended National Day-Eid al Adha holidays, post intends to move forward with requesting that the UAEG investigate these serious claims and provide us with the results of this investigation within a specific period of time (per guidance in 7 FAM 426.2-2.)   B5, D5

We have reviewed guidance in 7 FAM 426.3 on factors to consider in this regard.

Charges

B1, K1

three charges have now been brought against Hamdan:

UNCLASSIFIED                                                          DOS 000165

## UNCLASSIFIED

1. الترويج للارهاب (تحسين صورة الجماعات الارهابية و التبرير للاعمال التي تقوم بها.

Promoting Terrorism.

The source explained that this was based on actions to improve the image of terrorist groups and justify their actions, apparently linked to unspecified actions Mr. Hamdan took online.

2. المشاركة في اعمال تنظيم ارهابي.

Participating in the work of a terrorist organization.

3. التعاون مع تنظيم ارهابي : ترجمة بعض البيانات.
اخذ بيانات من تنظيم ارهابي و وضعه في الانترنت

Assisting terrorist organization — "Cooperation with a terrorist organization."

The source shared that Hamdan is alleged to have "translated some statements" and to have taken information from a terrorist group and put it on the internet.

We are working to determine the sentencing possibilities for these crimes.                                    B1, K1

According to our contact, all of these charges stem from Hamdan's activites on the internet.

**Media and ACLU Outreach**

During our consular visit on Thursday, Hamdan did expand his Privacy Act waiver to include the ACLU. Subsequent to that, I was in contact with Jennie Pasquarella and Ahilan Arulanantham of the ACLU of Southern California on Thursday, December 11. It appears that Mr. Arulanantham has been active since our communication, as evidenced by his press release at http://www.aclu-sc.org/releases/view/102917, a story in the Daily Breeze newspaper of Torrance, CA (http://www.dailybreeze.com/ci_11224642?IADID) and a report on Los Angeles' KPFK radio (online at http://www.kpfk.org/kpfknews/1-latest-news/1371-12-03-08-extended-interview-with-hossam-hamdan.html.) Despite the appearance of quotations from "the chief consul" in some of this reporting, post continues to respect Hamdan's limited Privacy Act waiver — which does not include the media/press. Post understands that the UAEG is aware of at least some reporting on Hamdan's allegations.

I look forward to any input you and the good folks back there in CA have on this matter, and will report again following our consular visit tomorrow.

Regards,

Sean

**From:** Cooper, Sean
**Sent:** Thursday, December 11, 2008 4:34 PM
**To:** Stott, Erinn C
**Cc:** Mutair, Saeed
**Subject:** Abu Dhabi - Hamdan Update

## UNCLASSIFIED

DOS 000166

# UNCLASSIFIED

Erinn:

Senior consular FSN and I met with Hamdan this morning at Al Wathba Prison. He is in generally good spirits and has been communicating with his brother, wife, and mother by telephone on multiple occasions over the Eid holidays. (Prison officials allow more than the normal 10 minutes per week during the Eid.)

Hamdan has given his approval for the USG to formally protest his alleged mistreatment while in UAE State Security custody. Due to the high-level interest in this matter, I will discuss options for protest with the Front Office here in Abu Dhabi, and expect that we will have determined an appropriate course of action on Sunday or Monday. Please pass on post's request that Washington not take any action on a protest before our Front Office has weighed in.

Hamdan has executed a new limited Privacy Act waiver, now updated to include the ACLU. It remains a limited waiver. The waiver now allows communication with: Mona Hamdan, Hossam Hemdan, local attorney (as designated), Members of Congress and their staff, and officials from the ACLU.

He reports that he has been receiving all appropriate prescribed preventative medications (Lipitor for cholesterol and Zyloric for uric acid control). He has run out of "Essential Forte," which he describes a multivitamin that he took twice a day for the last eight months as his brother in Lebanon (a doctor) recommended it for his liver function. He is being seen by the prison physician, and expects to sit down with him again on Sunday.

Next week, Hamdan hopes to meet with a few local attorneys to determine which one he will choose as his representative. Hamdan and I agreed that the Embassy would seek to visit him again during the week of December 22 to learn the results of those meetings.

Hamdan thanked the Embassy for our efforts on his behalf, and we left him some English-language magazines for reading.

I will report back – probably before your OOB on Monday – with the results of my discussions with the Front Office on how best we protest.

Regards from Abu Dhabi,

Sean

519

# UNCLASSIFIED

DOS 000157

# EXHIBIT
# 12

Perry, Elizabeth L

_(139)_

_B_
_b5, 45_

| | |
|---|---|
| From: | Stott, Erinn C |
| Sent: | Thursday, May 28, 2009 3:45 PM |
| To: | 'Haas, Alexander (CIV)'; McDonough, Patricia E; Buckingham, Stephen (CIV) |
| Subject: | FW: Hossam Hemdan |
| Attachments: | CASC - 09 Abu Dhabi 484 2009.5.14.pdf; CASC - 08 Abu Dhabi 1175 2008.9.19.pdf; CASC - 08 Abu Dhabi 1383 2008.12.4.pdf; CASC - 09 Abu Dhabi 3 2009.1.4.pdf; CASC - 09 Abu Dhabi 285 2009.3.22.pdf; CASC - 09 Abu Dhabi 338 2009.4.2.pdf; CASC - 09 Abu Dhabi 363 2009.4.9.pdf |

Sean didn't hit reply all. Here is his email from this morning.

*Erinn C. Stott*
*Department of State, Office of Overseas Citizen Services*
*Citizen Services Specialist*
*Responsible for Iraq, Jordan, Libya, Saudi Arabia, UAE, Yemen*
*Back-up for Bahrain, Egypt, Kuwait, Lebanon, Oman, Qatar, Syria*
*202-736-4978 office*
*202-647-3732 fax*
*stottec@state.gov*
*Note: My work schedule is from 7am EST to 4pm EST.*

**From:** Cooper, Sean
**Sent:** Thursday, May 28, 2009 5:13 AM
**To:** Stott, Erinn C
**Subject:** RE: Hossam Hemdan

Dept. of State, A/ISS/IPS, Margaret P. Grafeld, Dir.
( ) Release (✓) Excise ( ) Deny ( ) Declassify
Date_____ Exemption _65, 45_____

APR 2 0 2011

Erinn:

Thanks for the quick guidance, and thanks to Alex and all for the advice, which I will certainly follow.

For Alex's request:

To date, we've had consular access to Naji Hamdan on the following dates. The October 19 visit took place at UAE State Security Headquarters in Abu Dhabi. All other visits took place at Al Wathba Central Prison.

    October 19, 2008
    December 3, 2008
    December 11, 2008
    December 16, 2008
    December 23, 2008
    January 21, 2009
    March 11, 2009
    April 8, 2009
    May 13, 2009

During the December 16 visit, Hamdan wrote an eight page statement alleging mistreatment while he was in State Security custody. On page 6 of this statement, Hamdan wrote:

    One man spoke to me in perfect English. I thought he was American (no accent). He said you are not the only person here with masters degree. I spoke back to him in English. I said sure, I know that, please help me out. He

1

said do what they want or these people "will fuck you up"!! I said if I do you promise to help me out of here?! He said it does not matter what I promise just do it. I said OK.

When Hamdan wrote this passage, he pointed it out to me and said that it was something he had not told me before. He said he was not sure that it was an American, but that the person spoke with an "American accent." We briefly discussed how many foreign nationals live or study in the United States for extended periods, often developing flawless accents when speaking in English. Hamdan again said he could not be sure whether the speaker was American. We did not further discuss this matter. I do not have record or recollection of Hamdan speaking about the "American accent" during any of our other visits.

Attached are PDFs of the Hamdan cables. There is further (and often more detailed) information in the ACS case record.

If I can provide more information, just let me know.

Thanks again,

Sean

**From:** Stott, Erinn C
**Sent:** Wednesday, May 27, 2009 10:44 PM
**To:** Cooper, Sean
**Subject:** FW: Hossam Hemdan

Sean,

Its rather long and cumbersome, but see below the responses from all offices involved. And in one day! In short, no office involved in Hamdan's case has any objection to you meeting with Hamdan's relatives. Please see Alex Haas's email for some cautions from DOJ as well as a request.

Erinn

*Erinn C. Stott*
*Department of State, Office of Overseas Citizen Services*
*Citizen Services Specialist*
*Responsible for Iraq, Jordan, Libya, Saudi Arabia, UAE, Yemen*
*Back-up for Bahrain, Egypt, Kuwait, Lebanon, Oman, Qatar, Syria*
*202-736-4978 office*
*202-647-3732 fax*
*stottec@state.gov*
*Note: My work schedule is from 7am EST to 4pm EST.*

**From:** Masilko, Barbara J
**Sent:** Wednesday, May 27, 2009 2:28 PM
**To:** Stott, Erinn C
**Subject:** RE: Hossam Hemdan

Erinn -- NEA would not object to CA doing it's job. Please make sure that Sean has informed the Abu Dhabi FO of the meeting request, that's all I ask! - Barbara

**From:** Stott, Erinn C
**Sent:** Wednesday, May 27, 2009 12:14 PM
**To:** Masilko, Barbara J
**Subject:** FW: Hossam Hemdan

2

DOS 001338

Barbara,

I'm checking with you just to get all the ducks in a row. L/LEI, L/CA, DOJ and OCS have weighed in below. Just making sure the Desk has no issues with Sean potentially meeting with Hamdan's brother and nephew during their upcoming visit to the UAE this weekend. They will be visiting Hamdan in jail. It is likely that they will want to meet with Sean, but they have not requested the meeting in so many words.

