# EXHIBIT
# 26

## Office of the Director of National Intelligence
## Washington, DC 20511

18 June 2010

Ms. Jennie Pasquarella
Staff Attorney
American Civil Liberties Union
ACLU of Southern California
1313 West Eight Street
Los Angeles, CA 90017

Reference: DF-2010-00042

Dear Mr. Lawler:

    This is a final response to your 29 January 2010 request to the Office of the Director of National Intelligence (ODNI) wherein you requested, under the Freedom of Information Act (FOIA) and Privacy Act, **"for any records from January 1, 1998 to the present...relating to or concerning:**

        **(1) Mr. Naji Jawdat Hamdan;**
        **(2) Mr. Hossham Jawdat Hemdan (a.k.a. Sammy Hemdan or Sam Hemdan)**
        **(3) Mr. Jehad Suliman; and**
        **(4) Hapimotors (a.k.a. Honda Acura Palace or HondAcura Palace).**

    Your request was processed in accordance with the FOIA, 5 U.S.C § 552, as amended, and Privacy Act, 5 U.S.C. § 552a. ODNI conducted a search for unclassified records responsive to your request and no records were located.

    Pursuant to FOIA Exemptions 1 and 3, 5 U.S.C § 552 (b)(1) and (3), the ODNI can neither confirm nor deny the existence of classified records responsive to your request. Exemption 1 protects information which is currently and properly classified in accordance with Executive Order 13526. Exemption 3 protects information that is specifically covered by statute. In this case, the applicable statute is the National Security Act, which protects information pertaining to intelligence sources and methods. Accordingly, no classified records systems were searched and this response should no be taken as an indication that records do or do not exist with respect to your request.

    Should you wish to appeal the denial of your request, please do so in writing to:

        Office of the Director of National Intelligence
        Information Management Office
        Washington, DC 20511

**Office of the Director of National Intelligence**
**Washington, DC 20511**

Appeals must be received within 45 days of the date of this letter.  If you have any questions, please call the Requester Service Center at (703) 275-3642.

Sincerely,

John F. Hackett
Director, Information Management Office

# EXHIBIT
# 27

Central Intelligence Agency



Washington, D.C. 20505

June 28, 2010

Jennie Pasquarella, Esq.
ACLU of Southern California
1313 W. Eighth Street
Los Angeles, CA 90017

Reference: P-2010-00628

Dear Ms. Pasquarella:

This is a final response to your 29 January 2009 request for information pertaining to your client Naji J. Hamdan. We processed your request under the Freedom of Information Act and the Privacy Act.

We conducted a search for CIA-originated responsive records that might reflect an open or otherwise acknowledged Agency affiliation existing through 6 May 2010, the date we accepted your request. We were unable to locate any such information or records.

With respect to responsive records that would reveal a classified connection to the CIA, in accordance with section 3.6(a) of Executive Order 13526, as amended, the CIA can neither confirm nor deny the existence or nonexistence of records responsive to your request. The fact of the existence or nonexistence of requested records is currently and properly classified and relates to CIA intelligence sources and methods information that is protected from disclosure by section 6 of the CIA Act of 1949, as amended. Therefore, you may consider this portion of the response a denial of your request pursuant to FOIA exemptions (b)(1) and (b)(3), and PA exemptions (j)(1) and (k)(1). I have enclosed an explanation of these exemptions for your reference and retention.

You have the right to appeal this response within 45 days of the date of this letter. You may address your appeal to the Agency Release Panel, in my care. Please explain the basis of your appeal.

We appreciate your patience while we were processing this request.

Sincerely,

Delores M. Nelson
Information and Privacy Coordinator

Enclosure

# EXHIBIT
# 28

U.S. Department of Homeland Security
Washington, DC 20528



August 12, 2010

Ms. Jennie Pasquarella
American Civil Liberties Union of Southern California
1313 West Eight Street
Los Angeles, CA 90017

Re: **DHS/OS/PRIV 10-0364**

Dear Ms. Pasquarella:

This is in further response to your January 29, 2010 Freedom of Information Act (FOIA) request to the Department of Homeland Security (DHS). Your request was received on February 3, 2010, seeking records from January 1, 1998 to the present, which were prepared, received, transmitted, collected and/or maintained by the Department of Justice, the Department of State, the Central Intelligence Agency, the Department of Homeland Security, the Department of Defense and any of their sub-agencies or divisions relating to or concerning the following:

(1) Mr. Naji Jawdat Hamdan;

(2) Mr. Hossam Jawdat Hemdan (a.k.a Sammy Hemdan or Sam Hemdan)

(3) Mr. Jehad Suliman; and

(4) Hapimotors (a.k.a Honda Acura Palace or HondaAcura Palace). The business is currently located at 1848 East 55th St, Los Angeles, CA 90058 and maintains a website at www.hapimotors.com

Additionally, you requested any records relating to or concerning any of the requestors or Hapimotors that may be cross-listed, cross-referenced or contained in the main file pertaining to another individual or entity. The request also includes, but not limited to the entirety of any document that includes the name of any of the requestors mentioned in your letter.

To provide your clients with the greatest degree of access authorized by law, we have processed your request under both the Privacy Act, 5 U.S.C. § 552a, and the FOIA, 5 U.S.C. § 552. Information about an individual that is maintained in a Privacy Act system of records may be accessed by that individual unless the agency has exempted the system of records from the access provisions of the Privacy Act. In this instance, the records are exempt pursuant to (j)(2) and (k)(2) of the U.S. Customs and Border Protection system of records identified to DHS/CBP-011 TECS, which is accessible from http://edocket.access.gpo.gov/2008/E8-29807.htm; Internet, accessed August 12, 2010.

A search of the following U.S. Immigration and Customs Enforcement (ICE) program offices was conducted for records that would be responsive to your request: Homeland Security Investigations (HSI), the Office of Enforcement and Removal Operations (ERO), the Office of the Executive Secretariat (OES), the Office of Principal Legal Advisor (OPLA), and the Office of Public Affairs (OPA). A search of ERO, OES, OPLA and OPA failed to locate responsive records. Additionally, a search of the Office of Inspector General and the Office of Intelligence and Analysis (OI&A) also failed to disclose any responsive records. However, a search of

the HSI produced a total of twenty-eight (28) pages. After a review of the documents, it was also determined that portions of the documents are withheld pursuant to Title 5 U.S.C § 552 FOIA Exemptions (b)(2)High, (b)(5), (b)(6), (b)(7)(C), and (b)(7)(E). I have provided an explanation of the exemptions below:

Privacy Act Exemption (j)(2) permits the government to withhold material reporting investigative efforts pertaining to enforcement of criminal law including efforts to prevent, control, or reduce crime or apprehend criminals.

Privacy Act Exemption (k)(2) protects investigatory material compiled for law enforcement purposes, other than criminal, which did not result in loss of a right, benefit or privilege under Federal programs, or which would identify a source who furnished information pursuant to a promise that his/her identity would be held in confidence.

FOIA Exemption 2(high) protects information applicable to internal administrative and personnel matters, such as operating rules, guidelines, and manual of procedures of examiners or adjudicators, to the extent that disclosure would risk circumvention of an agency regulation or statute, impede the effectiveness of an agency's activities, or reveal sensitive information that may put the security and safety of an agency activity or employee at risk. Whether there is any public interest in disclosure is legally irrelevant. Rather, the concern under high 2 is that a FOIA disclosure should not benefit those attempting to violate the law and avoid detection.

FOIA Exemption 5 protects from disclosure those inter- or intra-agency documents that are normally privileged in the civil discovery context. The three most frequently invoked privileges are the deliberative process privilege, the attorney work-product privilege, and the attorney-client privilege. After carefully reviewing the responsive documents, I determined that portions of the documents qualify for protection under the deliberative process privilege which protects the integrity of the deliberative or decision-making processes within the agency by exempting from mandatory disclosure opinions, conclusions, and recommendations included within inter-agency or intra-agency memoranda or letters. The release of this internal information would discourage the expression of candid opinions and inhibit the free and frank exchange of information among agency personnel.

FOIA Exemption 6 exempts from disclosure personnel or medical files and similar files the release of which would cause a clearly unwarranted invasion of personal privacy. This requires a balancing of the public's right to disclosure against the individual's right privacy. The types of documents and/or information that we have withheld may consist of birth certificates, naturalization certificates, driver license, social security numbers, home addresses, dates of birth, or various other documents and/or information belonging to a third party that are considered personal. The privacy interests of the individuals in the records you have requested outweigh any minimal public interest in disclosure of the information. Any private interest you may have in that information does not factor into the aforementioned balancing test.

Exemption 7(C) protects records or information compiled for law enforcement purposes that could reasonably be expected to constitute an unwarranted invasion of personal privacy. This exemption takes particular note of the strong interests of individuals, whether they are suspects, witnesses, or investigators, in not being unwarrantably associated with alleged criminal activity. That interest extends to persons who are not only the subjects of the investigation, but those who may have their privacy invaded by having their identities and information about them revealed in connection with an investigation. Based upon the traditional recognition of strong privacy interest in law enforcement records, categorical withholding of information that identifies third parties in law enforcement records is ordinarily appropriate. As such, I have determined that the privacy interest in the identities of individuals in the records you have requested clearly outweigh any minimal public interest in disclosure of the information. Please note that any private interest you may have in that information does not factor into this determination. The types of documents and/or information that we have withheld could consist of names, addresses, identification numbers, telephone numbers, fax numbers, or various other documents that are considered personal.

Exemption 7(E) protects records compiled for law enforcement purposes, the release of which would disclose techniques and/or procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law. I determined that disclosure of checkpoint locations and surveillance techniques could reasonably be expected to risk circumvention of the law. Additionally, the techniques and procedures at issue are not well known to the public.

The decision to withhold portions of the information was made by Catrina M. Pavlik-Keenan, FOIA Director, U.S. Immigration and Customs Enforcement (ICE), Department of Homeland Security. You have a right to appeal our withholding determination. Should you wish to do so, you must send your appeal and a copy of this letter, within 60 days of the date of this letter, to: Associate General Counsel (General Law), U.S. Department of Homeland Security, Washington, D.C. 20528, following the procedures outlined in the DHS regulations at 6 C.F.R. § 5.9. Your envelope and letter should be marked "FOIA Appeal" and reference our number as well as ICE's FOIA case number 2010FOIA2404. Copies of the FOIA and DHS regulations are available at www.dhs.gov/foia

This concludes the processing of your request within the Privacy Office. Our March 5, 2010 letter advised you that your request was of substantial interest to two or more components of DHS. We also tasked U.S. Customs and Border Protection (CBP) and Transportation and Security Administration (TSA) to conduct a search for responsive records. Your request is still pending with CBP and TSA. These components will process information independent of this office. You may contact those offices in writing at the addresses listed below:

> U.S. Customs and Border Protection
> 799 9th Street, NW, Mint Annex,
> Washington, D.C. 20229
> Telephone: 202-325-0150
>
> Transportation Security Administration
> 601 S. 12th Street
> 11th Floor, East Tower
> Arlington, VA 22202
> Telephone: 1-866-FOIA-TSA or 571-227-2300.

Provisions of the Act allow us to recover part of the cost of complying with your request. In this instance, because the cost associated with this response is below the $14 minimum, there is no charge.

If you need to contact this office again concerning your request, please refer to **DHS/OS/PRIV 10-0364**. This office can be reached at 866-431-0486.

Sincerely,

Vania T. Lockett
Associate Director, Disclosure & FOIA Operations

Enclosures: As stated, 28 pages

# EXHIBIT
# 29



**U.S. Department of Justice**

Civil Division, Federal Programs Branch

| **Via First-Class Mail** | **Via Overnight Delivery** |
|---|---|
| P.O. Box 883 | 20 Massachusetts Ave., NW |
| Washington, D.C. 20044 | Washington, D.C. 20001 |

Jeffrey M. Smith
Senior Counsel

Tel: 202/514-5751
Fax: 202/616-8202

November 12, 2010

Via Electronic Mail

Laboni A. Hoq
Traber & Voorhees
128 North Fair Oaks Ave.
Pasadena, CA 91103
lhoq@tvlegal.com

> **Re:** *Hamdan, et al. v. United States Dep't of Justice, et al.*, **2:10-cv-06149-JHN-JEMx**

Dear Laboni:

This letter responds to your two letters of November 8, 2010. ODNI, NSA, and CIA are prepared to move for summary judgment. At Plaintiffs request, these Defendants and NSD are willing to put off their summary judgment filings if Plaintiffs will agree not to seek discovery from these Defendants prior to their filing for summary judgment. If this is agreed, NSD will provide Plaintiffs with a declaration supporting the adequacy of its search by December 15, 2010.

Regarding DIA, FBI, TSA, and CBP, to the extent that these Defendants produce documents with exempt material redacted, the Defendants will mark each redaction with the applicable exemption or exemptions, as the FOIA statute, as amended by the OPEN Government Act of 2007, requires. To the extent that any of these Defendants makes a Glomar assertion regarding any system of records, that Defendant will identify, to the extent possible, the types of records and the exemption or exemptions supporting the Glomar response. Regarding any responsive documents that may be withheld in full as exempt, these Defendants will, to the extent possible, identify the number of pages and the applicable exemptions. At this time, these Defendants cannot commit to providing any other specific information about such documents, as it is unknown whether there will be any such documents, what the volume of such documents will be, and whether any descriptive information – including even the volume of records itself – will also be exempt. For example, if a document is classified, then the identity of the document's author may also be classified. After any fully exempt documents have been identified, DIA, FBI, TSA, and/or CBP will evaluate whether there is any segregable information about the documents that can be shared with Plaintiffs. In addition, if the aforementioned terms are agreeable to Plaintiffs, DIA, FBI, TSA, and CBP will agree to provide, via letter, a description of their respective searches demonstrating search adequacy by January 31, 2011. The FBI will provide its adequacy of search justification in its <u>Vaughn</u> declaration which will be submitted at such time as the parties are prepared to proceed with summary judgment motions to resolve the remaining issues in the case.

The Department of State is continuing its search as described in my November 1, 2010 letter to you. The State Department's task is made more difficult by Plaintiffs' refusal to narrow its request to exclude information that is irrelevant to Mr. Hamdan, Mr. Hemdan, Mr. Suliman, and Hapimotors. This refusal will require the State Department to process irrelevant information that may be classified and/or subject to other exemptions simply because that information happens to be in a document (such as an omnibus briefing paper) that contains a section relating to Mr. Hamdan. Given the ongoing search, the State Department is not in a position to make any additional commitments at this time, except to agree that where the State Department produces documents with exempt material redacted, it will mark each redaction with the applicable exemption or exemptions. Finally, while Plaintiffs have the right to seek a Court order setting forth a shorter production schedule, the Department of State is confident that it will be able to justify its ongoing efforts and projected production schedule to the Court. The process of doing so, including the preparation of supporting declarations, would take resources away from the ongoing search and potentially extend the length of time required to respond.

Sincerely,

Jeffrey M. Smith

# EXHIBIT
# 30





# DEFENSE INTELLIGENCE AGENCY

## WASHINGTON, D.C. 20340-5100

U-10-4,017/DAN-1A (FOIA)                          DEC 2 8 2010

Ms. Jennie Pasquarella
American Civil Liberties Union
of Southern California
1313 West Eighth Street
Los Angeles, CA 90017

Dear Ms. Pasquarella:

This responds to your Freedom of Information Act (FOIA) request, dated January 29, 2010, that you submitted to the Defense Intelligence Agency (DIA) for information concerning Mr. Naji Jawdat Hamdan, Mr. Hossam Jawdat Hemdan (a.k.a Sammy Hemdan or Sam Hemdan), Mr. Jehad Suliman, and Hapimotors. I apologize for the delay in responding to your request. In order to properly respond, it was necessary to consult with multiple offices within the agency. DIA's search located 27 responsive documents subject to the FOIA.

Upon review, I have determined that all substantive portions of the 27 documents are not releasable pursuant to the FOIA, and therefore all of these documents are being withheld in full. The documents are exempt from release pursuant to Exemptions 1, 2, 3, and 6 of the FOIA, 5 U.S.C. § 552 (b)(1), (b)(2), (b)(3), and (b)(6). Exemption 1 applies to information properly classified under the criteria of Executive Order 13526. Exemption 2 applies to information which pertains solely to the internal rules and practices of the agency, the release of which could risk circumvention of a legal requirement. Exemption 3 applies to information specifically exempted by a statute establishing particular criteria for withholding. The applicable statute is 10 U.S.C. § 424 which protects the identity of DIA employees and the organizational structure of the agency. Exemption 6 applies to information which if released would constitute an unwarranted invasion of the personal privacy of other individuals.

Sincerely,

Margaret J. Bertrain
for

Alesia Y. Williams
Chief, Freedom of Information Act Staff

# EXHIBIT
# 31

THE LAW OFFICES OF
# TRABER & VOORHEES

THERESA M. TRABER
BERT VOORHEES
LABONI AMENA HOQ
MARONEL BARAJAS

OF COUNSEL
HADSELL STORMER KEENY RICHARDSON & RENICK, LLP
LITT, ESTUAR, HARRISON, MILLER & KITSON, LLP

128 NORTH FAIR OAKS AVENUE
PASADENA, CALIFORNIA 91103
TEL: (626) 585-9611
FAX: (626) 585-1400

December 22, 2010

*Via U.S. Mail and E-mail*

Jeffrey M. Smith
Senior Counsel
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Washington, D.C. 20001

Re:     *Hamdan et al. v. U.S. Dept. of Justice, et al.*
        Case No. 10-06419 JHN (JEMx)

Dear Jeff:

This letter is pursuant to our stipulation that certain defendants would provide plaintiffs with declarations attesting to the adequacy of their searches for records responsive to plaintiffs' Freedom of Information Act ("FOIA") and Privacy Act ("PA") request. Plaintiffs have received such declarations from the following defendants: United States National Central Bureau ("USNCB"), Department of Justice - National Security Division ("NSD"), Department of Defense - Office of Freedom on Information ("OFOI") and Department of Defense - Office of Inspector General ("OIG"). This letter identifies what plaintiffs believe to be deficiencies in these declarations that call into question whether the searches were adequately conducted. Plaintiffs look forward to discussing these matters with you to determine whether the parties can work together to eliminate or narrow any disputes regarding the adequacy of these defendants searches.

As you know, in order to establish that their searches are legally adequate, defendants must demonstrate by way of declaration that their searches were conducted in a manner "reasonably calculated to uncover all relevant documents." *Zemansky v. U.S. Environmental Protection Agency*, 767 F.2d 569, 571 (9th Cir. 1985). "The adequacy of the search ... is judged by a standard of reasonableness and depends, not surprisingly, upon the facts of each case." *Id.* (quoting *Weisberg v. United States Dept. of Justice*, 705 F.2d 1344, 1351 (D.C. Cir. 1983)). Courts in this Circuit have set forth guidelines for what should be included in a search declaration in order to assess the adequacy of the search.

"Affidavits that do not denote which files were searched, do not reflect any systematic approach to document location, and do not provide information specific enough to enable [the requestor] to challenge the procedures utilized have been deemed insufficient." *Rodriguez v. McLeod*, 2008 U.S. Dist.

