# EXHIBIT
# A

**ACLU**
AMERICAN CIVIL LIBERTIES UNION
of SOUTHERN CALIFORNIA
FOUNDATION

**LIBERTY | JUSTICE | EQUALITY**

*By Facsimile, Certified Mail, Return Receipt Requested*

January 29, 2009

**Chair**
Stephen Rohde

**President**
Douglas Mirell

**Chairs Emeriti**
Danny Goldberg
Allan K. Jonas
Burt Lancaster*
Irving Lichtenstein, MD*
Jarl Mohn
Laurie Ostrow*
Stanley K. Sheinbaum
*deceased

**Chief Executive Officer**
Ramona Ripston

**Chief Counsel**
Mark D. Rosenbaum

**Chief Operating Officer**
Heather Carrigan

**Chief Financial Officer**
Brenda Maull

**Communications Director**
Gordon Smith

**Development Director**
Tracy Rice

**Legal Director**
Hector O. Villagra

**Managing Attorney &
Manheim Family Attorney
for First Amendment Rights**
Peter J. Eliasberg

**Department of Justice**
FOIA/PA Mail Referral Unit
Department of Justice
Room 115, LOC Building
Washington, DC 20530-0001
Fax: (301) 341-0772

Federal Bureau of Investigation
David M. Hardy, Chief
Record/Information Dissemination Section
Records Management Division
170 Marcel Drive
Winchester, VA 22602-4843
(540) 868-4591

Federal Bureau of Investigation
Los Angeles Field Office
Attn: FOIA Office
Suite 1700, FOB
11000 Wilshire Blvd.
Los Angeles, CA 90024-3672

INTERPOL – United States National Central Bureau
Allison Tanaka
FOIA/PA Specialist
Office of General Counsel
Washington, DC 20530-0001
(202) 616-9000

National Security Division
Arnetta James
FOIA Initiatives Coordinator
Room 6150, 950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001
(202) 307-3525

**ACLU**

AMERICAN CIVIL LIBERTIES UNION
of SOUTHERN CALIFORNIA

FOUNDATION

LIBERTY | JUSTICE | EQUALITY

**Chair**
Stephen Rohde

**President**
Douglas Mirell

**Chairs Emeriti**
Danny Goldberg
Allan K. Jonas
Burt Lancaster*
Irving Lichtenstein, MD*
Jarl Mohn
Laurie Ostrow*
Stanley K. Sheinbaum
*deceased

**Chief Executive Officer**
Ramona Ripston

**Chief Counsel**
Mark D. Rosenbaum

**Chief Operating Officer**
Heather Carrigan

**Chief Financial Officer**
Brenda Maull

**Communications Director**
Gordon Smith

**Development Director**
Tracy Rice

**Legal Director**
Hector O. Villagra

**Managing Attorney &
Manheim Family Attorney
for First Amendment Rights**
Peter J. Eliasberg

## Department of State
Margaret P. Grafeld
Office of Information Programs and Services
A/ISS/IPS/RL
U. S. Department of State
Washington, D. C. 20522-6001
Fax: (202) 261-8579

## Central Intelligence Agency
Adolfo Tarasiuk, Jr.
Chief Information Officer
Washington, D.C. 20505

## Department of Defense
Jim Hogan
Defense Freedom of Information Policy Office
1155 Defense Pentagon
Washington, D.C. 20301-1155
Fax: (703) 696-4506

Defense Intelligence Agency
Alesia Y. Williams
ATTN: DIAC, DAN-1A
Bldg. 6000
Washington, D.C. 20340-5100
Fax: (301) 394-5356
E-mail: foia@dia.mil

Defense Security Service
Les Blake
Chief, Office of FOIA and Privacy, GCF
1340 Braddock Place
Alexandria, VA 22314-1651
Fax: (703) 325-5341
E-mail: leslie.blake@mail.dss.mil

National Security Agency
Marianne Stupar
FOIA Requester Servivce Center/DJP4
9800 Savage Road, Suite 6248
Ft. George G. Meade, MD 20755-6248
Fax: (301) 688-4762

**ACLU**
FOUNDATION
AMERICAN CIVIL LIBERTIES UNION
of SOUTHERN CALIFORNIA

**LIBERTY | JUSTICE | EQUALITY**

**Chair**
Stephen Rohde

**President**
Douglas Mirell

**Chairs Emeriti**
Danny Goldberg
Allan K. Jonas
Burt Lancaster*
Irving Lichtenstein, MD*
Jarl Mohn
Laurie Ostrow*
Stanley K. Sheinbaum
*deceased

**Chief Executive Officer**
Ramona Ripston

**Chief Counsel**
Mark D. Rosenbaum

**Chief Operating Officer**
Heather Carrigan

**Chief Financial Officer**
Brenda Maull

**Communications Director**
Gordon Smith

**Development Director**
Tracy Rice

**Legal Director**
Hector O. Villagra

**Managing Attorney &
Manheim Family Attorney
for First Amendment Rights**
Peter J. Eliasberg

Office of the Inspector General
Dave Henshall
Senior Advisor, Information and Privacy
400 Army Navy Drive, Suite 1021
Arlington, VA 22202-4704
Fax: (703) 602-0294

**Department of Homeland Security**
Catherine M. Papoi
Deputy Chief FOIA Officer
Director, Disclosure & FOIA
The Privacy Office
245 Murray Drive, S.W.
STOP-0550
Washington, DC 20528-0550
Fax: (703) 235-0443
E-mail: foia@dhs.gov

Bureau of Customs and Border Protection
Mark Hanson
Director
FOIA Division
799 9th Street, NW
Mint Annex
Washington, DC 20229
Fax: (202) 325-0154

United States Immigration and Customs Enforcement
Catrina Pavlik-Keenan
800 N. Capitol Street
Fifth Floor, Suite 585
Washington, D.C. 20536
Fax: (202) 732-0310

Transportation Security Administration
Kevin J. Janet
FOIA Officer, TSA-20
601 South 12th Street
Arlington, VA 22202-4220
Fax: (571) 227-1406



**LIBERTY | JUSTICE | EQUALITY**

Under Secretary Office of Intelligence and Analysis
U.S. Department of Homeland Security
FOIA Officer / Requester Service Center- Quinton Mason
Washington, D.C. 20528
Fax: (202) 282-8191
Email: Quinton.mason@dhs.gov

**Office of the Director of National Intelligence**
Washington, D.C. 20511
Fax: (703) 275-1299
Email: dni-foia@ugov.gov

**Chair**
Stephen Rohde

**President**
Douglas Mirell

**Chairs Emeriti**
Danny Goldberg
Allan K. Jonas
Burt Lancaster*
Irving Lichtenstein, MD*
Jarl Mohn
Laurie Ostrow*
Stanley K. Sheinbaum
*deceased

**Chief Executive Officer**
Ramona Ripston

**Chief Counsel**
Mark D. Rosenbaum

**Chief Operating Officer**
Heather Carrigan

**Chief Financial Officer**
Brenda Maull

**Communications Director**
Gordon Smith

**Development Director**
Tracy Rice

**Legal Director**
Hector O. Villagra

**Managing Attorney &
Manheim Family Attorney
for First Amendment Rights**
Peter J. Eliasberg

**Re:**    <u>Request Under Freedom of Information Act and Privacy Act</u>
         *Expedited Processing Requested*

Dear FOIA Officer:

     This letter constitutes a request for records made pursuant to the Freedom of Information Act (FOIA), 5 U.S.C. § 552, and the Privacy Act, 5. U.S.C. § 552a, by the American Civil Liberties Union Foundation of Southern California (ACLU/SC) on behalf of Naji Jawdat Hamdan, Hossam Hemdan, and Jehad Suliman (hereinafter "Requestors"). *See* Exhibit A (Privacy Act authorizations for Requestors).

     The ACLU/SC and Requestors make this request for records to obtain information about the federal government's surveillance, monitoring, questioning, investigation, and participation in the overseas detention and torture of Mr. Naji Jawdat Hamdan. Mr. Hamdan's brother, Hossam Hemdan, and associate, Jehad Suliman, make this request for information pertaining to themselves because they also underwent substantial surveillance, monitoring, questioning and investigation because of their relationship to Mr. Hamdan.

**THE REQUESTORS**

     The **ACLU/SC** is a non-profit organization dedicated to defending and securing the rights granted by the U.S. Constitution and Bill of Rights. ACLU/SC's work focuses on the First Amendment, equal protection, due process, privacy, and furthering civil rights for disadvantaged groups. As part of its work, ACLU/SC disseminates information to the public through newsletters, news briefings, "Know Your Rights" documents, and other educational and informational materials.



**LIBERTY | JUSTICE | EQUALITY**

The ACLU/SC represented Mr. Naji Hamdan and Mr. Hossam Hemdan in a federal lawsuit challenging Mr. Hamdan's overseas detention in the United Arab Emirates, *Mallouk, et al. v. Obama, et al.*, CV 08-2003 (JR) (D.D.C. 2009). The ACLU/SC also represented Mr. Jehad Suliman for the purposes of reclaiming property unlawfully obtained from his home during the execution of a search warrant.

**Naji Jawdat Hamdan** is an American citizen, who was born in Lebanon on May 26, 1966. He moved to the United States in the early 1980s and lived mostly in the Los Angeles area until 2006. Mr. Hamdan is married to Mona Mallouk and has three children: Khaled, Hamza and Noor Hamdan.

Mr. Hamdan studied in the United States at Northrup University, and later started a successful auto parts business, called Honda Acura Palace or Hapimotors. He also was a founding member and part of the leadership of the Islamic Center of Hawthorne, a mosque in Hawthorne, CA. Mr. Hamdan served as a volunteer imam at that mosque.

For nearly a decade, Mr. Hamdan was subject to FBI surveillance. He was first visited by FBI agents at his home in December 1999, at which point agents asked him, among other things whether he knew Osama Bin Laden. The FBI approached him again shortly after September 11, 2001. In the following years, FBI agents returned to his home and to his workplace to question him on numerous other occasions. Mr. Hamdan also had difficulty traveling and was frequently pulled into secondary inspection at airports for questioning both leaving and returning to the United States.

In August 2006, Mr. Hamdan and his family moved to the United Arab Emirates (U.A.E.). Several months later, Mr. Hamdan returned to the United States for a brief visit. During that visit, he was subject to constant FBI surveillance. Three to four FBI cars also followed him around throughout the duration of his trip. Around the same time, the U.S. government began to question Mr. Hamdan's associates about him.

Then, sometime in 2007, on a return trip from Lebanon to the U.A.E., Lebanese intelligence officers detained Mr. Hamdan for no apparent reason. The authorities detained Mr. Hamdan for one week and subjected him to interrogation and physical abuse.

In July 2008, several months after Mr. Hamdan's detention in Lebanon, the FBI contacted Mr. Hamdan's brother Hossam Hemdan. The FBI official told Mr. Hossam Hemdan that FBI agents wanted to question Mr. Hamdan at the U.S. Embassy in Abu Dhabi. Hossam Hemdan contacted Mr. Hamdan, who agreed to meet with the agents. Two agents, Joshua Stone and Jerry Price, FBI agents from the Los Angeles Field Office, then flew from Los Angeles to the U.A.E. to interrogate him. They met Mr.

**Chair**
Stephen Rohde

**President**
Douglas Mirell

**Chairs Emeriti**
Danny Goldberg
Allan K. Jonas
Burt Lancaster*
Irving Lichtenstein, MD*
Jarl Mohn
Laurie Ostrow*
Stanley K. Sheinbaum
*deceased

**Chief Executive Officer**
Ramona Ripston

**Chief Counsel**
Mark D. Rosenbaum

**Chief Operating Officer**
Heather Carrigan

**Chief Financial Officer**
Brenda Maull

**Communications Director**
Gordon Smith

**Development Director**
Tracy Rice

**Legal Director**
Hector O. Villagra

**Managing Attorney &
Manheim Family Attorney
for First Amendment Rights**
Peter J. Eliasberg



LIBERTY | JUSTICE | EQUALITY

Hamdan at the Embassy and interrogated him for several hours. Approximately one month later, on August 26, 2008, the State Security forces of the United Arab Emirates (the "Amn al-Dawla") arrested Mr. Hamdan at his house, in the presence of his family, for no apparent reason. The State Security officials put a hood over Mr. Hamdan's head and took him away. They detained him in a secret location somewhere in Abu Dhabi for three months.

On November 19, 2008, the ACLU/SC filed a lawsuit in federal court alleging that Mr. Hamdan was in the constructive custody of the U.S. because the U.S. had asked the U.A.E. to detain him. One week after filing the lawsuit, Mr. Hamdan was criminally charged with three counts of terrorism and transferred from the secret location to criminal custody in Abu Dhabi. At that time, Mr. Hamdan reported that U.A.E. officials had severely tortured him during lengthy interrogation sessions. He also reported that he believed that at least one U.S. official was present for at least one torture and interrogation session. After a lengthy criminal trial before the Federal Supreme Court in the U.A.E., bereft of due process and transparency, Mr. Hamdan was convicted and sentenced to time served. In October 2009, the U.A.E. deported Mr. Hamdan to Lebanon where he is now recovering from this ordeal.

**Hossam (a.k.a. Sam or Sammy) Hemdan** is an American citizen, who was born in Lebanon on April 4, 1970. He moved to the United States in approximately 1987 and has resided in the Los Angeles area ever since. Mr. Hemdan currently lives in Hawthorne, California and owns and manages a car emissions testing company called Redondo Smog in Hawthorne, California.

Mr. Hemdan, like his brother, was subjected to FBI questioning, monitoring and surveillance beginning in 1999. Over the course of several years, Mr. Hemdan received numerous visits by the FBI to his home and workplace for questioning. On several occasions, he noticed FBI vehicles parked outside his shop. Since 2006, he has experienced routine difficulties leaving and entering the United States at airports and is routinely pulled into secondary inspection by federal authorities for questioning, including extensive questioning about his brother, Naji Hamdan. In addition, beginning in 2006, Mr. Hemdan began to have trouble receiving his mail at his home and has reason to believe that the FBI intercepted his mail.

**Jehad Suliman** is an American citizen, who was born in Palestine on September 29, 1963. Mr. Suliman moved to the United States in 1982 and to Los Angeles in 1988. He currently resides in Hawthorne, California. Mr. Suliman is the manager of Hapimotors, the business that Mr. Hamdan started and owned. He and Mr. Hamdan are close friends and associates.

