1  TONY WEST
   Assistant Attorney General
2  JOHN R. TYLER
   PETER D. LEARY
3  United States Department of Justice
   Civil Division
4  Federal Programs Branch
   P.O. Box 883
5  Washington, D.C. 20530
   Tel: (202) 514-3313
6  Facsimile: (202) 616-8470
   peter.leary@usdoj.gov
7
   *Attorneys for Defendants*
8
                    **UNITED STATES DISTRICT COURT**
9
                    **CENTRAL DISTRICT OF CALIFORNIA**
10

11

12  NAJI JAWDAT HAMDAN, *et al.*,          )   Case No: CV 10-6149-JHN-JEMx
                                            )
13  Plaintiffs,                             )   **DEFENDANTS' REPLY IN**
                                            )   **SUPPORT OF THEIR SUMMARY**
14  v.                                      )   **JUDGMENT MOTION AND**
                                            )   **OPPOSITION TO PLAINTIFFS'**
15  UNITED STATES DEPARTMENT OF             )   **SUMMARY JUDGMENT MOTION**
    JUSTICE, *et al.*,                      )
16                                          )   DATE: March 5, 2012
    Defendants.                            )   TIME: 3:00 p.m.
17                                          )   DEPT: Courtroom 790 Roybal
                                            )        Hon. Jacqueline H. Nguyen
18                                          )

19  / / /
    / / /
20  / / /

21

22

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

2

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

3

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

4
5

I.   The Searches Conducted By the FBI, the National Security
     Division (NSD), the Office of Intelligence &Analysis (OI&A),
     and the Defense Intelligence Agency (DIA) Were Adequate . . . . . . . . . . . 2

6

    A.   The FBI Conducted an Adequate Search . . . . . . . . . . . . . . . . . . 3

7
8

        i.    The FBI Has Searched Its Electronic
              Surveillance (ELSUR) Indices . . . . . . . . . . . . . . . . . . . . 3

9

        ii.   There Are No Tickler Files for the FBI to
              Search . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

10
11

        iii.  The FBI's Search of the CRS Would Have
              Located Responsive E-mails Subject to
              FOIA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

12
13

        iv.   The FBI Has Now Addressed the Adequacy
              of Its Search for Documents Related to
              Jehad Suliman . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

14

    B.   NSD Conducted an Adequate Search . . . . . . . . . . . . . . . . . . . . 7

15
16

        i.    NSD Has Now Searched Using Every Term
              Plaintiffs Requested . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

17

        ii.   NSD Searched for Documents Referring to
              Mr. Suliman . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

18

    C.   OI&A Conducted an Adequate Search . . . . . . . . . . . . . . . . . . . 9

19
20

        i.    OI&A's Search Was Not Limited to "Files
              Related to Communications and Policy" . . . . . . . . . . . . 9

21
22

        ii.   OI&A Searched the Databases that
              Comprise the "Enterprise Records System"
              (ERS) of the DHS . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

23

    D.   DIA Conducted an Adequate Search . . . . . . . . . . . . . . . . . . . 10

24

        i.    DIA Searched Its Foreign Intelligence
              Database . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

25
26

        ii.   DIA Has Now Searched the Files of Its
              Attaché in the U.A.E. . . . . . . . . . . . . . . . . . . . . . . . . . 11

27
28

II.   Defendants Properly Invoked the Glomar Doctrine . . . . . . . . . . . . 11

A.   Defendants' Declarations Are Sufficiently Detailed . . . . . . . 13

B.   Unsupported Speculation About Alleged
Governmental Activity Does Not Undermine the
Glomar Assertions in This Case . . . . . . . . . . . . . . . . . . . . . . . 14

C.   The Legality of Agency Activity Is Irrelevant to the
Exemption 1 and 3 Calculus . . . . . . . . . . . . . . . . . . . . . . . . . . 16

D.   Each Agency That Invoked the Glomar Doctrine
Did So Properly . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

i.   The CIA Properly Invoked the Glomar
Doctrine . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

ii.   NSD Properly Invoked the Glomar Doctrine . . . . . . . . 23

iii.   The ODNI Properly Invoked the Glomar
Doctrine . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

iv.   OI&A No Longer Seeks to Invoke the
Glomar Doctrine . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

III.   Defendants' Withholdings Are Proper . . . . . . . . . . . . . . . . . . . . . . 27

A.   The DIA Properly Invoked Exemption 3 . . . . . . . . . . . . . . . . 27

B.   The DIA and FBI Properly Invoked Exemption 1 . . . . . . . . . 30

C.   The FBI Properly Invoked Exemptions 6 and 7(C) . . . . . . . . 33

i.   The Privacy Interest of Third Parties is
Significant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

ii.   The Privacy Interest of FBI Special Agents
and Non-FBI Governmental Employees Is
Significant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

iii.   Plaintiffs Have Established No Credible
Public Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

D.   The DIA Properly Invoked Exemption 6 . . . . . . . . . . . . . . . . 37

E.   FBI Properly Invoked Exemption 7(E) . . . . . . . . . . . . . . . . . 39

i.   The FBI Properly Withheld Records as
Revealing Information that Could Reasonably
Be Expected to Potentially Increase the Risk
of Circumvention of the Law . . . . . . . . . . . . . . . . . . . 41

ii.     Exemption 7(E) Protects Even Commonly
        Known Techniques and Procedures if
        Disclosure Could Reduce or Nullify Their
        Effectiveness   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

iii.    Plaintiffs Have Produced No Evidence of
        Illegal FBI Conduct That Could Rebut the
        Government's Presumption of Legitimate
        Conduct   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

IV.     Defendants Have Properly Addressed 5 U.S.C. § 552(c)   . . . . . . . . 45

CONCLUSION   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

-iii-

# TABLE OF AUTHORITIES

## CASES

ACLU v. DoD,
   628 F.3d 612 (D.C. Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

ACLU v. DoD,
   723 F. Supp. 2d 621 (S.D.N.Y. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

ACLU v. DOJ,
   --- F. Supp. 2d ----, No. 10-0436, 2011 WL 4005324 (D.D.C. Sept.
   9, 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15, 20, 28

Afshar v. Dep't of State,
   702 F.2d 1125 (D.C. Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15, 23, 44

Aftergood v. CIA,
   355 F. Supp. 2d 557 (D.D.C. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19, 21

Agee v. CIA,
   524 F. Supp. 1290 (D.D.C. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

Allard K. Lowenstein Intern. Human Rights Project v. DHS,
   626 F.3d 678 (2d Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  39

Amnesty Int'l v. CIA,
   728 F. Supp. 2d 479 (S.D.N.Y. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

Asian Law Caucus v. DHS,
   2008 WL 5047839 (N.D. Cal. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . .  41, 43

August v. FBI,
   328 F.3d 697 (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  29

Barnard v. DHS,
   598 F. Supp. 2d 1 (D.D.C. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  43

Bassiouni v. CIA,
   392 F.3d 244 (7th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

Berman v. CIA,
   501 F.3d 1136 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Blackwell v. FBI,
   646 F.3d 37 (D.C. Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  34, 37, 41

Blanton v. DOJ,
   63 F. Supp. 2d 35 (D.D.C. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  43

Bowen v. FDA,
   925 F.2d 1225 (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  37, 42, 44

CIA v. Sims,
      471 U.S. 159 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Campbell v. DOJ,
      164 F.3d 20 (D.C. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4, 5

Canning v. DOJ,
      848 F. Supp. 1037 (D.D.C. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  30

Church of Scientology of Cal. v. Dep't of Army,
      611 F.2d 738 (9th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13, 30

Cottone v. Reno,
      193 F.3d 550 (D.C. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  44

Council on American-Islamic Relations, California v. FBI,
      749 F. Supp. 2d 1104 (S.D. Cal. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  42

Ctr. for Auto Safety v. EPA,
      731 F.2d 16 (D.C. Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23

Dobronski v. FCC,
      17 F.3d 275 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  36

DoD v. FLRA,
      510 U.S. 487 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  38

DOJ v. Reporters Comm. for Freedom of the Press,
      489 U.S. 749 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  34

Dep't of State v. Ray,
      502 U.S. 164 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  34, 44

FBI v. Abramson,
      456 U.S. 615 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  39

Fiduccia v. DOJ,
      185 F.3d 1035 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  32

Fisher v. DOJ,
      772 F. Supp. 7 (D.D.C. 1991), *aff'd*, 968 F.2d 92 (D.C. Cir. 1992) . . . . . . . .  40

Fitzgibbon v. CIA,
      911 F.2d 755 (D.C. Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16, 27, 34

Forest Serv. Emps. for Envtl. Ethics v. U.S. Forest Serv.,
      524 F.3d 1021 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

Frugone v. CIA,
      169 F.3d 772 (D.C. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15, 29

Gardels v. CIA,
   689 F.2d 1100 (D.C. Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Gerstein v. CIA,
   No. C-06-4643, 2008 WL 4415080 (N.D. Cal. 2008) . . . . . . . . . . . . . . . . 22, 30

Halkin v. Helms,
   690 F.2d 977 (D.D.C. 1982)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Halperin v. CIA,
   629 F.2d 144 (D.C. Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 14

Hunt v. CIA,
   981 F.2d 1116 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Hunt v. FBI,
   972 F.2d 286 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Ingle v. DOJ,
   698 F.2d 259 (6th Cir. 1983), *overruled on other grounds by* DOJ
   v.Landano, 508 U.S. 165 (1993)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Islamic Shura Council of S. California v. FBI,
   635 F.3d 1160 (9th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Iturralde v. Comptroller of the Currency,
   315 F.3d 311 (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Jordan v. DOJ,
   591 F.2d 753 (D.C. Cir. 1978), *overruled in part on other grounds
   by* Crooker v. ATF, 670 F.2d 1051 (D.C. Cir. 1981)  . . . . . . . . . . . . . . . . . . 29

Judicial Watch, Inc. v. Dep't of Commerce,
   337 F. Supp. 2d 146 (D.D.C. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 42

Judicial Watch v. DOJ,
   102 F. Supp. 2d 6 (D.D.C. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Keys v. DHS,
   510 F. Supp. 2d 121 (D.D.C. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Kimberlin v. Dep't of Treasury,
   774 F.2d 204 (7th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Lahr v. NTSB,
   569 F.3d 964 (9th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Larson v. Dep't of State,
   565 F.3d 857 (D.C. Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Lesar v. DOJ,
   636 F.2d 472 (D.C. Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

1

2    Lewis-Bey v. DOJ,
        595 F. Supp. 2d 120 (D.D.C. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

3    Lion Raisins v. USDA,
        354 F.3d 1072 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 13, 23

4    Maguire v. Mawn,
        No. 02 Civ. 2164, 2004 WL 1124673 (S.D.N.Y. May 19, 2004) . . . . . . . . . . 43
5

6    Martin v. DOJ,
        488 F.3d 446 (D.C. Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

7    Maydak v. DOJ,
        362 F. Supp. 2d 316 (D.D.C. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
8

9    Mayer Brown LLP v. IRS,
        562 F.3d 1190 (D.C. Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

10   Maynard v. CIA,
        986 F.2d 547 (1st Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
11

12   McDonnell v. United States,
        4 F.3d 1227 (3d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

13   Meeropol v. Meese,
        790 F.2d 942 (D.C. Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
14

15   Military Audit Project v. Casey,
        656 F.2d 724 (D.C. Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

16   Miller v. Casey,
        730 F.2d 773 (D.C. Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
17

18   Miller v. DOJ,
        562 F. Supp. 2d 82 (D.D.C. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

19   Minier v. CIA,
        88 F.3d 796 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 12, 19, 27
20

21   Milner v. Dep't of Navy,
        575 F.3d 959 (9th Cir. 2009), *overruled on other grounds by*
22      *Milner v. Dep't of Navy*, 131 S. Ct. 1259 (2011) . . . . . . . . . . . . . . . . . . . . . . 32

23   Morley v. CIA,
        508 F.3d 1108 (D.C. Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 27

24   Muslim Advocates v. DOJ,
        --- F. Supp. 2d –, No. 09-1754, 2011 WL 5439085 (D.D.C. Nov.
25      10, 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

26   Navasky v. CIA
        499 F. Supp. 269 (S.D.N.Y. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
27

28

NRDC v. DoD,
     442 F. Supp. 2d 857 (C.D. Cal. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

National Archives and Records Admin. v. Favish,
     541 U.S. 157 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 36, 44

Oglesby v. Dep't of the Army,
     920 F.2d 57 (D.C. Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

PHE, Inc. v. DOJ,
     983 F. 2d 248 (D.C. Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

People for the Am. Way Found. v. NSA,
     462 F. Supp. 2d 21 (D.D.C. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Peter S. Herrick's Customs & Int'l Trade Newsletter v. Customs
& Border Prot.,
     No. 1:04-cv-00377, 2006 WL 1826185 (D.D.C. June 30, 2006) . . . . . . . . . . 40

Phillippi v. CIA,
     546 F.2d 1009 (D.C. Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Physicians for Human Rights v. DoD,
     778 F. Supp. 2d 28 (D.D.C. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Public Citizen v. Dep't of State,
     11 F.3d 198 (D.C. Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Reliant Energy v. FERC,
     520 F. Supp. 2d 194 (D.D.C. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Riquelme v. CIA,
     453 F. Supp. 2d 103 (D.D.C. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 28

Rosenfeld v. DOJ, No. C 07-03240 MHP,
     No. C 07-03240, 2008 WL 3925633 (N.D. Cal. Aug. 22, 2008) . . . . . . . . . . . 8

Rothschild v, CIA,
     No. 91-1314, 1992 WL 71393 (D.D.C. Mar. 25, 1992) . . . . . . . . . . . . . . 20, 28

SafeCard Services, Inc. v. SEC,
     926 F.2d 1197 (D.C. Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Schrecker v. DOJ,
     254 F.3d 162 (D.C. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Senate of P.R. v. DOJ,
     823 F.2d 574 (D.C. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Silets v. DOJ,
     945 F.2d 227 (7th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

1    Smith v. ATF,
2        977 F. Supp. 496 (D.D.C. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  40

3    Spurlock v. FBI,
         69 F.3d 1010 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

4    Steinberg v. DOJ,
5        No. CIV A 93-2409-LFO, 1997 WL 349997 (D.D.C. June 18, 1997) . . . . . .  46

6    Students Against Genocide v. Dep't of State,
         257 F.3d 828 (D.C. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  44

7    Summers v. DOJ,
8        517 F. Supp. 2d 231 (D.D.C. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  33

9    Sussman v. Marshals Serv.,
         494 F.3d 1106 (D.C. Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  29

10   Talbot v. CIA,
         578 F. Supp. 2d 24 (D.D.C. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19, 30
11

12   Toolasprashad v. Bureau of Prisons,
         474 F. Supp. 2d 14 (D.D.C. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

13   Unidad Latina En Accion v. DHS,
         253 F.R.D. 44 (D. Conn. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  43
14

15   United States v. Armstrong,
         517 U.S. 456 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  34, 44

16   United States v. Chem. Found., Inc.,
         272 U.S. 1 (1926) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  34, 44
17

18   Weisberg v. DOJ,
         745 F.2d 1476 (D.C. Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

19   Wheeler v. DOJ,
         403 F. Supp. 2d 1 (D.D.C. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2
20

21   Wickwire Gavin, P.C. v. DIA,
         330 F. Supp. 2d 592 (E.D. Va. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  28

22   Wiener v. FBI,
23       943 F.2d 972 (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2, 22, 31

24   Wilbur v. CIA,
         355 F.3d 675 (D.C. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

25   Wilner v. NSA,
         592 F.3d 60 (2d Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12, 14, 17
26

27

28                                        -ix-

Wood v. FBI,
  432 F.3d 78 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

## STATUTES

5 U.S.C. § 552(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 24

5 U.S.C. § 552(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

5 U.S.C. § 552(b)(7)(E) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

5 U.S.C. § 552(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

10 U.S.C. § 424 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28, 30

50 U.S.C. § 403-1(i)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 25

50 U.S.C. § 403g . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 28

## EXECUTIVE ORDERS

Exec. Order 13470, 73 Fed. Reg. 45,325 (July 30, 2008) . . . . . . . . . . . . . . . . . . 28

Exec. Order 13526, 75 Fed. Reg. 707 (Dec. 29, 2009) . . . . . . . . . . . . . . . . . . 22, 24

# INTRODUCTION

More than a dozen agencies across the Government have made Herculean efforts to comply with plaintiffs' extremely broad request under the Freedom of Information Act (FOIA).  Countless hours have been expended by defendants conducting searches across the globe of relevant databases for potentially responsive records.  Pursuant to the undisputed facts in the record, there is no doubt that defendants have satisfied their obligations to conduct reasonable searches for responsive records subject to FOIA, and to produce such records that are not subject to any of FOIA's exemptions.