Also, do we have a go from NEA on sending the ACLU response? Sean's on stand-by until he gets your word.

Erinn

----------------
**From:** Youel Page, Kathryn
**Sent:** Wednesday, May 27, 2009 10:20 AM
**To:** McDonough, Patricia E; 'alexander.haas@usdoj.gov'; Stott, Erinn C
**Subject:** RE: Hossam Hemdan

I think we won't know until they get there if they ask to meet with Sean, although we should assume they will. I have no problem from a L/CA perspective with Sean taking this as a consular meeting. We should confirm with Sean that he won't discuss the law suit but will instead limit the discussion to consular matters.

Katy Youel Page
Office of the Legal Adviser, L/CA
U.S. Department of State
202-647-9178


**From:** Haas, Alexander (CIV) [mailto:Alexander.Haas@usdoj.gov]
**Sent:** Wednesday, May 27, 2009 10:01 AM
**To:** Stott, Erinn C; McDonough, Patricia E
**Cc:** Buckingham, Stephen (CIV); Henry, Terry (CIV)
**Subject:** RE: Hossam Hemdan

Erinn,

Our view is that the lawsuit should not stop State from doing its important consular work and if that involves meeting with families, so be it. But you should make sure that L agrees and has no objections.

b5,
b5

DOS 001339

Alex

---

**From:** Stott, Erinn C [mailto:StottEC@state.gov]
**Sent:** Wednesday, May 27, 2009 9:19 AM
**To:** Haas, Alexander (CIV); McDonough, Patricia E
**Subject:** RE: Hossam Hemdan

Not in so many words. The ACLU lawyer states they would "appreciate the opportunity to meet with you."

*Erinn C. Stott*
*Department of State, Office of Overseas Citizen Services*
*Citizen Services Specialist*
*Responsible for Iraq, Jordan, Libya, Saudi Arabia, UAE, Yemen*
*Back-up for Bahrain, Egypt, Kuwait, Lebanon, Oman, Qatar, Syria*
*202-736-4978 office*
*202-647-3732 fax*
*stottec@state.gov*
*Note: My work schedule is from 7am EST to 4pm EST.*

---

**From:** Haas, Alexander (CIV) [mailto:Alexander.Haas@usdoj.gov]
**Sent:** Wednesday, May 27, 2009 9:18 AM
**To:** Stott, Erinn C; McDonough, Patricia E
**Subject:** RE: Hossam Hemdan

I will consult here, but wanted clarification of one point. Have they asked for a meeting or is this a contingency? Sean's email says he'd be open to a meeting "should he choose to contact us during his time in the UAE."

---

**From:** Stott, Erinn C [mailto:StottEC@state.gov]
**Sent:** Wednesday, May 27, 2009 8:52 AM
**To:** McDonough, Patricia E
**Cc:** Haas, Alexander (CIV)
**Subject:** FW: Hossam Hemdan
**Importance:** High

Trish and Alex,

Please see Sean's emails below. Hamdan's brother and nephew will be in UAE this weekend and will be visiting him in jail. They have requested a meeting with Sean Cooper. Does L or DOJ have any objections/thoughts on this?

I'm asking each office involved individually, so if there are other offices you feel we should consult, please let me know.

Erinn

*Erinn C. Stott*
*Department of State, Office of Overseas Citizen Services*
*Citizen Services Specialist*
*Responsible for Iraq, Jordan, Libya, Saudi Arabia, UAE, Yemen*
*Back-up for Bahrain, Egypt, Kuwait, Lebanon, Oman, Qatar, Syria*
*202-736-4978 office*
*202-647-3732 fax*
*stottec@state.gov*
*Note: My work schedule is from 7am EST to 4pm EST.*

4

DOS 001340

**From:** Bernier-Toth, Michelle
**Sent:** Wednesday, May 27, 2009 8:49 AM
**To:** Stott, Erinn C; Lopatkiewicz, Viktoria
**Subject:** RE: Hossam Hemdan

From a consular perspective, no. But L and DOJ may have strong views. M

**From:** Stott, Erinn C
**Sent:** Wednesday, May 27, 2009 8:12 AM
**To:** Lopatkiewicz, Viktoria; Bernier-Toth, Michelle
**Subject:** FW: Hossam Hemdan

Do we in OCS have any issues with Sean meeting with Hamdan's family during their upcoming visit to the UAE this weekend? I'll pose the question to the other offices involved on the case as well, if need be, but wanted to get our perspective first.

Erinn

*Erinn C. Stott*
*Department of State, Office of Overseas Citizen Services*
*Citizen Services Specialist*
*Responsible for Iraq, Jordan, Libya, Saudi Arabia, UAE, Yemen*
*Back-up for Bahrain, Egypt, Kuwait, Lebanon, Oman, Qatar, Syria*
*202-736-4978 office*
*202-647-3732 fax*
*stottec@state.gov*
*Note: My work schedule is from 7am EST to 4pm EST.*

**From:** Cooper, Sean
**Sent:** Wednesday, May 27, 2009 8:07 AM
**To:** Stott, Erinn C
**Subject:** FW: Hossam Hemdan

Erinn:

Still have not sent the long-pending response to the ACLU query on the UAEG investigation. Got your email this morning, but am still awaiting a clear "OK" from NEA. I would imagine we should have that by OOB Abu Dhabi tomorrow.

Below is a separate query/information and response regarding an upcoming visit by Hamdan's brother and nephew. We've contacted the prison on their behalf, and it appears they'll have no trouble visiting.

We do have a PAW for Hossam Hemdan (the brother), so I would accept a meeting with him should he choose to contact us during his time in the UAE. (Barring any contradictory guidance from DC.)

Sean

**From:** Cooper, Sean
**Sent:** Wednesday, May 27, 2009 4:00 PM
**To:** 'Jennie Pasquarella'
**Cc:** Ahilan Arulanantham; Reem Salahi; sam hemdan
**Subject:** RE: Hossam Hemdan

5

DOS 001341

Jennie:

I am glad to hear that Hossam and his son will be able to visit with Naji. I would also be happy to meet with Hossam during his time in the UAE.

Based on your email, we have contacted Al Wathba Prison and informed them of Hossam's and Muhammad's desire to visit Naji. Their names have been added to the access lists at the prison. If they are arriving in Abu Dhabi on Thursday, their first opportunity to visit Naji would be during Friday's visiting hours. Prison officials inform us that they may visit between 8:30 a.m. and 5 p.m. on Friday, May 29.

The Embassy will be closed on Friday and Saturday, but we will be back in the office on Sunday, May 31. Hossam can reach me at this email address or by my direct phone (+971-2-414-2657) and let me know when it might be convenient for him to visit.

Regards,

Sean

R. Sean Cooper
Consul
U.S. Embassy Abu Dhabi
+971-2-414-2657
http://abudhabi.usembassy.gov/

**From:** Jennie Pasquarella [mailto:jpasquarella@aclu-sc.org]
**Sent:** Tuesday, May 26, 2009 9:29 PM
**To:** Cooper, Sean
**Cc:** Ahilan Arulanantham; Reem Salahi; sam hemdan
**Subject:** Hossam Hemdan

Dear Sean,
I hope this finds you well.

I'm writing to inform you that Naji's brother, Hossam Hemdan (Sammy Hemdan), will be traveling from Beirut to the UAE on Thursday, May 28th. He will be traveling with his son Muhammad Hemdan. They are hoping to meet with Naji in Al Wathba, and I think also would appreciate the opportunity to meet with you. Anything you could do to help ensure Hossam is given access to meet with Naji in Al Wathba would be much appreciated.

Thanks very much for your help.

Best, Jennie

Jennie Pasquarella
Staff Attorney
ACLU of Southern California
1313 West Eighth Street
Los Angeles, CA 90017
T: 213.977.5236
F: 213.977.5297
jpasquarella@aclu-sc.org

6

DOS 001342

# EXHIBIT
# 13

## UNCLASSIFIED

RELEASE TO CERTAIN PARTIES                    F70

| | |
|---|---|
| **From:** | Price, Gary S |
| **To:** | Cooper, Sean |
| **Subject:** | RE: UAE: Amcit Hamdan Sentenced to 1.5 yrs and Deportation (may be equivalent to time served) |
| **Date:** | Monday, October 12, 2009 2:14:59 PM |

For whatever it is worth, I was told that a person has to go to the country of the passport he used to enter the UAE. We will see if that hold true. I hope it is to the US and then we'll fix a flight direct to Atlanta or DC.

Thanks for the update.