Jeffrey M. Smith
December 22, 2010
Page 2

LEXIS 102415 (E.D. Cal. 2008)(quotations and citations omitted). For example, in *Lane v. DOI*, 523 F.3d 1128, 1139 (9th Cir. 2008), the defendant agency "produced the affidavit of [a] FOIA agent ... which explain[ed] the search procedures she used, the staff members she contacted, the files and emails examined, the time spent on various searches, and the 577 pages of documents sent to [plaintiff] in response to her request." The court held that the affidavit was sufficiently "detailed" and made in "good faith," in that it allowed the lower court to make a determination as to the adequacy of the search. *Id.*

Similarly, in *Rosenfeld v. Dept. Of Justice*, 2008 U.S. Dist. LEXIS 64620 (N.D. Cal 2008), the court identified the following information that defendant FBI was required to include in its adequacy of search declarations:

(1)     the nature and scope of all databases and indices maintained by defendants, including a description of the data contained in the same;

(2)     which databases and indices were searched in response to plaintiffs' requests, including case indices;

(3)     what terms were searched, or if a different mechanism for searching was used, to explain the same;

(4)     when the search was performed;

(5)     where the search was performed;

(6)     which databases and indices were not searched and why not.

*Id.* at *39-40. Here, among other deficiencies, all of the defendants have failed to identify the universe of records systems they utilize, let alone provide a description of the types of records contained in them. Without this information, plaintiffs cannot assess whether defendants' searches of only certain databases was "reasonably calculated to uncover all relevant documents." *Zemansky*, 767 F.2d at 571.

In addition, *Rosenfeld* discussed the importance of "search slips" – or internal agency records that document and keep track of agency searches. The FBI in *Rosenfeld* agreed to produce these search slips from certain offices. However, the court further ordered that for those FBI offices that did not use search slips, the FBI was required to explain how they keep track of searches (e.g. "information about any written records created to document the search."). *Id.* at *47-48. The production of these "search slips" (or comparable documentation of the searches) would provide plaintiffs a means by which to verify that the searches were conducted in the manner set forth in the declarations, as well as provide additional information missing from the declarations. This is especially crucial where – as here – the declarants were not primarily involved in conducting the searches, and invariably do not attest to having the requisite organizational standing or personal knowledge to make the declaration. *Id.* at *33-34 ("For an action involving a FOIA request, an agency may submit a declaration from an agency official with responsibility for coordinating the agency's decisions on FOIA requests where that official has *personal knowledge of the procedures* used in handling the FOIA request at issue *and is familiar with the documents in question*." (Citations and quotations omitted) (Emphasis added).

Jeffrey M. Smith
December 22, 2010
Page 3

As discussed below, defendants have for the most part failed to provide declarations which comprehensively include the information required in *Rosenfeld*, or that was held in *Lane*. Plaintiffs believe they are entitled to this information because without it they cannot properly assess the adequacy of defendants' searches. Plaintiffs do not waive their right to seek all of the information described above if this issue must be litigated. However, at this time plaintiffs would be willing to limit their request for further information about the adequacy of defendants' searches if defendants agree to provide them the information set forth below.

## USNCB

Defendant USNCB provided a search declaration from Allison Tanaka ("Tanaka Decl."). Ms. Tanaka identifies herself as a "Freedom of Information Act and Privacy Act specialist" and describes her job duties to include "respond[ing] to requests for records of the USNCB made under the ... FOIA ... and the PA." Tanaka Decl. ¶1. However, Ms. Tanaka does not identify that she personally responded to plaintiffs' request, or that she supervised the individual(s) that did. *See Carney v. Dept. of Justice*, 19 F.3d 807, 813-814 (2d Cir. 1994). While she claims to have "first-hand knowledge of [p]laintiffs' request and steps taken in response to it by USNCB," she fails to identify any facts to support this claim. *See Rosenfeld* at *33 (declaration inadequate where it "merely makes a legal conclusion without specifying how this personal knowledge was acquired."). As such, it appears Ms. Tanaka lacks both the requisite organizational standing and knowledge to attest to the adequacy of USNCB's search. As such, plaintiffs request that USNCB address these discrepancies and submit a new or supplemental declaration correcting the noted deficiencies.

Even if Ms. Tanaka's declaration was admissible, and USNCB's search was conducted as she describes, the declaration would still lack the detail required to establish the adequacy of USNCB's search. First, while USNCB identifies two records systems it searched in response to plaintiffs' request – the USNCB system of records and administrative files – it does not identify whether it also utilizes other records systems that were not searched, what types of records they contain and why they were not searched. Plaintiffs would ask that USNCB provide plaintiffs this missing information.

Second, as to the two records systems it did search, neither appear to specifically include "emails" or other records that may reside on the personal computers of USNCB's staff. Unless USNCB can attest that such emails and other records maintained by its staff have been searched, plaintiffs ask that USNCB conduct a subsequent search of these records to locate records response to plaintiffs' request.

Third, in searching its administrative files, it appears that USNCB used as search terms only the last names or part names of the subjects of the request. Plaintiffs would ask that USNCB explain why it failed to use all search terms provided by plaintiffs in its search of its administrative files, and if need be to conduct a subsequent search using all of the search terms plaintiffs identified.

Jeffrey M. Smith
December 22, 2010
Page 4

Finally, Ms. Tanaka's declaration at paragraph 6 states that searches conducted through its "Envoy Database" search engine and its "Case Document" search engine result in a "list of all USNCB case files containing the information queried." USNCB further asserts that its queries of these search engines in connection with plaintiffs' request "produced no records." Tanaka Decl., ¶12. To the extent USNCB maintains screen print-outs of such "no records" responses (or other documentation of search results), plaintiffs request that USNCB produce to these search documentation records.

## NSD

Defendant NSD provided a search declaration from Mark A. Bradley ("Bradley Decl."). Mr. Bradley established that he supervises NSD's execution of its obligations under FOIA, and he made his declaration based in part on reports by "other NSD personnel." Bradley Decl. ¶2. However, Mr. Bradley's declaration does not identify whether he directly supervised the "other NSD personnel" from whom he received reports. Plaintiffs request that NSD supplement its declaration with information establishing the requisite personal knowledge of the facts set forth in the declaration. *See Rosenfeld* at *33.

Mr. Bradley's declaration also fails to establish the adequacy of NSD's search for the following reasons. First, while Mr. Bradley's declaration states that NSD sent a search request to "each" of its four components, and that these components each searched their "case tracking data," no further information is provided about these searches to allow plaintiffs to determine whether the searches were adequate. In order to assess the adequacy of these "case tracking data" searches, plaintiffs request that NSD provide them with information regarding what types of documents are maintained as a part of the "case tracking data," when and where each of the searches were conducted, what search terms were used to conduct each of the searches and how much time was spent conducting each of the searches. *See Rosenfeld* at 39-40; *Lane* at 1139. Plaintiffs also request that NSD provide them with the "search sheets" referenced in paragraph 6 of Mr. Bradley's declaration (and any other documentation of searches conducted in response to plaintiffs' request). *See Rosenfeld* at 47-48.

Second, NSD states that it asked its attorneys and support personnel to search their "paper files, electronic files, and electronic mail accounts." To the extent these search requests are different from the "case tracking data" searches referenced above (which is not clear from the declaration), NSD separately failed to provide plaintiffs with the information necessary to assess the adequacy of these searches. Irrespective, plaintiffs request that NSD identify when it requested these individuals to carry out the searches and any documentation of the request, how many people were solicited to search their files, and their job titles. Of those solicited to conduct an individual search, NSD should also identify how many of them affirmatively responded that they had searched for and located no responsive records along with any correspondence documenting these responses.

Third, regarding NSD FOIA's search of the "policy and paper files" of NSD component Office of Intelligence ("OI"), NSD again provides no information to allow plaintiffs to assess the adequacy of

Jeffrey M. Smith
December 22, 2010
Page 5

this search. Plaintiffs request that NSD provide information regarding what is contained in those "policy and paper files," and when the files were searched.

Fourth, regarding the search terms used to conduct any of the above-referenced searches, it appears NSD used only six search terms, *see* Bradley Decl., ¶6, and excluded the additional 21 search terms identified in plaintiffs' request. Plaintiffs request that NSD explain why it limited its searches to the six search terms identified in Mr. Bradley's declaration. If NSD cannot provide proper justification for so limiting its searches, plaintiffs ask that NSD conduct a further search with each of the search terms identified in plaintiffs' request.

Finally, other than the "case tracking data" of its four components, the "paper files, electronic files, and electronic mail accounts" of its attorneys and support personnel, and the "policy and correspondence files" of its component OI, NSD does not identify the nature and scope of each of the other records system it maintains, what is contained in those systems, and why it did not search them in response to plaintiffs' request. *See Rosenfeld* at 39-40. Plaintiffs request that NSD provide plaintiffs with information to identify each of its records systems, what types of records are contained in them, whether they were searched in response to plaintiffs' request using the search terms plaintiffs provided, and if not, why not.

## DOD-OIG

As with USNCB and NSD, defendant DOD-OIG's declaration from John R. Crane fails to properly establish that he has the requisite organizational standing and personal knowledge to attest to the adequacy of the DOD-OIG search. To the contrary, Mr. Crane admits that the entity DOD-OIG initially tasked to conduct the search – DCIS – is supervised by the Office of the Deputy Inspector General for Investigations (ODIG INV). Crane Decl., ¶4(a). There is no evidence that Mr. Crane supervised DCIS's response to plaintiffs' request, or the responses of the other entities that DOD-OIG later tasked with responding to plaintiffs' request. *See* Crane Decl., ¶¶17-29.

However, the information contained in Mr. Crane's declaration – together with the internal communications documenting DOD-OIG's search – go a long way toward providing plaintiffs the information they need to assess the adequacy of DOD-OIG's search. While we are satisfied that DOD-OIG conducted an adequate search of the records systems identified in Mr. Crane's declaration, we still need an accounting of the universe of records systems maintained by DOD-OIG. Specifically, at http://privacy.defense.gov/notices/oig/, DOD-OIG identifies that it maintains 16 separate records systems. Only one of these systems – the DOD Hotline Program Case File – is identified in Mr. Crane's declaration as having been searched in response to plaintiffs' request. While Mr. Crane's declaration identifies other records systems searched in response to the request, this information alone does not allow plaintiff to determine whether all relevant records systems were searched. Plaintiffs will need DOD-OIG to identify whether each of the records systems identified in the above-referenced website was searched (and provide any search records that have not already been provided), which of those

Jeffrey M. Smith
December 22, 2010
Page 6

records systems were not searched, and reasons why they were not searched.

If DOD-OIG is willing to provide plaintiffs with this information, and the information does not demonstrate the need for further search of DOD-OIG's records, plaintiffs would be willing to negotiate a stipulated dismissal of DOD-OIG from this suit on mutually agreeable terms.

## DOD - OFOI/ FOID

In its declaration by William T. Kramer ("Kramer Decl."), Defendant FOID affirms that it never conducted a search for records responsive to plaintiffs' request for the same reasons set forth in its denial of plaintiffs administrative appeal. FOID continues to takes the position that it has no obligation to search for responsive records primarily because plaintiffs failed to establish a "link or involvement" between DOD and the requesters. As set forth in their administrative appeal, plaintiffs do not agree that the nature of their request does not establish a connection with the DOD. Irrespective, plaintiffs are not aware of any legal authority that allows FOID to take the position that plaintiffs must establish such a connection before it will be required to conduct a search for requested records. Indeed, none of the other DOD components to whom we served our request has taken this position. If you are aware of any authority to support FOID's position, please provide it to us for our consideration.

Nonetheless, Mr. Kramer's declaration admits that plaintiffs' request relates to an "intelligence related organization." Kramer Decl., ¶5. He also identifies that he supervises the processing of FOIA requests for documents within the possession of the Office of the Secretary, and the Office of the Chairman of the Joint Chiefs of Staff ("OSD/JS"). As reported by DOD in response to its Privacy Act obligations, OSD/JS maintains a record system identified as "CIFA Operational and Analytical Records." DOD states that the "[c]ategories of individuals covered by [this] e system" include, "[i]ndividuals involved in, or of interest to, DoD counterintelligence or law enforcement investigations, operations, or analytical projects." As such, there is a clear connection between plaintiffs' request and records maintained by FOID. Plaintiffs ask that FOID task OSD/JS with conducting a search of the "CIFA Operational and Analytical Records" to locate records responsive to plaintiffs' request.

Very Truly Yours,

Laboni A. Hoq

cc:    Jennie Pasquarella

# EXHIBIT
# 32



**U.S. Department of Justice**

**Federal Bureau of Investigation**

*Washington, D.C. 20535*
*December 29, 2010*

MS. JENNIE PASQUARELLA
ACLU OF SOUTHERN CALIFORNIA
1313 WEST EIGHTH STREET
LOS ANGELES, CA 90017

Subject: HAMDAN, NAJI JAWDAT/HAPIMOTORS
FOIPA No. 1143419- 000

Subject: HEMDAN, HOSSAM JAWDAT
FOIPA No. 1143421

Subject: SULIMAN, JEHAD
FOIPA No. 1143422

Dear Ms. Pasquarella:

The enclosed documents were reviewed under the Freedom of Information/Privacy Acts (FOIPA), Title 5, United States Code, Section 552/552a. Deletions have been made to protect information which is exempt from disclosure, with the appropriate exemptions noted on the page next to the excision. In addition, a deleted page information sheet precedes the pages being released to indicate where pages were removed entirely. The exemptions used to withhold information are marked below and explained on the enclosed Form OPCA-16a:

| Section 552 | | Section 552a | |
|---|---|---|---|
| ☒(b)(1) | ☐(b)(7)(A) | ☐(d)(5) |
| ☒(b)(2) | ☐(b)(7)(B) | ☒(j)(2) |
| ☐(b)(3)_____ | ☒(b)(7)(C) | ☐(k)(1) |
| _____ | ☒(b)(7)(D) | ☐(k)(2) |
| _____ | ☒(b)(7)(E) | ☐(k)(3) |
| _____ | ☐(b)(7)(F) | ☐(k)(4) |
| ☐(b)(4) | ☐(b)(8) | ☐(k)(5) |
| ☐(b)(5) | ☐(b)(9) | ☐(k)(6) |
| ☒(b)(6) | | ☐(k)(7) |

**118 pages** were reviewed and **99 pages** are being released. Due to the condition of the original documents, we have found that some of the copies reproduced therefrom have been extremely difficult to read. While we realize the quality of some of the documents is poor, every effort has been made to obtain the best copies possible.

☒ You have the right to appeal any denials in this release. Appeals should be directed in writing to the Director, Office of Information Policy, U.S. Department of Justice, 1425 New York Ave., NW, Suite 11050, Washington, D.C. 20530-0001. Your appeal must be received by OIP within sixty (60) days from the date of this letter in order to be considered timely. The envelope and the letter should be clearly marked "Freedom of Information Appeal." Please cite the FOIPA Number assigned to your request so that it may be easily identified.

Sincerely yours,

David M. Hardy
Section Chief
Record/Information Dissemination Section
Records Management Division

Enclosures

# EXHIBIT
# 33



**U.S. Department of Justice**

Civil Division, Federal Programs Branch

| | |
|---|---|
| **Via First-Class Mail** | **Via Overnight Delivery** |
| P.O. Box 883 | 20 Massachusetts Ave., NW |
| Washington, D.C. 20044 | Washington, D.C. 20001 |

Jeffrey M. Smith
Senior Counsel

Tel: 202/514-5751
Fax: 202/616-8202

January 21, 2011

<u>Via Electronic Mail</u>

Laboni A. Hoq
Traber & Voorhees
128 North Fair Oaks Ave.
Pasadena, CA 91103
lhoq@tvlegal.com

**Re:** *Hamdan, et al. v. United States Dep't of Justice, et al.*, **2:10-cv-06149-JHN-JEMx**

Dear Laboni:

This letter responds to your letter of December 22, 2010.

The leading Ninth Circuit case on adequacy of search is *Lahr v. National Transportation Safety Board*, 569 F.3d 964 (9th Cir. 2009) In that case the Ninth Circuit found that search declarations submitted by the Central Intelligence Agency and the National Transportation Safety Board were sufficient to warrant summary judgment for those agencies. *See id.* at 986-88 The Ninth Circuit affirmed a decision by Judge Matz of the Central District of California which found that the CIA declaration was legally sufficient to justify the adequacy of its search. *See Lahr v. National Safety Transportation Board*, 2006 WL 2854314, at *10-*12 (C.D. Cal. Oct. 4, 2006). I have enclosed the declaration that Judge Matz and the Ninth Circuit found to be fully sufficient.

A number of features of this declaration are noteworthy and demonstrate that the fourteen defendant components in this case are not saddled with the extensive and burdensome requirements that you attempt to impose. First, note the basis of the knowledge of the declarant, Terry Buroker:

> Through the exercise of my official duties, I am familiar with the above-captioned litigation and Plaintiff's FOIA request that is the subject of this case. I make the following statements based upon my personal knowledge and information made available to me in my official capacity.

Buroker Decl. ¶ 4.

Next, note that the Buroker Declaration does not provide, because it is not required, an exhaustive list of all records systems at the CIA. Nor does it provide, again because it is not required, a description of the reasons why certain parts of the CIA were not searched. Rather, the declaration lists the four sub-components (directorates) within the CIA, and states:

> In the instant case, the search focused on one directorate – the DI [Directorate of Intelligence] – determined to be reasonably likely to have records responsive to the Plaintiff's request. Given the nature of their respective missions, functions, and record systems, as well as the nature of the information sought . . . no other directorate would be reasonably likely to possess responsive records.

*Id.* ¶ 21 (footnote omitted). The Ninth Circuit's endorsement of this declaration demonstrates that where the search was targeted at specific systems or sub-components of an agency it is sufficient for the agency to aver, under oath, that these were the only systems of sub-components likely to possess responsive records. The agency need not catalog every place it did not search or provide a detailed explanation for why those places are not likely to contain responsive records.

Note also, the description of the search:

> DI personnel trained to conduct FOIA searches and other record searches, and who conduct such searches as part of their regular responsibilities, conducted a thorough and diligent search of the automated DI records system. No responsive information was located in the automated records systems at the directorate level.

> Because searches of the DI automated records system had located no responsive information (and due to the atypical nature of the project), my office tasked the request to the Office of Transnational Issues in the DI. Under the direction of a senior OTI weapons analyst, . . . office and individual analyst files, including local databases, e-mail, and desk files, were searched for information on the TWA-800 project as a whole. Once assembled these records were then forwarded to my office, where members of my staff who were familiar with Plaintiff's request, the manually searched the [documents].

> All reasonable efforts were made to identify, retrieve, and process the records responsive to Plaintiff's FOIA request.

*Id.* ¶¶ 23-25. This description was found by the Ninth Circuit to provide "sufficient detail" about the CIA's search for responsive records. *Lahr*, 569 F.3d at 987. Note that this "sufficient detail" does not include descriptions of the databases searched, the number of databases searched, the identity or number of persons whose e-mails and desk files were searched, the dates of the search, the time consumed by the search, or even the search terms that were used in electronic searches. Moreover, the initial portion of the manual search was overseen by a senior weapons analyst – clearly not someone who reported to the declarant. Nevertheless, the declaration was sufficient because, while the declarant who provides official capacity information regarding the search must have responsibility for supervising the processing of the FOIA request, he does not have to have supervisory responsibility

over each person who participates in the search.