Mr. Suliman, like Mr. Hamdan and Mr. Hemdan, has also been subject to FBI

**Chair**
Stephen Rohde

**President**
Douglas Mirell

**Chairs Emeriti**
Danny Goldberg
Allan K. Jones
Burt Lancaster*
Irving Lichtenstein, MD*
Jarl Mohn
Laurie Ostrow*
Stanley K. Sheinbaum
*deceased

**Chief Executive Officer**
Ramona Ripston

**Chief Counsel**
Mark D. Rosenbaum

**Chief Operating Officer**
Heather Carrigan

**Chief Financial Officer**
Brenda Maull

**Communications Director**
Gordon Smith

**Development Director**
Tracy Rice

**Legal Director**
Hector O. Villagra

**Managing Attorney &
Manheim Family Attorney
for First Amendment Rights**
Peter J. Eliasberg



**LIBERTY | JUSTICE | EQUALITY**

**Chair**
Stephen Rohde

**President**
Douglas Mirell

**Chairs Emeriti**
Danny Goldberg
Allan K. Jonas
Burt Lancaster*
Irving Lichtenstein, MD*
Jarl Mohn
Laurie Ostrow*
Stanley K. Sheinbaum
*deceased

**Chief Executive Officer**
Ramona Ripston

**Chief Counsel**
Mark D. Rosenbaum

**Chief Operating Officer**
Heather Carrigan

**Chief Financial Officer**
Brenda Maull

**Communications Director**
Gordon Smith

**Development Director**
Tracy Rice

**Legal Director**
Hector O. Villagra

**Managing Attorney &
Manheim Family Attorney
for First Amendment Rights**
Peter J. Eliasberg

questioning, monitoring and surveillance. Beginning around 2002, Mr. Suliman was questioned by FBI agents at the Hapimotors shop on at least two occassions. After Mr. Hamdan was detained in Lebanon in 2008, FBI agents again approached Mr. Suliman for questioning about Mr. Hamdan. Also, beginning in 2006, Mr. Suliman experienced problems leaving and returning to the U.S. at airports. On one trip, federal agents questioned him extensively at the airport before and after a trip about Mr. Hamdan and Hapimotors. Finally, in July 2009, during the time of Mr. Hamdan's trial in the U.A.E., about one dozen law enforcement agents searched Mr. Suliman's home and property subject to a valid search warrant and seized some of Mr. Suliman's possessions. According to the search warrant, authorities were investigating Mr. Suliman for MediCal fraud. However, documents unrelated to MediCal, but pertaining to Naji Hamdan and Hapimotors, were seized.

## THE REQUEST FOR RECORDS

We seek disclosure of **any records**[1] from January 1, 1998 to the present, which were prepared, received, transmitted, collected and/or maintained by the Department of Justice, the Department of State, the Central Intelligence Agency, the Department of Homeland Security, the Department of Defense and **any** of their sub-agencies or divisions **relating to** or **concerning:**[2]

(1) Mr. Naji Jawdat Hamdan;

(2) Mr. Hossam Jawdat Hemdan (a.k.a. Sammy Hemdan or Sam Hemdan)

(3) Mr. Jehad Suliman; and

(4) Hapimotors (a.k.a Honda Acura Palace or HondAcura Palace). The business is currently located at 1848 East 55th St, Los Angeles, CA 90058 and maintains a website at www.hapimotors.com.

---

[1] The term "records" as used herein includes but is not limited to all communications preserved in electronic or hard copy form, including but not limited to correspondence, documents, data, videotapes, audio tapes, CDs, DVDs, floppy disks, zip disks, faxes, files, e-mails, notes (including handwritten notes), letters, summaries or records of personal conversations, reports and/or summaries of interviews, reports and/or summaries of investigations, guidelines, evaluations, instructions, analyses, memoranda, agreements, orders, prescriptions, charts, expressions of statements of policy, procedures, protocols, reports, rules, training manuals, or studies.

[2] The term "concerning" means referring to, describing, evidencing, commenting on, responding to, showing, analyzing, reflecting, or constituting.

**ACLU**
AMERICAN CIVIL LIBERTIES UNION
of SOUTHERN CALIFORNIA
FOUNDATION

**LIBERTY | JUSTICE | EQUALITY**

**Chair**
Stephen Rohde

**President**
Douglas Mirell

**Chairs Emeriti**
Danny Goldberg
Allan K. Jonas
Burt Lancaster*
Irving Lichtenstein, MD*
Jarl Mohn
Laurie Ostrow*
Stanley K. Sheinbaum
*deceased

**Chief Executive Officer**
Ramona Ripston

**Chief Counsel**
Mark D. Rosenbaum

**Chief Operating Officer**
Heather Carrigan

**Chief Financial Officer**
Brenda Maull

**Communications Director**
Gordon Smith

**Development Director**
Tracy Rice

**Legal Director**
Hector O. Villagra

**Managing Attorney &
Manheim Family Attorney
for First Amendment Rights**
Peter J. Eliasberg

As is apparent from the plain language of this request, we seek not only the contents of any primary or main files on the Requestors and Hapimotors, but also any records relating to or concerning any of the Requestors or Hapimotors that may be cross-listed, cross-referenced or contained in the main file pertaining to another individual or entity. The request is also meant to include, but not be limited to the entirety of any document that includes the name of any of the requestors.

## SUGGESTED SEARCH TERMS FOR ELECTRONIC SEARCHES

To enable an adequate search of all electronic databases, we suggest that you use the following search terms, among others, to locate responsive records:

1. Naji Jawdat Hamdan
2. Hamdan, Naji Jawdat
3. Naji Hamdan
4. Hamdan, Naji
5. N. Hamdan
6. Hamdan, N.
7. Naji J. Hamdan
8. Hamdan, Naji J.
9. Hossam Hemdan
10. Hemdan, Hossam
11. Hossam Hamdan
12. Hamdan, Hossam
13. Sam Hemdan
14. Hemdan, Sam
15. Samy Hemdan
16. Hemdan, Samy
17. Sammy Hemdan
18. Hemdan, Sammy
19. Sammy Jawdat Hemdan
20. Hemdan, Sammy Jawdat
21. Jehad Suliman
22. Suliman, Jehad
23. Honda Acura Palace
24. HondAcura Palace
25. Hapimotors
26. Hapimotors.com
27. Authentic auto parts



LIBERTY | JUSTICE | EQUALITY

## REQUEST FOR EXPEDITED PROCESSING

**Chair**
Stephen Rohde

**President**
Douglas Mirell

**Chairs Emeriti**
Danny Goldberg
Allan K. Jonas
Burt Lancaster*
Irving Lichtenstein, MD*
Jarl Mohn
Laurie Ostrow*
Stanley K. Sheinbaum
*deceased

**Chief Executive Officer**
Ramona Ripston

**Chief Counsel**
Mark D. Rosenbaum

**Chief Operating Officer**
Heather Carrigan

**Chief Financial Officer**
Brenda Maull

**Communications Director**
Gordon Smith

**Development Director**
Tracy Rice

**Legal Director**
Hector O. Villagra

**Managing Attorney &
Manheim Family Attorney
for First Amendment Rights**
Peter J. Eliasberg

Expedited processing is warranted when there is a "compelling need" for the information. 5 U.S.C. § 552(a)(6)(E). For requests made by organizations "primarily engaged in disseminating information," "an urgency to inform the public about actual or alleged federal government activity" constitutes a "compelling need." 5 U.S.C. § 552(a)(6)(E)(v)(II).[3]

This request implicates a matter of urgent public concern: namely, the nature and extent of the federal government's surveillance and detention of American citizens in the name of national security. Information regarding the federal government's handling of the Naji Hamdan case – both his surveillance in the U.S. and his detention and torture abroad – is of particularly urgent public concern because Mr. Hamdan and many others believe that the U.S. government requested that he be detained by a foreign government known for torturing prisoners, in order to obtain additional information from him. Whether or not the federal government had one of its citizens detained and tortured by a foreign government is a matter of urgent public concern. In addition, information responsive to this request will shed light on the extensive FBI surveillance, monitoring and questioning that Mr. Hamdan and his associates underwent for many years. In particular, the information may show whether the surveillance was suspicion-less or whether there was specific criminal activity that the FBI was investigating. Such information is of urgent public concern as the federal government seeks to improve its surveillance and investigative techniques in the face of new terrorism threats, while balancing concerns for civil liberties.

This request is also made by an organization, the ACLU/SC, "primarily engaged in disseminating information." 5 U.S.C. § 552(a)(6)(E)(v)(II); 6 C.F.R. § 5.5(d)(1)(ii).

---

[3] *See also Amer. Civil Liberties Union v. U.S. Dep't of Defense*, 2006 WL 1469418 (N.D. Cal. 2006) (ordering expedited processing of a request for records under the FOIA statute where plaintiffs had alleged a compelling need to know about the Department of Defense's practice of gathering information on political protests in the United States); *Washington Post v. Dep't of Homeland Sec.*, 459 F. Supp. 2d 61, 66 (D.C.C. 2006) (holding that expedited processing of a request for information from the Secret Service about who visited Vice-President Cheney during CIA-leak investigation was proper under the statute where plaintiff had asserted "statutory entitlement to expedited review of the FOIA request, based on the statutory predicate that the plaintiff has a 'compelling need' for the information."); *Elec. Privacy Info. Ctr. v. Dep't of Justice*, 416 F. Supp. 2d 30 (D.D.C.2006) (granting a preliminary injunction and ordering expedited processing and disclosure of documents concerning the Bush Administration's policy of conducting surveillance of domestic communications).



**LIBERTY | JUSTICE | EQUALITY**

Chair
Stephen Rohde

President
Douglas Mirell

Chairs Emeriti
Danny Goldberg
Allan K. Jonas
Burt Lancaster*
Irving Lichtenstein, MD*
Jarl Mohn
Laurie Ostrow*
Stanley K. Sheinbaum
*deceased

Chief Executive Officer
Ramona Ripston

Chief Counsel
Mark D. Rosenbaum

Chief Operating Officer
Heather Carrigan

Chief Financial Officer
Brenda Maull

Communications Director
Gordon Smith

Development Director
Tracy Rice

Legal Director
Hector O. Villagra

Managing Attorney &
Manheim Family Attorney
for First Amendment Rights
Peter J. Eliasberg

*See American Civil Liberties Union v. Dep't of Justice*, 321 F. Supp. 2d 24, 30 n.5 (D.D.C. 2004) (non-profit public interest group that "gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw material into a distinct work, and distributes that work to an audience," is "primary engaged in disseminating information"). Dissemination of information to the public is a critical and substantial component of the ACLU/SC's mission and work. The ACLU/SC disseminates information to the public through newsletters, news briefings, "Know Your Rights" documents, and other educational and informational materials. ACLU/SC also disseminates information to individuals, tax-exempt organizations, not-for-profit groups, and members through its website, http://www.aclu-sc.org. The ACLU/SC website homepage includes a section for news, along with links to information about current issues of public interest. The website also contains archives of press releases and other documents demonstrating the thorough extent to which the ACLU/SC disseminates information to the public on numerous issues. *See* www.aclu-sc.org/news_stories.

The ACLU/SC also shares information with the national ACLU office. The ACLU publishes information through multiple outlets including newsletters, action alerts, videos, and other media. ACLU publications are disseminated across the country to individuals and organizations. The ACLU also publishes an electronic newsletter, which is distributed to subscribers by e-mail, and maintains a website of civil rights and civil liberties information at http://www.aclu.org.

Expedited processing is also warranted because the information sought relates to "[a] matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence." 28 C.F.R. § 16.5(d)(1)(iv). The instant request relates to the case of Naji Hamdan, a matter of exceptional media interest, which is reflected in the widespread news coverage of his case in local, national and international media outlets. *See, e.g.*, Jonathan S. Landay, *Did U.S. Push Detention of American without Charges?*, McCLATCHY NEWSPAPERS, Nov. 17, 2008; Jonathan S. Landay, *ACLU Suing Bush, Others Over Illegal Detentions Abroad*, McCLATCHY NEWSPAPERS, Nov. 18, 2008; Denise Nix, *ACLU Suing to Free U.S. Citizen*, DAILY BREEZE, Nov. 18, 2008; Jonathan S. Landay, *Are Overseas Detentions of U.S. Citizens Unconstitutional?*, THE SACRAMENTO BEE, Nov. 18, 2008; Denise Nix, *ACLU Suing to Free U.S. Citizen*, CONTRA COSTA TIMES, Nov. 18, 2008; Raja Abdulrahim, *ACLU Seeks Release of American, Ex-Hawthorne Resident Held in UAE for 3 Months*, L.A. TIMES, Nov. 20, 2008; Jonathan S. Landay, *American Alleges Torture in UAE Detention*, McCLATCHY NEWSPAPERS, Dec. 2, 2008; Denise Nix, *Former Hawthorne Resident Describes Torture Abroad*, DAILY BREEZE, Dec. 3, 2008; Raja Abdulrahim, *Family Says U.S. Man Detained in Emirates was Tortured*, L.A. TIMES, Dec. 4, 2008; Jesse J. Holland, *Lawsuit: US Responsible for Man's UAE Imprisonment*, ASSOCIATED PRESS, Dec. 13, 2008; Karl Vick, *American Muslim's Case Poses a Test, U.S. Role Alleged in Detention in UAE*, THE WASH. POST, Mar. 23, 2009,



**LIBERTY | JUSTICE | EQUALITY**

**Chair**
Stephen Rohde

**President**
Douglas Mirell

**Chairs Emeriti**
Danny Goldberg
Allan K. Jonas
Burt Lancaster*
Irving Lichtenstein, MD*
Jarl Mohn
Laurie Ostrow*
Stanley K. Sheinbaum
*deceased

**Chief Executive Officer**
Ramona Ripston

**Chief Counsel**
Mark D. Rosenbaum

**Chief Operating Officer**
Heather Carrigan

**Chief Financial Officer**
Brenda Maull

**Communications Director**
Gordon Smith

**Development Director**
Tracy Rice

**Legal Director**
Hector O. Villagra

**Managing Attorney &
Manheim Family Attorney
for First Amendment Rights**
Peter J. Eliasberg

at A2; Anna Schecter, *American Detained, Tortured in UAE at U.S. Gov'ts Behest, ACLU Says Naji Hamdan Says He Was Beaten Until Losing Consciousness in Abu Dhabi Prison*, ABC NEWS, June 8, 2009; Muhammad Shamsaddin Megalommatis, *Amnesty Int'l Report 2009 on the UAE – the Impermissible Territory of Human Degeneration*, AMERICAN CHRONICLE, July 2, 2009; *American Held in UAE: "Proxy Detention"?, U.S. Citizen Faces Terror Charges in Dubai; Attorneys Says He Was Tortured, Forced to Confess*, CBS NEWS, July 19, 2009; Barbara Surk, *UAE Prosecutor: U.S. Man had Al-Qaida Ties, American on Trial Alleges He was Tortured, Denies Terror-Related Charges*, ASSOCIATED PRESS, Aug. 24, 2009; Barbara Surk, *American Naji Hamdan Convicted by Emirates Court on Terror Charges*, ASSOCIATED PRESS, Oct. 12, 2009.

Accordingly, the Requestors are entitled to expedited processing of this request.

## LIMITATION OR WAIVER OF SEARCH AND REVIEW FEES

We request a limitation of processing fees pursuant to 5 U.S.C. § 552(a)(4)(A)(ii)(II) ("fees shall be limited to reasonable standard charges for document duplication when records are not sought for commercial use and the request is made by … a representative of the news media …") and 6 C.F.R. § 5.11(d)(1) (search fees shall not be charged to "representatives of the news media"). The information sought in this request is not sought for a commercial purpose. The Requestors include a non-profit organization who intends to disseminate the information gathered by this request to the public at no cost.

The "term 'a representative of the news media' means any person or entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience." 5 U.S.C. § 552(a)(4)(A)(ii). The statutory definition does not require that the requester is a member of the traditional media. As long as the requester meets the definition in any aspect of its work, it qualifies for limitation of fees under this section of the statute.