Plaintiffs, however, complain that they have not obtained confidential national security and law enforcement information, the existence of which defendants can neither admit nor deny, and which would in any event be exempt from production under FOIA even if it did exist.  Plaintiffs also invite the Court to substitute their assessment of the risk to national security posed by their FOIA request for that of intelligence and law enforcement agencies uniquely trained and positioned to evaluate that risk, and ask that the Court order the release of sensitive national security and law enforcement information that has been properly withheld.  Yet, release of these records, which include classified information, the sources and methods used by our country's Intelligence Community, and the investigative techniques, methods, and procedures employed by the Federal Bureau of Investigation (FBI), would undermine the Government's efforts to investigate violations of criminal and national security laws and to protect the United States from domestic and foreign threats.  Such was not the intent of Congress in enacting the FOIA.  Because their legal positions are inconsistent with prevailing law – and would, in fact, lead to the disclosure of the very national security and law enforcement information that FOIA is statutorily designed to protect – plaintiffs' requests should be rejected.

Finally, throughout their opposition, plaintiffs argue that alleged deficiencies in defendants' declarations should result in the forced production of records or, at least, *in camera* review by the Court.  But "[r]equiring an agency to disclose exempt information

1   is not authorized by FOIA." <u>Spurlock v. FBI</u>, 69 F.3d 1010, 1016 (9th Cir. 1995).  "A

2   district court only has *jurisdiction* to compel an agency to disclose *improperly withheld*

3   agency records." <u>Minier v. CIA</u>, 88 F.3d 796, 803 (9th Cir. 1996) (emphasis in original).

4   Accordingly, as the records in this case have been properly withheld, the Court should

5   grant defendants summary judgment.  But if, for some reason, the Court should find any

6   agency has insufficiently supported its withholdings, the proper remedy is to provide that

7   agency with an opportunity to submit a more detailed declaration.  <u>See, e.g.</u>, <u>Wiener v.</u>

8   <u>FBI</u>, 943 F.2d 972, 979 (9th Cir. 1991) (remanding for submission of more detailed

9   *Vaughn* index, where agency, in original *Vaughn* index, "did not disclose all it could").

10  *In camera* review, while allowed in certain limited circumstances, should be undertaken

11  "only in the exceptional case and only after the government has submitted as detailed

12  public affidavits and testimony as possible." <u>Lion Raisins v. USDA</u>, 354 F.3d 1072,

13  1083 (9th Cir. 2004) (citation and quotation omitted).  However, given the state of the

14  record in this case, both alternatives are unnecessary.  Defendants have fulfilled their

15  responsibilities under FOIA; their Motion for Summary Judgment should be granted.

## ARGUMENT

**I.   The Searches Conducted By the FBI, the National Security Division (NSD), the Office of Intelligence &Analysis (OI&A), and the Defense Intelligence Agency (DIA) Were Adequate**

19       "FOIA requires an agency responding to a request to demonstrate that it has

20  conducted a search reasonably calculated to uncover all relevant documents." <u>Lahr v.</u>

21  <u>NTSB</u>, 569 F.3d 964, 986 (9th Cir. 2009) (citation and quotation omitted).  However,

22  "[t]he immensity of the task of responding to the thousands of FOIA requests submitted

23  to the government on a daily basis requires a rule of reason: the issue is not whether

24  documents might (or do) exist that are responsive to a request but rather whether the

25  search conducted by the agency was 'adequate,' <u>Weisberg v. DOJ</u>, 745 F.2d 1476, 1485

26  (D.C. Cir. 1984) (emphasis omitted), under a general standard of 'reasonableness.'

27  <u>Oglesby v. Dep't of the Army</u>, 920 F.2d 57, 67 n.13 (D.C. Cir. 1990)." <u>Wheeler v. DOJ</u>,

28  403 F. Supp. 2d 1, 10 (D.D.C. 2005).  In other words, "a search need not be perfect, only

1  adequate, and adequacy is measured by the reasonableness of the effort in light of the

2  specific request." Meeropol v. Meese, 790 F.2d 942, 956 (D.C. Cir. 1986).

3      The exceptionally broad FOIA request submitted by plaintiffs to seventeen

4  government components has led to a nearly innumerable number of extensive searches of

5  record systems throughout the law enforcement, homeland security, national security,

6  and intelligence offices of the Government.  Moreover, where plaintiffs have raised

7  questions about defendants' searches, without conceding their original searches were in

8  any way inadequate, agencies have even been willing to conduct additional searches.

9  Defendants have exceeded the requirements for adequate searching set forth Ninth

10  Circuit caselaw.  A detailed rebuttal of plaintiffs' remaining critiques is set forth below.[1]

11      **A.     The FBI Conducted an Adequate Search**

12      **i.     The FBI Has Searched Its Electronic Surveillance (ELSUR) Indices**

13      Plaintiffs criticize four aspects of the FBI's search.  First, plaintiffs complain that

14  the FBI failed to search its ELSUR indices.[2]  See Pls'. Opp'n (ECF No. 42-1) at 12.

15  Without conceding it was obligated to search its ELSUR database originally, the FBI has

16  now performed an ELSUR search on Naji Hamdan, Hossam Hemdan, Jehad Suliman,

17  and Hapimotors (including the aliases provided by plaintiffs).  Dec. 21, 2011 Decl. of

18  David M. Hardy (Ex. 1) at ¶ 57 ("Dec. 21, 2011 Hardy Decl.").  This search of the

19  ELSUR indices failed to locate any responsive records subject to FOIA.  See id.

20

21

22  _____

23      [1] At one point, plaintiffs expressed concerns about the search and withholdings of U.S. Customs and Border Protection (CBP), a component of the Department of Homeland Security (DHS).  However, plaintiffs has since stipulated that they would challenge neither the adequacy of CBP's search nor the propriety of its withholdings.  See e-mail from Laboni Hoq to Peter D. Leary (Dec. 9, 2011, 17:13 EST), e-mail from Laboni Hoq to Peter D. Leary (Dec. 21, 2011, 00:09 EST) (Ex. 6).

26      [2] "ELSUR indices are used to maintain information on subjects whose electronic and/or voice communications have been intercepted as the result of a consensual electronic surveillance or a court-ordered (and/or sought) electronic surveillance conducted by the FBI."  Dec. 21, 2011 Hardy Decl. at ¶ 20.  The ELSUR indices are a separate system of records from the FBI's Central Record System (CRS).  Id. at ¶ 21.

### ii.    There Are No Tickler Files for the FBI to Search

Second, plaintiffs object that the FBI failed to search its "tickler" files.  See Pls'. Opp'n at 12.  "A tickler copy or tickler file copy was a courtesy copy of a document (*i.e.*, a duplicate) that was, at one point in time, maintained at the FBI."   Dec. 21, 2011 Hardy Decl. at ¶ 58.  Tickler files were, by their nature, ephemeral – in the 1940s and 1950s (a point in time when ticklers were used at the Bureau), ticklers were to be retained for only 60 days.  See Schrecker v. DOJ, 254 F.3d 162, 165 (D.C. Cir. 2001).  However, contrary to plaintiffs' apparent belief, these temporary duplicate files are no longer used by the FBI, and none of the searches conducted in this case have given the FBI reason to believe that there were at any time ticklers for FBI files responsive to plaintiffs' request. Dec. 21, 2011 Hardy Decl. at ¶ 58.

These facts are in stark contrast to those in the case cited by plaintiffs: Campbell v. DOJ, 164 F.3d 20 (D.C. Cir. 1998).  In Campbell, the D.C. Circuit ordered the FBI to search for tickler files for a point in time when ticklers were apparently still being kept,[3] and, importantly, in a case where documents already produced by the Bureau had alluded to potentially responsive tickler records.  Id. at 27-29; see also Schrecker, 254 F.3d at 164 (ordering FBI to search for tickler files where the Government had acknowledged there were at one time ticklers for certain FBI files responsive to the plaintiff's request). But even as it ordered the FBI to search for tickler files in Campbell, the D.C. Circuit acknowledged that:

> in most cases, the FBI need not conduct . . . tickler searches when the FOIA requester does not expressly ask it to do so.  FOIA demands only a reasonable search tailored to the nature of a particular request.  When a request does not specify the locations in which an agency should search, the agency has discretion to confine its inquiry to a central filing system if additional searches are unlikely to produce any marginal return; in other words, the agency generally need not search every record system.

Campbell, 164 F.3d at 27-28 (citation and quotation omitted).

Here, plaintiffs' request did not specify the FBI should search its tickler files, tickler files are no longer utilized by the Bureau, and nothing in the FBI's extensive

---

[3] The Campbell case dealt with a 1988 FOIA request.  See Campbell, 164 F.3d at 26.

1    search has indicated that tickler files relevant to plaintiffs' request ever existed.  As the

2    Campbell court recognized, "the scope of the FBI's search for ticklers need only be as

3    broad as is reasonable in light of the evidence compelling such a search."  Id. at 27 n.3.

4    The FBI's search, judged by a standard of reasonableness and based upon the facts of

5    this case, has clearly been adequate.  Finally, it should be noted that even when tickler

6    files were generated historically, they were never part of a records system – there was

7    (and is) no system or database to search for tickler copies.  Dec. 21, 2011 Hardy Decl. at

8    ¶ 59.  Requiring the FBI to search for ticklers in this matter would be unduly

9    burdensome.

10           **iii.**   **The FBI's Search of the CRS Would Have Located Responsive**
                  **E-mails Subject to FOIA**

11

12         Third, plaintiffs complain that the FBI failed to search the e-mail files for various

13    individuals who plaintiffs assert are Bureau employees,[4] and allege that the FBI's

14    declaration is unclear with respect to whether the e-mails of FBI personnel are stored in

15    the CRS.  See Pls'. Opp'n at 13.  As clarified in the FBI's supplemental declaration, the

16    e-mails of all FBI personnel are not automatically uploaded into the CRS.  Dec. 21, 2011

17    Hardy Decl. at ¶ 60.  "Rather, e-mail message originators must decide whether a

18    particular message is appropriate for preservation or upload because it is important to a

19    case or investigation, exercising judgment similar to the decision to retain and file paper

20    records."  Id.  If an e-mail is determined to be a record, it is uploaded into the FBI's

21    Automated Case Support (ACS) System.[5]  Therefore, the FBI's search of the CRS would

22

23         [4] The FBI will neither confirm nor deny whether various individuals who plaintiffs assert
work for the Bureau are, in fact, FBI employees.  Government employees maintain privacy

24    interests against, inter alia, "embarrassment, shame, stigma, and harassment" that could result
from public association with a particular government action, see Forest Serv. Emps. for Envtl.

25    Ethics v. U.S. Forest Serv., 524 F.3d 1021, 1026 (9th Cir. 2008), and in this action the FBI has
properly withheld names and other identifying information of FBI Special Agents, FBI support

26    personnel, local law enforcement personnel, non-government third parties, and other agency
employees.  See Section III. C. infra.

27
         [5] The ACS can be described as an internal computerized subsystem of the CRS.  Because

28    the CRS cannot electronically query the case files for data, such as an individual's name or
social security number, the required information is duplicated and moved to the ACS so that it

have located uploaded e-mails that were potentially responsive to plaintiffs' request, regardless of the individual who generated them, a point supported by plaintiffs' own acknowledgment that the FBI produced responsive e-mails.  See Pls'. Opp'n at 13 n.10.

### iv.   The FBI Has Now Addressed the Adequacy of Its Search for Documents Related to Jehad Suliman

Fourth, plaintiffs argue that the FBI's search is inadequate because it failed to address the adequacy of its search for documents related to Jehad Suliman.  See Pls'. Opp'n at 13-14.  Although the original request for records in this matter was made by the ACLU on behalf of several named parties, including Mr. Suliman, it is undisputed that Mr. Suliman is neither a plaintiff in this lawsuit, nor does the ACLU represent him in this litigation.  Accordingly, FBI initially did not address its search for documents related to Mr. Suliman.  However, after additional consideration, and in light of the Privacy Act waiver signed by Mr. Suliman and submitted with the FOIA request in question, without conceding any error, the FBI has now submitted a supplemental declaration addressing the search it conducted for documents relating to Mr. Suliman.[6]

In response to plaintiffs' original FOIA request, the FBI searched the CRS using a six-way phonetic breakdown of "Jehad Suliman" to include any variations of the first and/or last name that sounds like or is spelled differently than Mr. Suliman's name.  Dec. 21, 2011 Hardy Decl. at ¶ 24.  As a result of that search, the FBI identified only one responsive cross-reference subject to FOIA, which was located within material responsive to plaintiff Hamdan's arrest and detention in the United Arab Emirates (U.A.E.).  Id.  The cross-reference (Bates pages: FBI-ACLU-115-118) was processed and released to plaintiffs on December 30, 2010.  Id.  Although the FBI did not perform a search of its ELSUR indices for records potentially responsive to plaintiffs' FOIA/Privacy Act request at the initial stage of the litigation, as described above, it has

---

can be searched.  See Dec. 21, 2011, Hardy Decl. at ¶ 15.

[6] This supplemental declaration also supports the propriety of various withholdings by the FBI pursuant to Exemptions 1, 6, 7(C) and 7(E).

1   now performed an ELSUR search with respect to Mr. Suliman (including the aliases

2   provided by plaintiffs).  Id. at ¶ 25.  This ELSUR search located no responsive records

3   subject to FOIA.  Id.

4        **B.**    **NSD Conducted an Adequate Search**

5          Before describing their specific objections to NSD's actual search, plaintiffs raise

6   two general complaints – they assert it would be "surprising" if NSD failed to locate any

7   responsive records subject to FOIA, and they postulate that NSD's search must have

8   discovered responsive documents because of their understanding of the search

9   methodology NSD employed.  See Pls'. Opp'n at 15-16.  Plaintiffs' initial point

10  "amounts to nothing more than mere speculation that as yet uncovered documents might

11  exist, which is not enough to undermine the determination that [an] agency conducted an

12  adequate search for the requested records."  Morley v. CIA, 508 F.3d 1108, 1120 (D.C.

13  Cir. 2007) (citation and quotation omitted); see also Wilbur v. CIA, 355 F.3d 675, 678

14  (D.C. Cir. 2004) (same).  It is well settled that "[a]gency affidavits are accorded a

15  presumption of good faith, which cannot be rebutted by purely speculative claims about

16  the existence and discoverability of other documents."  SafeCard Services, Inc. v. SEC,

17  926 F.2d 1197, 1200 (D.C. Cir. 1991) (citation and quotation omitted); see also NRDC v.

18  DoD, 442 F. Supp. 2d 857, 878 (C.D. Cal. 2006) (same).  Here, NSD has submitted two

19  declarations explaining that it conducted extensive searches, and stating that those

20  searches failed to locate any responsive records subject to FOIA.  See Aug. 8, 2011 Decl.