Gary Price

**From:** Cooper, Sean
**Sent:** Monday, October 12, 2009 11:44 AM
**To:** Abu Dhabi Front Office; Stott, Erinn C; Kazi, Pamela R; Lopatkiewicz, Viktoria; Woodley, Allison; McGovern, Bridget (Helen-Mary); Youel Page, Kathryn; McDonough, Patricia E; Price, Gary S
**Subject:** UAE: Amcit Hamdan Sentenced to 1.5 yrs and Deportation (may be equivalent to time served)

The UAE Federal Supreme Court today announced a guilty verdict against Amcit Naji Hamdan, sentencing him to 1.5 years in prison and subsequent deportation. Based on the way time served is calculated in the UAE, Hamdan may be eligible for near immediate deportation. The prison authorities will likely calculate his exact sentence completion (and deportation) date this week.

CONS will seek clarification of which charges Hamdan was found guilty. This was not announced in the court, but we will follow up with the attorneys.

Hamdan, we believe, maintains US and Lebanese nationality. The Court did not specify to where he would be deported. Historically, persons who have multiple nationalities are at least sometimes allowed to choose their place of deportation.

In addition to consular officials from the U.S. Embassy, several of Hamdan's family members were in the courtroom for the announcement of the verdict and sentence, as were media representatives from local newspapers and the Associated Press.

We're drafting a front channel report which will be coming through clearances shortly.

Sean

R. Sean Cooper
Consul
U.S. Embassy Abu Dhabi
+971-2-414-2657
http://abudhabi.usembassy.gov/

UNITED STATES DEPARTMENT OF STATE
REVIEW AUTHORITY: FRANK TUMMINIA
DATE/CASE ID: 15 APR 2011  201000711

## UNCLASSIFIED

DOS 001699

# EXHIBIT
# 14

UNCLASSIFIED

**E4**

CLASSIFICATION: UNCLASSIFIED
Page 1 of 2

RELEASE TO CERTAIN PARTIES

From:     svcsmartmfi
Sent:     10/22/2009 4:46:17 AM
To:       SMART Core
Subject:  Update - Arrest Case of Naji Hamdan - Consular Visit

<u>UNCLASSIFIED</u>
· Sensitive



| | |
|---|---|
| MRN: | 09 ABU DHABI 991 |
| Date/DTG: | Oct 22, 2009 / 220841Z OCT 09 |
| From: | AMEMBASSY ABU DHABI |
| Action: | WASHDC, SECSTATE,*PRIORITY* |
| E.O.: | 12958 |
| TAGS: | CASC, AE |
| Captions: | SENSITIVE |
| Sensitivity: | Sensitive |
| Reference: | Abu Dhabi 966 and previous |
| Pass Line: | For CA/OCS/ACS/NESA - Erinn Stott, NEA/ARP - Bridget McGovern |
| Subject: | Update - Arrest Case of Naji Hamdan - Consular Visit |

UNCLAS ABU DHABI 000991

For CA/OCS/ACS/NESA - Erinn Stott, NEA/ARP - Bridget McGovern

Sensitive

E.O. 12958: N/A
TAGS: CASC, AE (HAMDAN, NAJI JAWDAT)
SUBJECT: Update - Arrest Case of Naji Hamdan - Consular Visit

REF: Abu Dhabi 966 and previous

1. (SBU) On October 21, 2009, Consul and Conasst visited Naji Jawdat Hamdan at Al Wathba Prison, Abu Dhabi. During the visit, Hamdan appeared to be in good spirits and said that he was in good health. Hamdan is currently awaiting a formal determination of his sentence completion and deportation date.

2. (SBU) Since Hamdan's October 12 sentencing (reported reftel), post has been in frequent contact with the court, prosecutor's office, the prison, and with UAE State Security to track the progress of his case file and the calculation of his time served. Post anticipates that a final deportation date will be determined in the coming week, and that deportation should soon follow. These calculations were delayed as prison authorities requested documentation of Hamdan's time in State Security custody.

3. (SBU) Hamdan said that he hopes to be deported to Lebanon, but

UNITED STATES DEPARTMENT OF STATE
REVIEW AUTHORITY: ROBERT R STRAND
DATE/CASE ID: 29 OCT 2010  201000711

UNCLASSIFIED

DOS 00211

. CLASSIFICATION: UNCLASSIFIED
Page 2 of 2

# UNCLASSIFIED

that he "just wanted to be out" and would not be overly disappointed
if UAE authorities insist upon his deportation to the USA. (Note:
The UAEG has sometimes required deportees to be repatriated to the
country in whose passport the UAE residency permit was placed.
Hamdan's UAE residency permit was in his U.S. passport. End note.)
He thanked the embassy for our efforts on his behalf over the past
year.

4. (U) Post will continue to provide all appropriate consular
assistance to Mr. Hamdan.

OLSON

| Info: | BEIRUT, AMEMBASSY, *ROUTINE* |
| --- | --- |
| Attachments: | metadata.dat |
| Dissemination Rule: | Archive Copy |

**UNCLASSIFIED**
Sensitive

# UNCLASSIFIED

DOS 002120

# EXHIBIT
# 15

UNCLASSIFIED                                                    **E2**

ACTION OCS-00

INFO    LOG-00    CA-00    DS-00    UTED-00   H-00     TEDE-00  L-00
        NEA-00    PPT-00   DSCC-00  SAS-00    /000W
                      ------------------163102   040751Z /38

)040739Z JAN 09
FM AMEMBASSY ABU DHABI
TO SECSTATE WASHDC 1951               RELEASE TO CERTAIN PARTIES
INFO AMCONSUL DUBAI

UNCLAS ABU DHABI 000003

Department for CA/OCS/ACS/NESA - Erinn Stott, NEA/ARP - Barbara
Masilko

Sensitive

E.O. 12958: N/A
TAGS: CASC, AE (HAMDAN, NAJI JAWDAT)
SUBJECT: Update: ARREST CASE OF NAJI HAMDAN -Diplomatic Note on
Reported Mistreatment Delivered

REF:  (A) 08 Abu Dhabi 1175
      (B) 08 Abu Dhabi 1383

1. (SBU) On December 31, 2008, Consul and Conasst met with UAE MFA
Acting Director for Consular Affairs Mohamed Al Nowais to deliver
diplomatic note number 1161, in which post requests MFA investigate
Amcit Naji Hamdan's reports of mistreatment while in UAE State
Security custody. (Reported ref B.) The text was prepared in
coordination with CA/OCS and DOJ. Al Nowais said he was not very
familiar with the case, but added that he knew the Foreign Minister
was personally aware of and "following this matter" (Note:
Ambassador raised this matter with the Foreign Minister in a
December 21 meeting). Text of the note follows.
BEGIN DIPNOTE 1161 TEXT

        The Embassy of the United States of America presents its
compliments to the Ministry of Foreign Affairs and has the honor to
bring to the attention of the Ministry of Foreign Affairs the
following:

On August 28, 2008, American citizen Naji Jawdat Hamdan was
detained by UAE State Security forces in Ajman. The U.S. Embassy
did not receive consular notification of Mr. Hamdan's detention from
UAE authorities; American consular officials learned of the arrest
through his family. Mr. Hamdan remained in State Security custody
until November 26, when he was transferred to Al Wathba Central
Prison, Abu Dhabi. During Mr. Hamdan's almost three months in State

UNITED STATES DEPARTMENT OF STATE
REVIEW AUTHORITY: ROBERT R STRAND
DATE/CASE ID: 29 OCT 2010 201000711                    UNCLASSIFIED

Security custody, the United States [REDACTED] consular access on one occasion - October 19 - despite repeated requests for consular access. During this visit, the consular officer was unable to speak privately with Mr. Hamdan, and their discussion was observed by three State Security officials.

Subsequent to Mr. Hamdan's transfer to Al Wathba, Mr. Hamdan reported to U.S. consular officials that he was abused during his time in UAE State Security custody. From August 28, 2008 until September 17 or 18, he claims to have been subject to daily interrogation and mistreatment.

Mr. Hamdan stated that during the first week of custody he was placed in a room with the air conditioning "on full cold" for 24 hours and deprived of any bedding or blankets, left with only light pajamas for warmth. The following day, he reportedly was placed in the same room for 3-4 hours.

Mr. Hamdan said that during the second week, he was placed in a very uncomfortable chair that his captors told him was an "electric chair." This chair, according to Mr. Hamdan, pressed on his thighs and the center of his back, causing extreme discomfort and the loss of circulation in his lower legs. Mr. Hamdan stated that his forearms were secured with Velcro straps and was blindfolded in this chair for hours while being struck in the head by his captors. He claimed that they beat his head with hands and fists, but never left a mark. Mr. Hamdan reported that at no time was he electrically shocked. At one point, Mr. Hamdan said he lost consciousness, waking to find himself on the floor and "soaked with sweat." He said that his captors accused him of faking this loss of consciousness, that he was carried to his cell and that an hour later a doctor checked on him, declaring him "fine."