That this declaration was found to be legally sufficient by Judge Matz and by the Ninth Circuit in *Lahr* makes a number of points clear:

1. There is no requirement that the agency list, much less describe, "all databases and indices" maintained by it.
2. There is no requirement to provide specific descriptions or case indices for databases searched.
3. There is no requirement to provide search terms used (although Defendants in this case have generally been willing to provide this information anyway).
4. There is no requirement to state when the search was performed.
5. There is no requirement to state where the search was performed.
6. There is no requirement to identify all databases and indices that were not searched or to explain why they were not searched.[1]

In light of *Lahr*, we believe that the declarations provided to you are sufficient to establish the sufficiency of the searches of USNCB, NSD, DoD OIG, and DoD OFOI. Nevertheless, these Defendants have attempted to address Plaintiffs' specific concerns to the extent practicable.

## USNCB

As an initial matter, we disagree that Allison Tanaka's statement that "I make the statements contained herein on the basis of my first-hand knowledge of Plaintiffs' request and steps taken in response to it by USNCB" is "a legal conclusion." This is a factual statement and, as Ms. Tanaka has personal knowledge about her own personal knowledge, it, and her declaration, are admissible. In any event, the basis for Ms. Tanaka's personal knowledge is as follows:

Ms. Tanaka personally reviewed the FOIA request, conducted the search for records, processed the request and communicated with the Office of Information Policy which has appellate authority over USNCB's FOIA responses. Kevin R. Smith, USNCB General Counsel, supervised the processing of the request by Ms. Tanaka and was the signatory for responses.

Next, as noted above, an agency is not required to provide an exhaustive list of its records systems. However, USNCB has done so. Paragraphs 2 and 3 describe USNCB's systems of records and Paragraph 12 states that these are "the only systems of records maintained by USNCB."[2]

USNCB did not search the personal computers of its staff and did not have an obligation to do

---

[1] To the extent that *Rosenfeld v. DOJ*, 2008 WL 3925633 (N.D. Cal. Aug. 22, 2008), is to the contrary, that opinion, which is not precedential in any event, does not represent good law in light of the Ninth Circuit's subsequent holding in *Lahr*.

[2] The reference in Paragraph 12 to "paragraphs 3 and 4" should be to "paragraphs 2 and 3."

so. FOIA obligates an agency to search only the files where responsive documents, if any exist, would be reasonably likely to be. In this case, that was USNCB's record systems. In support of this conclusion, USNCB provides the following additional information:

> The records that Plaintiffs requested would constitute investigative records which would be saved in investigative case files, and therefore be found only in the record systems noted in my declaration. Requests for investigative assistance from domestic and foreign law enforcement agencies are transmitted to the USNCB's Command Center via the NLETS system, facsimile or secure email. The Command Center opens a case file in Envoy and indexes appropriate information. The request for law enforcement assistance is dispatched to the appropriate division and assigned to a staff analyst or detail agent. All messages received by the Command Center, staff analysts and detail agents are saved to the case file, including email messages that are case related.

Next, USNCB's use of electronic search terms was adequate:

> The index of the administrative files is a Microsoft Excel spreadsheet. The index was searched by parts of the names of the subject of the requests because the terms produced the broadest search criteria. When the "Find All" button in the find feature is selected, every occurrence of the criteria for the search would be listed. The "Find All" feature places the user's cursor into the cell where the information is listed in the spreadsheet. Paragraph seven of the declaration explains that part of search term could be used to locate records in the administrative files.

In any event, on January 6, 2011, Ms. Tanaka personally conducted another search using all of search terms provided by the Plaintiffs. This search located no responsive records.

Finally, you request print outs of the "no records" responses. An agency does not have an obligation to provide such print outs and in many cases such print outs would be impossible, classified, or law enforcement sensitive. In this case, USNCB would be willing to produce print outs (with redactions described below) if it could be assured that this would resolve all claims concerning USNCB's processing of and response to Plaintiffs' FOIA request. Because the search engines search occurrences of any text string that is entered into the text search box, some of the printouts contain information concerning other subjects with the same first, middle, or last names; the USNCB case numbers; Uniform Resource Locator of the USNCB database; and summaries of messages from foreign National Central Bureaus. This information would be redacted. The information in the index of the administrative files that did not meet the search criteria would also be redacted.

## NSD

As described above, the agency declarant is not required to be the direct supervisor of every person who participates in the search; he need only be responsible for supervising the processing of the FOIA request at issue. Mark Bradley has thus established that he is a sufficient declarant. NSD further believes that the substance of its declaration is sufficient, but is providing the following additional information at your request.

First, you asked for additional information regarding the case tracking data that was searched by NSD. NSD provides the following additional information:

NSD produces case tracking data relating to each matter or case for which a component of the Division has responsibility. Each component enters and maintains its own case information. When a case or matter is opened in the National Security Division, administrative personnel enter basic case information so that the matter or case can be tracked though completion. Basic case information includes (but is not limited to) subject, case identification number, attorney assigned, and related cases.

Second, you asked for additional information regarding the searches of the paper files, electronic files, and electronic mail accounts maintained by individual employees. NSD provides the following additional information:

NSD's practice is for components to conduct electronic searches of case tracking data and, when there are positive search results, and depending on the case, further target NSD personnel to search their electronic mail accounts, electronically maintained records, and personal working files. In this case, tracking data in the OAAG, the Counterespionage Section (CES), the Counterterrorism Section (CTS) and the correspondence and policy files of the Office of Intelligence (OI) were searched and attorneys in the OAAG, CES and CTS conducted further searches of their electronic mail accounts, electronically maintained records and their personal working files.

Third, you asked for additional information regarding the policy and paper files maintained by the Office of Intelligence. NSD provides the following additional information:

The correspondence and policy files of the Office of Intelligence (OI) consist of correspondence files in which OI is a party in the correspondence, as well as policy files where the Department of Justice's opinion is sought relating to an intelligence or National Security matter. These policy matters range from weighing in on proposed legislative initiatives to operational case information that has a broader impact on the practices of the Department of Justice.

Fourth, you asked why NSD used six search terms and omitted 21 other search terms suggested by Plaintiffs. NSD determined that there would not be any additional search results

gained by using multiple variations of the same name or entity and so chose the most basic of the six search terms and used them.

Finally, you ask about records systems maintained by NSD that were not searched. NSD does not maintain any systems other than those that were searched and the OI Operations Files which are consistently Glomared and were Glomared in this case.

## DoD OIG

DoD OIG believes that its declaration is fully sufficient to establish the adequacy of its search. Nevertheless, in an effort to reach resolution, DoD OIG is providing the information sought in your letter in a chart enclosed with this letter. This chart sets forth DoD OIG's 16 records systems, describes their contents, identifies which systems were searched, and explains why each unsearched system was not searched.

## DoD OFOI

DoD OFOI does not maintain substantive DOD records, and thus does not conduct FOIA searches. Rather, when it receives a FOIA request, FOID identifies where in DOD responsive documents are reasonably likely to be located and then tasks relevant offices within the Office of the Secretary of Defense and Joint Chiefs of Staff and/or refers the request to other relevant DoD components that handle their own FOIA requests. In this case, as explained in the Declaration of William Kammer, FOID determined that the places where responsive documents might reasonably be found were the intelligence components of DoD: the Defense Intelligence Agency and the National Security Agency. DoD OFOI would have referred Plaintiffs' request to these components, but because Plaintiff had already sent the request to them, it was unnecessary. As you are aware, NSA and DIA have each separately responded to Plaintiffs' request.

Your letter requests a search of "CIFA Operational and Analytical Records." Counterintelligence Field Activity ("CIFA") was shut down in approximately mid-2008. CIFA's responsibilities and records were transferred to DIA. The CIFA records are now within DIA's systems of records and were searched by DIA in response to your FOIA request.[3] These records are not within the purview of DoD OFOI's authority or responsibility.

\* \* \*

---

[3] On December 27, 2010, DIA proposed the deletion of the "CIFA Operational and Analytical Records" as a separately listed system because the records are now covered by a different DIA system. *See* 75 Fed. Reg. 81,247.

USNCB, NSD, DoD OIG, and DoD OFOI have made all reasonable efforts to provide you with as much information about their respective searches as practicable, and have provided information in excess of what the Ninth Circuit has found to be sufficient. We are hopeful that Plaintiffs will demonstrate their good faith by dismissing these Defendants so as to lay the groundwork for productive discussions to narrow issues with regard to the remaining Defendants.

Sincerely,

Jeffrey M. Smith

EXHIBIT
34



**U.S. Department of Justice**

Civil Division, Federal Programs Branch

| | |
|---|---|
| **Via First-Class Mail** | **Via Overnight Delivery** |
| P.O. Box 883 | 20 Massachusetts Ave., NW |
| Washington, D.C. 20044 | Washington, D.C. 20001 |

Jeffrey M. Smith
Senior Counsel

Tel: 202/514-5751
Fax: 202/616-8202

February 15, 2011

Via Electronic Mail

Laboni A. Hoq
Traber & Voorhees
128 North Fair Oaks Ave.
Pasadena, CA 91103
lhoq@tvlegal.com

**Re:** *Hamdan, et al. v. United States Dep't of Justice, et al.,* **2:10-cv-06149-JHN-JEMx**

Dear Laboni:

As you know, U.S. Immigration and Customs Enforcement ("ICE") released documents responsive to your clients' Freedom of Information Act request on two occasions last year. ICE has re-reviewed these documents and determined that it can release some information that was previously redacted. Thus, I am sending, via electronic mail, another copy of the previously released ICE records with certain of the redactions removed.

Sincerely,

Jeffrey M. Smith

EXHIBIT
35

Central Intelligence Agency



Washington, D.C. 20505

25 February 2010

Jennie Pasquarella, Esq.
ACLU of Southern California
1313 W. Eighth Street
Los Angeles, CA 90017

Reference: F-2010-00687

Dear Ms. Pasquarella:

This is a final response to your 29 January 2009 [sic] Freedom of Information Act (FOIA) request, on behalf of your clients Naji Jawdat Hamdan, Hossam Hemdan, and Jehad Suliman, received in the office of the Information and Privacy Coordinator on 17 February 2010, for records pertaining to:

1. Mr. Naji Jawdat Hamdan;
2. Mr. Hossam Jawdat Hemdan (a.k.a. Sammy Hemdan or Sam Hemdan);
3. Mr. Jehad Suliman; and
4. Hapimotors (a.k.a. Honda Acura Palace or HondAcura Palace).

We have assigned your request the reference number above. Please use this number when corresponding with us so that we can identify it easily. Items 1-3 falls under the purview of the Privacy Act and will be addressed via separate correspondence under P-2010-00382, P-2010-00383, and P-2010-00384, respectively.

In accordance with section 3.6(a) of Executive Order 12958, as amended, the CIA can neither confirm nor deny the existence or nonexistence of records responsive to Item 4 of your request. The fact of the existence or nonexistence of requested records is currently and properly classified and is intelligence sources and methods information that is protected from disclosure by section 6 of the CIA Act of 1949, as amended. Therefore, your request is denied pursuant to FOIA exemptions (b)(1) and (b)(3). I have enclosed an explanation of these exemptions for your reference and retention. As the CIA Information and Privacy Coordinator, I am the CIA official responsible for this determination. You have the right to appeal this response to the Agency Release Panel, in my care, within 45 days from the date of this letter. Please include the basis of your appeal.

Sincerely,

Delores M. Nelson

Delores M. Nelson
Information and Privacy Coordinator

## Explanation of Exemptions

### Freedom of Information Act:

(b)(1) exempts from disclosure information currently and properly classified, pursuant to an Executive Order;

(b)(2) exempts from disclosure information, which pertains solely to the internal personnel rules and practices of the Agency;

(b)(3) exempts from disclosure information that another federal statute protects, provided that the other federal statute either requires that the matters be withheld, or establishes particular criteria for withholding or refers to particular types of matters to be withheld. The (b)(3) statutes upon which the CIA relies include, but are not limited to, the CIA Act of 1949;

(b)(4) exempts from disclosure trade secrets and commercial or financial information that is obtained from a person and that is privileged or confidential;

(b)(5) exempts from disclosure inter-and intra-agency memoranda or letters that would not be available by law to a party other than an agency in litigation with the agency;

(b)(6) exempts from disclosure information from personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of privacy;

(b)(7) exempts from disclosure information compiled for law enforcement purposes to the extent that the production of the information (A) could reasonably be expected to interfere with enforcement proceedings; (B) would deprive a person of a right to a fair trial or an impartial adjudication; (C) could reasonably be expected to constitute an unwarranted invasion of personal privacy; (D) could reasonably be expected to disclose the identity of a confidential source or, in the case of information compiled by a criminal law enforcement authority in the course of a criminal investigation or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source ; (E) would disclose techniques and procedures for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law; or (F) could reasonably be expected to endanger any individual's life or physical safety;

(b)(8) exempts from disclosure information contained in reports or related to examination, operating, or condition reports prepared by, or on behalf of, or for use of an agency responsible for regulating or supervising financial institutions; and

(b)(9) exempts from disclosure geological and geophysical information and data, including maps, concerning wells.

January 2007

# EXHIBIT
# 36

THE LAW OFFICES OF
# TRABER & VOORHEES

THERESA M. TRABER
BERT VOORHEES
LABONI AMENA HOQ

OF COUNSEL
HADSELL STORMER KEENY RICHARDSON & RENICK, LLP
LITT, ESTUAR, HARRISON, MILLER & KITSON, LLP

128 NORTH FAIR OAKS AVENUE
PASADENA, CALIFORNIA 91103
TEL: (626) 585-9611
FAX: (626) 585-1400

February 28, 2011

*Via U.S. Mail and E-mail*

Jeffrey M. Smith
Senior Counsel
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Washington, D.C. 20001

> Re: *Hamdan et al. v. U.S. Dept. of Justice, et al.*
> Case No. 10-06419 JHN (JEMx)

Dear Jeff:

This letter responds to your letter dated January 21, 2011 regarding the search declarations of defendants United States National Central Bureau ("USNCB"), Department of Justice - National Security Division ("NSD"), Department of Defense - Office of Inspector General ("DOD-OIG") and Department of Defense - Office of Freedom on Information (" DOD-OFOI").

In your letter you cite *Lahr v. National Transportation Safety Board*, 569 F.3d 964 (9th Cir. 2009) as the "lead Ninth Circuit case on adequacy of search," and further assert that [i]n light of *Lahr*, the declarations provided by [USNCB, NSD, DOD-OIG, and DOD-OFOI] are sufficient to establish the adequacy of [their] searches." We disagree with these conclusions, and believe the import you place on *Lahr* is misplaced given the strikingly different facts of this case. We believe the "lead" Ninth Circuit case on adequacy of search – and certainly the most positively cited – is *Zemansky v. U.S. Environmental Protection Agency*, 767 F.2d 569 (9th Cir. 1985) (cited by *Lahr* at 986-87).

*Zemansky* held that "[t]he adequacy of the search ... is judged by a standard of reasonableness and depends, not surprisingly, upon the facts of each case." *Zemansky* at 571 (quotations and citations omitted). Based on the facts if this case, USNCB, NSD, DOD-OIG, and DOD-OFOI (and the other defendants in the case) should provide the information set forth in our December 22 letter to allow us to evaluate the adequacy of their searches. *See Rosenfeld v. Dept. Of Justice*, 2008 U.S. Dist. LEXIS

Mr. Jeffrey M. Smith
February 28, 2011
Page 2


64620 (N.D. Cal 2008) (identifying specific information FBI required to provide so that the court could evaluate the adequacy of its search)[1]; *see also Rosenfeld v. Dept. of Justice*, 2010 U.S. Dist. LEXIS 90445 (N.D. Cal. 2010) ("the FBI must provide some basis for the court to evaluate whether its decision to not search additional databases was reasonable.").

The portions of *Lahr* you rely on dealt mainly with plaintiff's claim that the CIA's search was inadequate because it produced documents that appeared to make reference to responsive records not produced or identified in a *Vaughn* index. There, because plaintiff failed to present "persuasive evidence ... that the [allegedly withheld] records [elsewhere referenced] now exist," *id.* at 987, or "ever existed," *id.* at 988, the court held that defendants searches were sufficient. Here, on the other hand, defendants USNCB, NSD, DOD-OIG, and DOD-OFOI have not produced *any* responsive documents. Nor are we now claiming that these defendants are withholding specific documents. As such, the issues addressed in *Lahr* simply are not present in the instant case.[2] Rather, defendants declarations are inadequate for the separate myriad reasons set forth in our December 22 letter. Among those is that several defendants failed to "provide some basis for the court to evaluate whether its decision to not search additional databases was reasonable," which renders these defendants' searches inadequate. *See Rosenfeld*, 2010 U.S. Dist. LEXIS 90445, *19. In light of the facts of this case and apposite Ninth Circuit law providing guidelines for the type of information agencies should produce to allow adversaries to evaluate the

---

[1] Your characterization of *Rosenfeld v. Dept. Of Justice*, 2008 U.S. Dist. LEXIS 64620 (N.D. Cal 2008) as no longer "good law" in light of *Lahr v. National Transportation Safety Board*, 569 F.3d 964 (9th Cir. 2009) is baseless. As discussed, *Lahr* does not even address many of the issues raised and litigated in *Rosenfeld*, let alone decide them in a contrary manner.

[2] In addition, the description of the searches in *Lahr* provide far more relevant detail about the adequacy of the searches than those offered in the search declarations of USNCB, NSD, DOD-OIG, and DOD-OFOI. For example, Judge Matz held that "[a]t first glance, it might seem that a search limited to those employees 'principally responsible' for the Main Wreckage Flight Path Study and animations ... rather than *all* employees who worked on them, would not be 'reasonably calculated' to locate all relevant documents. However, it is undisputed that [one of the individual's asked to conduct the search] was the *only* staff member responsible for deriving the calculations and computations of the flight path of Flight 800, and [another individual asked to conduct the search] was the *only* staff member responsible for the animations." *Lahr v. National Transportation Safety Board*, 2006 U.S. Dist. LEXIS 76170, *16 (C.D. 2006) (emphasis in original). Only after Judge Matz was provided with the names and job duties of the individuals who were asked to search for responsive information, and the reasons why they were the only individuals asked to search for documents, was he able to evaluate the adequacy of defendant's search. This is precisely the same information we are seeking from defendants here. *See* discussion of NSD's search declaration, below.

Mr. Jeffrey M. Smith
February 28, 2011
Page 3

adequacy of their searches, we believe we are entitled to the information we seek from USNCB, NSD,
DOD-OIG, and DOD-OFOI in the event this issue must be litigated.

That said, we appreciate the additional information USNCB, NSD, DOD-OIG, and DOD-OFOI
have provided us regarding their searches through your January 21 letter. While certain of these
defendants have come a good way toward addressing our concerns, we ask that they make the following
additional commitments before we agree to dismiss them from the case on mutually agreeable terms.
We share your hope that we can reach agreement on these matters so we can avoid litigating them in
court.

## USNCB

First, we ask that Ms. Tanaka either incorporate the three additional paragraphs attributed to her
in your January 21 letter in her search declaration, or execute a new declaration with this information.
The declaration should include that Ms. Tanaka conducted a subsequent search for responsive records
on January 6, 2011, using all of our search terms, and provide a representation of the results of that
search.