For the reasons stated above with respect to expedited processing, the ACLU/SC qualifies as a "representative of the news media" under the statutory definition, because the ACLU/SC routinely gathers information of interest to the public, uses editorial skills to turn it into distinct work, and distributes that work to the public. *See Electronic Privacy Information Center v. Department of Defense*, 241 F. Supp. 2d 5 (D.D.C. 2003) (non-profit organization that gathered information and published it in newsletters and otherwise for general distribution qualified as representative of news media for purpose of limiting fees). Accordingly, any fees charged must be limited to duplication costs.



LIBERTY | JUSTICE | EQUALITY

## WAIVER OR REDUCTION OF ALL COSTS

**Chair**
Stephen Rohde

**President**
Douglas Mirell

**Chairs Emeriti**
Danny Goldberg
Allan K. Jonas
Burt Lancaster*
Irving Lichtenstein, MD*
Jarl Mohn
Laurie Ostrow*
Stanley K. Sheinbaum
*deceased

**Chief Executive Officer**
Ramona Ripston

**Chief Counsel**
Mark D. Rosenbaum

**Chief Operating Officer**
Heather Carrigan

**Chief Financial Officer**
Brenda Maull

**Communications Director**
Gordon Smith

**Development Director**
Tracy Rice

**Legal Director**
Hector O. Villagra

**Managing Attorney &
Manheim Family Attorney
for First Amendment Rights**
Peter J. Eliasberg

We request a waiver or reduction of all costs pursuant to 5 U.S.C. § 552(a)(4)(A)(iii) ("Documents shall be furnished without any charge . . . if disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester"); *see also* 6 C.F.R. § 5.11(k).

The public interest fee waiver provision "is to be liberally construed in favor of waivers for noncommercial requesters." *McClellan Ecological Seepage Situation v. Carlucci*, 835 F.2d 1282, 1284 (9th Cir. 1987). The Requestors need not demonstrate that the records would contain evidence of misconduct. Instead, the question is whether the requested information is likely to contribute significantly to public understanding of the operations or activities of the government, good or bad. *See Judicial Watch, Inc. v. Rossotti*, 326 F.3d 1309, 1314 (D.C. Cir. 2003).

Disclosure of the information sought is in the public interest and will contribute significantly to public understanding of the federal government's policies and practices of monitoring, surveillance, questioning, and participation in overseas detention and torture of American citizens. As shown by the news reporting cited above, these issues are of intense public concern. The requested records relate directly to operations or activities of the government that potentially impact or infringe fundamental rights and freedoms. The records are not sought for commercial use, and the Requestors plan to disseminate the information disclosed through print and other media to the public at no cost, and through meetings with members and affected communities. As demonstrated above, the Requestors have both the intent and ability to convey any information obtained through this request to the public.

The Requestors state "with reasonable specificity that [their] request pertains to operations of the government," and "the informative value of a request depends not on there being certainty of what the documents will reveal, but rather on the requesting party having explained with reasonable specificity how those documents would increase public knowledge of the functions of the government." *Citizens for Responsibility and Ethics in Washington v. U.S. Dept. of Health and Human Services*, 481 F. Supp. 2d 99, 107-109 (D.D.C. 2006).

In the event a waiver or reduction of costs is denied, please notify me in advance if the anticipated costs exceed $100.

**ACLU**
AMERICAN CIVIL LIBERTIES UNION
of SOUTHERN CALIFORNIA
FOUNDATION

LIBERTY | JUSTICE | EQUALITY

## CONCLUSION

**Chair**
Stephen Rohde

**President**
Douglas Mirell

**Chairs Emeriti**
Danny Goldberg
Allan K. Jonas
Burt Lancaster*
Irving Lichtenstein, MD*
Jarl Mohn
Laurie Ostrow*
Stanley K. Sheinbaum
*deceased

**Chief Executive Officer**
Ramona Ripston

**Chief Counsel**
Mark D. Rosenbaum

**Chief Operating Officer**
Heather Carrigan

**Chief Financial Officer**
Brenda Maull

**Communications Director**
Gordon Smith

**Development Director**
Tracy Rice

**Legal Director**
Hector O. Villagra

**Managing Attorney &
Manheim Family Attorney
for First Amendment Rights**
Peter J. Eliasberg

If this request is denied in whole or part, please justify all deletions by reference to specific FOIA exemptions. We expect you to release all segregable portions of otherwise exempt material. For example, we expect you to redact names of individuals for whom privacy waivers are not enclosed, if such redaction is required by the Privacy Act or other law, and release any otherwise disclosable records as redacted. We also expect that this FOIA request will be processed in accordance with the presumption of disclosure and President Obama's directive to federal agencies on January 26, 2009. Pres. Obama, Memo. for the Heads of Exec. Offices and Agencies, Freedom of Information Act, 74 Fed. Reg. 4683 (Jan. 26, 2009) ("The Freedom of Information Act should be administered with a clear presumption: In the face of doubt, openness prevails. The Government should not keep information confidential merely because public officials might be embarrassed by disclosure, because errors and failures might be revealed, or because of speculative or abstract fears.").

We reserve the right to appeal a decision to withhold any information, or to deny expedited processing or a waiver of fees. We look forward to your reply to the request for expedited processing within ten (10) calendar days, as required under 5 U.S.C. § 552(a)(6)(E)(ii)(I). Notwithstanding your decision on the matter of expedited processing, we look forward to your reply to the records request within twenty (20) business days, as required under 5 U.S.C. § 552(a)(6)(A)(I).

If you have questions, please contact Jennie Pasquarella at 213-977-5236 or via e-mail at jpasquarella@aclu-sc.org. Thank you in advance for your timely consideration of this request. Please furnish records as soon as they are identified to the undersigned at:

> ACLU of Southern California
> 1313 W. Eighth Street
> Los Angeles, CA 90017

I certify that the information provided supporting the request for expedited processing is true and correct to the best of our knowledge and belief.

Sincerely,

Jennie Pasquarella
Staff Attorney
ACLU of Southern California

## AUTHORIZATION

I, __NASI  JAWDAT  HAMDAN__ hereby authorize attorneys from the ACLU
of Southern California, 1313 West 8th Street, Los Angeles, CA 90026, to submit a request under
the Freedom of Information Act and the Privacy Act to the federal government and to receive
responsive documents on my behalf.

I declare under penalty of perjury under the laws of the United States of America that the
foregoing is true and correct.

Executed on October  17, 2009, in Abu Dhabi, United Arab Emirates.

_NASI  JAWDAT  HAMDAN_
Name (print)

_____
Address:

_ABU DHABI , U.A.E_
City, State Zip

_____
Signature

# AUTHORIZATION

I, HOSSAM HEMDAN, hereby authorize attorneys from the ACLU of Southern California, 1313 West 8th Street, Los Angeles, CA 90026, to submit a request under the Freedom of Information Act and Privacy Act to the federal government and to receive responsive documents on my behalf.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 04, 2009, in Hawthorne, California.

Hossam Hemdan
Name (print)

12636 TRURO AV.
Address

HAWTHORNE CA 90280
City, State Zip

Signature

State of California County of
LOS ANGELES
Subscribed and sworn to (or affirmed)
Before me on this 04 day of 09, 2009 by
Hossam Hemdan
personally known to me or proved to me on
the basis of satisfactory evidence to be the
person(s) who appeared before me.

Signature Hushmet Ali Khan

HUSHMET ALI KHAN
Commission # 1822868
Notary Public - California
Los Angeles County
My Comm. Expires Nov 16, 2012

# AUTHORIZATION

I, _Jehad Suliman_ , hereby authorize attorneys from the ACLU of Southern California, 1313 West 8th Street, Los Angeles, CA 90026, to submit a request under the Freedom of Information Act and Privacy Act to the federal government and to receive responsive documents on my behalf.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September _04_ , 2009, in _Hawthorne_ , California.

_Jehad Suliman_
Name (print)

_14107 Ramona Ave_
Address

_Hawthorne, CA 90250_
City, State Zip

Signature

State of California County of
_LOS ANGELES_
Subscribed and sworn to (or affirmed)
Before me on this _04_ day of _09_ , 20_09_ by
_Jehad Suliman_
personally Known to me or proved to me on
the basis of satisfactory evidence to be the
person(s) who appeared before me.

Signature _Hushmet Ali Khan_



HUSHMET ALI KHAN
Commission # 1822666
Notary Public - California
Los Angeles County
My Comm. Expires Nov 16, 2012

# EXHIBIT
# B

1  AHILAN T. ARULANANTHAM (SBN 237841)
   aarulanantham@aclu-sc.org
2  MICHAEL KAUFMAN (SBN 254575)
   mkaufman@aclu-sc.org
3  ACLU FOUNDATION OF SOUTHERN CALIFORNIA
   1313 West Eighth Street
4  Los Angeles, California 90017
   Tel: (213) 977-5232
5  Fax: (213) 977-5297

6  WILMER HARRIS (SBN 150407)
   wharris@sdshhlaw.com
7  LABONI A. HOQ (SBN 224140)
   lhoq@sdshhlaw.com
8  SCHONBRUN, DE SIMONE, SEPLOW,
   HARRIS, HOFFMAN & HARRISON LLP
9  715 Fremont Avenue, Suite A
   South Pasadena, California 91030
10 Tel: (626) 441-4129
   Fax: (626) 283-5770

11

12

13              UNITED STATES DISTRICT COURT

14              CENTRAL DISTRICT OF CALIFORNIA

15

16

17  NAJI JAWDAT HAMDAN, et al.,          ) Case No: CV 10-6149 JHN (JEMx)
                                          )
18              Plaintiffs,               ) **DECLARATION OF PLAINTIFF NAJI**
                                          ) **JAWDAT HAMDAN  IN SUPPORT OF**
19        vs.                             ) **PLAINTIFFS' OPPOSITION TO**
                                          ) **DEFENDANTS' MOTION FOR**
20  UNITED STATES DEPARTMENT              ) **SUMMARY JUDGMENT AND CROSS-**
    OF JUSTICE, et al.,                   ) **MOTION FOR SUMMARY**
21                                        ) **JUDGMENT**
                                          )
22              Defendants.               )
                                          ) Hearing Date: January 23, 2012
23                                        ) Time: 2:00 pm
                                            Place: Courtroom 790
24

25

26

27

28

## DECLARATION OF NAJI JAWDAT HAMDAN

I, Naji Jawdat Hamdan, hereby declare as follows:

1.      I am a plaintiff in the above-captioned case.  The facts stated here are based on my personal knowledge.  If called as a witness, I could and would competently testify to the following matters.

2.      I am a naturalized U.S. citizen, originally from Lebanon.  I was previously married to Mona Mallouk, with whom I have three children: Khaled, Hamza and Noor Hamdan.  I currently reside in Lebanon.  I have five siblings, including Hossam Hemdan, who resides in the Los Angeles area.

3.      I moved to the United States in the early 1980s, ultimately settling in the Southern California area.  I studied at Northrop University, and later started a successful auto parts business, called Honda Acura Palace or Hapimotors.

4.      I was a founding member and part of the leadership of the Islamic Center of Hawthorne, a mosque in Hawthorne, CA.  I served as a volunteer imam at that mosque.

5.      I have been interrogated a number of times by Federal Bureau of Investigation ("FBI") agents since the late 1990s.  I was first visited by FBI agents at my home in December 1999.   The FBI approached me again shortly after September 11, 2001.

6.      In the following years, FBI agents returned to my home and workplace to question me on numerous other occasions.  During those occasions, the FBI agents would ask me if I was associated with any terrorist activities or groups, and I would always unequivocally respond that I am not. During this time period, I frequently traveled for work and was regularly pulled into secondary inspection at airports for questioning both leaving and returning to the United States.

7.      In August 2006, my family and I moved to the United Arab Emirates ("U.A.E."), where I started a new business. On the day of our scheduled flight to the U.A.E., my family and I were detained and questioned by federal agents at the airport

1

1  for several hours, which forced us to miss our flight.  Several months later, I returned
2  to the United States for a brief visit.  When I arrived at the airport, I was met by agents
3  at the airplane door, and was interrogated for several hours at the airport.  During that
4  visit, I was subject to constant surveillance and was followed by several cars
5  throughout the duration of my trip.  Based on my past encounters with the FBI, I
6  believe I was being followed by FBI agents or law enforcement officials affiliated
7  with the FBI.

8      8.      In 2007, my wife and children moved to Lebanon to be closer to our
9  families.  I planned to continue my business activities in the U.A.E., and to go back
10  and forth as needed between the two countries, which are very near to each other.  At
11  some point in January 2008, during a trip to Lebanon, I was detained by Lebanese
12  intelligence officers for no apparent reason.  The Lebanese authorities detained me for
13  one week and subjected me to interrogation and physical abuse.  After one week I was
14  taken before a Lebanese official, who released me.  At the time, he told me that they
15  were releasing me because there was no basis for any allegations against me.  I later
16  learned through a friend of my brother's, who was a general in the Lebanese Military
17  Intelligence Services, that a foreign power was responsible for my detention.  The
18  general spoke on condition of anonymity and declined to name the particular foreign
19  power because he feared for his own safety for speaking out about my detention.

20      9.      In July 2008, the FBI contacted my brother Hossam and told him that
21  they were interested in speaking with me at the US Embassy in Abu Dhabi, which I
22  agreed to do.  Later that month, when I arrived at the Embassy, I was met by a number
23  of agents, including two people who identified themselves as Joshua Stone and Gary
24  Price.  There may have been other agents I met that day whose names I do not recall.
25  Two agents then interrogated me for several hours.

26      10.      Approximately one month later, on August 26, 2008, the State Security
27  forces of the United Arab Emirates (the "Amn al-Dawla") arrested me at my house,
28  for no apparent reason.  The State Security officials put a  blind folded me, hand and

2

1   foot cuffed me, and took me away to a secret location where they kept me for the next
2   three months.

3       11.    During my detention, I was severely tortured during lengthy interrogation
4   sessions. I was repeatedly beaten in a variety of different ways. On several occasions
5   they strapped me to an electric chair and threatened to electrocute me if I refused to
6   answer their questions in the way they wanted.  The constant brutality I suffered
7   made me sure that they would kill me. During my time in detention, I was held in
8   solitary confinement, and not allowed to contact my family or anyone else. When I
9   was taken outside my cell, I was forced to wear a blind fold and hand cuffs.

10      12.    Approximately a month after I was first detained, I was subjected to one
11  particularly brutal interrogation session. I was brought into a room, where I was
12  instructed to sign a statement admitting that I was a member of al-Queda. When I
13  denied that I was an al-Qaeda member, I was whipped with a stick, repeatedly kicked
14  in my stomach and side, and they threatened that they would bring my wife to the
15  same room to be tortured before my eyes. During the session, I passed out several
16  times.

17      13.    As I lay on the floor crying from the beatings, I was approached by a man
18  who spoke in perfect English with an American accent. From my decades living in
19  the United States, I am very familiar with American accents. Although I was
20  blindfolded, I was able to look down through the bottom of the blind fold, and through
21  that area could see that this person was wearing Western style slacks and shoes,
22  whereas my other interrogators wore sandals and Arab style attire. Because I could
23  tell that this man was an American, I spoke to him in English and begged for him to
24  help me. He told me that I had to: "do what they want or they will fuck you up!"

25      14.    My interrogators continued to beat me, and I eventually said I would
26  admit to whatever they wanted me to admit. I later signed a statement that said that I
27  was a member of al-Queda, even though I knew it was false, so that they would stop
28  torturing me. It is possible that the statement included other admissions as well, but I

3

1  am not sure because my interrogators did not allow me to read much of the statement I
2  signed.