21  of Susan L. Kim (ECF No. 29-24) at ¶ 11 ("Aug. 8, 2011 Kim Decl."); Dec. 21, 2011

22  Decl. of Mark A. Bradley (Ex. 2) at ¶ 6 ("Dec. 21, 2011 Bradley Decl.").  Those

23  declarations are entitled to a presumption of good faith, regardless of plaintiffs'

24  speculation about what they think NSD *should* have found.  See, e.g., Toolasprashad v.

25  Bureau of Prisons, 474 F. Supp. 2d 14, 15 (D.D.C. 2007) ("The fact that a search has

26  yielded no records is immaterial to resolving a FOIA claim."); see also Iturralde v.

27  Comptroller of the Currency, 315 F.3d 311, 315 (D.C. Cir. 2003) (sufficiency unrelated

28  to "fruits of the search").

1    As for plaintiffs' other general criticism, it is fundamentally a complaint that

2  NSD's search was too thorough – NSD's four components did not simply search case

3  tracking data, but NSD attorneys and support personnel also searched their paper files,

4  electronic files, and electronic mails accounts.  It is unclear how a search that employed

5  an additional layer of thoroughness could have harmed plaintiffs.  In any event, "while

6  NSD sometimes relies on its searches of Case Tracking data before expanding a search

7  to paper and electronic files and electronic mail accounts, here each component was

8  instructed to search all of its files, regardless of the results of any case tracking search, at

9  the outset of its initial search.  In other words, *before* any search was performed, the

10  personnel of each component were told to search case tracking *and* paper files, electronic

11  files, and electronic mail accounts," Dec. 21, 2011 Bradley Decl. at ¶ 6 (emphasis in

12  original); that search failed to locate any responsive records subject to FOIA.  Id.

13    To the extent that plaintiffs appear to question whether NSD conducted a search at

14  all – arguing that "NSD's declaration only states that certain unspecified individuals

15  were 'request[ed]' to search their files, not that they did so" – a Court order requiring

16  NSD to "make clear that the appropriate personnel *actually carried out* the required

17  searches" is clearly unnecessary.  See Pls'. Opp'n at 16 (emphasis in original).  NSD's

18  original declaration stated that "NSD FOIA sent search requests to each of NSD's four

19  components . . . . [and] [e]ach component *conducted a search*," Aug. 8, 2011 Kim Decl.

20  at ¶ 7 (emphasis added); moreover, "[i]n response to this request, NSD attorneys and

21  support personnel *searched* their paper files, electronic files, and electronic mail

22  accounts [.]"  Id. at ¶ 8 (emphasis added).  NSD's declaration (which is accorded a

23  presumption of good faith) has provided a sufficiently detailed description of the search

24  that took place.  Plaintiffs' attempt to, in essence, conduct discovery about the search

25  that took place is inappropriate.[7]

26

27    [7] The lone district court case cited by plaintiffs for the proposition that NSD should be
required to produce "any written records created to document the search" is inapposite.  In that

28  case, an agency had produced search slips to detail its searches, but those search slips "lack[ed]
information about what kind of search was performed, what indices were searched or which field

Neither of plaintiffs' general complaints undermines the adequacy of NSD's search; plaintiffs' two critiques about specific aspects of the search are equally meritless.

### i.   NSD Has Now Searched Using Every Term Plaintiffs Requested

Plaintiffs argue that NSD improperly limited its search terms beyond those that plaintiffs requested. <u>See</u> Pls'. Opp'n at 16.  Without conceding any inadequacy in its original search, NSD conducted an additional search, including every search term requested by plaintiffs. <u>See</u> Dec. 21, 2011 Bradley Decl. at ¶ 7.  This additional search failed to locate any responsive records subject to FOIA. <u>See id.</u>

### ii.   NSD Searched for Documents Referring to Mr. Suliman

Plaintiffs contend NSD failed to search for any documents referring to Jehad Suliman. <u>See</u> Pls'. Opp'n at 16.  On this point, plaintiffs are mistaken.  NSD did conduct a search with respect to Mr. Suliman; however, this search failed to locate any responsive records subject to FOIA. <u>See</u> Dec. 21, 2011 Bradley Decl. at ¶ 6.

### C.   OI&A Conducted an Adequate Search

### i.   OI&A's Search Was Not Limited to "Files Related to Communications and Policy"

Plaintiffs criticize two aspects of OI&A's search.  First, plaintiffs object that OI&A's search of "paper files, email files and electronic files related to communications and policy" was improperly limited insofar as the search only sought "files related to communications and policy." <u>See</u> Pls'. Opp'n at 14-15.  Upon further review, OI&A clarifies that the sentence which plaintiffs reference from OI&A's August 11, 2011 declaration should have read "paper files, email files and electronic files" without the limitation of "related to communications and policy."  Dec. 21, 2011 Decl. of Tony R. Tucker (Ex. 3) at ¶ 15 ("Dec. 21, 2011 Tucker Decl.").  The OI&A search in this case

---

office files were searched," and although they purportedly described the searches conducted by agency field officers, "none of the search slips produced were created at the field offices." <u>Rosenfeld v. DOJ</u>, No. C 07-03240 MHP, 2008 WL 3925633, at *16 (N.D. Cal. Aug. 22, 2008). None of the same considerations are relevant here.  NSD's search makes clear what kind of search was performed, including what terms were used and what types of files were searched, and the search was conducted and coordinated at NSD, which has no field offices.

was conducted on paper files, e-mail files and electronic files without any such limitation, in accordance with the typical search and processing of FOIA requests at OI&A.  Id.

### ii.   OI&A Searched the Databases that Comprise the "Enterprise Records System" (ERS) of the DHS

Second, plaintiffs contend OI&A should have searched its "ERS database," noting that OI&A's declaration makes no mention of having done so.  See Pls'. Opp'n at 14.  However, ERS is not a searchable database, as plaintiffs apparently believe, but rather is a system of records maintained by DHS containing multiple databases/information systems that OI&A uses as part of its operations.  Dec. 21, 2011 Tucker Decl. at ¶ 16.  The information contained in this system of records includes intelligence and related data received from other DHS components, U.S. Government departments and agencies (including law enforcement agencies), elements of the Intelligence Community, and foreign, State, local, territorial, tribal, and private sector entities.  Id.  In other words, it is not possible to "search" ERS, *per se*, as there is no unified interface for all of the databases it encompasses.  Id.  Rather, it is possible to search each of the databases/information systems that are covered by ERS, and OI&A has submitted a declaration attesting these OI&A databases were searched in response to plaintiffs' request.  Id.  No responsive records subject to FOIA were found.  Id.

### D.   DIA Conducted an Adequate Search

### i.   DIA Searched Its Foreign Intelligence Database

Plaintiffs criticize two aspects of DIA' search.  First, they contend DIA should have searched its Foreign Intelligence database, noting that DIA's declaration makes no mention of having searched this database.  See Pls'. Opp'n at 15.  However, as set forth in its supplemental declaration, DIA did search its Foreign Intelligence and Counterintelligence Records (FICOR) system as part of its initial search for responsive records.  Dec. 21, 2011 Decl. of Alesia Y. Williams (Ex. 4) at ¶ 7 ("Dec. 21, 2011 Williams Decl.").  Specifically, DIA's original declaration explained that the Defense

1   Counterintelligence and HUMINT Center (DX) had conducted a search and did not

2   locate any responsive records subject to FOIA.  Aug. 4, 2011 Decl. of Alesia Y.

3   Williams (ECF. No. 29-13) at ¶ 11 ("Aug. 4, 2011 Williams Decl.").  DX's search

4   included the FICOR system.  Dec. 21, 2011 Williams Decl. at ¶ 7.

5              **ii.    DIA Has Now Searched the Files of Its Attaché in the U.A.E.**

6              Second, plaintiffs contend DIA should have searched the personal electronic and

7   hard copy files of its Attaché in the U.A.E.  See Pls'. Opp'n at 15.  DIA did not search

8   the U.S. Defense Attaché Office (USDAO) in the U.A.E. as part of its initial search,

9   "because it was determined that the USDAO U.A.E. would not likely maintain

10  responsive records.  However, in December 2011, the USDAO U.A.E. conducted an

11  electronic and manual search for records pertaining to Naji Jawat Hamdan, Hossam

12  Jawdat Hemdan, and Jehad Suliman, which did not locate any responsive records subject

13  to FOIA.  The Attaché also asked personnel working in the USDAO if they had any

14  historical knowledge of records related to these subjects."  Dec. 21, 2011 Williams Decl.

15  at ¶ 8.  No responsive documents subject to the FOIA were located.  Id.

16             In sum, each of plaintiffs' concerns with the adequacy of the defendants' searches

17  has been addressed, either through additional searches (without conceding any

18  inadequacy in the initial searches that were conducted) or through explanations of why

19  the searches would be impossible or unreasonable.  There can be no question that the

20  searches conducted by the defendants in this case were more than adequate.

21  **II.   Defendants Properly Invoked the Glomar Doctrine[8]**

22             Plaintiffs contend that courts have allowed Glomar responses "only in limited

23  circumstances," Pls'. Opp'n at 36, but there is no question that "a government agency

24  may issue a 'Glomar Response,' that is, refuse to confirm or deny the existence of certain

25

26  ─────────────────

27  [8] Although the title of section IV in plaintiffs' brief states that National Security Agency
    improperly invoked the Glomar doctrine, plaintiffs have confirmed this reference was an error.
    See e-mail from Laboni Hoq to Peter Leary (Oct. 19, 2011, 13:46 EST) (Ex. 7).  Plaintiffs do not

28  oppose summary judgment on behalf of National Security Agency.  See id.; see also Pls'.
    Statement of Uncontroverted Facts (ECF No. 42-8) at ¶ 71.

1    records, if [a] FOIA exemption would itself preclude the acknowledgment of such

2    documents[,]" <u>Minier</u>, 88 F.3d at 800, or that courts frequently allow agencies to do just

3    that.  <u>See, e.g.</u>, <u>Bassiouni v. CIA</u>, 392 F.3d 244, 246 (7th Cir. 2004) ("Every appellate

4    court to address the issue has held that the FOIA permits the CIA to make a 'Glomar

5    response' when it fears that inferences from <i>Vaughn</i> indexes or selective disclosure

6    could reveal classified sources or methods of obtaining foreign intelligence.").  In fact,

7    "[t]he Glomar doctrine is well settled as a proper response to a FOIA request because it

8    is the only way in which an agency may assert that a particular FOIA statutory

9    exemption covers 'the existence or nonexistence of the requested records' in a case in

10   which a plaintiff seeks such records."  <u>Wilner v. NSA</u>, 592 F.3d 60, 68 (2d Cir. 2009)

11   (<i>quoting</i> <u>Phillippi v. CIA</u>, 546 F.2d 1009, 1012 (D.C. Cir. 1976)).

12           The harm to be protected against by a Glomar response arises from the fact that

13   knowledge as to whether an agency does or does not possess records responsive to a

14   series of FOIA requests may permit another entity to develop information protected by

15   an exemption.  In other words, an "accumulation" of such knowledge, derived from an

16   agency's responses to multiple requests "over time," <u>see</u> <u>People for the Am. Way Found.</u>

17   <u>v. NSA</u>, 462 F. Supp. 2d 21, 32 (D.D.C. 2006), can permit an entity to "piec[e] together,"

18   from multiple "bits of information" — like the pieces of a "jigsaw puzzle" —

19   information that is protected by a FOIA exemption.  <u>See</u> <u>Gardels v. CIA</u>, 689 F.2d 1100,

20   1106 (D.C. Cir. 1982) (<i>quoting</i> <u>Halperin v. CIA</u>, 629 F.2d 144, 150 (D.C. Cir. 1980)).

21   For example, if an agency "were to admit publicly in response to an information request

22   that no information about Persons X, Y or Z exists, but in response to a separate

23   information request about Person T state only that no response could be made, this

24   would give rise to the inference" that records exist regarding Person T.  <u>See</u> <u>People for</u>

25   <u>the Am. Way Found.</u>, 462 F. Supp. 2d at 29-30.  Under these circumstances, each piece

26   of information – that is, an agency's response to one FOIA request – may not be "of

27   obvious importance in itself[,]" <u>see</u> <u>Gardels</u>, 689 F.2d at 1106 (citation omitted), but is

28   properly protected when the larger mosaic is considered.

1

**A.     Defendants' Declarations Are Sufficiently Detailed**

2      Plaintiffs contend defendants have submitted "boilerplate" declarations that fail to

3 adequately justify their Glomar assertions, and argue that the Court should therefore

4 order defendants to produce *Vaughn* indices or submit any classified records for *in*

5 *camera* review.  Of course, as the Ninth Circuit has recognized, the specificity of an

6 affidavit submitted to support a Glomar assertion is necessarily limited by the very

7 reason an agency makes such a response in the first place.  See Hunt v. CIA, 981 F.2d

8 1116, 1120 (9th Cir. 1992) (upholding a Glomar assertion because "the affidavits were

9 as specific as possible given the nature of the information the CIA sought to protect.");

10 see also CIA v. Sims, 471 U.S. 159, 179 (1985) ("It is conceivable that the mere

11 explanation of why information must be withheld can convey valuable information to a

12 foreign intelligence agency."); Lion Raisins, 354 F.3d at 1084 ("We do not imply that the

13 government must disclose facts that would undermine the very purpose of its

14 withholding."); Church of Scientology of Cal. v. Dep't of army, 611 F.2d 738, 742 (9th

15 Cir. 1979) ("[T]he government need not specify its objections in such detail as to

16 compromise the secrecy of the information").  Here, the declarations submitted by the

17 Central Intelligence Agency (CIA), NSD, and the Office of the Director of National

18 Intelligence (ODNI) "strike[] the appropriate balance between justifying the applicability

19 of the exemption[s] with sufficient specificity to permit [plaintiffs] meaningfully to

20 challenge [them] and the [agencies'] need to avoid providing a description that is so

21 specific that it risks revealing protected sources and methods." Berman v. CIA, 501 F.3d

22 1136, 1142 (9th Cir. 2007).  As the declarations in this case are far from conclusory, but

23 rather are appropriate under the circumstances, the Court should reject plaintiffs'

24 improper attempt to force defendants to provide additional information.  Id.

25      Plaintiffs' real suspicion appears to be that defendants have over (or improperly)

26 classified any records that might exist, or exaggerated (or invented) a national security

27 risk to avoid disclosure.  But it is well settled, in this Circuit and others, that an agency's

28 declaration is entitled to enhanced deference in cases – such as this one – where national

security concerns are implicated.  See Berman, 501 F.3d at 1140 ("[C]ourts are required to give 'great deference' to the CIA's assertion that a particular disclosure could reveal intelligence sources or methods[.]"); see also Wilner, 592 F.3d at 76 ("We affirm our deferential posture in FOIA cases regarding the uniquely executive purview of national security.") (citation and quotation omitted); Larson v. Dep't of State, 565 F.3d 857, 865 (D.C. Cir. 2009) (same).  Accordingly, while the Court is entitled to conduct an *in camera* review if it ultimately determines that is necessary, plaintiffs' invitation for the Court to review the propriety of the defendants' classification decisions is improper.  As the Ninth Circuit has recognized, "judges are poorly positioned to evaluate the sufficiency of the CIA's intelligence claims[.]"  Berman, 501 F.3d at 1141-42; see also Wilner, 592 F.3d at 76 ("We have consistently deferred to executive affidavits predicting harm to the national security, and have found it unwise to undertake searching judicial review. . . . Recognizing the relative competencies of the executive and judiciary, we believe that it is bad law and bad policy to second-guess the predictive judgments made by the government's intelligence agencies[.]") (citations and quotations omitted); Larson, 565 F.3d at 865 ("If an agency's statements supporting exemption contain reasonable specificity of detail as to demonstrate that the withheld information logically falls within the claimed exemption and evidence in the record does not suggest otherwise . . . the court should not conduct a more detailed inquiry to test the agency's judgment and expertise or to evaluate whether the court agrees with the agency's opinions."); Halperin, 629 F.2d at 148 (D.C. Cir. 1980) ("Judges . . . lack the expertise necessary to second-guess [] agency opinions in the typical national security FOIA case.").