Mr. Hamdan said that in the third week of custody he was brought to a room with 10-15 persons in it (he said that he could see feet and legs through the bottom of his blindfold, as well as hear many voices) and seated in a chair. He claimed that, after several minutes seated, he was slapped by an unseen assailant "from nowhere." Mr. Hamdan said that he was then taken from the chair, placed face down on the floor. He explained that one person sat on his back while another raised his bare feet behind him. A third person then, according to Mr. Hamdan, proceeded to beat Mr. Hamdan's bare feet with a large stick, which Mr. Hamdan described as "half baseball (bat) size." Mr. Hamdan explained that they hit his feet about ten times, then allowed him some water, then began beating his feet again. This cycle, Mr. Hamdan claimed, was repeated at least twice. Mr. Hamdan claimed that his feet felt "like they were twice normal size." Mr. Hamdan said he reflexively struggled as he was struck, causing another person to seize Mr. Hamdan's wrists behind his back and place a knee directly on his wrists. Mr. Hamdan

UNCLASSIFIED

DOS 002115

claimed to still have some pain in UNCLASSIFIED from this
incident.

        Mr. Hamdan said that after being struck with the stick
several times, he grabbed the lower leg of one of his captors,
begging for the beating to stop. The captor then, according to Mr.
Hamdan, slapped him "severely" in the face, knocking him to the
ground. Mr. Hamdan claims that this cycle of him begging and being
struck was repeated 5-6 times.

        Mr. Hamdan said that, following these strikes to the face, he
was suddenly kicked in the right abdomen by someone wearing a

"military boot." The kick, according to Mr. Hamdan, was delivered
with such force that Mr. Hamdan feared he would die. He said he has
suffered from liver problems in the past, and that the assailant
then proceeded to kick him two more times in the right abdomen. Mr.
Hamdan claimed that, as he asked his attacker to stop, the official
asked him whether State Security should bring Mr. Hamdan's wife and
subject her to similar treatment. Mr. Hamdan said that he feared
for his life and asked to see a doctor, complaining of distinct pain
at two places in his right side. Mr. Hamdan said that the doctor
later performed a quick check with his hands and declared that Mr.
Hamdan was "fine."

        Mr. Hamdan said that he was blindfolded any time that he left
his holding room, including during questioning/interrogation
sessions. Mr. Hamdan claimed that physical mistreatment, including
slaps and strikes to the face and body, was administered in every
session.

        Mr. Hamdan reported that after approximately three weeks in
custody, the daily questioning/interrogation and physical attacks
suddenly ceased. He said he was left in his solitary cell - his
only contact with jailers was as they delivered his food and
medicines - until approximately October 16, three days before the
initial visit by U.S. consular officials. Mr. Hamdan said that
State Security officials then came to his cell, asked his clothing
sizes, and said he would be released "in a few days." Mr. Hamdan
said that on October 19, the day of the consular visit, he was taken
in a truck from the holding cell to the visitors' area at State
Security Headquarters. Mr. Hamdan claimed that during that drive he
was instructed not to provide any details of his treatment to the
visiting consular officer, under implied threat of further
mistreatment.

        Mr. Hamdan said that following the consular visit that was
observed by three State Security officials, he was returned to his
cell, where the isolation treatment continued until around November

UNCLASSIFIED

23.   Mr. Hamdan claimed that questioning of Mr. Hamdan began again,
with particular focus on his written statement.   Mr. Hamdan claimed
that State Security officials took his initial statement, gathered
under duress over the first weeks of his custody, and then
"twisted", "warped", and "stretched" it to be incriminating.   He
said that officials claimed "We're going let you go," and that they
just needed to get the paperwork finished.   The original statement,
which Mr. Hamdan said was about 4 pages in length, grew to about 20
pages.   Mr. Hamdan explained that he signed the statement because he
felt that he had no other choice and felt desperate after three
months of detention and mistreatment.

        The reported treatment of Mr. Hamdan by UAE State Security,
lack of consular notification, and limited consular access are
clearly in violation of article 36 of the Vienna Consular Convention
to which both the United States of America and the United Arab
Emirates are signatory.

        The Embassy respectfully requests that the Ministry of
Foreign Affairs investigate these reports of physical mistreatment
of Mr. Naji Jawdat Hamdan and provide the results of its
investigation to the Embassy within the next thirty days.     The
Embassy further requests that the Ministry of Foreign Affairs take
appropriate measures to ensure that instances of mistreatment of
Americans do not occur.

        The Embassy of the United States of America avails itself of
this opportunity to renew to the Ministry of Foreign Affairs the
assurances of its highest consideration.

Embassy of the United States of America,
Abu Dhabi, December 31, 2008

    ED DIPNOTE TEXT

OLSON


NNNN


UNCLASSIFIED

# EXHIBIT
# 16

UNCLASSIFIED **E23**

ACTION OCS-00

INFO   LOG-00    CA-00     DS-00    UTED-00  H-00      TEDE-00  L-00
       NEA-00    PPT-00  · DSCC-00  SAS-00 ·     /000W
                 ------------------4BD106   020616Z /38

P 020605Z APR 09
FM AMEMBASSY ABU DHABI
TO SECSTATE WASHDC PRIORITY 2324 RELEASE TO CERTAIN PARTIES·
INFO AMCONSUL DUBAI

UNCLAS ABU DHABI 000338

Department for CA/OCS/ACS/NESA - Erinn Stott, NEA/ARP - Barbara
Masilko

Sensitive

E.O. 12958: N/A
TAGS: CASC, AE (HAMDAN, NAJI JAWDAT)
SUBJECT:  Update:  ARREST CASE OF NAJI HAMDAN - UAE Government
Reports No Evidence of Mistreatment

REF:   (A) 08 Abu Dhabi 1175
  (B) 08 Abu Dhabi 1383
  (C) Abu Dhabi 3

1. (SBU) SUMMARY:  On April 1, 2009, Ambassador, accompanied by
Conchief, was summoned to meet with UAE MFA Director for Consular
Affairs Ambassador Sultan Mohammed Al Qortasi. Al Qortasi reported
that an investigation undertaken by the UAE MFA and Ministry of
Interior (MOI) into allegations of mistreatment made by Amcit Naji
Hamdan uncovered no information to substantiate Hamdan's claims. He
added that Hamdan's legal case was moving forward, and that he
expected the trial to begin "soon," perhaps within a month. During
the meeting Al Qortasi floated the idea of transferring Hamdan to
U.S. custody following his trial. END SUMMARY.
2. (SBU) Post delivered a diplomatic note on December 31, 2008 which
requested MFA investigate Amcit Naji Hamdan's reports of
mistreatment while in UAE State Security custody. (Delivery of note
reported ref C. Details of allegations reported ref B.) The text was
prepared in coordination with CA/OCS and DOJ. Extensive follow-up
with the MFA included multiple conversations between Conchief and
the Director and Deputy Director of Consular Affairs as well as a
second dipnote delivered on March 23, 2009.
3. (SBU) During an April 1 meeting, Al Qortasi said that MFA and MOI
had investigated the claims of mistreatment related in the embassy's
diplomatic note. The investigation uncovered that Hamdan was treated
in accordance with UAE law and that his treatment during three
months of "investigation" by UAE State Security was "good." Al

UNITED STATES DEPARTMENT OF STATE
REVIEW AUTHORITY: ROBERT R STRAND
DATE/CASE ID: 29 OCT 2010  201000711

UNCLASSIFIED

Qortasi said that Hamdan was involved in terrorist activities and
said he was charged with three crimes: 1. Promotion of terrorism, 2.
Cooperation with terrorists and 3. Engaging in terrorist activity.
Specifically, Al Qortasi said that Hamdan had served as a translator
for terrorists in Pakistan, Lebanon and Iraq, and that Hamdan had
worked to promote terrorist organizations. Al Qortasi related that
Hamdan's case had the personal attention of the UAE Minister of
Foreign Affairs.

4. (SBU) Ambassador and Conchief thanked Al Qortasi for the
Ministry's efforts to look into these serious allegations. Both also
welcomed the news that Hamdan would soon have the opportunity to
respond to charges in court. Ambassador and Conchief reiterated the
importance of timely and appropriate consular access to citizens and
pointed out that such access had not been forthcoming in Mr.
Hamdan's case. Conchief also pointed out that there had been no
formal notification of Hamdan's arrest from the UAEG, and that
initial consular access took place only under the observation of UAE
State Security officials.

5. (SBU) During the meeting, Al Qortasi made an offer to transfer
Hamdan to U.S. custody. Al Qortasi indicated that such a transfer
could be made following Hamdan's trial if he is found guilty.
Ambassador said that he was unable to make a formal response to such
an offer at this time, but pointed out the lack of a prisoner
transfer treaty between the US and UAE.

6. (SBU) COMMENT: Hamdan's allegations of mistreatment have not
been substantiated. Such mistreatment would not be consistent with
previous known actions of the UAE State Security Department. In
light of the serious nature of the allegations and substantiated
evidence that the UAEG had failed to provide consular access and
notification in accordance with the Vienna Convention on Consular
Relations, post requested that the UAEG investigate Hamdan's
reports. END COMMENT.