Second, we would agree to accept printouts of USNCB's "no records" responses with the
redactions you describe, but only if USNCB attests in its search declaration that none of the redactions
relate in any way to any of the subjects of our FOIA request. We also ask that USNCB not redact from
the printouts any information that identifies the methodology or logistics of the searches, *e.g.* the dates
and times when the searches were conducted, the places where the searches were conducted, the records
systems searched, etc. We continue to contend that we are entitled to this information in order to
evaluate the adequacy of USNCB's search. *See Rosenfeld v. Dept. Of Justice,* 2008 U.S. Dist. LEXIS
64620, *39-40.

If USNCB will agree to these requests, we would be amenable to negotiating a voluntary
dismissal of USNCB on mutually agreeable terms.

## NSD

While we appreciate the additional information provided by NSD, this new information
unfortunately begets further questions. In addition, NSD has failed to respond to certain of our requests
for additional information, such as our request that it produce the "search sheets" referenced in its search
declaration. We therefore ask that NSD commit to addressing the following issues before we discuss
the possibility of dismissing it from the case.

First, your January 21 letter states that "NSD's practice is for components to conduct electronic
searches of case tracking data and, when there are positive results, and depending on the case, further

Mr. Jeffrey M. Smith
February 28, 2011
Page 4

target NSD personnel to search their electronic mail accounts, electronically maintained records, and personal working files." It goes on to state that in response to our request, "tracking data in OAAG[3], the Counterespionage Section (CES), the Counterterrorism Section (CTS) and the correspondence and policy files of the Office of Intelligence (OI) were searched and attorneys in the OAAG, CES and CTS conducted further searches of their electronic mail accounts, electronically maintained records and their personal working files." According to its stated practice, NSD's search of OAAG, CES and CTS must have produced "positive results" or else attorneys in those components would not have been asked to "conduct[] further searches of their electronic mail accounts, electronically maintained records and their personal working files." However, NSD never produced or identified the "positive results" from its searches of OAAG, CES and CTS. We ask that these results be provided to us.

Second, NSD has failed to respond to our request in our December 22 letter that it "identify when it requested these individuals to carry out the searches and any documentation of the request, how many people were solicited to search their files, and their job titles. Of those solicited to conduct an individual search, NSD should also identify how many of them affirmatively responded that they had searched for and located no responsive records along with any correspondence documenting these responses." As discussed above, we believe we are entitled to this information so that we can evaluate the adequacy of NSD's search. We ask that NSD commit to providing us this information.

Third, regarding its Operation Files, it is our position that NSD must search these files and that it cannot refuse to provide details of that search based on a blanket response that all documents in those files are classified. *See, e.g., Berman v. CIA*, 501 F.3d 1136, (9th Cir. 2007) (Congress did not grant CIA "blanket" protection from FOIA). We therefore ask that NSD search its Operation Files for responsive records, and inform use when it conducted this search.

Fourth, regarding the "case tracking data" – the only record system NSD claims to maintain apart from individual employee files and the OI Operational Files – NSD's search of this record system appears to have only yielded positive results from three of its components, namely, OAAG, CES and CTS. If this is the case, we ask that NSD attest to this fact in its search declaration. If this is not the case, we ask that NSD identify each of the other of its components from which the search yielded positive results, and that it produce those results. We further ask, as we did in our December 22 letter, that you commit to producing the "search sheets" referenced in paragraph 6 of Mr. Bradley's declaration.

Finally, NSD provides no valid justification for limiting its search to only six of the 27 search terms we provided in our FOIA request. NSD's conclusory determination that "there would not be any additional search results gained by using multiple variations of the same name or entity" is not supported

---

[3] Your letter does not identify the full title of this components. We request that you provide this information to us.

Mr. Jeffrey M. Smith
February 28, 2011
Page 5

by any facts. Nor is there any basis for NSD's determination that the six search terms it used in its search represent "the most basic" of the terms offered. To the contrary, as is clear from the responsive documents we have received from a number of other defendant agencies subject to our request, both the first and last names of each of the three individual subjects of our request are routinely misspelled or spelled in different ways based on the transliteration from Arabic. The search terms we provided in our request include some of the common spellings or misspellings of these individuals' names. We offered these common spellings so that agencies could use them in their searches to collect all responsive documents referencing these individuals. For these reasons, we ask that NSD conduct another search using the remaining 21 search terms identified in our request that it did not previously use.

## DOD-OIG

We appreciate the additional information DOD-OIG provided in chart form regarding the records systems it maintains, the contents of those records systems, and the reasons it did not search certain of those records systems in response to our request. Based on this additional information, it appears that DOD-OIG should also have searched the following three records systems for responsive documents: Congressional Correspondence Tracking System, Public Affairs Files, Office Functional Files. The descriptions of these files demonstrate that they are reasonably likely to have responsive documents.

DOD-OIG stated that the Congressional Correspondence Tracking System includes "correspondence and related records from and to a member of Congress on requests for congressional assistance in resolving problems." Here, both Naji Hamdan and individuals and organizations working on his behalf sought congressional assistance regarding his detention and torture in the U.A.E. It is therefore reasonable that the Congressional Correspondence Tracking System should have documents responsive to our request.

DOD-OIG states that its Public Affairs Files include "information created or compiled in response to inquiries about OIG DoD activities and functions." It also states that "had searches by other components identified responsive inquiries, investigations, or related documents, the Office of Communications would have been tasked to conduct a search." Here, to the extent the Congressional Correspondence Tracking System has responsive documents, the Public Affairs Files should be searched. In addition, because another DOD component – Defense Intelligence Agency ("DIA") -- has located documents responsive to our request, it appears the Office of Communications should have been tasked to conduct a search of the Public Affairs Files.

Finally, DOD-OIG states that the Office Functional Files includes "files of the Office of General Counsel" which "provides legal advice and counsel to OIG DoD components" who have "primary responsibility for OIG DoD inquiries or investigations." It also states that "had searches by other components identified responsive inquiries, investigations, or related documents, the Office of General Counsel would have been tasked to search this system." For the same reasons it should have searched

Mr. Jeffrey M. Smith
February 28, 2011
Page 6

the Public Affairs Files, DOD-OIG should have tasked the Office of General Counsel to search the Office Functional Files.

For these reasons, we ask that DOD-OIG search the three above referenced records systems for responsive records.

## DOD-OFOI

Regarding DOD-OFOI, your January 21, 2011 letter reiterates that among the offices it tasks to carry out searches for responsive records is the Secretary of Defense and Joint Chiefs of Staff. Given that the government's practice of proxy detention – to which we contend Naji Hamdan was subject – has been sanctioned by the highest levels of government, we believe these offices are reasonably likely to have documents responsive to our request. We accept your representation that the formal records system maintained by this office – the Counter Intelligence Field Activity ("CIFA") Operational and Analytical Records – is no longer operating and that the records in that system are now kept in a separate records system maintained by DIA. Specifically, as set forth in 75 C.F.R. 81247, those records appear to be maintained by DIA in the Intelligence/Counterintelligence/Operational Record System.

However, since we now know that DIA's search in response to our request has uncovered responsive documents, and these records could have originated in the office of the Secretary of Defense and Joint Chiefs of Staff, we believe DOD-OFOI's job is not done. We ask that DOD-OFOI task the office of the Secretary of Defense and Joint Chiefs of Staff to conduct a separate search for documents, including those kept on the personal computers of its staff (including emails and documents), in the paper files of its staff, and in its other office files.

Very Truly Yours,

Lahom A. Hoq

cc:     Jennie Pasquarella

# EXHIBIT
# 37

THE LAW OFFICES OF
# TRABER & VOORHEES

THERESA M. TRABER
BERT VOORHEES
LABONI AMENA HOQ
REBECCA B. PETERSON-FISHER

OF COUNSEL
HADSELL STORMER KEENY RICHARDSON & RENICK, LLP
LITT, ESTUAR, HARRISON, MILLER & KITSON, LLP

128 NORTH FAIR OAKS AVENUE
PASADENA, CALIFORNIA 91103
TEL: (626) 585-9611
FAX: (626) 585-1400

March 29, 2011

*Via U.S. Mail and E-mail*

Jeffrey M. Smith
Senior Counsel
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Washington, D.C. 20001

> Re: *Hamdan et al. v. U.S. Dept. of Justice et al.*
> Case No. 10-06419 JHN (JEMx)

Dear Jeff:

This letter responds to your letter dated March 11, 2011, in which you respond to certain issues we raised with defendants FBI, ICE, CBP, DIA, TSA and DOS's responses to our FOIA request.

## FBI - Record Legibility and Search Issues

Your letter acknowledges that many of the records FBI produced in response to our request are difficult to read. However, you state that FBI has not been able to obtain more legible copies of these records. We find this difficult to understand, given that FBI has been capable of both searching for and identifying these records as responsive to our request. It also has been able to read a number of then well enough to redact them. *See, e.g.* FBI-ACLU-7 through 24. In order for FBI to either identify responsive records and/or redact those records based on claimed exemptions, the copies of the records in FBI's possession would have to be readable. We therefore ask that FBI make further efforts to provide us legible copies of FBI-ACLU-7 through 24, possibly including having them transcribed to a legible format.

Further, you state that the FBI failed to produce records from the *Mallouk v. Bush* files – a *habeas* case brought by Naji Hamdan's wife and brother Hossam Hemdan to effectuate his release from U.A.E. state security detention – because those files are not indexed in a way that would result in their being located using our search terms. This explanation for the FBI's failure to locate and produce these records demonstrates that the FBI both failed to comply with the specific language of our request, as well as the letter and spirit of FOIA. As you know, our request asked that defendants *not* limit their searches to the "main files on the Requestors [Naji Hamdan, Hossam Hemdan, Jehad Suliman] and Hapimotors,

Jeffrey M. Smith
March 29, 2011
Page 2

but also [search for] any records relating to or concerning any of the Requestors or Hapimotors that may be cross-listed, cross-referenced or contained in the main file pertaining to another individual or entity." We also specifically stated that "[t]he request is also meant to include, but not be limited to the entirety of any document that includes the name of any of the requestors." Thus, the FBI – and all other defendants – should have produced at least those records that refer to the subject by their names (including possible misspellings of those names). In addition, while we provided defendants "suggested" search terms, we asked that defendants also use "other[] [terms] to locate responsive records," *e.g.* internal case numbers, code names/numbers, and other identifying information (such as social security numbers, drivers' license numbers and addresses, all of which information the FBI solicited from the plaintiffs here). The FBI's failure to locate documents responsive to our request in the *Mallouk* files demonstrates that it failed to conduct "a search reasonably calculated to uncover all relevant documents." *Zemansky v. U.S. E.P.A.*, 767 F.2d 569, 571 (9th Cir. 1985) (citations and quotations omitted). For all of these reasons, including as more specifically set forth below, it is now clear that the FBI failed to conduct an adequate search for responsive records. As such, we ask that the FBI do a more expansive search that meets its obligations under FOIA.

The fact that FBI failed to do an adequate search for responsive records is further evidenced by your statement that it has produced FD-302s – which you describe as reports or summaries of interviews conducted by law enforcement investigators – *only* "concern[ing] interviews *of* Mr. Hamdan and Mr. Hemdan." (Emphasis added). However, a number of individuals were interviewed by the FBI *about* Mr. Hamdan whereas summaries or notes of those interviews have not been produced. The FBI also subjected several individuals to surveillance because of their association with Mr. Hamdan whereas records related to that surveillance have not been produced. *C.f.* FBI-ACLU-25-26 (Notes of FBI surveillance of Naji Hamdan's residence). Among the individuals who the FBI interviewed and/or subjected to surveillance because of their connection to Mr. Hamdan include, but are not limited to, Ahmad Azzad (who was interviewed by the FBI) and Imam Sheikh Othman Rakha (who was followed by the FBI in 2007). The FBI should search for and produce records of interviews of these people, or records related to its surveillance efforts of them.

Further, the FBI issued subpoenaes to at least one individual and one entity for records related to Mr. Hamdan and his former business Hapimotors. Specifically, the FBI subpoened Dan Sieu (a loan officer at the Far East National Bank, who processed a loan issued by this bank for the property on which Hapimotors is located), as well as the Far East National Bank for such records. Neither of those subpoenas, nor records obtained in response to them, have been produced despite the fact that they are directly responsive to our request. We ask that the FBI produce all records related to the FBI's decision to issue these subpoenas, as well as the subpoenas and records obtained by them.

Finally, the FBI does not appear to have searched for or produced any emails or other communications between the agents assigned to carry out surveillance against Mr. Hamdan – Joshua Stone and Jerry Price – and others in the FBI or in other agencies (such as the DOS) regarding the subjects of the request. *See* FBI-ACLU 82 (referencing "internal communications" between the FBI and

Jeffrey M. Smith
March 29, 2011
Page 3

the DOS regarding Mr. Hamdan's arrest and detention in Lebanon). In addition, it is our understanding that the FBI has an attaché in the UAE who would have communicated with DOS at or around the time Mr. Hamdan was arrested and detained there. Our review of the records demonstrates that the FBI's search failed to uncover these and other plainly responsive records, and thus its search was not adequate. We therefore ask that the FBI conduct a subsequent search to locate these records, and promptly let us know when they will be produced to us.

## CBP, ICE, DIA, and TSA - *Vaughn* Indices

As you know, we have repeatedly requested that you provide us with *Vaughn* indices for those defendants who have withheld from production, in whole or in part, information responsive to our request. While you have previously represented that certain defendants would consider providing use with such *Vaughn* indices, it appears that you are now taking the blanket position that you are not required to do so. We disagree with this position, as set forth in our October 22, 2010 stipulation filed with the Court. Moreover, we find your refusal to provide us with *Vaughn* indices counterproductive in light of our agreement to meet and confer to narrow the issues in dispute. As discussed below, the most efficient way for the parties to meet and confer in good faith as to information withheld from production is for defendants to provide us document by document explanations for at least certain of those withholdings. As such, we ask that CBP (subject to the below limitations), ICE, DIA, and TSA provide us with *Vaughn* indices identifying information sufficient to justify any redaction or full withholding of responsive records.

With regard to CBP, for example, while your March 11 letter purports to provide explanations for CBP's redactions, those explanations do not provide sufficient information to justify a number of the redactions. For example, your letter identifies three overlapping explanations for information withheld under exemption 7(E): "computer codes," "computer terminal identification numbers," and "other law enforcement sensitive information." We do not anticipate challenging redactions made to "computer codes" or "computer terminal identification numbers" – though we do not concede that the redactions CBP made to such information are necessarily proper under exemption 7(E). We do, on the other hand, anticipate seeking disclosure of redactions made to information CBP characterizes as "other law enforcement sensitive information" to the extent that information is not properly withheld under exemption 7(E). However, we cannot tell from the information provided which 7(E) redactions are "other law enforcement sensitive information," as opposed to "computer codes" or "computer terminal identification numbers." As such, we cannot narrow the issues in dispute to only those records that CBP claims is "other law enforcement sensitive information."

Indeed, exemption 7(E) does not allow a blanket exemption for "other law enforcement sensitive information." Rather, it only allows the government to exempt information that "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." For these reasons, we aks that CBP identify which

Jeffrey M. Smith
March 29, 2011
Page 4

redactions apply to "other law enforcement sensitive information," and that it provide further explanation as to why such information meets the requirements of exemption 7(E). In doing so, we ask that CBP remove any redactions that do not comply with the requirements of exemption 7(E).[1] Only then can we determine whether there remains any disputes as to the validity of CBP's redactions, and whether those disputes can be resolved without court intervention. We also ask that CBP remove redactions of the names of any of the subjects of our FOIA request made under exemptions 6 and 7(C). *See, e.g.* CBP record 162 (appearing to redact in the "remarks" section the name of Naji Hamdan).

Regarding the one record CBP has withheld in full under exemption 7(E), you assert that this record contains the same information as another record that has been produced in the ATS records. Please identify both the bates number of the fully withheld record, as well as the bates number of the record you claim contains the same information. We will then be able to tell you whether will agree not to challenge its withholding.

Finally, you state that CBP has redacted records based on exemption 3. We have not been able to locate any records redacted under this exemption in the CBP records. Please identify the bates number of the record(s) redacted and/or fully withheld under exemption 3.

### DOS and ICE - Search Declarations

Finally, your letter does not address the questions we raised in our January 28, 2011 letter regarding whether DOS has completed its search for responsive records and is willing to provide us a search declaration. Nor does it identify whether ICE is willing provide us a search declaration. As we have discussed, we think such declarations would allow us to address – and hopefully resolve – any search issues without court intervention. Please let us know if DOS and ICE is willing to provide us with their search declarations at this time.

Very truly yours,

Laboni A. Hoq

cc:    Jennie Pasquarella

---

[1] However, we have determined that we will not challenge CBP's redactions to the following records: CBP 1-27, 148-153, 174-192, 214-218, 243-252, 278-280, 295-320. We therefore do not request CBP to include any information about these records in a *Vaughn* index.

# EXHIBIT
# 38



U.S. Department of Justice

Federal Bureau of Investigation

*Washington, D.C. 20535*

*May 5, 2011*

MS. JENNIE PASQUARELLA
ACLU OF SOUTHERN CALIFORNIA
1313 WEST EIGHTH STREET
LOS ANGELES, CA 90017

Subject: HAMDAN, NAJI JAWDAT/HAPIMOTORS
FOIPA No. 1143419- 000

Dear Ms. Pasquarella:

The enclosed documents were reviewed under the Freedom of Information/Privacy Acts (FOIPA), Title 5, United States Code, Section 552/552a. Deletions have been made to protect information which is exempt from disclosure, with the appropriate exemptions noted on the page next to the excision. In addition, a deleted page information sheet was inserted in the file to indicate where pages were withheld entirely. The exemptions used to withhold information are marked below and explained on the enclosed Form OPCA-16a:

| Section 552 | | Section 552a | |
|---|---|---|---|
| ☒(b)(1) | ☐(b)(7)(A) | ☐(d)(5) |
| ☐(b)(2) | ☐(b)(7)(B) | ☒(j)(2) |
| ☐(b)(3)_____ | ☒(b)(7)(C) | ☐(k)(1) |
| _____ | ☐(b)(7)(D) | ☐(k)(2) |
| _____ | ☒(b)(7)(E) | ☐(k)(3) |
| _____ | ☐(b)(7)(F) | ☐(k)(4) |
| ☐(b)(4) | ☐(b)(8) | ☐(k)(5) |
| ☒(b)(5) | ☐(b)(9) | ☐(k)(6) |
| ☒(b)(6) | | ☐(k)(7) |

**654 page(s)** were reviewed and **422 page(s)** are being released.

☒ Document(s) were located which originated with, or contained information concerning other Government agency(ies) [OGA]. This information has been:

  ☐ referred to the OGA for review and direct response to you.

  ☒ referred to the OGA for consultation. The FBI will correspond with you regarding this information when the consultation is finished.

☒ You have the right to appeal any denials in this release. Appeals should be directed in writing to the Director, Office of Information Policy, U.S. Department of Justice,1425 New York Ave., NW, Suite 11050, Washington, D.C. 20530-0001. Your appeal must be received by OIP within sixty (60) days from the date of this letter in order to be considered timely. The envelope and the letter should be clearly marked "Freedom of Information Appeal." Please cite the FOIPA Number assigned to your request so that it may be easily identified.