3      15.    On one occasion while I was imprisoned in the secret location, I was
4  visited by a U.S. Consular official by the name Sean Cooper. Because Mr. Cooper
5  visited me in the presence of four State Security officers who threatened me before
6  that meeting that I should not say a word about the torture to the visitors, I could not
7  clearly state to him that I was being tortured, although I did my best to indicate it
8  through my facial expressions during the brief time that we spoke. After Mr. Cooper
9  first visited me in October 2008, the torture sessions stopped for a period but then
10  started up again in approximately November.

11      16.    At the end of November, 2008, I was released from the secret location at
12  which I had been detained, and taken to a public prison used for people charged with
13  crimes. At that time I was transferred from U.A.E. State Security detention to
14  criminal custody in Abu Dhabi. At the time, I was not told that I was being criminally
15  prosecuted or what the charges were, but I later learned that I was charged with three
16  counts of terrorism-related crimes. I was never told the specifics of those crimes, but I
17  have learned through documents produced in this litigation that the charges related to
18  my alleged "activities on the internet." I was transferred roughly one week after the
19  American Civil Liberties Union of Southern California filed a lawsuit alleging that the
20  United States government had caused my detention in the U.A.E.

21      17.    After I left U.A.E. State Security detention I prepared a hand-written
22  statement recounting the torture and abuse I had faced while in U.A.E. State Security
23  custody, as well as the fact that an individual who spoke English with an American
24  accent was present in at least one of the torture sessions. Attached hereto as Exhibit A
25  is a true and correct copy of that statement. Mr. Cooper visited me several times after
26  I was transferred to criminal custody, and I gave that statement to him, at which time I
27  pointed out to him that I was confronted by an interrogator with an American accent. .
28

4

18.   I was later convicted by the Federal Supreme Court in the U.A.E., presumably on the basis of my coerced confession, and sentenced to time served. I never learned the exact basis for the verdict. In October 2009, I was deported to Lebanon.

19.   As a result of the torture and abuse I experienced while in U.A.E. state security detention, I remain traumatized to this day. I still have nightmares about the beatings, the electric chair, and other awful things that happened to me in detention. Though I am an American citizen and have family and friends in the U.S., I am still scared to return there because I fear that I will be mistreated by the U.S. government, even though I have done nothing wrong.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct and that this declaration was executed on October 10, 2011 in Beirut, Lebanon.

Naji Jawdat Hamdan

5

# EXHIBIT A

$\textcircled{1}-\textcircled{8}$

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 03-10-2011 BY 65179/DMH/BAW/STP/b1s

Nasi HAMDAN statement to MR. Cooper - Consul -

(1) Detention:

I was detained August-26th- 2008  By state security officers in Ajman UAE while I was Resting During the lunch Break @ my Home. I Received a call to My cell Phone First saying that My parked car was Hit (accident) by another car, and that I should come Down to take care of the Matter.

When I came down to the parking lot, I was surprised by several, white Dressed men, surrounding me, then one Hand-cuffed my Right wrist to his, and said we need to search your home. I asked about the problem and who they were, I Received No answer.

they took me upstairs to my apt. and they searched every inch of the House; they took my laptop & other Papers & files (work Related). - for about 3-4 Hours.

then they brought me down to their vehicle, black culour have tinted windows, they Hand cuffed me & blind folded me then took me to my Garage (Repair shop) & Did the same as to my apt.

After that, they put me back in the same vehicle Hand cuffed & Blind folded; I asked where we'll be going; they said Just stay quiet you'll know later.

they Drove about one & a half Hour, I Did Not know where we were going or what is Going on. I was extremely scared but I stayed as calm as I could.

when we Reached to the place (later I learned from consul, Mr cooper that I was in AbuDHABi state security, after almost 2 months), I was Received by uniformed men, still blind folded but could see through the nose (down) side a little bit, they took me in to a small cell that a big (small), Mattress (on the floor), Blanket, and a Pillow. the cell's lights were extremely Bright as if you Have a camera flash in your eyes 24 HRS. (video camera on) Ceiling

ACLU-Hamdan-371

the wall and floor were painted Glossy White to Reflect the light more & more.

I was I do not leave that cell except to the bathroom or to meet interrogators and always blind folded when leaving the cell. I Do not Know Day from Night except when they call for Prayers' times. Did not see the Sun or smell fresh air till I left the torture :

① the first Day, Interrogator met me, said that they knew everything about me and that I should tell them everything!    I said concerning what?! and I asked if they were from the Detectives or who they were. I did not know anything about state security. I thought that it was somewhat related to my Jobs, and possibly someone bought one of my cars and was not satisfied or related problems.

He kicked me to the knee (left side), and said' you should admit to everything because we (they) already know it.

I said, please Don't hurt me or beat me, I Have Health Problems and can't receive any Hits or Kicks. I said what Do you want to know, He said you tell me. then came to my mind the FBI visit to the embassy (ABu DHABi). I told him are you inquiring about the FBI visit and meeting. He said: exactly, that is one of them. I told him exactly what happened to me in Lebanon, and why the FBI came for, and what the meeting was about. He was not satisfied, at all time I felt that there were other people in the Room 3-4, some times one talks sometimes I Just feel their presence.

He called the police man outside and told Him to Remove my mattress from cell. by the time I got Back to my cell

(3)-(8)

I founded It empty, completely!
they had the A/c up and I stayed in the corner trying to
Keep myself a bit warm, but wasn't able, the rest of the
Day and night till next Day.
I wasn't able to sleep or eat.

next Day around noon time or so. I was taken to interrogation
again. They sat me on an electric Chair; they told
me you are sitting on an electric Chair, they strapped
my wrists to It But they DiD not turn It on.
the shape of the chair (from the way I sat on It) is
very weird, because It's higher from the front. It pokes
the Back side of the knees and mak the circulation
stops to the feet and below the knees. after ten minutes
or so I started to feel Num on My legs and after that
I felt I had no legs. the same thing happens to the
lower back (which is still hurts upuntill this minute &
my taking Panadol Daily to keep the pain Down @ night).
they shortly after I was left with one person in the
Room (the way I felt It). and He started punching
me on the sides of my Head, and slapping me
straight to my Head from the top. using cussing
words and swearing that He will make me loose my
weight & loosing one or more organs of my body.
and I'm begging him to stop and telling him that
I will sign anything he wants ok admit to anything
He wants. but He never stopped. I Started to sweat
then I lost conscience, I DiD not wake till later on
His & another guy's slaps to my face & the patting of
water to my face. when I woke up. I was Drowned
with my sweat! I told the guy please Don't beat me any more
He said No one beat you, you are lying, I said can't

Ⓓ⑧

stand up please, I beg you let me put my Head to the
floor for couple minutes, he said No, & Called policemen
to carry me to my cell.
they put back Mattress and Blanket, threw me on
mattress and after 1/2-2 HRs they pick me up.
I was sliding my feet and carried by two men to
the clinic (Blind folded). Doctor checks my vitals & says
all is good He is fine. Interrogator yells in my ear
DIDN'T I say that you were lying ?!!
I told the Doctor please, I passed out!
He said you're OK!

was taken back to my Cell, and mattress and other
stuff were Removed again for the Rest of the Day.
I was almost fainted in the cell I DID not feel anything,
I Could not Raise my head or any part of my body.

- Next Day I was taken again to interrogation Room.
I was sat on the same Chair, & I was asked to admit!
I said I Admit to everything you want. I Received a Kick.
The man said admit to what you did!
they asked me about internet sites, I told them what
I know & which sites I Blouse, and Gave them passwords
& my email address with user & password.
later in another day
- they asked if was assigned by FBI for a special assignment
IN U.A.E

ACLU - Hamdan-374

- they asked About my investments IN U.A.E

- they asked If I met or financed any terrorist organizations

(5)(6)

I was always answering to the best of my knowledge & with full honesty.

They started to take my statement since I was Born, till I Traveled to the U.S.A till I came back to U.A.E in full details.

I Gave them truthfull answers to the best of my knowledge along with Dates etc...

- I was surprised one Night in Ramadan that when I was with an Interrogator called Abu KHALed, that his boss called to another office angryly, then came back to me and said you need to Change your statement or you'll be going to the 2nd office & you'll be Tortured !!

I said Change what? !

He took me to the second office & to my surprise there was at least 10 people (from what I Could Sneak a peak reaugh the Blind fold).

I was told that I should admit that I am a member of Alquaeda !! I said I am Not !! & then I am a member of Hamas !! I said I am Not !!

One man said Give him 5 minutes to admit or Else !!

2 minutes passed, the He came into the Room said did He admit ?! Some one said No, then Some one caught me & pulled me Down to the floor, face Down, took My arms towards my Back, sat on them with his Knees, then another person left my Legs up & another one with a stick started the Whiping of my feet !!)

ACLU-HADRAN-375

6 8

I screamed hard, I was so hurt!
they stopped for one minute, gave me water & said
Drink, since when the sheep Drinks water.
It'll be easier to skin it !!
I Drank a sip, then they Repeat the Beating the same
way at least 3 times.
I am begging & screaming, but no one listens!

I said please give me to my embassy, I need to see
the ambassador. they said: you sign a paper that
you are a member of alquaeda with your finger
print on it, then we'll let you go or meet the
ambassador !!
I said I can't sign it!
they started to slap me, hard slaps to my face
and left ear. I'm holding the man's leg &
begging him to stop. every slap I fall to the
floor & a man picks me up to receive another
slap and so on several times.

one man spoke to me in perfect english, I thought
He was American (No Accent). He said you are Not
the only person Here with masters Degree. I spoke
Back to him in English, I said Sure, I know
that, please Help me out. He said Do what they
Want of these People, I will Reach Home today !!
I said IfsDo you promise to help me out of here ?!
He said it does not matter what I promise just Do it.
I said ok.

While I was sitting on the floor crying & waiting for

(7)(8)

the Second Round of Beating, a man approaches me & says (in arabic), Did you Break his Nose already the said No. I covered my knows & begged them Not to Do It.

While Doing that, He Comes arround & kicks me as hard as a kick could be to the Right side of my stomach!

I felt that was ded, I lost my breath for few seconds, I Could not here or feel what was arround me for few seconds. Then I hear them Laughing & he is saying that they should only kick me to Right side since all the organs on the Right side are Replaceable!!

I said I have Liver problem, he said that is Replaceable & he Repeats the kiks at least twice after that to the same spot!!!

I was Hurt Really bad, my side stomach kept Hurting for at least Couple of weeks after that, & my wRist (Right) & lower back still Hurt me till this minute.

I was asked few questions at the start & I answered them the way they want, then I was taken to interrogation Room & asked other Questions & I admitted to what Ever they asked to admit to!! But they DiD not ask me about being alqueed member or Hamas member with their questions at that time. I was surprised later after 8½ months that they changed the statement again and Twisted it in an unbelievable way that I cannot immagine, & they changed the Questions & Twisted the answers

ACLU-Hamdan377

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 03-10-2011 BY 65179/DMH/DAW/STP/bls



ACLU - Hamdan-378

to fit what they want & wish. & I was told that I'll be leaving for 3 days Home, and asked me what I wish to do when I leave Home & whom I miss from my family the most and All these kind words etc.

& Due to the fact that was under tremendous stress, 3 months of solitary confinement & torture, I just signed a statement that is fully false and doesn't Represent what I am or what I told them.

I am not a terrorist, I never was, I am a regular american muslim who's looking to raise his kids and live a comfortable life with his family. Why this Happened to me ?! I DO NOT KNOW, but I believe that the Truth will Prevail soon, God willing.

note: there might be additional information that I'm missing at this moment Due to the time & place where I'm writing this statement, one of which, they threatened to bring my wife and torture here before my eyes if I DID NOT sign or admit, and occasional slapping & Kicking during NORMAL interrogations.

NAME: NAJI HAMDAN

ACLU - Hamdan-379   Signature: _[signature]_

Date: 12/16/2008

I swear that all the information on this Document is true to the best of My Knowledge. _[signature]_

# EXHIBIT
# C

1   Ahilan T. Arulanantham (SBN 237841)
    aarulanantham@aclu-sc.org
2   Michael Kauffman (SBN 254575)
    mkaufman@aclu-sc.org
3   ACLU FOUNDATION OF
      SOUTHERN CALIFORNIA
4   1313 West Eighth Street
    Los Angeles, California 90017
5   Tel: (213) 977-5232
    Fax: (213) 417-2232
6
    Wilmer Harris (SBN 150407)
7   wharris@sdshhlaw.com
    Laboni A. Hoq (SBN 224140)
8   lhoq@sdshhlaw.com
    SCHONBRUN, DE SIMONE, SEPLOW,
9     HARRIS, HOFFMAN & HARRISON LLP
    715 Fremont Avenue, Suite A
10  South Pasadena, California 91030
    Tel: (626) 441-4129
11  Fax: (626) 283-5770

12  Attorneys for Plaintiffs

13              UNITED STATES DISTRICT COURT

14            CENTRAL DISTRICT OF CALIFORNIA

15

16  NAJI JAWDAT HAMDAN,              )   Case No: CV 10-6149 JHN (JEMx)
    HOSSAM HEMDAN, ACLU OF           )
17  SOUTHERN CALIFORNIA,             )
                                     )   DECLARATION OF PLAINTIFF
18              Plaintiffs,          )   HOSSAM HEMDAN IN SUPPORT
                                     )   OF PLAINTIFFS' OPPOSITION
19          v.                       )   TO DEFENDANTS' MOTION FOR
                                     )   SUMMARY JUDGMENT AND
20  UNITED STATES DEPARTMENT         )   CROSS-MOTION FOR
    OF JUSTICE; FEDERAL BUREAU       )   SUMMARY JUDGMENT
21  OF INVESTIGATION, a component    )
    of the U.S. Department of Justice; U.S.)   Hearing Date: January 23, 2012
22  NATIONAL CENTRAL BUREAU -        )   Time: 2:00 pm
    INTERPOL, a component of the U.S.)   Place: Courtroom 790
23  Department of Justice; NATIONAL  )
    SECURITY DIVISION, a component   )
24  of the U.S. Department of Justice;)
    DEPARTMENT OF STATE;             )
25  UNITED STATES CENTRAL            )
    INTELLIGENCE AGENCY;             )
26  UNITED STATES DEPARTMENT         )
    OF DEFENSE; DEFENSE              )
27  INTELLIGENCE AGENCY, a           )
    component of the U.S. Department of)
28  Defense; NATIONAL SECURITY       )

1  AGENCY, a component of the U.S.
   Department of Defense; OFFICE OF
2  INSPECTOR GENERAL, a
   component of the U.S. Department of
3  Defense; DEFENSE OFFICE OF
   FREEDOM OF INFORMATION, a
4  component of the U.S. Department of
   Defense; UNITED STATES
5  DEPARTMENT OF HOMELAND
   SECURITY;  BUREAU OF
6  CUSTOMS & BORDER
   PROTECTION, a component of the
7  U.S. Department of Homeland
   Security; TRANSPORTATION
8  SECURITY ADMINISTRATION, a
   component of the U.S. Department of
9  Homeland Security; IMMIGRATION
   AND CUSTOMS ENFORCEMENT
10 ("ICE"), a component of the U.S.
   Department of Homeland Security;
11 OFFICE OF INTELLIGENCE &
   ANALYSIS, a component of the U.S.
12 Department of Homeland Security;
   OFFICE OF DIRECTOR OF
13 NATIONAL INTELLIGENCE,

14          Defendants.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF HOSSAM HEMDAN

# DECLARATION OF HOSSAM HEMDAN

I, Hossam Hemdan, hereby declare as follows:

1. I am a plaintiff in the above-captioned case. The facts stated here are based on my personal knowledge. If called as a witness, I could and would competently testify to the following matters.