### B. Unsupported Speculation About Alleged Governmental Activity Does Not Undermine the Glomar Assertions in This Case

Likewise, plaintiffs' unsubstantiated assertion that "there is widespread public acknowledgment that Defendants engage in the sorts of methods at issue in this case," Pls.' Opp'n at 41, misses the mark.  Even assuming *arguendo* that plaintiffs correctly describe agency methods, the fact that an agency generally engages in an activity is wholly different from an official acknowledgment that the agency actually engaged in

1   that activity at a certain time, in a certain place, and in a certain way.  Gardels, 689 F.2d

2   at 1105.  In Gardels, the D.C. Circuit rejected a plaintiff's similar allegation that

3   "[e]veryone already assumes . . . that a large, multi-faceted university like California

4   must have had some sort of covert CIA contact at some point in the CIA's thirty-year

5   history."  Id.  The court stated that "an official recognition by the CIA itself that it has

6   had such contact is significantly more than the assumption on which plaintiff relies . . . .

7   Official acknowledgment ends all doubt and gives the foreign organization a firmer basis

8   for its own strategic or tactical response."  Id.  Similarly, the U.S. District Court for the

9   District of Columbia recently upheld a Glomar response to an ACLU FOIA request

10  seeking records from the CIA documenting the alleged practice of using unmanned

11  drones to kill selected human targets.  See ACLU v. DOJ, --- F. Supp. 2d ----, No. 10-

12  0436 (RMC), 2011 WL 4005324, at *13 (D.D.C. Sept. 9, 2011) ("[D]espite speculation

13  or overt factual assertions of the CIA's involvement in drone strikes rampant in the

14  various articles cited in Plaintiffs' briefs, the statements of journalists, 'experts,' or even

15  unofficial or unidentified sources (even were they CIA personnel) are not 'official'

16  disclosures by the CIA.");  see also Afshar v. Dep't of State, 702 F.2d 1125, 1130-31

17  (D.C. Cir. 1983) ("[E]ven if a fact . . . is the subject of widespread media and public

18  speculation, its official acknowledgment by an authoritative source might well be new

19  information that could cause damage to the national security.").

20          Without acknowledging whether any of the methods plaintiffs allege are at issue in

21  this case have, in fact, been employed by any defendant, it is enough to note that

22  numerous courts have approved Glomar responses where substantive responses, either

23  admitting or denying that particular documents existed, "would remove any lingering

24  doubts that a foreign intelligence service might have on the subject, and [where] the

25  perpetuation of such doubts may be an important means of protecting national security."

26  Frugone v. CIA, 169 F.3d 772, 774-75 (D.C. Cir. 1999) (citation and quotation omitted);

27  see also Hunt, 981 F.2d at 1118; Military Audit Project v. Casey, 656 F.2d 724, 744-45

28  (D.C. Cir. 1981) ("We cannot assume, as the appellants would have us, that the CIA has

**DEFENDANTS' REPLY IN SUPPORT OF THEIR SUMMARY JUDGMENT MOTION AND OPPOSITION TO PLAINTIFFS' SUMMARY JUDGMENT MOTION**   -15-

1   nothing left to hide.  To the contrary, the record before us suggests either that the CIA

2   still has something to hide or that it wishes to hide from our adversaries the fact that it

3   has nothing to hide.").  Ultimately, "[i]t is one thing for a reporter or author to speculate

4   or guess that a thing may be so or even, quoting undisclosed sources, to say that it is so;

5   it is quite another thing for one in a position to know of it officially to say that it is so."

6   ACLU v. DoD, 628 F.3d 612, 621-22 (D.C. Cir. 2011) (citation and quotation omitted).

7   After all, if plaintiffs' rationale carried the day, since it is already public knowledge that

8   the Intelligence Community engages in intelligence operations, all the information about

9   specific operations would be available under FOIA.

10       In essence, plaintiffs invite this Court to overrule the reasoned judgments of

11   intelligence agencies as to what information must be protected from disclosure under

12   Exemptions 1 and 3, based on plaintiffs' guesswork about whether information exists in

13   this case and untethered suspicions about what methods the Intelligence Community may

14   employ.  Of course, defendants should not be required officially to acknowledge the

15   precise intelligence activities or methods they employ or consider, and it is the

16   Intelligence Community that is deemed to have the competence to "weigh the variety of

17   complex and subtle factors in determining whether disclosure of information may lead to

18   an unacceptable risk of compromising the Agency's intelligence-gathering process."

19   Sims, 471 U.S. at 180; see also Fitzgibbon v. CIA, 911 F.2d 755, 766 (D.C. Cir. 1990)

20   (disapproving a district court's performance of "its own calculus as to whether or not

21   harm to the national security or to intelligence sources and methods would result from

22   disclosure").  This Court should reject plaintiffs' invitation for the Court to substitute its

23   own (or plaintiffs') assessment of the risk to national security posed by the FOIA request

24   in this case for that of three intelligence agencies.

25       **C.**   **The Legality of Agency Activity Is Irrelevant to the Exemption 1 and 3**
             **Calculus**
26
27       Finally, plaintiffs argue that defendants should not be allowed to provide a Glomar

28   response pursuant to exemptions 1 or 3 to protect any records that United States

     government was involved in Mr. Hamdan's alleged torture in the U.A.E. by a foreign

1  government because any such agency activity would be illegal.  But numerous courts

2  have rejected the notion that FOIA lawsuits can be used to assess the legality of alleged

3  agency action.  See, e.g., Wilner, 592 F.3d at 75 (declining to consider the alleged

4  illegality of the Terrorist Surveillance Program in upholding the National Security

5  Agency's Glomar response); Lesar v. DOJ, 636 F.2d 472, 483 (D.C. Cir. 1980) (holding

6  that although the "surveillance of [the FBI's target] strayed beyond the bounds of its

7  initial lawful security aim, that does not preclude the possibility that the actual

8  surveillance documents and the Task Force materials that comment upon those

9  documents may nevertheless contain information of a sensitive nature, the disclosure of

10  which could compromise legitimate secrecy needs"); Amnesty Int'l v. CIA, 728 F. Supp.

11  2d 479, 505 (S.D.N.Y. 2010) ("[B]ecause the records at issue fall under the coverage of

12  Exemption 3, the CIA is permitted to withhold their disclosure regardless of the alleged

13  illegality of the practices contained therein."); Agee v. CIA, 524 F. Supp. 1290, 1292

14  (D.D.C. 1981) ("While some of the documents shed light on the legality or illegality of

15  CIA's conduct, the (b)(1) or (b)(3) claims are not pretextual.  Any possibility of illegal

16  conduct on the part of the CIA does not defeat the validity of the exemptions claimed.").

17    Just last year, in another FOIA case filed by the ACLU, the District Court for the

18  Southern District of New York flatly rejected plaintiffs' argument with respect to

19  exemption 3 in an instructive opinion:

20    Plaintiffs also conflate the question whether the conduct of the Agency or
21  its personnel is consistent with the Constitution and laws of the United
   States, and the question of disclosures under FOIA. . . .

22    Plaintiffs' contention, to limit Exemption 3 to "lawful" intelligence sources
23  and methods, finds no basis in the statute.  Congress demonstrated its ability
   to qualify and limit other FOIA exemptions in such a manner, but did not do
24  so in Exemption 3. . . .

25    Case law also supports the Government's position. In Sims, the Supreme
   Court permitted the Government to withhold identifying information of
   scientists involved in a covert CIA program researching the use of chemical,
26  biological, and radiological materials to control human behavior.  471 U.S.
   at 161, 105 S.Ct. 1881.  The Supreme Court reversed a Court of Appeals'
27  decision that tied withholding the information to whether the Government
   needed to guarantee confidentiality to the scientists who worked on the
28  program.  Id. at 164, 105 S.Ct. 1881.  Sims rejected the Court of Appeals'

1

construction because it would have inserted limiting language into
Exemption 3. . . .

2

3

Here, Plaintiffs similarly seek to insert "limiting language" into Exemption
3 that would tie the withholding statute to questions of legality of the
particular intelligence source or method employed, and confer an
unwarranted competence to the district court to evaluate national
intelligence decisions. Id. at 169, 105 S.Ct. 1881. This approach was
rejected in Sims, and I do not accept it here. It is also worth noting that
Sims upheld an Exemption 3 withholding despite an Executive Order
officially repudiating parts of the underlying program that led to the death
of human test subjects. Id. at 162 n. 2, 105 S.Ct. 1881 (citing Exec. Order
No. 12333, § 2.10, 3 C.F.R. 213 (1982)). . . .

4

5

6

7

8

The case law and the plain language of the statutes are clear. Courts are not
invested with the competence to second-guess the CIA Director regarding
the appropriateness of any particular intelligence source or method.
Exemption 3 is not qualified in the way Plaintiff suggests. Declining to
reach the legality of the underlying conduct is not, as Plaintiffs asserted at
oral argument, an "abdication of ... the Court's responsibility ... under the
statutory structure." Oral Arg. Tr. at 18 (Mar. 24, 2010). It is the result
commanded by the statute.

9

10

11

12

13

ACLU v. DoD, 723 F. Supp. 2d 621, 627-29 (S.D.N.Y. 2010).[9]

14

In any event, the agencies have all submitted declarations attesting that to the

15

extent they provided a Glomar response, "that determination was not made to conceal

16

any violation of law, inefficiency, or administrative error; to prevent embarrassment to a

17

person, organization, or agency; or to prevent or delay the release of information that

18

does not require protection in the interests of national security." Dec. 21, 2011 Decl. of

19

Elizabeth Anne Culver (Ex. 5) at ¶ 5; Dec. 21, 2011 Bradley Decl. at ¶ 9; Aug. 3, 2011

20

Dec. of John H. Hackett (ECF No. 29-3) at ¶ 23 ("Aug. 3, 2011 Hackett Decl.").

21

Plaintiffs have provided no reason to doubt the veracity of these declarations, which are

22

23

[9] The same court also rejected the argument, raised by plaintiffs here, that the thirty-year-
old Navasky opinion somehow undermined its conclusion, noting: "Navasky v. CIA is
distinguishable. 499 F. Supp. 269, 274 (S.D.N.Y. 1980). In Navasky, the district court rejected
the CIA's contention that Exemption 3 shielded from disclosure the names of authors and titles
of books associated with the CIA's clandestine book publishing activities. Id. at 274. The court
found that such 'covert propaganda activities' were not properly considered 'intelligence,' which
the court defined as 'a product resulting from the original collection of information.' Id. at
274-75. Since, the court held, the book publishing program was not 'intelligence,' information
about the program could not be withheld as an intelligence source or method under Exemption 3.
Id. In contrast, the case on which I am asked to rule clearly involves 'intelligence sources or
methods.'" ACLU, 723 F. Supp. 2d at 629.

24

25

26

27

28

1 | "not controverted by either contrary evidence in the record nor by evidence of agency
2 | bad faith." <u>Miller v. Casey</u>, 730 F.2d 773, 776 (D.C. Cir. 1984) (citation and quotation
3 | omitted).

4 |      **D.    Each Agency That Invoked the Glomar Doctrine Did So Properly**

5 |         **i.    The CIA Properly Invoked the Glomar Doctrine**

6 |      Whether or not the CIA has records responsive to plaintiffs' FOIA request is
7 | exempt from production under Exemption 3.  There is no dispute that the National
8 | Security Act of 1947 (NSA), 50 U.S.C. § 403-1(i)(1), invoked by the CIA, is a
9 | withholding statute that exempts production under FOIA Exemption 3.  <u>See</u> <u>Sims</u>, 471
10 | U.S. at 167.  Therefore, all that remains is for the Court to determine, as a matter of law,
11 | whether the fact of the existence or not of responsive records "falls within the scope of
12 | the statute." <u>Minier</u>, 88 F.3d at 803 (citation omitted).  The NSA "protect[s] intelligence
13 | sources and methods from unauthorized disclosure[.]" 50 U.S.C. § 403-1(i)(1).  The
14 | term "intelligence sources and methods" is extremely broad and applies to "all sources of
15 | intelligence that provide, or are engaged to provide, information the Agency needs to
16 | perform its statutory duties with respect to foreign intelligence." <u>See</u> <u>Sims</u>, 471 U.S. at
17 | 169-70.  Any information that "can reasonably be expected to lead to unauthorized
18 | disclosure of intelligence sources and methods," is protected from disclosure by the NSA
19 | and is therefore exempt from disclosure under Exemption 3.  <u>Gardels</u>, 689 F.2d at 1103
20 | (citation and quotation omitted); <u>see also</u> <u>Talbot v. CIA</u>, 578 F. Supp. 2d 24, 29 (D.D.C.
21 | 2008) ("[T]he confirmation or denial of the use of aliases in State Department records
22 | could reveal intelligence sources and methods . . . ."); <u>Aftergood v. CIA</u>, 355 F. Supp. 2d
23 | 557, 562 (D.D.C. 2005) (the release of intelligence budget information would reveal
24 | intelligence methods and is therefore protected from disclosure).  Here, if the CIA were
25 | to confirm or deny the existence of responsive records, information about how it
26 | obtained intelligence, as well as its interest (or not) in plaintiffs, would be released.  This
27 | would clearly result in an "unauthorized disclosure" of CIA's "intelligence sources and
28 | methods." 50 U.S.C. § 403-1(i)(1).

1   Likewise, the Central Intelligence Agency Act of 1949, 50 U.S.C. § 403g,

2   qualifies as an Exemption 3 statute that protects agency records from disclosure through

3   FOIA.  See Minier, 88 F.3d at 801.  Plaintiffs argue that § 403g provides only "limited

4   sanctuary" from the CIA's FOIA obligations, but courts have accepted a wide range of

5   definitions for what constitutes an Agency "function."  See, e.g., ACLU, 2011 WL

6   4005324, at *5 ("The fact of the existence or nonexistence of responsive information

7   falls within the ambit of § 403g because whether the CIA cooperates with, is interested

8   in, or actually directs drone strikes pertains to (possible) functions of CIA personnel.");

9   Riquelme v. CIA, 453 F. Supp. 2d 103, 111 (D.D.C. 2006) (accepting CIA's argument

10  that a FOIA request seeking information relating to CIA agents' "activities, assistance,

11  participation, involvement, and contacts" speaks to the "functions" of CIA agents,

12  protected from disclosure under § 403g); Rothschild v. CIA, No. 91–1314 (HHG), 1992

13  WL 71393, at *2 (D.D.C. Mar. 25, 1992) (concluding "internal files and control numbers

14  – cable numbers and dissemination controls – organizational data" relate to the CIA's

15  "organization" and "functions" and therefore could be withheld pursuant to § 403g).

16  Accordingly, § 403g certainly encompasses clandestine intelligence activities, sources

17  and methods that relate to the functions of the CIA and its employees, and release of

18  such information would violate the statute.

19  Curiously, plaintiffs fail to acknowledge that "there exists a near-blanket FOIA

20  exemption for CIA records."  Berman, 501 F.3d at 1140 (citation and quotation omitted).