Post will continue to provide all appropriate consular assistance
to Mr. Hamdan.
OLSON


NNNN


UNCLASSIFIED

DOS 002150

# EXHIBIT
# 17

UNCLASSIFIED                           **E12**

ACTION OCS-00

INFO  LOG-00   CA-00   DS-00    UTED-00  H-00      TEDE-00  L-00
      NEA-00   PPT-00  DSCC-00  SAS-00   /000W
                      ------------------CFFA5C  010520Z /38
290923Z OCT 09 PER UR SVC
FM AMEMBASSY ABU DHABI            RELEASE TO CERTAIN PARTIES
TO SECSTATE WASHDC IMMEDIATE 3033
INFO AMEMBASSY BEIRUT
AMCONSUL DUBAI

UNCLAS ABU DHABI 001012


For CA/OCS/ACS/NESA - Erinn Stott, NEA/ARP - Bridget McGovern

Sensitive

E.O. 12958: N/A
TAGS: CASC, AE (HAMDAN, NAJI JAWDAT)
SUBJECT: Update - Arrest Case of Naji Hamdan - Deportation
Scheduled

REF:  Abu Dhabi 991 and previous

1. (SBU) On October 29, 2009, Al Wathba Prison officials informed
post that Amcit Naji Jawdat Hamdan is scheduled to be deported from
the UAE on October 30, 2009 at 0020 hours local. Hamdan is scheduled
to travel to Beirut, Lebanon on Emirates Airlines flight 955 from
Dubai.

2. (SBU) On October 12, 2009, the UAE Federal Supreme Court found
Hamdan guilty of terrorism-related offenses, sentencing him to a
prison term of 1.5 years and subsequent deportation. Based on the
method time served is calculated in the UAE, the authorities have
determined that Hamdan has completed his prison sentence.

3. (SBU) Hamdan was charged with promoting terrorism, participating
in the work of a terrorist organization, and assisting a terrorist
organization. The court ruling did not specify on which specific
counts Hamdan was found guilty. (Post followed up as it was not
announced in the courtroom.) Based on discussions with the court and
other legal experts, this is not an uncommon practice in the UAE
legal system.

4. (U) Post will continue to report any further developments in this
matter.

OLSON


UNITED STATES DEPARTMENT OF STATE
REVIEW AUTHORITY: ROBERT R STRAND             UNCLASSIFIED
DATE/CASE ID: 29 OCT 2010  201000711

DOS 002135

UNCLASSIFIED

NNNN

UNCLASSIFIED

DOS 002136

EXHIBIT
18

UNCLASSIFIED                                                **E14**

ACTION OCS-00

INFO   LOG-00    CA-00     DS-00    UTED-00   H-00      TEDE-00  L-00
       NEA-00    PPT-00    DSCC-00  SAS-00    /000W
       ------------------C2DB3E  121404Z /38

121246Z OCT 09 ZDK
FM AMEMBASSY ABU DHABI        RELEASE TO CERTAIN PARTIES
TO SECSTATE WASHDC IMMEDIATE 2982
INFO AMEMBASSY BEIRUT

UNCLAS ABU DHABI 000966


Dept for CA/OCS/ACS/NESA, NEA/ARP

Sensitive

E.O. 12958: N/A
TAGS: CASC, AE (HAMDAN, NAJI JAWDAT)
SUBJECT: Update - Arrest Case of Naji Hamdan - Trial - Verdict and
Sentencing

REF:  (A) Abu Dhabi 921
-     (B) Abu Dhabi 844
-         (C) Abu Dhabi 738
-     (D) Abu Dhabi 625
-         and previous

1. (SBU) On October 12, 2009, the UAE Federal Supreme Court
announced a guilty verdict against Amcit Naji Jawdat Hamdan,
sentencing him to a prison term of 1.5 years and subsequent
deportation. Based on the method time served is calculated in the
UAE, Hamdan may be eligible for near immediate deportation. Prison
authorities are expected to calculate his exact sentence completion
(and deportation) date this week.

2. (SBU) Post understands that Hamdan may possess both US and
Lebanese nationality. The court did not specify to where he would be
deported. To date, it remains unclear to where the UAEG intends to
deport Hamdan.

3. (SBU) Post will seek clarification of which charges Hamdan was
found guilty. These details were not announced in the court.

4. (SBU) In addition to consular officials, several of Hamdan's
family members were in the courtroom for the announcement of the
verdict and sentence, as were media representatives from local
newspapers and the Associated Press. The courtroom was open to the
public.


UNITED STATES DEPARTMENT OF STATE
REVIEW AUTHORITY: ROBERT R STRAND         UNCLASSIFIED
DATE/CASE ID: 29 OCT 2010  201000711

5. (U) Post will continue to provide UNCLASSIFIED consular assistance to Mr. Hamdan.

GREENE

NNNN

UNCLASSIFIED

DOS 002138

28

# EXHIBIT
# 19

```
12:20              SEACATS SEIZURE CASE                 07272011
CASE NO:  2006272000034901

STATUS: 7001 - SEIZURE CASE CLOSED-REMISSION AMOUNT PAID.  INPUT DTE: 03092007

VIOLTR NAME: HAMDAN                   , NAJI     VIOLTR ID:
VIOLATION DATE: 08232006     DISCOVERY DTE: 08232006
MITIGATED AMT:       2500.00
VIOLATION         VIOLATION DESCRIPTN     VIOLATION      VIOLATION DESCRIPTN
31USC5332         BULK CASH SMUGGLING
31USC5317         SEARCH AND FORFEITURE
31USC5316         REPORTS ON EXPORTING/I


O.I. CASE NO:
COMMENTS:
```

LH FLIGHT #457
TO FRANKFURT                            AT APPROXIMATELY 1450 HRS MR. NAJI
HAMDAN, HIS WIFE AND TWO (2) SONS IN ROUTE TO DUBAI WERE SELECTED FOR AN
EXAMINATION.  I EXPLAINED THE U. S. CURRENCY REPORTING REQUIREMENTS AT WHICH
TIME MR. HAMDAN VERBALLY DECLARED $9000.  MR. HAMDAN WAS HANDED A CF 503 FORM
TO READ, TO WRITE DOWN THE AMOUNT OF MONEY HE WAS DECLARING AND TO INITIAL HIS
NAME ON THE FORM.  MR. HAMDAN READ AND WROTE DOWN $9,500.00 AND THEN SIGNED.
HAMDAN PRESENTED $9,455.00 FOR VERIFICATION.  AN ADDITIONAL $21,000.00 IN MONEY
ORDERS WAS DISCOVERED IN AN ENVELOPE IN MR. HAMDAN'S HANDCARRIED BAG. A TOTAL
OF $30,675.00 WAS SEIZED ON 6051S #(b)(7)(E).  CASH IN THE AMOUNT OF $9000.00 WAS
PLACED IN SEB #   (b)(7)(E)   $13,000. IN MONEY GRAM MONEY ORDERS WAS PLACED IN SEB#
(b)(7)(E)   $6,000.00 IN WESTERN UNION MONEY ORDERS WAS PLACED IN SEB (b)(7)(E) AND
$2,000.00 IN CONTINENTAL EXPRESS MONEY ORDERS WAS PLACED IN SEB #(b)(7)(E).  THE
AMOUNT OF $675.00 WAS GIVEN TO MR. HAMDAN AND HIS FAMILY FOR HUMANITARIAN
RELIEF.

2



```
12:22                    SEACATS S/A/S SHORT/LONG SUMMARY INFO        07272011
                                   FPF CASE NBR: 2006272000034901
FISCAL YEAR:* 2006 TYPE:* SZ CONTROL NBR                 VIOLATOR NBR: 01 TOTAL: 01
TOPIC
VIOLATOR BUSINESS NAME:
 ID#:              TYPE:    CTZNSHP: US DOB: 05261966 SEX: M RACE: W
VIOLATOR LAST NAME: HAMDAN                                      HISPANIC: N
         FIRST NAME: NAJI              MIDDLE NAME: JAWDAT
         STREET:* 12636 TRURO AVE                   APT/SUITE:
         CITY:* HAWTHORNE                 ST: CA CNTRY:* US ZIP: 90250
PERSONAL SEARCH: 08232006 1626 ARREST/IND:          SEIZURE: 08232006 1500
         OI CSE#
CONTRIBUTING INFO:
PORT:* 2720                        NAME-TITLE-AGENCY
DECLARATION TKN BY:                -CBP OFFCR-C
ARRSG OFC:                    CASE AGENT:
SEIZING OFFICER                    -CBP OFFCR-C
SUPERVISOR                        SUPVY CBP OFFCR-C
PORT DIRECTOR    :        PETER GORDON - ACTING APD
CONVEYANCE TYP:* C   INCIDENT CTGY         SCIP?:    QRY NTFY?
** INCIDENT IS APPROVED -  08/24/2006, FP&F CASE ACCEPTED **
```