☐ The enclosed material is from the main investigative file(s) in which the subject(s) of your request was the focus of the investigation. Our search located additional references, in files relating to other individuals, or matters, which may or may not be about your subject(s). Our experience has shown, when ident, references

usually contain information similar to the information processed in the main file(s). Because of our significant backlog, we have given priority to processing only the main investigative file(s). If you want the references, you must submit a separate request for them in writing, and they will be reviewed at a later date, as time and resources permit.

⊠ See additional information which follows.

Sincerely yours,

David M. Hardy
Section Chief
Record/Information Dissemination Section
Records Management Division

Enclosures

# EXHIBIT
# 39

## Laboni Hoq

| | |
|---|---|
| **From:** | Laboni Hoq <lhoq@sdshhlaw.com> |
| **Sent:** | Friday, July 22, 2011 4:21 PM |
| **To:** | 'Smith, Jeffrey (CIV)' |
| **Cc:** | mkaufman@aclu-sc.org |
| **Subject:** | Hamdan et al. v. DOJ et al.: Proposals to Narrow Issues in Dispute re Defendants USNCB, CBP, ICE and TSA |

Dear Jeff:

As follow up to our call on Wednesday regarding our ongoing negotiations to narrow issues in dispute as to certain defendants, we are prepared to make the following proposals.

As a threshold matter, we understand that it is your position that you cannot discuss as to any defendants whether they have withheld documents pursuant to FOIA exemption 552(c). As we discussed with you during our call with the Department of State on May 13, 2011, based on recent developments in the case Islamic Shura Council v. FBI, Case No. SACV07-088-CJC (ANx), it is our view that, at the least, every FOIA defendant who takes that position must provide an in camera declaration to the Court as to whether or not they are withholding records under section 552(c). Until defendants in this case do so, and the Court has had the opportunity to address the validity of the claimed exemption, we cannot agree to fully dismiss any defendants.

However, as to other issues in dispute, we propose the following:

### USNCB:

As set forth in our letter dated June 7, 2011, the search records you provided us show that USNCB uncovered over 70 documents that appear to contain the names of the subjects of our request, including Naji Jawdat Hamdan and Hossam Hemdan. For example, one of USNCB's search documents shows that a search for the name "Naji Hamdan" retrieved 72 documents. Another search for the name "Naji Jawdat Hamdan" retrieved 10 documents. As you know, our FOIA request broadly asks for all documents referencing these individuals. Given the unique nature of these names, it is hard to believe that the documents USNCB retrieved do not reference the subjects of our request. If, as we suspect, the documents retrieved do reference the subjects of our requests, USNCB should produce those documents to us, or at least the reasonably segregable portions of those documents. If, on the other hand, the documents obtained in the searches do not contain the names of the subjects of our request, USNCB should provide us a declaration to this effect including an explanation for any false positive search results. If USNCB is willing to produce the apparently responsive records and/or provide us with a declaration attesting to the fact that the records retrieved in the searches are not responsive to our request, we would agree to stipulate that USNCB's search has been adequate.

### CBP:

If CBP is willing to conduct the 3 additional searches referenced in our February 28, 2011 letter using the key word searches identified in our request and produce and/or identify all responsive records from that search, we will stipulate that CBP's search for responsive records has been adequate. In the event these additional searches locate responsive records, and upon review of those records and any claims of exemptions thereto, we may also agree not to challenge the claimed exemptions. As to the records already produced by CBP to date, we have determined that we will not challenge the claimed exemptions to that production, though we do not concede that the claimed exemptions are valid. As discussed above, we reserve our right to litigate CBP's obligations under exemption 552(c).

### ICE:

We have determined that we will not challenge the claimed exemptions to ICE's production of documents in response to our request, though we do not concede that the claimed exemptions are valid. We also will not challenge the adequacy

1

of ICE's search for responsive records. As discussed above, we reserve our right to litigate ICE's obligations under exemption 552(c).

TSA:

We are waiting to hear from you as to whether TSA will provide us with any of the information we requested in our June 9, 2011 letter regarding the adequacy of TSA's search for responsive records. Specifically, we asked that TSA (1) search the sub-offices identified in our April 8, 2011 letter or explain why such searches are not likely to locate responsive records, (2) identify all records systems searched in each sub-offices identified in your February 15, 2011 letter, the search terms used to carry out those searches and any other information that could alleviate our concerns with the adequacy of the searches in those sub-offices as set forth in our April 8, 2011 letter, (3) provide any documentation of the searches conducted. While we are willing to discuss these matters on a conference call as you proposed, we need some assurance that TSA will be prepared to respond to these specific inquiries. We hope to address these matters soon so that we have ample time to consider whether we will dispute the adequacy of TSA's search on summary judgment.

We look forward to your response to these proposals.

Regards,

Laboni A. Hoq, Esq.
Schonbrun DeSimone Seplow Harris Hoffman & Harrison, LLP
S. Pasadena Office
715 Fremont Avenue, Suite A
S. Pasadena, CA 91030
Phone: 626-441-4129, Ext. 309
Fax: 626-283-5770

# EXHIBIT
# 40

## Laboni Hoq

| | |
|---|---|
| **From:** | Laboni Hoq <lhoq@sdshhlaw.com> |
| **Sent:** | Thursday, August 04, 2011 2:13 PM |
| **To:** | Smith, Jeffrey (CIV) (Jeffrey.Smith5@usdoj.gov) |
| **Cc:** | mkaufman@aclu-sc.org |
| **Subject:** | Hamdan et al. v. Dept. of Justice et al.: USNCB |

Dear Jeff:

I light of the information USNCB has provided us regarding the adequacy of its search, the only issue we will be pursuing against USNCB on summary judgment is whether it has withheld any records under FOIA section 552(c).

Thanks,

Laboni A. Hoq, Esq.
Schonbrun DeSimone Seplow Harris Hoffman & Harrison, LLP
S. Pasadena Office
715 Fremont Avenue, Suite A
S. Pasadena, CA 91030
Phone: 626-441-4129, Ext. 309
Fax: 626-283-5770

# EXHIBIT
# 41

## Laboni Hoq

| | |
|---|---|
| **From:** | Laboni Hoq <lhoq@sdshhlaw.com> |
| **Sent:** | Friday, September 16, 2011 1:15 PM |
| **To:** | Smith, Jeffrey (CIV) (Jeffrey.Smith5@usdoj.gov) |
| **Cc:** | mkaufman@aclu-sc.org |
| **Subject:** | Hamdan v. DOJ et al: DIA search adequacy |

Dear Jeff:

I have had an opportunity to review DIA's declaration attesting to the adequacy of its search for responsive records in this case. If DIA can confirm that it searched its "Foreign Intelligence" system of records (a records system it identified in response to its Privacy Act obligations), we would be willing to stipulate that its search was adequate. If it did not do so, we ask that it search this records system and produce any responsive records or include them on its Vaughn index.

Please let me know if DIA is willing to provide this information.

Regards,

Laboni

Laboni A. Hoq, Esq.
Schonbrun DeSimone Seplow Harris Hoffman & Harrison, LLP
S. Pasadena Office
715 Fremont Avenue, Suite A
S. Pasadena, CA 91030
Phone: 626-441-4129, Ext. 309
Fax: 626-283-5770

# EXHIBIT
# 42

**Laboni Hoq**

| | |
|---|---|
| **From:** | Michael Kaufman <mkaufman@aclu-sc.org> |
| **Sent:** | Thursday, September 29, 2011 10:27 AM |
| **To:** | 'Smith, Jeffrey (CIV)' |
| **Cc:** | 'Laboni Hoq' |
| **Subject:** | Hamdan: TSA, summary judgment briefs |

Jeff,

I write to respond to your letter regarding TSA, and raise an issue related to the parties' summary judgment briefing.

First, we appreciate the thoroughness with which TSA responded to our requests for additional information. In light of the information that TSA provided us, we have determined that we will not challenge the claimed exemptions to TSA's production of documents, though we do not concede that the claimed exemptions are valid. We also will not challenge the adequacy of TSA's search for responsive records. However, consistent with our position with respect to other defendants, we cannot agree to dismiss TSA from the case entirely unless TSA confirms that it has not withheld any documents under 552(c). If TSA cannot provide such an assurance, we reserve our right to litigate TSA's obligations under exemption 552(c).

Second, we propose that the parties agree to modify the brief lengths for the plaintiffs' opposition to summary judgment and cross motion, and the defendants' opposition and reply briefs. Given the number of defendants and issues in this case, it is simply unrealistic for the parties to fully brief the case within the ordinary 25 page limit. While the defendants' opening memorandum in support of summary judgment fell within the 25 pages, it was supported by well over a hundred pages of declarations that contained, in large part, the substance of the defendants' arguments. In particular, the CIA and FBI affidavits contain a great deal of pure legal argument, and are each quite lengthy.

In light of the number and complexity of the issues at play, we propose the following agreement for the balance of the parties' summary judgment briefing: the plaintiffs will file a single memorandum in support of their opposition for summary judgment and cross motion, which will be limited to 90 pages. The defendants will file a single memorandum in support of their opposition and reply, which will also be limited to 90 pages. Plaintiffs' reply in support of their cross motion will be limited to 45 pages. We believe that this will afford both parties the ability to brief the issues adequately.

Please let us know if you have any questions regarding our proposal. We request that the defendants respond to our proposal by Monday October 3, 2011. If the defendants are not amenable to such an agreement, we intend to seek leave of the court to file an enlarged brief.

Regards, Michael

Michael Kaufman
Attorney / SPILF Fellow
ACLU of Southern California
1313 West 8th Street
Los Angeles, CA 90017
phone: (213) 977-5232
fax: (213) 417-2232
e-mail: mkaufman@aclu-sc.org

# EXHIBIT
# 43

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 03-10-2011 BY 65179/DMH/BAW/STP/bls

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MONA MALLOUK, et al.,              )
                                   )    1:08-cv-02003-JR
                                   )
        Petitioners,               )
                                   )
    v.                             )
                                   )
                                   )
GEORGE W. BUSH, et al.             )
                                   )
        Respondents.               )
                                   )

## PUBLIC DECLARATION OF MICHAEL J. HEIMBACH, ASSISTANT DIRECTOR, COUNTERTERRORISM DIVISION, FEDERAL BUREAU OF INVESTIGATION

I, Michael J. Heimbach, hereby declare the following:

1.          (U) I am the Assistant Director, Counterterrorism Division, Federal Bureau of Investigation ("FBI"), United States Department of Justice. I am responsible for, among other things, directing the conduct of FBI counterterrorism investigations. As Assistant Director, I have official supervision and control over the files and records of the Counterterrorism Division, FBI, Washington, DC.

2.          (U) The matters stated herein are based on my personal knowledge, my review and consideration of the information available to me in my official capacity, and information furnished by Special Agents and other employees of the FBI. My conclusions have been reached in accordance therewith.

ACLU - Hamdan-222

3.          (U) I submit this declaration in support of the Government's Response to this Court's Order to Show Cause and the Government's Motion to Dismiss the above-

captioned case and specifically to address some of the allegations set forth in the Petition for Writ of Habeas Corpus ("Petition") filed on behalf of Naji Hamdan ("Hamdan").

4.    (U) In my capacity as Assistant Director of the FBI's Counterterrorism Division, I have been delegated original classification authority by the Director of the FBI. See Executive Order 13292, § 1.3(c). As a result, and pursuant to all applicable Executive Orders, I am responsible for the protection of classified information within the Counterterrorism Division, including the sources, methods, and techniques used by the FBI in the collection of that information. Thus, I have been authorized by the Director of the FBI to execute declarations and other affidavits in order to protect such classified information.   Pursuant to Executive Order 12958, as amended by Executive Order 13292, the classification "Secret" is applied to information, the unauthorized disclosure of which reasonably could be expected to cause serious damage to the national security that the original classification authority is able to identify or describe.

A.    (U)    **Facts Subject to This Declaration.**

5.    (U) At no time did the FBI request that the Lebanese Government detain or arrest Hamdan.

6.    (U) The FBI sought to interview Hamdan in the United Arab Emirates ("UAE") concerning his detention in Lebanon, which had occurred in early January 2008. The FBI contacted Hamdan's brother, petitioner Hossam Hemdan, on July 8, 2008, in an effort to facilitate such an interview. At his brother's request, Hamdan called the FBI on July 9, 2008. During this call, Hamdan agreed to meet FBI personnel for an interview at the U.S.

ACLU - Hamdan-223

-2-

Embassy in Abu Dhabi, which Hamdan indicated was a 2 ½ hour drive from his UAE residence.

7.     (U) The Petition claims that the interview occurred in August and three weeks prior to Hamdan's detention in the UAE. In fact, this interview occurred on July 16, 2008, approximately six weeks before his detention in the UAE. This interview was entirely voluntary and Hamdan was free to leave whenever he wanted.

8.     [REDACTED]

9.     (U) The FBI did not direct the UAE to investigate Hamdan or direct actions taken by the UAE during their investigation.

10.     (U) At no time did the FBI request that the UAE detain or arrest Hamdan.

11.     (U) The FBI has neither interrogated nor observed any interrogation of Hamdan while he has been in UAE custody.

12.     (U) The FBI has not expressed any opinion to the UAE about Hamdan's continued detention or trial by the UAE.

B.     (U)   **Basis for Classification and Harm to National Security that Would Result from Disclosure.**

13.     [REDACTED]

14.     [REDACTED]

15.     [REDACTED]

ACLU - Hamdan-224

-3-

(U) Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 12, 2009

Michael J. Heimbach
Assistant Director
Counterterrorism Division
Federal Bureau of Investigation

ACLU - Hamdan-225

-4-

# EXHIBIT
# 44

Ahilan T. Arulanantham (SBN 237841)
aarulanantham@aclu-sc.org
Jennifer L. Pasquarella (SBN 263241)
jpasquarella@aclu-sc.org
ACLU FOUNDATION OF SOUTHERN CALIFORNIA
1313 West Eighth Street
Los Angeles, California 90017
Tel: (213) 977-5236
Fax: (213) 977-5297

Attorneys for Plaintiffs


Bert Voorhees (SBN 137623)
bv@tvlegal.com
Laboni A. Hoq (SBN 224140)
lhoq@tvlegal.com
TRABER & VOORHEES
128 N. Fair Oaks Avenue
Pasadena, California 91103
Tel: (626) 585-9611
Fax: (626) 585-1400

Attorneys for Plaintiffs

Tony West
Assistant Attorney General
John R. Tyler
Jeffrey M. Smith
United States Department of Justice
Civil Division
Federal Programs Branch
P.O. Box 883
Washington, D.C. 20530
Tel: (202) 514-5751
Facsimile: (202) 616-8202
Jeffrey.Smith5@usdoj.gov

Attorneys for Defendants

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NAJI JAWDAT HAMDAN, HOSSAM HEMDAN, ACLU OF SOUTHERN CALIFORNIA,<br>Plaintiffs,<br>v.<br>UNITED STATES DEPARTMENT OF JUSTICE; FEDERAL BUREAU OF INVESTIGATION, a component of the U.S. Department of Justice; U.S. NATIONAL CENTRAL BUREAU - INTERPOL, a component of the U.S. Department of Justice; NATIONAL SECURITY DIVISION, a component of the U.S. Department of Justice; DEPARTMENT OF STATE; UNITED STATES CENTRAL INTELLIGENCE AGENCY; UNITED STATES DEPARTMENT OF DEFENSE; DEFENSE INTELLIGENCE AGENCY, a component of the U.S. Department of Defense; NATIONAL SECURITY | Case No: CV 10-6149 (JEMx)<br><br>**JOINT RULE 26 REPORT** |

1  AGENCY, a component of the U.S.
2  Department of Defense; OFFICE OF
   INSPECTOR GENERAL, a component
3  of the U.S. Department of Defense;
   DEFENSE OFFICE OF FREEDOM OF
4  INFORMATION, a component of the
   U.S. Department of Defense; UNITED
5  STATES DEPARTMENT OF
   HOMELAND SECURITY;  BUREAU
6  OF CUSTOMS & BORDER
   PROTECTION, a component of the U.S.
7  Department of Homeland Security;
   TRANSPORTATION SECURITY
8  ADMINISTRATION, a component of the
   U.S. Department of Homeland Security;
9  IMMIGRATION AND CUSTOMS
   ENFORCEMENT, a component of the
10 U.S. Department of Homeland Security;
   OFFICE OF INTELLIGENCE &
11 ANALYSIS, a component of the U.S.
   Department of Homeland Security;
12 OFFICE OF DIRECTOR OF
   NATIONAL INTELLIGENCE,
13 Defendants.

14  / / /
15  / / /
    / / /
16
17
18
19
20
21
22
23
24
25
26
27
28

**JOINT RULE 26 REPORT**

1        Pursuant to Fed. R. Civ. P. 26(f), Central District L.R. 26-1 and the Court's

2  September 24, 2010 Scheduling Order, plaintiffs Naji Jawdat Hamdan, Hossam Hemdan and

3  the ACLU of Southern California (collectively "plaintiffs"), and Defendants United States

4  Department of Justice ("DOJ"); Federal Bureau of Investigation ("FBI"), U.S. National

5  Central Bureau - Interpol ( "USNCB"), National Security Division of the DOJ ("NSD"),

6  Department of State ("DOS"), Central Intelligence Agency ("CIA"), United States

7  Department of Defense ("DOD"); Defense Intelligence Agency ("DIA"), National Security

8  Agency of the DOD ("NSA"), Office of Inspector General of the DOD ("DOD-OIG"),

9  Defense Office of Freedom of Information ("OFOI"), Bureau of Customs & Border

10  Protection of the DHS ("CBP"), Transportation Security Administration ("TSA"), and the

11  Office of Director of National Intelligence ("ODNI") (collectively "defendants"), held a

12  telephone conference on October 14, 2010, exchanged correspondence on October 15, 2010,

13  October 19, 2010, and October 21, 2010, and now submit the following joint report.

14        **JOINT RULE 26 REPORT PURSUANT TO SCHEDULING ORDER**

15  **1.**    **Statement of the Case**

16        **a.**    **Plaintiffs' Statement of the Case**

17        This is an action brought by plaintiffs Naji Jawdat Hamdam, Hossam Hemdan, and

18  the American Civil Liberties Union of Southern California ("ACLU-SC") pursuant to the

19  Freedom of Information Act ("FOIA"), 5 U.S.C. §§552 *et seq.*, and the Privacy Act ("PA"),

20  5 U.S.C. §§552a *et seq.*, seeking records related to plaintiff Hamdan, his brother plaintiff

21  Hemdan, Jehad Suliman, and the business Hapimotors located in Los Angeles, California.

22  Plaintiffs sent their FOIA request on January 29, 2010, and seek to enforce it through this

23  action.