2. I am a U.S. citizen, originally from Lebanon. I currently reside in the Los Angeles area, where I have been living since 1987.

3. I have been interrogated a number of times by Federal Bureau of Investigation ("FBI") agents since the late 1990's. During their interrogations of me, FBI agents have repeatedly asked me many questions about my brother, plaintiff Naji Jawdat Hamdan.

4. In the first part of 2008, an FBI agent by the name Joshua Stone requested that I ask Naji to agree to be interrogated by the FBI in the U.A.E., where he was living at the time. I spoke to Naji about this matter, and he agreed to meet with FBI agents in the U.A.E.

5. Approximately six weeks after the FBI agents met with Naji in the U.A.E., I learned from Naji's wife that the U.A.E.'s State Security Department ("SSD") had detained Naji. I contacted Joshua Stone again as soon as I learned this, in order to ask if he had any information about Naji's detention in the U.A.E. Mr. Stone acknowledged having learned of Naji's detention but refused to speak to me further about the matter.

6. Soon after I heard of Naji's detention, I also contacted the U.S. Embassy in Abu Dhabi, U.A.E. to see if they could give me information about Naji's detention by the SSD.

7. I am aware that documents released by the FBI in response to the FOIA request at issue in this case mention Ali Soussi. Mr. Soussi was a friend of mine and Naji's in the 1990's. I lost touch with Ali by the late 1990s, but heard that he moved to Yemen and then to his native country of Libya, and that he was

---

1 | imprisoned there for several years.

2     8.      Recently, in August of this year (2011) I saw a story on MSNBC.com
3 | showing that Ali had been released from prison in Libya and had joined the
4 | movement to oust Libyan leader Moammar Qadafi. Attached here as Exhibit A is a
5 | true and correct copy of that news story.

6     9.      On or about September 23, 2011 I tried to contact Ali through his
7 | brother Monsur Soussi, who lives in Libya. I spoke with Monsur by phone. He
8 | gave me the sad news that Ali had recently been killed in the hostilities in Libya.

9

10 | I declare under penalty of perjury under the laws of the United States of America
11 | and the State of California that the foregoing is true and correct and that this
12 | declaration was executed on October 6, 2011 in Redondo Beach, California.

13

14                                                  Hossam Hemdan

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT
# A

*Recommended:*
History or
histrionics in U.N.'s
Palestine vote?

*Recommended:*
Palestinian UN vote:
What is it? Why
now?

*Recommended:*
Austrian man, 80,
accused of raping
daughters is freed

*Recommended:*
Afghan warlords
need help with cable
too

advertisement

World Blog provides a dynamic look at world events and trends from NBC News
correspondents, producers, and bureaus around the world.

↓ About this blog    ↓ Archives          🖾 Receive e-mail updates   🖾 Subscribe to RSS      Like   6K

Leave your comment below                        Recommend   270              32              42

## 26
Aug
2011
4:21pm, EDT

# Freed Libyan prisoner: 'We gonna catch you, Gadhafi'



Freed Libyan prisoner hunts Gadhafi

Sep
20

*By Stephanie Gosk, NBC News Correspondent*

TRIPOLI – Libya's Abu Salim prison is one of the world's most notorious. For four decades,
Moammar Gadhafi threw "enemies of the state" behind its bars without a trial to languish for years.
Stories of torture and months in solitary confinement were common.



hide

In 1996, guards allegedly killed more than 1,200 prisoners in what is now known as the "Abu Salim Massacre." Last February, lawyers seeking justice for the families of those killed staged protests in Benghazi that eventually sparked the nation-wide uprising.

This week rebel forces successfully battled for control of the feared prison. They opened the doors and let everyone out. Some of the prisoners, unable to believe that Gadhafi's reign is over and angry over the years of their lives lost in jail, are now driven by one goal: Find Gadhafi.

Amid the chaos at Gadhafi's recently conquered compound we met Ali Ahmed Sussi. He was released from the Abu Salim prison on Wednesday. Sussi was born in Benghazi but like many Libyans, he traveled abroad to get his education. He studied communication at the University of California and lived in Los Angeles with his family for 12 years.

Driven by hatred for Gadhafi's regime, the father of three returned to Libya to start a revolution in 2004. But when he smuggled weapons into the country from Yemen, the government caught wind of the plan, arrested him, and locked him up at Abu Salim.

older

newer



Sergey Ponomarev / AP

A Libyan walks inside the Abu Salim prison in Tripoli, Libya on Friday. It is one of Libya's most notorious prisons and the scene of a 1996 massacre of prisoners.

Now, seven years later, the rebel forces have freed him.

Standing among the hundreds of armed fighters who saved him, Sussi said "I can smell freedom."

As soon as he was released the 46-year-old asked for fatigues and a gun. His hopes of staging a revolution are over, but he can still take part in the final days of one.

    

fugitive. He told us "I will search home to home, room to room, alley to alley. We gonna catch you Gadhafi."

**Browse:** featured, libya, stephanie-gosk, abu-salim-prison, triploi

# Most popular posts

| **Palestinians face US counteroffensive on UN vote** | **Palestinian UN vote: What is it? Why now?** | **Pakistan flood victims take 'double hit'** | **How rap music fueled the Arab Spring uprisings** | **Hist histr U.N.' Pale vote** |
|---|---|---|---|---|
| 4 days ago | 5 days ago | 4 days ago | 5 days ago | 4 days ago |
| 31 | 17 | 19 | 129 | |
| Recommend 424 | Recommend 159 | Recommend 116 | Recommend 1K | Recom |

## Discuss this post

* After entering a Facebook comment, your image and name may display on this page. All privacy settings are controlled within your Facebook account.

 Login & settings    New comment notifications    Share this on Facebook    Share this on Twitter    Email this to a friend   hide

# EXHIBIT D



**United States Department of State**

*Washington, D.C. 20520*

MAR 1 2 2010
Case Number:  201000711

Ms. Jennie Pasquarella, Esq.
*American Civil Liberties Union*
*Of Southern California*
1313 West Eighth Street
Los Angeles, CA 90017

Dear Ms. Pasquarella:

This is in response to your Freedom of Information Act/Privacy Act (FOIA/PA) request, dated January 29, 2010 on behalf of Naji Jawdat Hamdan, Hossam Hemdan, and Jehad Suliman, for copies of documents concerning records regarding the federal government's surveillance, monitoring, questioning, investigation, and participation in the overseas detention and torture of Mr. Naji Jawdat Hamdan, his brother, Mr. Hossam Hemdan, and his associate, Mr. Jehad Suliman.  The time period of your request is from January 1, 1998 to the present.

We will begin the processing of your request based upon the information provided in your communication.  We will notify you as soon as responsive material has been retrieved and reviewed.

We wish to advise you that the cut-off date for retrieving records is either the date you have given the Department by specifying a particular time frame, or the date the search initiated.

**Fees**

The Freedom of Information Act (FOIA) requires agencies to assess fees to recover the direct costs of processing requests, unless a fee waiver has been granted.

---

*Office of Information Programs and Services*
*U.S. Department of State, SA-2*
*Washington, DC 20522-8100*
  *Website:  www.foia.state.gov*

*Inquiries:*
*Phone:  1-202-261-8484*
*FAX:  1-202-261-8579*
*E-mail:  FOIAStatus@state.gov*

- 2 -

According to our regulations, by making a FOIA request, you have agreed to pay all applicable fees up to $25 unless a fee waiver has been granted. You may specify a willingness to pay a greater amount. If the estimated fees exceed this limit, you will be notified.

☐  You have stated your willingness to pay the fees incurred in the processing of this request up to $_____.

☒  Please let us know if you are willing to pay the fees that will be incurred in the processing of your request. You may set a limit of the maximum amount that you wish to pay. Please be advised that, without an agreement to pay fees, your request will be processed without cost up to the required first 2 hours of search time (for all other requester category only) and duplication of the first 100 pages (for all other, media, educational and non-commercial scientific requester categories).

We will notify you of the costs incurred in processing your request as soon as the search for, and review of, any responsive documents have been completed.

Based upon the information that you have provided, we have placed you in the requester category checked below. This request will be processed in accordance with the fee schedule designated for that category (see 22 C.F.R. 171, enclosed).

☐  Commercial Use Requesters – Requires us to assess charges that recover the full direct costs of searching for, reviewing for release, and duplicating the record(s) sought.

☐  Educational Institution Requesters – Requires us to assess charges that recover the cost of duplicating the record(s) sought only, after the first 100 pages of duplication.

☐  Non-commercial Scientific Institution Requesters – Requires us to assess charges that recover the cost of duplicating the record(s) sought only, after the first 100 pages of duplication.

☒  Representatives of the News Media – Requires us to assess charges that recover the cost of duplicating the record(s) sought only, after the first 100 pages of duplication.

*Office of Information Programs and Services*          *Inquiries:*
*U.S. Department of State, SA-2*                       *Phone: 1-202-261-8484*
*Washington, DC 20522-8100*                            *FAX: 1-202-261-8579*
*Website:  www.foia.state.gov*                         *E-mail:  FOIAStatus@state.gov*

- 3 -

☐ All Other Requesters – Requires us to assess charges that recover the full reasonable direct cost of searching for and duplicating the record(s) sought, after the first 100 pages of duplication, and the first two hours of search time.

   ☐ You have indicated your inclusion in a category different than the one indicated above. Please forward the information requested on the enclosed sheet titled "Requester Categories" to substantiate your inclusion in a particular category of requester.

## Fee Waiver

☐ Your request for a fee waiver has been granted; therefore, your request will be processed at no charge to you.

☒ Based upon the information provided in your letter, your request for a fee waiver has been denied. If you wish to appeal this decision, you may write to the Chief, Requester Liaison Division, at the address given on the bottom of this page. Your appeal should address the points listed in the enclosed sheet titled "Requests for Fee Waivers." Your appeal must be sent to us within 30 days from the date that you receive this letter.

## Expedition

☐ After consideration of your request for expedited processing under the Department's rules governing Freedom of Information Act requests, we have determined that your request does warrant expedited processing.

   Although we cannot promise that the processing of your request will be completed by a specific date, it will be processed ahead of all other requests now pending with the Department, except for those other requests already determined to warrant expedition.

☒ Our published regulations regarding expedition, 22 C.F.R. 171.12(b), require a specific showing of a compelling need. Expeditious

---

*Office of Information Programs and Services*
*U.S. Department of State, SA-2*
*Washington, DC 20522-8100*
   *Website:  www.foia.state.gov*

*Inquiries:*
*Phone:  1-202-261-8484*
*FAX:  1-202-261-8579*
*E-mail:  FOIAStatus@state.gov*

- 4 -

processing is granted only in the following situations: (1) imminent threat to the life or physical safety of an individual; (2) urgently needed by an individual primarily engaged in disseminating information in order to inform the public concerning actual or alleged Federal Government activity and the information is urgently needed in that a particular value of the information would be lost if not disseminated quickly; (3) substantial humanitarian reasons; and (4) loss of substantial due process rights. Your request does not meet any of the established criteria. Regrettably, I must advise that you have not provided adequate justification for expedition. However, you may be assured that we will make every effort to process your request in as timely a manner as possible. For your convenience, I have enclosed a copy of the Department's expeditious processing criteria.

If you wish to appeal the denial of expedition, you may write to the Chief, Requester Liaison Division, at the address below, within 30 days of receipt of this letter.

## Other Agency Material

☐ Some of the material that you seek appears to have been originated by another agency(ies). If you wish to contact the Freedom of Information/Privacy Office of that agency(ies), the address(es) can be found on the attached list.

☐ Some of the records you seek are no longer in the possession of the State Department. The majority of Department of State records (excluding passport and visa records) which are 25 years or older are transferred to the National Archives and Records Administration (NARA) in accordance with Title 22, Code of Federal Regulations, Part 171.6. Accordingly, requests for such records should be addressed to:

> National Archives and Records Administration
> 8601 Adelphi Road, Room 311
> College Park, MD 20740-6001

---

*Office of Information Programs and Services*
*U.S. Department of State, SA-2*
*Washington, DC 20522-8100*
*Website: www.foia.state.gov*

*Inquiries:*
*Phone: 1-202-261-8484*
*FAX: 1-202-261-8579*
*E-mail: FOIAStatus@state.gov*

- 5 -

☐    For pre-1925 passport records, and visa records dating 1910-1940,
      please contact:

           Civil Records
           National Archives & Records Administration
           Washington, DC 20408

If you wish to review further information on our requirements for
maintenance or disposal of records, please visit the following website:
foia.state.gov/records.asp.

While we will make every effort to meet the time limits cited in the FOIA
(5 U.S.C. § 552), unusual circumstances may arise for extending the time
limit (see enclosure). We appreciate your patience in this matter.

If you have any questions, please do not hesitate to contact us at the number
or address below. We can provide faster service if you include the case
number of your request in your communications with us.

We are pleased to be of service to you.

           Sincerely,

           Wilma M. Manning
           Requester Communications Branch
           *ISO 9001:2000 Certified*

Enclosures:  As stated.

*Office of Information Programs and Services*      *Inquiries:*
*U.S. Department of State, SA-2*      *Phone:  1-202-261-8484*
*Washington, DC 20522-8100*      *FAX:  1-202-261-8579*
    *Website:  www.foia.state.gov*      *E-mail:  FOIAStatus@state.gov*

§ 171.15 Fees to be charged—
categories of requesters.

Under the FOIA, there are four
categories of requesters:
Commercial use requesters,
educational and noncommercial
scientific institutions,
representatives of the news
media, and all other requesters.
The fees for each of these
categories are:
(a) *Commercial use requesters.*
When the Department receives a
request for documents for
commercial use as defined in §
171.11(l), it will assess charges
that recover the full direct costs
of searching for, reviewing for
release, and duplicating the
record sought. Commercial use
requesters are not entitled to two
hours of free search time or 100
free pages of reproduction of
documents. The Department may
recover the cost of searching for
and reviewing records even if
there is ultimately no disclosure
of records (*see* § 171.16(b)).
(b) *Educational and non-
commercial scientific institution
requesters.* The Department shall
provide documents to requesters
in this category for the cost
of reproduction alone, excluding
charges for the first 100 pages.
To be eligible for inclusion in
this category, a requester must
show that the request is being
made as authorized by and under
the auspices of a qualifying
institution, as defined in §
171.11(m) and (n), and that the
records are not sought for a
commercial use, but are sought .
in furtherance of scholarly (if the
request is from an educational
institution) or scientific (if the
request is from a noncommercial
scientific institution) research.
(c) *Representatives of the news
media.* The Department shall
provide documents to requesters
in this category for the cost of
reproduction alone, excluding
charges for the first 100 pages.
To be eligible for inclusion in
this category, a requester must
meet the criteria in § 171.11(o),
and the request must not be
made for a commercial use. A
request for records supporting

the news dissemination function
of the requester shall not be
considered to be a commercial
use request.
(d) *All other requesters.* The
Department shall charge
requesters who do not fit into
any of the categories above fees
that recover the full reasonable
direct cost of searching for and
reproducing records that are
responsive to the request, except
that the first 100 pages of
reproduction and the first two
hours of search time shall
be furnished without charge.