21  But nearly twenty years ago, the Ninth Circuit recognized that it was "only a short step

22  from exempting all CIA records from FOIA" and stated that: "[i]f Congress did not

23  intend to give the CIA a near-blanket FOIA exemption, it can take notice of the courts'

24  incremental creation of one, and take the necessary legislative action to rectify the

25  matter."  Hunt, 981 F.2d at 1120.  In the face of 19 years of Congressional silence, the

26  court recently acknowledged that "Congress . . . has to date left the [National Security

27  Act] materially unaltered and so we must continue to afford the CIA broad deference."

28  Berman, 501 F.3d at 1140.  Accordingly, plaintiffs' attempt to argue that the CIA could

1   respond substantively to their FOIA request without disclosing classified information or

2   its sources and methods flatly ignores the state of the law:

3       The NSA provides the Director with "very broad authority to protect all
        sources of intelligence information from disclosure."  Sims, 471 U.S. at
4       168-69, 105 S.Ct. 1881.  Because of this "sweeping power," id. at 169, 105
        S.Ct. 1881, courts are required to give "great deference" to the CIA's
5       assertion that a particular disclosure could reveal intelligence sources or
        methods, id. at 179, 105 S.Ct. 1881.  The term "sources" is to be broadly
6       construed and encompasses not only "secret agents," but instead reaches all
        sources of information the CIA relies upon, including publicly available
7       information.  Id. at 170-71, 105 S.Ct. 1881.

8   Id.

9       Fundamentally, it is irrelevant whether plaintiffs believe that the CIA could

10  disclose additional information without endangering national security.  And it is equally

11  irrelevant whether "all" plaintiffs seek is "whether the CIA had any involvement of any

12  kind in [Mr. Hamdan's] detention and torture in the U.A.E."  Pls'. Opp'n at 45.

13  Plaintiffs are not "more knowledgeable than the [CIA] about what disclosure of

14  information would harm intelligence sources and methods."  Aftergood, 355 F. Supp. 2d

15  at 563.  That plaintiffs "subjectively believe[] releasing the requested . . . information

16  would not compromise sources and methods of intelligence is of no moment."  Id.  As

17  the Supreme Court stated in Sims, it is the CIA's responsibility to decide when classified

18  information about the United States' intelligence sources and methods should be

19  disclosed.  471 U.S. at 180.  Here, after explaining how disclosing whether or not the

20  CIA possessed records pertaining to plaintiffs could reveal the Agency's sources and

21  methods of gathering intelligence, the Agency concluded that revealing such information

22  would harm national security.  See Aug. 9, 2011 Decl. of Elizabeth Culver (ECF No. 29-

23  11) at ¶43.  The CIA is entitled to "great deference" that a disclosure could reveal

24  sources and methods, and the Agency enjoys a "near-blanket exemption" with respect to

25  its records.  Plaintiffs have offered no credible argument to the contrary.[10]

26  _____

27      [10] To the extent that plaintiffs believe alleged past interest by the Intelligence Community
    in Mr. Hamdan undercuts the CIA's Glomar assertion, the Ninth Circuit has rejected this very
28  argument.  In Hunt, the Ninth Circuit upheld a Glomar assertion by the CIA, accepting the
    Agency's argument that it was "irrelevant that some of the information sought by Hunt had

1    The CIA also properly asserted a Glomar response to plaintiffs' record request

2    because the existence or nonexistence of responsive records is itself a classified fact

3    under Executive Order (E.O.) 13526, and therefore exempt from disclosure under

4    Exemption 1, 5 U.S.C. § 552(b)(1).  The Executive Order requires that:

5         (1) an original classification authority is classifying the information; (2) the
          information is owned by, produced by or for, or is under the control of the
6         United States Government; (3) the information falls within one or more of
          the categories of information listed in section 1.4 of th[e] order; and (4) the
7         original classification authority determines that the unauthorized disclosure
          of the information reasonably could be expected to result in damage to the
8         national security, which includes defense against transnational terrorism,
          and the original classification authority is able to identify or describe the
9         damage.

10   E.O. 13526, 75 Fed. Reg. 707, 2009 WL 6066989 (Dec. 29, 2009) at § 1.1(a).

11   The fact of the existence or not of responsive records satisfies these requirements.

12   The first three requirements have not been contested; plaintiffs' arguments focus on the

13   fourth prong.  But the CIA declaration describes the possible damage to national security

14   that could be expected to result from the release of this information, and the Court must

15   defer to the Agency's determination regarding national security matters.  Plaintiffs'

16   choice not to believe the CIA is of no consequence—their opinions on national security

17   matters are entitled to no weight at all.  The existence or not of responsive records is a

18   properly classified fact under an Executive Order, and is therefore exempt from

19   disclosure under FOIA Exemption 1.

20   In any event, should the Court somehow find that the CIA's declaration does not

21   provide detail to support the Agency's action, the proper remedy is to provide the CIA

22   with an opportunity to submit a more detailed declaration.  See Wiener, 943 F.2d at 979

23   (remanding for submission of more detailed *Vaughn* index, where agency, in original

24   *Vaughn* index, "did not disclose all it could"); Gerstein v. CIA, No. C-06-4643 MMC,

25   2008 WL 4415080, at *13 (N.D. Cal. 2008) ("Where an agency's affidavit is determined

26

27   already been made public by other governmental and law enforcement agencies.  If, indeed,
     other agencies have made public information that the CIA is, or may be interested in a person, it
28   becomes important that the CIA not be compelled to confirm or deny such reports."  Hunt, 981
     F.2d at 1120.

to be insufficient, and it appears that a more detailed affidavit could be presented, the court should permit the agency to provide a more detailed affidavit."). This approach makes eminent sense, as FOIA "bars the courts from prying loose from the government even the smallest bit of information that is properly classified or would disclose intelligence sources or methods." Afshar, 702 F.2d at 1130. Moreover, while it is true that the Agency may, if necessary, produce a classified declaration for review by the court *in camera*, such review should only be undertaken if necessary. See Lion Raisins, 354 F.3d at 1083 ("[A] district court may rely solely on *ex parte* affidavits only in the exceptional case and only after the government has submitted as detailed public affidavits and testimony as possible.") (citation and quotation omitted); see also Ingle v. DOJ, 698 F.2d 259, 267 (6th Cir. 1983), *overruled on other grounds by* DOJ v. Landano, 508 U.S. 165 (1993); Silets v. DOJ, 945 F.2d 227, 231 (7th Cir. 1991) (*citing* Kimberlin v. Dep't of Treasury, 774 F.2d 204 (7th Cir. 1985)); Ctr. for Auto Safety v. EPA, 731 F.2d 16, 20 (D.C. Cir. 1984). Given the state of the record, neither of these options should be necessary. The Agency is entitled to summary judgment without the need to file additional declarations or submit to *in camera* review.

### ii.    NSD Properly Invoked the Glomar Doctrine

Plaintiffs' primary criticism of NSD's Glomar assertion is that NSD did not provide a detailed description of the damage that would result from the revelation of the existence of records.[11]  But the Ninth Circuit has repeatedly rejected attempts by plaintiffs to force agencies to provide detailed descriptions of particular harm when they submit a Glomar response. See Hunt, 981 F.2d at 1117-20; see also Berman, 501 F.3d at 1142 ("We did not require the CIA to identify particular harms that would occur if the documents were disclosed.") (citation and quotation omitted). Just so here.

---

[11] Plaintiffs also argue NSD's Glomar assertion was improper because NSD's declaration only indicated unintended disclosure would "tend" to reveal information that would harm national security. NSD's supplemental declaration, which further explains the harm that *would* result, makes this complaint moot. See Dec. 21, 2011 Bradley Decl. at ¶ 9. In any event, as explained further in the section below, the Ninth Circuit has rejected plaintiffs' particular criticism. See Berman, 501 F.3d at 1143.

1    As originally set forth in Susan Kim's August 8, 2011 declaration, id. at ¶ 10, and

2    further explained upon in Mark Bradley's December 20, 2011 declaration:

3        Acknowledging that [the Office of Intelligence (OI)] maintains information
         in its operations files pertaining to particular individuals would disclose that
4        persons within the scope of the request were pertinent to the approval of
         FISA applications.  This would permit hostile intelligence services to use
5        FOIA to acquire information about U.S. intelligence investigations.
         Furthermore, information disclosed in response to a FOIA request becomes
6        public information.  Intelligence organizations are expert at acquiring and
         analyzing information in the public domain.  Thus, information given to one
7        FOIA requester will be available to subsequent requesters and to foreign
         powers and their intelligence services.  If OI were to indicate that it
8        maintains responsive information in its operations files, these responses
         would provide trained intelligence analysts with individual pieces of
9        information that could be compiled into a catalog of FISA activities.
         Intelligence services could use these disclosures to discover which
10       intelligence agents operating in this country were known to the U.S.
         Government and which were not. This information could be used to deploy
11       counterintelligence assets against the U.S. Government and impair U.S.
         intelligence collection.

12       Id. at ¶ 8.

13   In other words, OI's operations files consist exclusively of intelligence

14   information, the existence or nonexistence of which is itself a classified fact under E.O.

15   13526, and therefore exempt from disclosure under Exemption 1.  The evidence

16   demonstrates that confirming or denying such information would threaten national

17   security because it would give foreign intelligence entities to obtain an important

18   window into the functioning of the U.S. Intelligence Community.  NSD's declaration

19   describes the possible damage to national security that would result from the release of

20   this information, and its opinion on this matter is entitled to substantial deference.

21   Plaintiffs' final aside – that such a Glomar assertion by NSD would "contravene

22   the intent of Congress" – is nonsensical.  FOIA does not demand that the Government

23   expose U.S. intelligence operations to public view, nor does it discriminate between

24   which agency conducts those operations.  See 5 U.S.C. § 552(b)(1); see also E.O. 13526,

25   § 3.6(a).  NSD properly relied on E.O. 13526 in electing not to search OI's operations

26   files.  See Aug. 8, 2011 Kim Decl. at ¶ 10; Dec. 21, 2011 Bradley Decl. at ¶ 8.  NSD's

27   decision to assert a Glomar response was clearly justified and is fully supported.

28

1          ### iii.   The ODNI Properly Invoked the Glomar Doctrine

2              Plaintiffs contend that the ODNI's declaration is insufficient because it "states

3    only that confirming even the existence of the requested records 'tends' to reveal

4    information that 'could' lead our nation's enemies . . . to some unspecified advantage[.]"

5    Pls'. Opp'n at 44.  Interestingly, plaintiffs cite the <u>Berman</u> decision to support their

6    argument, characterizing its holding as "permitting refusal to provide *Vaughn* index

7    because CIA declaration stated that disclosure 'would' rather than merely 'could'

8    disclose intelligence methods."  <u>Id.</u>  In fact, <u>Berman</u> eviscerates plaintiffs' position.

9              The plaintiff in <u>Berman</u> had argued that the CIA declaration in question only

10   stated disclosure of information "could" reveal sources and methods, rather than

11   definitively affirming that disclosure would divulge them.  As an initial matter, the Ninth

12   Circuit rejected plaintiffs' characterization of the Agency's declaration, noting that the

13   CIA had stated disclosure of the requested records "'*would* disclose specific intelligence

14   methods, including technical collection methods,' [and] that disclosure '*would* tend to

15   reveal the identities of intelligence sources[.]'"  <u>Berman</u>, 501 F.3d 1142-43 (emphasis

16   added).  Plaintiffs have similarly undersold ODNI's declaration, which notes: "[t]o

17   disclose whether the ODNI maintains classified records on any of the individuals or the

18   business named in the request *would* reveal that the Intelligence Community has

19   employed intelligence sources and methods to collect that information or potentially that

20   the Intelligence Community has been unsuccessful in collecting such information.  This

21   information *would* be extremely valuable to our adversaries."  Aug. 3, 2011 Hackett

22   Decl. at ¶ 25 (emphasis added).  But even more damning to plaintiffs' argument here was

23   the <u>Berman</u> court's ultimate conclusion:

24              More fundamentally, the CIA Director need not demonstrate to a certainty
             that disclosure will result in intelligence sources or methods being revealed.
25              Instead, the NSA entrusts the Director[12] with the discretion to determine that

26   _____

27        [12] The NSA instructs the Director of National Intelligence to "protect intelligence sources
     and methods from unauthorized disclosure."  50 U.S.C. § 403-1(i)(1).  Prior to the reorganization
28   of the Intelligence Community, the statute referred to the Director of Central Intelligence.  <u>See</u>
     <u>Sims</u>, 471 U.S. at 167.

1   documents should remain secret because the substantial risk that sources
2   and methods will be compromised outweighs the public interest in
    disclosure.  In Sims, the Supreme Court deferred to the CIA's conclusion
3   that disclosure of the requested information "posed an unacceptable risk of
    revealing protected 'intelligence sources.' " 471 U.S. at 179, 105 S.Ct.
4   1881; see also Wolf, 473 F.3d at 377 ("[I]nformation is exempt under [the
    NSA] if the Agency demonstrates that an answer to the query can
5   *reasonably be expected* to lead to unauthorized disclosure." (emphasis
    added) (citation and quotation marks omitted)).  We must therefore defer to
6   the CIA's determination that disclosure would run the unacceptable risk that
    sources or methods would be revealed.  [Plaintiff] has asserted that such
7   risks are present here, not only with regard to revelation of sources and
    methods, but also in his warning that disclosure "reasonably could be
8   expected to cause exceptionally grave damage to the national security of the
    United States."  Because the CIA is better situated to gauge the national
9   security implications of disclosure, see Sims, 471 U.S. at 179, 105 S.Ct.
    1881, we defer to its judgment.

10  Berman, 501 F.3d at 1143.

11        Similarly, this Court must defer to the ODNI's determination that the existence of

12  classified records can neither be confirmed nor denied, pursuant to Exemptions 1 and 3,[13]

13  because providing that information "could reasonably be expected to cause exceptionally

14  grave and irreparable damage to the national security of the United States."  Aug. 3,

15  2011 Hackett Decl. at ¶ 22.

16        Plaintiffs' collateral arguments are equally meritless.  Their contention that it is

17  "no mystery" that the Intelligence Community has "employed sources and methods

18  against Mr. Hamdan" must be rejected for the reasons set forth *supra* in Section II. B.

19  As for plaintiffs' implication that the ODNI only purports to protect *whether* sources and

20  methods have been employed, rather than the specific sources and methods themselves, a

21  cursory reading of the declaration dispels any such notion.  See Aug. 3, 2011 Hackett

22  Decl. at ¶ 25 ("[T]o disclose whether the ODNI maintains records pertaining to the

23  subjects of this request *would reveal Intelligence Community intelligence sources and*

24  *methods* that the DNI is charged with protecting.") (emphasis added).

25              **iv.    OI&A No Longer Seeks to Invoke the Glomar Doctrine**

26        The declaration submitted by OI&A in support of its motion for summary

27  judgment indicated that the "I&A FOIA Office did not search certain classified systems

28

    _____

    [13] Specifically, ODNI invoked the NSA to protect sources and methods.

within I&A because the existence or non-existence of responsive records in these files is itself properly classified information pursuant to Executive Order 13526." Aug. 10, 2011 Decl. of Donna Lewis (ECF No. 29-42) at ¶ 9. However, upon further review, OI&A has confirmed that "[e]ach division at I&A conducted a search of all relevant databases within its control. . . .  no classified systems within I&A were unsearched because of their classified nature (or for any other reason).  To be clear, I&A is <u>not</u> asserting a Glomar response in this case."  Dec. 21, 2011 Tucker Decl. at ¶ 12 (emphasis in original).  Finally, as confirmed by OI&A, no responsive records subject to FOIA were found by any of OI&A's divisions (each of which conducted a search).  <u>Id.</u> at ¶ 13.