3

```
12:25        SIGNIFICANT ENFORCEMENT ACTIVITY REPORT      072711
                       SEAR (PAGE 1 OF 4)

PORT: LAX INTL ARPT                               SEAR #

TOPIC
PORT:             OFFICE:        PLACE OF INCIDENT: W485/LAX/CA/US
DATE  OF INCIDENT:  08232006     TIME OF INCIDENT:  1500
INC #: 2006SZ007865101           CASE #:
SEAR QUALIFICATION(S):

RELATED SEAR #'S:

REASON FOR AMENDMENT:

SEIZED ITEM(S):
ITEM #: 001   SEIZED FROM VIOL #: 01   OF TOTAL # OF 01 VIOLATORS IN INCIDENT
   CATEGORY CODE          DESC:  U.S. CURRENCY (CASH)
   COMM/CD              QTY:            90.00 UM       FDIN:
   DOMESTIC VALUE:       9000 CNTRY OF ORIGIN: US CONCEAL:  C CLOTHING
                                                           X FOR MORE: +
```

15



12:26 ███████     SIGNIFICANT ENFORCEMENT ACTIVITY REPORT     072711 ███████
                           SEAR (PAGE 3 OF 4)

PORT: LAX INTL ARPT                                SEAR # ███████

                    OFFICER NAME (LAST/FIRST) TITLE - AGENCY
DISCOVERING:
SEIZING:          ███████ CBP OFFCR-C
ARRESTING:
CASE OFFICER:
PARTICIPATING:

NOTIFICATION/OFFICER INVOLVED:
  TIME NOTIFIED:              TIME ARRIVED:
ACTION TAKEN:
PUBLICITY INSTRUCTIONS:   NONE
CONTRIBUTING INFO ██████████████████ ███████ █████████████████
ACS SELECTIVITY INFORMATION:   NONE
OFFICER AUTHORIZING SEAR:   PHONE ███████
  NAME-TITLE-AGENCY ███████ SUPVY CBP OFFCR-C

12:26      **SIGNIFICANT ENFORCEMENT ACTIVITY REPORT**    072711
SEAR (PAGE 4 OF 4) - SUMMARY

PORT: LAX INTL ARPT                       SEAR #

================================ SUMMARY ================================

LH FLIGHT #457
TO FRANKFURT                AT APPROXIMATELY 1450 HRS MR. NAJI
HAMDAN, HIS WIFE AND TWO (2) SONS IN ROUTE TO DUBAI WERE SELECTED FOR AN
EXAMINATION. I EXPLAINED THE U. S. CURRENCY REPORTING REQUIREMENTS AT WHICH
TIME MR. HAMDAN VERBALLY DECLARED $9000. MR. HAMDAN WAS HANDED A CF 503 FORM
TO READ, TO WRITE DOWN THE AMOUNT OF MONEY HE WAS DECLARING AND TO INITIAL HIS
NAME ON THE FORM. MR. HAMDAN READ AND WROTE DOWN $9,500.00 AND THEN SIGNED.
HAMDAN PRESENTED $9,455.00 FOR VERIFICATION. AN ADDITIONAL $21,000.00 IN MONEY
ORDERS WAS DISCOVERED IN AN ENVELOPE IN MR. HAMDAN'S HANDCARRIED BAG. A TOTAL
OF $30,675.00 WAS SEIZED ON 6051S ███████. CASH IN THE AMOUNT OF $9000.00 WAS
PLACED IN SEB ███████, $13,000. IN MONEY GRAM MONEY ORDERS WAS PLACED IN SEB#
███████ $6,000.00 IN WESTERN UNION MONEY ORDERS WAS PLACED IN SEB #███████ AND
$2,000.00 IN CONTINENTAL EXPRESS MONEY ORDERS WAS PLACED IN SEB #███████. THE
AMOUNT OF $675.00 WAS GIVEN TO MR. HAMDAN AND HIS FAMILY FOR HUMANITARIAN
RELIEF.

18

TO FRANKFURT ███████ ████████ ██████ AT APPROXIMATELY 1450 HRS MR. NAJI LH FLIGHT #457 HAMDAN, HIS WIFE AND TWO (2) SONS IN ROUTE TO DUBAI WERE SELECTED FOR AN EXAMINATION. I EXPLAINED THE U. S. CURRENCY REPORTING REQUIREMENTS AT WHICH TIME MR. HAMDAN VERBALLY DECLARED $9000. MR. HAMDAN WAS HANDED A CF 503 FORM TO READ, TO WRITE DOWN THE AMOUNT OF MONEY HE WAS DECLARING AND TO INITIAL HIS NAME ON THE FORM. MR. HAMDAN READ AND WROTE DOWN $9,500.00 AND THEN SIGNED. HAMDAN PRESENTED $9,455.00 FOR VERIFICATION. AN ADDITIONAL $21,000.00 IN MONEY ORDERS WAS DISCOVERED IN AN ENVELOPE IN MR. HAMDAN'S HANDCARRIED BAG. A TOTAL OF $30,675.00 WAS SEIZED ON 6051S #█████ CASH IN THE AMOUNT OF $9000.00 WAS PLACED IN SEB #█████ $13,000. IN MONEY GRAM MONEY ORDERS WAS PLACED IN SEB █████, $6,000.00 IN WESTERN UNION MONEY ORDERS WAS PLACED IN SEB █████ AND $2,000.00 IN CONTINENTAL EXPRESS MONEY ORDERS WAS PLACED IN SEB #█████. THE AMOUNT OF $675.00 WAS GIVEN TO MR. HAMDAN AND HIS FAMILY FOR HUMANITARIAN RELIEF.

to Frankfurt ██████ ████████ ██████ ████ LH flight 457 Hamdan, his wife ██████ ████████ ██████ t approximately 1450hrs Mr. Naji ████████ ██████ and their two (2) sons ████████ were selected for an examination. I asked Mr. Hamdan where they were traveling to. He said they were traveling to Dubai. I asked what type of work he did. He replied he worked in an auto dismantler company and sold new and used parts. I explained to Mr. and Mrs. Hamdan the U. S. currency reporting requirements. I informed them they have to file a report with the U.S. government if they were transporting more than $10,000.00 in currency or monetary instruments. Mr. Hamdan stated he had less than $10,000. I stated it didn't matter who the money belonged to, it could belong to a friend, relative or even a company, but if they had more than $10,000.00 dollars, they were responsible for it and had to file a report with the U.S. government. Mr. Hamdan stated verbally they had approximately $9,000.00 dollars. I handed a CP-503 to Mr. Hamdan and asked him to read it, write the amount they were declaring on the form and sign it. Mr. Hamdan read and wrote the amount of $9,500.00, then signed the form. I asked Mr. and Mrs. Hamdan to take out all the money they had in their possession and place it on the bench. Mr. Hamdan placed a brown paper bag, his wallet and loose bills on the bench. I opened the brown paper bag and it contained a bundle of $100.00 dollar bills wrapped with a rubber band. The total amount in the brown paper bag was $9000.00 dollars. The wallet had $155.00 dollars and loose bills totaled $300.00 dollars. Upon examination of carry-on bags, $220.00 was found in Mrs. Hamdan's purse. Mr. Hamdan's black handcarry bag was also examined and an envelope with twenty-one (21) money orders ($1000.00 dollars each) was discovered. At this time the decision was made to seize Mr. and Mrs. Hamdan's money for violations of 31USC5316 and 31USC5332. Mr. and Mrs. Hamdan and their two (2) children were transported to the FIS area at Tom Bradley International Airport. An examination of the checked in bags was conducted with negative results. A patdown was conducted with supervisor approval on Mr. Hamdan with negative results, as well as negative results on Mrs. Hamdan's patdown. A total of $30,675.00 dollars was seized on 6051S ██████. Cash for the amount of $9,000.00 USD was placed in SEB #█████ $13,000.00 in money orders from Money Gram placed in SEB █████ $6,000.00 in money orders from Western Union placed in SEB █████ and $2,000.00 in money orders from Continental Express placed in SEB #█████ The amount of $675.00 dollars was given to Mr. Hamdan for humanitarian relief Passengers left the FIS area without further incident and the money was placed in the █████ It was not possible to place a stop payment on the Money Orders form Money Gram, Western Union and Continental Express due to office hours being closed. On 08/24/06 all Money Order Companies were contacted to have a stop payment placed. Supervisor █████ at Money Gram was contacted and

a letter was faxed (Corporate Security Department) to request stop payment on thirteen (13) money orders █████████████████████████ at Western Union was contacted and he submitted stop payment request to Product Support Department on six (6) money orders ████████████ at Continental Express was contacted and a letter was faxed requesting a stop payment on two (2) money orders.