24        Plaintiffs seek to uncover information pertaining to the U.S. government's decade-

25  long surveillance by the FBI of plaintiffs Hamdan, Hemdan and Suliman. Plaintiffs also

26  seek to shed light on the role the U.S. government played in plaintiff Hamdan's 2008

27  detention in a secret prison in the United Arab Emirates ("U.A.E") where he was tortured

28  and interrogated, with the apparent participation of at least one U.S. official. They also seek

1    to reveal information pertaining U.S. involvement in his arbitrary detention for one week

2    by intelligence officials in Lebanon in 2007. *See* First Amended Complaint ("FAC"),

3    Docket No. 8. ¶¶41-54.

4        Plaintiffs have reason to believe that Hamdan's detention and torture in the U.A.E.

5    in August 2008 was at the behest of the U.S. government pursuant to its well-known

6    practice of proxy detention – or using foreign governments as the U.S. government's proxy

7    to detain and interrogate terrorism suspects abroad outside the rule of law. *Id.*, ¶¶38-40, 48-

8    52.

9        Plaintiffs Hamdan, Hemdan and the ACLU-SC, a public interest organization whose

10   mission is to, among other things, ensure that the U.S. government acts in compliance with

11   the Constitution and federal laws and disseminate information in this regard, served a FOIA

12   Request on January 29, 2010 on a number of government agencies who they have reason

13   to believe maintain records related to above-described events. When certain of these

14   agencies failed to timely respond to the request, plaintiffs exhausted their administrative

15   remedies, *see* FAC, ¶¶69-125, and thereafter filed this lawsuit.

16        In this action, plaintiffs claim that defendant agencies violated FOIA by (1) failing

17   to respond to their request, (2) failing to timely search for, process and/or release the

18   requested records, (3)     failing to grant their request for expedited processing because it

19   implicates matters of public urgency, namely, the nature and extent of the federal

20   government's surveillance and detention of an American citizen in the name of national

21   security, and (4) failing to grant plaintiffs' request for a public interest fee waiver.

22        **b.**    **Defendants' Statement of the Case**

23        The first paragraph of Plaintiffs' Statement of the Case adequately and accurately

24   describes the nature of this case. The remaining paragraphs contain statements that are

25   irrelevant, argumentative, and based on conjecture.

26   **2.**    **Subject Matter Jurisdiction**

27

28

1       Plaintiffs assert that this Court has subject matter jurisdiction over all defendants
2  pursuant to 5 U.S.C. §552(a)(4)(B) and §552(a)(6)(E)(iii). This Court also has subject
3  matter jurisdiction over this action pursuant to 28 U.S.C. §1331 and 5 U.S.C. §§701-706.

4  **3.   Legal Issues**

5       This case presents the following legal issues:

6      a.    Did defendants fail to adjudicate plaintiffs' FOIA/PA Request by failing to
7  provide a timely final response?

8      b.    Did defendants conduct an adequate search for records responsive to plaintiffs'
9  FOIA/PA Request?

10      c.    Did defendants promptly release records responsive to plaintiffs' FOIA/PA
11  Request?

12      d.    Did defendants properly withhold records and/or portions of records pursuant
13  to one or more of the applicable FOIA exemptions?

14      e.    Did defendants violate FOIA by denying plaintiffs' request for expedited
15  processing?

16      f.    Did certain defendants violate FOIA by denying plaintiffs' request for a fee
17  waiver?

18  **4.   Parties, evidence, etc.**

19      **a.   *Parties***

20       The parties in this case are those identified above, as well as defendants the
21  Department of Homeland Security ("DHS") and its components Immigration and Customs
22  Enforcement ("ICE") and the Office of Intelligence and Analysis ("OI&A") which plaintiffs
23  added as defendants in the FAC filed on October 14, 2010. Plaintiffs were not able to add
24  these parties as defendants until after they filed their original Complaint because at the time
25  of the filing of that Complaint plaintiffs were in the process of exhausting their
26  administrative remedies against them. Now that plaintiffs have exhausted their
27  administrative remedies against DHS, ICE and OI&A, *see* FAC, ¶¶108-116, it is plaintiffs'
28

1  position that they are proper parties in the case.  Defendants DHS, ICE and OI&A have not

2  yet appeared in the case, and their litigation positions are not included in this report.

3       **b.**   ***Witnesses***

4       The percipient witnesses in this case are those representatives of defendants who must

5  attest by declaration to, *inter alia*, the adequacy of defendants' searches for responsive

6  records and the justification of defendants' withholding of responsive records on account

7  of one or more FOIA exemptions.  It is plaintiffs' position that defendants are obligated to

8  identify these declarants pursuant to  Fed. R. Civ. P. 26(a)(I)(A)(i).

9       It is defendants' position that  prospective declarants are not covered by Fed. R. Civ

10  P. 26(a)(I)(A)(i) as they do not have "discoverable information."  As noted  *infra* in Part

11  7.b.ii, discovery is not available in Freedom of Information Act cases except in

12  extraordinary circumstances not present here.  Moreover, caselaw demonstrates that FOIA

13  defendants have no obligation to provide supporting declarations prior to moving for

14  summary judgment. *See, e.g., Miscavige v. IRS*, 2 F.3d 366, 369 (11th Cir. 1993) (plaintiff's

15  "early attempt in litigation of this kind to obtain a Vaughn index . . . is inappropriate until

16  the government has first has a chance to provide the court with information necessary to

17  make a decision on the applicable exemption"); *Pyne v. Comm'r*, 1999 WL 112532, at *3

18  (D. Hawaii., Jan. 6, 1999) (denying motion for *Vaughn* index prior to filing of summary

19  judgment motion); *United States Comm'n on Refugees v. Dep't of State*, 1992 WL 35089,

20  at *1 (D.D.C. Feb. 7, 1992) (concluding that "the preparation of a Vaughn index is

21  unwarranted before the filing of dispositive motions in FOIA action"); *Stimac v. United*

22  *States Department of Justice*, 620 F. Supp. 212, 213 (D.D.C. 1985) ("The preparation of a

23  Vaughn index would be premature before filing of dispositive motions.").

24       **c.**   ***Key documents***

25       The key documents in this case are the plaintiffs' FOIA

26  request and subsequent correspondence between the parties, much of which is attached to

27  plaintiffs' Complaint.  Plaintiffs' contend that in        addition to the above-mentioned

28  declarations, the key documents in this case are the documents plaintiffs seek through their

1  Request and defendants' indices of withheld records or portions of records identifying the

2  justification for the withholding, also known as a *Vaughn* indexes, *see Vaughn v. Rosen*, 484

3  F.2d 820, 827 (D.C. Cir. 1973), *cert denied*, 415 U.S. 977.  It is plaintiffs' position that

4  defendants should produce *Vaughn* indices from defendants who withhold records pursuant

5  to one or more FOIA exemptions upon asserting the exemption(s) pursuant to Fed. R. Civ.

6  P. 26(a)(I)(A)(ii), rather than waiting to produce them when they file their summary

7  judgment motions.  *See also ACLU v. Dept. of Defense*, 339 F. Supp. 2d 501 (S.D.N.Y.

8  2004) (requiring defendants' to produce *Vaughn* index prior to filing motion for summary

9  judgment).

10        It is defendants' position that declarations do not constitute "documents" as that term

11  is used in litigation.  Moreover, it is defendants' position that they are not required to

12  produce supporting declarations prior to filing for summary judgment.  *See, e.g., Miscavige*

13  *v. IRS*, 2 F.3d 366, 369 (11th Cir. 1993) (plaintiff's "early attempt in litigation of this kind

14  to obtain a Vaughn index . . . is inappropriate until the government has first has a chance to

15  provide the court with information necessary to make a decision on the applicable

16  exemption"); *Pyne v. Comm'r*, 1999 WL 112532, at *3 (D. Hawaii., Jan. 6, 1999) (denying

17  motion for *Vaughn* index prior to filing of summary judgment motion); *United States*

18  *Comm'n on Refugees v. Dep't of State*, 1992 WL 35089, at *1 (D.D.C. Feb. 7, 1992)

19  (concluding that "the preparation of a Vaughn index is unwarranted before the filing of

20  dispositive motions in FOIA action"); *Stimac v. United States Department of Justice*, 620

21  F. Supp. 212, 213 (D.D.C. 1985) ("The preparation of a Vaughn index would be premature

22  before filing of dispositive motions.").

23  **5.    Damages**

24        Plaintiffs are not seeking damages in this case.

25  **6.    Insurance**

26        The question of insurance coverage is not relevant to this case.

27  **7.    Motions/Dispositive Motions/Status of Discovery/Discovery Plan/
        Discovery cut-off**

28        ***a.    Motions/Dispositive Motions***

1    The parties agree that, like in other FOIA cases, plaintiffs' claims may be resolved by
2    motions for summary judgment rather than by trial. However, as set forth below, the parties
3    agree that it is premature to set any firm deadlines for all dispositive motions or other
4    motions at this time.

5        **b.    Discovery/Discovery Plan**
6            **i.    Plaintiffs' Position**

7    It is plaintiffs' position that while district courts may defer discovery in FOIA cases
8    until after defendants have filed motions for summary judgment, such deferral is not
9    mandatory and plaintiffs are nonetheless entitled to discovery – including depositions of key
10   witnesses and narrowly tailored written discovery – as to the issues in dispute. *See Church*
11   *of Scientology v. IRS*, 991 F.2d 560, 562-63 (9th Cir. 1993), *vacated in part on other*
12   *grounds in* 30 F.3d 101 (1994) (district court abused its discretion in barring discovery by
13   plaintiffs relevant to applicability of FOIA exemptions and accuracy and completeness of
14   declarations); *ACLU v. Dept. of Defense*, 339 F. Supp. 2d 501 (S.D.N.Y. 2004) (requiring
15   defendants' to produce *Vaughn* index even though defendant had not sought summary
16   judgment); *Citizens for Responsibility and Ethics in Washington v. U.S. Dept. of Justice*,
17   602 F.Supp.2d 121, 124 (D.D.C. 2009) (permitting discovery prior to summary judgment
18   in FOIA case); *see also* Fed. R. Civ. Proc. 26(a)(1)(A)(i-ii) (requiring the parties to make
19   early disclosure of witnesses likely to have discoverable information and a copy – or
20   description by category and location – of all documents that a party has in its possession,
21   custody or control that the party may use to support its claims or defenses). Here, plaintiffs
22   contend that they are entitled to discovery as to the factual basis for both the alleged
23   adequacy of defendants searches for responsive records and the exemptions they have
24   asserted to justify their withholding of responsive records.

25           **ii.    Defendants' Position**

26   It is defendants' position that discovery is not appropriate in FOIA actions except in
27   extraordinary circumstances which are not present here.    *See, e.g., Lane v. Dep't of the*
28   *Interior*, 523 F.3d 1128, 1134 (9th Cir. 2008) ("Discovery is not typically a part of FOIA

1   and Privacy Act cases . . . ." (quotation and alteration omitted); *id.* ("Courts routinely delay
2   discovery until after summary judgment in such cases . . . ."); *Miner v. CIA*, 88 F.3d 796,
3   803 (9th Cir. 1996) (holding that "ordinary rules of discovery cannot be followed in FOIA
4   cases where the issue is whether one party is entitled to non-disclosed documents.");
5   *Miscavige v. IRS*, 2 F.3d 366, 369 (11th Cir. 1993); *Noland v. Dep't of Justice*, 973 F.2d
6   843, 849 (10th Cir. 1992); *Simmons v. Dep't of Justice*, 796 F.2dd 709, 711-12 (4th Cir.
7   1986); *Taylor v. Babbitt*, 673 F. Supp. 2d 20, 22-23 (D.D.C. 2009) ("discovery in FOIA
8   actions is rare" and even "in the exception case in which a court permits discovery in a
9   FOIA action, such discovery should only occur after the government has moved for
10  summary judgment" (citation and alterations omitted)); *Church of Scientology v. IRS*, 991
11  F.2d 560, 563 (9th Cir. 1993) (ordering discovery only after defendant's summary judgment
12  submission had been determined to be inadequate), *vacated*, 30 F.3d 101 (9th Cir. 1994);
13  *Lion Raisins, Inc. v. USDA*, 2009 WL 160283, at *2 (E.D. Cal. Jan. 21, 2009) ("FOIA cases
14  are usually decided at the summary judgment stage. . . . If the government affidavits
15  submitted in connection with a motion for summary judgment are sufficient to meet the
16  government's burden, the case can be decided without discovery."); *City & County of
17  Hololulu v. U.S. EPA*, 2009 WL 973154, at *1 (D. Haw. Apr. 9, 2009); *Lawyers' Comm'n
18  for Civil Rights v. U.S. Dep't of the Treas.*, 534 F. Supp. 2d 1126, 1131 (N.D. Cal. 2008)
19  ("Procedurally, district courts typically decide FOIA cases on summary judgment before a
20  plaintiff can conduct discovery."); *Wolf v. CIA*, 569 F. Supp. 2d 1, 9 (D.D.C. 2008);
21  *Judicial Watch, Inc. v. Dep't of Justice*, 185 F. Supp. 2d 54, 65 (D.D.C. 2002) ("Discovery
22  is not favored in lawsuits under the FOIA."); *Broaddrick v. Executive Office of the
23  President*, 139 F. Supp. 2d 55, 63 (D.D.C. 2001) (noting that "discovery is not typically a
24  part of FOIA and Privacy Act cases").

25      *c.*     **Parties Initial Agreements regarding Further and/or Final Responses to
                 Plaintiffs' Request**
26
27          While plaintiffs are not waiving their right to seek discovery in this case, in light of
28  the parties' initial agreements on a schedule by which certain defendants will produce
    further and/or final responses to their FOIA/PA Request, and their continuing efforts to

Case 2:10-cv-06149-DSF-JEM Document 42-6 Filed 10/12/11 Page 76 of 105 Page ID
Case 2:10-cv-06149-JHN -JEM Document #12345iled 10/22/10 Page 10 of 12 Page ID
#:479

1  reach agreement on a schedule by which certain defendants will produce *Vaughn* indices,
2  plaintiffs will defer seeking discovery at this time. Specifically, the parties have tentatively
3  agreed that on or before the dates identified here, certain defendants will provide plaintiffs
4  with the following further and/or final responses to their Request:

5       For the following defendants that have allegedly conducted searches but have not
6  located any responsive records, defendants shall produce no later than November 15, 2010,
7  declarations attesting to the adequacy of their searches for responsive records: USNCB,
8  DOD-OIG, and OFOI. Thereafter, the parties will meet and confer to discuss any issues in
9  dispute, discuss the propriety of further responses and/or discovery, and if necessary set a
10  summary judgment briefing schedule as to these defendants.

11       For the following defendants who have yet to provide final responses to plaintiffs'
12  Request, defendants will produce final responses including any non-exempt responsive
13  documents or portions of documents subject to FOIA: Federal Bureau of Investigation, the
14  National Security Division of the Department of Justice, the Defense Intelligence Agency
15  of the Department of Defense, the U.S. Customs and Border Protection, and the
16  Transportation Security Administration. In addition, the parties are continuing to meet and
17  confer over the next week as to whether these defendants will commit to producing a
18  *Vaughn* index by a date certain after they have provided plaintiffs with their final responses
19  to the Request. The parties will notify the Court of any further agreements they have made
20  with respect to these defendants.

21       For the following defendants who asserted a *Glomar* response, i.e., a statement that
22  the fact of the existence or nonexistence of the requested records is classified and/or
23  otherwise exempt from disclosure, *see Phillippi v. CIA*, 546 F.2d 1009 (D.C. Cir. 1974), the
24  parties intend to file cross-motions for summary judgment regarding their disputes as to
25  defendants' justification for this response: NSA, CIA, ODNI. The parties will meet and
26  confer as to an appropriate schedule, and upon doing so will submit a stipulation setting
27  forth a briefing schedule for the cross-motions as to these defendants.

28

Case 2:10-cv-06149-DSF-JEM Document 42-6 Filed 10/12/11 Page 77 of 105 Page ID
Case 2:10-cv-06149-JHN -JEM Document #2346iled 10/22/10 Page 11 of 12 Page ID
#:480

1    As to defendant DOS, the parties have agreed to continue to meet and confer over the
2  next week to determine whether DOS can identify a date certain on which it will provide its
3  final response to the Request as well as a *Vaughn* index, if necessary. The parties will notify
4  the Court within two weeks of the filing of this report of any agreements they have made
5  with respect to the DOS.

6         **d.    Discovery Cut-off**
7         In light of the parties' initial agreements for providing further and/or final responses
8  to the Request and their continued meet and confer efforts in this regard, the parties ask that
9  the Court not set a discovery cut-off at this time.

10  **8.    Manual for Complex Litigation**
11        The parties do not believe that the procedures set forth in the Manual for Complex
12  Litigation are relevant to this case.

13  **9.    Expert discovery**
14        The parties do not intend to conduct expert discovery in this case.

15  **10.    Settlement**
16        The parties have not had any settlement discussions to date. The parties are aware of
17  their obligation under L.R. 16-15.4 to select a settlement mechanism. At this time the
18  parties intend to select an attorney from the Court's Settlement Officer Panel as the
19  settlement officer in this case.

20  **11.    Trial Estimate/Trial Counsel**
21        The parties do not anticipate the need for a trial in this case.

22  **12.    Independent Expert or Master**
23        The parties do not anticipate the need for an independent expert or master in this case.

24  **13.    Timetable**
25        Plaintiffs anticipate filing a stipulation with the Court within two weeks of their filing
26  of this report to identify any agreements they have made with respect to the deadlines for
27  defendants' to provide further and/or final responses to the Request, as well as any summary
28  judgment briefing schedule(s).

Case 2:10-cv-06149-DSF-JEM   Document 42-6   Filed 10/12/11   Page 78 of 105   Page ID
Case 2:10-cv-06149-JHN -JEM   Document #:1234Filed 10/22/10   Page 12 of 12   Page ID
#:481

**14.   Other Issues**

None at this time.

Dated: October 22, 2010                    Respectfully submitted,


                                           TRABER & VOORHEES


                                           By _____//s//_____
                                                  Laboni A. Hoq
                                           Attorneys for Plaintiffs


                                           ACLU FOUNDATION OF SOUTHERN
                                           CALIFORNIA


                                           By _____
                                                  Jennifer L. Pasquarella
                                           Attorneys for Plaintiffs


                                           U.S. DEPARTMENT OF JUSTICE
                                           CIVIL DIVISION, FEDERAL PROGRAMS
                                           BRANCH

                                           By _____
                                                  Jeffrey M. Smith
                                           Attorneys for Defendants


JOINT RULE 26 REPORT                              10

# EXHIBIT
# 45

1   Ahilan T. Arulanantham (SBN 237841)
    aarulanantham@aclu-sc.org
2   Jennifer L. Pasquarella (SBN 263241)
    jpasquarella@aclu-sc.org
3   ACLU FOUNDATION OF SOUTHERN CALIFORNIA
    1313 West Eighth Street
4   Los Angeles, California 90017
    Tel: (213) 977-5236
5   Fax: (213) 977-5297

6   Attorneys for Plaintiffs

7
    Bert Voorhees (SBN 137623)                Tony West
8   bv@tvlegal.com                            Assistant Attorney General
    Laboni A. Hoq (SBN 224140)                John R. Tyler
9   lhoq@tvlegal.com                          Jeffrey M. Smith
    TRABER & VOORHEES                         United States Department of Justice
10  128 N. Fair Oaks Avenue                   Civil Division
    Pasadena, California 91103                Federal Programs Branch
11  Tel: (626) 585-9611                       P.O. Box 883
    Fax: (626) 585-1400                       Washington, D.C. 20530
12                                            Tel: (202) 514-5751
    Attorneys for Plaintiffs                  Facsimile: (202) 616-8202
13                                            Jeffrey.Smith5@usdoj.gov

14                                            Attorneys for Defendants

15                          .