**§ 171.15 Fees to be charged—categories of requesters.**

Under the FOIA, there are four categories of requesters: Commercial use requesters, educational and noncommercial scientific institutions, representatives of the news media, and all other requesters. The fees for each of these categories are:

(a) *Commercial use requesters.* When the Department receives a request for documents for commercial use as defined in § 171.11(l), it will assess charges that recover the full direct costs of searching for, reviewing for release, and duplicating the record sought. Commercial use requesters are not entitled to two hours of free search time or 100 free pages of reproduction of documents. The Department may recover the cost of searching for and reviewing records even if there is ultimately no disclosure of records (*see* § 171.16(b)).

(b) *Educational and non-commercial scientific institution requesters.* The Department shall provide documents to requesters in this category for the cost of reproduction alone, excluding charges for the first 100 pages. To be eligible for inclusion in this category, a requester must show that the request is being made as authorized by and under the auspices of a qualifying institution, as defined in § 171.11(m) and (n), and that the records are not sought for a commercial use, but are sought in furtherance of scholarly (if the request is from an educational institution) or scientific (if the request is from a noncommercial scientific institution) research.

(c) *Representatives of the news media.* The Department shall provide documents to requesters in this category for the cost of reproduction alone, excluding charges for the first 100 pages. To be eligible for inclusion in this category, a requester must meet the criteria in § 171.11(o), and the request must not be made for a commercial use. A request for records supporting the news dissemination function of the requester shall not be considered to be a commercial use request.

(d) *All other requesters.* The Department shall charge requesters who do not fit into any of the categories above fees that recover the full reasonable direct cost of searching for and reproducing records that are responsive to the request, except that the first 100 pages of reproduction and the first two hours of search time shall be furnished without charge.

## Expeditious Processing Information Sheet

Expedited processing shall be granted to a requester after the requester requests such and demonstrates a compelling need for the information. A compelling need in deemed to exist where the requester can demonstrate one of the following:

1. **A Compelling Need** means that the failure to obtain the records on an expedited basis could reasonably be expected to pose an imminent threat to the life or physical safety of an individual.

2. **A Compelling Need** means that the information is urgently needed by an individual primarily engaged in disseminating information in order to inform the public concerning actual or alleged Federal Government activity. An individual primarily engaged in disseminating information to the public. Representatives of the news media would normally qualify; however, other persons must demonstrate that their primary activity involves publishing or otherwise disseminating information to the public, not just to a particular segment or group.

    (a) **Urgently Needed** means that the information has a particular value that will be lost if not disseminated quickly. Ordinarily this means a breaking news story of historical interest only, or information sought for litigation or commercial activities would not qualify nor would a news media publication or broadcast deadline unrelated to the news breaking nature of the information.

    (b) **Actual or Alleged Federal Government Activity.** The information concerns some actions taken, contemplated, or alleged by or about the Government of the United States, or one of its components or agencies, including the Congress.

3. **Substantial Due Process** rights of the requester would be impaired by the failure to process immediately; or

4. **Substantial Humanitarian** concerns would be harmed by the failure to process immediately.

A demonstration of compelling need by a requester shall be made by a statement certified by the requester to be true and correct to the best of their knowledge.

RC-IS-7.5.1b-1
July 6, 2005

# EXHIBIT E



United States Department of State

*Washington, D.C. 20520*

Case No.: 201000711
ER, NEA, S/WCI, Dubai Segments
DEC 1 7 2010

Jennie Pasquarella, Esq.
Staff Attorney
ACLU
1313 W. Eighth Street
Los Angeles, CA 90017

Dear Ms. Pasquarella:

In response to your request dated January 29, 2009 under the Freedom of
Information Act (Title 5 USC Section 552) and the Privacy Act (Title 5 USC
Section 552a), pertaining to your clients, Naji Jawdat Hamdan, Hossam
Hemdan, and Jehad Suliman, we initiated searches of the following
Department of State record systems: the Central Foreign Policy Records (the
principal record system of the Department of State), the Bureau of Diplomatic
Security, the Bureau of Intelligence and Research, the Office of the Legal
Advisor, the Office of Overseas Citizens Services, the Office of Passport
Services, the Bureau of Near Eastern Affairs, the Office of Counterterrorism,
the Office of the Ambassador-at-large for War Crimes Issues, the Office of the
Secretary, the Office of the Deputy Secretary of State, and the American
Embassies in Abu Dhabi and Beirut and the American Consulate General in
Dubai.

The searches of the American Consulate General in Dubai, the Bureau of Near
Eastern Affairs, the Office of the Ambassador -at-large for War Crimes Issues
and the Central Foreign Policy Records have been completed, resulting in the
retrieval of 41 documents responsive to your request. After reviewing these
documents, we have determined that 22 may be released in full, 18 may be
released with excisions, and one must be withheld in full. All released material
is enclosed.

- 2 -

An enclosure provides information on Freedom of Information Act exemptions and other grounds for withholding material. Where we have made excisions, the applicable exemptions are marked on each document. The one document withheld in full was withheld under exemption (b)(1) of the Freedom of Information Act (FOIA).

In the case of a document released in part, all non-exempt material that is reasonably segregable from the exempt material has been released.

We will keep you informed as your case progresses. If you have any questions, you may contact the trial attorney, Jeffrey Smith at (202) 514-5751.

Sincerely,

Alex Galovich
Co-Director, Acting
Office of Information Programs and Services

Enclosures: As stated.

# The Freedom of Information Act (5 USC 552)

## FOIA Exemptions

(b)(1) Withholding specifically authorized under an Executive Order in the interest of national defense or foreign policy, and properly classified.
### Executive Order 12958, as amended, classification categories:
1.4(a) Military plans, systems or operations
1.4(b) Foreign government information
1.4(c) Intelligence activities, sources or methods, or cryptology
1.4(d) Foreign relations or foreign activities of the US including confidential sources
1.4(e) Scientific, technological or economic matters relating to national security, including defense against transnational terrorism
1.4(f) USG programs for safeguarding nuclear materials or facilities
1.4(g) Vulnerabilities or capabilities of systems, installations, infrastructures, projects, plans or protection services relating to US national security, including defense against transnational terrorism
1.4(h) Information on weapons of mass destruction

(b)(2) Related solely to the internal personnel rules and practices of an agency.

(b)(3) Specifically exempted from disclosure by statute (other than section 552b of Title 5), e.g.:
INA       The Immigration and Nationality Act, Title 8 USC Section 1202(f)
CIA       The Central Intelligence Agency Act of 1949, Title 50 USC Section 403(g)
ARMEX   The Arms Export Control Act, Title 22 USC 2778(e)
EXPORT  The Export Administration Act of 1979, 50 App. USC 2411(c)(1)

(b)(4) Privileged/confidential trade secrets, commercial or financial information from a person.

(b)(5) Interagency or intra-agency communications forming part of the deliberative process, attorney-client privilege, or attorney work product.

(b)(6) Release would constitute a clearly unwarranted invasion of personal privacy.

(b)(7) Information compiled for law enforcement purposes that would:
(A) Interfere with enforcement proceedings
(B) Deprive a person of a fair trial
(C) Constitute an unwarranted invasion of personal privacy
(D) Disclose confidential sources
(E) Disclose investigation techniques
(F) Endanger life or physical safety of any individual

## Other Grounds for Withholding

NR      Material not responsive to your FOIA request, excised in accordance with our agreement.

# EXHIBIT
# F



**United States Department of State**

*Washington, D.C. 20520*

FEB 17 2011

Case No.: 201000711
DS, INR, L/CA, S/ES, S/CT, Beirut, Abu Dhabi

Jennie Pasquarella, Esq.
Staff Attorney
ACLU
1313 W. Eighth Street
Los Angeles, CA 90017

Dear Ms. Pasquarella:

I refer to our letter dated December 17, 2010 regarding the release of certain Department of State material under the Freedom of Information Act (Title 5 USC Section 552) and the Privacy Act (Title 5 USC Section 552a), pertaining to your clients, Naji Jawdat Hamdan, Hossam Hemdan, and Jehad Suliman.

The search and the review of the records of the Bureau of Diplomatic Security, the Bureau of Intelligence and Research, the Office of the Legal Adviser for Consular Affairs, the Office of the Executive Secretariat, the Office of the Coordinator for Counterterrorism, and the U.S. Embassy in Beirut have been completed, resulting in the retrieval of 36 documents responsive to your request.

In addition, the search of the records of the U.S. Embassy in Abu Dhabi has also been completed; for ease of review, we have divided the Abu Dhabi search into two parts. The review of the first part, consisting of 38 documents, has been completed.

After reviewing these documents, we have determined that 21 may be released in full, 20 may be released with excisions, and 33 must be withheld in full. All released material is enclosed.

- 2 -

An enclosure provides information on Freedom of Information Act and Privacy Act exemptions and other grounds for withholding material. Where we have made excisions, the applicable exemptions are marked on each document. Of the documents withheld in full, 21 were withheld under exemptions (b)(1) and (k)(1); 23 under exemptions (b)(5) and (d)(5); and seven under exemption (b)(6) and personal privacy grounds of the Privacy Act.

Some of the documents retrieved came from files not subject to the Privacy Act. These documents have been reviewed under the Freedom of Information Act (FOIA) alone, and only FOIA exemptions are cited where material has been withheld.

In some cases, two or more exemptions may apply to the same document. In the case of a document released in part, all non-exempt material that is reasonably segregable from the exempt material has been released.

We will keep you informed as your case progresses. If you have any questions, please contact Trial Attorney Jeffrey Smith at 202-514-5751.

Sincerely,

Alex Galovich
Co-Director, Acting
Office of Information Programs and Services

Enclosures:
    As stated.

# EXHIBIT G



United States Department of State

*Washington, D.C. 20520*

Case No.: 201000711
Abu Dhabi 2-10; D1-2, PPT
APR 1 8 2011

Jennie Pasquarella, Esq.
Staff Attorney, ACLU
1313 W. Eighth Street
Los Angeles, CA 90017

Dear Ms. Pasquarella:

I refer to our letters dated December 17, 2010 and February 17, 2011 regarding the release of certain Department of State material under the Freedom of Information Act (Title 5 USC Section 552).

The search and review of the records of the Office of the Deputy Secretary of State and the review of the records retrieved from the American Embassy in Abu Dhabi and the Office of Passport Services have now been completed, resulting in the retrieval of 539 documents responsive to your request. We have determined that 322 may be released in full, 113 may be released with excisions, and 104 must be withheld in full. All released material is enclosed.

An enclosure provides information on Freedom of Information Act and other grounds for withholding material. Where we have made excisions, the applicable exemptions are marked on each document. Of the documents withheld in full, 104 were withheld under exemptions (b)(5) and (d)(5); four under exemption s (b)(6) and personal privacy grounds of the Privacy Act; four under exemptions (b)(1) and (k)(1) and one under exemption (b)(3)INA.

In some cases, two or more exemptions may apply to the same document. In the case of a document released in part, all non-exempt material that is reasonably segregable from the exempt material has been released.

Some of the documents retrieved came from files not subject to the Privacy Act. These documents have been reviewed under the Freedom of Information

GRAFELD DECLARATION
Civil Action No. CV-10-6149
Exhibit 5

- 2 -

Act (FOIA) alone, and only FOIA exemptions are cited where material has been withheld.

We will keep you informed as your case progresses. If you have any questions, please contact Trial Attorney Jeffrey Smith at 202-514-5751.

Sincerely,

Alex Galovich
Co-Director, Acting
Office of Information Programs and Services

Enclosures:
    As stated.

EXHIBIT
H



United States Department of State

*Washington, D.C. 20520*

APR 2 9 2011

Case No.: 201000711
Segments: LLEI 1-5, OCS1, ABUD 5,6,9, D1

Jennie Pasquarella, Esq.
Staff Attorney
ACLU of Southern California
1313 West Eighth Street
Los Angeles, CA  90017

Dear Ms. Pasquarella:

I refer to our letters dated December 17, 2010 and February 17, 2011 regarding the release of certain Department of State material under the Freedom of Information Act (Title 5 USC Section 552) and the Privacy Act (Title 5 USC Section 552a).

The search and review of the records of the <u>Office of the Legal Adviser for Law Enforcement and Intelligence</u> has now been completed, resulting in the retrieval of 356 documents responsive to your request.  We have determined that 102 may be released in full, 43 may be released with excisions, and 211 must be withheld in full.  All released material is enclosed.

An enclosure provides information on Freedom of Information Act (FOIA) and Privacy Act (PA) grounds for withholding material.  Where we have made excisions, the applicable exemptions are marked on each document.  Of the documents withheld in full, 19 cite exemptions (b)(1) and (k)(1); 208 cite exemptions (b)(5) and (d)(5); nine cite exemption (b)(6) and personal privacy grounds of the PA; and two cite exemption (b)(7)(c) of the FOIA.

The search and review of the records of the <u>Office of Overseas Citizens Services</u> has also been completed, resulting in the retrieval of 136 documents responsive to your request.  We have determined that 51 may be released in full, 48 may be released with excisions, and 37 must be withheld in full.  All released material is enclosed.

- 2 -

Where we have made excisions, the applicable exemptions are marked on each document. Of the documents withheld in full, 25 cite exemptions (b)(1) and (k)(1); 36 cite exemptions (b)(5) and (d)(5); 17 cite exemption (b)(6) and personal privacy grounds of the PA; 18 cite exemption (b)(7)(c) of the FOIA; and one cites exemption (b)(7)(e) of the FOIA.

Finally, as you may recall, nineteen documents retrieved from the <u>American Embassy in Abu Dhabi</u> (ABUD 5, 6, and 9) and the <u>Office of the Deputy Secretary of State</u> (D1) required interagency coordination before we could make a final determination. That review has been completed and we have determined that nine may be released in full and 10 may be released with excisions. All released material is enclosed.

In some cases, two or more exemptions may apply to the same document. In the case of a document released in part, all non-exempt material that is reasonably segregable from the exempt material has been released.

Some of the documents retrieved came from files not subject to the Privacy Act. These documents have been reviewed under the Freedom of Information Act (FOIA) alone, and only FOIA exemptions are cited where material has been withheld.

If you have any questions, please contact Trial Attorney Jeffrey Smith at 202-514-5751.

Sincerely,

Alex Galovich
Co-Director, Acting
Office of Information Programs and Services

Enclosures:
    As stated.

# EXPLANATION OF GROUNDS FOR WITHHOLDING

## The Freedom of Information Act (FOIA) Exemptions (5 USC 552)

**(b)(1)** Withholding specifically authorized under an Executive Order in the interest of national defense or foreign policy, and properly classified.