**III.   Defendants' Withholdings Are Proper**

    **A.    The DIA Properly Invoked Exemption 3**

    In determining whether Exemption 3 applies, the court conducts a two-part inquiry. "First, a court must determine whether there is a statute within the scope of Exemption 3.  Then, it must determine whether the requested information falls within the scope of the statute." <u>Minier</u>, 88 F.3d at 801 (citation omitted). "Exemption 3 differs from other FOIA exemptions in that its applicability depends less on the detailed factual contents of specific documents; the sole issue for decision is the existence of a relevant statute and the inclusion of withheld material within the statute's coverage." <u>Morley</u>, 508 F.3d at 1126 (citation and quotation omitted).  In other words, as long as the information withheld is within the scope of the statute, it is exempt from disclosure under Exemption 3.  <u>See</u> <u>Minier</u>, 88 F.3d at 801; <u>see also</u> <u>Fitzgibbon</u>, 911 F.2d at 761-62; ("[T]he sole issue for decision is the existence of a relevant statute and the inclusion of the withheld material within the statute's coverage.") (citation and quotation omitted).

    DIA based its Exemption 3 withholdings on 10 U.S.C. § 424, which provides that "no provision of law shall be construed to require the disclosure of [either] (1) the organization or any function of [the Defense Intelligence Agency]; or (2) the number of persons employed by or assigned or detailed to [the Defense Intelligence Agency] or the name, official title, occupational series, grade or salary of any such person."  As its text

1   makes clear, and as courts have recognized, § 424 "is indeed a statute that falls within

2   the scope of Exemption 3."  Physicians for Human Rights v. DoD, 778 F. Supp. 2d 28,

3   36 (D.D.C. 2011); see also Wickwire Gavin, P.C. v. DIA, 330 F. Supp. 2d 592, 602 (E.D.

4   Va. 2004) ("There can be no question that § 424 is a withholding statute intended to

5   prevent information from disclosure.").  Plaintiffs do not dispute that § 424 qualifies as a

6   withholding statute, nor could they.

7        The next question then before the Court is whether the requested information falls

8   within the scope of the statute.  It clearly does.  Plaintiffs' argument – that § 424 merely

9   protects the name, title, or identifying information of DIA employees[14] – ignores the first

10  prong of the statute.  Section 424 does not just protect the identifying information of

11  DIA employees and detailees, it also "prohibits the disclosure of 'the organization *or any*

12  *function* of' the DIA[.]"  Miller v. DOJ, 562 F. Supp. 2d 82, 112 (D.D.C. 2008)

13  (emphasis added).  And while the law interpreting what constitutes a "function" of the

14  DIA is sparse, as previously discussed, courts have accepted a wide range of definitions

15  for what constitutes a "function" of the CIA pursuant to § 403g, the analogous

16  Exemption 3 statute that protects CIA records from disclosure through FOIA.  See, e.g.,

17  ACLU, 2011 WL 4005324, at *5; Riquelme, 453 F. Supp. 2d 103 at 111; Rothschild,

18  1992 WL 71393 at *2.  Section 424 similarly protects a wide variety of information, and

19  the records protected here fall within the heart of that protection.

20       Section 1.7(b)(5) of E.O. 13470 specifically states that one of DIA's functions is

21  to "[c]onduct foreign defense intelligence liaison relationships and defense intelligence

22  exchange programs with foreign defense establishments, intelligence or security services

23  of foreign governments, and international organizations[.]"  See E.O. 13470,[15] 73 Fed.

24

25       [14] Plaintiffs have not challenged any of DIA's withholding of Agency office
     name(s)/symbol(s), phone numbers, an e-mail address on the classified network and similar
26   information, the release of which would reveal DIA's organizational structure and possibly
     reveal the identity of a DIA employee.  Accordingly, plaintiffs have waived any objection to
27   these properly asserted Exemption 3 withholdings.

28       [15] DIA's declarant mistakenly cited § 1.7(b)(5) of E.O. 12333 for this language, see Aug.
     4, 2011 Williams Decl. at ¶ 32, which actually appears in E.O. 13470.  On July 30, 2008, by E.O.

1    Reg. 45325, 2008 WL 2951285 (July 30, 2008) at § 1.7(b)(5).  And a key purpose of

2    plaintiffs' request is the ferreting out this very information – plaintiffs want to know

3    exactly which third parties, including which foreign countries and their officials, with

4    whom the DIA and its personnel have (or have not) interacted, and, if so, in what

5    capacity.  But as plainly stated in its declaration, which is entitled to "substantial

6    weight," see Frugone, 169 F.3d at 775, "[w]hich countries DIA chooses to share or not

7    share specific intelligence with *is an agency function*."  Aug. 4, 2011 Williams Decl. at

8    ¶ 32 (emphasis added).  Accordingly, the DIA properly withheld specific information

9    that would reveal its functions or the functions of its personnel.

10         In addition, because some of these same records involve sources and methods used

11   by the intelligence agencies of the U.S. Government, DIA also now asserts the NSA to

12   protect information related to sources and methods.[16]  As previously established, the

13

14   13470, the President updated and clarified E.O. 13355 of August 27, 2004, E.O. 12333 of
     December 4, 1981, as amended.  See 2008 WL 2951285 at 45325; also *available* at

15   http://www.nctc.gov/docs/eo_13470.pdf (last visited Dec. 21, 2011).

16         [16] It is possible that plaintiffs may complain DIA's decision to tie its previous Exemption

17   3 withholdings to this additional statute is inappropriate.  Not so.  While it is generally true that
     agencies may "not make new exemption claims to a district court after the judge has ruled in the

18   other party's favor," until there has been a ruling for the plaintiff agencies are free to claim
     different or additional exemptions.  Senate of P.R. v. DOJ, 823 F.2d 574, 580-81 (D.C. Cir.

19   1987); see also Sussman v. Marshals Serv., 494 F.3d 1106, 1118-19 (D.C. Cir. 2007) (upholding
     district court permitting assertion of exemption for the first time in opposition to motion for

20   reconsideration); Reliant Energy v. FERC, 520 F. Supp. 2d 194, 202 (D.D.C. 2007) (allowing
     new bases for withholding in second motion for summary judgment because denial of first

21   motion for summary judgment was not a ruling for the plaintiff).  In particular, assertions of
     exemptions at a later date may be justified "[i]f the value of the material which otherwise would

22   be subject to disclosure were obviously high, *e.g.*, confidential information compromising the
     nation's foreign relations or national security."  Jordan v. DOJ, 591 F.2d 753, 780 (D.C. Cir.

23   1978) (en banc), *overruled in part on other grounds* by Crooker v. ATF, 670 F.2d 1051 (D.C.
     Cir. 1981) (en banc); see also August v. FBI, 328 F.3d 697, 702 (D.C. Cir. 2003) (allowing

24   assertion of exemption for the first time on appeal when, *inter alia*, "wholesale disclosure would
     pose a significant risk to the safety and privacy of third parties").  Here, not only has DIA not

25   raised a new exemption (but merely explained another statute supports some of its earlier
     Exemption 3 withholdings), but disclosure of the withheld information would compromise

26   highly sensitive data.  Moreover, plaintiffs will have the opportunity to address the application of
     the NSA to these DIA records in their impending reply, so they are not prejudiced.  See, e.g.,

27   Maydak v. DOJ, 362 F. Supp. 2d 316, 319 (D.D.C. 2005) (allowing government to assert new
     exemptions because plaintiff had "ample opportunity to respond"); Judicial Watch v. DOJ, 102

28   F. Supp. 2d 6, 12 n.4 (D.D.C. 2000) ("DOJ will be free to raise exemption 5 as its ground for

1   NSA is a withholding statute that exempts production under FOIA Exemption 3.  See

2   Sims, 471 U.S. at 167.  Thus, the Court must determine whether these records fall within

3   the scope of the statute.  Here, the DIA has attested that the protected information

4   "would illustrate with clarity which sources and methods are used to conduct the

5   intelligence collection mission."  Dec. 21, 2011 Williams Decl. at ¶ 11.  Accordingly, the

6   information falls within the scope of the NSA and has been properly withheld.

7       Finally, DIA met its obligation to disclose as much information as possible given

8   its need to guard against disclosing the very information it seeks to protect.  Plaintiffs

9   have provided no reason to doubt Ms. Williams' good faith assertion that the documents

10   were carefully reviewed for reasonably, but there is no reasonably segregable

11   information that can be released to the plaintiffs.  Aug. 4, 2011 Williams Decl. at ¶ 34.

12       **B.    The DIA and FBI Properly Invoked Exemption 1**

13       Plaintiffs' complaints with respect to the exemption 1 withholdings of the DIA and

14   FBI largely rehash unconvincing arguments raised elsewhere in plaintiffs' brief.

15   Plaintiffs complain that the DIA and FBI have not provided sufficiently detailed

16   descriptions of the classified information the agencies have withheld, but the agencies'

17   declarants wrote with "reasonable specificity."  Canning v. DOJ, 848 F. Supp. 1037,

18   1045 (D.D.C. 1994).  Explicit detail is not required in cases such as this – again, "the

19   government need not specify its objections in such detail as to compromise the secrecy

20   of the information."  Church of Scientology of Cal., 611 F.2d at 742; see also Sims, 471

21   U.S. at 179.  The agencies' positions, which are entitled to a presumption of good faith,

22   "appear[] 'logical' and 'plausible' in protecting [classified information] from foreign

23   discovery.  In one word, [they] make[] good sense."  Gardels, 689 F.2d at 1105; see also

24   Talbot, 578 at 28.  In any event, should the Court find that a declaration does not provide

25   detail to support an agency's action, the proper remedy is to provide the agency an

26   _____

27   withholding the []document in a future motion for summary judgment, when [plaintiff] will have
    a proper opportunity to respond.").  In any event, as all of the Exemption 3 material at issue is

28   properly protected pursuant to § 424 (and properly withheld under Exemption1), the Court need
    not even reach whether a portion of the information is simultaneously protected by the NSA.

1   opportunity to submit a more detailed declaration.  See, e.g., Wiener, 943 F.2d at 979;

2   Gerstein,  2008 WL 4415080, at *13.[17]

3       A couple of plaintiffs' specific points deserve rebuttal.  First, even a cursory

4   review of DIA's declaration belies plaintiffs' assertion that DIA withheld a document

5   under Section 1.4(b) of EO 13526 – which pertains to "foreign government" information

6   – but failed to state whether the information was provided with the "expectation" that it

7   would be "held in confidence[.]"[18]  DIA's declaration explains, at length, that:

> As a general rule, *information obtained by the United States from a foreign government* through diplomatic channels *is expected to be kept confidential*. . . . Failure of the U.S. government to honor this *expectation of confidentiality* would adversely affect our ability to obtain from foreign governments information that is essential to the effective conduct of U.S. foreign policy.  Disclosure of foreign government information provided in confidence would cause foreign officials, not only of the government providing the information, but of other governments as well, to conclude that U.S. officials are unable and/or unwilling to preserve the confidentiality expected in such exchanges.  Foreign governments and their representatives thus would be less willing in the future to furnish information important to the conduct of U.S. foreign relations and other governmental functions, and in general less disposed to cooperate in foreign relations matters of common interest.

15  Aug. 4, 2011 Williams Decl. at  ¶ 21 (emphasis added); see also id. at ¶¶ 22-24 (further

16  describing the expectation that information provided by foreign governments should

17  remain in confidence).  As Ms. Williams explained, the document in question "contains

18  foreign government information as defined by E.O. 13,526, disclosure of which

19  reasonably could be expected to cause damage to U.S. foreign relations, and thereby to

20  the national security, *as described above*."  Id. at ¶ 25 (emphasis added).  Accordingly,

21  DIA has clearly stated that the foreign information in question was provided with an

22  expectation of confidence.

23

24      [17] It bears noting, with respect to the records DIA has withheld in full pursuant to both
25   Exemptions 3 and 1, that neither § 424 nor the NSA require a determination that the disclosure
    of information would be expected to result in damage to the national security (a fact that
26   plaintiffs do not dispute).  Therefore, although the DIA has properly determined that national
    security would be harmed if any of the information at issue were released – see Aug. 4, 2011
27   Williams Decl. at ¶ 32 – if the Court is satisfied that the DIA's withholdings are proper under
    Exemption 3, it need not even conduct the additional analysis required under Exemption 1.

28      [18] Pls'. Opp'n at 21, fn. 18.

1    Second, plaintiffs complain that FBI's declaration is "not supplemented by a

2    *Vaughn* index or any further explanation for the FBI's withholdings under exemption 1

3    that might otherwise compensate for its deficiencies." Pls'. Opp'n at 23.  But "[t]here is

4    no statutory requirement of a *Vaughn* index or affidavit. . . . When an agency denies a

5    request, the agency bears the burden of justifying its denial with a sufficiently detailed

6    description of what it is refusing to produce and why so that the requester and the court

7    can have a fair idea what the agency is refusing to produce and why." Fiducia v. DOJ,

8    185 F.3d 1035, 1042 (9th Cir. 1999).  Satisfying this requirement is particularly

9    challenging in the context of classified information protected by Exemption 1 – "as

10   *Vaughn* itself recognized, where the only question is whether information has been

11   deemed by the executive to be so sensitive as to pose a risk to national security were it

12   disclosed, a more detailed statement of the characteristics of the withheld information

13   would serve no useful end." Halkin v. Helms, 690 F.2d 977, 996 (D.D.C. 1982).  Here,

14   although the FBI did not submit a *Vaughn* index, it filed an extensive declaration that

15   struck "the appropriate balance between justifying the applicability of the exemption[s]

16   with sufficient specificity to permit [plaintiffs] meaningfully to challenge [them] and the

17   [Bureau's] need to avoid providing a description that is so specific that it risks revealing

18   protected [information]." Berman, 501 F.3d at 1142.

19   Third, plaintiffs identify various documents, see Pls'. Opp'n at 23-24, and

20   speculate that less extensive withholdings should be sufficient to protect the classified

21   information contained therein.  But plaintiffs' speculation that "the FBI's intelligence

22   activities, sources or methods could [] be protected by more limited and targeted

23   redactions," id., is just that: speculation.  Plaintiffs have offered no controverting

24   evidence of bad faith; accordingly, this Court "must accord substantial weight" to the

25   FBI's declaration and reject plaintiffs' invitation to substitute their assessment of the risk

26   to national security posed by additional disclosure.  See Milner v. Dep't of Navy, 575

27   F.3d 959, 963 (9th Cir. 2009), *overruled on other grounds by* Milner v. Dep't of Navy,

28   131 S. Ct. 1259 (2011).

1

## C.    The FBI Properly Invoked Exemptions 6 and 7(C)

2    The FBI properly withheld personal identifying information of third parties, FBI

3  special agents, and non-FBI federal government employees from documents pursuant to

4  both Exemption 6 and Exemption 7(C).[19]  Like Exemption 6, Exemption 7(C) protects

5  the privacy of individuals from unwarranted invasion, and determining its applicability

6  requires an agency to balance the relevant individual privacy rights against the public

7  interest in disclosure.  However, where the records at issue are compiled for law

8  enforcement purposes (as is undisputed here), Exemption 7(C) provides even broader

9  privacy protection that does Exemption 6.  <u>Lahr</u>, 569 F.3d at 973-75; <u>see also</u> <u>Summers</u>

10  <u>v. DOJ</u>, 517 F. Supp. 2d 231, 243 (D.D.C. 2007) ("While its language is similar to

11  Exemption 6, Exemption 7(C) places an even lower burden on the agency to justify

12  withholding information.").

13    As with Exemption 6, the personal privacy rights protected by Exemption 7(C)

14  "encompass a broad range of concerns relating to an individual's control of information

15  concerning his or her person."  <u>Lahr</u>, 569 F.3d at 974 (citation and quotation omitted).