██████████████████

# EXHIBIT
# 20

REQUESTED BY: (k)(2), (b)(6), (b)(7)c

O F F I C I A L   U S E   O N L Y

| DEPARTMENT OF HOMELAND SECURITY ICE | TECS ACCESS CODE (b)2 |
|---|---|
| | PAGE 1 |
| R E P O R T   O F   I N V E S T I G A T I O N | CASE NUMBER (k)(2), (b)(2)high |

TITLE: OPERATION SKY BUCKS

CASE STATUS:    INTERIM RPT

| REPORT DATE 082806 | DATE ASSIGNED 100505 | PROGRAM CODE 2, (b)(2)hig | REPORT NO. 049 |
|---|---|---|---|

RELATED CASE NUMBERS:

COLLATERAL REQ:

TYPE OF REPORT:
INVESTIGATIVE FINDINGS

TOPIC: SEIZURE OF $30,000 FROM HAMDAN/ INTERVIEW OF (b)(2), (b)(6), (b)(7)c

SYNOPSIS:
On August 23, 2006, Officers with U.S. Customs and Border Protection (CBP), Anti-Terrorism & Contraband Enforcement Team and Special Agents with the U.S. Immigration and Customs Enforcement (ICE), Financial/National Security Unit at the Assistant Special Agent in Charge, Los Angeles International Airport (ASAC/LAX) conducted an outbound enforcement examination of Lufthansa Airlines (LH) flight 457 from Los Angeles to Frankfurt, Germany. The purpose of the examination was to enforce the bulk cash smuggling statute involving Operation Lima Hotel.

This report documents the examination of Naji HAMDAN and the interview of (b)(6), (b) (k)(2), (b)(6), (b)(7)c along with the seizure of $30,000.00.

| DISTRIBUTION: RACLX SACLA | SIGNATURE: (k)(2), (b)(6), (b)(7)c |
|---|---|
| | APPROVED: (k)(2), (b)(6), (b)(7)c |
| | ORIGIN OFFICE: LX LAX AIRPORT - RAC | TELEPHONE: 562 624 2), (b)(6), (b)|
| | | TYPIST: (k)(2), (b)(6), (b)(7)c |

O F F I C I A L   U S E   O N L Y
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

ICE.000044.10FOIA2404

O F F I C I A L   U S E   O N L Y

| DEPARTMENT OF HOMELAND SECURITY ICE | PAGE    2 |
|---|---|
| | CASE NUMBER: (k)(2); (b)(2)high |
| R E P O R T   O F   I N V E S T I G A T I O N C O N T I N U A T I O N | REPORT NUMBER: 049 |

CASE PROGRAM CODES:

(b)(2)high

O F F I C I A L   U S E   O N L Y

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

ICE.000045.10FOIA2404

O F F I C I A L   U S E   O N L Y

| DEPARTMENT OF HOMELAND SECURITY ICE | PAGE 3 |
|---|---|
| | CASE NUMBER (k)(2), (b)(2)high |
| R E P O R T   O F   I N V E S T I G A T I O N   C O N T I N U A T I O N | REPORT NUMBER: 049 |

DETAILS OF INVESTIGATION:

On August 23, 2006, Officers with U.S. Customs and Border Protection (CBP), Anti-Terrorism & Contraband Enforcement Team and Special Agents with the U.S. Immigration and Customs Enforcement (ICE), Financial/National Security Unit at the Assistant Special Agent in Charge, Los Angeles International Airport (ASAC/LAX) conducted an outbound enforcement examination of Lufthansa Airlines (LH) flight 457 from Los Angeles to Frankfurt, Germany. The purpose of the examination was to enforce the bulk cash smuggling statute involving Operation Lima Hotel.

CBP Officers and ICE Agents encountered United States citizen Naji HAMDAN as he boarded Lufthansa flight #457 to Frankfurt, Germany. HAMDAN was born in Beirut, Lebanon and had an ultimate destination of Dubai, UAE. HAMDAN was traveling with ████ (k)(2), (b)(6), (b)(7)c ████ and ████ (k)(2), (b)(6), (b)(7)c ████ After CBP Officer ██ (k)(2), (b)(6), (b)(7)c ██ had explained the Currency and Monetary Instruments Reporting requirements (CMIR), HAMDAN stated he was in possession of $9,500.00 USD in currency, so had not filed a CMIR. A search of HAMDAN'S luggage revealed that he was in possession of $30,675 USD. A total of $30,000.00 was administratively seized from HAMDAN ████ (k)(2), (b)(2)high ████ . Of that amount, $9,000.00 was in U.S. currency and $21,000.00 was in U.S. Money Orders. The remaining $675.00 was remitted to HAMDAN for humanitarian purposes. The currency was seized for violation of 31 USC 5332, Bulk Cash Smuggling and 31 USC 5316, Report on Exporting and Importing Monetary Instruments. HAMDAN and his ██ (b)(6), (b) ██ were both interviewed by ICE agents; neither were arrested.

ICE INTERVIEW OF ████ (k)(2), (b)(6), (b)(7)c ████



O F F I C I A L   U S E   O N L Y

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

O F F I C I A L   U S E   O N L Y

| DEPARTMENT OF HOMELAND SECURITY ICE | PAGE    4 |
|---|---|
| | CASE NUMBER     (k)(2): (b)(2)high |
| R E P O R T   O F   I N V E S T I G A T I O N   C O N T I N U A T I O N | REPORT NUMBER: 049 |

(k)(2); (b)(6); (b)(7)c

The investigation is continuing.

O F F I C I A L   U S E   O N L Y

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

ICE.000047.10FOIA2404

# EXHIBIT
# 21



U.S. Department of Homeland Security
Arlington, Virginia 20598

**Transportation
Security
Administration**

## By Certified Mail - Return Receipt Requested

FEB 1 2010

Naji Hamdan
4448 El Segundo Blvd. West 205
Hawthorne, CA 90250

Or

Naji Hamdan
121636 Truro Ave.
Hawthorne, CA 90250

> Re: Initial Notification of Threat Assessment
> Federal Aviation Administration Airman Certificate Number 545853151

Dear Mr. Hamdan:

This letter serves as an initial notification of a threat assessment (Initial Notification). Based upon materials available to the Transportation Security Administration (TSA), which I have personally reviewed, and pursuant to 49 United States Code § 46111, I have determined that you pose or are suspected of posing a security threat. Accordingly, TSA is initiating the process to revoke all certificates issued to you by the Federal Aviation Administration (FAA).

As part of this process, TSA is concurrently notifying the FAA of the determination that you pose or are suspected of posing a threat and requesting that the FAA suspend all certificates issued to you by the FAA.

No later than 15 calendar days after the date of service of this Initial Notification, you may serve upon TSA a written request for copies of releasable materials and an unclassified summary of the classified information upon which this Initial Notification was based.

In addition, you may serve upon TSA a written reply to the Initial Notification no later than 15 calendar days after the date of service of the Initial Notification, or 15 days after the date of service of TSA's response to your request for copies of the releasable material upon which this Initial Notification was based, whichever is later. This written reply should include any information that you believe TSA should consider in reviewing the basis for the Initial Notification.

2

In your written reply, you may request an in-person or written hearing before an
administrative law judge. If requested, the in-person hearing will be held either at TSA
headquarters or a location selected by TSA in the metropolitan Washington, D.C. area.
The administrative law judge will issue a written decision no later than 30 calendar days
after the conclusion of the hearing. The administrative law judge's decision may be
appealed by either party to the Transportation Security Oversight Board (TSOB). The
TSOB shall issue a Final Determination, which constitutes a final agency order. You
should serve all documents upon:

> Kelly D. Wheaton
> Assistant Chief Counsel
> Threat Assessment and Internal Investigations
> TSA Headquarters
> 12th Floor, TSA -2
> 601 South 12th Street
> Arlington, VA 20598

TSA does not disclose classified information, as defined in Executive Order 12968
section 1.1(d), and TSA reserves the right to not disclose any other information or
material not warranting disclosure or protected from disclosure under law.

You may, if you choose, be represented by counsel during this process at your own
expense.

> Sincerely,
>
> Keith Kauffman
> Acting Deputy Administrator

cc:   The Honorable J. Randolph Babbitt
      Administrator
      Federal Aviation Administration

# EXHIBIT
# 22



**DEPARTMENT OF DEFENSE**
**OFFICE OF FREEDOM OF INFORMATION**
**1155 DEFENSE PENTAGON**
**WASHINGTON, DC 20301-1155**

**FEB 0 5 2010**

Ref: 10-F-0569

Ms. Jennie Pasquarella
Staff Attorney
ACLU of Southern California
1313 W. Eighth Street
Los Angeles, CA 90017

Dear Ms. Pasquarella:

This is in response to your January 29, 2010, Freedom of Information Act (FOIA) and Privacy Act request on behalf of Naji Jawdat Hamdan, Hossam Hemdan, and Jehad Suliman (the "requesters"). I note that you have also directly submitted this request to the Department of Justice, the Federal Bureau of Investigation (FBI), INTERPOL, the Department of State, the Central Intelligence Agency (CIA), the Department of Homeland Security (DHS), the Defense Intelligence Agency (DIA), the Defense Security Service (DSS), the National Security Agency (NSA), the Department of Defense Office of the Inspector General and the Director of National Intelligence (DNI). We received your request on February 1, 2010, and assigned it FOIA case number 10-F-0569.

You are seeking records which were prepared, received, transmitted, collected and/or maintained on the three "requesters" and Hapimotors, and were created from January 1, 1998, to the present. In addition, you have requested expedited processing pursuant to 5 U.S.C. § 552(a)(6)(E) and 5 U.S.C. § 552(a)(6)(E)(v)(II); a limitation of processing fees pursuant to 5 U.S.C. § 552(a)(4)(A)(ii)(II), as a representative of the news media, and a waiver of all costs pursuant to 5 U.S.C. § 552(a)(4)(A)(iii).