16                  **UNITED STATES DISTRICT COURT**

17              **CENTRAL DISTRICT OF CALIFORNIA**

18
19  NAJI JAWDAT HAMDAN, HOSSAM           )   Case No: CV 10-6149 JHN (JEMx)
    HEMDAN, ACLU OF SOUTHERN             )
20  CALIFORNIA,                          )
    Plaintiffs,                          )   **JOINT STIPULATION RE**
21  v.                                   )   **SCHEDULING**
    UNITED STATES DEPARTMENT OF          )
22  JUSTICE; FEDERAL BUREAU OF           )
    INVESTIGATION, a component of the    )
23  U.S. Department of Justice; U.S.     )
    NATIONAL CENTRAL BUREAU -            )
24  INTERPOL, a component of the U.S.    )
    Department of Justice; NATIONAL      )
25  SECURITY DIVISION, a component of    )
    the U.S. Department of Justice;      )
26  DEPARTMENT OF STATE; UNITED          )
    STATES CENTRAL INTELLIGENCE          )
27  AGENCY; UNITED STATES                )
    DEPARTMENT OF DEFENSE;               )
28  DEFENSE INTELLIGENCE AGENCY,         )
    a component of the U.S. Department of )
    Defense; NATIONAL SECURITY           )

1 AGENCY, a component of the U.S. )
Department of Defense; OFFICE OF )
2 INSPECTOR GENERAL, a component )
of the U.S. Department of Defense; )
3 DEFENSE OFFICE OF FREEDOM OF )
INFORMATION, a component of the )
4 U.S. Department of Defense; UNITED )
STATES DEPARTMENT OF )
5 HOMELAND SECURITY; BUREAU )
OF CUSTOMS & BORDER )
6 PROTECTION, a component of the U.S. )
Department of Homeland Security; )
7 TRANSPORTATION SECURITY )
ADMINISTRATION, a component of the )
8 U.S. Department of Homeland Security; )
IMMIGRATION AND CUSTOMS )
9 ENFORCEMENT, a component of the )
U.S. Department of Homeland Security; )
10 OFFICE OF INTELLIGENCE & )
ANALYSIS, a component of the U.S. )
11 Department of Homeland Security; )
OFFICE OF DIRECTOR OF )
12 NATIONAL INTELLIGENCE, )
Defendants. )
13

14 ///
///
15 ///
16

17

18

19

20

21

22

23

24

25

26

27

28

1        WHEREAS counsel for plaintiffs Naji Hamdan, Hossam Hemdan and American Civil

2  Liberties Union - Southern California (collectively "plaintiffs") have met and conferred with

3  counsel for defendants United States Department of Justice ("DOJ"), Federal Bureau of

4  Investigation ("FBI"), U.S. National Central Bureau - Interpol ("USNCB"), National

5  Security Division of the DOJ ("NSD"), Department of State ("DOS"), Central Intelligence

6  Agency ("CIA"), United States Department of Defense ("DOD"); Defense Intelligence

7  Agency ("DIA"), National Security Agency of the DOD ("NSA"), Office of Inspector

8  General of the DOD ("DOD-OIG"), Defense Office of Freedom of Information ("OFOI"),

9  Bureau of Customs & Border Protection of the DHS ("CBP"), Transportation Security

10  Administration ("TSA"), and the Office of Director of National Intelligence ("ODNI")

11  (collectively "defendants") pursuant to Fed. R. Civ. P. 26(f) and Central District Local Rule

12  26-1;

13        WHEREAS plaintiffs and defendants (collectively the "parties") have been engaging

14  in further meet and confer discussions regarding the status of defendants' responses to

15  plaintiffs' Freedom of Information Act Request;

16        WHEREAS the parties agree that there is continuing benefit to engaging in these meet

17  and confer discussions and working together cooperatively to narrow the issues in dispute

18  in this matter;

19        WHEREAS defendants USNCB, DOD-OIG, OFOI, NSD, DIA, TSA and CBP have

20  agreed to provide plaintiffs with declarations and/or letters addressing the adequacy of their

21  searches for records responsive to plaintiffs' Request by dates certain;

22        WHEREAS defendants FBI, TSA, CBP and DIA have agreed to complete their

23  searches for records responsive to plaintiffs' Request and provide plaintiffs final responses

24  – including production of any non-exempt or partially non-exempt records subject to

25  redaction(s) – by a date certain;

26        WHEREAS to the extent defendants TSA, CBP and DIA's searches for responsive

27  records locate records they claim are wholly exempt from production, these defendants have

28

1   agreed to provide plaintiffs certain information about these records on a date certain to

2   allow plaintiffs to meet and confer with them about the propriety of the claimed exemptions;

3   WHEREAS defendant DOS has agreed to complete its search for records responsive

4   to the Request and provide plaintiffs on a rolling basis its final response(s) – including

5   production of any non-exempt or partially non-exempt records subject to redaction(s) – by

6   dates certain;

7   WHEREAS the parties agree that no dispositive motions are appropriate as to

8   defendants USNCB, DOD-OIG, NSD, FBI, TSA, CBP, DIA and DOS until such time as

9   these defendants provide plaintiffs the above-mentioned final responses and/or adequacy

10   of search declarations/letters and the parties have had an opportunity to meet and confer to

11   narrow any issues in dispute;

12   WHEREAS the parties agree to delay filing any dispositive motions regarding the

13   final responses of defendants CIA, ODNI, NSA and NSD until after they have met and

14   conferred over any disputed issues regarding the other defendants referenced above, and

15   plaintiffs agree not to serve discovery on these defendants prior to their filing motions for

16   summary judgment;

17   NOW THEREFORE IT IS HEREBY STIPULATED AND AGREED BY AND

18   AMONG THE PARTIES, THROUGH THEIR RESPECTIVE COUNSEL OF RECORD,

19   AS FOLLOWS:

20   1.   Defendant NSD will provide plaintiffs with a declaration attesting to the

21   adequacy of its search for records responsive to the Request by December 15, 2010.

22   2.   Defendants FBI, TSA, CBP and DIA will complete their searches for records

23   responsive to plaintiffs' Request and provide plaintiffs final responses  – including

24   production of non-exempt or partially non-exempt records subject to redaction(s) – by

25   December 31, 2010.

26   3.   To the extent defendants TSA, CBP and DIA's searches for responsive records

27   locate records they claim are wholly exempt from production, these defendants will identify,

28   to the extent possible, the number of pages withheld and the claimed exemption(s); to the

1   extent these defendants assert a *Glomar* response regarding any types of records that may

2   contain responsive records, they will, to the extent possible, identify the types of records

3   subject to the *Glomar* response and the claimed exemption(s).

4       4.   Defendant DOS will complete its search for records responsive to the Request

5   and provide plaintiffs on a rolling basis final response(s) – including any non-exempt or

6   partially non-exempt records subject to redactions – on following dates:  December 17,

7   2010, February 17, 2011 and April 18, 2011.

8       5.   On or before May 18, 2011, the parties shall meet and confer regarding the

9   adequacy of defendants' responses, the need for discovery, and the need for any dispositive

10   motions.  The parties shall also meet and confer, in good faith, to determine whether it is

11   possible to narrow the issues in dispute.

12       6.   On or before May 27, 2011 the parties shall file a Joint Status Report with the

13   Court, informing the Court of the parties' positions as to any issues in dispute, the need for

14   and proposed timing of discovery, and the need for and timing of any dispositive motions.

15

16   Dated: November 15, 2010        Respectfully submitted,

17

18           TRABER & VOORHEES

19

20           By     *//s//*
21               Laboni A. Hoq
            Attorneys for Plaintiffs

22

23           ACLU FOUNDATION OF SOUTHERN
        CALIFORNIA

24

25

26           By

27             Ahilan T. Arulanantham
        Attorneys for Plaintiffs

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, FEDERAL PROGRAMS
BRANCH

By _____
        Jeffrey M. Smith
Attorneys for Defendants

EXHIBIT
46



# The Washington Post

## American To Be Freed By Ethiopia Faces Hurdle

By Stephanie McCrummen and Dafna Linzer
Washington Post Foreign Service
Friday, April 13, 2007

ADDIS ABABA, Ethiopia, April 12 -- A U.S. citizen arrested in Somalia and held without charge in a secret Ethiopian prison was set to be released and flown back to the United States as early as Friday. But State Department officials booking his flight discovered that his name had been placed on a no-fly list at the request of the FBI and that no airline would take him, U.S. officials said.

The FBI has no plans to charge Amir Meshal, 24, and did not inform the State Department that his name had been placed on the list, said the officials, speaking on condition of anonymity because the issue remains unresolved.

"Clearly, there had been a hitch," said an official involved in efforts to return Meshal to his family in Tinton Falls, N.J.

Representatives from the departments of State and Justice and the FBI met Thursday to figure out why Meshal's name was on the list and how to remove it so he could go home. The Department of Homeland Security's no-fly list contains the names of thousands of people deemed security risks.

Meshal was among dozens of people who headed toward the Kenyan border in January after an Ethiopian military campaign that ousted a Islamic movement in Somalia.

Meshal and several others were arrested by the Kenyan military, then held by Kenyan, Somali and finally Ethiopian authorities, during which time he was questioned by FBI officials without an attorney or U.S. consular official present, officials have said. It is unclear why Meshal was in Somalia.

Ethiopia has been holding without charge at least 41 people seized in Somalia.

The United States and Ethiopia have accused some of Somalia's Islamic leaders of having ties to terrorism, which the leaders have denied.

The FBI has carried out interrogations of dozens of the detainees in Ethiopia's secret prison.

FBI Special Agent Richard Kolko confirmed that there were no charges against Meshal, and State Department officials said the FBI told them that no charges were pending.

"The FBI interviewed Meshal in Kenya, didn't come up with any reasons to charge him and, as far as I know, they haven't thought of anything new that he could be charged with here," one of the officials said.

Meshal's attorney, Jonathan Hafetz of the Brennan Center for Justice at New York University, called the case "another step in this continuing travesty where the rights of an American citizen are being trampled on."

Meshal still was scheduled to go before a military tribunal here Saturday, but his case could be heard Friday. His mother, Fifi Meshal, said by telephone that the family had not received word on whether or when he would be coming home.

*Linzer reported from New York.*

View all comments that have been posted about this article.

© 2007 The Washington Post Company

Advertisement

**To investors who want to retire comfortably.**

If you have a $500,000 portfolio, download the guide by *Forbes* columnist and money manager Ken Fisher's firm. It's called **"The 15-Minute Retirement Plan."** Even if you have something else in place right now, it *still* makes sense to request your guide!

Click Here to Download Your Guide!

FISHER INVESTMENTS™

**Sponsored Links**

**53 Year Old Mom Looks 25**
The Shocking Results of Her $4 Wrinkle Trick Has Botox Docs Worried

**The Disney® Movie Club**
Hurry, For A Limited Time Get 4 Movies For Only $1! Free Shipping.

**Royal Incentive Rewards**
Plan an Annual Company Retreat with a Royal Caribbean® Cruise!

**Buy a link here**

# EXHIBIT
# 47

Case 2:10-cv-00149-DSF-JEM Document 42    Filed 10/12/11 Page 90 of 105 Page ID
#:2359

# McClatchy Washington Bureau

🖶 Print This Article

Posted on Mon, Mar. 19, 2007

## CIA didn't try to stop secret deportation of U.S. citizen, officials say

### Jonathan S. Landay and Shashank Bengali | McClatchy Newspapers

*last updated: May 25, 2007 01:52:03 AM*

NAIROBI, Kenya -- ]

NAIROBI, Kenya—CIA officers in Kenya failed to use their influence to win the release of an American citizen who was sec
Somalia and is now imprisoned in Ethiopia, a country that the State Department says abuses detainees, according to an int
government e-mail.

The message, which was read to McClatchy Newspapers, said that some U.S. officials thought the CIA station in Nairobi ha
with Kenyan authorities to free Amir Mohamed Meshal, 24, of Tinton Falls, N.J., but didn't use it. The message's author w
failure to demand Meshal's release might set a bad precedent.

The State Department has claimed that it had no control over Kenya's action. A U.S. intelligence official in Washington saic
involved in the matter.

Meshal presented U.S. officials with a dilemma. He was captured by Kenya in January along with about 150 men, women,
nationalities as they fled a U.S.-backed offensive against Islamist militias by the Somali government and Ethiopian forces.

FBI agents interviewed Meshal twice while he was in custody in Nairobi, Kenya's capital, and concluded that he was a "jiha
trained in al-Qaida camps and might be dangerous. They didn't have enough evidence, however, to charge him with a crim
returned to the United States.

Despite the fact that neither the U.S. nor Kenya filed charges against him, Meshal was among at least 80 detainees who we
Somali town of Baidoa between Jan. 20 and Feb. 10 on chartered aircraft, according to flight records released by a Kenyan
and Kenyan, British and American human-rights monitors believe that most of them were turned over to Ethiopia.

Another American who was caught fleeing Somalia, Daniel Joseph Maldonado, confessed to joining al-Qaida. He was turne
authorities in Kenya, returned to Texas and charged with training at an al-Qaida camp.

The U.S. and Ethiopian governments were tight-lipped Monday on the conditions of the detainees who are secretly imprisc
Multiple telephone calls to Ethiopian officials and the U.S. Embassy in Addis Ababa went unanswered, and the State Depa:
response when asked for an update on the condition of Meshal and whatever efforts were under way to obtain his release.

The Ethiopian Embassy in Washington also had no comment.

Human rights advocates have expressed fears that some prisoners in Ethiopia face abuse, particularly members of the Oro
Front, an Ethiopian insurgent group that's been fighting since 1973 for independence for the country's Oromo ethnic grouj

John Sifton of Human Rights Watch, a New York-based organization that's monitoring the issue, said one detainee reporte
telephone call to his sister in Kenya last month that Ethiopian soldiers had tortured prisoners.

The allegation couldn't be confirmed. But the State Department's 2006 human rights report cited reports of "beating, abus
mistreatment of detainees ... by security forces" in Ethiopia and "poor prison conditions."

The Bush administration, which charged that Somalia's Islamist militias were an al-Qaida front, backed the Ethiopian offe
coordinated with Ethiopia, the Somali interim government and Kenya on an operation to capture fleeing terrorist suspects

Another prisoner who was able to communicate with his family was Osman Yassin Ahmed, a Somalia-born Swedish citizer
along with his wife, their 7-month-old daughter and a son who's about 3 years old.

Ahmed, 39, called his younger brother in Stockholm one day in early February from Addis Ababa.

CIA didn't try to stop secret deportation of U.S. citizen... Case 2:10-cv-06049-DSF-JEM Document 42 Filed 10/12/11 Page 93 of 105 Page ID http://www.mcclatchydc.com/2007/05/...didnt-try-t...
#:2360

"I spoke to him for about 50 seconds," the brother, Sahal Yassin Ahmed, said in a telephone interview from Stockholm on `Hello, I'm fine, I'm in Addis somewhere near the embassy (district).' He never called me again."

Ahmed was arrested around Jan. 6 on the Somali-Kenyan border and spent at least two weeks in prison in Kenya, accordir human rights groups.'

His brother said he'd been living in Stockholm for 17 years and had traveled to Somalia last October to obtain a passport fo daughter and bring his family back to Sweden.

His brother said that while in prison in Kenya, Ahmed met with representatives of the Swedish Embassy, who brought the since the detainees' transfer to Somalia on a flight in late January, Ahmed's relatives have received little information on the from Swedish authorities in Stockholm, Nairobi or Addis Ababa.

"They don't want to tell us anything," Sahal Yassin Ahmed said.

———

(Landay reported from Washington.)

———

(c) 2007, McClatchy-Tribune Information Services.

Need to map

McClatchy Newspapers 2007

# EXHIBIT
# 48



**HOT TOPICS:**
Apple Juice • Pat Robertson • Michaele Salahi
SEARCH

Home   Video   News   Politics   Investigative   Health   Entertainment   Money   Tech      World News   Nightline   This Week   20/20   WWYD?   G

MORE: Peace Corps Scandal   Terrorism   USA Swim Sex Abuse   Scams   'Brian Ross Investigates'   Asleep in the Cockpit   Blood Diamonds   Twitter   Brian

HOME  >  INVESTIGATIVE UNIT

# ABC News Exclusive: Torture Tape Implicates UAE Royal Sheikh

By VIC WALTER, REHAB EL-BURI, ANGELA HILL and BRIAN ROSS (@brianross)
April 22, 2009

Recommend  602

A video tape smuggled out of the United Arab Emirates shows a member of the country's royal family mercilessly torturing a man with whips, electric cattle prods and wooden planks with protruding nails.

Share

202 Comments

Print

Text Size  − / +

A man in a UAE police uniform is seen on the tape tying the victim's arms and legs, and later holding him down as the Sheikh pours salt on the man's wounds and then drives over him with his Mercedes SUV.

In a statement to ABC News, the UAE Ministry of the Interior said it had reviewed the tape and acknowledged the involvement of Sheikh Issa bin Zayed al Nahyan, brother of the country's crown prince, Sheikh Mohammed.

"The incidents depicted in the video tapes were not part of a pattern of behavior," the Interior Ministry's statement declared.

The Minister of the Interior is also one of Sheikh Issa's brother.

The government statement said its review found "all rules, policies and procedures were followed correctly by the Police Department."

"If this is their complete reply, then sadly it's a scam and it's a sham," said Sarah Leah Whitson of Human Rights Watch.

"It is the state that is torturing them," she said, "if the government does not investigate and prosecute these officers, and those commanding those officers."

The 45-minute long tape was smuggled out of the country by Bassam Nabulsi, of Houston, Texas, a former business associate of Sheikh Issa.



WAT

WATCH THE FULL EPISODE
Nightline: Guy AND Doll: M

### Terry Moran Recommend

Dying Woman Behind Perry's HI
'Facebook Economy' Has Create
Says Company COO
Albert Brooks on Playing a Gan

## ABC News on Facebo

Like   46,729 people like this
friends.



ABC

A video tape smuggled out of the United Arab... View Full Caption

$79/HR Job - 288 Openings
Make $79/hr Working From
Home. Requirements:
Computer. As Seen On MSN.
www.governmentjobs.com/job

Nabulsi is now suing the Sheikh in federal court in Houston, alleging he also was tortured by UAE police when he refused to turn over the videos to the Sheikh following their falling out.

"They were my security, really, to make my case that this man is capable of doing what I say he can do," said Nabulsi in an interview to be broadcast Wednesday on the ABC News program Nightline.

Nabulsi says the video tapes were recorded by his brother, on orders from the Sheikh who liked to watch the torture sessions later in his royal palace.

 Pat Robertson's Alzheir Stuns
2,798 people recommend

 Emails Show Obama Wl Watched Huge Loan to
14,600 people recommend

 Dakota Meyer, Marine I Recipient, Says He's Nc
2,267 people recommend

**THE BLOTTER ALERTS**

Sign Up For Blotter Alerts!