### Executive Order 12958, as amended, Classification Categories:

**1.4(a)** Military plans, systems or operations

**1.4(b)** Foreign government information

**1.4(c)** Intelligence activities, sources or methods, or cryptology

**1.4(d)** Foreign relations or foreign activities of the US including confidential sources

**1.4(e)** Scientific, technological or economic matters relating to national security, including defense against transnational terrorism

**1.4(f)** USG programs for safeguarding nuclear materials or facilities

**1.4(g)** Vulnerabilities or capabilities of systems, installations, infrastructures, projects, plans or protection services relating to US national security, including defense against transnational terrorism

**1.4(h)** Information on weapons of mass destruction

**(b)(2)** Related solely to the internal personnel rules and practices of an agency.

**(b)(3)** Specifically exempted from disclosure by statute (other than section 552b of Title 5), e.g.:

| | |
|---|---|
| **INA** | Immigration and Nationality Act, Title 8 USC Section 1202(f) |
| **CIA** | Central Intelligence Agency Act of 1949, Title 50 USC Section 403(g) |
| **ARMEX** | Arms Export Control Act, Title 22 USC 2778(e) |
| **EXPORT** | Export Administration Act of 1979, 50 App. USC 2411(c)(1) |

**(b)(4)** Privileged/confidential trade secrets, commercial or financial information from a person.

**(b)(5)** Interagency or intra-agency communications forming part of the deliberative process, attorney client privilege. or attorney work product.

**(b)(6)** Release would constitute a clearly unwarranted invasion of personal privacy.

**(b)(7)** Information compiled for law enforcement purposes that would:

**(A)** Interfere with law enforcement proceedings.

**(B)** Deprive a person of a fair trial.

**(C)** Constitute an unwarranted invasion of personal privacy.

**(D)** Disclose confidential sources.

**(E)** Disclose investigation techniques.

**(F)** Endanger life or physical safety of any individual.

**NR**   Material not responsive to your FOIA request, excised in accordance with our agreement.

## Privacy Act Grounds for Witholding  (5 USC 552a)

**(d)(5)** Information compiled in reasonable anticipation of a civil action proceeding.

**(j)(1)** CIA records.

**(j)(2)** Enforcement of criminal law, including efforts to prevent, control, or reduce crime or apprehend criminals, except records of arrest.

**(k)(1)** Classified pursuant to E.O. 12958 in the interest of national defense or foreign policy such as intelligence sources and methods.

**(k)(2)** Investigatory material compiled for law enforcement purposes.

**(k)(3)** Regarding protective services to the President of the US or other individual pursuant to Title 18, USC, Section 3056.

**(k)(4)** Required by statute to be maintained and used solely as statistical records.

**(k)(5)** Investigatory material compiled solely for the purpose of determining suitability eligibility or qualifications for Federal civilian employment or for access to classified information, the disclosure of which would reveal the identity of the person who furnished information pursuant to a promise that his identity would be held in confidence.

**(k)(6)** Testing or exam material used to determine individual qualifications for appointment or promotion in Federal service, the release of which would compromise the testing or exam process.

**(k)(7)** Material used to determine potential for promotion in the armed services.

**pp**   Information about another person or persons which does not constitute a record about the requester as defined in the access provision of the Privacy Act  (section **(d) (1)**) and which may not be released except pursuant to a written request or with the prior written consent of the person or persons concerned (section **(b)**).

**NR**   Material not responsive to your Privacy Act request.

# EXHIBIT
# I

## Laboni Hoq

| | |
|---|---|
| **From:** | Smith, Jeffrey (CIV) <Jeffrey.Smith5@usdoj.gov> |
| **Sent:** | Friday, August 05, 2011 11:27 AM |
| **To:** | Laboni Hoq |
| **Cc:** | mkaufman@aclu-sc.org |
| **Subject:** | RE: Hamdan et al. v. Dept. of Justice et al.: DOS-Office of the Counselor search |

Dear Laboni:

The State Department informs me that the search of the Office of the Counselor produced six responsive documents. These documents have been reviewed and are pending out processing.

Regards,

Jeff

**From:** Laboni Hoq [mailto:lhoq@sdshhlaw.com]
**Sent:** Thursday, August 04, 2011 5:08 PM
**To:** Smith, Jeffrey (CIV)
**Cc:** mkaufman@aclu-sc.org
**Subject:** Hamdan et al. v. Dept. of Justice et al.: DOS-Office of the Counselor search

Dear Jeff:

This responds to Alex Galovich's July 29, 2011 letter on behalf of the Department of State ("DOS") as it relates to the search performed by the Office of the Counselor of the DOS. While DOS has provided some of the information we requested about that Office's methodology of its searches, the letter does not tell us whether the search resulted in any responsive records. As indicated in Mr. Galovich's July 1, 2011 letter, DOS only initiated a search for responsive records of Office of the Counselor of the DOS after we requested that it do so in our May 16, 2011 letter. To date, DOS has not notified us whether that search located responsive records, nor has it produced any such records or indicated a basis to withhold them. Please provide us this information.

Thanks,

Laboni A. Hoq, Esq.
Schonbrun DeSimone Seplow Harris Hoffman & Harrison, LLP
S. Pasadena Office
715 Fremont Avenue, Suite A
S. Pasadena, CA 91030
Phone: 626-441-4129, Ext. 309
Fax: 626-283-5770

# EXHIBIT
# J



United States Department of State

*Washington, D.C. 20520*

SEP – 2 2011

Case No.: 201000711

Jennie Pasquarella, Esq.
Staff Attorney
ACLU
1313 W. Eighth St.
Los Angeles, CA 90017

Dear Ms. Pasquarella:

I refer to our letter dated April 29, 2011 regarding the release of certain Department of State material under the Freedom of Information Act (Title 5 USC Section 552) and the Privacy Act (Title 5 USC Section 552a), pertaining to your clients, Naji Jawdat Hamdan, Hossam Hemdan, and Jehad Suliman.

In addition to our previous searches, we also conducted a search of the records of the Office of the Counselor of the State Department, resulting in the retrieval of six documents responsive to your request. After reviewing these documents, we have determined that five may be released in full and one may be released in part. All released documents are enclosed.

An enclosure provides information on Freedom of Information Act exemptions and other grounds for withholding material. Where we have made excisions, the applicable exemptions are marked on the document.

If you have any questions, you may contact the trial attorney in this case, Jeffrey Smith at (202) 514-5751.

Sincerely,

Alex Galovich
Co-Director, Acting
Office of Information Programs and Services

Enclosures:
As stated.

GRAFELD DECLARATION
Civil Action No. CV-10-6149
Exhibit 9

## The Freedom of Information Act (5 USC 552)

### FOIA Exemptions

(b)(1)   Information specifically authorized by an executive order to be kept secret in the interest of national defense or foreign policy. Executive Order 13526 includes the following classification categories:

  1.4(a)  military plans, systems, or operations;
  1.4(b)  foreign government information;
  1.4(c)  intelligence activities, sources or methods, or cryptology;
  1.4(d)  foreign relations or foreign activities of the US, including confidential sources;
  1.4(e)  scientific, technological, or economic matters relating to national security, including defense against transnational terrorism;
  1.4(f)  U.S. Government  programs for safeguarding nuclear materials or facilities;
  1.4(g)  vulnerabilities or capabilities of systems, installations, infrastructures, projects, plans, or protection services relating to US national security, including defense against transnational terrorism;
  1.4(h)  weapons of mass destruction;

(b)(2)   Related solely to the internal personnel rules and practices of an agency

(b)(3)   Specifically exempted from disclosure by statute (other than 5 USC 552), for example:

  ARMEX   Arms Export Control Act, 22 USC 2778(e)
  EXPORT   Export Administration Act of 1979, 50 App. USC 2411(c)(1)
  FSA   Foreign Service Act of 1980, 22 USC 4003 & 4004
  INA   Immigration and Nationality Act, 8 USC 1202(f)
  IRAN   Iran Claims Settlement Act, Sec. 505, 50 USC 1701, note

(b)(4)   Trade secrets and confidential commercial or financial information

(b)(5)   Interagency or intra-agency communications forming part of the deliberative process, attorney-client privilege, or attorney work product

(b)(6)   Personal privacy information

(b)(7)   Law enforcement information whose disclosure would:
       (A)  interfere with enforcement proceedings
       (B)  deprive a person of a fair trial
       (C)  constitute an unwarranted invasion of personal privacy
       (D)  disclose confidential sources
       (E)  disclose investigation techniques
       (F)  endanger life or physical safety of an individual

### Other Grounds for Withholding

NR   Material not responsive to a FOIA request excised with the agreement of the requester

# EXHIBIT
# K

THE LAW OFFICE OF
# TRABER & VOORHEES

THERESA M. TRABER
BERT VOORHEES
LABONI AMENA HOQ
REBECCA B. PETERSON-FISHER

OF COUNSEL
HADSELL STORMER KEENY RICHARDSON & RENICK, LLP
LITT, ESTUAR, HARRISON, MILLER & KITSON, LLP

128 NORTH FAIR OAKS AVENUE
PASADENA, CALIFORNIA 91103
TEL: (626) 585-9611
FAX: (626) 585-1400

May 16, 2011

*Via U.S. Mail and E-mail*

Jeffrey M. Smith
Senior Counsel
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Washington, D.C. 20001

Re:     *Hamdan et al. v. U.S. Dept. of Justice, et al.*
         Case No. 10-06419 JHN (JEMx)

Dear Jeff:

Thank you for convening the call on Friday with counsel for the Department of State ("DOS") Jeremy Freeman regarding DOS's search, review and production of responsive documents in this case. We appreciate DOS's willingness to provide further information to allow us to assess the adequacy of DOS's responses to our FOIA request, as well to conduct additional searches and release additional documents or portions thereof as appropriate. This letter memorializes our request for further information about the searches DOS has already conducted, as well as for additional searches for responsive documents.

We are in receipt of DOS's correspondence dated December 17, 2010, February 17, 2011, April 18, 2011 and April 29, 2011 identifying the 17 records systems DOS searched in response to our request. Regarding these searches, we request that DOS identify the methodology it used to locate responsive records in each of these 17 records systems. As discussed, we request that DOS describe how these searches were conducted, including who conducted and/or oversaw the searches, what document sources were searched (*i.e.* electronic records systems, specific individuals' email files, specific individuals' personal hard-copy and electronic working files, etc.), and what search terms if any were used in carrying out the searches. To the extent DOS created any documents directing others to conduct searches, *i.e.* search tasking forms or emails to individuals asking them to either carry out or direct searches, we ask that such documents be produced to us. If the methodology for carrying out searches included searching the email, electronic and hard copy files of individuals, we ask that the names and job titles of the individuals whose files were searched be provided to us. As set forth in our prior correspondence to you regarding certain other defendants in this case, we believe we are entitled to this information to assess the adequacy of DOS's searches for responsive records.

Mr. Jeffrey M. Smith
May 16, 2011
Page 2

As we discussed in our call, in addition to the 17 records systems DOS states it searched, we believe there are a few other records systems that are likely to have records responsive to our request. Among these are the Office of Intelligence and Research ("INR"),[1] the Bureau of Political Military Affairs, the Counselor of the Department,[2] and the following DOS information systems: External Research Records (STATE-10), Intelligence and Research Records (STATE-15), International Narcotics and Law Enforcement Affairs (INL) (STATE-74), Legal Case Management Records (STATE-21), Overseas Citizens Services Records (STATE-05)[3] and Overseas Records (STATE-25). We request that DOS search these additional records systems. In addition, we ask that DOS identify the methodology for how these searches will be conducted, including by providing the information we request above regarding the 17 records systems it previously searched.

As set forth in DOS's letters dated December 17, 2010, February 17, 2011, April 18, 2011 and April 29, 2011, DOS has withheld 386 documents. As we discussed, in order to engage in meaningful negotiations regarding the validity of these withholdings and thereby attempt to narrow the issues in dispute, we request that DOS provide us a *Vaughn* index identifying the subject matter of the documents and the legal basis for the withholdings. In addition we ask that DOS identify the actual volume of fully withheld records by identifying the total number of pages that make up the 386 fully withheld documents. We understand that preparing a *Vaughn* index may take some time, and we are willing to negotiate an appropriate date for any summary judgment motion that takes into account sufficient time for production of the *Vaughn* index.

We also discussed that, based our initial review of the records DOS produced in full or in part, it appears that there a few groups of documents that are missing from DOS's production. Among those are (1) correspondence between the DOS, FBI and the UAE government regarding the FBI's visit to the UAE to interview Naji Hamdan in the summer of 2008 (which interview was conducted by FBI agents Joshua Stone and Jerry (or Gary) Price) (*see* DPS001425), (2) correspondences with the DOS and the

---

[1]That INR would have responsive records is confirmed by the records produced by DOS. *See* DOS001269, DOS 001276, DOS 001424-27 attached hereto.

[2]Mr. Freeman indicated that all responsive documents (both hard copy and electronic) from the Counselor of the Department would be maintained by the Executive Secretariat, and that DOS had searched the Executive Secretariat's records systems for responsive records. We ask that DOS confirm this information, and provide a description of its search of the Executive Secretariat's records systems.

[3]While Mr. Freeman represented that the Overseas Citizens Services Records were searched, we would further request that DOS identify how this record system was searched, including who conducted and/or oversaw the search, whether the search was conducted electronically or by review of hard copy documents, what search terms if any were used to carry out the search and any documents identifying the parameters of the search.

Mr. Jeffrey M. Smith
May 16, 2011
Page 3

FBI legal attaches (and their assistants) who serve the Abu Dhabi and Beirut embassies and the Dubai consulate regarding Naji Hamdan and/or Hossam Hemdan (*see* DOS 001176-77, DOS 001739-41, DOS 001742-43, DOS1261-62 attached here), and (3) correspondence between the DOS and the UAE government starting in late September 2008 that, among other things, led to U.S. consular access to Mr. Hamdan on October 19, 2008 (see DOS 001424-27 attached here), the subsequent observations of Mr. Hamdan's trial by U.S. consular officers, and a number of related events. While these correspondence were referenced in the documents produced, the actual correspondences do not appear to be part of the production. We ask that DOS explain this apparent failure to produce these responsive records, and, if appropriate, conduct a subsequent search for them.

We also discussed our concerns with certain of DOS's redactions to the documents produced to date. Regarding redactions made pursuant to FOIA exemption (b)(1) and Privacy Act exemption (k)(1) which are also marked "unclassified," Mr. Freeman clarified that the portions redacted continue to be classified while the portions produced have been determined to be unclassified. We ask that the DOS confirm this representation so that we can determine which, if any, of these redactions we will seek to challenge. Regarding redactions made pursuant to FOIA exemption (b)(5) and Privacy Act exemption (d)(5), Mr. Freeman stated that most of these redactions are for information that is protected by the attorney-client privilege and/or the work product protection. We ask that DOS confirm this representation, as well as identify those (b)(5) and (d)(5) exemptions that are not based on the attorney-client and/or work product protections and the specific basis for the redactions so that we may determine which, if any, of these redactions we may seek to challenge. Regarding redactions made to certain correspondence and attached documents, it appears that the names of certain senders and/or recipients have been redacted from these documents pursuant to FOIA exemption (b)(6), (b)(7) (c) and a purported Privacy Act exemption identified as "PP." We are attaching with this letter examples of such redactions (*see, e.g.* DOS 001192-93, DOS001194-95, DOS001198-1200, DOS001205-07, DOS001213-20, DOS 1265-69, DOS 1270-76, DOS 1424-27, DOS 001566-67, DOS001692-93, DOS 001735, DOS 001764-66, DOS 001979-88 attached here). We ask that DOS provide additional information to justify these redactions, or else produce unredacted copies of these documents. In your review of these above-referenced redactions, if upon further consideration you believe that withheld information can nonetheless be disclosed, we would appreciate your promptly providing us any such information.