16  Also like Exemption 6, "the *only* relevant public interest in the FOIA balancing analysis

17  is the extent to which disclosure of the information sought would shed light on an

18  agency's performance of its statutory duties or otherwise let citizens know what their

19  government is up to."  <u>Id.</u> (citation and quotation omitted) (emphasis in original).  A

20  court evaluating an Exemption 7(C) withholding "need not conclude that an invasion of

21  privacy would occur with certainty, but only that it could reasonably be expected."  <u>Id.</u> at

22  977.

23    Once a court has determined that there are relevant privacy interests at stake, a

24  requester must demonstrate that the interest served by disclosure "is a significant one, an

25  interest more specific than having the information for its own sake, and that disclosure is

26

27    _____

28    [19] The FBI also withheld personal identifying information for FBI support personnel and
local law enforcement personnel; plaintiffs have conceded that they do not challenge these
withholdings. Pls'. Opp'n at 30, n.26.

1   likely to advance that interest." Id. at 974 (citation and quotation omitted).  And where

2   "the public interest being asserted is to show that responsible officials acted negligently

3   or otherwise improperly in the performance of their duties, the requester must establish

4   more than a bare suspicion in order to obtain disclosure.  Rather, the requester must

5   produce evidence that would warrant a belief by a reasonable person that the alleged

6   Government impropriety might have occurred." National Archives and Records Admin.

7   v. Favish, 541 U.S. 157, 174 (2004).  But as the Supreme Court has recognized, there is a

8   presumption of legitimacy accorded to the Government's official conduct.  Dep't of State

9   v. Ray, 502 U.S. 164 (1991); see also United States v. Armstrong, 517 U.S. 456, 464

10  (1996) ("In the absence of clear evidence to the contrary, courts presume that

11  Government agents have properly discharged their official duties") (citation and

12  quotation omitted); United States v. Chem. Found., Inc., 272 U.S. 1, 14-15 (1926) ("The

13  presumption of regularity supports the official acts of public officers and, in the absence

14  of clear evidence to the contrary, courts presume that they have properly discharged their

15  official duties").

16       Plaintiffs seek identifying information for third parties and governmental

17  employees (both FBI special agents and others).  Because the privacy interests of each

18  group differ, they should be considered separately.

19              **i.    The Privacy Interest of Third Parties is Significant**

20       The FBI withheld information to protect the identities of third parties who (1) are

21  of investigative interest, (2) provided information to the FBI, and (3) merely were

22  mentioned in the records.  It is axiomatic that anything that would associate a third party

23  with a criminal or national security investigation would invade the third party's privacy

24  and potentially damage his/her reputation.  See DOJ v. Reporters Comm. for Freedom of

25  the Press, 489 U.S. 749, 770-71 (1989).  Individuals have a "strong interest . . . in not

26  being associated unwarrantedly with alleged criminal activity." Fitzgibbon, 911 F.2d at

27  767 (citation and quotation omitted); see also Blackwell v. FBI, 646 F.3d 37, 41 (D.C.

28  Cir. 2011) ("[T]he Supreme Court has made clear that requests for such third party

1  information are strongly disfavored.") (citation and quotation omitted); Martin v. DOJ,

2  488 F.3d 446, 457 (D.C. Cir. 2007) ("privacy interests are particularly difficult to

3  overcome when law enforcement information regarding third parties is implicated").

4  　　　Here, the FBI determined that the individuals to whom the information pertains

5  maintain a substantial privacy interest in not having their identities disclosed.  See Aug.

6  10, 2011 Decl. of David M. Hardy (ECF No. 29-25) at ¶¶ 85-88 ("Aug. 10, 2011 Hardy

7  Decl.").  An individual who was of investigative interest to the FBI because of his/her

8  alleged criminal activities may reasonably fear that disclosure of his/her identity could

9  subject him/her to harassment, embarrassment and undue public attention.  Id. at ¶ 86.

10  An individual who has provided information to the FBI may reasonably fear that release

11  of his/her identity will subject him/her to harassment, intimidation, legal consequences,

12  economic reprisal, or possible physical harm.  Id. at ¶ 87.  And an individual who is

13  mentioned in connection with the FBI's criminal and terrorist investigations could

14  reasonably fear that disclosure of his/her identity would subject him/her to possible

15  harassment or criticism and focus derogatory inferences and suspicion on him/her.  Id. at

16  ¶ 88.  It is clear that these third parties have far more than a *de minimis* privacy interest

17  in keeping their identifying information their own.[20]

18  　　　**ii.　The Privacy Interest of FBI Special Agents and Non-FBI**
　　　　　　**Governmental Employees Is Significant**

19

20  　　　That FBI agents "have a legitimate interest in keeping private matters that could

21  conceivably subject them to annoyance or harassment" has been upheld repeatedly by

22  courts, including the Ninth Circuit.  Lahr, 569 F.3d at 977; see also Hunt v. FBI, 972

23  F.2d 286, 288 (9th Cir. 1992); Wood v. FBI, 432 F.3d 78, 88-89 (2d Cir. 2005);

24

25  　　　[20] With respect to plaintiffs' allegation that they have identified a third-party individual
who is deceased, and therefore any information about that third-party currently withheld could

26  be released, plaintiffs have failed to provide sufficient proof that this individual has died.  The
FBI would release records for an individual where proof of death has been provided, which

27  would include a copy of a death certificate, Social Security Death index, obituary or a
recognized reference source.  Death is also presumed if the birth date of the subject is more than

28  100 years ago.  Plaintiffs' declaration, based on hearsay, is clearly insufficient.  Dec. 21, 2011
Hardy Decl. at ¶ 61(b).

1  McDonnell v. United States, 4 F.3d 1227, 1255 (3d Cir. 1993); Maynard v. CIA, 986

2  F.2d 547, 566 (1st Cir. 1993). The same rationale applies to the name and identifying

3  information of non-FBI government personnel whose names appear in FBI records.

4  And, lower level officials, whether they be FBI agents or non-FBI government

5  employees, "generally have a stronger interest in personal privacy than do senior

6  officials." Dobronski v. FCC, 17 F.3d 275, 280 n.4 (9th Cir. 1994). Indeed, release of

7  the names and personal information of FBI special agents is a serious matter, for it may

8  not only subject those individuals to embarrassment or harassment, but also danger, as

9  "individual[s] targeted by [] law enforcement actions [may] carry a grudge which may

10 last for years[, and] may seek revenge on the agents involved in a particular

11 investigation." Aug. 10, 2011 Hardy Decl. at ¶ 82. Public disclosure of FBI agents'

12 identities can also undercut their work, crippling their "effectiveness in conducting other

13 investigations." Id. at ¶ 81. Likewise, non-FBI federal government employees, could

14 reasonably fear that disclosure of their identities of these individuals could subject them

15 to unauthorized inquiries and harassment, as they are in a position to have access to

16 information regarding an official law enforcement investigation. Id. at ¶ 89. Individuals

17 in both groups maintain a substantial privacy interest in not having their identities

18 disclosed.

19        Nor, it should be noted, have the privacy interests of any FBI agents or non-FBI

20 government employees whose names may appear in these records been diminished by

21 any allegations of official impropriety. The Ninth Circuit had held that "an

22 investigator's privacy interest may be reduced when there are doubts about the integrity

23 of his efforts." Lahr, 569 F.3d at 977. But plaintiffs have produced no evidence that any

24 particular FBI agent or governmental employee who may be mentioned in the requested

25 documents themselves behaved improperly, or that their individual efforts were

26 unreliable, regardless of plaintiffs' general suspicions about "governmental" misconduct

27 in this case. See id. at 978 ("Although the public interest in disclosing government

28 impropriety may outweigh an agent's privacy interests in some circumstances, we cannot

1   say that an FBI agent's privacy interests are reduced because of speculation that he may

2   have information about general improper conduct by the FBI.").

3              **iii.   Plaintiffs Have Established No Credible Public Interest**

4          Against each of these significant privacy interests, the FBI balanced the public

5   interest being asserted by plaintiffs – that the disclosure of these third parties' and

6   governmental employees' identities would somehow reveal that responsible officials had

7   acted negligently or otherwise improperly in the performance of their duties.  But despite

8   the serious nature of their accusations, plaintiffs have produced no underline(evidence) that would

9   warrant a belief by a reasonable person that Government impropriety might have

10  occurred to outweigh the obvious privacy interests at stake.[21]  Moreover, upon balancing

11  the third parties and special agents' privacy interests against the public's interest in

12  disclosure, the FBI determined that the information withheld would not enlighten the

13  public on how the FBI conducts its internal operations and investigations.  Aug. 10, 2011

14  Hardy Decl. at ¶¶ 80-89.  Therefore, the Bureau concluded that the disclosure of this

15  identifying information would constitute an unwarranted invasion, even a clearly

16  unwarranted invasion, of privacy.  Id.  This determination was correct, and these

17  withholdings should be upheld pursuant to Exemption 6 and 7(C).

18             **D.    The DIA Properly Invoked Exemption 6**

19         Exemption 6 exempts from disclosure information about individuals in

20  "personnel and medical and similar files" when the disclosure "would constitute a clearly

21  unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6).  As plaintiffs do not

22  contest that the information DIA has withheld is contained in a personnel, medical, or

23  similar file, this Court "must balance the privacy interest protected by the exemption[]

24  against the public interest in government openness that would be served by disclosure."

25  ─────────────────

26         [21] Plaintiff Hamdan's bare allegation that during his detention a man wearing "Western-
    style slacks and shoes" spoke to him in English with "a perfect American accent," Pls.' Opp'n at

27  4, falls far short of meeting the "demanding Favish standard."  Blackwell, 646 F.3d at 41
    (rejecting a plaintiff's attempt to overcome an Exemption 7(C) withholdings by the FBI where

28  the "only support [plaintiff] offers for his allegation of government misconduct is his own
    affidavit," which lacked any substantiation or evidentiary support).

1   <u>Lahr</u>, 569 F.3d at 973.  "The privacy interest protected by Exemption 6 encompasses the

2   individual's control of information concerning his or her person."  <u>DoD v. FLRA</u>, 510

3   U.S. 487, 500 (citation and quotation omitted) (1994); <u>see also</u> <u>Bowen v. FDA</u>, 925 F.2d

4   1225, 1228 (9th Cir. 1991) ("Exemption 6 is intended to protect individuals from the

5   injury and embarrassment that can result from the unnecessary disclosure of personal

6   information." (citation and quotation omitted).  In contrast, "the only relevant public

7   interest in the FOIA balancing analysis [is] the extent to which disclosure of the

8   information sought would shed light on an agency's performance of its statutory duties

9   or otherwise let citizens know what their government is up to."  <u>DoD</u>, 510 U.S. at 497

10   citation and quotation omitted).

11        Here, DIA properly asserted Exemption 6 to withhold the names of non-DIA

12   government employees because release of these names would constitute a clearly

13   unwarranted invasion their privacy by identifying their relationship with an intelligence

14   agency.  Aug. 4, 2011 Williams Decl. at ¶ 33; <u>see also</u> Dec. 21, 2011 Williams Decl. at

15   ¶ 9.  Public knowledge of these individuals' relationship with an intelligence agency

16   could be expected to lead to adverse consequences for individuals and an injury to their

17   privacy.  Dec. 21, 2011 Williams Decl. at ¶ 10.  Specifically, revealing this information

18   "could lead, at a minimum, to an unwelcome change in how [the individuals] are

19   perceived within their community."  <u>Id.</u>  In an even worse scenario, persons with a

20   grudge against the Intelligence Community could seek out known intelligence agency

21   employees for the purpose of causing intimidation, harassment, or even physical harm.

22   <u>Id.</u>  Against this clearly unwarranted invasion of privacy, DIA weighed the fact that

23   disclosing the information would not shed any light on an agency's performance of its

24   statutory duties, and determined it was appropriate to assert Exemption 6 to protect the

25   information.  <u>Id.</u>

26        While its analysis was proper, in light of plaintiffs' representation that they "seek

27   the names only of high-level officials who have thrust themselves into the public arena,"

28   Pls.' Opp'n at 29 (citation and quotation omitted), DIA reviewed these Exemption 6

1    withholdings once more.  Upon further examination, DIA confirms that "[n]one of the

2    third party names withheld from plaintiffs related to individuals who were high-ranking

3    officials or officials who had policy-making and implementation positions."  Dec. 21,

4    2011 Williams Decl. at ¶ 9.  DIA's Exemption 6 withholdings should be upheld.

5         **E.    FBI Properly Invoked Exemption 7(E)**

6         Exemption 7(E) protects from disclosure "records or information compiled for law

7    enforcement purposes" where release of such information "would disclose techniques

8    and procedures for law enforcement investigations or prosecutions, or would disclose

9    guidelines for law enforcement investigation or prosecutions if such disclosure could

10   reasonably be expected to risk circumvention of the law."  5 U.S.C. § 552(b)(7)(E).

11   Here, the FBI properly asserted Exemption 7(E) to withhold investigative techniques and

12   procedures, the location and identity of FBI units, and the dates, types, and bases for

13   investigations.  Plaintiffs' opposition does not contest the latter two areas of

14   withholdings – their brief only alleges that the FBI improperly withheld investigative

15   techniques and procedures.  Accordingly, any objection to the withholding, pursuant to

16   Exemption 7(E), of the location and identity of FBI units, or the dates, types, and bases

17   for investigations has been waived.[22]

18        Exemption 7(E) is comprised of two clauses: the first relates to law enforcement

19   "techniques or procedures," and the second relates to "guidelines for law enforcement

20   investigations or prosecutions."  5 U.S.C. § 552(b)(7)(E); see also Allard K. Lowenstein

21   Intern. Human Rights Project v. DHS, 626 F.3d 678, 681-82 (2d Cir. 2010) (finding both

22   the text and legislative history support reading of Exemption 7(E) as two separate

23   clauses).  The latter category of information may be withheld only if "disclosure could

24   reasonably be expected to risk circumvention of the law."  5 U.S.C. § 552(b)(7)(E).   No

25

26   _____

27        [22] Even if plaintiffs were to argue they somehow had not waived these objections, there is
     no dispute that the records and/or information in question were "compiled for law enforcement
     purposes," and the FBI's declaration, see Aug. 10, 2011 Hardy Decl. at ¶¶ 101-02, appropriately

28   describes how that release of the records/information "could reasonably be expected to risk
     circumvention of the law."  FBI v. Abramson, 456 U.S. 615, 622 (1982).

1  such showing of harm is required for the withholding of law enforcement "techniques or

2  procedures," however, which receive categorical protection from disclosure.  See Keys v.

3  DHS, 510 F. Supp. 2d 121, 129 (D.D.C. 2007) (citing Peter S. Herrick's Customs & Int'l

4  Trade Newsletter v. Customs & Border Prot., No. 1:04-cv-00377, 2006 WL 1826185, at

5  *7 (D.D.C. June 30, 2006)); Judicial Watch, Inc. v. Dep't of Commerce, 337 F. Supp. 2d

6  146, 181 (D.D.C. 2004); Smith v. ATF, 977 F. Supp. 496, 501 (D.D.C. 1997) (citing

7  Fisher v. DOJ, 772 F. Supp. 7, 12 n.9 (D.D.C. 1991), aff'd, 968 F.2d 92 (D.C. Cir.

8  1992)).[23]  The withheld information challenged by plaintiffs, which includes techniques

9  and procedures related to surveillance and credit searches, as well as a stratagem the

10  details of which if revealed would preclude its use in future cases, see Dec. 21, 2011

11  Hardy Decl. at ¶¶ 54, 62, is protected by this categorical protection.  However, even if

12

13

14  [23] PHE, Inc. v. DOJ, 983 F. 2d 248 (D.C. Cir. 1993), is not to the contrary.  In PHE, the
circuit court stated that a defendant "under both the (b)(2) and (b)(7)(E) exemptions the agency

15  must establish that releasing the withheld materials would risk circumvention of the law."  983
F.2d at 250.  It is not clear, however, that the PHE court considered the clauses of exemption

16  (7)(E) separately.  In PHE, the court considered a request for a portion of the FBI's Manual of
Investigative Operations and Guidelines ("MIOG") and the National Obscenity Enforcement

17  Unit's ("NOEU") Obscenity Prosecution Manual.  Id. at 249.  The FBI withheld portions of the
MIOG under both exception (b)(2) and (b)(7)(E).  Id.  The FBI demonstrated to the court's

18  satisfaction that releasing the redacted portions of the MIOG could lead to circumvention of the
law, meaning that it had satisfied its burden under both (b)(2) and (b)(7)(E).  See id.