You explain in your request that the "requesters" have been the subject of questioning, monitoring and surveillance by the FBI; that the requesters have had difficulty traveling and were subject to secondary inspections at airports and questioned both leaving and returning to the United States; that Mr. Hamdan was detained overseas, arrested, charged, tried before the Federal Supreme Court in the U.A.E., convicted and sentenced to time served. However, your request establishes no link or involvement of the Department of Defense (DoD) with the requesters, other than the fact that the DoD is a part of the Federal Government. It appears that you are seeking information that may have been shared with some component of the DoD. In that case, if records existed they potentially may be intelligence reports. As you have already directly submitted your request to DNI, CIA, NSA and DIA (all intelligence related organizations), and have provided no explanation or information to link the "requesters" with other components of the DoD, I am closing your request with no further action.

If you are not satisfied with this action, you may appeal to the appellate authority, the Director of Administration and Management, Office of the Secretary of Defense. To submit your appeal, you should write directly to the Defense Freedom of Information Policy Office, ATTN: Mr. James Hogan, 1155 Defense Pentagon, Washington, DC 20301-1155. Your appeal should be postmarked within 60 calendar days of the date of this letter, should cite to case number 10-F-0569, and should be clearly marked "Freedom of Information Act Appeal."

Sincerely,

Paul J. Jacobsmeyer
Chief

# EXHIBIT
# 23



NATIONAL SECURITY AGENCY
CENTRAL SECURITY SERVICE
FORT GEORGE G. MEADE, MARYLAND 20755-6000

FOIA Case: 60766
5 February 2010

Jennie Pasquarella, Esquire
ACLU of Southern California
1313 W. Eighth Street
Los Angeles, CA 90017

Dear Ms. Pasquarella:

This responds to your Freedom of Information Act (FOIA) request
submitted via facsimile on 29 January 2010, which was received by this office
on 1 February 2010, for "any records from January 1, 1998 to the present,
which were prepared, received, transmitted, collected and/or maintained by
the Department of Justice, the Department of State, the Central Intelligence
Agency, the Department of Homeland Security, the Department of Defense and
any of their sub-agencies or divisions relating to or concerning: (1) Mr. Naji
Jawdat Hamdan; (2) Mr. Hossam Jawdat Hemdan (a.k.a. Sammy Hemdan or
Sam Hemdan); (3) Mr. Jehad Suliman; and (4) Hapimotors (a.k.a. Honda Acura
Palace or HondAcura Palace)." Your letter has been assigned FOIA Case
Number 60766. Please refer to this case number when contacting us about
your request. For purposes of this request and based on the information you
provided in your letter, you are considered an "all other" requester. There are
no assessable fees for this request; therefore, we did not address your request
for a fee waiver. Also, since this is a final response letter within ten calendar
days, we are not addressing your request for expedited processing. Your
request has been processed under the provisions of the FOIA.

You may be aware that one of the NSA/CSS missions is to collect,
process, and disseminate communications or signals intelligence information
for intelligence and counter intelligence purposes and to support military
operations. NSA collects information on unspecified persons and entities to
prevent and protect against terrorist attacks, the proliferation of weapons of
mass destruction, intelligence activities directed against the United States,
international criminal drug activities, and other hostile activities directed
against the United States. The roles and responsibilities that NSA exercises are
delineated in Executive Order, 12333, as amended.

FOIA Case: 60766

The classified nature of the National Security Agency's efforts prevents us from either confirming or denying the existence of intelligence records responsive to your request, or whether any specific technique or method is employed in those efforts. The fact of the existence or non-existence of responsive records is a currently and properly classified matter in accordance with Executive Order 12958, as amended. Thus, your request is denied pursuant to the first exemption of the FOIA, which provides that the FOIA does not apply to matters that are specifically authorized under criteria established by an Executive Order to be kept secret in the interest of national defense or foreign relations and are properly classified pursuant to such Executive Order.

Moreover, the third exemption of the FOIA provides for the withholding of information specifically protected from disclosure by statute. Thus, your request is also denied because the fact of the existence or non-existence of the information is exempted from disclosure pursuant to the third exemption. The specific statutes applicable in this case are Title 18 U.S. Code 798; Title 50 U.S. Code 403-1(i); and Section 6, Public Law 86-36 (50 U.S. Code 402 note).

The Initial Denial Authority for NSA information is the Deputy Associate Director for Policy and Records, Diane M. Janosek. As your request is being denied, you are hereby advised of this Agency's appeal procedures. Any person denied access to information may file an appeal to the NSA/CSS Freedom of Information Act Appeal Authority. The appeal must be postmarked no later than 60 calendar days of the date of the initial denial letter. The appeal shall be in writing addressed to the NSA/CSS FOIA Appeal Authority (DJP4), National Security Agency, 9800 Savage Road STE 6248, Fort George G. Meade, MD 20755-6248. The appeal shall reference the adverse determination and shall contain, in sufficient detail and particularity, the grounds upon which the requester believes that the determination is unwarranted. The NSA/CSS FOIA Appeal Authority will endeavor to respond to the appeal within 20 working days after receipt, absent any unusual circumstances.

Sincerely,

PAMELA N. PHILLIPS
Chief
FOIA/PA Office

134

# EXHIBIT
# 24



**U.S. Department of Justice**

INTERPOL – U.S. National Central Bureau

_Washington D.C. 20530_

February 19, 2010

FOIA # 2010-054

Ms. Jennie Pasquarella
Staff Attorney
ACLU of Southern California
1313 West Eighth Street
Los Angeles, CA  90017

Dear Ms. Pasquarella:

This responds to your request to the INTERPOL-U. S. National Central Bureau (USNCB) pursuant to the Freedom of Information Act/ Privacy Act (FOIA/PA) for information relating to or concerning Naji Jawdat Hamdan, Hossam Jawdat Hemdan, Jehad Suliman and Hapimotors. You provided a list of 27 search terms. We received your request on February 17, 2010. Please refer to the above FOIA number assigned to your request in any additional correspondence.

A search of the USNCB indices produced no records. Since we located no records, either no records ever existed in our system of records, or if a criminal investigative record existed in the USNCB system of records and the criminal investigation was closed on any date up through 1999, those records would have been destroyed and would no longer be available for retrieval. You may be interested to know that the USNCB investigative records are retained only for a period of seven (7) years from the date a case is closed.

If you are not satisfied with the USNCB's action on your request, you may appeal by writing to:

Co-Director
Office of Information Policy
U.S. Department of Justice
Suite 11050
1425 New York Avenue, NW
Washington, DC  20530-0001

You must make your appeal in writing and it must be received by the Office of
Information Policy within 60-days of the date of the letter denying your request. Both the letter
and the envelope should be clearly marked "Freedom of Information Act Appeal."

If you have any questions concerning this request, please contact Allison Tanaka at
(202) 353-0803.

Sincerely,

Timothy A. Williams
Director

By:      Kevin R. Smith
         General Counsel

# EXHIBIT
# 25

Central Intelligence Agency



Washington, D.C. 20505

25 February 2010

Jennie Pasquarella, Esq.
ACLU of Southern California
1313 W. Eighth Street
Los Angeles, CA 90017

Reference: F-2010-00687

Dear Ms. Pasquarella:

This is a final response to your 29 January 2009 [sic] Freedom of Information Act (FOIA) request, on behalf of your clients Naji Jawdat Hamdan, Hossam Hemdan, and Jehad Suliman, received in the office of the Information and Privacy Coordinator on 17 February 2010, for records pertaining to:

1. Mr. Naji Jawdat Hamdan;
2. Mr. Hossam Jawdat Hemdan (a.k.a. Sammy Hemdan or Sam Hemdan);
3. Mc. Jehad Suliman; and
4. Hapimotors (a.k.a. Honda Acura Palace or HondAcura Palace).

We have assigned your request the reference number above. Please use this number when corresponding with us so that we can identify it easily. Items 1-3 falls under the purview of the Privacy Act and will be addressed via separate correspondence under P-2010-00382, P-2010-00383, and P-2010-00384, respectively.

In accordance with section 3.6(a) of Executive Order 12958, as amended, the CIA can neither confirm nor deny the existence or nonexistence of records responsive to Item 4 of your request. The fact of the existence or nonexistence of requested records is currently and properly classified and is intelligence sources and methods information that is protected from disclosure by section 6 of the CIA Act of 1949, as amended. Therefore, your request is denied pursuant to FOIA exemptions (b)(1) and (b)(3). I have enclosed an explanation of these exemptions for your reference and retention. As the CIA Information and Privacy Coordinator, I am the CIA official responsible for this determination. You have the right to appeal this response to the Agency Release Panel, in my care, within 45 days from the date of this letter. Please include the basis of your appeal.

Sincerely,

Delores M. Nelson

Delores M. Nelson
Information and Privacy Coordinator