**E-mail address:**

Facebook social plugin

SIGN UP

More Newsletters »

1 Tip to Lose Stomach Fat
This unusual article shows 3 ve;
stomach fat.
TruthAboutStomachFat.com

Man "Cheats" Credit Score
He Added 183 Points to His Cre
This 1 Easy Tip
www.TheCreditSolutionProgran

5 foods you must not eat
Cut down a bit of stomach fat e\
eating these 5 foods.
Thedietsolutionprogram.com

3-in-1 Credit Scores - $0
View your Credit Report & Scor
Bureaus in 60 seconds.
FreeScoreOnline.com

The Sheikh begins by stuffing sand down the man's mouth, as the police officers restrains the victim.

Then he fires bullets from an automatic rifle around him as the man howls incomprehensibly.

### Sadistic Torture by Sheikh

At another point on the tape, the Sheikh can be seen telling the cameraman to come closer.

"Get closer. Get closer. Get closer. Let his suffering show," the Sheikh says.

Over the course of the tape, Sheikh Issa acts in an increasingly sadistic manner.

He uses an electric cattle prod against the man's testicles and inserts it in his anus.

At another point, as the man wails in pain, the Sheikh pours lighter fluid on the man's testicles and sets them aflame.

Then the tape shows the Sheikh sorting through some wooden planks. "I remember there was one that had a nail in it," he says on the tape.

The Sheikh then pulls down the pants of the victim and repeatedly strikes him with board and its protruding nail. At one point, he puts the nail next to the man's buttocks and bangs it through the flesh.

"Where's the salt," asks the Sheikh as he pours a large container of salt on to the man's bleeding wounds.

The victim pleads for mercy, to no avail.

The final scene on the tape shows the Sheikh positioning his victim on the desert sand and then driving over him repeatedly. A sound of breaking bones can be heard on the tape.

Sheikh Issa's lawyer, Daryl Bristow of Baker Botts in Houston, told ABC News "the tape is the tape."

The torture victim was identified by Nabulsi as an Afghan grain dealer, Mohammed Shah Poor, who the Sheikh accused of short changing on a grain delivery to his royal ranch on the outskirts of Abu Dhabi.

The UAE government, in its statement, says the matter was settled privately between the Sheikh and the grain dealer, "by agreeing not to bring formal charges against each other, i.e., theft on the one hand and assault on the other hand."

Nabulsi says Sheikh Issa became increasing violent and sadistic following the 2004 death of his father, the UAE's first and only president until that time, Sheikh Zayed bin Sultan Al Nahyan.

"It's like you flipped a switch and the man took a wrong turn in his life and started getting violent," said Nabulsi.

Sheikh Issa is one of the country's 22 royal sheikhs but does not hold an official position in the UAE government.

### Man Says U.S. Embassy Officials in Abu Dhabi Knew of Torture Tape

Nabulsi first met Sheikh Issa when he traveled to Houston for medical reasons. Nabulsi provided hotel and limousine services and their relationship grew into a business partnership, he says.

Nabulsi, in his lawsuit, says he was falsely arrested on narcotics trafficking charges by Abu Dhabi police when he refused to turn over the tapes and mistreated in prison, where he was held for three months.

"They would stick a finger up his anus and say, 'this is from Sheik Issa, are you going to give us the tapes,'" said Nabulsi's Houston lawyer, Tony Buzbee.

"They would keep him from sleeping, deny him his medications, tell him they were going to rape his wife, kill his child. They made him pose naked while they took pictures," the lawyer alleges.

The UAE government said its review "also confirmed that Mr. Nabulsi was in no way mistreated during his incarceration for drug possession."

After a short trial, Nabulsi was convicted of having prescription medicine without a prescription from a local doctor. Evidence at the trail showed his doctor in Houston had prescribed the medicine.

Nabulsi was expelled from the country and his passport is stamped with the notation "Not Allowed to Return to the UAE."

Nabulsi says officials at the U.S. Embassy in Abu Dhabi were aware of the torture tapes but took no action to protest the Sheikh's action.

The UAE is considered a stalwart U.S. ally in the region, with close cooperation in working against al Qaeda. The U.S. Navy has an important base outside Dubai.

Nabulsi says he even showed portions of the tape to a Department of Homeland Security official stationed in Abu Dhabi to train UAE police, Bill Wallrap.

Nabulsi says after the U.S. official watched the tapes, he advised Nabulsi to "gather your family and get out of the country as soon as possible for your own safety."

A spokesman for DHS said neither Wallrap nor the DHS would have any comment on the torture tapes.

In its 2008 Human Rights report, the U.S. State Department referred to "reports that a royal family member tortured a foreign national who had allegedly overcharged him in a grain deal." The State Department made no reference to the video tapes played for the U.S. official.

### Rep. McGovern Weighs In

Other U.S. embassy employees did help, says Nabulsi, who credits them with keeping him alive by their visits to the prison.

Asked why neither he nor his brother didn't report the torture he saw on the tape to authorities in the UAE, Nabulsi said, "I mean the whole government is all brothers. I mean the president is al Nahyan, the crown prince is al Nahyan, the foreign minister is al Nahyan, the foreign minister is al Nahyan. What can you do?"

The co-chairman of the House Human Rights Commission, Rep. James McGovern (D-MA), said the existence of the tape requires the U.S. to take action.

"Granted that they're strategically located in a key part of the world, but it's hard to imagine that we're going to keep going on as if it' business as usual when this kind of stuff happens," said McGovern. "My guess is that this is just the tip of the iceberg."

Sheikh Issa's lawyer, Bristow, has moved to have the case, which also involves allegations surrounding their business dealings, transferred to courts in the UAE.

Wherever it is heard, said Bristow, "You may be assured that in due

course the one-sided "story" being told to ABC by the Nabulsi's and their lawyers will be completely addressed and the Nabulsi's will be discredited," he said in a letter to ABC News.

The "'story that we think ABC is being told is grossly misleading; it is in large measure demonstrably untrue; and it is defamatory to Sheikh Issa." Bristow represented George W. Bush in the Florida recount case in 2000. Among the firm's partners is former Secretary of State James Baker.

Click Here for the Investigative Homepage.

**MORE FROM ABC NEWS**

Top Video of '09: Secret Torture Tapes Revealed

Torture Tape Implicates UAE Sheikh

Taliban Video: Girl Beaten for 'Adultery'

Dubai's Dirty Little Secret

**FROM AROUND THE WEB**

Girlfriend of suspect in San Francisco Giants fan Bryan Stow beating jailed *(ESPN)*

UCLA's Anderson apologetic after arrest *(ESPN)*

The Unthinkable Poised to Happen: 50% unemployment, a 90% stock market collapse, 100% annual inflation. See disturbing charts. *(Newsmax.com)*

In debt? The true story of one man's debt management plan. *(CareOne)*

How Many Generals Does It Take? *(AOL Defense)*

[What's This?]

2011 Auto & Hybrid Prices
Buying a New Car? Find Discount Automobile Pricing in Your Zip Code!
www.WhyPaySticker.com

5 Foods for a Flat Belly:
Surprising foods that help to burn abdominal fat.
TruthAboutStomachFat.com

Man "Cheats" Credit Score
News: He Added 183 Points to His Credit Score Using This 1 Easy Tip
www.TheCreditSolutionProgram.com

Recommend  602    Email    Print    Share

## Comment & Contribute

Do you have more information about this topic? If so, please click here to contact the editors of ABC News.

POST YOUR COMMENT

View All Comments (202)

**finditi**
3:43 PM EDT
Jun 14, 2010

i would very much like to know whether the Sheikh and his former partner who video taped (and could easily be an accomplice to this torture) have been banned from the United States as torturers.... or do other countries not care and let them enjoy vacations and business travel despite these disgusting acts.

**HarveyK45**
9:33 AM EDT
May 19, 2010

Talk about foresight, who packs salt to rub into the wounds of your victims?

**dragonslayer8808**
5:22 PM EDT
May 17, 2010

From Dr. Salee Amina Mohammed: I have read the article about Sheikh Issa Bin Zayed Al-Nahyan, of the royal family of Abu Dhabi. As I was not present at any trial of Sheikh Issa, nor able to examine any evidence, I am not writing to either condom nor protect the person or the actions allegedly depicted in the video tape, which appeared to represent inhumane acts on another human being, allegedly perpetrated by Sheikh Issa. I would like, however, to make a couple of relevant statements, as well as to correct a statement made by a previous commentator. The comment with which I have concern is that of someone who refered to the Sheikh issa event, defining all of the sons of His Highness Sheikh Zayed Bin Sultan Al-Nahyan as "effeminate." In my life, I have had the privilege of knowing h.H. Sheikh Zayed and many of his family, including several of his sons. I did not know Sheikh Issa Bin Zayed whatsoever, and had never met him. I also had never met H.H. Sheikh Khalifa Bin Zayed, who was always described to me as very hard working. However, of the several sons of Sheikh Zayed and their wives who I did know, some of whom I knew very well, I saw no demonstration of "effeminate" charicteristics of any type in those sons. Also, I saw in them characteristics which were, in general, extremely admirable. I developed a lot of respect for them, due to what I often saw to be very noble and honorable conduct. I did not know every possible thing about every son of Sheikh Zayed, but I think it is highly irresponsible for the commentator to label all of Sheikh Zayed's sons as "effeminate." Also, for those who criticize the fact that Sheikh Issa was acquitted at trial in his country, they might consider the fact that during the Rodney King riots in Los Angeles, a rioter was caught on video tape mercilessly beating an innocent truck driver. he was acquitted. Temporary insanity or not being of right mind at the time of the crime is an often used excuse for leniency or acquittal.

View All Comments (202)

## Today in ABC News



Facebook Aids Job Seekers



Listeria Outbreak From Cantaloupe



Cat Finds Way Home 5 Years Later



Pat Robertso
Alzheimer's



External links are provided for reference purposes.
ABC News is not responsible for the content of
external Internet sites. Copyright © 2011 ABC News
Internet Ventures.

BACK TO TOP

**Sections**

News

Politics

Investigative

Health

Entertainment

Money

Technology

Travel

Recipes

Behind the Scenes

**Shows**

Good Morning America

World News with Diane
Sawyer

Nightline

This Week with Christiane
Amanpour

20/20

Primetime

What Would You Do?

ABC News Now

ABC.com

**Tools**

iPad App

Mobile

Register

Sign In

Facebook

Twitter

Blogs

Emails & News Alerts

Message Boards

RSS Headlines

**Abou**

Contac

Feedb

Adverti

Privac

Interes

Terms

ABC N

Site M

# EXHIBIT
# 49



**Common
Dreams.org**
Join the movement. For the greater good.

Published on Sunday, May 24, 2009 by The New York Times

## US Relies More on Aid of Allies in Terror Cases

by Eric Schmitt and Mark Mazzettil

WASHINGTON - The United States is now relying heavily on foreign intelligence services to capture, interrogate and detain all but the highest-level terrorist suspects seized outside the battlefields of **Iraq** and **Afghanistan** , according to current and former American government officials.

The change represents a significant loosening of the reins for the United States, which has worked closely with allies to combat violent extremism since the 9/11 attacks but is now pushing that cooperation to new limits.

In the past 10 months, for example, about a half-dozen midlevel financiers and logistics experts working with **Al Qaeda** have been captured and are being held by intelligence services in four Middle Eastern countries after the United States provided information that led to their arrests by local security services, a former American counterterrorism official said.

In addition, Pakistan's intelligence and security services captured a Saudi suspect and a Yemeni suspect this year with the help of American intelligence and logistical support, Pakistani officials said. The two are the highest-ranking Qaeda operatives captured since **President Obama** took office, but they are still being held by Pakistan, which has shared information from their **interrogations** with the United States, the official said.

The current approach, which began in the last two years of the Bush administration and has gained momentum under Mr. Obama, is driven in part by court rulings and policy changes that have closed the secret prisons run by the **Central Intelligence Agency** , and all but ended the transfer of prisoners from outside Iraq and Afghanistan to American military prisons.

Human rights advocates say that relying on foreign governments to hold and question terrorist suspects could carry significant risks. It could increase the potential for abuse at the hands of foreign interrogators and could also yield bad intelligence, they say.

The fate of many terrorist suspects whom the Bush administration sent to foreign countries remains uncertain. **One suspect** , **Ibn al-Shaykh al-Libi** , who was captured by the C.I.A. in late 2001 and sent to Libya, was recently reported to have died there in Libyan custody.

"As a practical matter you have to rely on partner governments, so the focus should be on pressing and assisting those governments to handle those cases professionally," said Tom Malinowski,

Washington advocacy director for **Human Rights Watch** .

The United States itself has not detained any high-level terrorist suspects outside Iraq and Afghanistan since Mr. Obama took office, and the question of where to detain the most senior terrorist suspects on a long-term basis is being debated within the new administration. Even deciding where the two Qaeda suspects in Pakistani custody will be kept over the long term is "extremely, extremely sensitive right now," a senior American military official said, adding, "They're both bad dudes. The issue is: where do they get parked so they stay parked?"

How the United States is dealing with terrorism suspects beyond those already in the prison at Guantánamo Bay, Cuba, was a question Mr. Obama did not address in the **speech he gave Thursday** about his antiterrorism policies. While he said he might seek to create a new system that would allow preventive detention inside the United States, the government currently has no obvious long-term detention center for imprisoning terrorism suspects without court oversight.

Mr. Obama has said he still intends to close the Guantánamo prison by January, despite misgivings in Congress, and the Supreme Court has ruled that inmates there may challenge their detention before federal judges. Some suspects are being imprisoned without charges at a United States air base in Afghanistan, but a federal court has ruled that at least some of them may also file **habeas corpus** lawsuits to challenge their detentions.

American officials say that in the last years of the Bush administration and now on Mr. Obama's watch, the balance has shifted toward leaving all but the most high-level terrorist suspects in foreign rather than American custody. The United States has repatriated hundreds of detainees held at prisons in Cuba, Iraq and Afghanistan, but the current approach is different because it seeks to keep the prisoners out of American custody altogether.

How the United States deals with terrorism suspects remains a contentious issue in Congress.

**Leon E. Panetta** , the director of the C.I.A., said in February that the **agency might continue its program of extraordinary rendition** , in which captured terrorism suspects are transferred to other countries without extradition proceedings.

He said the C.I.A. would be likely to continue to transfer detainees from their place of capture to other countries, either their home countries or nations that intended to bring charges against them.

As a safeguard against torture, Mr. Panetta said, the United States would rely on diplomatic assurances of good treatment. The Bush administration sought the same assurances, which critics say are ineffective.

A half-dozen current and former American intelligence and counterterrorism officials and allied officials were interviewed for this article, but all spoke on the condition of anonymity because the detention and interrogation programs are classified.

Case 2:10-cv-06149-DSF-JEM  Document 42-6  Filed 10/12/11  Page 103 of 105  Page ID
#:2372
US Relies More on Aid of A      in Terror Cases                                    Page 3 of 3

Officials say the United States has learned so much about Al Qaeda and other militant groups since the 9/11 attacks that it can safely rely on foreign partners to detain and question more suspects. "It's the preferred method now," one former counterterrorism official said.

The Obama administration's policies will probably become clearer after two task forces the president created in January report to him in July on detainee policy, interrogation techniques and **extraordinary rendition** .

In many instances now, allies are using information provided by the United States to pick up terrorism suspects on their own territory - including the two suspects seized in Pakistan this year.

The Saudi militant, Zabi al-Taifi, was picked up by Pakistani commandos in a dawn raid at a safe house outside Peshawar on Jan. 22, an operation conducted with the help of the C.I.A.

A Pakistani official said the Yemeni suspect, Abu Sufyan al-Yemeni, was a Qaeda paramilitary commander who was on C.I.A. and Pakistani lists of the top 20 Qaeda operatives. He was believed to be a conduit for communications between Qaeda leaders in Pakistan and cells in East Africa, Iran, Yemen and elsewhere. American and Pakistani intelligence officials say they believe that Mr. Yemeni, who was arrested Feb. 24 by Pakistani authorities in Quetta, helped arrange travel and training for Qaeda operatives from various parts of the Muslim world to the Pakistani tribal areas.

He is now in the custody of Pakistan's main spy agency, the Directorate for **Inter-Services Intelligence** , but his fate is unclear. The Pakistani official said that he would remain in Pakistani hands, but that it would be difficult to try him because the evidence against him came from informers.

American officials said the United States would still take custody of the most senior Qaeda operatives captured in the future. As a model, they cited the case of Abd al-Hadi al-Iraqi, an Iraqi Kurd who is said to have joined Al Qaeda in the late 1990s and risen to become a top aide to **Osama bin Laden** , and who was captured by a foreign security service in 2006. He was handed over to the C.I.A., which transferred him to Guantánamo Bay in April 2007. He was one of the last detainees shipped there.

Copyright 2009 The New York Times Company

Article printed from **www.CommonDreams.org**

URL to article: **http://www.commondreams.org/headline/2009/05/24**

# EXHIBIT
# 50

## The New York Times

This copy is for your personal, noncommercial use only. You can order presentation-ready copies for distribution to your colleagues, clients or customers here or use the "Reprints" tool that appears next to any article. Visit www.nytreprints.com for samples and additional information. Order a reprint of this article now.



November 11, 2009

# American Sues F.B.I., Saying He Was Detained in Africa

### By SCOTT SHANE

WASHINGTON — A New Jersey man who contends that he was detained and mistreated in Kenya, Somalia and Ethiopia in 2007 with the approval of the United States filed a lawsuit on Tuesday against F.B.I. agents and other unidentified American officials who he says interrogated him and threatened him with execution.

The lawsuit, filed in Federal District Court in Washington, contends that the detention and treatment of the man, Amir Meshal, violated the Constitution and other laws and seeks unspecified damages. Mr. Meshal, represented by lawyers for the American Civil Liberties Union and Yale Law School, asserts that his mental suffering amounted to torture and describes his forced transfers as an illegal use of rendition, the transport of a prisoner for interrogation.

A Federal Bureau of Investigation spokesman, Bill Carter, said officials would not comment on the lawsuit.

Mr. Meshal, 26, an American citizen and a Muslim whose parents immigrated from Egypt, said in the lawsuit that he traveled to Egypt in 2005 and then to Somalia in 2006, hoping to experience life under Islamist rule. In December 2006, he said he fled to Kenya as the Islamic courts that had seized power in Somalia faced off against rival Somali forces backed by Ethiopia.

He said that he was captured by soldiers in Kenya and that he was jailed and questioned by Americans who he believes were F.B.I. agents. The lawsuit asserts that the agents accused Mr. Meshal of working for Al Qaeda and threatened him, but it does not say he was physically harmed.

In February 2007, the lawsuit says, Mr. Meshal was flown to Somalia and then to Ethiopia, where he was held for more than three months and repeatedly questioned by American interrogators who he believes worked for the F.B.I. His hands were cuffed behind his back whenever he was in his cell, and he was sometimes kept in solitary confinement, the lawsuit says.

In May 2007, after inquiries about Mr. Meshal by news organizations and Representative Rush D. Holt, Democrat of New Jersey, he was released and flown back to the United States.

"No American citizen should ever be subjected to what Amir went through, and the government officials who were responsible for what happened should be held accountable," said Jonathan Hafetz of the A.C.L.U., who represents Mr. Meshal.

Copyright 2009 The New York Times Company