We look forward to DOS's response to these requests, and our further negotiations to narrow issues in dispute between the parties.

Very truly yours,

Laboni A. Hoq

cc: Michael Kaufman
Enclosures

# EXHIBIT
# L



United States Department of State

*Washington, D.C. 20520*

**JUL - 1 2011**

Laboni A. Hoq, Esq.
Traber & Vorhees
128 North Fair Oaks Avenue
Pasadena, CA 91103

Re:   *Hamdan et al. v. U.S. Department of Justice, et al.*
      **Case No. 10-CV-06419**

Dear Laboni Hoq:

This letter is in response to your letter dated May 16, 2011 regarding the FOIA request at issue in *Hamdan et al. v. U.S. Department of Justice, et al.*, No. 10-CV-06419, in the United States District Court for the Central District of California.

When the Department receives a FOIA request, the Office of Information Programs and Services (IPS) evaluates the request and determines which offices, overseas posts, or other records systems within the Department may reasonably be expected to contain the records requested. This determination is based on the description of the records requested, and requires a familiarity with the Department's records system holdings, applicable records disposition schedules, and the substantive and functional mandates of numerous Department offices and Foreign Service posts. Factors such as the nature, scope, and complexity of the request itself are also relevant.

The records of the Department are maintained in both centralized and decentralized record systems. The Central Foreign Policy Records (the "Central File") is the Department's centralized records system and contain over 30 million documents of a substantive nature that establish, discuss, or define foreign policy, set precedents, or require action or use by more than one office. Among other things, the Central File includes official record copies of almost all incoming and outgoing telegrams between the Department and Foreign Service posts, as well as other select substantive correspondence documents, including diplomatic notes; correspondence to and from the White House, members of Congress, and other federal agencies; position papers and reports; memoranda of conversations; and interoffice memoranda. Because the Central File is the Department's most comprehensive and authoritative compilation of documents, it is by far the records system most frequently searched in response to FOIA requests.

The search of the Central File was conducted using the following search terms: "naji jawdat hamdan;" "hossam hemdan;" "jehad suliman;" and "honda acura palace." A supplemental search of the Central File was conducted using the following keywords: "naji jawdat hamdan;" "naji hamdan;" "hamdan naji;" "n. hamdan;" "naji j. hamdan;" "hamdan naji jawdat;" "hamdan naji;" "hamdan n;" "hamdan j;" "hossam hemdan;" "hemdan hossam;" "hossam hamdan;" "sam* hemdan;" "hemdam sam*;" "sam* hemdan;" "samm* hemdan;" "hemdan samm*;" "samm* jawdat hemdan;" "hemdan samm* jawdat" or "j* had sul*iman;" "sul*iman j*had;" "Honda acura palace; "hondacura palace;" "hapimotor*;" "hapimotors.com;" "authentic auto part*;" "Honda acura;" "hondacura." The asterisk is a wildcard character that can be used as a substitute for any combination of letters in a search, thereby increasing the flexibility and efficiency of searches. For example, a search for "sam* hemdan" would retrieve records that mention sam hemdan, samy hemdan, sami hemdan, samm hemdan, sammie hemdan, and sammy hemdan.

In addition to the Central File, the Department also undertook searches of decentralized records within the following components: the Bureau of Diplomatic Security, the Office of Overseas Citizens Services, the Office of Passport Services, the Office for the Coordinator of Counterterrorism, the Office of the Ambassador at Large for War Crimes Issues, the Office of the Executive Secretariat, the Office of the Deputy Secretary, the Office of the Deputy Secretary for Resources and Management, the United States Embassy in Abu Dhabi, the United States Embassy in Beirut, and the United States Consulate General in Dubai; the Bureau of Near Eastern Affairs, the Bureau of Intelligence and Research, and the Office of Legal Adviser.

The Bureau of Diplomatic Security conducted a search of its electronic and paper files under the names of: Naji Jawdat Hamdan; Hamdan, Naji Jawdat; Naji Hamdan; Hamdan, Naji, N.; Hamdan, Naji J. Hamdan; Hamdan, Naji J.; Hossam Hemdan; Hemdan, Hossa; Hossam, Hamdan; Hamdan, Hossam; Sam Hemdan; Hemdan, Sam; Samy Hemdan; Hemdan, Samy; Sammy Hemdan; Hemdan, Sammy; Sammy Jawdat Hamdan; Hemdan, Sammy Jawdat; Jehad Suliman; Suliman, Jehad; Honda Acura Palace; HondAcura Palace; Hapimotors; Hapimotors.com ; and Authentic auto parts.

The Office of Overseas Citizens Services conducted searches of paper files and electronic records using the following search terms: Naji Jawdat Hamdan, Naji Hamdan, Jawdat Hamdan, Hossam Hemdan, Sam Hemdan, Sammy Hemdan; and Jehad Suliman.

The Office of Passport Services conducted a search in the Passport Information Electronic Records System (PIERS), Passport Lookout Tracking System (PLOTS) and the Travel Document Issuance System (TDIS) databases using the names: Naji Jawdat Hamdan; Hossam Jawdat Hemdan; Sam Hemdan; Sammy Hemdan; and Jehud Suliman.

The Office of the Coordinator for Counterterrorism conducted a search of its paper and electronic records. The following search terms were used in their electronic search: Hamdan; Hemdan; Suliman; Hapi; and Honda.

The Office of Ambassador at Large for War Crimes Issues conducted a search of its paper and electronic records, using the key words "prisoners" and "military prison." This search was conducted only in an abundance of caution; its mission is to formulate U.S. policy responses to atrocities committed in areas of conflict, including the former Yugoslavia, Rwanda, Sierra Leone, Cambodia, and Iraq.

The Department's Executive Secretariat maintains centralized records of the Secretary of State and of certain high ranking Department officials. This records system is a unique collection of material used to support the work of the highest levels of the Department. The Executive Secretariat conducted searches of the electronic Secretariat Tracking and Retrieval Systems (STARS) and STEPS (the STARS historical database) using the following keywords: "Hamdan;" "Hemdan;" "Suliman;" "Hapimotors;" "Honda;" and "Authentic."

The Office of the Deputy Secretary conducted a search using the following search terms: Naji Jawdat Hamdan; Hamdan, Naji Jawdat; Naji Hamdan; Hamdan, Naji; N. Hamdan; Hamdan, N; Naji J. Hamdan; Hamdan, Naji; Hossam Hemdan; Hemdan, Hossam; Hossam Hamdan; Hamdan, Hossam; Sam Hemdam; Hemdam, Sam; Samy Hemdan; Hemdan, Samy; Sammy Hemdan; Hemdan, Sammy; Sammy Jawdat Hemdan; Hemdan, Sammy Jawdat; Jehad Suliman; Suliman, Jehad; Honda Acura Palace; HondAcura Palace; Hapimotors; Hapimotors.com; and Authentic auto parts.

The Office of the Deputy Secretary for Management and Resources conducted a search using the following search terms: Naji; Jawdat; Hamdan; Hossam; Hemdan; Sam; Samy; Sammy; Jehad; Suliman; Honda; Acura; and Hapimotors.

The U.S. Embassy in Abu Dhabi conducted a search using the search terms: Naji Jawdat Hamdan; Hossam Jawdat Hemdan; Sammy Hemdan; Sam Hemdan; Jehad Suliman; Hapimotors; Honda Acura Palace; and HondaAcura Palace.

The U.S. Embassy in Beirut and the U.S. Consulate General in Dubai conducted searches for records that mentioned the individuals or the company named in the FOIA request.

We are in the process of gathering additional information regarding the details of the searches conducted by the Bureau of Near Eastern Affairs, the Bureau of Intelligence and Research, and the Office of the Legal Adviser.

We have considered your request that we conduct additional searches. Although the searches already undertaken by the Department are reasonably calculated to uncover the records that are the subject of your request, we have nevertheless initiated a search of the records of the Office of the Counselor to the Department of State. Information regarding that search is being gathered.

3

As noted above, the Department has already conducted searches of some of the components cited in your letter, including the Bureau of Intelligence and Research, the Office of Overseas Citizens Services, and records at diplomatic and consular posts overseas.

Other components cited in your letter are not reasonably likely to contain records that are the subject of your FOIA request. The Bureau of Political-Military Affairs provides policy direction in the areas of international security, security assistance, military operations, defense strategy and plans, and defense trade. The System of Records Notice for International Narcotics and Law Enforcement Personnel Records (INLPR) notes that those records are "maintained primarily on contracted personnel serving in criminal justice roles for the purposes of documenting individuals' experience and skills relevant to INL funded programs; ensuring maintenance of the public trust, personnel safety, and accountability; providing aggregate statistical data for program management purposes; providing information related to employment suitability for service in high-risk environments, including authority to carry weapons; and capturing and validating flight mission data." The External Research (STATE-10) system of records that you cite includes records pertaining to "former and current Bureau of Intelligence and Research consultants/experts; individuals nominated to be Bureau of Intelligence and Research consultants/experts; consultants/experts to other bureaus who have been employed by the Bureau of Intelligence and Research; principal investigators and action officers of government supported research on foreign affairs." The Legal Case Management Records (STATE-21) includes records pertaining to "individuals who have filed administrative grievances and Equal Employment Opportunity complaints; individuals involved in disciplinary proceedings; individuals involved in alleged criminal activity or activity in violation of regulations; individuals who have sued the Department of State or any officials, or who have raised administrative and management questions which require legal analysis."

Page three of your letter refers to an "apparent failure to produce" certain records. As detailed above, the Department conducted exhaustive searches for records responsive to the FOIA request at issue in this case. The Department conducted a line-by-line review of all of the responsive records located as a result of those searches, and produced all reasonably segregable portions of those records that are not exempt from release.

As part of that review, the Department determined that some information that was originally classified could be declassified and released. Thus, some of the pages that were released contain paragraphs that were originally marked as classified. Those pages are now marked as unclassified. Information that continues to warrant classification has been withheld under FOIA exemption (b)(1) and Privacy Act exemption (k)(1).

Sincerely,

Alex Galovich
Acting Director
Office of Information Programs and Services

4

# EXHIBIT M



# United States Department of State

*Washington, D.C. 20520*

**JUL 2 9 2011**

Laboni A. Hoq, Esq
Traber & Vorhees
128 North Fair Oaks Avenue
Pasadena, CA 91103

**Re:** *Hamdan et al. v. U. S. Department of Justice, et al.*
  *Case No. 10-CV-0641*

**Ref:** *July 1, 2011, letter of Alex Galovich, Office of Programs and Services, US Department of State*

Dear Laboni Hoq:

In the above-referenced letter, it was noted that the Department of State still needed to provide information about the execution of four other internal searches, to wit searches in the Bureau of Near Eastern Affairs, the Bureau of Intelligence and Research, the Office of the Legal Advisor, and the Office of the Counselor. We now have the results of those searches and their search procedures are detailed below.

The Bureau of Near Eastern Affairs conducted searches of both its electronic and paper, classified and unclassified files under the search criteria of country, subject matter, and names of Foreign Service officers generating relevant records during the time frame. The Bureau of Near Eastern Affairs' files are arranged for retrieval of information by country, subject matter and/or the name of the Foreign Service Officer generating relevant records during the time frame.

The Office of the Legal Advisor conducted searches of both its electronic and paper, classified and unclassified files using the names Hamdan, Hemdan and Naji as search criteria. The Office of the Legal Advisor's electronic files are arranged to retrieve name-specific information or by date within country/subject matter files.

The Bureau of Intelligence and Research conducted searches of both its electronic and paper, classified and unclassified files under the following search criteria within subject matter and chronologically organized files: Naji Jawdat Hamdan; Hamdan, Naji Jawdat; Naji Hamdan; Hamdan, Naji; N. Hamdan; Hamdan, N.; Naji J. Hamdan; Hamdan, Naji J.; Hossam Hemdan; Hemdan, Hossam; Hossam Hamdan; Hamdan, Hossam; Sam Hemdan; Hemdan, Sam; Samy Hemdan; Hemdan, Samy; Sammy Hemdan; Hemdan, Sammy; Sammy Jawdat Hemdan; Hemdan, Sammy Jawdat; Jehad Suliman; Suliman, Jehad; Honda Accura Palace; HondaAcura Palace; Hapimotors; Hapimotors.com; Authentic auto parts. The Bureau of Intelligence and Research maintains no records on U. S. citizens.

The Office of the Counselor conducted searches of both its electronic and paper, classified and unclassified files using the search criteria of key words Hamdan, Hemdan and Suliman. The electronic and hard copy records of the Office of the Counselor are arranged by date within subject.

We believe that the above satisfies your request that the Department of State describe how the designated searches were conducted.

Sincerely,

Alex Galovich
Acting Director
Office of Information Programs and Services

# EXHIBIT N

## Laboni Hoq

| | |
|---|---|
| **From:** | Leary, Peter (CIV) <Peter.Leary@usdoj.gov> |
| **Sent:** | Monday, November 14, 2011 9:37 AM |
| **To:** | Michael Kaufman |
| **Cc:** | Laboni Hoq |
| **Subject:** | RE: Hamdan: DOS sample documents |

Michael,

I was not aware of this issue but will check with the State Department and let you know what I find.

Thanks,

Peter

**From:** Michael Kaufman [mailto:mkaufman@aclu-sc.org]
**Sent:** Thursday, November 10, 2011 8:58 PM
**To:** Leary, Peter (CIV)
**Cc:** 'Laboni Hoq'
**Subject:** FW: Hamdan: DOS sample documents

Peter,

I write to follow up on an issue I raised several months ago with Jeff regarding DOS's production. As described more fully below, we found that a number of the DOS emails had attachments that were not produced. I don't believe that Jeff ever responded to our request that DOS produce these missing attachments. Could you please let us know whether DOS intends to produce the missing attachments?

Thanks, Michael

**From:** Michael Kaufman
**Sent:** Wednesday, August 17, 2011 5:05 PM
**To:** 'Smith, Jeffrey (CIV)'
**Cc:** 'Laboni Hoq'; Michael Kaufman
**Subject:** Hamdan: DOS sample documents

Jeff,

Below please find our list of documents produced in part and withheld in part, to be included in the 91 documents for which the Department of State will prepare a Vaughn index. The list includes 30 documents, designated by DOS's internal numbering system. After receiving DOS's productions, we Bates numbered the DOS documents sequentially. Tomorrow, we will provide you a pdf with the selected documents with Bates numbers. For ease of reference, we propose that the parties refer to the documents by their Bates numbers in the summary judgment briefing.

Per our agreement, the remaining 61 documents will be compromised as follows: (1) 55 documents selected by taking every fifth document from a "scrambled" list of the documents withheld in full; and (2) the 6 documents that were located in DOS's supplemental search of the Office of the Counselor.

In our review of the DOS productions, we noticed that there were a number of emails with attachments for which DOS did not produce (either in redacted or unredacted form) the attachments. For example, see EE74, F71 and H57. There were several other documents with missing attachments in addition to these. We request that DOS review its production and produce the missing attachments. We also request that DOS permit plaintiffs to identify up to five additional documents from any future production to be included in the "sample" for summary judgment briefing.