19  Accordingly, with respect to the MIOG, the court did not need to reach the question whether the
document was also properly withheld under the first clause of (b)(7)(E).

20  With respect to the NOEU manual, the court found that NOEU had "provided almost no
reason" for its withholding.  Id. at 248.  While the court acknowledged that NOEU could justify

21  the withholding if it had shown a valid circumvention risk, it did not say that NOEU needed to
make a circumvention showing in order support withholding under the first clause of (b)(7)(E).

22  See id. at 252.  In the briefing before the court in PHE, counsel for the party seeking disclosure
argued two alternative positions - that there was no categorical protection for techniques and

23  procedures and that the NOEU manual did not actually contain techniques and procedures.  See
Appellant's Br., No. 91-504 at 9-10, 1992 WL 12599902 (D.C. Cir. July 1, 1992).  It is not

24  evident from the court's decision which of these two positions it accepted.

25  Tellingly, even after PHE, other judges in D.D.C. have recognized categorical protection
for law enforcement techniques and procedures.  See Keys, 510 F. Supp. 2d at 129 (D.D.C.

26  2007); Judicial Watch, 337 F. Supp. 2d at 181 (D.D.C. 2004); Smith, 977 F. Supp. at 501
(D.D.C.1997).  Moreover, shortly before the PHE decision, a panel of the circuit court including

27  two of the judges that would eventually decide PHE, summarily affirmed "for substantially the
same reasons stated by the district court" a district court decision noting that non-investigatory

28  law enforcement records "reflecting techniques or procedures are now entitled to categorical
protection under Exemption 7."  Fisher, 772 F. Supp. at 12 n.9.

1   the Court were to accept plaintiffs' argument that the phrase "if such disclosure could

2   reasonably be expected to risk circumvention" applies to law enforcement techniques

3   and procedures, the FBI has established that the material redacted from the disputed

4   records could reasonably be expected to potentially increase the risk of circumvention of

5   the law.  See, e.g., Asian Law Caucus v. DHS, No. C 08-00842 CW, 2008 WL 5047839,

6   at *3 (N.D. Cal. Nov. 24, 2008) ("The Ninth Circuit has not squarely addressed this

7   issue. . . . The Court need not take a side in this debate because, even under the

8   interpretation that applies the 'circumvention' phrase to all of exemption 7(E), Defendant

9   carried its burden to justify non-disclosure.").

10              **i.    The FBI Properly Withheld Records as Revealing Information
                        that Could Reasonably Be Expected to Potentially Increase the**
11                      **Risk of Circumvention of the Law**

12          As the D.C. Circuit has recently made clear, because of the Government's interest

13   in deterring crime, Exemption 7(E) "is written in broad and general terms."  Mayer

14   Brown LLP v. IRS, 562 F.3d 1190, 1193 (D.C. Cir. 2009).  Therefore, even if the

15   "circumvention" phrase applies to all of Exemption 7(E), in order to properly withhold

16   documents, the Government need not show that circumvention of the law as the result of

17   the disclosure is certain or even likely.  Id.  Rather, information is exempt if disclosure

18   "could increase the risks that a law will be violated or that past violators will escape

19   legal consequences."  Id. (emphasis omitted).  Even the risk that such information will

20   "embolden" a person to attempt to break the law is sufficient to justify withholding.  Id.

21   at 1194.  No "highly specific burden of showing how the law will be circumvented" is

22   placed upon the government; it is sufficient for the government to "demonstrate logically

23   how the release of the requested information might create a risk of circumvention of the

24   law."  Id. (citation and quotation omitted); Blackwell, 646 F.3d at 42 ("Exemption 7(E)

25   sets a relatively low bar for the agency to justify withholding").

26          Plaintiffs object that the FBI did not provide sufficient information about

27   the investigative techniques and procedures withheld pursuant to Exemption (b)(7)(E) in

28   its August 10, 2011 declaration.  Accordingly, the FBI has submitted a supplemental

1   declaration which clarifies that "the protected information includes techniques and

2   procedures related to surveillance and credit searches." Dec. 21, 2011 Hardy Decl. at

3   ¶ 62. As further explained therein:

4       Disclosure of this information could enable subjects of FBI investigations to
        circumvent similar currently used techniques and procedures by law
5       enforcement. The relative benefit of these techniques and procedures could
        be diminished if the actual techniques and procedures were revealed in this
6       matter. This in turn could facilitate the accumulation of information by
        other investigative subjects regarding the circumstances under which these
7       techniques and procedures were used or requested and the value of the
        information obtained. Release of this type of information could enable
8       criminals to educate themselves about the law enforcement investigative
        techniques and procedures employed for the location and apprehension of
9       individuals and therefore allow these individuals to take countermeasures to
        circumvent the effectiveness of these techniques and procedures and to
10      continue to violate the law.

11  Id.

12      In addition, with respect to the Exemption 7(E) withholding related to the FBI's

13  processing of four pages responsive to plaintiffs' January 29, 2009 request concerning

14  Jehad Suliman, the FBI withheld information related to a stratagem it had employed, the

15  details of which if revealed would preclude its use in future cases. Disclosing the

16  withheld information could similarly enable subjects of FBI investigations to evade the

17  Bureau's techniques and procedures and continue to violate the law. Id.

18      It is clear that disclosure of the protected information could increase the risks that

19  a law will be violated or that past violators will escape legal consequences; accordingly,

20  the FBI's Exemption 7(E) withholding of details of certain investigative techniques and

21  procedures was proper and should be upheld.

22              **ii.   Exemption 7(E) Protects Even Commonly Known Techniques
                        and Procedures if Disclosure Could Reduce or Nullify Their
23                      Effectiveness**

24      "Courts have held Exemption 7(E) applies even when the identity of the

25  techniques has been disclosed, but the manner and circumstances of the techniques are

26  not generally known, or the disclosure of additional details could reduce their

27  effectiveness." Council on American-Islamic Relations, California v. FBI, 749 F. Supp.

28  2d 1104, 1123 (S.D. Cal. 2010) (citing Bowen, 925 F.2d at 1228-29); see also Judicial

Watch, 337 F. Supp. 2d at 181 ("While Exemption 7(E)'s protection is generally limited to techniques or procedures that are not well-known to the public, even commonly known procedures may be protected from disclosure if the disclosure could reduce or nullify their effectiveness.") (citation and quotation omitted).  Indeed, courts have frequently upheld Exemption 7(E) withholdings in such a circumstance.  See, e.g., Muslim Advocates v. DOJ, --- F. Supp. 2d ----, No. 09–1754, 2011 WL 5439085, at *9 (D.D.C. Nov. 10, 2011) ("Although some information regarding the FBI's use of the particular techniques and procedures . . . may be known, there is no principle   . . . that requires an agency to release all details concerning its techniques simply because some aspects of them are known to the public.") (citation and quotation omitted); Lewis-Bey v. DOJ, 595 F. Supp. 2d 120, 137-38 (D.D.C. 2009) (withholding details of ATF's electronic surveillance efforts);  Barnard v. DHS, 598 F. Supp. 2d 1, 23 (D.D.C. 2009) (rejecting the plaintiff's argument that information regarding particular procedures witnessed by the plaintiff and others could no longer be withheld); Asian Law Caucus v. DHS, No. C 08-00842 CW, 2008 WL 5047839, at *4 (N.D. Cal. 2008) ("Knowing about the general existence of government watchlists does not make further detailed information about the watchlists routine and generally known."); Unidad Latina En Accion v. DHS, 253 F.R.D. 44, 52 -53 (D. Conn. 2008) ("While the public generally knows that the Government uses surveillance techniques to aid in its investigations, the details, scope, and timing of those techniques are not necessarily well-known to the public."); Maguire v. Mawn, No. 02 Civ. 2164, 2004 WL 1124673, at *3 (S.D.N.Y. May 19, 2004) ("Although the public may know that banks often employ bait money, the public does not know whether and how a specific bank employs bait money."); Blanton v. DOJ, 63 F. Supp. 2d 35, 49-50 (D.D.C. 1995) (allowing withholding of polygraph information under 7(E) because, although public knows about polygraph, public does not know specifics of polygraph procedures and techniques).  Here, although plaintiffs may argue that the public is aware the FBI utilizes techniques such as surveillance and credit

1  searches, the details, scope and timing of those procedures are properly protected, as

2  revealing such detail would reduce or even nullify their efficacy.[24]

3          iii.    **Plaintiffs Have Produced No Evidence of Illegal FBI Conduct**
                   **That Could Rebut the Government's Presumption of Legitimate**
4                  **Conduct**

5          As their last argument, plaintiffs once more conjure the unsupported specter of

6  governmental misconduct, this time with respect to the FBI, arguing that to the "extent

7  that the material withheld under exemption 7(E) reveals the FBI played a role in Mr.

8  Hamdan's abduction and torture, it should be required to produce such information."

9  Pls.' Opp'n at 35.  But as the Supreme Court has recognized, there is a presumption of

10 legitimacy accorded to the Government's official conduct.  See, e.g., Ray, 502 U.S. at

11 164; Armstrong, 517 U.S. at 464); Chemical Foundation, 272 U.S. at 14-15.  As the

12 Supreme Court held in the face of similarly ungrounded accusations in the Favish case

13 (in the Exemption 7(C) context), where "the public interest being asserted is to show that

14 responsible officials acted negligently or otherwise improperly in the performance of

15 their duties, the requester must establish more than a bare suspicion in order to obtain

16 disclosure.  Rather, the requester must produce evidence that would warrant a belief by a

17 reasonable person that the alleged Government impropriety might have occurred."

18 Favish, 541 U.S. at 174.

19 _____

20 [24] To the extent they imply information protected by the FBI cannot be withheld because
   it is already in the public domain, plaintiffs fail to meet their burden of proof.  In order to
21 conclude that an agency has waived the protections of the FOIA exemptions, a court must be
   "confident that the information sought is truly public and that the requester receive[s] no more
22 than what is publicly available before [finding] a waiver."  Cottone v. Reno, 193 F.3d 550, 555
   (D.C. Cir. 1999); see also Bowen, 925 F.2d at 1228 ("Contrary to [plaintiff's] assertions,
23 however, prior agency disclosures do not necessarily result in an agency's waiver to subsequent
   claims of exemption.").  Thus, when advancing a waiver argument, a plaintiff bears the burden
24 of producing evidence that "the specific information sought [has] already been disclosed and
   preserved in a permanent public record."  Students Against Genocide v. Dep't of State, 257 F.3d
25 828, 836 (D.C. Cir. 2001) (citation and quotation omitted).  If a plaintiff fails to meet "the initial
   burden of pointing to information in the public domain that duplicates that being withheld," the
26 Government is entitled to summary judgment.  Public Citizen v. Dep't of State, 11 F.3d 198, 201
   (D.C. Cir. 1993); see also Afshar, 702 F.2d at 1130 ("a plaintiff asserting a claim of prior
27 disclosure must bear the initial burden of pointing to specific information in the public domain
   that appears to duplicate that being withheld").  Plaintiffs' utter lack of any such showing falls
28 far short of satisfying their burden.

1    Again, despite plaintiffs' serious accusations, they have produced no <u>evidence</u>

2  that would warrant a belief by a reasonable person that Government impropriety might

3  have occurred so as to require *in camera* judicial review, let alone the production of

4  exempt records.  Indeed, were mere accusations, however grave, sufficient to trigger *in*

5  *camera* review, the burden upon the judiciary would be staggering.  "Allegations of

6  government misconduct are easy to allege and hard to disprove, so courts must insist on

7  a meaningful evidentiary showing."  <u>Id.</u> at 175 (citation and quotation).  Plaintiffs have

8  made no such showing here.

9  **IV.   Defendants Have Properly Addressed 5 U.S.C. § 552(c)**

10    Finally, plaintiffs complain that "the government has taken the position that it can

11  provide false information to FOIA requesters where it seeks to withhold information

12  under Section 552(c)," Pls'. Opp'n at 48, and ask the Court to compel defendants to

13  submit *in camera* declarations establishing any entitlement to exclude records.  Without

14  confirming or denying whether any agency has excluded records pursuant to § 552(c), it

15  is sufficient to note that defendants previously addressed this issue through an August

16  10, 2011 *in camera*, *ex parte* submission, <u>see</u> ECF No. 30, and further address it through

17  a December 22, 2011 *in camera*, *ex parte* submission.[25]  No further Government action is

18  required.  Moreover, plaintiffs' implication that the exclusion of particular information in

19  response to FOIA requests is somehow improper (whether or not that occurred in this

20  case) ignores the text of § 552(c) – which expressly permits agencies to treat certain,

21  specified categories of law enforcement and national security records "as not subject to

22  the requirements" of FOIA – as recognized by the Ninth Circuit earlier this year:

23    Congress added section 552(c) to the FOIA in 1986 to allow an agency to

24    *treat the records as not subject to the [FOIA] requirements* in three specific

25    [25] Because "it is essential to the viability of the exclusion mechanism that requesters not

26  be able to deduce whether an exclusion was employed at all in a given case," it is "the
   government's standard litigation policy in the defense of FOIA lawsuits that wherever a FOIA

27  plaintiff raises a distinct claim regarding the suspected use of an exclusion, the government
   routinely will submit an *in camera* declaration addressing that claim, one way or the other."

28  Memorandum from Attorney General Edwin Meese on the 1986 Amendments to the FOIA (Dec.
   1987), at 29-30 (*available* at www.justice.gov/oip/86agmemo.htm#exclusions).

categories involving: (1) ongoing criminal investigations; (2) informant identities; and (3) classified foreign intelligence or international terrorism information.  5 U.S.C. § 552(c)(1)-(c)(3).

Islamic Shura Council of S. California v. FBI, 635 F.3d 1160, 1167-68 (9th Cir. 2011) (emphasis added) (quotation omitted); see also Steinberg v. DOJ, No. CIV.A. 93–2409–LFO, 1997 WL 349997, at *1 (D.D.C. June 18, 1997) ("Section 552(c) allows the Government to 'exclude' certain highly sensitive information from the scope of the Freedom of Information Act ('FOIA').  An 'exclusion' is different from an exemption in that the Government need not even acknowledge the existence of excluded information. Rather, the Government is permitted to file an *in camera* declaration, which explains either that no exclusion was invoked or that the exclusion was invoked appropriately.").

## **CONCLUSION**

For the reasons set forth above, defendants' Motion for Summary Judgment should be granted.


Dated: December 22, 2011                      Respectfully Submitted,

                                              TONY WEST
                                              Assistant Attorney General


                                              JOHN R. TYLER
                                              Assistant Branch Director


                                              */s/ Peter D. Leary*
                                              PETER D. LEARY
                                              Trial Attorney
                                              United States Department of Justice
                                              Civil Division
                                              Federal Programs Branch
                                              P.O. Box 883
                                              Washington, D.C.  20530
                                              Telephone: (202) 514-3313
                                              Facsimile: (202) 616-8470
                                              peter.leary@usdoj.gov

                                              *Counsel for Defendants*